IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

---

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

Plaintiffs,

VS. NO.: 2:13-cv-02289 dkv
JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and,
MARK P. CLEMONS,

Defendants.

---

MEMORANDUM OF LAW IN SUPPORT OF RESPONSE OF DEFENDANTS, PEDIATRIC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, M.D., TO METHODIST HEALTHCARE – MEMPHIS HOSPITALS' MOTION TO QUASH DEFENDANTS' SUPBOENA AND MOTION FOR PROTECTIVE ORDER, AND TO PLAINTIFFS' JOINDER IN METHODIST HEALTHCARE – MEMPHIS HOSPITALS' MOTION

---

COME NOW defendants, Pediatric Anesthesiologists, P.A. ("Pediatric Anesthesiologists") and Babu Rao Paidipalli, M.D., ("Dr. Paidipalli"), by and through their counsel of record and file their Memorandum of Law in Support of their Response In Opposition to Methodist Healthcare – Memphis Hospitals' Motion To Quash Defendants' Subpoena And Motion For Protective Order, And Plaintiffs' Joinder In Methodist Healthcare – Memphis Hospitals' Motion, in support of which defendants would state and show as follows:

## FACTS AND PROCEDURAL HISTORY

Defendants have filed and served a subpoena *duces tecum* on Methodist Healthcare – Memphis Hospitals (hereinafter "Methodist"), to obtain certain documents which are listed as item numbers 1 – 5 in the subpoena. A copy of the defendants' subpoena *duces tecum* served on Methodist is attached hereto as Exhibit A. Defendants contend that all documents requested in the subpoena *duces tecum* are relevant to the defenses asserted by defendants in this cause and furthermore, are reasonably calculated to lead to the discovery of admissible evidence in accordance with *Fed. R. Civ. P.* 26(b)(1).

Plaintiffs' Complaint filed in this cause (ECF 1, paragraphs 8 – 12) asserts a claim for medical malpractice against Pediatric Anesthesiologists, P.A., Babu Rao Paidipalli, M.D., and Mark D. Clemons, M.D., and also asserts a claim against the defendants for negligent infliction of emotional distress based upon the alleged medical malpractice claim, for care provided to plaintiffs' son, Brett Lovelace, at Methodist Le Bonheur Children's Medical Center, 50 N. Dunlap, Memphis, Tennessee, on March 12, 2012, allegedly resulting in Brett Lovelace's death on March 14, 2012. In defendants' Answer (ECF 13, paragraph 3), defendants deny any medical negligence on their part and deny that they caused injury to, and the subsequent death of the patient, Brett Lovelace. In their Answer (ECF 13, paragraph 21), defendants assert fault against non-parties, Kelly Kish, a nurse employed with Methodist Healthcare – Memphis Hospitals (hereinafter "Methodist"), and Methodist, based on Kelly Kish's nursing negligence in her care provided to the patient, Brett Lovelace, and negligence by other personnel of Methodist responsible for the care provided to the patient. Kelly Kish has admitted she was negligent in an "Agreed Order" (Exhibit B hereto) entered with the Tennessee Board of Nursing on February 20,

2013, which is a public record filed with the Tennessee Secretary of State, which resulted in Kelly Kish's nursing license being revoked.

