IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| DANIEL LOVELACE AND HELEN LOVELACE<br><br>  Plaintiffs,<br><br>vs.<br><br>PEDIATRIC ANESTHESIOLOGISTS, P.A.;<br>DR. BABU RAO PAIDIPALLI &<br>DR. MARK P. CLEMONS<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:13-CV-02289-JPM-dkv<br>)<br>)<br>)<br>)<br>) |

## METHODIST HEALTHCARE – MEMPHIS HOSPITALS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

COMES NOW non-party Witness Methodist Healthcare – Memphis Hospitals ("Methodist"), by and through undersigned counsel, and files this Memorandum of Law in Support of its Motion for Protective Order. In further support of its Motion for Protective Order, Methodist states as follows:

### PROCEDURAL FACTS

On December 6, 2013, Defendants Pediatric Anesthesiologists, P.A. and Babu Rao Paidipalli, M.D. (collectively "Defendants") filed a Motion for Qualified Protective Order ("Motion") and Memorandum in Support (collectively D.E. 59). Defendants seek to engage in *ex parte* communications with seven of Brett Lovelace's "treating healthcare providers." (Motion p. 2.) In particular, Defendants seek to interview Elesia Turner ("Ms. Turner"), Clinical Risk Manager at Methodist Le Bonheur Children's Hospital ("Le Bonheur"). *Id.* Ms. Turner, however, is not a "healthcare provider" under the Tennessee Health Care Liability Act, and she

1

does not possess relevant information to this case. Further, any information Ms. Turner *does* possess is confidential and privileged under the Tennessee Patient Safety and Quality Improvement Act ("TPSQIA"). Accordingly, this Court should grant Methodist's Motion for Protective Order, prohibiting Defendants from participating in *ex parte* communications with Ms. Turner.

## LAW AND ARGUMENT

### I. STANDARD FOR THE GRANTING OF A PROTECTIVE ORDER

Rule 26(c) of the Federal Rules of Civil Procedure authorizes "any person from whom discovery is sought [to] move for a protective order in the court where the action is pending" in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." Fed. R. Civ. P. 26(c)(1). Specifically, Rule 26(c) permits the court, for good cause, to forbid the disclosure of discovery, forbid inquiry into certain matters, and limit the scope of disclosure or discovery to certain matters. Fed. R. Civ. P. 26(c)(1)(A), (D). "Courts have been inclined to limit the scope of discovery directed to non-parties in order to protect the non-party form harassment, inconvenience, or disclosure of confidential documents." *Royal Surplus Lines Ins. Co. v. Sofamor Danek Group*, 190 F.R.D. 463, 467 (W.D. Tenn. 1999). Further, "[a] district court has a wide discretion in weighing **any** relevant factors in deciding whether to grant a motion for protective order." *Key Components, Inc. v. Edge Elec., Inc.*, No. 3:07-CV-224, 2008 WL 4937560, at *4 (E.D. Tenn. Nov. 17, 2008) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995)) (emphasis added).[1]

---

[1] A copy of *Key Components* is attached to this Motion as Exhibit A.

2

## II. THIS COURT SHOULD GRANT METHODIST'S MOTION BECAUSE MS. TURNER IS NOT A TREATING HEALTHCARE PROVIDER UNDER THE TENNESSEE HEALTH CARE LIABILITY ACT, AND ANY INFORMATION SHE POSSESSES IS NOT RELEVANT.

In 2012, the Tennessee legislature revised Tennessee's Health Care Liability Act to allow defendants in medical malpractice cases filed on or after July 1, 2012, to engage in *ex parte* communications with the subject patient's healthcare providers. Tenn. Code Ann. § 29-26-121(f)(1) states:

> Upon the filing of any "healthcare liability action," as defined in § 29-26-101[2], the named defendant or defendants may petition the court for a qualified protective order allowing the defendant or defendants and their attorneys the right to obtain protected health information during interviews, outside the presence of claimant or claimant's counsel, with the **relevant patient's treating "healthcare providers,"** as defined by § 29-26-101.[3] Such petition shall be granted under the following conditions:

---

[2] (1) "Health care liability action" means any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based. Tenn. Code. .Ann. §29-26-101(a)(1) (2011).

