# EXHIBIT K

Excerpts from Deposition of Kelly Kish, R.N.

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TENNESSEE

---

DANIEL LOVELACE and
HELEN LOVELACE, Individually
and as Parents of BRETT
LOVELACE, Deceased,

        Plaintiff,

v.               Case Number 2:13-cv-02289

PEDIATRIC ANESTHESIOLOGISTS,
P.A., BABU RAO PAIDIPALLI, and
MARK P. CLEMONS,

        Defendant.

---

VIDEOTAPE DEPOSITION

OF

KELLY KISH

May 15, 2014



JILL W. HODGES, RPR, LCR #380
P O BOX 381722
Germantown, Tennessee 38138-1722
(901) 335-7952

R I V E R S I D E    R E P O R T I N G

1    A.    Yeah, I don't remember all the blankets.

2  I remember his feet, you know, his legs being

3  tucked under.  I don't remember them being that

4  far, and I can't tell which way his face is

5  facing there.  He kind of had longer hair than I

6  remember, but that's um ...

7    Q.    But do you have any reason to doubt

8  that's the same person in all these pictures?

9    A.    Yes, that's correct.

10         MS. MAGEE:  Did you mark this as 8?

11         MR. LEDBETTER:  Yes, mark it,

12         please.

13         (Whereupon, the above-mentioned

14         photograph was marked as Exhibit Number

15         8 to the testimony of the witness.)

16    Q.    (By Mr. Ledbetter)  Now, at the time --

17  at the time that you were there with him and his

18  parents were there with him, did Dr. Clemons have

19  an opportunity to see Brett positioned on his

20  stomach with his legs bunched up under him?

21         MS. MAGEE:  Object to the form.

22         MR. TALLEY: Go ahead and answer.

23    Q.    (By Mr. Ledbetter)  Go ahead and answer.

24    A.    He did.  He did.

1        Q.    Okay.   For how many minutes would Dr.

2    Clemons have been there talking and chatting as

3    he had a clear view of this patient in this

4    position on his stomach?

5                        MS. MAGEE:   Same objection.

6                        MR. TALLEY: Go ahead and answer.

7        A.    I would say approximately five minutes.

8        Q.    Okay.   Did either he or anyone acting on

9    behalf of the anesthesia team say, good gracious,

10   get him in his side in a normal position?

11                       MR. GILMER:   Object to the form.

12                       MS. MAGEE:   Object to the form.

13       Q.    (By Mr. Ledbetter)   Did they say that?

14                       MR. TALLEY: Go ahead and answer.

15       A.    No, they did not.

16       Q.    If they had said that to turn him to a

17   lateral position, would you have done that?

18       A.    I would have done that.

19       Q.    Okay.   And if they had told you that he

20   needed to be on supplemental oxygen, would you

21   have attached that or connected him to

22   supplemental oxygen?

23       A.    I would have.

24                       MS. MAGEE:   Object to the form of

1           the question.

2      Q.    (By Mr. Ledbetter)   Do you agree that in

3  the course of what happened in the ensuing hour

4  and a half that if he had been moved to the

5  horizontal position or lateral position or if he

6  had been on supplemental oxygen that what

7  happened to him might have been avoided?

8                MR. GILMER:   Calls for speculation.

9                MS. MAGEE:   Same.

10                MR. TALLEY:   Go ahead and answer if

11           you can.

12      Q.    (By Mr. Ledbetter)   Do you believe that

13  if the doctors had ordered him to be placed in a

14  lateral Fowler's position and given supplemental

15  oxygen that what happened to Brett Lovelace might

16  have been or could have been prevented?

17                MR. GILMER:   Same objection.

18                MS. MAGEE:   Objection, calls for

19           speculation.

20                MR. TALLEY: If you can answer, go

21           ahead.

22      A.    Like I said before, if I had had him

23  supine, I don't think this would have happened.

