IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as
Parents of BRETT LOVELACE, deceased,

    Plaintiffs,

vs.

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and,
MARK P. CLEMONS,

    Defendants.

NO.:   2:13-cv-02289 dkv
JURY TRIAL DEMANDED

### PLAINTIFFS' PARTIAL MOTION IN LIMINE TO EXCLUDE DEFENDANTS', BABU RAO PAIDIPALLI AND PEDIATRIC ANESTHESIOLOGISTS, P.A., PROPOSED EXPERT WITNESS TESTIMONY OF TIMOTHY W. MARTIN, M.D., IRA LANDSMAN, M.D., DWAYNE ACCARDO, DIANE DOWDY, and EDWARD L. BRUNDICK, III, AT TRIAL AND BRIEF

Come the Plaintiffs, Daniel Lovelace and wife, Helen Lovelace, Individually, and as Parents of Brett Lovelace, deceased, by counsel, and for their Partial Motion In Limine to Exclude Defendants', Babu Rao Paidipalli and Pediatric Anesthesiologists, P.A., Proposed Expert Witness Testimony of Timothy W. Martin, M.D., Ira Landsman, M.D., Dwayne Accardo, Diane Dowdy, and Edward L. Brundick, III, at Trial and Brief, state:

### INTRODUCTORY STATEMENT

According to the Complaint, this litigation arose on March 12, 2012 due to the medical negligence of Defendants, Babu Rao Paidipalli and Mark P. Clemons, and Dr. Paidipalli's group, Pediatric Anesthesiologists, P.A. This suit was filed by the parents of Brett Lovelace, deceased, who are Daniel Lovelace and Helen Lovelace. Brett Lovelace, 12 years of age, entered Le

1

Bonheur Children's Hospital in Memphis, Tennessee on March 12, 2012, to undergo a tonsillectomy and adenoidectomy. The surgery was performed by Defendant, Mark P. Clemons; at the time, general anesthesia was administered to Brett Lovelace by Defendants, Babu Rao Paidipalli and Pediatric Anesthesiologists, P.A. The acts of negligence in this case arose in the O.R., during surgery, as well as in the PACU (Post-Anesthesia Care Unit or recovery room) afterwards. [See Expert Witness Report of Jason D. Kennedy, M.D., Exhibit G attached hereto]. Defendants, Babu Rao Paidipalli and Mark P. Clemons, have both admitted that (a) Brett Lovelace should have been on supplemental oxygen at all times; and (b) that such a patient should not be allowed to lie on his face on the gurney in the PACU or recovery room.

Due to substandard medical care of the Defendants, Brett suffered anoxic encephalopathy and died. The positional asphyxia suffered by Brett Lovelace in the PACU, which led to anoxic encephalopathy was due to Brett being positioned on his face on the gurney while still under the effect of anesthesia; his knees were bent under his chest/diaphragm; he was in a prone position in which his lungs and upper airways, viz., diaphragm, mouth, and nose, were compromised and obstructed; in fact, his mouth and nose were not patent to observers when he arrived in the PACU; his position was due to or compounded by the errors of the Defendants, who bungled the "hand-off" to the PACU nurse by leaving the patient without supplemental oxygen in the above-described prone, knees-to-chest position on his face. After coding in the PACU, Brett Lovelace died two (2) days later at Le Bonheur Children's Hospital from the anoxic encephalopathy that he suffered in the PACU as a result of a tonsillectomy gone bad.

The primary objections to the listed defense expert witnesses here are that they contradict statements under oath of the Defendant, Paidipalli, their patron, so as to revive his defense; they express opinions outside their respective areas of expertise and assert legal opinions; they also

offer opinions that lack reliability under any stated methodology, lack peer-review support, demonstrate no established rate-of-error, which opinions are also not shown to be generally accepted in the relevant medical community. Moreover, the opinions are "for this litigation" only, and are, thus, deficient.

