# EXHIBIT E

*Excerpts from Depositions of:* Mark P. Clemons, M.D., Babu Rao Paidipalli, M.D., and Kelly Kish, R.N.

\*

Pediatric Otolaryngology Principles and Practice Pathways, Wetmore, *et al.*, 585-586

\*

Airway Obstructions/Respiratory Complications @ 595, *Id.*

\*

Reedy v. CSX Transp., Inc., 2007 WL 1469047, \*3 (W.D. Pa. May 18, 2007)

\*

Jackson v. City of Pittsburgh, 2010 WL3222137 (W.D. Pa. 2010)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE


DANIEL LOVELACE AND      )
HELEN LOVELACE,          )
INDIVIDUALLY AND AS      )
PARENTS OF BRETT         )
LOVELACE, DECEASED,      )
                         )
                         )
    Plaintiffs,          )
VS.                      )      2:13-CV-02289dkv
                         )
                         )
PEDIATRIC                )
ANESTHESIOLOGIST, P.     )
A. BABU RAO              )
PAIDIPALLI, AND MARK     )
P. CLEMONS,              )
                         )
                         )
    Defendants.          )

_____


DEPOSITION

OF

MARK CLEMONS, M.D.


February 6, 2014

*ORIGINAL*


MID-SOUTH REPORTING
Pepper Glenn, CCR
P. O. Box 609
Southaven, Mississippi 38671
(901) 525-1022

1    did you ever look at the Physicians' Desk

2    Reference to study Fentanyl's warnings?

3         A.        No, as I don't give Fentanyl.

4         Q.        Did you, on March 12, 2012, know that

5    there were specific warnings about respiratory

6    suppression, an alteration in the respiratory

7    rate of patients given the drugs?

8         A.        No, I did not know this.

9         Q.        So you lack knowledge of the FDA

10   approved warnings that applied to these drugs

11   that were given to Brett Lovelace by

12   Dr. Paidipalli?

13        A.        Correct.

14        Q.        Now, when Brett Lovelace reached the

15   recovery room -- which I'm going to call PACU or

16   I may call it recovery.

17        A.        We prefer recovery room, too.

18        Q.        Okay.  It's interchangeable.  He was

19   not -- this is a question, not an answer.  He was

20   not on supplemental oxygen at that time, was he?

21        A.        My experience at LeBonheur is

22   everybody leaving the operating room is on

23   supplemental oxygen.

24        Q.        Do you recall him --

1    Q.      Do you know what a lateral position
2  is?
3    A.      On their side.
4    Q.      Okay.  Is that -- would that have been
5  a proper position for Brett to have been -- been
6  in, is on his side?  Would that have been an
7  effective --
8    A.      Commonly.
9            MR. GILMER:  Object to the
10      form.
11  BY MR. LEDBETTER:
12    Q.      Would that have been an effective
13  position for him to have been in?
14    A.      On the side would have been a good
15  position.
16    Q.      All right.  Now, at the time that you
17  departed the PACU after Brett Lovelace's surgery,
18  did you leave any orders for the attending nurse
19  in the PACU to put him in a different position
20  such as a lateral position or a Fowler's
21  position?
22    A.      I don't routinely tell the nurse to
23  put them in any particular position.  The
24  recovery room has its procedures to get people

1    awake and kids move around, but I had no -- I

2    don't believe I had any orders for any particular

3    position.

4        Q.        Now, would you agree that the lateral

5    position, which is also a Sims' position I'll

6    reference, you would have been able to observe

7    whether or not Brett Lovelace's airway was

8    functional -- his upper airway was functional,

9    could you not have?

10       A.        What you would better observe is

11   whether he was drooling or bleeding in the

12   lateral position, whether he was breathing or

13   not.  I don't know that that would have helped

14   you.

15       Q.        Okay.  Now, had you left him with

16   orders for supplemental oxygen, that would also

17   have been prudent if no one had, would it not

18   have?

19             MR. JOHNSON:  Objection.

20       A.        My experience is they roll out of the

21   operating room on oxygen whether I order it or

22   not.

23   BY MR. LEDBETTER:

24       Q.        But you did not verify that?

1    A.        No, I don't believe so.

2    Q.        Now, when it comes to doing this type

3  of surgery, what is called a T&A, do you agree

4  that it requires, between you and the

5  anesthesiologist, a high degree of cooperation

6  because you are sharing airway?

7    A.        We do share the airway.

8    Q.        Okay.  And you must jointly assure

9  that oxygen is provided to the patient, agree?

10    A.        Oxygen should be provided to the

11  patient.

12    Q.        And must jointly assure that carbon

13  dioxide is eliminated?

14    A.        If you're ventilating the patient,

15  oxygen is going in and carbon dioxide is going

16  out.

17    Q.        Okay.  But you understand -- you agree

18  that it's your joint goal to make sure that

19  carbon dioxide is eliminated?  In other words, it

20  isn't pooled so that they develop hypercapnia

21  or --

22    A.        Respire.  Oxygen goes in and carbon

23  dioxide goes out.

24    Q.        And you must both assure that there is

*IN THE UNITED STATES DISTRICT COURT*

*FOR THE WESTERN DISTRICT OF TENNESSEE*

| | |
|---|---|
| DANIEL LOVELACE AND HELEN LOVELACE, Individually, and as Parents of BRETT LOVELACE, Deceased | ) ) ) ) ) |
| Plaintiff, | ) ) |
| VS. | )NO. 2:13-cv-02289 dkv ) |
| PEDIATRIC ANESTHESIOLOGISTS, PA; BABU RAO PAIDIPALLI and MARK P. CLEMONS , | ) ) ) ) |
| Defendants. | ) |

*DEPOSITION OF BABU RAO PAIDIPALLI, M.D.*

**January 9, 2014**

*MIDSOUTH REPORTING SERVICE*

*LU ANNE R. DUDLEY, CSR, LCR #349*
*P.O. BOX 1631*
*CORDOVA, TENNESSEE 38088*
*(901) 525-1022*

1    better because the tongue will fall out and the

2    bleeding, if there is any bleeding, they will be in

3    what is called post-tonsillectomy position.   It is

4    semi prone.   That is laying on the side.

5    (Indicating.)

6    Q         Well, this idea of a semi-prone position is

7    an old position that goes back to the fifties, does

8    it not?

9              It is not a current --

10   A         I don't know.

11   Q         Okay.  Well, current practice concerning

12   the apnea that we are discussing is not to allow them

13   being on their face because that blocks the airway.

14   A         No patient should be.  It doesn't matter

15   whether it is sleep apnea patient or any patient

16   should not be on the mouth in the bed.

17                        MR. LEDBETTER:  Okay.  I think

18                   we need to probably change a tape.

19                        MR. COOK:  All right.  Shall

20                   we take a short break, please.

21                        VIDEOGRAPHER:  Off the record

22                   at 11:02 a.m.

23                        (Brief recess.)

24                        VIDEOGRAPHER:  Back on the

25                   record at 11:10 a.m.

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TENNESSEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually
and as Parents of BRETT
LOVELACE, Deceased,

        Plaintiff,

v.                Case Number 2:13-cv-02289

PEDIATRIC ANESTHESIOLOGISTS,
P.A., BABU RAO PAIDIPALLI, and
MARK P. CLEMONS,

        Defendant.


VIDEOTAPE DEPOSITION

OF

KELLY KISH


May 15, 2014





JILL W. HODGES, RPR, LCR #380
P O BOX 381722
Germantown, Tennessee  38138-1722
(901) 335-7952

R I V E R S I D E    R E P O R T I N G

1   not seen the orders since I took care of him that

2   day.   We use our judgment.

3        Q.   Well, sitting here today -- I wouldn't

4   ask you this if I thought this was false -- is it

5   your best understanding that he was neither

6   delivered with supplemental oxygen nor was there

7   an order that he continue to have it?

8                  MR. GILMER:   Let me object.   You've

9             asked this question about ten times

10            in about ten different ways.

11       Q.   (By Mr. Ledbetter)   So it's ten

12   questions.   Do you remember it?

13                 MS. MAGEE:   Object to the form.

14                 MR. TALLEY:   Go ahead and answer.

15       A.   It is my recollection he did not come to

16   me on oxygen when he came from the O.R.

17       Q.   Now, could you tell me whether Dr.

18   Paidipalli insured that Brett Lovelace was safely

19   discharged from the PACU?

20                 MR. GILMER:   Object to the form.

21       Q.   (By Mr. Ledbetter)   In accordance with

22   LeBonheur's policies?   Did he insure that?

23                 MR. GILMER:   Object to the form.

24       A.   That he was discharged?

1          MS. MAGEE:  Same objection.

2     A.    I do not remember having a patient like

3  that.

4     Q.    What was the common, customary and

5  accepted position for a child of that age who had

6  had a tonsillectomy as they delivered to you?

7          MS. MAGEE:  Object to form.

8          MR. GILMER:  Object.

9     Q.    (By Mr. Ledbetter)  What's the common,

10  accepted position that they came in?

11          MS. MAGEE:  Object to the form.

12          MR. GILMER:  Same.

13          MR. TALLEY:  Go ahead and answer.

14     A.    They normally would be in a

15  semi-Fowler's position.

16     Q.    You better state that clearly for them.

17     A.    A semi-Fowler's position.  Usually

18  that's supine with the head of the bed elevated a

19  little bit.

20     Q.    And why is that the right way to

21  position someone who's had a tonsillectomy and

22  adenoidectomy?

23          MR. GILMER:  Object to the form.

24          MS. MAGEE:  Join the objection.

1          MR. TALLEY:   If you can answer.

2      A.    Well, that's the most common position

3  for most of our post-op patients to be able, you

4  know, with the head of their bed up a little bit

5  so that they're -- easier for them to breathe

6  instead of being flat with the head up a little

7  20 or 30 degrees.

8      Q.    What about mucus and then blood and such

9  things as that coming out freely rather than

10  pooling?

11          MS. MAGEE:   Object to the form.

12          MR. GILMER:   Object to the form.

13      Q.    (By Mr. Ledbetter)   Is that one reason

14  also that the secretions that came from the

15  surgery could come out?

16          MS. MAGEE:   Same objection.

17      A.    It's possible that that would be a

18  reason.

19      Q.    Okay.   After Brett was turned over,

20  did -- turned over after the code or before the

21  code was called, did you observe a pool of mucus

22  and blood where his face had been on the gurney?

23      A.    I don't recall that.

24      Q.    Don't recall, okay.   Had you on previous

1    and answered.

2        Q.    (By Mr. Ledbetter)   Do you agree with

3    that?

4                    MR. TALLEY:   Go ahead and answer,

5            last time.

6        Q.    (By Mr. Ledbetter)   Do you agree Dr.

7    Clemons -- do you agree with him when he says

8    that he could have ordered his position to be

9    changed or moved but left it alone, Clemons, Page

10   61, Lines 9 through 11?

11       A.    He could have told me to put him in a

12   different position.

13       Q.    And do you agree with Dr. Clemons who on

14   Page 25 of his deposition said, my experience at

15   LeBonheur is everybody leaving the operating room

16   is on supplemental oxygen, Page 25, Lines 21

17   through 24?   Do you agree with that?

18       A.    Always on -- did he say always on

19   supplemental oxygen?

20       Q.    My experience is everybody leaving is on

21   supplemental oxygen; in other words, was that a

22   custom?