As stated in the Agreed Order (Exhibit B), Kelly Kish admitted the following facts to be true, all of which are alleged in defendants' Answer (ECF 13, paragraph 21): Kelly Kish was employed as a registered nurse by Le Bonheur Children's Hospital in Memphis, Tennessee from about February 11, 2008 through March 23, 2012. Kelly Kish was assigned to care for a twelve-year old patient [Brett Lovelace] in the post anesthesia care unit (PACU) following the patient's tonsillectomy/adenoidectomy. The patient was the only patient assigned to Kelly Kish during the approximately 90 minutes the patient was in PACU. Kelly Kish placed a pulse oximeter on the patient, but the oximeter worked only intermittently, and Kelly Kish did not notify anyone of the problem and did not replace the device. At no time did Kelly Kish attempt to speak with or rouse the patient, despite charting a rating of 9 out of 10 on the Aldrete scale. Such a score [if true] would indicate, among other things, full breathing, high oxygen saturation, full consciousness, good circulation, and lively activity and motor control. Kelly Kish never roused or checked on the patient to make these ratings, but instead charted these ratings based on her observations of the patient's status when he initially entered the PACU. Among other things, Kelly Kish charted the patient's level of consciousness as "arousable on calling" from the time he entered the PACU up until the "Harvey" code was called. Throughout her time caring for the patient, Kelly Kish documented oxygen saturations that were not reflected on the print-out. Kelly Kish documented, for example, 100% oxygen saturation when the monitor read only "artifact" or levels below 25%. At one point, the patient was heard making snoring and/or gasping noises, which the patient's parents brought to Kelly Kish's attention.

The Agreed Order further contains the following facts admitted as true by Kelly Kish, which are alleged in defendants' Answer (ECF 13, paragraph 21): Approximately 30 minutes after the patient was admitted to the PACU, Kelly Kish documented the patient's blood pressure as 118 over 56. Approximately 45 minutes after the patient was admitted to the PACU, Kelly Kish documented the patient's blood pressure as 106 over 53. Approximately 60 minutes after the patient was admitted to the PACU, Kelly Kish charted that the patient's blood pressure as 84 over 42. Kelly Kish did not take any action in response to these changes in the patient's blood pressure. Approximately 90 minutes after the patient was admitted to the PACU, Kelly Kish left to obtain fluids for the patient. Upon her return, the patient's father asked Kelly Kish for help turning the patient, as the patient's leg appeared blue. When the patient was turned supine, he was noted to be deeply cyanotic, apneic, and pulseless. CPR was initiated, and a "Harvey" code indicating a nonresponsive patient, was called. The patient died approximately 48 hours later. During the patient's time in the PACU, Kelly Kish accessed Facebook and at least one other social media website using a hospital computer.

Defendants have further alleged in their Answer (ECF 13, paragraph 21) that the care provided by Kelly Kish to the patient, Brett Lovelace, was in violation of and a gross deviation from the recognized standard of acceptable professional practice for a registered nurse practicing in the post-anesthesia care unit in the Memphis, Tennessee community at the time of the foregoing incident, and that such deviation from the applicable standard of care was the cause of the injury to, and death of, Brett Lovelace, which would not otherwise have occurred; and that Kelly Kish, and her employer, Methodist Healthcare - Memphis Hospitals, are responsible to plaintiffs for the harm and damages suffered by the patient, Brett Lovelace, and by his parents, the plaintiffs herein, as a result of the grossly negligent care provided by Kelly Kish, who at all

times relevant hereto was acting in the scope and course of her employment with Methodist. Defendants have further alleged that the plaintiffs' allegations of negligence in the Complaint are applicable to all Methodist Healthcare - Memphis Hospitals' personnel who were responsible for monitoring Brett Lovelace in the PACU, including but not limited to, Kelly Kish.

Methodist has admitted in its Memorandum of Law (ECF 33-1, page 2) that Methodist settled plaintiffs' claim against it and that "Methodist and Plaintiffs entered into a Confidential Settlement Agreement and Release on or about December 19, 2012." The amount of the settlement and the other terms of the settlement entered into between plaintiffs' and Methodist, and the scope of the Release signed by plaintiffs are unknown to defendants.

## **LAW AND ARGUMENT**

### I.

### ITEM 1 OF SUBPOENA - PRINT-OUTS AND OTHER DOCUMENTS CONTAINING DATA, VITAL SIGNS, VALUES, READINGS, AND OTHER INFORMAITON RECORDED BY MONITORING EQUIPMENT UTILIZED IN THE CARE OF BRETT LOVELACE IN THE POST ANESTHESIA CARE UNIT (PACU)