[3] (2) "Health care provider" means:

(A) A health care practitioner licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68, including, but not limited to, medical resident physicians, interns, and fellows participating in a training program of one of the accredited medical schools or of one of such medical school's affiliated teaching hospitals in Tennessee;

(B) A nongovernmental health care facility licensed under title 68, chapter 11;

(C) A nongovernmental health facility licensed under the Mental Health, Developmental Disability, and Personal Support Services Licensure Law, compiled in title 33, chapter 2, part 4;

(D) The employee of a health care provider involved in the provision of health care services, including, but not limited to, physicians, nurses, licensed practical nurses, advance practice nurses, physician assistants, nursing technicians, pharmacy technicians, orderlies, certified nursing assistants, technicians and those physicians and nurses employed by a governmental health facility; or

(E) A professional corporation or professional limited liability company established pursuant to title 48, a registered limited liability partnership rendering professional services under title 61 and which consists of one (1) or more health care practitioners licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68, or any legal entity that is not itself required to be licensed but which employs one or more health care practitioners licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68.

3

  (A) The petition must identify the treating healthcare provider or providers for whom the defendant or defendants seek a qualified protective order to conduct an interview;

  (B) The claimant may file an objection seeking to limit or prohibit the defendant or defendants or the defendant's or defendants' counsel from conducting the interviews, which may be granted only upon good cause shown that a **treating healthcare provider does not possess relevant information** as defined by the Tennessee Rules of Civil Procedure; and

  (C)(i) The qualified protective order shall expressly limit the dissemination of any protected health information to the litigation pending before the court and require the defendant or defendants who conducted the interview to return to the healthcare provider or destroy any protected health information obtained in the course of any such interview, including all copies at the end of the litigation

    (ii) The qualified protective order shall expressly provide the participation in any such interview by a treating healthcare provider is voluntary.

Tenn. Code Ann. § 29-23-121(f)(1) (emphasis added).

  **A.** **Ms. Turner was not one of Brett Lovelace's treating healthcare providers.**

As outlined above, Tenn. Code Ann. § 29-26-121(f)(1) only applies to the "relevant patient's treating 'healthcare providers.'" *Id.* Ms. Turner, as a Clinical Risk Manager for Le Bonheur, is not the type of employee that the Tennessee legislature meant to subject to *ex parte* communications under the statute. While Ms. Turner is a registered nurse, she does not assist in the care and treatment of patients. Ms. Turner's job as a Clinical Risk Manager is to evaluate and improve the quality of patient care at Le Bonheur. Ms. Turner did not treat Brett Lovelace at any point during his stay at Le Bonheur, and therefore does not meet the requirements of Tenn. Code Ann. § 29-26-121(f)(1). Accordingly, this Court should grant Methodist's Motion for Protective Order, precluding Defendants from engaging in *ex parte* communications with Ms. Turner.

4

### B.     Any information Ms. Turner possesses is not relevant to this case.

Even if this court finds that Ms. Turner was one of Brett Lovelace's treating healthcare providers, this Court should grant Methodist's Motion because Ms. Turner "does not possess relevant information as defined by the Tennessee Rules of Civil Procedure ...." Tenn. Code Ann. § 29-26-121(f)(1)(B). The Tennessee Rules of Civil Procedure define relevant information as information that "relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ...." Tenn. R. Civ. P. 26.02(1).

Here, as discussed above, any information Ms. Turner does possess relates to the improvement of patient care at Le Bonheur. Ms. Turner did not treat, interact, or even see Brett Lovelace while he was under Le Bonheur's care. Any information Ms. Turner has does not relate to a claim by Plaintiffs, nor by a defense of Defendants. Therefore, that information is not relevant, and this Court should grant Methodist's Motion and preclude Defendants from communicating with Ms. Turner *ex parte*.