24  The doctor did not tell me and it was not his --

```
 1   not seen the orders since I took care of him that
 2   day.  We use our judgment.
 3       Q.   Well, sitting here today -- I wouldn't
 4   ask you this if I thought this was false -- is it
 5   your best understanding that he was neither
 6   delivered with supplemental oxygen nor was there
 7   an order that he continue to have it?
 8              MR. GILMER:  Let me object.  You've
 9          asked this question about ten times
10          in about ten different ways.
11       Q.   (By Mr. Ledbetter)  So it's ten
12   questions.  Do you remember it?
13              MS. MAGEE:  Object to the form.
14              MR. TALLEY:  Go ahead and answer.
15       A.   It is my recollection he did not come to
16   me on oxygen when he came from the O.R.
17       Q.   Now, could you tell me whether Dr.
18   Paidipalli insured that Brett Lovelace was safely
19   discharged from the PACU?
20              MR. GILMER:  Object to the form.
21       Q.   (By Mr. Ledbetter)  In accordance with
22   LeBonheur's policies?  Did he insure that?
23              MR. GILMER:  Object to the form.
24       A.   That he was discharged?
```

1          MS. MAGEE:  Same objection.

2      A.    I do not remember having a patient like

3  that.

4      Q.    What was the common, customary and

5  accepted position for a child of that age who had

6  had a tonsillectomy as they delivered to you?

7          MS. MAGEE:  Object to form.

8          MR. GILMER:  Object.

9      Q.    (By Mr. Ledbetter)  What's the common,

10  accepted position that they came in?

11          MS. MAGEE:  Object to the form.

12          MR. GILMER:  Same.

13          MR. TALLEY:  Go ahead and answer.

14      A.    They normally would be in a

15  semi-Fowler's position.

16      Q.    You better state that clearly for them.

17      A.    A semi-Fowler's position.  Usually

18  that's supine with the head of the bed elevated a

19  little bit.

20      Q.    And why is that the right way to

21  position someone who's had a tonsillectomy and

22  adenoidectomy?

23          MR. GILMER:  Object to the form.

24          MS. MAGEE:  Join the objection.

```
 1              MR. TALLEY:  If you can answer.
 2       A.    Well, that's the most common position
 3  for most of our post-op patients to be able, you
 4  know, with the head of their bed up a little bit
 5  so that they're -- easier for them to breathe
 6  instead of being flat with the head up a little
 7  20 or 30 degrees.
 8       Q.    What about mucus and then blood and such
 9  things as that coming out freely rather than
10  pooling?
11              MS. MAGEE:  Object to the form.
12              MR. GILMER:  Object to the form.
13       Q.    (By Mr. Ledbetter)  Is that one reason
14  also that the secretions that came from the
15  surgery could come out?
16              MS. MAGEE:  Same objection.
17       A.    It's possible that that would be a
18  reason.
19       Q.    Okay.  After Brett was turned over,
20  did -- turned over after the code or before the
21  code was called, did you observe a pool of mucus
22  and blood where his face had been on the gurney?
23       A.    I don't recall that.
24       Q.    Don't recall, okay.  Had you on previous
```

1   and answered.

2       Q.    (By Mr. Ledbetter)   Do you agree with

3   that?

4                 MR. TALLEY:   Go ahead and answer,

5       last time.

6       Q.    (By Mr. Ledbetter)   Do you agree Dr.

7   Clemons -- do you agree with him when he says

8   that he could have ordered his position to be

9   changed or moved but left it alone, Clemons, Page

10  61, Lines 9 through 11?

11      A.    He could have told me to put him in a

12  different position.

13      Q.    And do you agree with Dr. Clemons who on

14  Page 25 of his deposition said, my experience at

15  LeBonheur is everybody leaving the operating room

16  is on supplemental oxygen, Page 25, Lines 21

17  through 24?   Do you agree with that?

18      A.    Always on -- did he say always on

19  supplemental oxygen?

20      Q.    My experience is everybody leaving is on

21  supplemental oxygen; in other words, was that a

22  custom?

23      A.    It's common, very common.

24      Q.    Okay.   Well, that will do it.   Now,