1. Attached hereto is Defendants' Expert Disclosure containing the opinions of Timothy W. Martin, M.D. [Exhibit A]. Five (5) of Martin's opinions should be excluded at the trial of this case under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and Rules 701-703, F.R.E. The following opinions of Martin should be stricken: (A) prior to his transport to the PACU, the patient was awake, followed commands and breathed in the O.R.; (B) the patient's position in the PACU was not unsafe; (C) the only duty of Defendants in the PACU was when and if they were called to assist; (D) supplemental oxygen for the patient is not required in the PACU; and (E) Nurse Kelly Kish was grossly negligent. These opinions are to be excluded for the following reasons:

**DAUBERT[1] PROFILE OF OPINIONS**

| TEST | EVALUATION |
|---|---|
| Are opinions based upon scientific or medical evidence which has been tested and based upon a methodology that has been tested? | No. The witness cites no current standard, clinical guideline, text or authoritative source, nor does he use medical records to support his opinions. Further, the witness did not use reliable methods, ignored the eyewitness accounts of the parents and medical records that show that Brett Lovelace arrived in the PACU on "room air" (without oxygen) and was positioned on his face. Opinions (A), (B), (C), (D), and (E) are all subject to this defect. Regarding Opinion (A), Babu Rao Paidipalli admitted that Brett Lovelace was "not fully recovered" and that the PACU was where he was to be "fully awake" [Paidipalli Dep. 26:16-18; 30:6-11]; Clemons agreed that Brett Lovelace was not fully awake even when he saw him in the PACU [Clemons Dep. 49:2-6] [Exhibit F]. Helen Lovelace states that Brett Lovelace was never awake. [Helen Lovelace Dep. 41:4-21] [Exhibit F]. Opinion (B) is also contradicted by Babu Rao Paidipalli in his deposition wherein he admitted that no patient should be allowed to be positioned on his face. [Paidipalli Dep. 48:11-16] [Exhibit F]; Daniel Lovelace also testified that his son was on his face the entire time that he was in the PACU. [Daniel Lovelace Dep. 21:20-22; 23:20-24][Exhibit F]. Also, Opinion (B) is improper, based upon Exhibit 4 to the Deposition of Kelly Kish in paragraph 6 |

---

[1] <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 593-597 (1993).

| | |
|---|---|
| | wherein she states: "Upon arrival to the PACU, the patient positioned himself prone, with his legs drawn up under him, buttocks in the air, arms crossed over head, <u>and his face down on the mattress</u>. At no time did (Kelly Kish) change the patient's position nor did Dr. Clemons who saw it." [Exhibit 4 - Agreed Order; Kish Dep. 123:16-24][Exhibit F]. Nurse Kish also testified that Dr. Paidipalli and Grace Freeman, his CRNA, were "no shows" in the PACU. [Kish Dep. 117:3-17][Exhibit F]. Nurse Kish further testified that if she had been told to use supplemental oxygen or told to turn the patient from that position that she would have. However, neither doctor told her to do that, nor did Grace Freeman. [Kish Dep. 125:8-18; 125:19-23][Exhibit F]. Opinion (C) relative to the Defendants' duty is likewise lacking in support. What the witness appears to say is that an abandonment or improper termination of the doctor-patient relationship was perfectly agreeable. Numerous medical articles have been published on post-operative patient hand-overs and how to make them safer, <u>e.g.</u>, Anesth Analg 2012: 115:102-115, "Can We Make Post-Operative Patient Hand-Overs Safer? A Systematic Review of the Literature" [Exhibit F]. Moreover, the Recovery Position, not used for the patient by the physicians in this case, calls for an unconscious person to be placed in a supine position <u>so as to maintain an open airway as a conscious person would</u>. The purpose for this Recovery Position to be used in the PACU, which was not ordered by either physician, <u>is to prevent airway obstructions which can cause the patient to suffocate,</u> as here. This witness totally avoids mention of this. Under the A.S.A. Clinical Practice Guidelines, which Paidipalli was obliged to follow, <u>A.S.A. Guidelines for Patient Care in Anesthesiology</u> (October 19, 2011) in III, Guidelines for Anesthesia Care [Exhibit F], there are specific rules set out for pre-anesthetic care, peri-anesthetic care, and post-anesthetic care. Post-anesthetic care is found in III (E), 1-6, and details numerous duties of the anesthesiologist. The opinion of this witness flouts this Clinical Practice Guideline which required Paidipalli to ensure the availability of nursing personnel and equipment necessary for safe post-anesthetic care; to ensure adequate transfer of care information for the patient's specific needs in order to ensure a safe transition; said Clinical Practice Guideline further <u>required Paidipalli to remain with the patient as long as medically necessary until the receiving healthcare provider had all of the information needed and to ensure that the patient was discharged from the PACU unit in accordance with the policies established by the Department of Anesthesiology</u>. None of these standards were cited by this witness, and none of these tasks were performed or completed by Defendants. Next, in Opinion (D), this witness states that supplemental oxygen is not required. However, Dr. Paidipalli disagreed, said that it was required and that he did not know that the patient was not on supplemental oxygen, as he was supposed to be. [Paidipalli Dep. 18:13-23; 19:3-8; 39:5-16][Exhibit F]. Next, Opinion (E) that Nurse Kish was grossly negligent, is also improper. Although a jury might conclude that Nurse Kish was negligent, or even grossly negligent, such is not the province of a physician to make a legal determination or render legal conclusions. The opinion should be stricken as legal in nature and tenor. See Rules 701-703, F.R.E. |
| Were opinions subjected to peer-review or publication? | No. Opinion (A) is contrary to proof that Brett Lovelace was never awake; Opinion (B) is contrary to proof that Brett |