23       A.    It's common, very common.

24       Q.    Okay.   Well, that will do it.   Now,

# Pediatric Otolaryngology

## Principles and Practice Pathways

Ralph F. Wetmore
Harlan R. Muntz
Trevor J. McGill

**Second Edition**



⊛ Thieme

## ■ Indications for Surgery

As with any surgical procedures that have been practiced for long time, the indications for tonsil and adenoid surgery have often changed both in type and incidence over the life of their use. Tonsil and adenoid surgery initially found favor for treatment of recurrent streptococcal infection and chronic adenotonsillitis, but currently these procedures are performed more commonly for upper airway obstruction and sleep disordered breathing. In addition to these two major indications, there are several minor indications for one or both procedures.

> **Special Consideration**
>
> The indications for tonsillectomy and adenoidectomy have changed both in type and incidence over the life of their use.

---

**At a Glance**

Indications for Tonsillectomy with or without Adenoidectomy

Recurrent infection/chronic tonsillitis

Streptococcal carriage

Airway obstruction/sleep disordered breathing ✓

Peritonsillar abscess

Cryptic tonsillitis/hemorrhagic tonsillitis

Periodic fever, aphthous-stomatitis, pharyngitis, and cervical adenopathy (PFAPA) syndrome/pediatric autoimmune neuropsychiatric disorders associated with streptococcal infection (PANDAS) syndrome

Tonsillar asymmetry/suspicion of malignancy

Effects on dental and facial growth

---

### Recurrent Infection/Chronic Tonsillitis

Prior to the 20th century, physicians had very limited treatment options when dealing with recurrent streptococcal infections and their serious sequelae—rheumatic fever and heart disease. Penicillin, an effective treatment, would remain undiscovered for a few more decades, but, as noted, development of new techniques of tonsillectomy and adenoidectomy during the early 20th century, that were both effective and safer, gave new hope to counter one of the major public health issues of the time. For this reason, tonsillectomy and adenoidectomy grew in popularity to become the most common surgical procedure performed in children (aside from circumcision) until the development of myringotomy with tubes in the 1960s. Because the indications for surgery were not well-defined and the procedure was performed by a variety of physicians, many of whom had little surgical training in disorders of the throat, both tonsillectomy and adenoidectomy were utilized for a variety of conditions including viral infections, chronic sore throats, recurrent acute otitis media, and other poorly defined maladies. The medical literature is laden with thousands of articles supporting the value, or lack thereof, of tonsillectomy in the treatment of chronic pharyngotonsillitis. In an effort to make sense of the infectious indications for tonsillectomy and adenoidectomy, Paradise, Bluestone and colleagues initiated two Children's Hospital of Pittsburgh studies to examine this problem.[6,7] Inclusion criteria for the 1984 study are included in **Table 38.1**. In this randomized trial the incidence of throat infection was significantly lower in the surgical group compared with the nonsurgical group for the first 2 years (92% vs. 34%, 84% vs. 41%). Although the third year differences were not statistically significant, the statistics again favored the surgical group. The authors of this trial concluded that children who met these strict criteria should be considered candidates for surgery.

In the 2002 study, inclusion criteria were much less stringent than in the previous study. As in the previous study, children in the surgical group had significantly less throat infections compared with the control group, although the incidence of infections in the control group over the three follow-up years was also small. The authors concluded that the little benefit from surgery was not worth the risks of the procedure.

Blakely and Magit[8] performed a meta-analysis of four randomized controlled trials including both of the Pittsburgh studies and found that tonsillectomy resulted in a 43% reduction in the incidence of pharyngitis. The authors concluded that tonsillectomy reduced the incidence of recurrent pharyngitis to a moderate degree. Burton et al.[9] also performed a review of five studies (four in children

**Table 38.1   Paradise Criteria for Tonsillectomy[6]**

| Frequency of infection |
| --- |
| 7 episodes in 1 year OR |
| 5 episodes in each of 2 years OR |
| 3 episodes in each of 3 years |
| Each episode characterized by one of following: |
| 1. Oral temperature of 101°F (38.3°C) or higher |
| 2. Enlarged (>2 cm) or tender anterior cervical lymph nodes |
| 3. Tonsillar exudates |
| 4. Positive culture for GABHS |
| Adequate antibiotic therapy must have been administered for proven or suspected streptococcal episodes. |
| Each episode must have been confirmed by examination and its qualifying features described in a clinical record at the time of occurrence. |

*Abbreviations:* GABHS, group A beta-hemolytic streptococcus.

and one in adults) and concluded that adenotonsillectomy was effective in reducing the number of episodes of sore throat and days with sore throat, and reported that more severely affected children were more likely to benefit from a surgical procedure.

Although it is easy to recommend surgery for patients who present with seven documented streptococcal infections in 1 year, one needs to weigh both the risks and benefits of performing a surgical procedure with significant morbidity in the early postoperative period and rare, but ever present, mortality. Occasionally, a young child with recurrent viral exudative tonsillitis may suffer enough that the benefits of adenotonsillectomy outweigh the risks. Likewise, teenagers with recurrent throat infections over a several year period also benefit in many cases, but careful thought should be given on an individual basis in making a recommendation for surgery.

## Streptococcal Carriage

Some children carry the group A beta-hemolytic streptococcus (GABHS) bacteria but are asymptomatic. These streptococcal carriers may result from an infection that fails to completely clear or may include patients who are colonized with the streptococcal organism but fail to exhibit symptoms. In these cases the streptococcal organism can become attached to biofilms, a bacterial community, rather than an attachment of single bacterial cells, that exists within the tonsillar crypts.[10] Bacteria within biofilms are typically difficult to eradicate with antibiotics—a factor that explains why the carriage state is often difficult to eliminate.

Assessment of anti-GABHS antibody titers may give some indication as to whether the child is in a carrier state or has an indolent infection. The two titers most frequently examined are anti-streptolysin O (ASO) and anti-DNase B (ADB). In the past a positive throat culture and elevated titers were consistent with an active streptococcal infection, whereas a positive throat culture and nonelevated titers were consistent with a carrier state. The presence of a carrier state is concerning for several reasons. One is that a streptococcal carrier may convert to an active infectious state or may pass the infection on to another family member or schoolmate. James et al.[11] reported the incidence of the spread of infection from streptococcal carriers to other family members as being only 9%, so the true incidence of streptococcal infection being passed by carriers may be small. On the other hand, Johnson et al. recently examined the role of antibody titers and active infection and demonstrated that it is the change in titers, rather than an absolute value, that determines the presence of an active infection.[12] If one is going to use antibody levels to demonstrate the clearance of an active infection, then at least two levels need to be compared to demonstrate clearance of infection—one single titer is not enough. Johnson et al. also suggested that following two different antibody types (e.g., ASO, ADB) is

more accurate in defining infection than using just one antibody type.[12]

### Special Consideration

A change in antibody titers, not the absolute value, determines the clearance of an active streptococcal infection.

Treatment of the carrier state should be considered when there is a family history of rheumatic fever, a history of acute glomerulonephritis, a history of "ping-pong" spread of disease through a family or the carrier is in a school experiencing a GABHS epidemic. Medical treatment to reduce carriage includes amoxicillin-clavulanate, clindamycin, or rifampin. Tonsillectomy should be considered in resistant cases.

## Airway Obstruction/ Sleep Disordered Breathing

Obstructive sleep apnea has been estimated to affect ~1 to 2% of children, and the overwhelming cause of sleep disordered breathing (SDB) in children is the result of adenoid and tonsillar hyperplasia.[13] Although severe symptoms such as right heart failure were recognized to result from adenotonsillar hypertrophy as far back as 1965, more subtle signs of SDB due to adenotonsillar hyperplasia have become more commonly recognized since the proliferation of pediatric sleep centers in the past decade and the demonstration of sleep norms in pediatric patients by Marcus in 1992.[14,15] Current standards and indications for pediatric polysomnography were outlined by the American Thoracic Society in 1996,[16] and a more detailed discussion of pediatric SDB and obstructive sleep apnea syndrome (OSAS) can be found in Chapter 37.

In addition to cardiovascular effects, such as pulmonary hypertension and elevation of systemic blood pressure, SDB is also responsible for a variety of other problems in children including effects on growth hormone secretion, neurobehavioral abnormalities, and enuresis.[17–23] Treatment of the underlying airway obstruction with tonsillectomy and adenoidectomy results in improvements in all of these conditions in affected patients. In addition to improved sleep, relief of upper airway obstruction results in weight gain due to enhancement in the sense of smell (improved nasal breathing), ability to chew and breathe at the same time, disappearance of dysphagia for solid foods, and less expenditure of calories for breathing, especially during nighttime.

Although history and physical examination may be sufficient to consider surgical intervention in many patients with SDB, polysomnography still remains the gold standard in documenting the degree of nighttime obstruction.[24] The most important factors in reviewing polysomnography include the apnea-hypopnea index (AHI; the number of apneas/hypopneas per hour), oxygen desaturation as

room for exploration and control. Secondary bleeding occurs any time after the first 24 hours but is seen most commonly between 5 and 10 days postoperatively. Occasionally delayed hemorrhage can occur as late as a month, but up to 14 days postoperatively is more typical. Retained adenoid tissue has been blamed as the cause for secondary hemorrhage following adenoidectomy, although the occurrence of delayed bleeding following adenoidectomy is rare.[84] The cause of secondary hemorrhage following tonsillectomy appears to be variable. Some authors cite surgical technique as the major cause. Surgical ties may occasionally loosen and fall off. Suture ligature prevents that occurrence but may result in more extensive bleeding if the suture needle is inserted too deeply into the tonsillar fossa, injuring the wall of a larger vessel. Electrocautery has been implicated as a cause, with higher diathermy power settings more likely to cause bleeding than lower settings.[86] Gallagher et al. showed lower rates of postoperative hemorrhage with the use of the microdebrider compared with coblation and electrocautery.[87]

Other factors may play a role in the increased incidence of secondary hemorrhage. Patients that are dehydrated appear to have a higher incidence of bleeding. Often the patient exhibits a prodrome of increased pain and poor hydration, followed by an episode of bleeding. D'Agostino et al. showed a statistically significant occurrence of secondary hemorrhage at nighttime, compared with daytime, with two periods (from 10 PM to 1 AM, and 6 to 9 AM) being of highest frequency.[88] Comparison of chronic tonsillitis and airway obstruction demonstrates that chronic tonsillitis is a risk factor for a higher incidence of delayed hemorrhage.[89] Giger et al. showed an increased risk of delayed hemorrhage in quinsy tonsillectomy patients, with the nonabscess side being affected more often than the infected side.[90] The incidence of secondary hemorrhage increases with age,[89] a factor probably related to the size of blood vessels feeding the tonsils and the presence of scar tissue and fibrosis around the capsule which is the result of recurrent infection. Myssiorek and Alvi reported that excessive intraoperative blood loss and elevated mean arterial pressure postoperatively were also risk factors for bleeding.[89]

The treatment of secondary hemorrhage is dependent on the amount of bleeding, the number of episodes, and the presence of a clot in the fossa. Brief minor episodes of bleeding can be managed by observation. Depending on the amount of bleeding, the patient should be kept nothing by mouth (NPO) and hydrated with intravenous fluids. Some clinicians favor having the child chew on ice chips to prevent any further bleeding. The presence of a clot in the fossa is suggestive of a blood vessel that is intermittently bleeding or oozing, and more aggressive treatment including exploration of the fossa in the operating room should be considered. Active bleeding or recurrent bouts of bleeding should result in immediate operative exploration. Recurrent bleeding may also be a sign of a coagulation defect, and hematology consultation should be considered

in those cases. The rate of blood transfusion in postoperative hemorrhage patients ranges from 0 to 2.3% in several series.[91]

## Airway Obstruction/Respiratory Complications

The second major category of complications that results from tonsil and adenoid surgery is upper airway and respiratory compromise during the perioperative period. As noted previously, the major indication for tonsil and adenoid surgery today is for SDB and OSAS. Many children are not immediately better following tonsil and adenoid surgery, and some actually may be worse. Necessary respiratory support includes supplemental oxygen, suctioning, repositioning the child, and, occasionally, use of a nasal airway. Failure of improvement with this support is an indication for more intensive postoperative observation in an intensive care unit setting. 