Contrary to Methodist's assertions in its Memorandum of Law, the information contained in the above-described documents requested in item number 1 of defendants' subpoena *duces tecum,* Exhibit A hereto, can only be obtained from the documents listed in the subpoena. The documents requested in item number 1 are known to be inconsistent with and, in some instances, contrary to the medical records of Methodist for the patient in question, based on Kelly Kish's admissions of fact contained in the "Agreed Order" entered by the Tennessee Board of Nursing, revoking the license of Kelly Kish (Exhibit B hereto). As stated in the Agreed Order, Kelly Kish admitted that she entered into the medical records information which was not accurate. (Agreed

5

Order, Exhibit B hereto, paragraphs 8 – 11.) Accordingly, it is extremely important to defendants' defense, and essential to determining the truth as to the actual condition of the patient while he was being "cared for" in the PACU, for Methodist to produce the print-outs of the monitoring equipment utilized by Methodist in its care of the patient in the PACU. Such print-outs are the only known source of objective data, including the patient's heart rate, blood pressure, and oxygen saturations, which would show the actual condition of the patient during the entire time the patient was in the PACU, which is when the patient suffered a "code" event, resulting in his death two days later.

II.

ITEM 2 OF SUBPOENA - ANY AND ALL MEDICAL RECORDS, INCLUDING X-RAYS AND BILLING RECORDS PERTAINING TO BRETT S. LOVELACE

Methodist Healthcare – Memphis Hospitals does not object to producing all medical records, including x-rays and billing records pertaining to Brett S. Lovelace, which were requested in item number 2 of defendants' subpoena, and therefore should be required to produce the same forthwith.

III.

ITEM 3 OF SUBPOENA - ANY AND ALL LOGS, INCLUDING PRINT-OUTS OF ANY COMPUTER LOG, AND ANY PAPER LOG FOR THE POST ANESTHESIA CARE UNIT (PACU) AT LE BONHEUR CHILDREN'S HOSPITAL FOR MARCH 12, 2012

The documents requested in item number 3 of defendants' subpoena *duces tecum,* consist of "any and all logs" for the Post Anesthesia Care Unit at Le Bonheur Children's Hospital for March 12, 2012, and contrary to Methodist's motion, such request is not "vague, overly broad or unduly burdensome". The logs for the PACU are maintained by Methodist in the ordinary course of its business and they would identify the persons who were present in the PACU on

6

March 12, 2012, the date the patient suffered the "code" event. There is nothing vague, overly broad, or unduly burdensome about this request.

Furthermore, it is unknown how the requested documents could possibly be protected by the "attorney-client privilege" and/or the "work product doctrine" asserted in general terms by Methodist, as Methodist has failed to "describe the nature of the withheld documents, communications, or tangible things in a manner, without revealing information itself privileged or protected, will enable the parties to assess the claim", as required by *Fed. R. Civ. P.* 45(d)(2)(A). Defendants submit that whatever "attorney-client privilege" and/or "work product doctrine" privilege which might conceivably apply to this request has been waived by the failure to provide the information required by *Fed. R. Civ. P.* 45(d)(2)(A).

IV

ITEM 4 OF SUBPOENA - ANY AND ALL DOCUMENTS WHICH COMPRISE OR ARE CONTAINED IN THE PERSONNEL FILE OF KELLY KISH

Methodist objects to the production of the above-referenced records on the grounds that such documents are "not relevant and not reasonably calculated to lead to discovery of admissible evidence". Further, Methodist objects on the grounds that the request "seeks confidential, proprietary and/or sensitive business information, or commercially private data of Methodist and Ms. Kish, non-parties"; and finally Methodist objects on the grounds that "Ms. Kish's personnel file is protected by the Tennessee Patient Safety and Quality Improvement Act" (ECF 33-1, p. 3).

Defendants respectfully submit that the personnel file of Kelly Kish, Methodist's employee who has admitted that she provided negligent care causing injury to the patient and that she engaged in acts of dishonesty related to the practice of nursing (Exhibit B, paragraphs 20 and 21) and who resigned from Methodist in lieu of termination (Exhibit B, paragraph 17),

7

would be expected to contain information that, if not itself admissible, would likely lead to the discovery of admissible evidence in this cause. For example, Kelly Kish's personnel file would reasonably be expected to contain information pertaining to the facts about the patient's care in question, which may not be contained in any other document, facts about the monitoring equipment utilized in the care of the patient in question, including facts about any defective, inoperative, or otherwise non- functioning equipment used in the care of the patient in question, and possibly facts about the care provided to the patient by other employees of Methodist.