### III.    THIS COURT SHOULD GRANT METHODIST'S MOTION FOR PROTECTIVE ORDER BECAUSE ANY INFORMATION MS. TURNER POSSESSES IS CONFIDENTIAL AND PRIVILEGED UNDER THE TENNESSEE PATIENT SAFETY AND QUALITY IMPROVEMENT ACT.

### A.     This Court should apply the TPSQIA to this case.

While there is no healthcare facility peer review privilege under federal common law, Congress enacted Federal Rule of Evidence 501 so that courts had "the flexibility to develop rules of privilege on a case-by-case basis." *Trammel v. U.S.*, 445 U.S. 40, 47 (1980). "[T]he presence of a state law privilege must be considered, particularly where a significant number of states recognize such a privilege." *John B. v. Goetz*, 879 F. Supp. 2d 787, 901 (M.D. Tenn. 2010). All fifty states and the District of Columbia have a state law peer review privilege. *Sevilla v. U.S.*, 852 F. Supp. 2d 1057, 1066 (N.D. Ill. 2012).

The important policy interests behind the peer review privilege foster "candid and conscientious evaluation of clinical practices" which is "a *sine qua non* of adequate hospital care." *Id.* at 1068. In *Sevilla*, the United States District Court for the Northern District of Illinois concluded:

> To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. The only consequence in not recognizing the privilege is to require the plaintiff in this case to do what plaintiffs in medical malpractice cases are routinely required to do in all other cases, namely adduce proof independent of what occurred in the peer review process.

*Id.* (quoting *Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1062 (7th Cir. 1981) and citing *Freeman v. Fairman*, 917 F. Supp. 586, 588–89 (N.D. Ill. 1996)).

"[C]omity favors recognizing a state law privilege, as a component of federal common law, to the extent that doing so will not impose a substantial cost on federal policies." *Goetz*, 879 F.Supp.2d at 901 (citing *Shadur*, 664 F.2d at 1061). For example, in *In re DOJ Subpoena Duces Tecum*, No. 04-MC-018 DV, 2004 WL 2905391 (W.D. Tenn. June 22, 2004), this Court addressed a similar issue, holding that since the "needs of the federal government in this instance is to punish physicians who perpetrate frauds on the government and on patients," disclosure of peer review materials by a non-party hospital to the federal government in its criminal investigation of a physician was warranted. *Id.* at *2; *see also In re Administrative Subpoena Blue Cross Blue Shield of Massachusetts, Inc.*, 400 F.Supp.2d 386 (D. Mass. 2005) (federal interest in enforcement of laws against health care fraud was a sufficiently strong enough interest to refuse to recognize peer review privilege); *Nilavar v. Mercy Health System-Western Ohio*, 210 F.R.D. 597, 6 (S.D. Ohio 2002) (in this federal antitrust claim, the "paramount interest of the federal antitrust laws in preserving free competition outweigh the interests underlying the state medical peer review privilege").

6

Here, however, there is no federal policy which would be violated by the application of the TPSQIA. In fact, the stated policies of the federal Health Care Quality Improvement Act of 1986 ("HCQIA") and the TPSQIA are substantively identical. *See* Tenn. Code Ann. § 68-11-272(a) ("It is the policy of this state to encourage the improvement of patient safety, the quality of patient care and the evaluation of the quality, safety, cost, processes and necessity of healthcare services by hospitals, healthcare facilities and healthcare providers. Tennessee further recognizes that certain protections must be available to these entities to ensure that they are able to effectively pursue these measures."); 42 U.S.C. § 11101(5) ("There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review."). Therefore, applying Tennessee's peer review statute to this case would not only not violate any federal policies, it would *further* the objectives outlined in HCQIA. Accordingly, this Court should apply the TPSQIA to this case.