4

| | |
|---|---|
| | Lovelace was on his face the entire time while he was in the PACU; Opinion (C) is contrary to literature and guidelines in Anesthesia and Otolaryngology; Opinion (D) is contrary to the admissions and testimony of the Defendants; and (E) is a legal opinion that is contrary to Rules 701-703, F.R.E., and is devoid of any scientific basis, is outside the witness' area of competence, and is inadmissible. There is no peer-reviewed literature or guidelines sourced by the witness. Under the American Society of Anesthesiologists Guidelines for Expert Witness Qualifications and Testimony (A.S.A., October 16, 2013)[Exhibit F], under (B) Expert Witness Ethical Guidelines, it states the following as requirements that this witness (anesthesiologist) did not meet: (1) The physician's review of the medical facts should be truthful, thorough and impartial. The physician should not exclude any relevant information to create a view favoring either the Plaintiff or the Defendant; and (2) The physician's testimony should reflect scientific evidence and accepted practice standards prevalent at the time of the event in question. |
| Was a potential rate-of-error known for these opinions? | No. He gives opinions, only, and does not support them at all. This applies to Opinions (A) – (E). Pure ipse dixit. |
| Are the opinions generally accepted in the scientific community? | No. He failed to consult the records for the patient and failed to consider that his proffered standard of care opinions were directly contradicted by his employer/Defendant. Opinions (A) – (E) are speculative, weigh evidence, are legal in nature and tone, are unscientific and are simply "fact-filters." He disagrees with the "generally accepted standard" stated by both Drs. Paidipalli and Clemons. |
| Was the expert's research in the field conducted independent of litigation? | No. Martin adopts positions and opinions that are contrary to fact, contrary to Dr. Paidipalli, tender legal opinions or weighs the credibility of a witness. |

2.  Attached hereto is Defendants' Expert Disclosures containing the opinions of Ira Landsman, M.D. [Exhibit B]. Three (3) of Landsman's opinions should be excluded at the trial of this case under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Rules 701-703, F.R.E. The following opinions of the witness warrant exclusion: (A) the patient was awake and ventilating; (B) the patient was prone and the patient's head was to the side, a good position; and (C) Grace Freeman properly handled the transfer, and Defendants had no further duty to the child. These opinions are to be excluded for the following reasons:

**DAUBERT[2] PROFILE OF OPINIONS**

---

[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-597 (1993).