### Special Consideration

Many children remain symptomatic following tonsil and adenoid surgery for a few days, and some children may be actually worse.

In a series by Sanders et al. most respiratory complications were seen during the induction of anesthesia or emergence from anesthesia.[92] Premedication did not result in any significant complications, but many of the children with OSAS took longer to reach stage 3 of anesthesia, and many patients had associated episodes of pharyngeal obstruction, breath holding, and oxygen desaturation. These children also had prolonged emergence and time to extubation. Following surgery, these children were more likely to need supplemental oxygen, an oral or nasal airway or other respiratory support.[92] The need for medical intervention postoperatively was greater in a group of children with OSAS, compared with a non-OSAS group (F-9). Low weight, severity of OSAS and young age (<3 years of age) all correlated with an increased risk of respiratory complications.[92] Satham et al. also reported an increase in respiratory complications in children younger than age 3.[93] Biavati et al. reported on a comparison of medical conditions versus an abnormal chest radiograph or electrocardiogram prior to surgery as a predictor of respiratory complications. Five medical conditions—cerebral palsy, seizures, age <3, congenital heart disease, and prematurity—were all better predictors of postoperative obstruction than obtaining a chest radiograph or electocardiography.[94]

Down syndrome patients present a particular challenge because of a high incidence of OSAS, anatomical abnormalities (midfacial and mandibular hypoplasia, narrow nasopharynx, macroglossia), increased secretions, and hypotonia.[95] Goldstein et al. noted that interventions such as supplemental oxygen, positioning of the child, insertion of a nasal airway, administration of racemic epinephrine,

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
**(Cite as: 2007 WL 1469047 (W.D.Pa.))**

c

United States District Court,
W.D. Pennsylvania.
Dennis REEDY, Plaintiff,
v.
CSX TRANSPORTATION, INC., t/d/b/a CSX, De-
fendant.

Civil Action No. 06-758.
May 18, 2007.

Charles A. Frankovic, Pribanic & Pribanic, Pittsburgh,
PA, for Plaintiff.

Anthony J. Rash, Dickie, McCamey & Chilcote,
Pittsburgh, PA, for Defendant.

### OPINION AND ORDER
FRANCIS X. CAIAZZA, U.S. Magistrate Judge.
#### I. OPINION
**\*1** The parties' cross-motions to exclude the tes-
timony of the others' liability experts (*see* Docs. 15
and 17) will be denied, consistent with the analyses
below.[FN1]

> FN1. Although there is little definitive case
> law on the issue of whether a motion to strike
> an expert is considered a non-dispositive
> matter subject to resolution by a magistrate
> judge, at least one court has expressly so
> held, and several others have suggested in
> passing the same. *Coppedge v. K.B.I., Inc.,*
> 2007 WL 397495, \*1 n. 1 (E.D.Tex. Feb. 1,
> 2007) (reviewing cases). Given the timeli-
> ness concerns raised by the parties' pending
> mediation on June 7, 2007, *see* Doc. 14, the
> undersigned will eschew the report and
> recommendation process and follow the law

permitting magistrate judge review. Im-
portantly, the court notes that this is not a
case where an unfavorable *Daubert* ruling is
dispositive of the Plaintiff's claims. *Cf., e.g.,*
*Quinby v. Plumsteadville Family Practice,*
*Inc.,* 907 A.2d 1061, 1070-71 (2006) ("[w]ith
all but the most self-evident medical mal-
practice actions," plaintiff "must provide a
medical expert who will testify as to the el-
ements of duty, breach, and causation") (ci-
tation omitted).

### BACKGROUND
In this diversity action, the Plaintiff Dennis Reedy
claims negligence against the Defendant CSX for
injuries sustained on his job at Keystone Iron & Metal
Co. ("Keystone"). *See generally* Compl., attached to
Notice of Removal (Doc. 1). Keystone handles and
processes scrap metal and, on October 25, 2005, CSX
delivered to it an empty open-top gondola car ("the
Rail Car" or "the Car"). *See generally* Def.'s Br. (Doc.
18) at 1. After the Car was parked, and consistent with
usual practices, Keystone employees began moving it
to be spotted for loading. *Id.* at 3. The airbrakes, one of
two braking systems on the Car, was disengaged, and
the handbrake was applied to slow and stop the Car.
*Id.* at 3, 4-5.[FN2] Once the Car was loaded, it was parked
in an area having a downgrade slope of less than two
percent, where it awaited pickup by CSX; again, it
was secured by the handbrake. *See id.* (citing record evi-
dence).

> FN2. The parties are in agreement the air-
> brakes did not cause the accident described
> below, so that system is irrelevant for the
> purposes of this lawsuit.

The Rail Car began to roll, Mr. Reedy moved the
truck he was operating into its path, and the Car col-
lided with the truck, thereby injuring the Plaintiff. *See*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
**(Cite as: 2007 WL 1469047 (W.D.Pa.))**

*generally* Compl. at ¶ 14. According to his pleadings, Mr. Reedy took this action to prevent the Car from rolling into a public railroad crossing, *see id.* at ¶¶ 12-13, and the Defendant's liability expert does not question his judgment in this regard. *Cf.* discussions *infra.*

The parties' theories of causation are straight-forward enough. CSX believes that the Plaintiff's co-worker, James Ramsey ("Mr.Ramsey"), misapplied the handbrake. *See generally* Def.'s Br. (Doc. 18) at 7; Expert Rpt. of Philip J. Daum, P.E. (filed as Ex. 4 to Doc. 15) at 5 ("[t]he rolling of the [C]ar ... could not have occurred unless the handbrake ... had not been properly applied").[FN3] The Plaintiff and his expert believe that mechanical failure(s) and/or improper maintenance of the Car's handbrake system proximately caused the accident. *See generally* Expert Rpt. of Bob R. Tucker (attached as Ex. 5 to Doc. 20) (handbrake slipped and brake shoes/pads "were badly worn," causing Car to roll).

> FN3. Despite his co-worker's alleged negligence, the Plaintiff's employer, Keystone, has not been named as a defendant. This presumably is so given the operation of Pennsylvania's Workers' Compensation law. *See generally Farabaugh v. Pennsylvania Turnpike Comm'n,* 911 A.2d 1264, 1266 n. 1 (Pa.2006) (making same assumption in negligence case where employer was not sued).

Each party seeks to preclude the testimony of the other's liability expert, and their Motions are now ripe for adjudication.

*ANALYSIS*

**A. *The Defendant's Expert, Mr. Daum***

The Plaintiff attacks Mr. Daum's reliance on his inspection of the Rail Car in November 2006, over one year after the accident and following the Car's continued use for hundreds of miles. *See generally* Pl.'s Br. (Doc. 16) at 4. Counsel relies on the Pennsylvania common law doctrine of "remoteness," which allows the introduction of evidence regarding the condition of a physical object only if "accompanied by proof that it has not changed in the mean [time]." *See Ritson v. Don Allen Chevrolet,* 336 A.2d 359, 362 (Pa.Super.1975) (citations omitted). This doctrine parallels federal law requiring "substantial similarity" between an expert's experiment/testing conditions and those of the accident in suit. *See, e.g., Griffin v. Hickson,* 2002 WL 988006, *4 (E.D.Pa. May 9, 2002) (citations omitted).

*2 These inquiries are the "flip side" of one another, so the court need not make a choice-of-law determination. The question is whether Mr. Daum's report and anticipated testimony impermissibly rely on observations made in November 2006 regarding physical conditions of the Car that had substantially changed since the time of the accident.

The first component examined by Mr. Daum was the Car's handbrake housing, which contains gears with teeth. *See* Daum's Rpt. at 3. The expert relies on CSX maintenance records to conclude that no components in the housing were replaced after the accident. *Id.* He therefore posits that the gears were in the same (if not, the court observes, a further deteriorated) condition at the time of the inspection than when the accident occurred. *Id.* Based on his examination, Mr. Daum has opined:

> The condition claimed by Mr. Ramsey, where he describes the handbrake skipping a tooth and the chain loosening, could not exist unless there was physical evidence, such as teeth missing from gears. No such physical evidence exists.
>
> *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
**(Cite as: 2007 WL 1469047 (W.D.Pa.))**

The court agrees with the Defendant that, absent evidence of CSX's replacement of the handbrake housing components, Mr. Daum's examination would satisfy the "remoteness" and "substantial similarity" tests annunciated above. Simply put, if none of the subject parts were replaced, their condition could only have deteriorated over the course of the Car's additional use, not improved. The Plaintiff, however, questions the veracity of CSX's evidence:

[T]here is a lack of service documentation for the [C]ar during the time it was in service post-accident. Specifically, it was admitted during the deposition of [the] Defendant's expert that an annual brake test ... was performed during 2006, but no documentation [has been] provided by [CSX].... [T]o assume that no cogs[or] gears ... were replaced during this brake test requires the Court to take a leap of faith [and] assume that the [C]ar was in essentially the same condition in November of 2006 as it was [at the time of the accident].

*See* Pl.'s Br. in Opp'n (Doc. 20) at 3.[FN4]

FN4. Counsel also suggests that there exists an issue of fact regarding the potential presence of orange paint on the teeth of the gear in question. *See* Pl.'s Reply Br. (Doc. 22) at 4 n. 2. The Plaintiff relies on Mr. Daum's testimony that it was "possible" his inspection video revealed orange paint on the gear, suggesting the part had been replaced. *See* Dep. Tr. of P. Daum at 74 (attached as un-numbered Ex. to Doc. 22); *but see id.* (opining that discoloration of gear was result of "normal rust and grime"). Presumably, counsel theorizes that new gears are painted, and all of the paint would have been worn off an old gear. Even indulging the Plaintiff's theory, the presence of orange paint in November 2006 would be significant only if it was completely absent at the time of the accident. In any event, the "orange paint" the-

ory appears too tenuous to support the exclusion of Mr. Daum's testimony, especially if the Defendant can show to the court's satisfaction that any repairs to the Car would have been reflected in its maintenance records. *See* discussion *infra* in text.

Defense counsel appears to indicate that the 2006 annual brake test contemplated by the Plaintiff did not occur. *See generally* Def.'s Opp'n Br. (Doc. 19) at 5. The court cannot be sure, however, given the difference in terminology used by the parties. *Cf. id.* ("Contrary to [the] Plaintiff's intimations, the record is devoid of proof that a *single-car test* was performed" between time of accident and Mr. Daum's inspection) (emphasis added).