Again, since Methodist did not provide the necessary information required by *Fed. R. Civ. P.* 45(d)(2)(A), which would allow or enable the parties to assess the claim of privilege or protection, it is unknown what "confidential, proprietary and/or sensitive business information, or commercially private data" of Methodist, or of Ms. Kish, might be contained in the personnel file, and therefore defendants submit such objection is waived.

Finally, with regard to Methodist's assertion that Ms. Kish's personnel file is protected by the Tennessee Patient Safety and Quality Improvement Act, defendants submit that such assertion as to the entire personnel file is not supported by T.C.A. 68-11-272. Even though the statute on which Methodist bases its objection, T.C.A. 68-11-272, broadly defines a "quality improvement committee", and broadly defines the functions of such a committee, the blanket assertion by Methodist that Kelly Kish's entire personnel file is privileged under such statute is not well-founded. And since Methodist failed to provide the necessary information required under *Fed. R. Civ. P.* 45(d)(2)(A), defendants are unable to assess the claim with regard to any particular documents that may be a part of Kelly Kish's personnel file. Accordingly, defendants submit that Methodist has waived such objection.

V.

ITEM 5 OF SUBPOENA - ANY AND ALL DOCUMENTS EVIDENCING ANY SETTLEMENT AGREEMENT ENTERED INTO BETWEEN DANIEL AND HELEN LOVELACE AND METHODIST HEALTHCARE – MEMPHIS HOSPITALS PERTAINING TO ANY CLAIM OF DANIEL AND HELEN LOVELACE, INDIVIDUALLY, AND/OR AS PARENTS OF BRETT LOVELACE, DECEASED, AND ANY AND ALL DOCUMENTS EVIDENCING ANY RELEASE OF CLAIMS AGAINST ANY PERSONS BY DANIEL AND HELEN LOVELACE, INDIVIDUALLY, AND/OR AS PARENTS OF BRETT LOVELACE, DECEASED

Methodist objects to the above-referenced documents on the basis that "it seeks confidential information from a non-party" (ECF 33-1, p. 3). Methodist also objects, albeit only in general terms, to all requests on the grounds of "attorney-client privilege, attorney work product doctrine, protection under the Tennessee Patient Safety and Quality Control Act or any other relevant statutes of the state of Tennessee or under the United States Code regarding confidentiality" (ECF 33-1, p. 3). It is difficult to imagine how there could be any attorney-client privilege, attorney work product privilege, or protection under the Tennessee Patient Safety and Quality Control Act, applicable to any executed settlement agreement and executed release documents. Furthermore, it is submitted that there is no statute of the State of Tennessee or statute in the United States Code known to the undersigned which provides any privilege or protection to a settlement agreement or release of claims entered into by private parties, simply because the parties have stated in the settlement agreement that it is confidential.

Methodist's main objection to defendants' request for its settlement agreement and release documents appears to be as follows: "Defendants' request to Methodist, a non-party witness, for the confidential settlement agreement and release entered into by the plaintiffs and Methodist is improper and places undue burden on Methodist in requiring it to divulge the terms of the confidential agreement" (ECF 33-1, p. 7). Methodist asserts no statute or case law in support of its above-stated objection. Defendants respectfully submit that federal case law

supports the defendants' discovery of a confidential settlement agreement between the plaintiffs and a non-party healthcare provider.