B.  **Any information Ms. Turner possesses is confidential and privileged under the TPSQIA.**

As discussed above, the TPSQIA was enacted to support Tennessee's policy "to encourage the improvement of patient safety, the quality of patient care and the evaluation of the quality, safety, cost, processes and necessity of healthcare services by hospitals, healthcare facilities and healthcare providers." Tenn. Code Ann. § 68-11-272(a). The Tennessee legislature "recognize[d] that certain protections must be available to these entities to ensure that they are able to effectively pursue these measures. *Id.*

The TPSQIA provides, in pertinent part:

Records of a QIC[4] and testimony or statements by a healthcare organization's officers, directors, trustees, healthcare providers, administrative staff, employees or other

---

[4] "Quality improvement committee" or "QIC" is defined as "a committee formed or retained by a healthcare organization, an activity of a healthcare organization, or one (1) or more individuals employed by a healthcare

7

committee members or attendees relating to activities of the QIC **shall be confidential and privileged** and **shall be protected from direct or indirect means of discovery**, subpoena or admission into evidence in any judicial or administrative proceeding.

Tenn. Code. Ann. § 68-11-272(c)(1) (emphasis added).

Any information that Ms. Turner has obtained through her position as a Clinical Risk Manager is "confidential and privileged," and should be "protected from direct or indirect means of discovery." *Id.* Ms. Turner's daily responsibilities include "evaluat[ing] the safety, quality, processes, costs, appropriateness, or necessity of healthcare services ...." Tenn. Code. Ann. § 68-11-272(b)(4). Any information Ms. Turner possesses through her position as Clinical Risk Manager is exactly the type of information the Tennessee legislature intended to protect when it enacted the TPSQIA. Therefore, this Court should apply the TPSQIA, such that Defendants should not be allowed to participate in *ex parte* communications with Ms. Turner. Accordingly, this Court should grant Methodist's Motion for Protective Order.

## CONCLUSION

For the reasons set forth herein, Non-Party Witness Methodist Healthcare - Memphis Hospitals respectfully requests this Court to grant its Motion for Protective Order, prohibiting Defendants' counsel from participating in *ex parte* communication with Elesia Turner, Clinical Risk Manager for Methodist Le Bonheur Children's Hospital.

---

organization" who "evaluate the safety, quality, processes, costs, appropriateness or necessity of healthcare services" by performing a number of different functions, including "[e]valuation and improvement of the quality of healthcare services rendered, [d]etermination that health services rendered were professionally indicated or were performed in compliance with the applicable standard of care, [d]etermination that the cost of health care rendered was reasonable," etc. Tenn. Code Ann. § 68-11-272(b)(4)

8

Respectfully submitted,

s/ Craig C. Conley
Craig C. Conley (# 19341)
Ormonde B. DeAllaume (# 26266)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
Facsimile: (901) 577-2303
cconley@bakerdonelson.com
odeallaume@bakerdonelson.com

*Attorneys for Non-Party Witness*
*Methodist Healthcare – Memphis Hospitals*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of December, 2013, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

s/ Craig C. Conley
Craig C. Conley

M AKP 2451685 v1
2910081-000466 12/17/2013

2008 WL 4937560
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.

KEY COMPONENTS, INC., Plaintiff,
v.
EDGE ELECTRONICS, INC., Defendant.

No. 3:07-CV-224.   |   Nov. 7, 2008.

**Attorneys and Law Firms**

Jack M. Tallent, II, Kevin C. Stevens, Kennerly, Montgomery & Finley, PC, Knoxville, TN, for Plaintiff.

Joseph K. Christian, Linda Hamilton Mowles, Lewis, King, Krieg, Waldrop & Catron, P.C., Knoxville, TN, for Defendant.

**Opinion**

### MEMORANDUM AND ORDER

CLIFFORD SHIRLEY, JR., United States Magistrate Judge.

*1 This civil action is before the Court pursuant to 28 U.S.C. § 636(b), the Rules of this Court, and by the Order [Docs. 49, 53] of the Honorable R. Leon Jordan, Senior United States District Judge, for disposition of the plaintiff's Motion to Compel Discovery Disclosures [Doc. 48] and the defendant's Motion to Compel. [Doc. 52] On September 15, 2008, the parties appeared before the Court for a hearing on the instant motions. Attorney Kevin C. Stevens appeared on behalf of the plaintiff and attorneys Joseph K. Christian and Linda Hamilton Mowles appeared on behalf of the defendant. After the hearing, the Court took the motions under advisement, and they are now ripe for adjudication. The Court will address each motion in turn.