| TEST | EVALUATION |
|---|---|
| Are opinions based upon scientific or medical evidence which has been tested and by use of a methodology which has been tested? | No. No scientific evidence used; no testing done; no known methodology stated. The witness cites no standard, nor does he use medical records to support his opinions. Further, the witness did not use reliable methods, ignored the eyewitness accounts of the parents and medical records that show that Brett Lovelace arrived in the PACU on "room air" (without oxygen) and was positioned on his face. Opinion (A) is contrary to the testimony of the Plaintiffs who testified that Brett Lovelace was never "awake," as they were with him the entire time that he was in the PACU. Opinion (B) is contrary to testimony of Defendants that a patient should not be on their face or mouth, with impaired breathing which was the condition of the patient in the PACU, per the Plaintiffs, photos taken at the time, and Nurse Kish. Opinion (C) is also disputed, as no witness has placed Grace Freeman, a nurse anesthetist, or Dr. Paidipalli, in the PACU at a time when the "hand-off" occurred.<br><br>Regarding Opinion (A), Babu Rao Paidipalli admitted that Brett Lovelace was "not fully recovered" and that the PACU was where he was to be "fully awake." [Paidipalli Dep. 26:16-18; 30:6-11][Exhibit F]. Helen Lovelace states that Brett Lovelace was never awake. [Helen Lovelace Dep. 41:4-21][Exhibit F]. Opinion (B) is also contradicted by Babu Rao Paidipalli in his deposition wherein he admitted that no patient should be allowed to be positioned on his face. [Paidipalli Dep. 48:11-16][Exhibit F]; Daniel Lovelace also testified that his son was on his face the entire time that he was in the PACU. [Daniel Lovelace Dep. 21:20-22; 23:20-24][Exhibit F]. Opinion (C), relative to Grace Freeman, is likewise lacking in support. Grace Freeman did not attend the patient in the PACU. [Kish Dep. 117:3-17][Exhibit F]. What the witness appears to be saying is that an abandonment or improper termination of the doctor-patient relationship was perfectly agreeable. Numerous medical articles have been published on post-operative patient hand-overs and how to make them safer, e.g., Anesth Analg 2012: 115: 102-15, "Can We Make Post-Operative Patient Hand-Overs Safer? A Systematic Review of the Literature" [Exhibit F]. Moreover, the Recovery Position, not used for the patient by the physicians in this case, is for an unconscious person to be placed in a supine position so as to maintain an open airway as a conscious person would. The purpose for this Recovery Position in the PACU, which was not ordered by either physician, is to prevent airway obstruction which can cause the patient to suffocate, as here. Also, Opinion (B) is improper based upon Exhibit 4 to the Deposition of Kelly Kish in paragraph 6 wherein she states: "Upon arrival to the PACU, the patient positioned himself prone, with his legs drawn up under him, buttocks in the air, arms crossed over head, and his face down on the mattress. At no time did (Kelly Kish) change the patient's position nor did Dr. Clemons who saw it." [Exhibit 4 - Agreed Order; Kish Dep. 123:16-24][Exhibit F]. Nurse Kish also testified that Dr. Paidipalli and Grace Freeman, his CRNA, were "no shows" in the PACU. [Kish Dep. 117:3-17][Exhibit F]. Nurse Kish further testified that if she had been told to use supplemental oxygen or told to turn the patient from that position that she would have. However, neither doctor told her to do that. [Kish Dep. 125:8-18; 125:19-23][Exhibit F]. This witness totally avoids mention of this. Also, under the A.S.A. Clinical |

6

| | |
|---|---|
| | Practice Guidelines, which Paidipalli was obliged to follow, A.S.A. Guidelines for Patient Care in Anesthesiology (October 19, 2011) in III, Guidelines for Anesthesia Care [Exhibit F], there are specific rules set out for pre-anesthetic care, peri-anesthetic care, and post-anesthetic care. Post-anesthetic care in III (E), 1-6, details numerous duties on the part of an anesthesiologist. Opinion (C) of this witness flouts this clinical practice guideline, which required Paidipalli to ensure the availability of nursing personnel and equipment necessary for safe post-anesthetic care; to ensure adequate transfer of care information for the patient's specific needs in order to ensure a safe transition; said Clinical Practice Guidelines further required Paidipalli to remain with the patient as long as medically necessary until the receiving healthcare provider had all of the information needed and to ensure that the patient was discharged from the PACU unit in accordance with the policies established by the Department of Anesthesiology. None of these were cited by this witness and, unsurprisingly, none of these duties were properly performed by Defendant. |
| Were opinions subjected to peer-review or publication? | No. The witness does not support his opinions with a shred of authority, e.g., clinical guidelines, journals, testimony, except his own. This applies to Opinions (A) – (C). There is no peer-reviewed literature or source cited by the witness. Under the American Society of Anesthesiologists Guidelines for Expert Witness Qualifications and Testimony (A.S.A., October 16, 2013)[Exhibit F], under (B) Expert Witness Ethical Guidelines, it states the following as requirements that this witness (anesthesiologist) did not meet: (1) The physician's review of the medical facts should be truthful, thorough and impartial. The physician should not exclude any relevant information to create a view favoring either the plaintiff or the defendant; and (2) The physician's testimony should reflect scientific evidence and accepted practice standards prevalent at the time of the event in question. |
| Was a potential rate-of-error known for these opinions? | No. He gives opinions, only, and does not support them at all. This applies to Opinions (A) – (C). |
| Are the opinions generally accepted in the scientific community? | No. He failed to consult the records for the patient and the deposition testimony of Paidipalli, and thus failed to establish that his opinions were supported by the records, standard hospital practice, a known scientific community, the proof and testimony in the case. This applies to Opinions (A) – (C). In fact, his opinions are directly counter to the standard practice admitted under oath by and in the testimony of both Defendant physicians. |
| Was the expert's research in the field conducted independent of litigation? | No. All challenged opinions are specific to this case. Landsman has simply stated ipse dixit opinions that are contrary to fact, medicine, and are solely "for this litigation," as he cites no sources, guidelines, tests, texts or records, etc. This applies to Opinions (A) – (C). |

3.   Attached hereto is Defendants' Expert Disclosures with the opinions of Dwayne Accardo [Exhibit C]. Five (5) of Accardo's opinions should be excluded at the trial of this case under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Rules 701-703, F.R.E.