Also absent is an adequate explanation regarding the evidence upon which CSX relies to show a lack of replacement. The Defendant frequently cites its "AAR-CRB History" on the Car, but fails to provide background information regarding this report; nor does there appear any sworn testimony, on personal knowledge, that any repairs to the Car would, either by necessity or as a result of standard operating procedures, be reflected on the AAR-CRB History.[FN5]

FN5. The Defendant's submissions indicate that the "AAR" is the Association of American Railroads. *See* Doc. 18-9 at 2. The evidence does appear to show that the AAR provides a series of detailed rules, compliance codes and procedures, *See id.* The court is uncertain, though, whether the AAR's rules and/or protocols are mandatory, industry standard, tied to federal, state or local regulations or certification, *et cetera.*

**\*3** These things said, the Plaintiff's argument begs the question of how CSX can "prove a negative," namely, that the gear housing components were not replaced despite the lack of any evidence they were. In

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
**(Cite as: 2007 WL 1469047 (W.D.Pa.))**

the court's view, this could be established by the sworn statement(s) of an appropriate CSX representative stating on personal knowledge that, if any repairs were made to the Rail Car, they would be reflected in the AAR-CRB History or some other existing documentation. If Defense counsel is capable of producing such evidence, CSX's failure to provide documentation regarding a purported "annual brake test" in 2006 would be immaterial.

In an effort to resolve the matter before the June 7th mediation in this case, the Defendant will be ordered to submit such an affidavit (if it can) within eleven (11) days of this Order. Presuming the submission eliminates reasonable doubt regarding whether the Car's handbrake housing components were replaced, Mr. Daum will be permitted to offer opinions and testimony based on his November 2006 inspection. Otherwise, and likely after the mediation, the court will order an evidentiary hearing to make a factual determination regarding whether replacements were made.[FN6]

> FN6. Although the current rulings are neither tentative nor advisory, they are being made now to provide guidance for the purposes of the parties' mediation. If, based on the analyses herein, portions of the liability experts' reports or testimony should be stricken or precluded at trial, these matters can be later revisited in the event mediation fails.

Next is the issue of the Rail Car's brake "shoes" and/or "pads ."[FN7] CSX concedes that two of the Car's eight brake shoes were replaced the day after the accident, and that the replaced shoes possessed brake pad material of a thickness at or less than the required industry standard of 3/8". *See* Def.'s Opp'n Br. at 5, 10. On this evidence alone, any testimony of Mr. Daum relying on the condition of the brake pads, post-accident, fails the "remoteness" and "substantial similarity" tests.

> FN7. On a rail car, brake shoes and pads do not appear to function as part of separate brake systems as they do in automobiles. *Compare* website at http://www.familycar.com/brakes.htm# Disc% 20Brake (in an automobile, "[t]he typical brake system consists of disk brakes in front," which utilize brake pads, and "drum brakes in the rear," which utilize brake shoes) *with, e.g.,* Def.'s Opp'n Br. at 10 ("With regard to the two replaced brake shoes [on the Car], it is undisputed that both possessed brake pad material [whose] thickness was 3/8" or less."). While the undersigned does not pretend to possess expertise on the matter, the important point is that the thickness of the Car's brake pads has some interrelationship with CSX's post-accident replacement of brake shoes. *See* discussion *infra* in text.

This does not end the inquiry, however, because the expert's report does *not* appear to rely on the condition of the brake pads at the time of the November 2006 inspection. *See* Daum's Rpt. at 4-5. Rather, Mr. Daum relies on the fact witness testimony of Mr. Ramsey and others to assert that the thickness of the brake pads still should have prevented the Car from rolling. *Id.* ("where a brake shoe's surface area has [any] remaining composition material, it is still fully effective in braking a car"). Irrespective of how convincing a jury may find this opinion, the Plaintiff has not shown it impermissible under *Daubert* or Federal Rule 702, nor does it implicate the doctrines of remoteness or substantial similarity.

As discussed further below, the law is clear that neither party may filter fact evidence and testimony through its expert merely to lend credence to the same. *See, e.g., Nimely v. City of New York,* 414 F.3d 381, 398 (2d Cir.2005) (courts should disallow expert testimony offered to "improperly bolster the account[s]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
(Cite as: 2007 WL 1469047 (W.D.Pa.))

given by the fact witnesses"; party cannot use expert opinion to expound upon "the credibility of trial testimony from crucial fact witnesses") (citations omitted); *S.E.C. v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998) (under *Daubert,* "helpfulness" requirement dictates that "[e]xpert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand"; "expert testimony must not be allowed to cross over the line of helpfulness and ... invade the quintessential jury function of determining the credibility of witnesses") (citation omitted). While Mr. Daum skirts the line in this regard [FN8] (and the Plaintiff's expert arguably jumps over it with both feet [FN9]), this is a separate issue from "remoteness," and the Plaintiff's objection is without merit.

> FN8. *Compare* Daum's Rpt. at 4 ("There is no objective proof that there was any type of gapping between the brake shoes and the wheels.") *with* Dep. Tr. of J. Ramsey (filed under Doc. 15-6) at 50 (post-accident condition of two brake pads would allow someone to "probably slide a paper envelope" between those pads and wheels).

> FN9. *See* Tucker's Rpt. at 3 ("Mr. Ramsey was well qualified to determine if the handbrake was working [im]properly based on his many prior years of railroad industry employment.").

*4 Last is Mr. Daum's opinion that, based on his November 2006 inspection, "the slack adjuster properly lengthened and shortened to maintain proper spacing of the brake shoes adjacent to the wheels ." Daum's Rpt. at 4. Plaintiff's counsel represents:

> As stated by both Messrs. Daum and Tucker, *brake shoe thickness* directly [a]ffects piston travel length, and also *is critical in determining whether the slack adjuster is functioning properly ....*

*See* Pl.'s Reply Br. at 3 (citing record evidence, emphasis added). Having reviewed the evidence cited by counsel, the court possesses insufficient expertise to determine whether a slack adjuster's functioning indeed is affected by brake pad thickness. Assuming it is, Mr. Daum's post-accident examination of the slack adjuster would be too "remote" given CSX's admitted replacement of two brake shoes the day after the accident. In light of the court's inability to determine whether the November 2006 testing of the slack adjuster reflected condition(s) substantially similar to ones existing at the time of the accident, an evidentiary hearing is necessary to determine the admissibility of Mr. Daum's testimony in this regard.[FN10]

> FN10. Normally, it would be the Defendant's burden to demonstrate substantial similarity. *See generally Hall v. United Ins. Co. of Amer.,* 367 F.3d 1255, 1261 (11th Cir.2004) ("[t]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert") (citations and internal quotations omitted). Here, though, it is the Plaintiff who has failed to sufficiently explain the interrelationship between the brake pads and the slack adjuster, despite representations in his brief that they exist and are significant. As for the potential evidentiary hearing regarding the replacement of handbrake housing components, this is appropriate given the Plaintiff's calling upon the Defendant to further prove a negative. *See generally U.S. v. Frazier,* 387 F.3d 1244, 1274 n. 4 (11th Cir.2004) ("the procedural handling of an objection to proposed expert testimony," including whether to have evidentiary hearing, "is a matter committed to the trial court's discretion") (citation omitted).

As for the remaining portions of Mr. Daum's report, the Plaintiff has not shown how they implicate

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
**(Cite as: 2007 WL 1469047 (W.D.Pa.))**

the remoteness and/or substantial similarity standards. Otherwise, counsel has failed to level a meaningful *Daubert* challenge, and there is no basis for rejecting the remainder of the report.

### B. *The Plaintiff's Expert, Mr. Tucker*

In seeking to preclude this expert's testimony, the Defendant argues that he has "failed to employ any scientific or technical method or procedure" in support of his opinions. Def.'s Br. at 9. Counsel also presents two somewhat related themes: (1) Mr. Tucker has not supported his causation theory with "any testing or hands-on operation of the railcar's handbrake" components; and (2) the expert has failed to account for an obvious alternative explanation for the accident, namely Mr. Ramsey's failure to properly set the handbrake. *See generally* Def.'s Br. at 6-7.

The problem with the Defendant's position, however, is that it demands too much of Mr. Tucker's opinions. The expert is *not* required to demonstrate, for example, that Mr. Ramsey was truthful and un-mistaken in testifying that the handbrake "slipped" when he attempted to set it. *Cf. generally* Ramsey's Rpt. at 3. To the contrary, Federal Rule of Evidence 703 permits an expert to "rely on facts from firsthand knowledge or observation, *information [to be] learned at the hearing or trial,* and [even] facts learned out of court." *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002) (emphasis added). Once the expert has identified a "factual foundation in the record," which Mr. Ramsey's sworn statements provide here, "the burden of exploring [the expert's] facts and assumptions" falls on "opposing counsel [through] cross-examination." *Id.* (citations omitted).

**\*5** In essence, both experts in this case are at-tempting to do the same thing. Based on facts in the record (and, in Mr. Daum's case, his November 2006 inspection to some degree), they are offering special-ized knowledge and experience to state opinions re-garding the most likely cause of the accident. Under

Rule 703, Mr. Tucker's decision to decline inspection of the car, over one year after the accident occurred, does not make his opinions any less admissible than Mr. Daum's. *See* discussion *supra* (expert may rely on "firsthand ... observation" or "information learned at the hearing or trial"). Nor does the rule requiring ex-perts to exclude obvious alternative explanations vi-tiate Mr. Tucker's permissible use of facts in the rec-ord to support one of the only two possible causes identified by the experts (*i.e.,* mechanical failure versus human error). And while Mr. Daum's later examination of the handbrake housing components, if admissible, certainly would undermine Mr. Ramsey's testimony that the handbrake "slipped," this goes to the fact witness' credibility and is for the jury to weigh; not the court in its "gatekeeper" role under *Daubert.*

These conclusions extend to the Defendant's ar-guments regarding the Car's worn brake pads and the excessive brake piston travel. Although counsel questions Mr. Ramsey's testimony regarding brake pad thickness, *see* Def.'s Br. at 11, CSX must concede that at least two of the shoes were worn to 3/8" inches or less, in excess of industry standard. *See* discussion *supra; see also* Dep. Tr. of J. Ramsey at 50 (inspection just after accident revealed that one "could probably slide a paper envelope" between two pads and their wheels, and two other pads "were worn down real bad [sic]"). In addition, the Plaintiff's expert has opined based on his specialized knowledge and experience that worn brake pads cause the cylinder piston travel to extend beyond safe limits. *See, e.g.,* Tucker's Rpt. at 4. There exists some factual basis in the record to support this opinion, and Rule 703 dictates that the Defendant's challenges are properly addressed through cross-examination rather than a finding of non-admissibility. *See* discussion *supra.*

Finally are CSX's general arguments regarding the alleged lack of scientific procedure and/or meth-odology to support Mr. Tucker's opinions. *See gener-ally* Def.'s Br. at 8. While the Defendant's brief makes

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591
**(Cite as: 2007 WL 1469047 (W.D.Pa.))**

reference to the Supreme Court's decision in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), *see id.* at 7, counsel's arguments do not account for the decision's recognition that different considerations arise within the context of non-scientific experts. Through its reading of *Kumho,* the Third Circuit Court has recognized that *"Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts ... in every case." *U.S. v. Davis,* 397 F.3d 173, 178 (3d Cir.2005). Indeed, the *Daubert* factors are "often ... of little use in evaluating non-scientific expert testimony," *see id .,* and where appropriate, the "relevant reliability concerns may focus upon personal knowledge or experience." *U.S. v. Ford,* 481 F.3d 215, 219 n. 5 (3d Cir.2007) (quoting *Kumho* ).