In *Scheurer Hospital v. Lancaster Pollard & Company, et al.*, 2012 U.S. Dist. LEXIS 160842 (E.D. Mich. November 9, 2012), the Court granted the defendants' motion to compel requiring the plaintiff in that case to produce the confidential settlement agreement entered into between the plaintiff and a third party, as well as any statements or communications that would explain what claims are actually settled and for what amounts. *Ibid.*, p. 4. The Court noted that the documents sought were not rendered non-discoverable by the fact that the settlement agreement between the plaintiff and the third party contained a confidentiality provision. The Court stated in this regard as follows:

> Agreements are not protected from discovery simply because they have been denominated "confidential" by the parties. A general concern for protecting confidential information does not equate to privilege… In the context of settlement agreements, the mere fact that settling parties agree to maintain the confidentiality of their agreement does not serve to shield the information from discovery. Simply put, litigants may not shield otherwise discoverable information from disclosure to others by agreeing to maintain its confidentiality.

*Ibid.* at p. 4, (citing numerous cases).

In *Scheurer, supra*, it was also noted that neither Rule 408 of the Federal Rules of Evidence, nor *Goodyear Tire & Rubber Company v. Childs*, 332 F. 3d 976 (6th Cir. 2003), preclude discovery or admissibility of a settlement agreement itself or the basic components of the agreement, such as statements explaining what claims were settled and for what amount. *Ibid.* at p. 3. Similar cases holding discovery of "confidential settlement agreements" include *National Union Fire Insurance Company v. Porter Hayden Company*, 2012 U.S. Dist. LEXIS 23716 (D. Md. February 24, 2012); *Channelmark Corporation v. Destination Products*

*International, Inc.*, 2000 U.S. Dist. LEXIS 9854 (N.D. Ill. July 12, 2000); and *First Sealord Surety v. Durkin*, 918 F. Supp. 2d 362 (E.D. Penn. January 17, 2013).

Defendants submit that the settlement agreement and terms thereof, including any release(s) signed, are relevant to the defendants' defenses and are reasonably calculated to lead to the discovery of admissible evidence regarding the issue of damages. T.C.A. 29-26-119 limits a plaintiff's recoverable economic damages to "actual economic losses suffered by the claimant by reason of the personal injury, including, but not limited to, costs of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer, either governmental or private, by Social Security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually." T.C.A. 29-26-119. If Methodist agreed to "write off" or otherwise extinguish any medical bills incurred by plaintiffs for the medical care provided during the admission in question (which plaintiffs allege as damages in their Complaint), then defendants are entitled to establish that such medical expenses have been "written off" or otherwise extinguished and therefore are not recoverable as damages pursuant to T.C.A. 29-26-119. Secondly, plaintiffs' Complaint alleges that plaintiffs are entitled to recover damages for "decedent's pecuniary losses due to his untimely death, which exceed, based upon a projection of pecuniary losses of and for Brett Lovelace, the sum of $2,000,000.00 over a normal work life to age 65…" (ECF 1, p. 7) Defendants submit that whatever settlement amount was paid by Methodist to plaintiffs might be considered by the triers of fact to be payment of the decedent's loss of earnings and/or loss of

earning capacity, in full or in part, unless the settlement agreement expressly states that the settlement amount paid does not constitute payment for the deceased's loss of earning capacity or loss of earnings. Accordingly, such facts are certainly discoverable, and are potentially admissible, to the extent they show a reduction in the plaintiff's economic losses in this matter pursuant to T.C.A. 28-26-119.

In *McDaniel v. General Care Corporation*, 627 S.W.2d 129 (Tenn. App. 1981), perm. app. denied, September 28, 1981, plaintiff was allowed by the Trial Court to testify that she had lost wages and medical expenses of certain amounts but the defendants were not permitted to establish before the jury what amount of these expenses were either reimbursed or paid by sources other than plaintiff's own assets, despite the fact that the parties had stipulated that none of the wages were in fact lost and that the plaintiffs had been reimbursed for all of the medical expenses. The Tennessee Court of Appeals reversed the Trial Court and held that it was error on the part of the trial court to permit the plaintiffs to prove medical expenses and loss of wages which were either reimbursed to them or paid by sources other than plaintiff's own assets. *Ibid.* 132 – 133. Therefore, based on *McDaniel*, if any of the medical expenses which plaintiff seeks to recover in this cause were "written off" or extinguished by Methodist, then those facts are certainly discoverable, and under *McDaniel* serve to preclude plaintiff from offering proof of such medical bills. Furthermore, based on *McDaniel*, defendants submit that unless the settlement agreement specifically states that the settlement amount paid is not for any economic losses, the triers of facts should be allowed to determine what amount of the decedent's loss of earning capacity or loss of earnings was paid or reimbursed by Methodist's settlement sum. At a minimum, the settlement agreement and terms thereof are discoverable.