**I. Plaintiff's Motion to Compel Discovery Disclosures [Doc. 48]**

The plaintiff moves the Court for the entry of an order compelling the defendant to revise its responses to certain discovery requests so as to remove the "Attorney's Eyes Only" designation from certain produced documents, specifically, the documents produced in response to the following requests for production: ¶¶ 3, 4, 6, 9, and 10. During the hearing, the parties advised the Court that the dispute over requests ¶¶ 9 and 10 had been resolved, leaving requests ¶¶ 3, 4, and 6 at issue. The Court sets forth each of the disputed requests, and the defendant's response, below:

Request ¶ 3: "Please identify all manufacturers and/or supplies for all 16-volt batteries sold, distributed, and advertised by Kinetik in the years 2006, 2007, and 2008."

Response: "See response attached hereto as Exhibit A[1] and marked CONFIDENTIAL-ATTORNEY EYES ONLY."

Request ¶ 4: "Please identify all battery specifications, including but not limited to cranking amps, cold cranking amps, amp hour rating, reserve capacity, and battery weight, provided to or received from any manufacturer and/or supplier related to the 16-Volt Batteries sold, distributed, and advertised by Kinetik in the years 2006, 2007, and 2008."

Response: "See response attached hereto as Exhibit A and marked CONFIDENTIAL-ATTORNEY EYES ONLY."

Request ¶ 6: "Please describe in detail all battery testing performed by Kinetic or at the request of Kinetic on the 16-Volt Batteries sold, distributed, and advertised by Kinetic in the

---

[1] Exhibit A, in turn, references two additional responsive exhibits, J and K, both of which are also marked CONFIDENTIAL-ATTORNEY EYES ONLY.

EXHIBIT A

                years 2006, 2007, and 2008, including in this description the specific batteries tested, the nature of the battery test performed, the person or entity performing such battery tests, the dates of such battery tests, and the results of such battery tests."

Response:    "See response attached hereto as Exhibit A and marked CONFIDENTIAL-ATTORNEY EYES ONLY."

Thus, the answers to the three disputed discovery requests have been provided to the plaintiff, but all have been identified as CONFIDENTIAL-ATTORNEY EYES ONLY. The Agreed Protective Order [Doc. 45] entered in this matter provides, in pertinent part, that:

> *2 Confidential and proprietary business information, such as information related to new products and/or processes; information constituting technical know-how; information relating to product research, development, and marketing strategies, pricing schemes, proprietary sales information, customer lists, suppliers and independent sales representatives, proprietary production processes, and technical data may be designated "CONFIDENTIAL-ATTORNEY EYES ONLY" information. Each page of the document or thing shall be marked substantially as follows: CONFIDENTIAL-ATTORNEY EYES ONLY. Only Qualified Persons under Paragraph 2(a) and independent experts designated under Paragraph 2(b) to whom it is necessary that the information be disclosed for purposes of this action shall have access to information designated CONFIDENTIAL-ATTORNEY EYES ONLY.

[Doc. 45 at ¶ 4] The term "Qualified Persons" is defined as:

> (a) The Court, court personnel, jurors, and the attorneys and their law firms of record in this action and any associated counsel, insurance claims personnel, any party's separate legal counsel, and stenographic, clerical, or paralegal employees of the foregoing to whom it is necessary that the information be disclosed for purposes of this action. Persons identified in this subparagraph (a) need not physically sign the Confidentiality Agreement, the general form of which is attached hereto as Exhibit A and incorporated by reference herein.
>
> (b) Independent experts or consultants employed by a party or its attorneys of record in this action who agree in writing to be bound by the terms of this Protective Order. The independent expert or consultant must read this Protective Order and complete and sign the Confidentiality Agreement in the general form of Exhibit A, attached. Any such form signed by an expert or consultant shall be kept in the respective counsel's file until the time for disclosure of such experts and/or consultants, if applicable.
>
> (c) Officers or employees designated specifically by each party in good faith as necessary to receive designated information and who agree, in writing, to be bound by the terms of this Protective Order. The officers or employees must read this Protective Order and complete and sign the Confidentiality Agreement in the general form of Exhibit A, attached.
>
> (d) Any other person who is designated as a Qualified Person by Order of the Court, after notice to all parties, or who, by agreement of the parties, is designated as a Qualified Person. Any person designated under this subparagraph must read this Protective Order and complete and sign the Confidentiality Agreement in the general form of Exhibit A, attached.

[Doc. 45 at ¶ 2]

The plaintiff moves the Court to remove the Attorney's Eyes Only designation, arguing that the results of testing on the batteries at issue and the manufacturer specifications of those batteries do not qualify for such designation. The defendant disagrees, arguing that the information is proprietary and that the defendant should not be required to disclose such information to the plaintiff, one of the defendant's direct competitors.

*3 As a court in the Western District of Tennessee explained:

Federal Rule of Civil Procedure 26 provides that "the court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed.R.Civ.P. 26(c)(1). To determine whether good cause exists, and the proper level of protection, the court "must balance the requesting party's need for discovery against the resisting party's claimed harm that will result from disclosure...." In general, courts utilize attorneys' eyes only" protective orders when especially sensitive information is at issue or the information is to be provided to a competitor.

*Westbrook v. Charlie Sciara & Son Produce Co., Inc.,* No. 07-2657 Ma/P, 2008 U.S. Dist. LEXIS 24649, at *10-11, 2008 WL 839745 (W.D.Tenn. Mar. 27, 2008) (citations omitted).

In addressing this issue, the Court finds the case of *Caldon, Inc. v. Advanced Measurement & Analysis Group, Inc.,* No. CA 04-1951, 2007 U.S. Dist. LEXIS 94506, 2007 WL 4571165 (W.D.Penn. Dec. 27, 2007), instructive. In *Caldon,* a case involving a claim of unfair competition involving ultrasonic measuring devices, the plaintiff moved the court to determine whether certain information about the devices could be designated "Attorney Eyes Only." The *Caldon* court summarized the issue as follows:

> Caldon wants to use three individuals as experts or consultants: Calvin Hastings, founder and former CEO of Caldon and Ernest Hauser, Caldon's former senior executive in charge of sales to the nuclear power industry, both of whom are now employed by Cameron, and Herbert Estrada, a consultant to Caldon who is now retired but continues to act as an outside consultant to Caldon.

> Caldon distinguishes between information about how a flow meter works (such as design specifications, software codes, internal wiring and circuitry, electronic components, processing methods, and proprietary algorithms), which it agrees should be given Attorney Eyes Only protection, and information about how well it works (such as test results and analyses, records of field performance, and information, data and analysis supporting or contradicting claims of accuracy)....

> Caldon argues that information relating to the performance of the flow meters should not be designated as Attorney Eyes Only, and asserts that such information will be sufficiently protected by a designation as "confidential." This designation permits the information to be disclosed to a broader group, including Plaintiff's experts and consultants Hastings, Hauser, and Estrada.

> Defendants' Protective Orders are designed to prevent what we will call this "performance" information from being divulged to Hastings, Hauser, and Estrada by designating that information as Attorneys Eyes Only. Westinghouse argues that the parties are in direct competition with one another in the sale of ultrasonic flow meters, and that much sensitive trade secret data will be exchanged during discovery which could give Caldon a competitive advantage. Defendants also argue that Caldon simply doesn't want to spend the money for an outside expert, and that others are available to fill this role.

*4 *Id.* at *3-5. The *Caldon* court went on to hold that:

> Under Rule 26(c)(7), a protective order may issue to protect trade secrets or other confidential research, development, or commercial information. *Smith v. Bic Corp.,* 869 F.2d 194, 199 (3d Cir.1989). The party seeking protection bears the burden of showing that it is entitled to the protection being sought. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). A party seeking to protect trade secrets must demonstrate good cause for the order it seeks. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 787 (3d Cir.1994). "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity." *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir.1984). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning" do not establish good cause. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986).