7

The following opinions of Accardo should be excluded: (A) defendants met the recognized standard of care in Memphis; (B) defendants had no duty to monitor a patient in the PACU; (C) the patient was awake in the O.R.; (D) a prone position is okay in the PACU; and (E) defendant verified 100% $O^2$ saturation of the patient in PACU. These opinions are to be excluded for the following reasons:

### DAUBERT[3] PROFILE OF OPINIONS

| TEST | EVALUATION |
|---|---|
| Are opinions based upon scientific or medical evidence which has been tested and by use of a methodology which has been tested? | No. Accardo is not a physician, but expresses an unqualified opinion that Defendants met the recognized standard of care of physicians in Memphis. No medical or scientific evidence was cited or used; no testing was done; no known medical basis or methodology therefore is stated. The witness does not cite any records of the patient. He is contradicted by the Defendants. Defendant, Paidipalli, failed to see the patient in the PACU, yet admits the patient was required to be on oxygen, yet failed to assure its use. Opinion (A) is unsupported by any iteration of a recognized standard or basis, or by the facts; Opinion (B) was directly counter to the A.S.A.. Clinical Practice Guidelines which delineate the specific PACU duties of an anesthesiologist, and ignores the Defendant's abandonment of the patient; Opinion (C) is contradicted by the parents, is not supported by Defendants and is pure ipse dixit, as Brett Lovelace was never awake in the PACU. As for Opinion (D), the knees-under-chest, prone position in which Brett Lovelace died on his face, without oxygen, of asphyxia, as his mouth was against the gurney surface, was the uncontroverted testimony of the parents. The witness ignores all proof that contradicts his proffered opinion; his métier is advocacy, not science. Regarding Opinion (E), no one, including Grace Freeman, has placed Defendant or Freeman, in the PACU so as to take the measurements that are the basis for this opinion. Further, the significance of the oxygen saturation readings in his proffered opinions are those of a mere nurse, and should be excluded as "medical expert testimony" addressing the standard of care of an M.D. Anesthesiologist. Further, Grace Freeman was not present in the PACU to take any such measurements, according to Nurse Kish, supra. |
| Were opinions subjected to peer-review or publication? | No. Opinions (A) – (E) cite no sources, texts, tests, journals, guidelines, or A.S.A. materials, and, in fact, are contrary to same; further, this nurse is unqualified and disallowed by the Tennessee nursing laws to render medical opinion testimony on the standard of care. |
| Was a potential rate-of-error known for these opinions? | No. He gives his opinions only; he neither cites nor sources any clinical guidelines, medical journal, records, text or study. Opinions (A) - (E) all suffer a like defect under this analysis. |

---

[3] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-597 (1993).

| | |
|---|---|
| Are the opinions generally accepted in the scientific community? | No. He failed to consult any standard, journal, text or guideline, is not an M.D., and offers no "hint" of an existing medical record, study or literature that agrees with him. Thus, the general acceptance of his opinions has not been established. |
| Was the expert's research in the field conducted independent of litigation? | No. All challenged Opinions (A) – (E) are specific to this case and were prepared "for this litigation" only. Pure ipse dixit. |

4.   Attached hereto is Defendants' Expert Disclosure containing the opinions of Diane Dowdy [Exhibit D]. Seven (7) of Dowdy's opinions warrant exclusion at the trial of this case, under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Rules 701-703, F.R.E. The following opinions of Dowdy should be stricken: (A) Nurse Kish did not put on cardiac monitor, which was negligent; (B) the failure to raise the head of the bed was negligent; (C) the patient's head was to the side, which was safe; (D) Nurse Kish failed to respond to patient gasps; (E) no other providers were guilty of a deviation of care; (F) physicians may rely on a PACU nurse; and (G) it was safe to leave the patient prone. These opinions are to be excluded for the following reasons:

**DAUBERT[4] PROFILE OF OPINIONS**

| TEST | EVALUATION |
|---|---|
| Are opinions based upon scientific or medical evidence which has been tested and by use of a methodology which has been tested? | No. The witness is a nurse; however, she chiefly renders medical and legal opinions for which she lacks a license or statutory authority (T.C.A. § 29-26-115), and which opinions are condemned by Rules 701-703, F.R.E. No scientific evidence was used; no testing done; no known methodology stated. The witness does not cite the prevailing and current in-service rule or standard at Le Bonheur, which does not require a cardiac monitor nor does she cite or use records from the patient's charts. She also contradicts the Defendant, her patron. Opinions (A) – (G) all suffer a lack of evidence, testing or any established authority or methodology of the witness to so opine. [A nurse, she is not permitted to render "standard-of-care" opinions pertaining to physicians]. |
| Were her opinions subjected to peer-review or publication? | No. Opinions (A) – (G) are totally unsupported by any peer-reviewed evidence cited in support by the witness. Pure ipse dixit. |
| Was a potential rate-of-error known or stated for these opinions? | No. All opinions are subject to this flaw. |
| Are her opinions generally accepted in the scientific | No. She is a nurse and exceeds the bounds and limits of her |

---

[4] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-597 (1993).

| | |
|---|---|
| community? | expertise; she contradicts Dr. Paidipalli and weighs testimony, serving as a selective "fact-finder." All of her opinions lack a basis in the record and the professional credentials to sustain them; her opinions contradict witnesses and selectively "skew" facts in a manner not acceptable to courts under Daubert. Opinions (A) – (G), suffer these defects. She, in fact, "adjudicates" fault without the use of any bases or authorities to support her "legal" opinions. These are unscientific opinions that are not generally accepted by any known scientific community. |
| Was the expert's research in the field conducted independent of litigation? | No. All challenged Opinions, viz., (A) – (G), are specific to this case. Dowdy is a mere nurse and exceeds her training, licensure and renders opinions "for this litigation," which unqualified opinions are contrary to fact, testimony and the records. Even her nursing opinions lack evidentiary support in the record. |

5.   Attached hereto is Defendants' Expert Disclosures containing the opinions of Edward L. Brundick, III [Exhibit E]. Brundick's opinions should be stricken before trial of this case under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) and Rules 701-703, F.R.E. All opinion testimony of Brundick should be stricken that is based upon fields in which he lacks expertise, viz. (i) psychology, (ii) career planning, (iii) learning disabilities, (iv) one's likelihood of having children, which opinions also lack peer-review support, credentials, and scientific basis or evidentiary support from those fields. Brundick provides no established rate-of-error; his opinions are not based upon data generally accepted by economists, and he uses only case-specific, "for this litigation only," factors, most of which are non-economic and, therefore, dehors the witness' area of "professed expertise." The witness had never previously qualified or been employed as an expert in these non-economic disciplines, or served as an actual economist.

In sum, his stated opinions warrant exclusion for the following reasons:

**DAUBERT[5] PROFILE OF OPINIONS**

---

[5] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-597 (1993).