*\*6* In this case, both experts rely on their impressive personal knowledge and experience in the railroad industry. *See* Pl.'s Opp'n Br. at 5 (Mr. Tucker has worked on railroad since he was 17, and has 30 years of investigation experience regarding accidents involving train movement); Appendix B to Daum's Rpt. (expert's curriculum vitae, revealing 24 years of mechanical engineering experience in, among other things, railcar design including brake systems). The court has little difficulty concluding that these experts' specialized knowledge and experience lend reliability to their opinions, at least to the extent contemplated above. *See, e .g., Betterbox Commc'ns Ltd. v. BB Techs., Inc.,* 300 F.3d 325, 328-29 (3d Cir.2002) (district court did not err in allowing expert testimony based on his "personal knowledge [and] experience" rather than "a methodology that satisfie[d] the *Daubert* factors"; expert's "practical experience sufficed under [the] liberal test" of whether he "possess [ed] skill or knowledge greater than the average layman") (citations omitted, some internal quotations in original). Which expert's permissible opinions are more persuasive is for the jury to decide. *See, e.g., Fillebrown v. Steelcase, Inc.,* 2003 WL 1191162, \*3 (3d Cir. Feb. 24, 2003) (*"Daubert* does not set up a test of which opinion has the best foundation," and "[i]t [is] appropriate for the jury to determine which of

the experts' opinions [is] the most persuasive") (citing and quoting binding published Third Circuit precedent).

For all of the reasons stated above, the court enters the following:

### II. *ORDER*

The parties' cross-Motions to exclude the testimony of liability experts **(Docs. 15 & 17)** are **DENIED,** consistent with the analyses in the above Opinion. In addition, the Defendant may submit, within eleven (11) days of the date of this Order, the affidavit of an appropriate CSX representative stating on personal knowledge that, if repairs were made to the Rail Car's handbrake housing, they would be reflected in the AAR-CRB History or some other existing documentation.

THESE THINGS ARE SO ORDERED.

W.D.Pa.,2007.
Reedy v. CSX Transp., Inc.
Not Reported in F.Supp.2d, 2007 WL 1469047 (W.D.Pa.), 73 Fed. R. Evid. Serv. 591

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

H

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Charles JACKSON, Plaintiff,
v.
The CITY OF PITTSBURGH, PENNSYLVANIA,
Timothy Kreger, Mark Goob, James Joyce, Gregory
Woodhall, Defendants.

Civil Action No. 07–111.
Aug. 13, 2010.

West KeySummary**Evidence 157** ⬤➞508

157 Evidence
   157XII Opinion Evidence
     157XII(B) Subjects of Expert Testimony
       157k508 k. Matters Involving Scientific or
Other Special Knowledge in General. Most Cited
Cases

   In a § 1983 action alleging excessive force re-
garding arrest of motorist, expert witness's opinions
regarding alleged misuse of narcotics officers, in plain
clothes and unmarked vehicles, to make traffic stops
were not relevant. The propriety of the traffic stop was
not at issue in the case. The disputed issues at trial
were the reasonableness of the inventory search of
motorist's car, whether there was probable cause to
arrest motorist for disorderly conduct or resisting
arrest or both, and the reasonableness of the force used
against motorist during the arrest. U.S.C.A.
Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules
Evid.Rule 702, 28 U.S.C.A.

Bonnie L. Kift, Law Office of Bonnie L. Kift, Ligo-
nier, PA, for Plaintiff.

Michael E. Kennedy, City of Pittsburgh, Department
of Law, Bryan Campbell, Pittsburgh, PA, for De-
fendants.

*MEMORANDUM OPINION*
NORA BARRY FISCHER, District Judge.
I. INTRODUCTION/RELEVANT PROCEDURE
   **\*1** This is a civil rights case brought by Plaintiff,
Charles Jackson, against Defendants, the City of
Pittsburgh, Pennsylvania, and officers Timothy
Kreger, Mark Goob, James Joyce and Gregory
Woodhall, arising from the officers' arrest of Plaintiff
on November 2, 2001 and the subsequent incarcera-
tion of him after a traffic stop in the Homewood sec-
tion of Pittsburgh.[FN1] This case is set for a trifurcated
jury trial on Plaintiff's § 1983 claims, commencing
with jury selection on August 23, 2010. The matters to
be tried are: first, Plaintiff's § 1983 claims asserting
that his Fourth Amendment rights were violated by the
defendant officers for allegedly conducting an un-
reasonable search of his vehicle, unlawfully arresting
him, and using excessive force against him while
effectuating his arrest; second, Plaintiff's *Monell* claim
against the City of Pittsburgh; and, third, Plaintiff's
claims for damages. Presently before the Court are
Defendants' motion in limine seeking to preclude the
testimony of James E. Baranowski[FN2] as an expert
witness at trial (Docket No. 126), their brief in support
of same (Docket No. 127), Plaintiff's brief in opposi-
tion and response (Docket No. 145, 149) as well as
Baranowski's expert report (Docket No. 76) and sub-
sequently submitted affidavits (Docket Nos. 87–5,
87–6, 151).

       FN1. A more detailed factual summary of the
       events of this case can be found in the Court's
       Memorandum Opinion on Defendants' mo-
       tion for summary judgment. (*See* Docket No.
       98). The Court has also issued three Memo-
       randum Orders limiting the parties' evidence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

at trial. (*See* Docket Nos. 165, 166, 167).

> **FN2.** Baranowski previously appeared as a Plaintiff in two cases before this Court, both styled *Baranowski v. Waters et al.,* at Civil Action Numbers 05–1379 and 08–544, which was disclosed to counsel during a telephone conference on July 7, 2009. (Docket No. 77). The parties were given an opportunity to object to the Court's continuing to preside over this matter, but no objections were made. (*See* text only entry July 17, 2009).

The Court heard oral argument from counsel as to Defendants' Motion during the Pretrial Conference on June 16, 2010 (Docket No. 164, 168) and a *Daubert* hearing [FN3] was held during which Baranowski was examined on August 2, 2010 (Docket No. 190). Plaintiff's counsel withdrew a request for further argument on the motion subsequent to the *Daubert* hearing but the Court permitted supplemental briefing. (Text Order 8/6/10). Defendants filed their supplemental brief on August 10, 2010 (Docket No. 195) and Plaintiff filed his supplement brief on August 11, 2010 (Docket No. 197). Defendants' Motion is now fully briefed and ripe for disposition.

> **FN3.** The *Daubert* hearing has yet to be fully transcribed. However, the trial in this matter is set for August 23, 2010 and the rulings set forth herein are needed for trial preparation purposes. Therefore, the Court bases its opinion on the evidence presented at the *Daubert* hearing but without citations to the hearing transcript.

For the following reasons, Defendants' Motion [126] is granted, in part and denied, in part. Baranowski will be permitted to testify as an expert on certain issues at trial; however, his testimony will be limited as set forth below.

## II. BACKGROUND

Plaintiff's proffer of Baranowski's testimony consists of his Report (Docket No. 76), his subsequently submitted affidavits (Docket Nos. 87–5, 87–6, 151) and his testimony at the *Daubert* hearing on August 2, 2010.

### A. *Baranowski's Qualifications*

Baranowski is a former police officer and is proffered by Plaintiff as an expert in the use of force by the police officers against Plaintiff in this case. (Docket No. 76). Baranowski was a member of the Pennsylvania State Police from 1986 through 2003, and a supervisor since 1992. (Docket No. 76–16; Docket No. 151 at ¶ 1). He attained the ranks of patrol commander, station commander and special projects supervisor. (Docket No. 151 at ¶ 1). In these roles, he has had extensive field experience in police actions, including traffic stops, drug raids, undercover work, street busts and saturation patrols. (*Id.*). He has also acted as a private consultant on police use of force, and police procedures cases, has trained various police departments in Southwestern Pennsylvania in use of force, force justification, officer safety, defensive tactics, and other topics, and has taught these subjects at the Municipal Police Officer's Education and Training Commission, Penn State University, Westmoreland Community College, California University of Pennsylvania and Indiana University of Pennsylvania. (*Id.*).

**\*2** Baranowski's consulting experience is largely related to accident reconstruction and, indeed, he fashions himself a "Collision Reconstruction Specialist" on his letterhead and website. However, he testified that he has been retained as an expert in six use of force cases, and has submitted expert reports in those cases, although he has yet to testify or be qualified as an expert in any of such case because those matters have settled.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
(Cite as: 2010 WL 3222137 (W.D.Pa.))

B. *Baranowski's Opinions*

In support of his opinions, Baranowski reviewed the Pittsburgh Office of Municipal Investigation Report as to the incident, the Office of Municipal Investigation ("OMI") statements of Plaintiff and the Defendant officers, the officers' respective personnel files, and the relevant police reports. (Docket No. 76). He also reviewed the relevant Pittsburgh Bureau of Police Orders and Policies, and testified that he considered additional sources that he did not cite in his report, including: the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA") standards and certain provisions of the Pennsylvania Vehicle Code and Crimes Code. (*Id.*). He further testified that he did not review the Defendant officers' arrest records or traffic incident reports, or the City of Pittsburgh Narcotics Officers' Handbook.

i. *Traffic Stop*

Baranowski offers a number of opinions regarding the initial traffic stop wherein the four police officers stopped Jackson for the traffic violation of making a turn without using a signal. (*Id.*). He first opines that because the officers were assigned to the Narcotics Bureau, they should "not be routinely conducting traffic stops, which is primarily a patrol function." (*Id.*). Baranowski believes that making traffic stops is a "poor use" and/or not a "productive use" of the Narcotics Officers' time. (Docket No. 76; Docket No. 151 at ¶ 3). However, he admitted while testifying that he did not review the City's Narcotics Officers' Handbook to determine if making such stops was a part of the officers' duties.

In addition, Baranowski maintains that conducting traffic stops in plain clothes and an unmarked vehicle, as the officers did in this case, is "unsafe and should only be done in exceptional cases." (Docket No. 76). In his view, plain clothes traffic stops have long been discouraged because they "create [ ] problems" and he insists that "most departments have a policy of allowing only officers in uniform [to] conduct traffic stops for minor violations." (*Id.*). He testified that he was not aware if the City of Pittsburgh had such a policy, but his opinion was based on his prior experience and the CALEA standards, which discourage the practice of using unmarked vehicles to conduct traffic stops.

He also believes that making traffic stops could expose the officers' identities to potential investigation targets, therefore, limiting their ability to make undercover buys and to operate in a covert manner. (*Id.*). He testified that, based on his experience, random traffic stops were counterproductive because of how undercover officers are typically used in the field. Undercover officers attempt to infiltrate a local drug organization and make drug purchases in a specific area, and then, after making a number of buys, they move to another area to work in order to avoid exposing their identities as police officers. In his view, hundreds of traffic stops of this kind would need to be conducted in order to make a significant drug arrest.