In *AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*, 646 F. Supp. 2d 385 (S.D. N.Y. May 14, 2009), the Court permitted the *plaintiff* to prove the amount of the plaintiff's settlement with a third party, in order to establish the reduction of the amount of damages to which plaintiff was entitled. The *defendant* in that case objected to the introduction of the settlement amount under Federal Rule of Evidence 408, but the Court rejected that objection on the grounds that Rule 408 does not prohibit evidence of settlements when offered for purposes not otherwise prohibited by the Rule (that is, when not offered to prove the defendants' liability). In the instant case, at this stage, defendants are simply seeking to discover the settlement agreement and terms thereof, including any releases that may have been signed, and are not seeking a determination as to the admissibility of any such documents or information.

## METHODIST HEALTHCARE – MEMPHIS HOSPITALS' MOTION FOR PROTECTIVE ORDER

Although Methodist's Motion for Protective Order is stated to be a separate and additional motion to its motion to quash defendants' subpoena *duces tecum*, it appears that Methodist's Motion for Protective Order requests the same relief, that is non-production of the documents requested in categories 1, 3, 4 and 5 in defendants' subpoena *duces tecum*. For the same reasons stated by defendants hereinbefore, defendants submit that plaintiffs' Motion for Protective Order should be denied.

## **CONCLUSION**

Based on the foregoing points and authorities, defendants respectfully submit that Methodist's Motion to Quash Defendants' Subpoena and Motion For Protective Order, and plaintiffs' Joinder of such motions, should be denied and that the Court should order Methodist to produce the documents requested in defendants' subpoena *duces tecum* forthwith. Alternatively, defendants respectfully submit that if the Court should find that defendants'

subpoena *duces tecum* should be modified in any way or that any of the documents requested in defendants' subpoena *duces tecum* should be subject to a protective order regarding production of such documents, defendants respectfully request that the Court fashion such order as deemed appropriate by the Court.

Respectfully submitted,

THE HARDISON LAW FIRM, P.C.

By: David M. Cook
DAVID M. COOK (5362)
ALBERT G. MCLEAN (5150)
Attorney for Defendants,
Pediatric Anesthesiologists, P.A. and
Babu Rao Paidipalli, M.D.
119 S. Main Street, Suite 800
Memphis, Tennessee 38103
(901) 525-8776
dcook@hard-law.com
amclean@hard-law.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served via the Court's electronic filing system upon:

| | |
|---|---|
| Mark Ledbetter, Esq.<br>Halliburton & Ledbetter<br>Attorney for Plaintiffs<br>254 Court Avenue<br>Suite 305<br>Memphis, TN 38103 | J. Kimbrough Johnson, Esq.<br>Marcy Dodds Magee, Esq.<br>Attorneys for Defendant, Mark P.<br>Clemons, M.D.<br>Thomason, Hendrix, Harvey, Johnson &<br>Mitchell, PLLC<br>2900 One Commerce Street<br>Memphis, TN 38103 |
| Craig C. Conley, Esq.<br>Ormonde B. DeAllaume, Esq.<br>Baker, Donelson, Bearman, Caldwell<br>& Berkowitz, P.C.<br>165 Madison Avenue, Suite 2000<br>Memphis, TN 38103 | Mary M. Bers, Esq.<br>Stephanie A. Bergmeyer, Esq<br>Office of the Attorney General and Reporter<br>For the State of Tennessee<br>P.O. Box 20207<br>Nashville, TN 37202-0207 |

this 30th day of August, 2013.

s/David M. Cook
DAVID M. COOK