> In determining good cause, the Third Circuit balances the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled. *Pansy,* 23 F.3d at 787.

> A district court has wide discretion in weighing any relevant factors and deciding whether to grant a motion for a protective order. *Pansy,* 23 F.3d at 787; *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995).

> Defendants in this case bear the burden of showing why information on the performance of its flow meters should be given the heightened protection it seeks and be designated as Attorney Eyes Only, and why current or former Caldon employees or consultants should not be

permitted to see this information in their capacity as experts to the Plaintiff.

In deciding the appropriate scope of a protective order, we are required to balance Caldon's interest in using the experts of its choice and having them have access to Defendants' testing data, against the Defendants' need to protect this information from being known to and used by competitors. We conclude that the Defendants have not shown good cause why their interests will not be protected if such information is designated as "confidential," and have not met their burden of showing why this particular information should be marked Attorneys Eyes Only. They have not shown that a clearly defined and serious injury will result from permitting the access to this information that Plaintiff seeks.

Accordingly, we will enter the protective order proposed by the Plaintiff, in the form attached to Doc. 39 as "Exhibit A," as the protective order in this case.

We are confident that the proposed order addresses Defendants' very real concerns. Plaintiff's proposed order includes provisions designed to prevent the disclosure of confidential or Attorney Eyes Only information, either deliberately or inadvertently, to those not covered by the order. Hastings and Hauser will also agree not to share any confidential information with Cameron or with anyone else employed by Cameron.

*5 While we are sympathetic to Defendants' concern that their trade secrets may used to the advantage of a competitor, we believe, on balance, that Plaintiff should be permitted to pursue its claims and prepare for trial with the experts and consultants it chooses, and we will approve Caldon's proposed protective order. The order we adopt does not permit uncontrolled discovery, since it has safeguards built in to prevent Hastings, Hauser and Estrada from improperly disclosing proprietary information to anyone, including Cameron. Plaintiff's proposed order also distinguishes between information relating to how the AMAG product is designed and operates, trade secrets which will still be protected as Attorney Eyes Only, and a much narrower category of performance-related information, such as testing results. Only the latter cannot be designated as Attorney Eyes Only.

*Caldon*, 2007 U.S. Dist. LEXIS 94506, at *5-8, 2007 WL 4571165. Thus, the *Caldon* court found that performance-related information, such as testing results, did not qualify for Attorney's Eyes Only protection. The Court finds the *Caldon* court's analysis persuasive, and adopts the same herein.

In the instant case, the Court finds that, with one exception, the defendant has not carried their burden as to the need for Attorney's Eyes Only protection for the information at issue, nor has the defendant shown that the disclosure of the requested information would result in an injury or competitive disadvantage for the defendant. The Court also finds that the plaintiff has shown a need for access to this information, though such access shall be limited only to a limited number of necessary individuals and only for use in the instant litigation. However, the Court finds that the identity of the manufacturer(s) and/or supplier(s) of the batteries falls outside the scope of the information needed by the plaintiff at this stage of the litigation, and, given the nature of the competition between the parties, that such information should remain flagged as Attorney's Eyes Only.

Accordingly, the plaintiff's motion [Doc. 48] is **GRANTED in part,** to the extent that the plaintiff shall be allowed to designate a limited number of necessary individuals who may access the information at issue subject to the terms of the Protective Order as it pertains to material designated as Confidential, and **DENIED in part,** to the extent that the plaintiff shall not be allowed to access the identity of the manufacturer(s) and/or supplier(s) of the batteries at issue. The parties are **DIRECTED** to meet and confer as to the number and identity of necessary individuals whom shall be allowed access as described above. Should the parties prove unable to agree, the parties shall contact chambers to schedule a telephone conference on the issue.