| TEST | EVALUATION |
| --- | --- |
| Are opinions based upon scientific, mathematical or economic evidence which has been tested and by use of a methodology which has been tested? | No. No scientific, mathematical or economic evidence was used or determinative in the areas questioned; no testing done; no known methodology is stated. The witness does not cite current standards, nor does he properly use measurements or records from the decedent; he bases his opinions on anecdote and assumptions that are not scientific or which are outside any claimed area of expertise (economist). For expert testimony to be admissible: (1) it must be based on the specialized knowledge of the expert, and; (2) it must be helpful to the trier of fact. Brundick, who has never testified before as an expert, is a certified investment management analyst and a certified financial planner. He has a Bachelor's and Master's in Business Administration and a law degree. He is not a medical, psychological, or vocational expert. He has no medical or vocational training or work experience. He did not interview Brett. Nonetheless, Brundick opines that Brett, because of his learning disabilities, would not obtain any college education or bachelor's degree educational attainment, and that Brett would not likely graduate from high school. His opinions are solely based upon what defense attorneys told him or a review of various documents. First, Brundick does not have the specialized training or knowledge to enable and qualify him to testify on the impact of Brett Lovelace's learning disabilities upon his likely future educational attainment. Second, Brundick's opinion is not helpful to the trier of fact since jurors can read the various documents that Brundick read, and reach their own conclusions. Third, Brundick relies on statistics for his opinion on the calculation of Brett's loss, but he has no degree or background in mathematics, statistical analysis, or in economic forecasting. Fourth, his conclusion that Brett Lovelace will have children, likewise, is unscientific ipse dixit. His sole area of expertise is investments. |
| Were opinions subjected to peer-review or publication? | No. His opinions are based upon psychological, learning disability and career information of the sort in which the witness has no credentials or expertise sufficient to bridge the gap between anecdote, fact and an expert economist's opinion. He has soared too far afield from any field or discipline that might tether him to prior work, education or a job, to be credible. Pure ipse dixit. |
| Was a potential rate-of-error known for these opinions? | No. He gives opinions only. He states no rate-of-error. He ignores Daniel Lovelace's uncontroverted testimony that Brett Lovelace was a "math genius," concluding that he will never finish high school, despite testimony to the contrary from his parents, who were then home-schooling him. |
| Are the opinions generally accepted in the scientific community? | No. By definition, an economist is not a psychologist, vocational expert, or learning disability expert, or special ed. teacher. The witness expressed opinions that are outside his area of professed expertise [economist], which are mere advocacy. He draws a broken line to connect his unproven assumptions to his foregone conclusions. |
| Was the expert's research in the field conducted independent of litigation? | No. All challenged opinions are specific to this case. Brundick is an investment advisor, is no economist, and lacks expertise in the very matters upon which his opinions rest, viz., child psychology, learning disabilities, and special ed. training. |

11

6. The above opinions of Timothy W. Martin, M.D., Ira Landsman, M.D., Dwayne Accardo, CRNA, Diane Dowdy, RN, and Edward L. Brundick, III, are highly improper, amount to "fact-filters," are unsupported, and lack any foundation in science, mathematics, psychology, economics or medicine. Further, the opinions of Dowdy, Accardo and Brundick exceed the bounds of their stated areas of expertise; therefore, all such opinions should be excluded at the trial of this case, under the following authorities:

    a. <u>Daubert</u>, supra;

    b. Rules 701-703, Federal Rules of Evidence;

    c. <u>Masters v. Norfolk Southern Ry. Co</u>., 2012 WL 393805 (W.D. Pa. 2012) [held, experts may not "filter facts"];

    d. <u>Robb v. Burlington Northern & Santa Fe Ry. Co</u>., 100 F.Supp.2d 867, 872-874 (N.D. Ill. 2000) [held, testimony that simply omits or skews facts is unreliable, unhelpful and inadmissible as expert testimony];

    e. <u>Kimble v. Earle M. Jorgenson Company</u>, 358 Ill. App.3d 400, 404-410, 830 N.E.2d 814, 819-822, 294 Ill. Dec. 402 (Ill. App. 2005) [held, testimony that is no different than what a juror could have determined should be stricken];

    f. <u>Barbera v. 40 Broad Delaware</u>, 29 Misc. 3d 1231(A), 2010 WL 4983062 (N.Y. City Civ. Ct.) [held, expert testimony is excluded that is "within the ken of the typical juror," as it lacks scientific authority and is based upon no body of scientific data];

    g.    Oddi v. Ford Motor Co., 284 F.3d 136, 159 (3rd Cir. 2000) [held, expert's evidence is not necessary … if … the primary facts can be accurately and intelligibly described to the jury];

    h.    Reedy v. CSX Transp., Inc., 2007 WL 1469047, *3 (W.D. Pa. May 18, 2007) [held, experts are not to "fact-filter" the evidence to support a party] [attached hereto as Exhibit F];

    i.    Polzo v. County of Essex, 196 N.J. 569, 960 A.2d 375 (N.J. 2008) [held, bald conclusions that are "net opinions" are not admissible as expert testimony];

    j.    Jackson v. City of Pittsburgh, 2010 WL3222137 (W.D. Pa. 2010) [unreported] [held, expert opinions that are offered that are more akin to advocacy or legal arguments, subvert the court's and jury's functions; credibility assessments of other witnesses are also improper expert testimony; expert opinion that is rife with advocacy and improper legal conclusions should be stricken] [attached hereto as Exhibit F]; and

    k.    Nashville Railway & Light Company v. W.H. Harrison, et al., 5 Tenn.App. 22, 1927 WL 2104 (Tenn.Ct.App.) [held, an expert witness may not be allowed to testify as to matters which are accorded to the common every day observation of ordinary persons].