**\*3** Baranowski explained that there are safety issues with the stops as well. In his report, he stated that "stops by persons dressed in the manner that narcotic officers would dress to conduct covert investigations could incite violent reactions from persons involved in the drug culture believing that the officers were going to 'rip them off'. This is why all officers are clearly identified as police officers during [a] raid, using various methods of identification including, raid jackets, uniformed police officers and marked police cars." (*Id.*). He explained that these opinions are rooted in "common sense" and his experience. In support of his safety concerns, he testified that he recalled a number of cases during former Governor Bob Casey's tenure where police impersonators pulled over a number of women and committed rapes. He recalled that the practice of using unmarked cars was discouraged within the state police at that time. As to this case, he did not recall Jackson's statement to OMI that when he was pulled over, he "figured [the car] was a plainclothes police car." However, he commented that Jackson's statement indicates that Jackson

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

was only "assuming" that the car was an undercover vehicle.

Baranowski suggests that the officers in this case could have radioed for a uniformed officer in a marked car to make the stop for them, rather than making the stop themselves. (*Id.*). But, he testified that he was not aware of how the City staffed its officers in the zone where the traffic stop occurred and had no idea if any such uniformed officers were available at the time of the stop at issue in this case.

In his report, Baranowski comments that the officers were "trolling" for drug arrests. He testified similarly. He bases this opinion on his interpretation of Detective Goob's OMI statement that "it's common for us to stop people for any violation, any and all violations, we stop people for, you know." (*Id.*). Baranowski believes that traffic stops like the one in this case would not yield a high quantity of drug seizures, without good information. He suggests that the officers were "profiling," or targeting a specific type of vehicle and/or driver prior to making the traffic stops, but testified that he was assuming that a profile was used. He further explained that while the use of a profile is common in law enforcement and not necessarily illegal,[FN4] the use of certain profiles, including racial profiles, have been found unconstitutional by the courts. He admitted in both his report and while testifying that he had not reviewed the traffic arrest records for any of the officers and that this type of information would be helpful to determine the success rate of the profiling and/or these types of traffic stops. Indeed, he commented in his report that "it would be interesting to review the traffic arrests of the officers involved in this incident, to determine whether or not it can be substantiated that these officers always enforce the traffic laws as indicated." (*Id.*).

> FN4. As an example, he cited an officer on traffic duty profiling red sports cars for speeding violations.

### ii. *Initial Encounter*

**\*4** As to the initial encounter with police after the traffic stop was effectuated, Baranowski accepts Jackson's statement to OMI that he invoked his Fifth Amendment right to remain silent and made no statements to police. (Docket No. 76). He then explains that "[u]nder the Pennsylvania Vehicle Code, municipal police officers do not have the authority to take a Pennsylvania resident into custody for minor traffic violations." (*Id.*). He admitted that a non-Pennsylvania resident without a license could be detained for traffic violations. He also opined that an officer cannot cite a person for a "violation of suspended drivers license" until information regarding the person's driving record received from PennDot is verified and a certified copy of the driving history is obtained. (*Id.*). He testified that PennDot is not operational 24 hours per day. In his view, and given the time of the incident in this case (around 9:00 p.m. or 10:00 p.m.), the officers "would not have been able to obtain these documents immediately and, therefore, the argument can be made that Mr. Jackson would have been free to leave the area." (*Id.*). Baranowski testified that the officers should have permitted Jackson to drive away and, if the officers sometime thereafter received verification from PennDot that Jackson's license was suspended, sent him a citation for driving with a suspended license in the mail.

Baranowski also commented on the merit of the charges against Jackson. In his report, he claims that "no evidence of a crime was ever discovered." (*Id.*). In his affidavit, Baranowski states that "Jackson was stopped for a minor traffic violation and ultimately convicted of a minor traffic violation" and that the other charges against him, including the disorderly conduct charge, were dismissed. (Docket No. 151 at ¶ 5). He then "assumes" that the charges were "without merit." (*Id.*). He posits that the officers "could not prove" that Jackson was operating a vehicle without a license and should not have assumed that his license was suspended. (*Id.*).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

### iii. *Plaintiff's Request to Move Car/ Defendants' Tow Policy Violation*

Baranowski next accepts Jackson's statement that he later asked to be permitted to move his car off the roadway, so that it would not have to be towed. (Docket No. 76). Baranowski believes that this request "could have easily been granted." (*Id.*). He explains that there were several parking lots and cross streets in close proximity to the location of the traffic stop where the vehicle could have been moved and that, if the officers did not believe that Jackson should be permitted to move the car, he (Jackson) should have been permitted to contact his father or another family member to move the car or he could have requested that one of the police officers move the car. (*Id.*). Baranowski opines that there was "no reason to tow the vehicle" because it was registered in Ohio and "there was no proof that Mr. Jackson didn't have a valid license." (*Id.*). Finally, Baranowski concludes that the denial of Jackson's request to have his car moved rather than towed was a violation of Pittsburgh Bureau of Police regulations, Order # 41–4, sections 1.1, 5.1 and 8.1. (*Id.*).

*5 In his affidavit, Baranowski further states that the City regulations do not grant the officers any discretion when towing vehicles, but give detained drivers like Jackson discretion to request that his car be moved to an area rather than be towed. (Docket No. 151 at ¶ 6).

### iv. *Custodial Inventory Search*

As to the custodial inventory, Baranowski states that a "custodial inventory is completed for the purpose of protecting and securing items of value inside the vehicle for the owner and to protect the police department and police officer from claims of malfeasance." (Docket No. 76). He also notes that for a custodial inventory to be valid, "there must be a written policy" of the police department requiring same and that the results of the search must be properly documented. (*Id.*). Baranowski concludes

that "in no circumstances can a custodial inventory be used in lieu of a search warrant or consent to search the vehicle for evidence." (*Id.*).

### v. *Use of Force*

Baranowski testified that the force used by the officers in this case was unnecessary and unwarranted and this opinion was based on his personal experience in such situations, his experience teaching, and his consideration of the City's Use of Force policy, the Continuum of Control and the CALEA standards. He testified that the City's Use of Force policy is in accord with the CALEA standards, although the City is not accredited by CALEA.

Baranowski admitted that many of the underlying facts are disputed in this case. But, he testified that he considered the "totality of the circumstances" and all of the evidence presented to him. Where necessary, he "married up" the facts, i.e., accepted certain facts and rejected others. He explained that he needed to weigh the facts in order to fully evaluate the case and that this was a practice/procedure that he typically used when conducting an internal evaluation of use of force cases when he was with the state police. He also considered the credibility of the parties, particularly Jackson's former involvement with law enforcement and the number of excessive force complaints filed against Detective Kreger when he was with the City Police Department. However, Baranowski testified that he did not wholly adopt Jackson's version of this encounter, but adopted some facts from the officers' version as well.

Turning to his opinions, Baranowski accepts the facts that during the custodial inventory of Jackson's car, Jackson asserted a desire to leave, that Jackson approached Detective Kreger, who was located at the driver's door, that Detective Kreger sensed Jackson approaching him, turned to confront him, and then, a confrontation occurred. (*Id.*).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
(Cite as: 2010 WL 3222137 (W.D.Pa.))

First, Baranowski opined that, contrary to the officers' testimony, he did not believe that Jackson approached Detective Kreger aggressively, menacingly, or with any evil intent. In his report, he explained that "[i]t is hard to imagine that anyone, but especially someone who like Mr. Jackson has had previous contact with police officers would approach a police officer in a menacing manner, while three other officers were standing by." (Docket No. 76). He also felt that "[i]t is a foregone conclusion that Mr. Jackson would not be successful in attacking Detective Kreger in these circumstances." (*Id.*). In Baranowski's opinion, "[i]t is far more likely that Mr. Jackson approached Detective Kreger to obtain something out of his car or his house keys and Detective Kreger overreacted, setting into motion the use of force in this matter." (*Id.*). He offers a number of additional assertions regarding this encounter:

*6 "In any event, there is no reason for Mr. Jackson to attack Detective Kreger, Jackson was not under arrest and had already invoked his right to leave."

"Mr. Jackson for all intent and purpose is out of there, but he stops to attack Kreger?"

"If Jackson is so incensed over the towing of his vehicle, why does he not attack one of the other police officers who were standing near Jackson?"

"Further, the identity of Mr. Jackson is known to the officers and his vehicle is in police custody at this point. Mr. Jackson has no opportunity to be successful in attacking one of the police officers involved in this incident and no opportunity of getting away with it."

"Mr. Jackson is in a no-win situation by attacking a police officer and quite frankly this scenario just doesn't ring true."

(Docket No. 76).

Baranowski expanded on these initial assertions while testifying. He explained that based on his experience and the location of the individuals at the time, with the car pulled over on the side of a two lane road, where Detective Kreger was conducting an inventory search from the driver's seat of the car with his back turned and the car door opened toward traffic, and Jackson and the three other officers at the rear of the car, that the officers should have handled the situation differently.

In his view, the three officers stationed at the rear of the car near Jackson should not have permitted Jackson to approach Detective Kreger from behind, whether Jackson was agitated or not. He believed that the officers should have intervened between Jackson and Kreger. Since there were three officers present, the officers should have used a swarming technique, i.e., circle around Jackson in order to prevent him from moving in any direction. This technique would involve minimal or no force. He further explained that the officers should not have permitted Jackson to approach on the driver's side of the car, and walk near potentially oncoming traffic for safety reasons.

Under cross-examination, Baranowski conceded that if Jackson aggressively approached Kreger from behind, Kreger would be justified in using a two hand push technique in order to separate them. He admitted that it is important for an officer to maintain space between himself and an approaching individual, both for the safety of the officer and the individual. Baranowski further testified that use of an armbar by an officer to take down an individual who is acting aggressively is an acceptable use of force in many situations. (*See* Docket No. 196 at 7). However, Baranowski testified that striking and kicking an individual who was subdued on the ground was not an acceptable use of force, given the circumstances.

vi. *Baranowski's Conclusion* s

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
(Cite as: 2010 WL 3222137 (W.D.Pa.))

Baranowski concludes that the use of force against Plaintiff was "unnecessary and unwarranted"; "the incident could have been avoided, had the officers followed their department's regulations"; "the necessity of using force in this matter [was] suspect and [was] created by the actions of the officers involved" and not by Plaintiff; and, because four officers were present, "it should have been unnecessary to use more than a swarming technique" to control Plaintiff, and "it should have been unnecessary to strike or kick him, once he was on the ground." (*Id.*). In his affidavit, Baranowski states that:

*7 Mr. Jackson was arrested for Disorderly Conduct, which was later dismissed when he objected to the towing of his vehicle. A person should not be arrested for Disorderly Conduct for voicing concerns to the police. And in fact, there is no evidence that Mr. Jackson's actions disturbed anyone in the vicinity. Mr. Jackson's actions resulting in his arrest stem from the police officer's use of force against him and not from Mr. Jackson's own actions.

(Docket No. 151 at 7).

III. DISCUSSION

The use of an expert witness at trial is governed by both the federal procedural and evidentiary rules. Rule 26 of the Federal Rules of Civil Procedure details the discovery procedures for the disclosure of expert witnesses, their reports and matters considered by the expert, while Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony at trial.