II. Defendant's Motion to Compel [Doc. 52]

The defendant moves the Court to compel the plaintiff to respond to approximately twenty outstanding discovery requests relating to the plaintiff's battery specifications, manufacturers and supplies, testing, and advertising.[2] The defendant contends that this information is relevant to a unclean hands defense to be raised by the defendant. The plaintiff opposes the motion, arguing that the information at issue is not relevant to any claim or defense asserted in the litigation and that, because the defendant has failed to raise an unclean hands defense in its answer, it has waived any such defense.

2  Given the number of disputed requests, rather than setting forth each request herein, the Court instead notes

that the disputed requests and responses are included in the defendant's motion. [Doc. 52 at pp. 2-7]

*6 The Sixth Circuit has held that:

> Failure to raise an affirmative defense by responsive pleading does not always result in waiver. The purpose of Fed.R.Civ.P. 8(c) is to give the opposing party timely notice of the affirmative defense and the opportunity to respond. The defendants raised their defense as soon as the defense became available. It is inconsequential that they raised it in briefing a dispositive motion instead of in an amended pleading. Belluardo and Middleton have had notice of the defense. No legitimate purpose would be served by requiring a remand to the district court for the defendants to amend their answer to add a defense that has already been briefed.

*Belluardo v. Cox Enters.*, 157 Fed. App'x 823, 830 (6th Cir.2005).

In the instant case, the Court finds that, given the early stage of the litigation, and given the notice plaintiff has received of the defendant's intent to rely on an unclean hands defense, the plaintiff is sufficiently on notice as to the unclean hands defense and that the defendant has not waived such a defense. The Court further finds that the subject of whether the defendant made literally false statements in its advertising remains at issue. In light of such a finding, the Court further finds that the accuracy of the plaintiff's own advertising is relevant to an unclean hands defense, *Cytosport, Inc. v. Nature's Best, Inc.*, No. CIV S-06-1799 DFL EFB, 2007 U.S. Dist. LEXIS 29039, *10-12, 2007 WL 1040993 (E.D.Cal. Apr.4, 2007), and thus the discovery at issue should be allowed, subject to Confidential and Attorney's Eyes Only designations consistent with the Protective Order [Doc. 45] and the Court's ruling above. The Court further finds that there has been no showing as to the relevance of conduct by the plaintiff after the instigation of the instant lawsuit, nor does the Court find such evidence to be relevant, and thus the plaintiff shall not be required to respond to any inquiries related to information placed on the plaintiff's website after the commencement of the instant suit. However, given that the Federal Rules of Civil Procedure, not state law, govern pleading requirements in federal cases, *Ridgway v. Ford Dealer Computer Servs.*, 114 F.3d 94, 98 n. 4 (6th Cir.1997), and given the Rule's emphasis on properly pled defenses, Fed.R.Civ.P. 8, the Court finds that the best course of action would be to allow the defendant, if it so chooses, to amend its Answer to properly assert an unclean hands defense before requiring the plaintiff to respond.

Accordingly, the defendant's motion [Doc. 52] is **DENIED in part,** to the extent that the plaintiff shall not be required to respond to any inquires as to actions taken by the plaintiff after the initiation of the instant suit, including any requests related to information placed on the plaintiff's website after the initiation of the suit, and **GRANTED in part,** to the extent that, if the defendant amends its Answer to assert an unclean hands defense, the plaintiff shall then be required to respond to the remaining requests, subject to Confidential and Attorney's Eyes Only designations in keeping with the Protective Order and the Court's ruling above. The defendant shall have ten days from the entry of this Order in which to amend its Answer, if it so chooses, and, in the event of such a filing, the plaintiff shall have twenty days from the filing of an Amended Answer to supplement its previous responses.

### III. Summary

*7 In summary, for the reasons and to the extent set forth more fully above, the plaintiff's motion [Doc. 48] is **GRANTED in part** and **DENIED in part,** and the defendant's motion [Doc. 52] is **GRANTED in part** and **DENIED in part.**

**IT IS SO ORDERED.**

---