7.    Judicial Estoppel, Estoppel by Oath. Defendants' Babu Rao Paidipalli and Pediatric Anesthesiologists, P.A., under Werne v. Sanderson, 954 S.W.2d 742 (Tenn. App. 1997), should be judicially estopped to assert in their defense of this case that supplemental oxygen was not a standard requirement for Brett Lovelace in transit to, as well as in, the PACU,

as Dr. Paidipalli testified in his deposition, under oath, that such was the standard. In fact, he reaffirmed this on several occasions. [Paidipalli Dep. 18:13-23; 19:3-8, 39:5-16] [Exhibit F]. See also Stearns Coal & Lumber Co. v. Jamestown R. Co., 131 Tenn. 203, 208, S.W. 334 (1919); In the Matter of the Guardianship of R.D.M., 306 S.W.3d 731 (Tenn. App. 2010; County of Obion v. McKinnis, 211 Tenn. 183, 364 S.W.2d 356, 357 (1962); Ryan v. Stanger Investment Co., 620 S.W.2d 505 (Tenn. App. 1981); Werne v. Sanderson, 954 S.W.2d 742, 745 (Tenn. App. 1997); Bubis v. Blackman, 435 S.W.2d 492 (Tenn. App. 1968); Pruitt v. Cantrell, 264 S.W.2d 793 (Tenn. 1954). The twin doctrines of judicial estoppel and estoppel by oath, bar Defendants' experts listed above from offering testimony to the effect that supplemental oxygen was not customary, required or standard for patients like Brett Lovelace at Le Bonheur. Further, Defendants' experts should likewise be judicially estopped and bound under estoppel by oath not to assert that the prone, face-down position of the Plaintiff, Brett Lovelace, in the PACU, was consistent with ordinary care or was in fact safe. Dr. Paidipalli, in his deposition, admitted under oath that such position for a patient like Brett Lovelace in the PACU was not safe and was not an approved position. [Paidipalli Dep. 48:11-16] [Exhibit F]. No expert witness or counsel should be permitted to assert a defense or present argument or opinion to the contrary of what Defendant previously testified to under oath in this case. Stearns, supra; et al.

  WHEREFORE, PREMISES CONSIDERED, Plaintiffs, Daniel Lovelace and wife, Helen Lovelace, Individually, and as Parents of Brett Lovelace, as Movants, pray that the Court rule and order, in limine, that Defendants', Babu Rao Paidipalli and Pediatric Anesthesiologists, P.A., proffered experts, Timothy W. Martin, M.D., Ira Landsman, M.D., Dwayne Accardo, CRNA, Diane Dowdy, R.N., and Edward L. Brundick, III, not be permitted to testify by opinion as to the matters detailed in Paragraphs 1 - 7, supra, upon the authority and precedents herein cited; and

that Defendants be judicially estopped or estopped by oath, to deny that (a) supplemental oxygen was necessary for Brett Lovelace in the PACU and an accepted standard and local practice in this case, or deny that (b) the prone position of the patient, Brett Lovelace, in the PACU was contrary to the accepted local practice and prevailing standards followed and to be used by Defendants at the time and place of this incident.

## REQUEST FOR HEARING ON MOTION

Plaintiffs, pursuant to Rules 103, 104 and 105, F.R.E., pray for a hearing on this Motion so as to determine which opinions addressed by this Motion shall be excluded or limited at trial.

Respectfully submitted,

**HALLIBURTON & LEDBETTER**

/s/ Mark Ledbetter
Mark Ledbetter (BPR #17637)
254 Court Avenue - Suite 305
Memphis, TN 38103
(901) 523-8153
Mark794@aol.com
Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via the Court's ECF filing system this 8th day of August, 2014:

J. Kimbrough Johnson/Marcy Dodds Magee/Margaret Cooper
2900 One Commerce Square
40 S. Main Street
Memphis, TN  38103
Attorneys for Mark Clemons
901/525-8721-phone
jjohnson@lewisthomason.com
mmagee@lewisthomason.com
mcooper@lewisthomason.com


Brad Gilmer/Jerry Potter/Karen Koplon/David Cook
The Hardison Law Firm
119 S. Main Street, Suite 800
Memphis, TN  38103
Attorneys for Babu R. Paidipalli & Pediatric Anesthesiologists, P.A.
901/525-8776 – phone
Bgilmer@hard-law.com
jpotter@hard-law.com
kkoplon@hard-law.com
dcook@hard-law.com

            /s/ Mark Ledbetter
            Mark Ledbetter, Certifying Attorney