A. *Rule 26 Analysis*

Baranowski testified that he did not produce all of the matters that he considered to the Defendants in conjunction with his expert report, including the 4th Edition of the CALEA standards (2001), which he referenced several times during his testimony. This is a violation of Rule 26(a)(2)(B), which provides that:

(2) Disclosure of Expert Testimony.

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(I) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) *the data or other information considered by the witness in forming them;*

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

FED.R.CIV.P. 26(a)(2) (emphasis added). A party is also required to supplement expert disclosures made under Rule 26(a)(2) pursuant to Rule 26(e)(2).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

FED.R.CIV.P. 26(e). Failure to abide by the disclosure requirements in these provisions is governed by Rule 37(c)(1), which provides that "[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED.R.CIV.P . 37(c)(1). However, prior to excluding evidence, the United States Court of Appeals for the Third Circuit has held that a district court must consider:

**\*8** (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted;

(2) the ability of the party to cure that prejudice;

(3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and

(4) bad faith or wilfulness in failing to comply with a court order or discovery obligation.

*Nicholas v. Pennsylvania State University,* 227 F.3d 133, 148 (3d Cir.2000). In addition, " 'the importance of the excluded testimony' should be considered." *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir.1997) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904 (3d Cir.1977)).

After considering all of these factors, the Court finds that they weigh against striking the proffered testimony that relies on the CALEA standards. First, Defendants have not expressly claimed prejudice related to the untimely disclosure. Secondly, as Plaintiff has pointed out on multiple occasions, they had the opportunity to depose Baranowski during the discovery phase of this case but chose not to do so. Moreover, after the Court determined that a *Daubert* hearing was necessary to resolve Defendants' motion

to exclude Baranowski, they were given the opportunity to cross-examine him. Thus, the prejudice to Defendants is minimal. Thirdly, any such prejudice can be cured by ordering that Plaintiff produce the CALEA standards to the Defendants prior to trial. The CALEA standards are cited in several of the City's Policies. Thus, the Defendants should have some familiarity with these documents, but pretrial disclosure of the specific CALEA standards relied on by Baranowski will enable Defendants to prepare more effective cross examination of him at trial. Finally, there is no evidence that the Rule 26 violation was made in bad faith or that the cited documents were willfully withheld and Baranowski's proffered expert testimony is a significant part of Plaintiff's case.

B. *Rule 702 Analysis*

1. Legal Standard

In their motion, Defendants have challenged the admissibility of proffered expert testimony. Federal Rule of Evidence 702, which memorializes the Supreme Court's landmark case *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), provides the basic framework for the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702.[FN5] The United States Court of Appeals for the Third Circuit has held that "Rule 702

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit ." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003) (citations omitted). "[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Id.* In this role, the district court is not the finder of fact but must focus on the methodology of the expert in order to "satisfy itself that 'good grounds' exist for the expert's opinion." *United States v. Mitchell,* 365 F.3d 215, 244 (3d Cir.2004) (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786, 125 L.Ed.2d 469). Thus, the district court should not conflate "its gatekeeping function with the fact-finders' function as the assessor of credibility." *In re TMI Litigation,* 193 F.3d 613, 713 (3d Cir.1999).

> FN5. FED R. EVID. 702 was amended in 2000 in response to *Daubert,* but pre–2000 precedent regarding the *Daubert* analysis also applies to the analysis under Rule 702. *See, e.g., Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008).

**\*9** *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion. *Mitchell,* 365 F.3d at 244 (quoting *Ruiz–Troche v. Pepsi Cola Bottling Co.,* 161 F.3d 77, 85 (1st

Cir.1998) (citations omitted)); *see also Kannankeril v. Terminix Intern., Inc.,* 128 F.3d 802, 809 (3d Cir.1997) ("The trial judge must be careful not to mistake credibility questions for admissibility questions."). The party asserting the admissibility of the proffered testimony has the burden to demonstrate by a preponderance of the evidence that the opinions are based on "good grounds." *Kannankeril,* 128 F.3d at 807.

In a case such as this, where an expert is proffered to testify regarding non-scientific matters, "[t]he relevant reliability concerns [will] focus upon personal knowledge [and] experience" of the witness and the methodology used will be applying that experience to the facts of the case. *Roberson v. City of Philadelphia,* Civ. A. No. 99–3574, 2001 WL 210294, at \*5, n. 10 (E.D.Pa. Mar.1, 2001) (internal quotation omitted); *see also* Fed.R .Evid. 702, Advisory Comm. Notes, 2000 Amd. ("when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of conversations."); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 907 (6th Cir.2004). As in other contexts, a witness may not testify as an expert outside the scope of his or her expertise—the expert's qualifications and skills set the boundaries for that expert's testimony.

Regarding the "fit" element of the analysis, a non-scientific expert "must apply his experience reliably to the facts; his opinions must be well-reasoned, grounded in his experience, and not speculative." *See Roberson,* 2001 WL 210294, at \*4. Further, a properly qualified non-scientific expert may not offer an opinion as to an ultimate legal issue because to permit this type of evidence would subvert the jury's function to decide the disputed facts and issues after being properly instructed as to the law by the court. *See Whitmill v. City of Philadelphia,* 29 F.Supp.2d 241,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

246 (E.D.Pa.1998) (excluding proffered expert testimony that an interaction with law enforcement "was not a proper *Terry* stop"); *Watkins v. New Castle County,* 374 F.Supp.2d 379, 392–93 (D.Del.2005) (excluding proffered expert testimony that the defendant police officers' conduct was reckless, willful, indifferent, and that they violated the plaintiff's constitutional rights); *Roberson,* 2001 WL 210294, at * 5, n. 10 (excluding proffered expert testimony that an officer's conduct was "deliberately indifferent" toward the plaintiff). Likewise, non-scientific expert witnesses are not permitted to express opinions as to the credibility of witnesses or of the facts generally. *See Whitmill,* 29 F.Supp.2d at 246–47 (excluding proffered expert testimony discussing the credibility of an officer-defendant). The ultimate inquiry is whether the proffered testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED.R.CIV.P. 702.

2. Trial Issues

**\*10** The matter is set for jury selection and trial on August 23, 2010. In their Joint Stipulations, the parties have proffered the following issues to be resolved at said trial:

1. Did the officers have probable cause to arrest the plaintiff and take him into custody for violating Pennsylvania Crimes Code 18 Pa.C.S.A. § 5503 and 5504, Disorderly Conduct and Resisting Arrest?

2. In making the arrest, was the force used by the officers reasonable and necessary?

3. The officers performed a search of the vehicle. It is disputed whether such search was an inventory search or a more invasive search which would require a warrant. If it was an inventory search, did the officers have a lawful basis to conduct an inventory search?

4. Are the Defendant officers entitled to qualified immunity on each of Plaintiff's claims as they did not

violate the clearly established rights of the Plaintiff and their actions on November 2, 2001, were objectively reasonable?

5. Did the Plaintiff suffer any compensable injuries, and if so, what is the proper measure of damages for such injuries?

6. Are punitive damages to be awarded to the Plaintiff?

(Docket No. 140).

3. *The Parties' Arguments*

Defendants challenge the foundation of Baranowski's opinions, arguing that they are unreliable because they are based on unproven or speculative facts. (Docket No. 126). They further maintain that Plaintiff's proffer of Baranowski is improper because his "opinions" are either not relevant to the issues in dispute at trial, or are not proper expert opinions because they involve statements resolving disputed facts, the resolution of which are within the province of the jury. Defendants concede that if Baranowski had the type of training and experience that he proffers in his report and affidavit, he would have the necessary qualifications to offer an opinion regarding the force used by the officers in this case. However, they do not believe that type of opinion is what has been proffered.

They specifically seek to exclude Baranowski's opinions that: (1) plain clothes, narcotics officers, such as the Defendants in this case, should not routinely engage in traffic stops because it is not a productive use of their time and can be dangerous when conducted out of uniform; (2) the Defendants were "trolling" or profiling for arrests prior to their stop of Plaintiff's car; (3) the Defendants acted improperly by arresting Plaintiff and taking him into custody for minor traffic violations [FN6]; (4) the Defendants acted improperly by refusing Plaintiff's request to call a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

family member to pick up his car, rather than to have it towed; and (5) Defendant Kreger's actions in pushing Plaintiff, who approached him from the rear, were not warranted given Baranowski's interpretation of the facts of the case. (Docket No. 127). In later briefing, Defendants further contend that several of Baranowski's opinions are improper legal conclusions and that, ultimately, his use of force opinion is within the understanding of lay jurors, negating the need for expert testimony on the issue of the reasonableness of the force used. (Docket No. 195).

> FN6. Defendants contend that Plaintiff was arrested for disorderly conduct resulting from his threatening actions toward them made after the traffic stop. (Docket No. 127).

**\*11** In response, Plaintiff maintains that Baranowski's expert report and proffered testimony are sufficient to withstand *Daubert* scrutiny and that any discrepancies should be tested by Defendants during cross-examination. (Docket No. 145). Plaintiff believes that Baranowski is properly qualified and has sufficient personal knowledge and experience regarding all matters raised in his report and later testimony. (Docket No. 197). Plaintiff contends that Baranowski's opinions are critical to his case and that they will assist the jury in resolving the disputed facts in this case. (*Id.*).

4. *Analysis of Baranowski's Opinions*

With this backdrop, the Court now turns to Defendants' challenge to the proffer of Mr. Baranowski. In this Court's estimation, Baranowski is qualified to offer an expert opinion regarding the use of force by the officers and their application of standardized police procedures in this case as well as the use of force continuum and the proper training for same, based on his experience with the state police, his training and his related teaching experience. Defendants admitted same during the pretrial conference. The methodology used by Baranowski in forming his opinions was to apply his personal knowledge and experience to the

facts of this case. This type of methodology is permitted in the context of expert testimony offered by a non-scientific expert. As noted, Defendants primarily challenge the "reliability" or "fit" of Baranowski's various opinions. They claim that many of his opinions are not relevant to the issues to be tried and that others are based on assumptions and speculation. They further argue that his opinions should be excluded because they are based on a flawed analysis of the facts, including his resolution of disputed factual issues and credibility assessments. The Court will address each of the challenged areas, in turn.

i. *Traffic Stop*

Baranowski's opinions regarding the propriety of the initial traffic stop and the City's alleged misuse of Narcotics Officers, in plain clothes and unmarked vehicles, to make traffic stops are not relevant and are based on improper assumptions and speculation. Thus, these opinions will be excluded at trial. First, the propriety of the traffic stop is not at issue in this case as Plaintiff pled guilty to a summary offense and paid a fine for failing to operate a turn signal. The disputed issues at trial are the reasonableness of the inventory search of Jackson's car, whether there was probable cause to arrest Jackson for disorderly conduct and/or resisting arrest and the reasonableness of the force used against Jackson during the arrest. (Docket No. 140, *Parties' Joint Stipulations* ). Thus, the proffered opinions that the narcotics officers were misused when making traffic stops or that it is unsafe to use undercover officers to make traffic stops are not relevant.

In any event, Jackson recognized that the unmarked vehicle that pulled him over was a police car. Specifically, in his sworn statement to OMI, Jackson stated "I went past Beer World, and I noticed there were lights like in the grill ... of a vehicle, which I figured was a plainclothes police car, pulled over to the right, thinking they're going—like going after someone around me or going somewhere, and they pulled right behind me." (Docket No. 83–2 at 36).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

Therefore, the safety concerns articulated by Baranowski simply were not present in this case. Further, as to Baranowski's suggestion that the officers should have radioed for a marked police car to make the stop, Baranowski admitted that he did not know if the City had a policy requiring them to do so, or if there were any marked police cars available in the area that could have made the stop if they had called. Thus, this opinion is without factual support.

**\*12** However, even if the traffic stop were in issue, Baranowski would not be permitted to testify regarding his opinions that the officers were "trolling" for drug arrests or "profiling" at the time of the incident. Baranowski admitted that he was assuming that a profile was used by the officers on the date of the arrest but pointed to no evidence in support of this assertion. He relied on a statement by Detective Goob that the officers often make traffic stops when on narcotics duty in support of his opinion that the officers were "trolling" for drug arrests but that term was not used at any point in the record. Baranowski did not review any of the officers' arrest records to determine if his belief that they did not always enforce traffic laws as they asserted was in error. Thus, these opinions are based on improper assumptions and/or speculation and must be excluded. Moreover, the terms "trolling" and "profiling" are prejudicial to Defendants, and the prejudice to them substantially outweighs the limited probative value of Baranowski's use of these terms, given that they have no factual support in the record. *See* FED.R.EVID. 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

In sum, the proffered expert testimony regarding the traffic stop is not relevant under Rule 403 and, the testimony relying on assumptions and speculation do not "fit" the case, and would not assist the trier of fact under Rule 702.

ii. *Initial Encounter*

Baranowski's opinions as to the initial encounter

between Jackson and the officers after the traffic stop shall be excluded. Based on his experience as a state trooper, Baranowski is arguably qualified to render an opinion as to the proper procedure to be followed after a traffic stop is made. However, his opinions as to how an officer is to determine if a person's license is suspended must be excluded because they are improper legal conclusions and/or without foundation. For instance, he summarizes the law; stating that an officer cannot arrest an individual for violation of traffic laws, but also that an out of state resident can be arrested for violations of traffic laws. He testified to his belief that an individual cannot be arrested for driving with a suspended license without first receiving information from PennDot that the person's license is suspended in the form of a certified copy of the person's driving record. He explained that officers in the field cannot rely on the information that is provided regarding a person's driving history in the computers in their squad cars to determine if a person's license is suspended. The parties dispute the applicable law in this area. Defendants challenged Baranowski on his interpretation of the law at the *Daubert* hearing, but he offered no policy, regulation or statute in support for his opinion. Defendants cited 75 Pa.C.S. § 6309.2 in opposition. The version of that statute in effect on November 2, 2001, provided, in relevant part, that:

**\*13** If a person operates a motor vehicle or combination on a highway or trafficway of this Commonwealth while the person's operating privilege is suspended, revoked, canceled, recalled or disqualified, or where the person is unlicensed, as verified by an appropriate law enforcement officer in cooperation with the department, the law enforcement officer shall immobilize the vehicle and the appropriate judicial authority shall be so notified.

75 Pa.C.S. § 6309.2(a)(1) (1996),1996 July 2, P.L. 535, No. 93, § 5. [FN7] This statute is silent regarding whether a certified copy of a person's driving record is required. Thus, there is no foundation for Baranowski's opinion. Baranowski, a former police

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

officer, is not qualified to engage in an analysis of the applicable law. Because there is no foundation for this testimony, it must be excluded.

> FN7. The present version of this statute provides that:

>> If a person operates a motor vehicle or combination on a highway or trafficway of this Commonwealth while the person's operating privilege is suspended, revoked, canceled, recalled or disqualified or where the person is unlicensed, as verified by an appropriate law enforcement officer in cooperation with the department, the law enforcement officer shall immobilize the vehicle or combination or, in the interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storage agent pursuant to subsection (c), and the appropriate judicial authority shall be so notified.

> 75 Pa.C. S. § 6309.2(a)(1) (2005). In any event, it is unclear whether either version of this statute was adopted by the City of Pittsburgh on the date of the incident. *See Commonwealth v. Henley,* 909 A.2d 352, 361–62 (Pa.Super.2006) (holding that the City of Pittsburgh did not adopt section 6309.2 and "municipalities are only subject to the specific procedures set forth in the statute if they choose to adopt them.").

iii. *Plaintiff's Request to Move Car/ Defendants' Towing Policy Violation*

Baranowski's opinions regarding the City's Towing Policy and the officers' compliance with same must also be excluded. The relevant policy provides that:

> Vehicles of arrested persons shall not be towed

unless:

> • the vehicle presents a traffic hazard and cannot be driven away;

> • it is necessary for investigative or evidentiary purposes;

> • the arrested person may give his permission to another person to move the vehicle;

> • the disposition of the vehicle shall be noted on the police report.

(Docket No. 160–2, D–10, Order # 41–4, § 5.1.). Baranowski's opinions consist of his interpretation of this law and do not rely on his experience with any other towing laws or regulations. His opinions are more akin to legal argument than expert testimony. He testified that the Towing Policy, as written, takes all discretion away from the officers in making a determination regarding whether to tow a vehicle but grants the arrested person, Plaintiff in this instance, the discretion to request that he be able to call another person to come to the scene of the traffic stop and move the car on his behalf. Baranowski then concluded that the officers acted in violation of this policy when they rejected Plaintiff's request to call his father to move the vehicle for him.

In this Court's estimation, Baranowski's analysis is an improper legal conclusion, which subverts both the Court's role in instructing the jury on the law and also the jury's role in resolving the disputed facts. There is also no factual or legal foundation for Baranowski's analysis; the policy is silent regarding the proper procedures to be used in the situation that these officers were presented with on November 2, 2001, i.e., Jackson is pulled over while driving by himself, the officers determine that he has a suspended Pennsylvania license, they determine that the vehicle is blocking traffic and must be towed, and Jackson

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

requests that he be able to call a third party to move his car rather than have it towed. Accordingly, Baranowski's opinions interpreting the Towing Policy are excluded.

### iv. *Custodial Inventory*

**\*14** Baranowski's opinions, to the extent that he has offered any, regarding the custodial inventory search are also excluded. In his report, Baranowski purportedly summarizes the law regarding a custodial inventory, and offers no actual opinions regarding how the search itself was conducted by the officers. Likewise, his affidavits and testimony did not address the custodial inventory. Because Baranowski's summary of the law regarding custodial inventories is not offered in support of any actual opinions, any testimony in this regard would serve no purpose other than to confuse the jury. This type of testimony would also invade the Court's duty to charge the jury as to the applicable law. Further, as no opinions on this issue were ever proffered, to the extent that Baranowski attempts to testify regarding the custodial inventory at trial, his opinions will be excluded as a violation of Rule 26 in light of the standards set forth above.

### v. *Reasons for the Disposition of the Dismissed Charges*

Baranowski's opinions regarding the reasons for the dismissal of the charges initially brought against Jackson, including resisting arrest and disorderly conduct, are excluded. Like the other matters discussed above, these opinions are also not grounded in fact and are legal conclusions or assumptions and speculation. To that end, Baranoski may not testify to any of the following: that because the charges were dismissed, one can "assume" that the charges were without merit; that no evidence of any crime ever existed; or that the officers did not have sufficient evidence to prove any of the dismissed charges. Moreover, Baranowski does not have expertise in the type of prosecutorial discretion involved in making the decision of whether to prosecute charges against an individual. Further, the Court will charge the jury

regarding the dismissal of the charges consistent with the instruction recommended in the Third Circuit's Model Civil Jury Instructions. *See* 3d Cir. Model Civil Jury Inst., § 4.12.2.

### vi. *Use of Force*

Baranowski will be permitted to testify as to the use of force by the police officers in this case. However, his testimony will be limited. Defendants contend that Baranowski's use of force opinions should be excluded because they involve improper credibility assessments and the resolution of disputed facts. The Court agrees that Baranowski is not permitted to make credibility assessments of the witnesses, including the truthfulness of their respective testimony or statements. *See Whitmill,* 29 F.Supp.2d at 246–47. Credibility assessments are left solely for the jury to decide and Baranowski's opinions evaluating the credibility of Jackson given his prior involvement with law enforcement and Detective Kreger in light of the prior complaints against him, will be excluded. *Id.* Baranowski's report and testimony also consist of his resolution of many factual disputes and he admitted that he was acting as a "fact finder" during his analysis. The resolution of factual disputes is likewise within the province of the jury, but "[a]n expert is ... permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon,* 46 Fed.Appx. 691, 695–96 (3d Cir.2002) (not precedential); FED.R.EVID. 702, 2002 Amendments ("The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."). Therefore, in this Court's estimation, Baranowski cannot testify in the manner that he has presented in his report. Many of his opinions and statements explain only why he feels certain evidence is more credible than the other evidence. These types of explanations impinge on the jury's function. To this end, given these and the other matters discussed above which are not admissible, Baranowski's report cannot

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)
**(Cite as: 2010 WL 3222137 (W.D.Pa.))**

be presented to the jury as an exhibit as Plaintiff has requested. *See* FED.R.EVID. 703 ("Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."); FED.R.EVID. 703, 2000 Amendments Comm. ("Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."). But, Baranowski's report may be used to impeach him.

*\*15* Despite the fact that Baranowski's presentation of the facts in his report resolves matters left for a jury determination, his opinions can be presented at trial if they are offered in response to properly formulated hypothetical questions. Said hypothetical questions must be founded on facts already in evidence and they must not be phrased in a manner requesting that the expert testify on the ultimate legal issue of whether the force used by the officers was "reasonable." *See Samples v. City of Atlanta,* 916 F.2d 1548, 1551–52 (11th Cir.1990) (discussing the use of a hypothetical question by a use of force expert in a § 1983 case); *Burger v. Mays,* 176 F.R.D. 153, 157 (E.D.Pa.1997) (holding that use of force expert may testify as to whether an officer's actions "were in line with standard police procedures," but prohibiting testimony that the officer's actions were "unreasonable"); *Tschappat v. Groff,* Civ. A. No. 3:CV–01–2279, 2004 WL 5509087, at \*4 (M.D.Pa. Jun.2, 2004). These opinions can then be tested through cross examination. *See Walker,* 46 Fed. Appx. at 696 (citing *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002)).

Finally, Defendants summarily contend that expert testimony is not needed in this case because the content of Baranowski's proffered testimony is not "beyond the ken of the average juror." (Docket No.

195). The Court disagrees. Expert testimony is commonly permitted in use of force cases and given Baranowski's considerable background and experience in these areas, his proffered testimony, so limited by this opinion, will assist the trier of fact on the disputed issues in this case.

The scope of Baranowski's permitted testimony is as follows:

(1) His knowledge, experience and extensive law enforcement background;

(2) The standardized police procedures at issue in this case, including the City of Pittsburgh's Use of Force Policy, the Continuum of Control, and the CALEA standards (if the CALEA standards are produced prior to trial as discussed above); and,

(3) Whether the Defendants' use of force was in accord with the standardized police procedures given the facts of this case (properly presented to him by way of a hypothetical question).

IV. CONCLUSION

For the foregoing reasons, Defendants' Motion [126] is granted, in part and, denied, in part. An appropriate Order follows.

W.D.Pa.,2010.
Jackson v. City of Pittsburgh, Pa.
Not Reported in F.Supp.2d, 2010 WL 3222137 (W.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.