IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

DANIEL LOVELACE and HELEN LOVELACE,
Individually and as Parents of
BRETT LOVELACE, Deceased

        Plaintiffs,

vs.                           No. 2:13-cv-02289-SHL-dkv

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDPAILLI; and
MARK P. CLEMONS,

        Defendants.

---

**DEFENDANT MARK P. CLEMONS, M.D.'S MOTION TO JOIN DEFENDANTS',
PEDIATRIAC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, M.D.'S
MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S DESIGNATED EXPERT
WITNESSES JASON KENNEDY, M.D. AND ROBERT E. MARSH UNDER F.R.E.
702/*DAUBERT* AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

---

Comes now defendant, Dr. Mark P. Clemons, and moves the Court to exclude opinions of plaintiff's designated expert witnesses Jason Kennedy, M.D., and Robert E. Marsh, under F.R.E. 702/*Daubert*. In support of this Motion, Dr. Clemons relies upon Federal Rule of Evidence 702/*Daubert* and would adopt and incorporate by reference the Motion and Memorandum of Law filed by co-defendants, Pediatric Anesthesiologists, P.A., and Babu Rao Paidipalli, M.D.'s filed in this Court on August 9, 2014 and attached hereto as Exhibit A.

LEWIS THOMASON

By: s/ Marcy D. Magee
          J. KIMBROUGH JOHNSON (7953)
          MARCY D. MAGEE (19360)
          One Commerce Square
          40 South Main Street, 29th Floor
          Memphis, TN 38103
          (901) 525-8721
          *Attorneys for Defendant,*
          *Mark Clemons, M.D.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via U.S. Mail, first class postage prepaid, and via the Court's ECF filing system:

Mr. Mark Ledbetter
Halliburton & Ledbetter
254 Court Avenue, Suite 305
Memphis, TN 38103

Mr. Bradley Gilmer
The Hardison Law Firm
119 South Main Street, Suite 800
Memphis, TN 38103

This the 12 day of August, 2014.

*s/ Marcy D. Magee*
Marcy D. Magee

5584473

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESESEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

        Plaintiffs,

Vs.

                              No. 2:13-cv-02289 dkv
                              JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and
MARK P. CLEMONS,

        Defendants.

---

### DEFENDANTS', PEDIATRIC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, M.D.'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S DESIGNATED EXPERT WITNESSES JASON KENNEDY, M.D. AND ROBERT E. MARSH UNDER F.R.E 702/*DAUBERT* AND MEMORANDUM OF LAW IN SUPPORT OF MOTION

---

Come now the defendants, Pediatric Anesthesiologists, P.A. and Babu Rao Paidipalli, M.D., by and through counsel of record, and in support of this Motion to Exclude Experts under F.R.E 702/*Daubert* would show to the Court as follows:

## BACKGROUND

This is a medical malpractice lawsuit in which plaintiffs, Daniel and Helen Lovelace, assert a claim for medical malpractice against Pediatric Anesthesiologists, P.A., Babu Rao Paidipalli, M.D., (a pediatric anesthesiologist) and Mark D. Clemons, M.D. (an otolaryngologist), and also assert a claim against these defendants for negligent infliction of emotional distress based upon alleged medical malpractice in the care provided to plaintiffs' twelve year old son, Brett Lovelace, at Methodist Le Bonheur Children's Medical Center,

1



EXHIBIT
A

following a tonsillectomy/adenoidectomy surgery on March 12, 2012, allegedly resulting in Brett Lovelace's death on March 14, 2012. (ECF 1, paragraphs 8 – 12.) Defendants deny any medical negligence on their part and deny that they caused injury to, and the subsequent death of the patient, Brett Lovelace. (ECF 13, paragraph 3.) Plaintiffs settled with Methodist LeBonheur pre-suit based upon the egregious care rendered by a nurse in the recovery room, which included fraudulent documentation of the child's vital signs and playing on Facebook and another website while charged with monitoring the child. The nurse's license was later revoked as a result of her actions.

Plaintiffs designated their only standard of care expert, Jason Kennedy, M.D., an adult cardiovascular anesthesiologist, on April 9, 2014. Dr. Kennedy's discovery deposition was taken by the defendants on June 25, 2014. Plaintiff also disclosed a damages expert, Robert E. Marsh, CPA. Mr. Marsh's discovery deposition was taken by the defendants on June 9, 2014.

In accordance with the "Order Granting Defendants' Unopposed Motion for Extension of Discovery Deadlines First Amended Scheduling Order" entered in the cause on January 22, 2014, (ECF 89), Motions to Exclude Experts under F.R.E. 702/Daubert Motions shall be filed by August 9, 2014. Defendants now therefore move to exclude opinions of Plaintiffs' experts, Jason Kennedy, M.D. and Robert E. Marsh, CPA, on the grounds that their opinions are unreliable under the case of *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 286 (1993) and Rule 702 of the Federal Rules of Evidence. Defendants seek exclusion because their opinions are outside of their respective areas of expertise, offer opinions that lack reliability under any stated methodology, lack peer-review support, demonstrate no established rate of error, which opinions are also not shown to be generally accepted in the relevant medical community and are "for this litigation" and thus deficient. Because these opinions are lacking in

2

trustworthiness pursuant to Rule 703 of the Federal Rules of Evidence, Defendants contend that the opinions set forth below should be excluded from the trial of this case.

In support of excluding testimony of Plaintiffs' experts under *Daubert*, defendant relies upon the sworn deposition testimony of Dr. Kennedy and Mr. Marsh, excerpts of which are attached as an exhibit to this Motion.

## <u>ARGUMENT</u>

As gatekeeper, the Court must ensure that a witness has the requisite ability to give expert testimony. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In *Daubert*, the Court determined that Rule 702 of the Federal Rules of Evidence allotted to the trial judge the task of determining whether an expert's testimony is admissible. <u>*Daubert,*</u> 509 U.S. at 597, 113 S.Ct. at 2799. The Court held that "general acceptance" was not indicative of the admissibility of scientific evidence. *Id.* The Court also noted that with determining whether expert testimony is admissible, the trial judge must determine that the testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.*

The United States Supreme Court expanded its analysis of the admissibility of scientific evidence in *General Electric Company v. Joiner*, 522 U.S. 136, 118 S.Ct. 512 (1997). The Court noted:

> [N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner*, 522 U.S. at 146, 118 S.Ct. 519.  The Court thus held that a district court's decision to admit or exclude scientific evidence would be measured by the abuse of discretion standard. Id.  Hence, it is within a trial or district court's discretion to conclude that expert testimony is inadmissible.

In *Kumho Tire Company, Ltd. v. Carmichael*, the United States Supreme Court expanded the trial court's duty to measure all expert testimony for reliability and relevance. 526 U.S. 137, 119 S.Ct.1167 (1999).  The Court disagreed with the Eleventh Circuit's holding that *Daubert* factors may only be considered when an "expert 'relies on the application of scientific principles' but not where an expert relies 'on skill- or experience-based observations.'"  *Kumho*, 526 U.S. at 151, 119 S.Ct. at 1176.  The Court responded by writing, "[w]e do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts.  Life and the legal cases that it generates are too complex to warrant so definitive a match."  *Id.*  The Court stated that the trial judge must have a great amount of discretion in determining whether an expert's testimony is reliable.  *Id.* at 151, 1176.  Hence, if the trial or district court has doubts as to the admissibility of evidence, as long as these doubts are reasonable, there is no abuse of discretion.  *Id.* at 153, 1177.

In a medical malpractice case, the plaintiff must prove by expert testimony: 1) the standard of care in the defendant's specialty; 2) a deviation from the standard; 3) and an injury caused by the deviation.  Tenn. Code Ann. § 29-26-115.  Medical malpractice cases typically involve a dispute over the diagnosis, treatment or other scientific matters.  *Peete v. Shelby County Health Care Corp.*, 938 S.W.2d 693 (Tenn. Ct. App. 1996).  Thus, expert testimony is required.

Rule 702 of the Federal Rules of Evidence was amended in response to *Daubert* and the many cases that followed, and provides that a qualified expert may testify in the form of an opinion or otherwise if:

4

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the fact of the case;

Fed. R. Evid. 702.

Rule 703 of the Federal Rules of Evidence states if the facts or data relied upon by the expert would otherwise be inadmissible; the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect. Fed. R. Evid. 703

### *Basis for Exclusion of Opinions of Dr. Kennedy:*

Defendant avers that certain opinions of Dr. Kennedy should be excluded at trial under Rule 702 of the Federal Rules of Evidence.  Dr. Kennedy is not a pediatric anesthesiologist like Dr. Paidipalli. He admits in his deposition that he does not put children to sleep, or wake them up, and thus he had adopted positions and opinions that are for this litigation only and are thus deficient under *Daubert.*

Dr. Kennedy is an adult cardiac anesthesiologist in Nashville. He takes care of "adult patients undergoing cardiac anesthesia and adult patients undergoing critical care." He also takes care of adult patients in the ICU. Dr. Kennedy has only been a licensed practicing anesthesiologist since June 2010-less than two years prior to the date in question, March 18, 2012. (See Expert Witness Report of Jason Kennedy, Exhibit 1).  He does "not work in the department of pediatric anesthesiology." (See Deposition of Jason Kennedy, Exhibit 2, P. 8, l. 11-20.) He does not take care of pediatric patients like 12 year old Brett Lovelace who have

surgery. His practice concerns adults with cardiac problems-not children that have had throat surgery.

He is not certified as a pediatric anesthesiologist by any organization. (See Curriculum Vitae of Jason Kennedy, Exhibit 3.)  Dr. Kennedy has no specialized training in pediatric anesthesiology.   (See Exhibit 2, p. 25 l. 8-12).   In fact, he has no interest in pediatric anesthesiology.  (See Exhibit 2, p. 27 l. 22-25)

Dr. Kennedy's opinions, therefore, were developed for the purposes of this litigation. He had to research textbooks to develop his opinions of the standard of care for Dr. Paidipalli. While Dr. Kennedy asserts that he reviewed Miller's Anesthesia generally, and "two or three pediatric-specific textbooks" to formulate his opinions in the case, he could not and did not even identify with any specificity the title, chapters, authors, or studies to which he referred. He admitted that these texts themselves were not authoritative on the issues of the pediatric anesthesiology rendered in this case. P.12, l. 12-p.13 l. 23. Dr. Kennedy cites three sources in his expert report that he apparently had to rely upon to determine what the standard of care was in the case to drfat his report since he has no experience with children like Brett Lovelace. (See Exhibit 1, fn. 2-3.)

He conducted no testing relative to his opinions in this case. (See Exhibit 1). He has given no lectures or presentations specific to pediatric anesthesiology.  (See Exhibit 2, P. 32, l. 24-25).  He has not authored any peer reviewed study or paper. (See Exhibit 3.)  Dr. Kennedy has not authored any articles or studies, whatsoever, on pediatric anesthesiology or post surgical complications involving children or throat surgery. (See Exhibit 3). In fact, his only publication as an anesthesiologist was in a text and concerns "intraoperative monitoring of patients' cardiac function in during cardiopulmonary bypass."  (See Exhibit 2, p. 10, l. 10-13). This case involves a tonsillectomy/adenoidectomy in a 12 year old child-not an adult cardiac patient.

Dr. Kennedy has never been qualified as an expert witness before. This is his first case to attempt to testify as an expert witness in any court.  (See Exhibit 2, p. 40, l. 12-20.)

As seen from his complete lack of training and experience with this type of patient and surgery, his testimony would not assist the trier of fact as required and should be excluded. He has developed opinions solely for the purposes of this litigation.

### *Basis for Exclusion of Opinions of Robert Marsh, CPA*:

Defendants aver that Mr. Marsh must be excluded as an expert for the following reason – his testimony regarding economic damages resulting from the alleged injury lacks any basis that adequately supports his conclusions – an analytical gap exists between the data and the opinion offered. Defendants are not asserting that Mr. Marsh is not an expert within the meaning of Rule 702, but his testimony should be excluded because the basis for the witness's opinion, i.e. testing, research, studies, or experience-based observations, does not adequately support the expert's conclusions.  *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997).  His opinions lack peer-review support, credentials and scientific basis or evidentiary support from those fields.  Moreover, his opinions provide no established rate of error; and his opinions are not based upon data generally accepted by economists.

Mr. Marsh failed to properly use measurements or records from the decedent; he bases his opinions on anecdote and assumptions that not scientific or which are outside any claimed area of expertise (economist). Mr. Marsh is a professional witness who makes a living reviewing cases in litigation.  His opinions are solely based upon an average white male and fails to take into account the specific information that was available to him regarding Brett's learning issues. He gives assumptions upon assumption, failing to take into consideration how this child and this child's family fit into the equation.

For instance, Mr. Marsh has asserted that the plaintiffs have suffered an economic loss as a result of the death of their son. However, all his calculations are derived from assumptions of what the future may have held for Brett Lovelace – i.e. – whether he would have even completed high school, let alone trade school or even college. Marsh's testimony reads as follows:

> **Q:    And so you didn't factor in his mental or educational accomplishments, or lack therof. Is that a fair statement.**
> **A:    That's correct. I treated him as the average statistical individual and provided earnings for a range of different education attainments.**

(See Deposition of Robert E. Marsh, pg. 12, lines 2-8, attached hereto as Exhibit 4.) Mr. Marsh also stated that he was aware that Brett Lovelace was home schooled but admittedly stated:

> **A:    ..I'm simply not an expert on home school, and there's not a whole lot of statistics with regard to education attainment of those who are home schooled that I feel comfortable relying on it.**

(See Exhibit 4, pg. 33, lines 6-10).

Moreover, Mr. Marsh gives assumptions of potential earnings based upon the assumption that Brett would have completed high school, yet he failed to take into consideration that Brett failed kindergarten, and by the time he was in sixth grade he could only read on a second grade level. (See Exhibit 4, pg. 34, lines 6-24.    Dr. Marsh admits that he could have prepared a potential earnings range in his calculations for people who have not graduated high school but didn't make such calculations in his report presumably because his potential earnings would have been lower.  (See Exhibit 4  pg. 36, lines 8-11).

The trial court, as the gatekeeper of proof, must ensure that the basis for the witness's opinion adequately supports the expert's conclusions. Marsh is relying on assumptions, not fact. In the present case, there is no data that can support the opinions offered by Marsh. Moreover, the opinion evidence is connected to the existing data only by the *ipse dixit* of the expert. Marsh

admits that he has had to make numerous assumptions to arrive at his calculations that are less than certain. Mere inferences are insufficient to create a straightforward connection between the expert's knowledge and the basis for the opinion – an analytical gap exists. As such, Marsh's speculative opinions on economic loss should be excluded.

## CONCLUSION

Defendants' respectfully urge the Court to grant this FRE Rule 702/*Daubert* challenge to Plaintiffs' experts, Dr. Kennedy and Mr. Marsh, and rule that they not be permitted to testify by opinion as to the matters set out above.

By:   s/ W. Bradley Gilmer
         JERRY O. POTTER (4284)
         W. BRADLEY GILMER (21490)
         KAREN S. KOPLON (16282)
         Attorneys for Defendants, Pediatric
         Anesthesiologists, P.A. and
         Babu Rao Paidipalli, M.D.
         THE HARDISON LAW FIRM, P.C.
         119 S. Main Street, Suite 800
         Memphis, Tennessee 38103
         (901) 525-8776
         jpotter@hard-law.com
         bgilmer@hard-law.com
         kkoplon@hard-law.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served via the Court's electronic filing system upon:

Mark Ledbetter, Esq.
Halliburton & Ledbetter
Attorney for Plaintiffs
254 Court Avenue
Suite 305
Memphis, TN 38103

J. Kimbrough Johnson, Esq.
Marcy Dodds Magee, Esq.
Attorneys for Defendant, Mark P.
Clemons, M.D.
Thomason, Hendrix, Harvey, Johnson &
Mitchell, PLLC
2900 One Commerce Street
Memphis, TN 38103

this 9th day of August, 2014.

s/ W. Bradley Gilmer
W. BRADLEY GILMER

# Expert Witness Report

*DANIEL LOVELACE and HELEN LOVELACE, Individually, and as Parents of BRETT LOVELACE, Deceased, vs. PEDIATRIC ANESTHESIOLOGISTS, P.A.; BABU RAO PAIDIPALLI; and MARK P. CLEMONS*

\*          \*          \*          \*          \*

## Prepared by: Jason D. Kennedy, M.D.

## Prepared for: Mark Ledbetter
## Halliburton and Ledbetter



I, Jason D. Kennedy, M.D., declare and state as follows:

I am over the age of 18 and have personal knowledge of the facts stated in this report.

I graduated from the University of Alabama School of Medicine in June 2003. I completed an internship at Carraway Methodist Medical Center in Birmingham, Alabama; a residency in anesthesiology from the University of Alabama at Birmingham Medical Center, Birmingham, Alabama from July 2004 through June 2007; a fellowship in Critical Care Anesthesiology from Emory University Medical Center, Atlanta, Georgia; and, a fellowship in cardio-thoracic Anesthesiology from Emory University Medical Center, Atlanta, GA. I have been a licensed medical doctor in the state of Tennessee with a specialty in Anesthesiology since June 8, 2010, and my Tennessee medical license number is 46094. My qualifications are set forth in my c.v. attached hereto.

I am currently an Assistant Professor of Clinical Anesthesiology at Vanderbilt University in Nashville, Tennessee, and have been in this position from July 2010 to present. Prior to my current position, I was an Instructor in Anesthesiology, Department of Anesthesiology, University of Alabama Birmingham-UAB (Birmingham, AL).

I have reviewed the medical records of Brett Lovelace for the hospitalization of March 12, 2012 through March 14, 2012 from LeBonheur Children's Medical Center. I have also reviewed the following:

(a)     Depositions of the parties;

(b)     Discovery;

(c)     Photographs of Brett Lovelace at LeBonheur; and

(d)     Pleadings.

I am familiar with the applicable standards of care and issues in this case specifically regarding anesthesiology treatment and care, medical, surgical and post-surgical/PACU care, in and for the Memphis area and hospital where the incident occurred,[1] and my opinions are set forth as follows:

---

[1] I belong to the American Society of Anesthesiologists [ASA] and the Society of Cardiovascular Anesthesiology [SCA], both organizations with physicians practicing in Memphis, Knoxville, Chattanooga, and surrounding areas; I attend meeting[s] of the ASA and SCA where physicians, including anesthesiologists from Memphis, Nashville, Knoxville, Chattanooga and surrounding areas attend; that I have been to Memphis three or four times; that I am familiar with and have worked surgical cases with ENT physicians as well as am familiar with their standard of care in the surgical context as respects the continued need to protect the patient's airway and ventilation and with the safety practices which were not followed in this case, viz., safe positioning, airway patency, supplemental oxygen needed post-surgery and in the PACU; that the communities of Nashville, where I practice, and Memphis are of comparable size; the medical communities adhere to similar practices and rules; there are more than 15 hospitals in Nashville and Memphis; each city has a hospital reported to be among the 100 largest hospitals in

1.      I have reviewed the medical records of Brett Lovelace which were provided to the attorney for the Lovelace family for the dates of hospitalization in March of 2012 from LeBonheur Children's Medical Center.

2.      Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett was appropriately and safely monitored and assessed in the PACU.  There are no records of them assessing the patient in the recovery room until after the initiation of the code, a period of about an hour.  Both physicians agreed that such monitoring and assessment was necessary, but neither assured nor verified that proper positioning, proper supplemental oxygen or proper monitoring occurred or was provided.[2]   Anesthesiologist supervision was needed until the patient, Brett Lovelace, was awake and maintaining his own airway.

3.      Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett had fully emerged from and recovered appropriately from the anesthetic prior to the removal of the endotracheal tube.  Brett's documented tidal volumes prior to extubation were a mere 145-180 cc's, this is a very small tidal volume for an 81 kg child.  This, combined with documented hypercarbia, makes it unlikely that he was ventilating adequately at the time of extubation.  Brett's high end tidal $CO_2$ level of 56 torr, as recorded on the anesthetic record, support the assertion that appropriate assessment and attention would have prevented his subsequent hypoxemia and acidosis.

4.      The Defendants failed to follow standards of care in that they failed to ensure adequate ventiltory support in a patient who was obese, with sleep apnea.  Brett's initial arterial blood gas (ABG) is recorded as a pH of 6.70, a partial pressure of $CO_2$ of 96/, a partial pressure of oxygen of Pa02 502/ HC03 of 12.  This ABG was performed after at least 10 minutes of positive pressure ventilation, since per the code note, he was reintubated at 1204 and the first blood gas is reported to be at 1218.  Therefore, the initial $CO_2$ was likely much higher.  There is a sample that is reported to be a venous sample that has a pH of 6.59, a $CO_2$ of >130.  This is an incredible amount of hypercarbia resulting likely a prolonged period of hypoventilation as consistent with a patient who was extubated in a non-fully awakened state (deep extubation) and without appropriate insurance that he was maintaining adequate respiratory rate and tidal volumes.  This was a clear breach of the standard of care in any patient who had undergone a general anesthetic, and especially true in an obese child with sleep-deprived breathing who undergoes tonsillectomy.

5.      Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett had adequate oxygen supplementation in the post-anesthesia care

America, e.g., BMH, Memphis, and VUMC, Nashville; and I have attended CME with Memphis anesthesiologists, e.g., New Horizons in Anesthesiology, and studied and learned the same principles and methods, as well as in medical school.

[2] See Clinical Practice Guideline: Tonsillectomy in Children, Baugh, et. al., Otolaryngology - Head and Neck Surgery 2011 144: S1; Guidelines for Patient Care in Anesthesiology, American Society of Anesthesiologists, October 29, 2011, Section I - III, including post-anesthetic care.

unit (PACU).   Defendants failed to reaffirm airway patency and adequacy of breathing. Defendants should have continued delivery of oxygen by mask to Brett Lovelace until his recovery was complete.   Further, Defendants failed to maintain airway patency with simple airway maneuvers or oro-nasopharyngeal airway until the patient was fully awake.   Neither Defendant could explain these lapses, but both agreed that such steps were required and standard.

6.   Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett was appropriately monitored in the post anesthesia care unit.   A patient in the prone or knee-chest position is difficult to monitor and ensure adequate oxygenation.   Dr. Paidipalli did not attend the patient in the PACU, reportedly and admittedly; and Dr. Clemons did nothing to correct Brett Lovelace's position when he saw him prone and on his face without oxygen support.   Placing Brett Lovelace in a left lateral or semi-prone ("tonsil position"), slight head-down position, with a pillow under the chest to allow secretions and blood to drain, was necessary, as well known, but not done, here, which was a failure to follow the pertinent standard of care. [3]

7.   The ENT surgeon failed to follow standards of care in that he failed to appropriately care for and recognize that Brett was not fully awakened from anesthesia.   He also failed to appropriately intervene by his lack of any personal action in the care of Brett or by not calling for an appropriate trained anesthesiologist to ensure that Brett was oxygenating and ventilating appropriately.   An ENT surgeon routinely cares for such patients and should have known to intervene at the time he saw Brett in the PACU.

8.   The ENT surgeon failed to follow standards of care in that he failed to intervene in Brett's poor positioning for a patient who was at high risk of respiratory compromise.   By documentation, he saw Brett in the PACU in the knee-chest prone position prior to his arrest, and did not act appropriately to correct the situation.

9.   Neither physician appropriately followed up on the possibility of the most likely anesthetic complication and cause of death in patients undergoing T & A – bleeding or loss of airway.   Neither arranged for adequate follow-up and evaluation by themselves, a CRNA or the nursing staff.   The suggestion that clinical judgment is appropriate for post-anesthetic care in this case is analogous to the judgment that a pilot uses when operating an airplane; however, the judgment of a physician is also based upon instruments similar to those that provide objective information and data to a pilot.   For example, in a storm, a pilot must disregard his physical senses and use the instruments to appropriately fly the airplane.   By analogy, the anesthesiologist, like the pilot, has to have an objective sense of the standard physiology variables in order to "land the plane" or bring the patient safely out of anesthesia.   In this case, clinical judgment is not a proper substitute for failure to pay attention to the details and condition of the patient, and to use customary and accepted safeguards.

10.   Neither physician adequately observed the patient in the PACU so as to be able to exercise any judgment whatsoever.   The patient was abandoned.   It does not appear that either physician advised the PACU nursing staff of the risks of this particular patient.   The

---

[3] Guidelines, Difficult Airway Society Guidelines For the Management of Tracheal Extubation,, Anesthesia 2012, 67, 318-340, Table 3.

anesthesiologist did not ensure that there was an adequate transfer of care information nor remain with the patient as long as medically necessary nor ensure that the patient was discharged from the PACU unit in accordance with proper anesthesiology policies. The ENT surgeon did no better.  See fn. 2, Guidelines for Patient Care in Anesthesiology, supra, at III, E, 1-6.

The foregoing opinions are rendered to a reasonable degree of medical certainty; it is further my opinion that the lack of attention and supervision, and failure to follow the appropriate standard of care, directly caused and contributed to the death of 12-year old Brett Lovelace.

Jason D. Kennedy, M.D.

**A80609D**

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION
                      - - - - - -
 3   DANIEL LOVELACE, and         )
     HELEN LOVELACE,              )
 4   Individually, and as Parents)
     of BRETT LOVELACE, deceased,)
 5                                )
     Plaintiffs,                  )
 6                                )
     vs.                          ) No. 2:13-cv-02289-SHL-dkv
 7                                )
     PEDIATRIC                    )
 8   ANESTHESIOLOGISTS, P.A.;     )
     BABU RAO PAIDIPALLI; and     )
 9   MARK P. CLEMONS,             )
                                  )
10   Defendants.                  )
     --------------------------
11
                    VIDEOTAPED DEPOSITION OF:
12
                    JASON D. KENNEDY, M.D.
13
                    NASHVILLE, TENNESSEE
14
                    WEDNESDAY, JUNE 25, 2014
15   ------------------------------------------------------
16
17
18
19
20
21
22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY:  IVA L. TALLEY, LCR
25   FILE NO.: A80609D
```

A80609D
## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 2**

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
 2                    WESTERN DIVISION
                      - - - - - -
 3    DANIEL LOVELACE, and      )
      HELEN LOVELACE,           )
 4    Individually, and as Parents)
      of BRETT LOVELACE, deceased,)
 5                              )
      Plaintiffs,               )
 6                              )
      vs.                       )  No. 2:13-cv-02289-SHL-dkv
 7                              )
      PEDIATRIC                 )
 8    ANESTHESIOLOGISTS, P.A.;  )
      BABU RAO PAIDIPALLI; and  )
 9    MARK P. CLEMONS,          )
                                )
10    Defendants.               )
      --------------------------
11
12         The videotaped deposition of
13    Jason D. Kennedy, M.D., taken on behalf of the
14    Defendants, Pediatric Anesthesiologists, P.A., and
15    Babu Rao Paidipalli, M.D., on June 25, 2014, commencing
16    at approximately 1:30 p.m., before Iva L. Talley, Court
17    Reporter for the State of Tennessee.
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3    HALLIBURTON & LEDBETTER
      Mark Ledbetter, Esq.
 4    254 Court Avenue, Suite 305
      Memphis, Tennessee 38103
 5    Telephone: (901) 523-8153
 6
      FOR THE DEFENDANTS, PEDIATRIC ANESTHESIOLOGISTS, P.A.,
 7    AND BABU RAO PAIDIPALLI, M.D.:
 8    THE HARDISON LAW FIRM
      W. Bradley Gilmer, Esq.
 9    119 S. Main Street, Suite 800
      Memphis, Tennessee 38103
10    Telephone: (901) 525-8776
      Email: bgilmer@hard-law.com
11
12    FOR THE DEFENDANT, MARK P. CLEMONS, M.D.:
13    LEWIS THOMASON
      J. Kimbrough Johnson, Esq.
14    2900 One Commerce Square
      40 South Main
15    Memphis, Tennessee 38103
      Telephone: (901) 577-6125
16    Email: kjohnson@lewisthomason.com
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    I N D E X
                                        PAGE
 2    EXAMINATION
         By Mr. Gilmer ........................  5
 3
      EXAMINATION
 4       By Mr. Johnson .....................  157
 5    EXAMINATION
         By Mr. Ledbetter ...................  189
 6
 7
 8
 9               E X H I B I T S
10    1   Second Notice to Take Audiovisual Deposition
             of Dr. Kennedy .....................  17
11    2   Dr. Kennedy's curriculum vitae .........  17
12    3-A Supplemental, list of textbooks reviewed by
             Dr. Kennedy ........................  19
13
      3-B Supplemental, Dr. Kennedy's up-to-date
14         curriculum vitae .....................  19
15    3-C Supplemental, online ASA standards
             reviewed by Dr. Kennedy ...........  19
16
17    4   Document entitled "Smith's Anesthesia
             For Infants and Children, Eighth Edition,"....  35
18    5   Notice to Take Audiovisual Deposition of
             Dr. Jason Kennedy filed May 22, 2014 .........  36
19
20    6   Collective, Plaintiff's Designation of
             Expert Witnesses and Physicians Not
21         Employed as Experts ...............  48
22
23    7   Anesthesia Record ......................  92
24
25
```

**Page 5**

```
 1          VIDEOGRAPHER:  This is the beginning of
 2    the videotaped deposition of Dr. Jason Kennedy.
 3    Today's date is June 25, 2014.  The time indicated on
 4    the video screen is 1:28 p.m.  The standard
 5    introduction has been waived by agreement.  The court
 6    reporter will now swear in the witness.
 7
 8          JASON D. KENNEDY, M.D.,
 9          having first been duly sworn, was examined
10    and testified as follows:
11
12              EXAMINATION
13    BY MR. GILMER:
14       Q    Would you state your name for the
15    record, please?
16       A    My name is Jason Duane Kennedy.
17       Q    All right.  Dr. Kennedy, we're here
18    today to take your deposition in the matter of Lovelace
19    vs. Paidipalli and Clemons.
20          You have been identified as an expert
21    for the plaintiff.  So today is the opportunity for us
22    to ask questions to learn all of your opinions that you
23    have in this case, because we don't want any surprises
24    at trial.  Okay?
25       A    Okay.
```

2 (Pages 2 to 5)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1  Q       Do we have an agreement that if you
2  don't understand my questions today that you'll ask me
3  to clarify so that we make sure that we're on the same
4  page?
5  A       Yeah.
6  Q       Have you ever given a deposition before?
7  A       I have given a deposition before in
8  relationship as a material witness when I was 21 years
9  old, as a paramedic.  And that's it.
10  Q       Okay.  As a -- and what did that case
11  involve?
12  A       It was a medical malpractice case
13  against a nursing home in which, as a paramedic, I
14  witnessed something.
15  Q       Okay.  And were you named as a party in
16  that case?
17  A       No, sir, I was not.
18  Q       Okay.  Is that the only deposition that
19  you've ever given?
20  A       It's the only deposition I've ever given
21  that I can recall.
22  Q       Okay.  And there are a number of ground
23  rules.  And I don't know if Mr. Ledbetter has gone over
24  those with you, but the first is obviously that you
25  tell the truth; you're sworn under oath today to do

Page 6

1  that.  The second is that we make sure we understand
2  each other.  And we've talked about that.  And the
3  third is that we make sure we have a clear record for
4  our court reporter here.
5  A       Okay.
6  Q       So if you'll wait for me to finish my
7  questions, I will try to wait for you to finish your
8  answers before I ask another question.
9  A       Yes, sir.
10  Q       And if you'll continue to give us verbal
11  responses -- no head nods or uh-huhs or uh-uhs, okay?
12  A       Yes, sir.
13  Q       All right.  Is this your office that
14  we're in today?
15  A       This is the Critical Care office.  My
16  office is actually in a different building.
17  Q       Okay.
18  A       This is the closest meeting room I could
19  find.
20  Q       Which office is your building?  I mean
21  which building is your office in?
22  A       My office is in the Medical Center East,
23  North Tower, fifth floor.
24  Q       Okay.  And is -- what department is
25  that?

Page 7

1  A       It's in the Department of Anesthesia.
2  Q       And is the Department of Pediatric
3  Anesthesia included in that building?
4  A       The Division of Pediatric Anesthesia is
5  under the Department of Anesthesia, yes, sir.
6  Q       And so is it contained in that same
7  building?
8  A       The offices are in different locations,
9  so the Department of Anesthesia has offices in multiple
10  buildings, just from the size of the department.
11  Q       And it's my understanding that you do
12  not work in the Department of Pediatric Anesthesiology.
13  A       I do not work in the Division of
14  Pediatric Anesthesiology.
15  Q       Which division do you work in?
16  A       I'm a cardiac anesthesiologist caring
17  for adult patients undergoing cardiac anesthesia and
18  for adult patients undergoing critical care.  I'm an
19  ICU physician, also.
20  Q       And how long have you been in that role?
21  A       I've been in this role for four years
22  now at Vanderbilt.
23  Q       So that takes us back to 2010?
24  A       Yes, sir.
25  Q       Okay.  And what have you done to prepare

Page 8

1  for your deposition today?
2  A       I've reviewed the medical records that I
3  received initially that included medical records from
4  Le Bonheur Children's Hospital.  I've reviewed the
5  depositions of -- from both defendants, and the
6  depositions, the expert opinions of the medical experts
7  that were sent to me.  And I'm trying to think of what
8  else I've reviewed.
9  Q       Have you reviewed the depositions of
10  both parents?
11  A       I do not recall seeing those, no, sir.
12  Q       Have you reviewed the deposition of
13  Kelly Kish, the PACU nurse?
14  A       I have.
15  Q       When did you review that?
16  A       I think I initially reviewed it probably
17  about a month ago, and then I reviewed it again, I
18  think, earlier this week.
19  Q       Have you reviewed the deposition of
20  Dr. Peretti?
21  A       I don't recall that.  There are several
22  physicians that I reviewed, and I don't remember him
23  specifically.
24  Q       Peretti is identified as the forensic
25  pathologist in this case on behalf of your side.  Have

Page 9

3 (Pages 6 to 9)

**A80609D**

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 10**

1  you seen his deposition transcript?
2    A    I saw the autopsy report, and I don't --
3  I think that might be -- if that's what you're
4  referring to, yes, I have seen that.
5    Q    But we had -- we took his testimony a
6  couple of weeks ago, and I don't think it's been drawn
7  up yet. So I don't know if you --
8    A    No, sir --
9    Q    That's what I'm trying to clarify.
10   A    -- I don't recall seeing that.
11   Q    Okay.
12   A    No, sir.
13   Q    And what about the plaintiffs'
14 economist, Dr. March, Jay March.
15   A    No, sir, I have not.
16   Q    When you reviewed Nurse Kish's
17 deposition, did that change or modify your opinions in
18 any way?
19   A    I cannot recall that it changed or
20 modified my opinions in any way.
21   Q    Prior to reviewing her deposition, you
22 had already formulated your opinions in this case?
23   A    I had formulated an opinion in this
24 case, yes, sir.
25   Q    Well, after reading her deposition, did

**Page 11**

1  you formulate any additional opinions?
2    A    I can't think of any change, based upon
3  the medical facts that were already present, that what
4  she said changed that.
5    Q    So her testimony did not modify, change,
6  or affect your opinions in any way?
7    A    I think her -- I can't think of -- no,
8  sir.
9    Q    Had you reviewed the order that she had
10 entered into when she lost her license for the care
11 that she provided in this case?
12   A    The order? I do remember reading that,
13 yes, sir.
14   Q    And so did you have that knowledge base
15 when you formed your opinions in this case?
16   A    No, sir, I did not.
17   Q    Okay. Now, we have had propounded to
18 the attorney for the plaintiffs a second notice to take
19 your deposition. Now, I understand we had your
20 deposition notice previously, and you had a case of
21 pink eye?
22   A    I did, yes, sir.
23   Q    Okay. I'm glad that got cleared up for
24 you.
25   A    [Laughs].

**Page 12**

1    Q    Now, between -- what did you do to
2  prepare for your deposition the first time it was
3  scheduled?
4    A    The same series of events. I reviewed
5  the available records that I had received, including
6  the depositions. I had went back and reviewed what the
7  current standards of care are within the anesthetic
8  practice of patients undergoing anesthetics,
9  specifically with sleep apnea, and I had reviewed
10 specifically that in relationship to pediatric
11 patients.
12   Q    Where did you review something
13 concerning what the standards of care were regarding
14 pediatric anesthesia in this particular case?
15   A    Multiple sources, including -- I think
16 it's called -- there's a textbook. There's Miller's
17 Anesthesia, which is a general anesthesia textbook, but
18 it has sections about pediatric anesthesia. It's
19 written by experts in pediatric anesthesia. And then
20 there's two or three pediatric-specific textbooks.
21   Q    Which textbooks are those?
22   A    I would have to get back to you. I
23 can't remember the name right offhand.
24   Q    Prior to reviewing Miller's and those
25 other three -- which I would ask that you supplement

**Page 13**

1  and provide Mr. Ledbetter with the list of those three
2  texts -- prior to reviewing those, were you familiar
3  with what the recognized standard of care was for a
4  pediatric anesthesiologist?
5    A    I was.
6    Q    Okay. Do you consider Miller's and the
7  other texts that you reviewed as reliable and
8  authoritative in establishing the standard of care for
9  pediatric anesthesiologists?
10   A    I would consider them reliable. I
11 don't -- I would say there's not a single authoritative
12 text, per se, but multiple sources.
13   Q    What, particularly out of Miller's, did
14 you review that you found beneficial to your opinions
15 in this case?
16   A    Specifically in relationship to the use
17 of end-tidal $CO_2$ monitoring in patients with the risk
18 of airway compromise after tonsils and adenoid section
19 and the risk associated with anesthetizing patients
20 with sleep apnea, be they adults or children.
21   Q    The other texts that you reviewed, what
22 did you -- what subject matter did you review in those?
23   A    The same thing.
24   Q    And from your review of those four
25 texts, did you find any difference in opinions?

## A80609D
## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 14**

1  A   No specific difference in opinion that I
2  can recall right offhand.
3  **Q   Would you agree with me that you cannot**
4  **practice medicine based solely on what is included in a**
5  **textbook?**
6  A   I would agree with that statement.
7  **Q   That the clinical judgment of the**
8  **physician is important to the judgments that he makes**
9  **in caring for a particular patient?**
10  A   I think clinical judgment is based upon
11  sound knowledge of the available literature and data
12  that's present to you. It's difficult to apply
13  judgment when you don't use the data that's available
14  to the patient.
15  **Q   Do you have any reason to believe that**
16  **Dr. Paidipalli was not a sound and reputable pediatric**
17  **anesthesiologist?**
18  MR. LEDBETTER: Object as to the form.
19  THE WITNESS: Yeah, I'd ask that you
20  restate the question.
21  BY MR. GILMER:
22  **Q   Do you have any reason to believe that**
23  **Dr. Paidipalli is not a sound physician?**
24  A   Based upon my review of the anesthetic
25  records, I would question the practices in Brett's

**Page 15**

1  specific case. Outside of that, I have no other
2  knowledge of Dr. Paidipalli's practices.
3  **Q   When you reviewed his deposition itself,**
4  **did it help clarify the issues that you may have had**
5  **with the medical record itself?**
6  A   My recollection of the deposition is
7  that it shed very little light on his insight into his
8  practice -- decisions or his understanding of the care
9  of the patient.
10  **Q   We'll get to those in just a bit. And**
11  **did you, in addition to reviewing these four texts to**
12  **get up to speed on pediatric anesthesiology and sleep**
13  **apnea patients and risk of airway compromise in adenoid**
14  **surgery, did you review any cases -- I mean any text**
15  **specific to the standard of care applicable to an ear,**
16  **nose, and throat surgeon?**
17  A   I did not.
18  **Q   Now, the notice that we filed in this**
19  **case asked for you to bring with you a number of**
20  **things. And first of all, have you seen the notice**
21  **that was filed?**
22  A   Let me review this. I do recall seeing
23  this, yes, sir.
24  **Q   Have you met with Dr. -- I mean Mr. --**
25  **he is a JD, I guess -- Mr. Ledbetter prior to your**

**Page 16**

1  deposition today?
2  A   Today is the first time I've met with
3  him.
4  **Q   Okay. And did you speak with him by**
5  **telephone prior to your deposition?**
6  A   I have, yes, sir.
7  **Q   Okay. On -- and we'll get to those in**
8  just a few minutes. How long did you meet with him
9  today?
10  A   Probably for about an hour.
11  **Q   And what did you go over?**
12  A   More specific?
13  **Q   What did you talk about during that**
14  **hour?**
15  A   What to expect during the deposition.
16  I've never been deposed before, so I just wanted to
17  make certain that I was aware of, kind of, the flow and
18  what would happen and what is the appropriate, I guess,
19  behavior in this kind of situation.
20  **Q   Did he help you define any terms?**
21  A   I don't recall him helping me define any
22  terms, no.
23  **Q   Prior to disclosing your opinions in**
24  **this case, were you familiar with the definition of**
25  **standard of care?**

**Page 17**

1  A   Yes, I am.
2  **Q   And what -- how do you define standard**
3  **of care?**
4  A   What a reasonably trained physician
5  practicing in a similar situation would do.
6  **Q   This notice asked for you to bring with**
7  **you a copy of your current C.V. And there had been one**
8  **provided to me by counsel, and I was wondering if you**
9  **would take a look at that and make sure that's up to**
10  **date.**
11  A   [Reviews document] I think there's
12  actually two additional publications that are not added
13  onto here that I have not had a chance to -- I'm in the
14  process of doing that now and I can send that to you.
15  **Q   Okay. Would you supplement those --**
16  A   I would be happy to.
17  **Q   -- afterwards? And let's go ahead, if**
18  **we may, and mark the notice as 1.**
19  **(Second Notice to Take Audiovisual**
20  **Deposition of Dr. Kennedy filed marked**
21  **as Exhibit 1 to this deposition.)**
22  MR. GILMER: And your C.V. as 2.
23  **(Dr. Kennedy's curriculum vitae marked**
24  **as Exhibit 2 to this deposition.)**
25  BY MR. GILMER:
26  **Q   Would you tell us on the record what the**

A80609D
## JASON D. KENNEDY, M.D.   JUNE 25, 2014

| | |
|---|---|
| 1 two publications are that are not included in your C.V. | 1 A I was at one time. I think I've let my |
| 2 today? | 2 membership lapse. |
| 3 A Do you mind if I look at this, please? | 3 Q And so that would be incorrect, that |
| 4 Q Sure. | 4 that's listed on your C.V. then, right? |
| 5 A I believe there's one publication | 5 A I don't know. I think it's like coming |
| 6 specifically in response to the use of echo -- | 6 up for renewal within the next couple of months. I |
| 7 transesophageal echo in patients who are hypothermic. | 7 honestly don't have -- recall where I'm at with that. |
| 8 And then there's a -- there's a book chapter that I do | 8 Q Okay. Let's walk through your C.V. just |
| 9 not have on that. | 9 for a second. |
| 10 Q And what is the book chapter on? | 10 A Yes, sir. |
| 11 A The book chapter is Intraoperative | 11 Q And I'll hand you this. |
| 12 Monitoring of Patients' Cardiac Function During | 12 (Document passed to the witness.) |
| 13 Cardiopulmonary Bypass. | 13 BY MR. GILMER: |
| 14 Q Are any of the publications that you've | 14 Q Now, describe for us -- first of all, |
| 15 listed on your curriculum vitae relevant to the issues | 15 how old are you? |
| 16 that are at issue in this case? | 16 A I'm 40. |
| 17 A I -- I can't think of any specifically, | 17 Q And where are you originally from? |
| 18 no, sir. | 18 A I grew up for the most part in |
| 19 Q Have you done any specific research | 19 Birmingham, Alabama. |
| 20 other than the text that we talked about that you had | 20 Q Where did you attend college? |
| 21 reviewed, Miller's and the three others? Have you done | 21 A I spent one semester at Jacksonville |
| 22 any other research regarding the issues in this case? | 22 State University, and then I completed my bachelor's |
| 23 A I just reviewed the ASA standards for | 23 degree at UAB, which is in Birmingham, Alabama. |
| 24 the management of patients with sleep apnea, and that's | 24 Q And why did you leave Jackson State? |
| 25 about it. | 25 A My parents got divorced, and my father |
| Page 18 | Page 20 |

| | |
|---|---|
| 1 Q The ASA standards that you reviewed, | 1 got -- there were just a lot of family problems. |
| 2 where did you review those? | 2 Q Do you have any physicians in your |
| 3 A They are published online. | 3 family? |
| 4 Q All right. | 4 A I do not. |
| 5 A They are easily able to be pulled up, | 5 Q Are you related to Mr. Ledbetter in any |
| 6 even by nonmembers, on the internet, and I can provide | 6 way? |
| 7 those for you if you'd like. | 7 A Not that I'm aware of. |
| 8 Q Okay. If you would do that for us, | 8 Q Do you know how you were assigned this |
| 9 we'll make that the next supplemental exhibit. So, so | 9 case from Mr. Ledbetter or how he got your information? |
| 10 far as our -- let's do a little list here. | 10 A I don't know. I remember I got a call |
| 11 Our supplemental exhibits thus far are | 11 from him. I honestly can't -- I know it was somebody, |
| 12 the names of the textbooks that you reviewed, your | 12 but it's been over a year ago. I don't remember right |
| 13 up-to-date curriculum vitae, and then the ASA standards | 13 offhand. |
| 14 that you reviewed online. | 14 Q Okay. You -- I show that you received |
| 15 (Supplemental, list of textbooks | 15 your MD in medicine from UAB? |
| 16 reviewed by Dr. Kennedy marked Exhibit 3-A to this | 16 A Yes, sir. |
| deposition.) | 17 Q And that was in the year 2003? |
| 17 (Supplemental, Dr. Kennedy's up-to-date | 18 A Yes, sir. |
| curriculum vitae marked Exhibit 3-B to this | 19 Q Then tell us briefly about -- where did |
| deposition.) | 20 you do your internship? |
| 18 (Supplemental, online ASA standards | 21 A I did a rotating internship at Carraway |
| reviewed by Dr. Kennedy marked Exhibit 3-C to this | 22 Methodist Medical Center, which is a private hospital |
| 19 deposition.) | 23 in Birmingham -- it's no longer open -- where I worked |
| 20 BY MR. GILMER: | 24 on multiple services, including internal medicine, |
| 21 Q And when we say AC -- ASA, I'm sorry -- | 25 cardiac surgery, anesthesia, family practice, also. |
| 22 we're talking about the American Society of | |
| 23 Anesthesiologists? | |
| 24 A Yes, sir. | |
| 25 Q Are you a member of that organization? | |
| Page 19 | Page 21 |

6 (Pages 18 to 21)

A80609D
### JASON D. KENNEDY, M.D.   JUNE 25, 2014

1    Q      During that internship, how long was
2  your rotation in anesthesia?
3    A      It was one month at the very end.
4    Q      Did you do a rotation in ear, nose, and
5  throat surgery?
6    A      Did not.
7    Q      Did you do a rotation in surgery?
8    A      I did a rotation in cardiac surgery.
9    Q      Since that rotation in cardiac surgery,
10 have you done any additional work in surgery?
11   A      Other than being in the operating room
12 on a daily basis as an anesthesiologist caring for
13 patients who undergo all types of surgeries, including
14 ENT, cardiac, orthopedics, and you name it, the kind of
15 surgery, that would be it.
16   Q      But you don't actually --
17   A      -- operate.
18   Q      -- do the operating, do you?
19   A      I occasionally do some minor procedures,
20 but --
21   Q      Such as?
22   A      ECMO cannulation, which is a type of
23 artificial heart/lung machine that is done usually
24 percutaneously.
25   Q      Okay.
                                                  Page 22

1    A      I'm the program director here at
2  Vanderbilt, and so I do that.
3    Q      Okay.  Your residency in anesthesiology
4  was also at UAB?
5    A      Yes, sir.
6    Q      And when you completed your residency
7  there, you did a fellowship in critical care
8  anesthesiology at Emory; is that right?
9    A      Prior to going to Emory, I spent one
10 year as an instructor in anesthesia caring for patients
11 of basically all ages at UAB.  As an instructor, that
12 is -- you work as an instructor your first year, and I
13 spent one year there.
14   Q      Tell me what being an instructor means.
15   A      You're -- you teach residents and
16 fellows, and you're the attending of record for all the
17 patients that you're caring for.  There's no
18 differences in your responsibilities to the patients or
19 to the residents or fellows any different than someone
20 who is an associate or assistant or full professor.
21   Q      During that time, how much time did you
22 spend at the -- was there a children's hospital there?
23   A      There is a children's hospital in
24 Birmingham.  The interesting thing is that they don't
25 do certain types of procedures there.  And two of those
                                                  Page 23

1  procedures that they don't do are liver transplants, at
2  the time -- and they have changed that since.  And the
3  other one is pediatric ortho onc, which means young
4  children that have malignant tumors of their bones.
5  And we did that at UAB.
6    Q      Okay.
7    A      And there was a limited number of people
8  that did those procedures, and I was one of those.
9    Q      And so those would be the only two types
10 of pediatric patients that you would have worked with?
11   A      At that time, yes, sir.
12   Q      Okay.  And then you did a fellowship in
13 critical care at Emory?
14   A      Yes, sir, I did.
15   Q      And so that the jury understands, tell
16 the jury what the difference is in a residency and a
17 fellowship.
18   A      A residency is your primary training, so
19 if you wanted to be an internist, a primary care
20 physician, you would do your residency in internal
21 medicine or family practice.  Then if you wanted to be,
22 for instance, a cardiologist, you would have to have
23 done your residency in internal medicine.  And then a
24 fellowship specializes you in one specific area.
25        It doesn't negate your previous training
                                                  Page 24

1  as a general anesthesiologist or as an internal
2  medicine doctor as, for instance, a cardiologist.  The
3  same could be said for a pediatric anesthesiologist.
4          It's actually not a recognized boarded
5  specialty.  You don't get boarded in pediatric
6  anesthesia currently.  That's just an additional
7  training without any board certification associated.
8    Q      But there are fellowships available in
9  pediatric anesthesiology?
10   A      There are.
11   Q      And you did not do one?
12   A      No, sir.
13   Q      And then after you completed your
14 critical care anesthesiology residency, which -- what
15 does critical care anesthesiology mean to you?
16   A      Critical care anesthesia is accepted to
17 mean basically the care of patients in an intensive
18 care unit.  So those patients, both postoperatively --
19 but, also, that come in -- not related to any type of
20 surgical procedure -- that require care in the
21 intensive care unit.
22        And in that fellowship, not only did I
23 do that, but part of my responsibility was to rotate it
24 with different medicine and subspecialties in the care
25 of patients within the hospital outside of the ICU.
                                                  Page 25

7 (Pages 22 to 25)

**ATKINSON BAKER, INC.**                    **1-800-288-3376**

## A80609D
## JASON D. KENNEDY, M.D.   JUNE 25, 2014

| | |
|---|---|
| 1     **Q**    **And then you did a fellowship in** | 1     A    I am board certified in adult |
| 2 **cardiothoracic anesthesiology at Emory?** | 2 anesthesia. |
| 3     A    Yes, sir, I did. | 3     **Q**    **Okay.** |
| 4     **Q**    **And did you go to Emory thinking that** | 4     A    I am board certified in critical care |
| 5 **you would do two fellowships?** | 5 medicine, and I'm board certified by the American -- |
| 6     A    I -- that was my initial plan. My | 6 what is it, American College of Echocardiography for -- |
| 7 initial plan was to do a third in congenital | 7 board certified in echo. So I'm triple boarded. |
| 8 pediatrics, but from a financial standpoint and a life | 8     **Q**    **Okay. Did you pass your boards on your** |
| 9 standpoint, my wife had had enough. | 9 **first attempt?** |
| 10     **Q**    **I can understand.** | 10     A    I passed my boards my second year of |
| 11     A    She said go get a job. | 11 residency. |
| 12     **Q**    **And cardiothoracic anesthesiology is** | 12     **Q**    **Second year of residency?** |
| 13 **what you chose to continue on doing; is that right?** | 13     A    Yes, sir. |
| 14     A    I practice both. | 14     **Q**    **Okay. Did you pass the written and the** |
| 15     **Q**    **You do practice both?** | 15 **oral on your first attempt?** |
| 16     A    I do practice both. | 16     A    I did. |
| 17     **Q**    **How is your practice divided between** | 17     **Q**    **Now, when you practiced in Alabama, were** |
| 18 **critical care and cardiothoracic, or do they just** | 18 **you licensed to practice medicine there?** |
| 19 **overlap on a repetitive basis?** | 19     A    I was, yes, sir. |
| 20     A    So when I'm assigned -- we have a | 20     **Q**    **Okay. And was that license through the** |
| 21 schedule going out anywhere between two to six months. | 21 **medical school, or do you have a separated medical** |
| 22 And so I will be assigned to be in the cardiothoracic | 22 **license in Alabama?** |
| 23 ICU here where we're -- the Intensive is for a 27-man | 23     A    So Alabama has a training license, and I |
| 24 ICU. And when I do that, that's my primary | 24 had that as a resident, but as a faculty member, when I |
| 25 responsibility. | 25 was an instructor, I had a full non-training license. |
|                              Page 26 |                              Page 28 |
| 1     I will occasionally cover people or take | 1     **Q**    **Do you still have a license in Alabama?** |
| 2 care of people who are having cases done just in a | 2     A    I let my license in Alabama expire |
| 3 suite right outside of our ICU, but for the most part, | 3 because I have no intention of going back to Alabama. |
| 4 I care for those patients for that week, and I'm on | 4     **Q**    **Okay. And you have been licensed in** |
| 5 24/7 for that week. And then I usually have some | 5 **Tennessee since June of 2010?** |
| 6 non-clinical days after that. | 6     A    Yes, sir. That's when I got here. |
| 7     And then I'll be in the operating room, | 7     **Q**    **And that's when you got to Vanderbilt?** |
| 8 so that my time -- when I'm in the operating room, I'm | 8     A    Yes, sir. |
| 9 dedicated to caring for patients who have any number of | 9     **Q**    **Have you worked at any other hospitals** |
| 10 cardiac or other procedures because we cover a number | 10 **in Tennessee?** |
| 11 of different locations in the hospital. | 11     A    No, sir. |
| 12     **Q**    **In either of those roles, do you work** | 12     **Q**    **Have you ever worked at or done grand** |
| 13 **with pediatric patients?** | 13 **rounds or any type of teaching in Memphis?** |
| 14     A    No, sir, not currently. | 14     A    No, sir, I have not. |
| 15     **Q**    **The university has a division of** | 15     **Q**    **Have you ever been in a hospital in** |
| 16 **pediatric anesthesiology in addition to your division** | 16 **Memphis?** |
| 17 **of cardiothoracic anesthesiology?** | 17     A    I don't think so. |
| 18     A    They do. | 18     **Q**    **Have you ever met an anesthesiologist** |
| 19     **Q**    **Have you applied to be in that division** | 19 **from Memphis?** |
| 20 **or ...** | 20     A    I think I have in a couple of meetings, |
| 21     A    No. | 21 but I couldn't tell you their names. |
| 22     **Q**    **Okay. Do you have any interest in** | 22     **Q**    **Have you had any conversations with any** |
| 23 **working in pediatric anesthesia?** | 23 **anesthesiologists that are familiar with the practice** |
| 24     A    Not currently, no. | 24 **at Le Boneur Hospital?** |
| 25     **Q**    **Now, you are not board certified?** | 25     A    Like I said, I've probably met several |
|                              Page 27 |                              Page 29 |

ATKINSON BAKER, INC.                                1-800-288-3376

A80609D
## JASON D. KENNEDY, M.D.  JUNE 25, 2014

1 anesthesiologists at different meetings that I've
2 attended, but I couldn't tell you their names.
3        Q        And during those meetings, did you
4 discuss the maintenance of the airway following a
5 post-adenoidectomy?
6        A        I don't recall what we talked about.
7        Q        What are your current teaching
8 responsibilities here at Vanderbilt?
9        A        Currently, I am responsible for teaching
10 all general anesthesia residents while they are on the
11 cardiothoracic rotation.  So they do two to four months
12 on that, from an anesthetic standpoint.
13        We also have fellows who are
14 subspecializing in cardiac anesthesia, and I'm
15 responsible for teaching them both the care and
16 management of those patients but also the use and
17 interpretation of transesophageal echo in the operating
18 room and outside the operating room.
19        I'm also responsible for teaching our
20 fellows in the ICU, our critical fellows, those -- so
21 those are anesthesiologists who have completed a
22 year -- I mean, the four years of training in
23 anesthesia, who are doing an additional year of
24 training for critical care.  So I'm responsible for
25 that.

Page 30

1        Up until about two months ago, I oversaw
2 the training program for echo, echocardiography, for
3 our fellows.  And I'm taking a temporary leave of that
4 for right now.  And that's, I think, about it.
5        Also, we have medical students that
6 rotate.  Frequently, we have several different courses
7 that the medical students now take through our
8 department, and I participate in that.
9        Q        How many other -- well, let me back up.
10 Do all the members of your department also have
11 teaching responsibilities like you?
12        A        It's a -- yes, sir.
13        Q        Being a teaching institution, everyone
14 that works here teaches; is that right?
15        A        Yes, sir.
16        Q        Okay.  And your teaching, is that
17 classroom teaching, or is that rounding on patients in
18 an operating-room-type setting, teaching?
19        A        We do some lectures.  Usually, it's not
20 large lectures of all the residents at one time.
21 Usually, it's smaller group lectures, so small -- kind
22 of small group discussions.  I've done some grand
23 rounds here.
24        Also, I've had some lectures with the
25 entire residency class, but that's not very common

Page 31

1 nowadays.  Most of my teaching is bedside teaching with
2 residents and fellows in the -- both at bedside, but in
3 the operating room.
4        Q        Transesophageal echo, is that -- did I
5 say that right?
6        A        Yes, sir, you did.
7        Q        And what is that exactly?
8        A        That is the use of an ultrasound mounted
9 on a -- kind of a gastroscope that goes in the mouth,
10 through the esophagus, and you image the heart, and
11 usually, you can also image the lungs.  Primarily, it's
12 the heart, and you look at cardiac function using that.
13        Q        Is that your primary interest here at
14 Vanderbilt?
15        A        That's one of my many interests at
16 Vanderbilt.
17        Q        Okay.  The presentations that you've
18 given, have any of those been related to the subject
19 matter at issue in this case?
20        A        I've discussed thoracic anesthesia at a
21 recent conference, and it was -- you know, it's dealing
22 with the airway management, but not specific to tonsils
23 and adenoids.
24        Q        And not specific to pediatric patients?
25        A        No, sir.

Page 32

1        Q        Back to your notice here, it also asks
2 you to bring with you any and all records and notes
3 that you have generated while working on this case.  Do
4 you have those with you?
5        A        I have them in my office.
6        Q        Okay.  And --
7        MR. LEDBETTER:  Let me respond.  I said
8 at the beginning of this that I had filed an objection
9 to this listed item, to all these listed items, similar
10 to the objection that had been filed on behalf of
11 Dr. Paidipalli.
12        And I didn't want to have to get into
13 the issue of Rule 30, 34, or 26, and the fact that our
14 discovery cutoff has lapsed and that this request came
15 seven days in advance of this and it's untimely, but
16 I'm reiterating that only because this witness did not
17 have this list and was not told to bring this list.
18        You can ask him about these items, but
19 we're not producing them, nor do I understand that you
20 intend to produce them from your witnesses.
21 BY MR. GILMER:
22        Q        Dr. Kennedy, what -- I have a
23 disclosure that was provided to us in this case.  It's
24 called an expert witness report.
25        A        Yes, sir.

Page 33

ATKINSON BAKER, INC.

1-800-288-3376

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  Q      And in addition to this expert witness
2  report that we have here, what other records and notes
3  have you made in this case?
4      A      I've got just a couple of things I wrote
5  down here this morning when I was looking at -- that's
6  Smith's, Smith's Anesthesia.  That's one of the other
7  books that I have.
8  Q      Okay.
9      A      And that's really it.
10  Q      Let me see that.
11      A      Here, that's about all I've got.
12      (Witness passes document to counsel.)
13  BY MR. GILMER:
14  Q      Was this something that you pulled from
15  the internet?
16      A      This is something I pulled off of -- we
17  have digital textbooks.  No one makes textbooks anymore
18  because it's just a lot of wasted trees.  So all of our
19  textbooks are now computerized, so I just pulled this
20  off, this textbook, that is considered probably -- I
21  won't say the authoritative textbook on pediatrics, but
22  one of the authoritative textbooks on pediatrics.
23  Q      And do you believe that the information
24  contained in this text is authoritative and reliable?
25      A      I believe it's reliable, and it's an

Page 34

1  often-referenced opinion by practicing pediatric
2  anesthesiologists.
3  Q      Do you believe it establishes what the
4  standard of care is for pediatric anesthesiologists?
5      A      I think it helps to establish the
6  standard of care.  The standard of care is associated
7  with a lot of different things.
8      MR. GILMER:  Let's mark this as our next
9  exhibit, please.
10      MR. LEDBETTER:  No objection.
11      (Document entitled "Smith's Anesthesia
         For Infants and Children, Eighth
12       Edition," marked Exhibit No. 4 to this
         deposition.)
13
14      (Off the record.)
15      MR. GILMER:  I did want to clarify one
16  thing on the record.  Mr. Ledbetter made a statement
17  about receiving a notice seven days prior to the
18  expiration of a deadline.
19  BY MR. GILMER:
20  Q      This -- the original notice to take your
21  deposition was filed on May 22nd and contained the same
22  list of items that I have today.  Did you see the
23  original notice?
24      A      I honestly don't know.
25      MR. JOHNSON:  That's the pre-pink eye.

Page 35

1      THE WITNESS:  Yeah.
2  BY MR. GILMER:
3  Q      Let's mark the original notice as our
4  next exhibit, please.
5      (Notice to Take Audiovisual Deposition
         of Dr. Jason Kennedy filed May 22, 2014
6       marked Exhibit No. 5 to this
         deposition.)
7
8  BY MR. GILMER:
9  Q      Now, the text that you pulled to review
10  in this case -- when did you pull this?
11      A      I just happened to pull it this morning
12  just before I walked over here.
13  Q      In addition to this Smith's Anesthesia
14  section that you have here marked as Exhibit 4, what
15  other notes and records did you generate with respect
16  to this case?
17      A      I think I jotted down a couple of things
18  on paper, but I don't remember where they are at right
19  now.
20  Q      Do you still have those things?
21      A      They are probably at my -- either at my
22  home office or in my office over here.
23  Q      Okay.  I would ask that you -- subject
24  to plaintiff's objection, I would ask that you preserve
25  those and not destroy that evidence because we may be

Page 36

1  entitled to that down the road.
2      A      Okay.
3  Q      The notes that you made, what did they
4  say?
5      A      Mostly, I was trying to develop a time
6  line of what happened.  And then I -- that's kind of --
7  I was trying to figure out through digging through all
8  those record-s, because it's quite voluminous, and I
9  was just trying to find out what were the course of
10  events.
11  Q      Were you able to put together what you
12  thought was the course of events?
13      A      I was able to piece together, as best as
14  I could.
15  Q      What other notes and records did you
16  generate besides that?
17      A      That's probably about it.
18  Q      Okay.  Did you communicate with
19  Mr. Ledbetter via email?
20      MR. LEDBETTER:  Objection to questions
21  concerning communication under Federal Rules.  They
22  pertain to expert witnesses.  You're not allowed to get
23  into communications unless they are under certain
24  circumstances, and your question does not address those
25  circumstances.

Page 37

10 (Pages 34 to 37)

A80609D

JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  BY MR. GILMER:
2      Q      Did Mr. Ledbetter give you any facts or
3  opinions related to this case before you formulated
4  your opinions in the case?
5      A      No, he didn't.
6      Q      What did he provide you with originally
7  so that you could form your opinions?
8      A      I think he just sent me the copy of
9  records from Le Bonheur Children's Hospital, and that's
10  it.
11      Q      And then at separate times, did he then
12  send you the depositions as they were completed?
13      A      Yeah.  That was quite a bit later.
14      Q      But he did not send you the parents'
15  depositions?
16      A      I don't recall seeing those.
17      Q      Did you know the parents were in the
18  PACU during the entire time that this -- that the child
19  was there?
20      A      I remember seeing something to that
21  effect that for a good portion of the time that the
22  parents were there.  I didn't know if it was all or
23  just part of it.
24      Q      Did you see the pictures that they took?
25      A      I did.

Page 38

1      Q      Okay.  Did you keep time records in the
2  case of how much time you expended?
3      A      Uh, yeah.  They were probably not to the
4  minute, but general records, yeah.
5      Q      Okay.  And have you -- how much time
6  have you spent thus far on this matter?
7      A      Probably -- up until today, probably
8  about twelve hours.
9      Q      When you initially got the medical
10  records, how much time did you spend reviewing those?
11      A      Probably an additional four or five
12  hours, just trying to go through.
13      Q      And then the time since then was
14  reviewing Dr. Clemons and Paidipalli's depositions?
15      A      And then go back and tie that in with
16  the medical record and seeing how they related.
17      Q      Have you billed him yet for your time?
18      A      I have.
19      Q      Okay.  And how much have you billed him
20  thus far?
21      A      I think twelve hours.  I think it was
22  $4,200, whatever that is.  I've not done the math in my
23  head.
24      Q      I did receive an addendum to your expert
25  report -- which I have marked up my copy of it.  But

Page 39

1  let's make sure we agree to two things.  The first is
2  that you have never given a deposition before --
3      A      I have never --
4      Q      -- other than as the paramedic?
5      A      That's the only one that I can recall,
6  and I'm trying to remember.  I was a witness in a car
7  accident and I had to go to court for that.  And that's
8  about it.
9      Q      Okay.  And this is your first case
10  testifying as an expert witness?
11      A      It sure is.
12      Q      Have you reviewed any cases prior to
13  this in a role as --
14      A      No, sir.
15      Q      -- an expert?
16      A      Not prior to this.
17      Q      This is the first one that you've
18  reviewed, the first one you've testified in?
19      A      The first one I've reviewed, the first
20  one I've testified in, yes, sir.
21      Q      And your time -- you charge $350 per
22  hour for review?
23      A      Yes, sir.
24      Q      And then $500 an hour for your
25  testimony?

Page 40

1      A      Yes, sir.
2      Q      Okay.  And do you -- is it at
3  Vanderbilt -- does the money go to Vanderbilt, and then
4  they recompensate you or --
5      A      Huh-uh, no.
6      Q      It goes to you directly?  Okay.  And do
7  you think you have submitted one or two bills to
8  Mr. Ledbetter?
9      A      I think I've only submitted one.
10      Q      Did it include the time for your
11  preparation for today's deposition?
12      A      I think I prepared for another two
13  hours.  Just this morning, I got in and just -- I
14  wanted to look through everything again and what I
15  pulled up here, which probably another hour or so,
16  I guess, for that.
17      Q      Do you intend to come to trial to
18  testify?
19      A      I guess, if subpoenaed, I will.
20      Q      All right.  So you only intend to come
21  if you're subpoenaed?
22      MR. LEDBETTER:  He's coming.
23      THE WITNESS:  If asked to come -- I
24  don't have to be subpoenaed.  If I'm asked to come,
25  I'll be happy to come.

Page 41

11 (Pages 38 to 41)

A80609D

**JASON D. KENNEDY, M.D.    JUNE 25, 2014**

1  BY MR. GILMER:
2      Q      And what will you charge for your trial
3  testimony?
4      A      I've honestly not put into any thought
5  into that.
6      Q      Okay. Will you charge the same $500 per
7  hour, or will you have a minimum or a maximum?
8      A      Sure. Actually, I mean I don't want to
9  agree to any --
10      Q      Well, you can charge him as much as you
11  want to. I just am trying to figure out what --
12      A      I have no -- I have put zero thought
13  into it.
14      Q      Okay.
15      A      I'm not doing this for any financial
16  reward.
17      Q      Okay. Well -- well, if you're not doing
18  it for financial reward, why are you doing it?
19      A      Because I think part of the process as
20  physicians is that we have to police ourselves.
21      Q      Is there any mandate at Vanderbilt that
22  you testify against other physicians?
23      A      Nope.
24      Q      Does the ASA have standards as to
25  serving as an expert witness?

Page 42

1      Q      That's fine. Have you reviewed any
2  specific guidelines from the hospital itself regarding
3  their policies and procedures?
4      A      I remember asking for one when I first
5  saw this for their PACU care. And I remember -- I
6  think I remember reviewing it, but that's been, like I
7  said, over a year ago. And, basically, I think what I
8  got was their PACU order set is what I got.
9      Q      And did that provide you with any basis
10  for your opinions in the case?
11      A      It did.
12      Q      What specifically?
13      A      Relating to the administration of
14  oxygen.
15      Q      What specifically about the
16  administration of oxygen?
17      A      That oxygen was to be administered to
18  patients upon a physician's order and when indicated
19  and to maintain certain saturations.
20      Q      And did you -- do you believe that
21  oxygen was not used in the PACU?
22      A      It was my understanding, by reading the
23  deposition, that oxygen was not used in the PACU.
24      Q      And what is your understanding from
25  reading the depositions regarding the ability of the

Page 44

1      A      They do, and I've looked at them before.
2  And I don't -- I couldn't quote them to you, but
3  basically, it's do the right thing, give your opinion
4  to the best of your ability, and be honest and faithful
5  to what you know.
6      Q      Do the -- does that standard require you
7  to be familiar with the issues upon which you're
8  testifying?
9      A      Yep.
10      Q      The depositions that you have reviewed,
11  did you make notes in those depositions?
12      A      I don't think I wrote on any one of the
13  depositions. I just looked through them.
14      Q      The medical records that you used, did
15  you put sticky notes on them or make any notations on
16  the records themselves?
17      A      I had a disc. It was on a disc.
18      Q      Okay.
19      A      On, like, a PDF. And so no, I didn't.
20      Q      Did you -- you didn't use the Adobe
21  modifier to add notes or --
22      A      No. I'm pretty computer illiterate
23  sometimes.
24      Q      Okay.
25      A      I'm sorry.

Page 43

1  PACU nurse to use supplemental oxygen?
2      A      You have to restate your question.
3  please.
4      Q      From reviewing the testimony in the case
5  and the PACU orders that you reviewed, is it -- do you
6  have an opinion as to whether the PACU nurse herself
7  could apply oxygen, if needed?
8      A      I've never been in a hospital where
9  someone can't apply oxygen --
10      Q      Someone --
11      A      -- if needed.
12      Q      Someone --
13      A      Anyone. I mean a nurse or a physician.
14      Q      Anyone can?
15      A      Anyone caring for a patient can apply
16  oxygen.
17      Q      Including Kelly Kish?
18      A      Including the nurse, Kelly Kish, yes.
19      Q      Now, No. 5 -- my No. 5 request of -- I
20  think we've gone over everything that you've reviewed.
21  We have talked about the records that you reviewed.
22  We've talked about the depositions that you reviewed.
23  Did you -- by the way, did you review any of Brett's
24  school records or records from other providers besides
25  Le Boneur?

Page 45

12 (Pages 42 to 45)

**ATKINSON BAKER, INC.**                    1-800-288-3376

A80609D

JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 46**

1    A   No, sir, I have not.
2    **Q**   **Now, you did read Dr. Peretti's**
3  **independent autopsy report?**
4    A   I read an autopsy report. And I
5  couldn't tell you the name of the physician at this
6  point.
7    **Q**   **All right. When you read his record,**
8  **was there anything that you disagreed with?**
9    A   I can't recall anything offhand that I
10 would have disagreed with.
11   **Q**   **We've talked about the medical text that**
12 **you've reviewed and the PACU orders that we just talked**
13 **about. Are there any other writings or records that**
14 **you reviewed to help formulate your opinions in this**
15 **case that we have not talked about?**
16   A   Let me sit here and think about it. I
17 can't think of anything. No, sir.
18   **Q**   **And this is an ongoing thing. If -- the**
19 **way you just answered that question, if at some point**
20 **today --**
21   A   I'll let you know.
22   **Q**   **Just let me know. And even if you**
23 **remember after the deposition, can we have an agreement**
24 **that if you remember something differently or remember**
25 **the answer to something, that you'll let Mr. Ledbetter**

**Page 47**

1  know so that he can --
2    A   Sure.
3    **Q**   **-- let us know?**
4    A   Absolutely.
5    **Q**   **Because Mr. Johnson and I do not want to**
6  **be surprised by anything that you come to trial to talk**
7  **about, okay?**
8    A   That's reasonable and fair.
9    **Q**   **All right.**
10   MR. LEDBETTER: One comment. And this
11 is not to inform the witness, but he cites some sources
12 in his report but you haven't asked about them. I
13 assume that --
14   MR. GILMER: I'll go through those.
15   MR. LEDBETTER: -- he's not misled you
16 by not saying -- there may be other things that he's
17 cited.
18   MR. GILMER: That's --
19   MR. LEDBETTER: Are you okay with that?
20   MR. GILMER: That's fine. Yeah, we'll
21 talk about those specifically when we go through your
22 record.
23 BY MR. GILMER:
24   **Q**   **Number 7 -- I think we may have covered**
25 **this, but I'm not sure. Have you been sued before?**

**Page 48**

1    A   I've never had a malpractice suit
2  against me or any other suit that I can -- no.
3    **Q**   **When you were a resident, was any of**
4  **care that you provided the issue -- at issue in a**
5  **lawsuit?**
6    A   Not that I'm aware of, no.
7    **Q**   **And have you ever had to make a claim**
8  **before a lawsuit was filed? In other words, someone**
9  **threatened to sue you, and you talked to your insurance**
10 **carrier and made a claim about it?**
11   A   No. I've never settled or anything like
12 that.
13   **Q**   **All right. And this is your first try**
14 **at being an expert witness; is that right?**
15   A   Yeah.
16   **Q**   **Now, the report that was eventually**
17 **provided to us, which we'll -- why don't we go ahead**
18 **and mark the plaintiff's designation of expert**
19 **witnesses and physicians not employed as experts as the**
20 **collective next exhibit.**
21     **(Collective, Plaintiff's Designation of**
     **Expert Witnesses and Physicians Not**
22     **Employed as Experts marked as Exhibit**
     **No. 6 to this deposition.)**
23
24 BY MR. GILMER:
25   **Q**   **And within this collective exhibit is?**

**Page 49**

1    MR. LEDBETTER: Is that Exhibit 5?
2    MR. GILMER: Yes -- this is Exhibit 6.
3    MR. LEDBETTER: Six, okay.
4  BY MR. GILMER:
5    **Q**   **Within Exhibit 6, there is Exhibit C,**
6  **which is your expert witness report.**
7    A   Yes, sir.
8    **Q**   **Now, did you prepare this yourself?**
9    A   I prepared it myself. The exact
10 wording, some of it, Dr. Led -- I mean, Mr. Ledbetter
11 helped me with.
12   **Q**   **Okay. And did you have previous drafts**
13 **of this report that you did before this final one was**
14 **published to us?**
15   A   I think that I had one that I sent to
16 him, but I can't remember right offhand.
17   **Q**   **Do you remember what changes you and**
18 **Mr. Ledbetter discussed?**
19   A   I don't remember exactly what it was
20 right offhand, no.
21   **Q**   **Well, when we're going through your**
22 **report in just a few minutes, then, I want you to tell**
23 **me if you remember anything that changed or anything**
24 **along those lines, and we'll talk about some of the**
25 **things that Mr. Ledbetter may have helped you with on**

**ATKINSON BAKER, INC.**

**1-800-288-3376**

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1 those.
2          MR. LEDBETTER:  Object to that
3 commentary.
4          MR. GILMER:  I'm sorry.  I thought he'd
5 just said that you had helped him with some wording on
6 some of it.
7 BY MR. GILMER:
8     Q       All right.  I think that concludes the
9 notice itself.  Do you have staff privileges at any
10 other hospitals besides Vanderbilt?
11    A       No.
12    Q       And does -- Vanderbilt has a children's
13 hospital, does it not?
14    A       Yes, sir.
15    Q       And do you put patients to sleep or
16 round on patients over there?
17    A       No, sir.
18    Q       Have you ever?
19    A       No, sir.
20    Q       Have you ever applied for staff
21 privileges anywhere else?
22    A       I applied for staff privileges at UAB
23 and received them.  I've never applied for staff
24 privileges at any other hospital and been denied.
25    Q       Okay.  We talked about your license here

Page 50

1 in Tennessee, and you had a license in Alabama that
2 lapsed.  Prior to the lapse in Alabama, was your
3 Alabama license ever revoked, suspended, denied, or put
4 on probation?
5    A       No, sir.
6    Q       The same for Tennessee; have you had any
7 of those issues here?
8    A       No, sir.
9    Q       Do you have a DEA number?
10    A       I do.
11    Q       And what is that number?
12    A       Uh ...
13    Q       Do you remember?
14    A       I don't a), remember right offhand, and
15 b), I'm not sure that I would give it to you even if I
16 did remember it, because I use that for prescribing
17 controlled substances.
18    Q       Okay.  And has your DEA number ever been
19 affected?
20    A       No.
21    Q       Okay.  You've never been sued.  And have
22 you ever put a patient -- a pediatric patient to sleep
23 for an adenoidectomy?
24    A       I have.
25    Q       Okay.  And when was that?

Page 51

1    A       2000 -- probably '4, I'm thinking
2 through 2005, 2006, when I was a resident.
3    Q       2004 through 2006?
4    A       Probably so, yeah, about.
5    Q       And about how many of those
6 procedures -- or we can even broaden it to
7 adenoidectomy, tonsillectomy, any type of throat
8 surgery on a pediatric patient?
9    A       Probably in excess of fifty.
10    Q       In 2012 and the year preceding that,
11 2011, you did not do any of those procedures, though,
12 correct?
13    A       What do you mean?
14    Q       In 2011 and 2012, you did not put any
15 pediatric --
16    A       No, sir.
17    Q       -- patients to sleep, did you?
18    A       No, sir.
19    Q       Have you ever put together a
20 twelve-year-old boy that weighed 81 kilos for a
21 pediatric ...
22    A       Sure, I have.
23    Q       Okay.
24    A       Yeah.
25    Q       And you consider yourself an expert in

Page 52

1 what fields of medicine?
2    A       Anesthesia, cardiac anesthesia, critical
3 care anesthesia, echocardiography.
4    Q       Anything else?
5    A       I'm program director of ECMO.  So I
6 don't -- that's E-C-M-O.  There's no "h" on it.
7    Q       Oh, got you.  That's right.  Don't pay
8 attention to my notes.  I've got terrible note-taking
9 skills.
10          The opinions that you expressed in this
11 case are also -- you're giving opinions about the
12 standard of care for an ENT physician.  Do you believe
13 that you have expertise in that field?
14    A       I don't recall giving an opinion about
15 the practice for an ENT physician.  I gave an opinion
16 about the practice of a physician who saw a patient in
17 distress or in an abnormal position.  No comment about
18 his practice as an ENT surgeon.
19    Q       What is the -- been the nature of your
20 practice, primarily, since you came to Vanderbilt?  Can
21 you just give me a thumbnail sketch of what your years
22 are like?
23    A       I'm sorry.  I don't --
24    Q       Do you see patients -- as an
25 anesthesiologist, you don't have clinic patients, do

Page 53

14 (Pages 50 to 53)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1  you?
2      A      I do not have clinic patients.
3      Q      Okay.
4      A      Though I occasionally see patients in
5  the clinic on the request of their specialist for the
6  preoperative evaluation of those patients.  I do that.
7  So yeah, I have seen an occasional patient in clinic,
8  trying to determine their fitness for anesthetic.
9      Q      Is your practice -- how much of your
10  practice is clinical versus teaching?
11      A      Uh --
12      Q      Or is all your teaching subsumed in --
13      A      Yeah, I'm a --
14      Q      -- your clinical practice.
15      A      There's different tracks within
16  Vanderbilt.  I am a -- I'm a clinician.  I mean that's
17  what I do.  I'm not a researcher.  I've published a
18  little bit.  I take part in that, but mostly on my own
19  time.  But I'm, primarily and foremost, a clinician.
20      Q      Do you believe that there's any
21  additional information out there that would be helpful
22  to you in making sure that your opinions are accurate
23  that you've given in this case?
24      A      I'm sure there's always additional data
25  that we don't get on any given point, but it's not -- I

Page 54

1  can't think of anything right immediately that I'm
2  running out to go get.
3      Q      Is there anyone you'd want to hear from
4  with respect to what they saw or did that you have not
5  seen or read?
6      A      I think it would be probably beneficial
7  to get the depositions of the operating room nurses
8  that cared for the patient to determine if there are
9  some holes in the depositions of the named
10  previous depositions that don't make sense as far as,
11  you know, who transported the patient to the PACU
12  recovery area and what the patient's condition was when
13  they were extubating.
14      Q      Anything else that you consider to be a
15  hole, so to speak?
16      A      It would be interesting to look at the
17  parents' depositions -- I have not seen that -- and
18  whoever was involved with the cardiac arrest effort
19  that occurred.  That might be helpful, but at that
20  point, the damage was already done, so it's probably
21  not as relevant to what happened intra-operatively,
22  which led to this.
23      Q      Have you discussed this case with anyone
24  other than Mr. Ledbetter?
25      A      I have not.

Page 55

1      Q      Have you had any firsthand contact with
2  the parents?
3      A      I have not.
4      Q      Have you talked with any other
5  physicians about the facts of this case?
6      A      I have asked another -- I've asked a
7  pediatric anesthesiologist her opinion regarding a
8  prone position in a post-recovery that had changed.
9  And that's about it.
10      Q      Who was that?
11      A      Hold on a second.  I'll tell you right
12  now.  Heidi Smith, Dr. Heidi Smith.  You put me on the
13  spot.
14      Q      And, again, what did you talk to her
15  about?
16      A      I specifically asked her about
17  positioning in the postoperative recovery patient.  She
18  had no other facts of the case, just --
19      Q      What did she have to say?
20      A      That she would never routinely allow a
21  child to go prone, of his size.
22      Q      What about semi-prone?
23      A      A semi-lateral position?
24      Q      (Nods in the affirmative.)
25      A      That is completely -- that's called the

Page 56

1  recovery position, but in a prone position, in a
2  knee-to-chest, no.
3      Q      Did you bring your medical records with
4  you today?
5      A      I did not.
6      Q      Have you had -- are you reviewing any
7  other cases as an expert witness right now?
8      A      I was asked to review a case one week
9  ago.  I just got the records.
10      Q      What -- by whom were you asked?
11      A      One of my senior partners is a physician
12  that has done previous medical/legal work and referred
13  the patient -- or referred an attorney to me in regards
14  to something that I do frequently.
15      Q      And is that a case that you're being
16  asked to review on behalf of a patient or on behalf of
17  a doctor?
18      A      I actually don't know who -- they didn't
19  tell me.  They just gave me the -- all they asked me to
20  do is look at these records, and I'm looking at the
21  records.
22      Q      Does it involve a child?
23      A      It involves an adult.
24      Q      Do you advertise yourself as being
25  available to be an expert witness?

Page 57

15 (Pages 54 to 57)

**ATKINSON BAKER, INC.**

**1-800-288-3376**

**A80609D**

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  A      No. Sometimes I ask myself why did I
2  agree to do this.
3      Q      And you don't know how Mr. Ledbetter got
4  in touch with you?
5      A      I can't remember right offhand. I was
6  thinking about that this morning because I figured you
7  would ask me that. But I don't really recall how.
8      Q      Do you remember when your first contact
9  from him was?
10      A      Over a year ago. I'm sure you could
11  tell me when.
12      Q      And would that be contained in some type
13  of correspondence that he had with you?
14      A      Probably an e-mail or probably in the --
15  I guess I have an envelope that had the disc in it that
16  he sent me with the medical records.
17      Q      Do you remember what your first contact
18  with him was about, like what was said, what was
19  referenced, that sort of thing?
20      MR. LEDBETTER:  Again, I renew my
21  objection to communications under Federal Rules.
22  BY MR. GILMER:
23      Q      Did he give you any of the facts of the
24  case?
25      A      No.

Page 58

1  someone who would have sleep apnea and put him at high
2  risk. If I recall right, he had some mention that he
3  had asthma or wheezing as a child, and he was on a
4  nebulizer and took a bronchodilator.
5      He underwent a tonsillectomy and
6  adenoidectomy under general anesthesia using an
7  endotracheal tube, using an inhalation induction, you
8  know, with a peripheral I.V. placed.
9      He had 200 milligrams of propofol, 100
10  milligrams of Lidocaine, 100 micrograms of fentanyl,
11  with a sevoflurane induction, starting off at 8
12  percent, and titrating down to about 3 percent.
13      His initial heart rate prior to
14  induction was about 70 and his baseline $CO_2$, after
15  intubation, was about 40, with tidal volumes of about
16  450, of which are consistent with normal tidal volumes
17  for a patient his size.
18      At the completion of surgery, he had
19  received no neuromuscular blocking agents, so that was
20  not an issue. He had an end-tidal $CO_2$ that had
21  progressively risen through the duration of the case
22  with tidal volumes that were down to in the 160s that
23  are not consistent with adequate minimal ventilation
24  for a child his size.
25      He was taken to the recovery room. He

Page 60

1      Q      Did he simply send you the -- did he
2  send you the complaint?
3      A      No.
4      Q      Just the medical records?
5      A      As far as I remember, he sent me the
6  medical records.
7      Q      Other than the report that we've
8  referenced here under Exhibit 6 that you did, did you
9  make any other reports in this case?
10      A      No, sir.
11      Q      Were you asked to sign any affidavit or
12  anything of that nature?
13      A      I think so. I don't think I sent it. I
14  think that's the report, right?
15      Q      Okay. Let's talk about this case
16  specifically now that we've gone through all of that.
17  Give me a brief summary of the facts that you think are
18  significant to this case.
19      A      Brett was a twelve-year-old boy with, I
20  think, some learning issues, developmental issues, that
21  presented for a tonsillectomy/adenoidectomy to Le
22  Boneur Children Hospital. He had a known history, by
23  report, of symptoms consistent with sleep apnea,
24  specifically snoring and gasping breaths.
25      His physical exam was consistent with

Page 59

1  never awakened and really fully emerged, by reports of
2  the parents. He did have emergence delirium, which
3  would be consistent with him thrashing around and
4  moving in an uncoordinated fashion, knocking his
5  monitors off, but that's not consistent with adequacy
6  of respiration, ventilation, or the ability to support
7  one's airway.
8      While in the recovery room, his oxygen
9  saturation was read as normal. There were some issues
10  with the finger probe maybe falling off. There, some
11  concerns were raised by the parents.
12      At one point, the surgeon came by and
13  saw the patient laying prone, knee-to-chest, with his
14  face down, and asked the parents if that's how he slept
15  and did nothing to correct the patient's obviously poor
16  position after a tonsillectomy and adenoidectomy.
17      And shortly thereafter, if I remember
18  right, at about 12 o'clock, the patient has a Code
19  Harvey, which is their cardiac arrest called in the
20  PACU. And Kish turned the patient over to evaluate him
21  when she noticed that he was not snoring anymore, which
22  the patient --
23      At that point in time, CPR was started.
24  He was intubated at, if I recall right, 12:04 p.m. A
25  blood gas that was drawn approximately fifteen minutes

Page 61

16 (Pages 58 to 61)

A80609D

JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 62**

1  later showed an arterial CO2 of 96. One done about
2  five minutes before that showed a venous CO2 of
3  "unmeasurable," in excess of 130. Normal arterial CO2
4  is 40 or so. Normal venous CO2 would be about 45.
5          Both of these, lab data and the
6  Anesthetic Record, were consistent with a patient who
7  had inadequate ventilation that led to hypoxemia and to
8  his cardiac arrest.
9          He subsequently was taken to the ICU
10 where he was cared for then. The lines were placed for
11 monitoring and for medicine administration. And over a
12 period, I think, of about 48 hours, which is pretty
13 consistent with assessing brain death, he had multiple
14 tests, including an echocardiogram; I think a blood
15 flow study to look at his brain; and he was declared
16 brain dead.
17         I think the organ donation center was
18 contacted, but I'd want to say that they refused any
19 visceral organs. They might have done skin and bone.
20     Q     Any other facts that you found
21 significant?
22     A     The other facts that I did find as
23 significant and relevant to the case is the way the
24 patient was monitored in the PACU. Nurse Kish was
25 noted to be on Facebook and using the computer. And

**Page 63**

1  the parents asked her to assess him on multiple
2  occasions, and she failed to do so.
3          Other issues are that Dr. Paidipalli
4  never assessed the patient in the recovery area, which
5  is very -- not consistent with the practice of
6  anesthesia, to assess a patient, especially with his
7  high risk of risk factors from sleep apnea and snoring
8  and his body size -- an 86-k twelve-year-old boy is a
9  very large twelve-year-old boy -- that the surgeon --
10 like I said, he stopped by, and other than noting that
11 the patient was in a very poor position, did nothing to
12 correct it.
13         Those are, I guess, the key -- the key
14 salient points. There's a lot of other pieces of data
15 that are out there that I'm sure can be interjected.
16     Q     Do you agree that Nurse Kish never
17 notified Dr. Paidipalli or Dr. Clemons of any problems?
18     A     I saw no documentation of that.
19     Q     Did you see where she notified them
20 of -- or did not notify them, in her deposition?
21     A     I -- if I recall right, she said that
22 she never called them. And Paidipalli reported never
23 being notified, as did Dr. Clemons.
24     Q     Do you believe it is unreasonable for an
25 anesthesiologist to rely on a trained PACU nurse to

**Page 64**

1  notify them of problems with her patient?
2      A     Can you restate the question?
3      Q     Do you believe that it is unreasonable
4  for Dr. Paidipalli to have relied on the PACU nurse to
5  notify him of any problems with his patient?
6      A     I think it's reasonable for him to rely
7  on her to notify him. It's also part of his
8  responsibility to check on the patient in the unit
9  before ninety minutes has transpired and -- especially
10 a patient as high risk as Brett was -- to convey his
11 concerns, which were very obvious -- or they should
12 have been obvious -- that he might have had, to make
13 sure that Nurse Kish carried out the appropriate level
14 of care.
15     Q     What did the standard of care require
16 Dr. Paidipalli to do with respect to speaking to Nurse
17 Kish?
18     A     To make sure that the -- an appropriate
19 level of hand-off was performed either by himself or
20 the CRNA in the room, that involved the patient's
21 current and past medical history, their anesthetic
22 course, and any surgical complications or surgical
23 issues that developed during the care of their patient,
24 and then to make an appropriate level of checks on the
25 patient in the post-op recovery period.

**Page 65**

1      Q     How frequently did the standard of care
2  require Dr. Paidipalli to check on a patient?
3      A     There's no designated time, per se.
4  It's dependent upon the patient's individual condition.
5          As a practicing anesthesiologist, I make
6  it a point either to accompany every patient to the
7  recovery room or check on them within ten or fifteen
8  minutes to make certain, and then if there are any
9  concerns, I make a point that the communication loop
10 is -- is kind of closed.
11         My responsibility as an anesthesiologist
12 is to supervise the care of the patient. And yes, the
13 nurses have a responsibility, and yes, the CRNAs have a
14 responsibility, but as a supervising physician, I'm
15 ultimately responsible for what they do or don't do,
16 because -- if they have a failure to do it based upon
17 their lack of understanding or lack of knowledge.
18     Q     Do you believe that you're the captain
19 of the ship, so to speak?
20     A     I believe I am the physician taking care
21 of the patient. I have a responsibility to supervise
22 the care of the patient.
23     Q     In other words, do you have the
24 responsibility to ensure that the other providers are
25 doing their job?

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1    A    I have a responsibility while the
2  patient is recovering from an anesthetic to ensure they
3  recover from that. The surgeon, who also has a shared
4  responsibility because it's -- especially since it's an
5  airway case -- has a responsibility to at least -- you
6  know, especially if he walked by and saw the patient in
7  a position that's not conducive to appropriate airway
8  support and not consistent with the standards set at
9  Le Bonheur -- to rectify the situation or make another
10 physician, specifically, the anesthesiologist, aware.
11    Q    Now, we'll go back through most of those
12 things again when we go through your report, but you
13 mentioned something a couple of times as you were
14 telling me what the salient facts were and it is what
15 the parents said or did. And I was wondering how you
16 had that information if you had not reviewed their
17 depositions?
18    A    I don't recall where it was at, to be
19 honest with you. I ... it was ... I honestly don't
20 recall.
21    Q    Are you familiar with the standard of
22 care for a PACU nurse?
23    A    I'm familiar with what is involved with
24 a PACU nurse caring for a patient, yes.
25    Q    Is playing on Facebook appropriate while

Page 66

1  they're having problems with the waveform, I think,
2  back in Kish's deposition, I think.
3    Q    Do you believe one way or the other of
4  whether Nurse Kish accurately recorded the O2
5  saturations while he was in the PACU?
6    A    Do I believe that she accurately
7  recorded? I think she probably accurately recorded it
8  to the best as she was paying attention or if the
9  monitor was working, but I don't have any reason to
10 think that she lied, per se.
11    Q    Do you agree that Nurse Kish was in a
12 position to have changed the outcome of this case?
13    A    I think there were multiple people in a
14 position to change the outcome of this case.
15    Q    Isn't --
16    A    And I think she's one of them, yeah.
17    Q    Had she notified Dr. Paidipalli of any
18 issues that were going on, he then could have assessed
19 the patient and perhaps changed the course?
20         MR. LEDBETTER: Object as to the form of
21 the question, and also invites speculation.
22 BY MR. GILMER:
23    Q    You can answer my question. He's going
24 to make objections all day.
25    A    Okay. I guess I would say that that

Page 68

1  you're monitoring a patient?
2    A    Absolutely not.
3    Q    Is that a deviation from the standard of
4  care?
5    A    I would say so.
6    Q    Is failing to ensure that the monitors
7  were appropriately working on a patient -- is that a
8  deviation from the standard of care?
9    A    Yeah.
10    Q    Is failing to reposition a patient who
11 is exhibiting breathing difficulties a deviation from
12 the standard of care?
13    A    Yeah.
14    Q    Is failing to apply supplemental oxygen
15 in the PACU Recovery a deviation from the standard of
16 care if it's called for?
17    A    That would be -- if it was called for,
18 yes.
19    Q    You, yourself, in going through the
20 facts, indicated that the O2 monitoring appeared normal
21 throughout his PACU course.
22    A    It was charted as normal, I would say
23 that.
24    Q    And --
25    A    But then there was some mention about

Page 67

1  would be -- it depends on the timing. You know, I
2  think this child was not fully awake, based upon my
3  review of the records, when he exited the operating
4  room.
5         So, you know, he was clearly very
6  hypercarbic, and this had been going on for a while.
7  And so that would be somewhat speculation on my part,
8  and I'm not willing to speculate. I'm only commenting
9  on what I saw present, based upon the medical records
10 and my opinion.
11    Q    Have you seen any toxicology reports or
12 lab reports that would indicate that the patient still
13 had anesthetic in his system at the time he expired?
14    A    I don't remember if there was a
15 toxicology report. The interesting thing about both
16 Sevoflurane and Isoflurane -- and this child received
17 Sevoflurane, which is an inhaled anesthetic -- is that
18 it works by being absorbed. You breathe it and then it
19 goes into the blood, but before it can actually have
20 any effect, it has to go into the brain.
21         So something called the blood-fat
22 solubility is very important. And your brain has a lot
23 of fat in it because your neurons are surrounded by
24 lipid -- lipid membranes, and so it's impossible to
25 monitor that. There's no toxicology report that would

Page 69

18 (Pages 66 to 69)

A80609D

JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 70**

1  show that.  So we don't monitor Sevoflurane levels.
2       What you do see -- and that's pretty
3  well-documented that Sevoflurane actually is around for
4  quite a while.  The child clearly received Fentanyl --
5  that's documented in the Anesthetic Record.  100
6  micrograms, which is about 1.2, 1.25 mcg per kilo for
7  this child, is enough even for a child his age with
8  obstructive sleep apnea to lead him to have significant
9  respiratory depression in the postoperative period.
10      The Sevoflurane definitely would cause
11  him to have what his anesthetic record demonstrates,
12  which is a rate of about 22 -- a respiratory rate of
13  about 22 and tidal volumes that are small.  And that's
14  very consistent with a volatile anesthetic still laying
15  around.
16      And the issue with having low tidal
17  volume, such as that, is that there's a certain amount
18  of what we call dead space within your lungs.  In order
19  for the air to get from here to your alveoli, where you
20  have gas exchange, it's about 150 cc's.  2 cc's per
21  kilo, actually, is what the norm is.
22      So even in Brett's situation, you would
23  use his height and not his weight to make that
24  determination.  So we'll say about 120 cc's for him.
25      That -- 120 cc's of that does not

**Page 71**

1  participate in gas exchange, so his effective tidal
2  volumes were only 100 cc's, which is consistent with
3  the medical record that clearly shows that he was quite
4  hypercarbic at the time of his arrest, and that of --
5       You know, there's only so much space in
6  your lungs, and a large portion of that is taken up by
7  nitrogen, which is the most common gas in the
8  atmosphere.  And then when you become very hypercarbic,
9  that CO2 actually will displace the available oxygen in
10  your blood.
11      So when we give supplemental oxygen,
12  we've trying to displace the nitrogen and just overcome
13  any hypoxemic effects.  The hypercarbia is still there.
14  It still makes you -- it still depresses your
15  respirations further.  It still makes you much more
16  sleepy.  And if you look at Brett's anesthetic record,
17  he had a end-tidal CO2 of 54, if I remember right.
18      Right before that was the last
19  documented CO2.  It could have been higher than that.
20  And I think there was a comment on one of the expert
21  opinions that this is not accurate.  It can
22  underestimate, but it doesn't ever overestimate your
23  CO2 in your blood.
24      And a CO2 of 54 by end-tidal -- there's
25  something called physiologic dead space.  And so his

**Page 72**

1  arterial CO2 at that point in time was usually no less
2  than 6 higher, so it was at least 60.  If you get a CO2
3  of 80, on most adults and children, you get what we
4  call 1 "MAC" of anesthetic.  It's enough sedative
5  potency to actually -- to operate on you.  Okay.  So
6  Brett was not far from that when we left the operating
7  room, and he had that much CO2.
8       So to get back to the answer to your
9  question, there's no way to monitor Sevoflurane
10  concentrations that we do in common clinical practice.
11  There's research ways that you can do that, and they
12  have shown that Isoflurane, for instance, will stick
13  around for about 96, sometimes 72 hours.  You can still
14  smell it frequently as patients come out.  That balto
15  agent [phonetic], that risk for a depression effect, is
16  still present, though not measured.
17  Q    End-tidal CO2 volumes change from second
18  to second?
19  A    It changes from not necessarily second
20  to second, but it can change over periods of breaths.
21  But, you know, for Brett, there was a clear marching up
22  of his CO2.  It just wasn't an isolated monitoring.
23      And I think one of your expert witnesses
24  made that comment that -- you know, "this isolated
25  measurement."  Brett's was not isolated.  It was --

**Page 73**

1  there was a clear pattern.  I mean that's what the data
2  clearly shows, is that this child had an increasing CO2
3  end-tidal, which would correlate with an increasing
4  arterial CO2, so inadequate ventilation with lower
5  tidal volumes.
6       And that is part of the instruments that
7  we use to fly the plane.  You know, there's definitely
8  a clinical judgment that goes along with this, but it
9  would be -- I guess the analogy would be that, you
10  know, Jimmy Doolittle flew an airplane to Japan and
11  completed a mission with a map and a compass, but you
12  wouldn't get onto an international 747 and not expect
13  the pilot to use the GPS to get you from here to Europe
14  or from here to Atlanta, whichever.
15  Q    Do --
16  A    Then so those monitoring systems, they
17  have to be tied in with clinical judgment, and you
18  can't just ignore those, and that's clearly there.
19  Q    Do you believe that Dr. Paidipalli
20  ignored the diagnostics?
21  A    He either ignored it or should have or
22  could -- he should have done something about it.  So I
23  don't know if he just said I don't care.  I can't read
24  his mind.  But the data is clearly there.
25      The end points from making the decision

19 (Pages 70 to 73)

A80609D

## JASON D. KENNEDY, M.D.    JUNE 25, 2014

1  to extubate that child clearly were not supportive of
2  that care. And a reasonable anesthesiologist given the
3  set of facts for Brett, in his physical condition,
4  that's well-documented by the Pre-Anesthetic Record,
5  clearly support the outcome. But it's an expected
6  outcome. It's not a surprise at all, taking the set of
7  facts and the anesthetic that was delivered to that
8  patient.
9      Q      The decision to extubate a patient and
10 wake them up, is that based solely on what the monitors
11 say?
12     A      No, no. There's a lot of different
13 points. So, you know, the first point is to decide
14 whether or not you're going to do -- especially for ENT
15 surgery, there's, you know, one of the -- probably the
16 single largest complication with T&A's is actually
17 bleeding postoperatively. That's the most common
18 concern.
19         The second most common concern is loss
20 of airway, which actually bleeding can cause loss of
21 airway for -- what happens is blood gets in your airway
22 and it gets on your vocal cords. And your cord spasms.
23 Children are at high risk for this.
24         And so the decision point in this is a
25 debated way to do it, and there's actually studies that

Page 74

1      There's judgment calls and then there's
2  "I'm ignoring the available monitoring I have." And
3  those are two separate points.
4      Q      Do you know what the CRNA that handed
5  the patient off to Nurse Kish informed her about?
6          MR. LEDBETTER: Object as to form.
7  Also, it's a double question.
8  BY MR. GILMER:
9      Q      Do you have what the -- do you have any
10 idea what the CRNA that transferred the patient to the
11 PACU reported to Nurse Kish?
12     A      I didn't see any documentation of what
13 she did or did not. There was some mention that -- I
14 think in one of the affidavits I saw that the
15 circulating nurse, maybe, brought the patient to PACU,
16 and not Kish, so -- but, I mean -- not Kish, but the --
17 I can't remember her name, the CRNA -- that one of them
18 brought -- so I'm not aware of the hand-off. And
19 there -- there's no documentation that I could find of
20 what exactly that was.
21     Q      If the patient was delivered to the PACU
22 with supplemental oxygen, would that change your
23 opinions in the case?
24     A      If the patient was delivered -- it would
25 make me think that the patient received oxygen, but it

Page 76

1  look at do you do an awake extubation so you have the
2  child fully awake and they are completely with it and
3  interacting with you, and it's, you know -- or do you
4  keep them deep anesthetized, pull the tube out, and
5  then stay in the room longer, let the gas, inhaled
6  agent, go down enough for them to support and maintain
7  their respirations, and then -- you know.
8          And sometimes you would even bring that
9  patient to the recovery room in that state and you
10 would stay with them and monitor them, one of -- either
11 the CRNA or the physician would stay with the patient
12 while they were monitored until they, you know, arouse
13 and make sure that they are appropriately monitored.
14         Both -- both -- both decisions are
15 reasonable choices, and there's actually studies that
16 show the benefits of one and the benefits of the other,
17 and that's a clinical decision that you make.
18         And I can't argue with that clinical
19 decision, but if you're going to do either one,
20 whatever that choice is, you have to do it in a
21 medically acceptable way, and that medically acceptable
22 way could be done in Nashville, Tennessee or Memphis or
23 Alaska, for that matter, but there are certain
24 physiologic variables about giving anesthetics that
25 don't change.

Page 75

1  wouldn't change my opinion to the fact that the patient
2  was extubated at a point when he was having inadequate
3  ventilation to support himself and that the end point
4  of him getting hypercarbic and developing respiratory
5  failure and subsequent hypoxemia were inevitable unless
6  something else was done about it. The point to impact
7  that was in the operating room before he ever left the
8  operating room, so --
9      Q      So the decision -- are you saying that
10 the decision to extubate led to the respiratory failure
11 some ninety minutes later?
12     A      Absolutely, no doubt about it.
13     Q      And there was no -- what clinical
14 indications or monitoring indications do you have from
15 the PACU that the patient was having difficulty
16 ventilating?
17     A      Two. Probably the most important one is
18 tachycardia, which is -- you know, is -- can be caused
19 by hypercarbia. Tachycardia in a infant can be -- or a
20 child; he's not an infant -- or an adult can be caused
21 by a variety of things.
22         This -- Brett received a medicine called
23 Glycopyrrolate, which does tend to increase your heart
24 rate, and he just had surgery, which are two things
25 that can cause your heart rate to go up. So can

Page 77

20 (Pages 74 to 77)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  hypercarbia.
2      So it's hard to differentiate that out.
3  They do not monitor end-tidal CO2 in the PACU
4  routinely, and I didn't see any record that they did it
5  there.
6      There's some issues with the accuracy of
7  CO2 as measured by me breathing through a mask or a
8  nasal cannula as versus an endotracheal tube as --
9  which was the measurement that Brett had, because they
10 used a 6.5 endotracheal tube that was cuffed for him,
11 which would make the end-tidal CO2 very accurate. And
12 so they didn't -- you know, once the tube was removed,
13 that's -- you know, we don't have any more data points
14 for that.
15     The other issue is that Brett clearly
16 had what we call emergence delirium, and that is
17 actually pretty common with kids. That's basically
18 what you and I might say you're awake but you're not
19 cognizant and you're not able to make rational
20 decisions. You'll swing at people. You will often
21 obstruct your airway. You can't control your airway.
22 You can't breathe -- you might breath a little bit, but
23 it's -- you know, we see this in adults all the time.
24     Children are much more prone. So
25 they're -- the amount of attention you have to pay to

Page 78

1  causing you to get more respiratory depressed and not
2  breathing even more, your PaO2 may be down to 75 or 80,
3  and your saturation will still be 99 percent.
4      So the monitoring devices that we use
5  have their limitations, and that's an important part of
6  what we do as anesthesiologists is ensuring, in spite
7  of those limitations, that we're making the appropriate
8  assessments of the patient, which includes specifically
9  physical exams.
10     Q      And that is also why it's important for
11 the PACU nurse to monitor the patient carefully?
12     A      Agreed.
13     Q      I want to go through and --
14         MR. GILMER: Well, how much more have
15 you got?
16         VIDEOGRAPHER: This would be a good time
17 to take a break.
18         MR. GILMER: Okay.
19         VIDEOGRAPHER: I've got about
20 twenty-five minutes, but --
21         MR. GILMER: Oh, I mean I can keep
22 going. I can keep going for twenty-five minutes, if
23 that's all right. I'll grab the medical record here.
24 BY MR. GILMER:
25     Q      The Anesthesia Record --

Page 80

1  this in a child is dramatically more, especially a
2  twelve-year-old child that weighs 80-something
3  kilograms, who has obstructive sleep apnea, like I
4  said, and is getting his tonsils done. It is
5  dramatically higher.
6      So when patients -- you know, one of the
7  primary things that, as a pediatric anesthesiologist,
8  you have to rule out is hypoxemia and hypercarbia. I
9  mean that is very clear. That's one of the first
10 things you have to do.
11     And, you know, oxygen saturation
12 monitors are specific but not very sensitive, and the
13 difference is that they are telling you the saturation
14 of hemoglobin -- of oxygen and hemoglobin. Okay. So
15 if when we talk about -- when we're looking through the
16 labs, we have something called PaO2, which is the
17 partial pressure of oxygen within the blood. Well,
18 that -- there's a -- you know, there's a relationship
19 between the two, and they are not linear. And that's
20 why oxygen saturation monitors are not a -- not a very
21 specific monitor of hypoxemia.
22     So if your PaO2 is 300, your sats going
23 to be 99 percent. Well, if your lung function is down
24 or you're hypercarbic and you're not ventilating well
25 and your CO2 is up to maybe 100, and that CO2 of 100 is

Page 79

1  A      Yes, sir.
2  Q      I would like for you to go through the
3  Anesthesia Record and explain to me exactly what ...
4  A      Okay. You want me to just go through
5  it, or do you have a specific question you --
6  Q      No, I -- yeah, I would like for you to
7  go through specifically the issues that you've just
8  discussed regarding the hypercarbia.
9  A      So may I share your pen? So as you can
10 see here [indicating], Brett came into the operating
11 room and he was put on nitrous, which is laughing gas
12 and air, 7 liters, amended in 3 liters -- an amendment
13 which is a normal way we induce a child -- and then
14 Sevoflurane, 8 percent. That's the maximum amount of
15 Sevoflurane.
16     So you're trying to, very quickly, get
17 the child -- but you don't have I.V. access. And then
18 once you get I.V. access, then they gave Robinul, which
19 is a medicine that prevents children from getting their
20 heart rate down a lot in -- so you see that. At the
21 same time, his heart rate, which is this dot here
22 [indicating], kicks up from 80 to 110, which -- the
23 good news about Robinul is it prevents the
24 brachycardia, but it also hides signs of hypercarbia,
25 such as tachycardia, because you don't know what that's

Page 81

A80609D
### JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  from.
2          After they got the Sevo- and they got
3  the IV on board, what they did is they gave this
4  Robinul I.V. and lidocaine, which is a local anesthetic
5  that we also use as an induction agent.  It makes the
6  Propofol, which is their -- a primary induction agent,
7  not burn as much, but it also has some centrally acting
8  CNS effects, itself.  It's 100 milligrams, 200
9  milligrams.
10         These are very reasonable, consistent
11  doses.  And 100 mcg of Fentanyl, which is a very potent
12  narcotic -- that's about 1.2 per kilo.  That's very
13  consistent.  And then they give Decadron, which is
14  often given to patients who have the tonsils done, just
15  to decrease swelling.
16         They gave him another 50 of Fentanyl
17  down here at the very end, which is -- probably caused
18  some of this issue; Zofran, 4 milligrams, which is an
19  anti-medic.  LR is a fluid.  And so what you --
20      Q      What's the -- stop just there for a
21  second.
22      A      Yep.
23      Q      You said they gave him 50 of Fentanyl
24  later?
25      A      Yeah.

Page 82

1      Q      And then that's probably what caused --
2      A      That -- that played into it.
3      Q      Okay.
4      A      This is multifactorial.
5      Q      Mm-hmm.
6      A      This is not a single -- you know,
7  there's multiple issues that come into this.
8      Q      All right.
9      A      Notice that the --
10     Q      Let me ask you some specific questions
11  about this.
12     A      Yes, sir.
13     Q      First of all, the initial drug choices:
14  Do you have any criticisms of the drugs themselves or
15  the amounts of drugs that were provided?
16     A      No, sir.
17     Q      Okay.
18     A      My only concern would be using -- some
19  would argue Fentanyl, because of its respiratory
20  depression effects in a patient with sleep apnea --
21  many people would argue that you get the child
22  completely awake before you give them any pain medicine
23  because what will happen is that this will depress
24  them, especially someone of his size and weight, and
25  especially giving it not here, but back here

Page 83

1  [indicating].  Even this  50 mcg could have suppressed
2  his breathing a little bit.
3      Q      Do you believe that that's a deviation
4  from the standard of care?
5      A      I don't think it's a lot of deviation
6  from the standard of care, no.
7      Q      Okay.  All right.  Continue.
8      A      So when you first see here they have his
9  tidal volumes, TSV tidal volumes and their documented
10  as 446, you know.  So Brett is 80-something kilos.  We
11  base normal tidal volumes on your ideal weight, which
12  is based upon your height, which -- for him, we'll just
13  say it's about 70 kilos, give or take a few.  That
14  would be about 420 cc's.  It would be 6 cc's per kilo.
15  Those are very reasonable tidal volumes.
16         And you see this 446, 416, 200, 145,
17  180, so these aren't isolated measurements.  And
18  usually, when we document these charts, we don't, like,
19  document the random number.  We document what is the
20  trend, because, you know, his heart rate can go
21  around -- his pulse ox might go around.  We don't
22  normally document that, especially on a written record.
23         And at the same time, you see his
24  end-tidal CO2.  Where is that at?  You know, you see
25  his tidal volumes going down, his respiratory rate

Page 84

1  actually going up, which is consistent with someone who
2  is actually getting hypercarbic but doesn't have
3  enough -- they are not exchanging their dead space very
4  well.
5          So -- and then his CO2, which is --
6  where is it at?  There's his FiO2.  That's his
7  saturation.  Where is his CO2?  I just saw it.  Here it
8  is, end-tidal CO2.
9          And you see this, where it started, what
10  looks to be 41, which is pretty consistent.  And I
11  think there was a note about that.  You know, a child
12  with sleep apnea, there's going to be a gradient of
13  about 4, 5.
14         I wouldn't see -- expect a
15  twelve-year-old who didn't have significant right heart
16  failure to have CO2s much higher than this walking
17  around.  Otherwise, they would have heart failure,
18  because hypercarbia chronically induces something
19  called cor pulmonale, which the increased resistance in
20  the pulmovasculature actually causes the right heart to
21  fail.  And there's symptoms that you see, like edema in
22  your legs and such as that, liver failure, kidney
23  failure.
24         And then what you see -- and that's a
25  very normal -- so his arterial CO2s really are probably

Page 85

22 (Pages 82 to 85)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1 about 45 here. And you see this gradual increase.
2 Again, this isn't just a random shot. This is -- this
3 is a trend. This is clearly there. And basically, his
4 tidal volumes are getting lower, his CO2 is going up,
5 and his respiratory rate is going up, trying to
6 compensate for that.
7       That clinical picture is very consistent
8 with a child that's hypoventilating, in that, you know,
9 they -- I think, if you look at the times here, they
10 suction extubated at 10:26. They turned their
11 Sevoflurane off here somewhere between 10:15 and 10:30.
12 They don't specify when. It's in the middle -- they
13 have an "x" here that makes me think it's closer to
14 10:30.
15       This child would still have a
16 significant amount of Sevoflurane on board. And the
17 Sevoflurane -- it depresses your respiration and shifts
18 what we call your CO2 respiratory drive curve.
19       So there's this linear relationship
20 between if your CO2 rate is "x," your ventilatory rate
21 will be a certain number, okay? And what happens is
22 Sevoflurane will shift that number over. You won't
23 breathe the same rate at a higher CO2. You'll be kind
24 of depressed. And the narcotics do the same thing.
25 Volatile anesthetics do it slightly differently.

Page 86

1       So what happens is that you get higher
2 CO2s. And that's expected, to have mildly high CO2s,
3 maybe an end-tidal of 45 or so, at the end of an
4 anesthetic, but 56 in a child with sleep apnea is very
5 concerning.
6    Q    Did Brett's breathing conditions prior
7 **to surgery, the conditions that he was there to have**
8 **surgery about --**
9    A    Uh-huh.
10    Q    -- contribute to his hypocarbia?
11    A    Absolutely, yeah. So it's
12 well-documented that -- and well-explained that
13 patients who have sleep apnea are at increased risk of
14 just apneic periods, and some of it is anatomy.
15       And there's really two types of sleep
16 apnea in children. There's Type 1 and Type 2. And
17 Type 1 is thought to be due to, you know, certain
18 things; and Type 2 is thought to be due to certain
19 things. And sometimes with kids who have sleep apnea
20 or syndrome, they may not necessarily be obese.
21       And even after you resect the tonsils in
22 a child who has had a T&A, they will still have
23 post-resection apneic periods just because their body
24 has been doing it for a while. We don't really know
25 why, but it does that.

Page 87

1    Q    Okay. What else is significant about
2 **the PACU Record?**
3    A    And this is the OR Record.
4    Q    I'm sorry, the OR Record.
5    A    Let me look if there's anything else.
6 With the tidal volumes -- I mean his heart rate is up,
7 but that could be from hypercarbia. Robinul in this --
8 you know, there's a big debate within medicine about do
9 you even give Robinul for a twelve-year-old because of
10 this right here, because it's going to mask your signs
11 a little bit, maybe.
12       You know some of it, I guess, is the
13 time, you know: "10:26, section and extubated, in PACU
14 ten minutes later." I wonder why ten minutes, you
15 know? Does that mean the report was given at that
16 time? I mean that's probably the paper charts. Was
17 that -- you know, it's -- you're writing it sometimes
18 not as it happens but later. So I don't see anything
19 dramatic.
20       Those are the big issues right there
21 that really, you know, stand out and jump out at you as
22 the fact that he was still probably asleep when he was
23 extubated and not really fully aroused.
24    Q    Do you know what clinical signs
25 **Dr. Paidipalli used to decide to extubate the patient?**

Page 88

1    A    Uh, I don't see any evidence of that. I
2 remember -- I remember in his deposition, he just kept
3 talking about clinical judgment without any, really,
4 explanation of what that was. So no, I don't.
5    Q    What does the standard of care require
6 **for a pediatric anesthesiologist extubating a patient?**
7 **What clinical signs is that -- does that standard**
8 **require them to consider?**
9    A    It sort of depends on if you're doing an
10 awake or a deep extubation. If you're doing an awake
11 extubation, it's reversal, if appropriate, and there's
12 the ability to protect your own airway, follow
13 commands, breathing adequate minimum minute adequate
14 tidal volumes at an adequate rate and be
15 hemodynamically stable.
16    Q    Okay. Do you have any criticisms of the
17 **pre-anesthesia evaluation done with this patient?**
18    A    I couldn't read it --
19    Q    Okay.
20    A    -- very well. I mean do you have a copy
21 of it? I don't think it's -- you've got the billing
22 form here and you've got the Anesthetic Care Record.
23    Q    Well, based upon your review of the
24 **chart, do you have any criticisms of it?**
25    A    They noted that he had sleep apnea.

Page 89

23 (Pages 86 to 89)

**ATKINSON BAKER, INC.**

**1-800-288-3376**

Case 2:13-cv-02289-SHL-dkv   Document 128-2   Filed 08/09/14   Page 24 of 63   PageID 1493

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 90**

1  They noted that he snored and had loud gasping
2  respiration, so they were clearly aware of his
3  respiratory history.
4         Other than that, Dr. Paidipalli's plan,
5  I couldn't actually -- it was uninterpretable.  I read
6  -- I thought I could read something, but I couldn't
7  honestly attest to the fact that I understood what his
8  thought processes were going into it.
9      Q     Do you have any criticisms or believe
10 that it was a deviation from the standard of care to
11 put this patient to sleep using general anesthesia?
12     A     No.
13     Q     Would local anesthesia be appropriate to
14 do an adenoidectomy and tonsillectomy?
15     A     I've never seen a local anesthetic done
16 in the United States.  And I'm sure they do it in some
17 places where post-op issues are, you know, more of a
18 concern, but I'm not aware that -- of anyone doing it,
19 no.
20     Q     Are you aware of any other way to
21 perform the surgery other than to put the patient to
22 sleep using general anesthetic?
23     A     You can do it under local, but I don't
24 think anyone does that.  I think it's usually a
25 general.  You don't have to do a tube, and endotracheal

**Page 91**

1  tube.  You can do an ILMA, which is a laryngeal mask
2  airway, which is a device that just sits above the
3  glottis.  Some centers do that, but I think that the
4  primary way people do a tonsils & adenoid is to put
5  asleep and put a breathing tube in.
6      Q     So the decision to intubate and use a
7  general anesthetic to perform the surgery was in
8  accordance with the standard of care?
9      A     Yes, sir.
10     Q     Okay.  The medicines that Dr. Paidipalli
11 chose and the amounts of them were also in accordance
12 with the standard of care?
13     A     Everything -- the little bit -- the
14 Fentanyl, I think you can make an argument that, in his
15 situation, that it may not have been wise, and if you
16 would have given it -- I would have given him a lot of
17 time to make sure any washed out his Sevoflurane.  That
18 was about it.
19     Q     Well, do you believe that it was a
20 deviation for him to use it at that point in the case?
21     A     That would probably be a stretch.
22     Q     It would be a stretch to consider it a
23 deviation, right?
24     A     Yes.
25     Q     Okay.

**Page 92**

1      A     Because if he's uncomfortable, then he's
2  going to be delirious, too, if he wakes up hurting.
3      Q     Do you have any opinion concerning the
4  documentation that Dr. Paidipalli made?
5      A     This chart is primarily done by the
6  CRNA, and the only thing that he did was this portion
7  right here [indicating] as -- you know, based upon the
8  handwriting, looking at it.  I'm not aware of any other
9  documentation that I saw other than the pre-op
10 anesthetic assessment, and that was uninterpretable.
11     Q     Do you have any criticisms of the
12 documentation made by the CRNA on this Anesthesia
13 Record?
14     A     The documentation seems fine.  The
15 medical decisions do not.
16         MR. GILMER:  Okay.  Let's mark the
17 Anesthesia Record as the next numbered exhibit.
18         (Anesthesia Record marked as
19         Exhibit No. 7 to this deposition.)
20 BY MR. GILMER:
21     Q     And, Doctor, for the record, the blue
22 ink that is on here, you just made, correct?
23     A     Yes, sir.
24         MR. GILMER:  Okay.  Why don't we take a
25 break?

**Page 93**

1         VIDEOGRAPHER:  This is the end of Disc
2  No. 1.  The time is 3:07.
3         (Recess taken from 3:07 to 3:15 p.m.)
4         VIDEOGRAPHER:  This is the beginning of
5  Disc 2 of the deposition of Dr. Jason Kennedy.  The
6  time is 3:15.  You may begin.
7  BY MR. GILMER:
8      Q     Doctor, we had just went through the
9  Anesthesia Record and talked about your -- the bases
10 for your opinions.  What, in your opinion, did the
11 standard of care require of Dr. Paidipalli to do rather
12 than extubate the patient at 10:26?
13     A     To allow the patient's spontaneous
14 respiratory drive to return to normal and to assist him
15 into that point.
16     Q     And how would he have done that?
17     A     By keeping the breathing tube in and
18 assisting his ventilation via the anesthetic machine as
19 a way you can manually support his breathing, or you
20 can put him back on the ventilator that's incorporated
21 into the anesthetic machine.
22     Q     This use of supplemental oxygen was not
23 sufficient?
24     A     No, because supplemental oxygen can
25 actually kind of hide that hypoc -- low tidal volume

24 (Pages 90 to 93)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  ventilation that you see.  It might have prevented him
2  de-saturating, but it wasn't going to prevent his
3  eventual outcome.
4     Q    The -- at the bottom right-hand corner
5  here, it talks about the -- what does this say,
6  "ICU/PACU at 10:35"?
7     A    Yeah.  That's either ICU or the
8  Post-Anesthesia Care Unit at 10:35 versus 10:36.  I
9  don't know if they were in the unit at 10:35 and did
10  that at 10:36.  And these are the vital signs.
11     Q    Okay.  And what do -- do the vital signs
12  indicate anything to you?
13     A    Nope.
14     Q    Anything abnormal?
15     A    He's a little tachycardiac, which means
16  he has a fast heart rate at 118.  His respiratory rate
17  is 22, which is a little fast.  And in someone who was
18  agitated and delirious, it would make me -- you know,
19  were trashing around in the bed or removing things, it
20  would make me very concerned that they are actually
21  hypercarbic.
22     Q    But being -- thrashing around or
23  emerging --
24     A    Moving.
25     Q    -- at that point, that in itself, can't

Page 94

1  that make you tachycardiac?
2     A    Yeah.  So can the glycopyrrolate, but
3  the combined picture -- so taking one single vital sign
4  out of -- out of context, can get you into trouble.
5  But if you take the totality of the data that's
6  present, it's very clear what happened to him, and this
7  was foreseeable coming out of the operating room.
8     Q    Let's go over your report that you did
9  in the case.
10     A    Yes, sir.
11     Q    That's your copy [indicating], and I'll
12  use his copy.  The first paragraphs have to do with
13  your background.  Let's see, it shows what you have
14  reviewed.  And we've talked about what you've reviewed.
15  Did the photographs of Brett help you form any opinions
16  in the case?
17     A    Yeah, it did.
18     Q    How so?
19     A    The fact that he was in a position that
20  I would not consider consistent with the standard way I
21  would position a post-tonsillectomy patient of Brett's
22  size and body habitus.
23     Q    What did the standard of care require as
24  far as the positioning of the patient?
25     A    You can do it in a lot of different

Page 95

1  ways.  You could be supine with the head elevated,
2  which according to Kish was a common thing.  You could
3  be in what they call the semi-lateral position with
4  your head slightly elevated with the -- basically kind
5  of sleeping on your side to allow some of the
6  secretions to come out.  That would be reasonable.
7        The knee/chest position, being
8  completely prone -- I've seen that, and I've done that
9  before with young babies, young children, but they are
10  so much smaller, and the weight, their total body
11  weight, is less of an issue, laying on their diaphram,
12  as in Brett's case, who was 82-, 81-kilos, not -- I've
13  never done that with an adult before.
14     Q    With -- when you say prone, Brett's face
15  was turned to the side, though, correct?
16     A    As best as I could tell in the picture,
17  he was face down and -- but it was -- I mean it was a
18  picture.  And that's -- and that's the best I have.
19  And I think there were statements made by Kish about
20  him being, you know, face into the gurney.
21     Q    And she had the ability to change that
22  position or notify someone about any concerns that she
23  had about that position?
24     A    As did the ENT surgeon, yes.
25     Q    Now, why do you believe that you're

Page 96

1  familiar with the standard of care for an
2  anesthesiologist practicing in Memphis, Shelby County,
3  Tennessee, in March of 2012?
4     A    Specific to what?  What?
5     Q    Well, specifically with your opinions to
6  this case.  Why do you believe that you're familiar
7  with the standard of care from Memphis when you have
8  not practiced there?
9     A    Based upon what Dr. Paidipalli's and
10  Dr. Kish's [sic] statements were, doing what they
11  normally did at the children's hospital, and in line
12  with what is normally practiced for anesthetic practice
13  throughout the rest of the country.
14     Q    Do you believe that the standard of care
15  that you are applying is a national standard of care?
16     A    I think there are certain aspects of it,
17  yes, and some of it regarding, for instance, the
18  administration of oxygen or being in a prone position,
19  I'm basing upon the statements that both the ENT
20  surgeon, the anesthesiologist, and Nurse Kish said what
21  was normal and customary in their practice.
22     Q    And so that would be the same for any
23  anesthesiologist practicing anywhere?
24     A    There might be subtleties about whether
25  or not you give oxygen to patients, but, you know, what

Page 97

25 (Pages 94 to 97)

**A80609D**

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1  is normal and customary in their practice. You know,
2  kind of doing the same thing in what we normally do is
3  probably the safest way to practice, and if you deviate
4  from that, that's usually where you get into trouble.
5      So if you bring out every patient prone,
6  then, you know -- or every patient on their side -- but
7  this, you know, by Nurse Kish or Dr. Paidipalli or
8  Dr. -- the ENT surgeon's own statements is that they
9  did not routinely do that, that that was different than
10 what they would normally, routinely do.
11     Q    **Getting back to my question about --**
12     A    I'm sorry.
13     Q    **-- what the standard of care is that**
14 **you're using in this case, your opinions that you are**
15 **using in this case, let's agree on a couple of things.**
16     A    Yes, sir.
17     Q    **Number one, you've never practiced**
18 **medicine in Memphis, right?**
19     A    Agreed, yes, sir.
20     Q    **You've practiced medicine in Birmingham**
21 **and in Nashville; is that right?**
22     A    And in Atlanta --
23     Q    **And Atlanta, okay.**
24     A    -- where I did my fellowship.
25     Q    **Okay. And do you believe that the same**

Page 98

1  **standard of the care applies in all four of those**
2  **cities?**
3      A    There are small -- there are aspects
4  that are subtly different, but the general practice of
5  medicine is pretty consistent amongst the issues that
6  I'm bringing up.
7      Q    **What are the subtleties that would be**
8  **different?**
9      A    What medicines you might use
10 specifically: Would you use Fentanyl or Morphine?
11 Would you use Dilaudid? Would you use an ILMA. Would
12 you do a deep or an awake anesthetic -- I mean
13 extubation.
14     Would you do -- what size tube you would
15 use, you know; what your reversal agent might be; if
16 you -- would you use neuromuscular blocking agents;
17 what fluids you might administer, Lactated Ringer's,
18 normal saline, plasmalyte. There's any number of
19 those.
20     As far as monitoring the patient, those
21 standards are pretty consistent across the country.
22     Q    **And would they be the same, say, in**
23 **St. Louis or Los Angeles?**
24     A    Yep.
25     Q    **And the standard -- the opinions upon**

Page 99

1  **which you base your understanding of the standard of**
2  **care has to do with that monitoring that you just**
3  **discussed that's consistent in all of those cities?**
4      A    Yes. If you went outside the United
5  States, they probably don't do capnography because they
6  don't have that technology available, but we have that
7  technology available here in most places in the United
8  States.
9      Q    **What -- tell me what you know about**
10 **Memphis and its medical community.**
11     A    I met a couple of good physicians in
12 different meetings, trips through Memphis a couple of
13 times. And that's about it.
14     Q    **How many hospitals are in Memphis?**
15     A    I don't know the answer to that.
16     Q    **Do you know how many beds are available**
17 **in the hospitals in Memphis?**
18     A    No, sir.
19     Q    **Do you know which hospital systems are**
20 **in Memphis?**
21     A    I know there's Methodist, and that's
22 about it.
23     Q    **Is there a teaching institution in**
24 **Memphis?**
25     A    I think so, but I don't know that for a

Page 100

1  fact. I think it's part of the UT network, but I'm not
2  100 percent certain of that.
3      Q    **What's your knowledge of the Methodist**
4  **Le Bonheur Hospital?**
5      A    Other than the records I've reviewed,
6  specifically the Methodist Le Bonheur. That would be
7  it.
8      Q    **Do you know which specialties are**
9  **available there?**
10     A    I know some of them, obviously,
11 pediatric ENT.
12     Q    **What else?**
13     A    But not all of them. I mean, probably,
14 the majority are specialties that you would find at any
15 hospital: Internal medicine, family practice,
16 endocrinology, hepatology, pediatric intensive care
17 medicine -- because he was -- Brett was cared for by
18 Pediatric Neurology.
19     Q    **Do you have any first-hand knowledge of**
20 **any of that?**
21     A    Other than the -- reviewing that, what I
22 saw in the depositions and the medical records, no.
23     Q    **Other than the depositions and the**
24 **medical record, you have no other knowledge of the**
25 **medical community in Memphis, do you?**

Page 101

26 (Pages 98 to 101)

A80609D

## JASON D. KENNEDY, M.D.    JUNE 25, 2014

1    A    No, sir.
2    Q    What is the population of Memphis?
3    A    It's more than Nashville. I think it's
4  about a million.
5    Q    Do you know which hospitals are in the
6  medical district?
7    A    No.
8    Q    How many hospitals are in Nashville?
9    A    How many hospitals in Nashville?
10 Vanderbilt, Centennial, Baptist, those are the only
11 ones I know for a cert are in Nashville.
12    Q    Do you know how many hospital beds are
13 available in Nashville?
14    A    Do not.
15    Q    Do you know what the population here is?
16    A    Less than Memphis.
17    Q    Do you know which specialties Nashville
18 has that Memphis does not?
19    A    No, because I know they do heart
20 transplants out there, from a cardiac standpoint, but
21 other than that, I don't know.
22    Q    So other than your knowledge of what the
23 Nashville standard of care is, you have no independent
24 knowledge of what the standard of care is in Memphis,
25 Shelby County, Tennessee?

Page 102

1         MR. LEDBETTER:  Object as to form. The
2  witness has already asked and answered this question on
3  this case and as to these issues.
4         THE WITNESS:  So what does that mean?
5         MR. GILMER:  Back to my question -- and
6  I'll ask counsel not to make speaking objections
7  anymore.
8  BY MR. GILMER:
9    Q    If -- other than the national standard
10 of care that you have discussed earlier, you have no
11 independent knowledge of the standard of care in
12 Memphis, Shelby County, Tennessee, do you?
13        MR. LEDBETTER:  Object as to form.
14        MR. GILMER:  Objection noted.
15        MR. LEDBETTER:  It's a compound
16 question.
17        THE WITNESS:  So ...
18 BY MR. GILMER:
19    Q    You can answer my question.
20    A    So just repeat it one more time for me.
21    Q    Sure. Other than your knowledge of the
22 national standard of care, you have no independent
23 knowledge of what the standard of care is in Memphis,
24 do you?
25    A    I've never practiced in Memphis, I want

Page 103

1  to say.
2    Q    And you have no -- you've had no
3  discussions with any anesthesiologist regarding the
4  standard of care in Memphis, have you?
5    A    I've never practiced in Memphis,
6  Tennessee. I've talked to Memphis anesthesiologists at
7  meetings before.
8    Q    Have you talked about the standard of
9  care, or is it just in passing?
10    A    We talk about medicine practice. We're
11 not talking about golf, usually. We're talking about
12 the practice of anesthesia, usually, when it's an
13 anesthesia meeting.
14    Q    Are you a part of any organization, any
15 organizational committee that develops guidelines and
16 policies and procedures for anesthesiologists?
17    A    No.
18    Q    Let's look at your document here. On
19 the first page, do you see anything on there that you
20 changed from your original report?
21    A    I'm just reading the --
22    A    Sure.
23    A    Not that I can see.
24    Q    Okay. On page 2 -- and I want to go
25 through these individually. The first one just says

Page 104

1  that you reviewed the medical records, and we've
2  already talked about that. Number two, would you read
3  that and then explain your basis for that?
4    A    "Defendants failed to follow the proper
5  standard of care in that they failed to appropriately
6  ensure that Brett was appropriately and safely
7  monitored and assessed in the PACU. There are no
8  records of them assessing the patient in the recovery
9  room until after the initiation of the code, a period
10 of about an hour.
11        "Both physician agreed that such
12 monitoring and assessment was necessary, but neither
13 assured nor verified the proper positioning, proper
14 supplemental oxygen, or proper monitoring occurred or
15 was provided.
16        Anesthesiologist supervision was needed
17 until the patient, Brett Lovelace, was awake and
18 maintaining his own airway." Continue?
19    A    No. We'll stop there. First of all,
20 there's a footnote, No. 2 there. Is that a -- it says
21 "See Clinical Practice Guideline:  Tonsillectomy in
22 Children." And that's about "Baugh, et al.,
23 Otolaryngology."
24    A    Yes.
25    Q    Is that something that you reviewed

Page 105

27 (Pages 102 to 105)

Case 2:13-cv-02289-SHL-dkv   Document 128-2   Filed 08/09/14   Page 28 of 63   PageID
1497

**A80609D**

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1  prior to forming your opinions in the case?
2      A       It is something I reviewed prior to
3  forming my opinions, yes.
4      Q       And that is in addition to the other
5  texts that we discussed earlier?
6      A       Yes. So whatever I footnoted in this
7  would be in addition to that.
8      Q       Why did you cite specifically to that
9  particular publication there?
10      A       Because I thought it was relevant to the
11  discussion, pertinent to the information provided.
12      Q       What did you -- what do you believe the
13  standard of care required Dr. Paidipalli to have done
14  with respect to the supervision of the patient?
15      A       So to have been present during
16  emergence, when the decision was made to extubate the
17  patient, and to make the decision to extubate him; to
18  either accompany him to the recovery room or to ensure
19  an appropriately trained person did that, specifically
20  a CRN, a licensed CRNA; to ensure that the nurse in the
21  recovery room was appropriately trained and educated
22  and was made aware of whatever issues that were
23  pertinent to this patient; to check on the patient at
24  some regularly stated interval to ensure that he was
25  cared for appropriately and, specifically, to any

Page 106

1  issues that he had; and make sure that the nurse was
2  aware of his specific issues that would impact his
3  monitoring.
4      Q       Based on the standard of care that
5  you're using, what -- what time frame should
6  Dr. Paidipalli have checked on the patient?
7      A       I would have immediately either
8  accompanied this patient to the PACU -- I would have
9  extubated the patient, but if -- after extubation,
10  based upon his body size and habitus, I would have
11  checked on him within ten or fifteen minutes.
12      Q       And when you say "I would have," you
13  agree with me that what you do does not establish a
14  standard of care, right?
15      A       I think a reasonably prudent
16  anesthesiologist, with an 82-kilo twelve-year-old boy
17  with sleep apnea, with his tonsils out, would check on
18  a patient. I think any reasonable anesthesiologist, be
19  they a pediatric anesthesiologist or an adult -- would
20  do that for a child that had recent airway surgery,
21  yes.
22      Q       When you transfer a patient to PACU, do
23  you accompany each and every patient that you do?
24      A       I either accompany every single patient
25  that I take care of or I immediately see them within

Page 107

1  ten or fifteen minutes.
2      Q       Each and every one?
3      A       Each and every single one.
4      Q       And do you rely on CRNAs to transport
5  patients sometimes from the operating room to the PACU?
6      A       I surely do.
7      Q       Do you ever admit -- I know that you
8  said that you do some practice in the ICU. Do you
9  admit patients from the operating room directly into
10  the ICU after extubation like this? Did, in other
11  words -- wait. That's a bad question.
12      A       Yes.
13      Q       In other words, do you have any
14  criticisms in this case about Dr. Paidipalli's decision
15  to admit this patient to the PACU versus the ICU?
16      A       A typical tonsil & adenoid that had been
17  extubated with appropriately tidal volumes, minimal
18  minute ventilation, I would have no problem going to a
19  PACU. A child that's clearly hypoventilating and not
20  responsive appropriately, I would consider sending to
21  the ICU.
22      Q       What would have been different with the
23  monitoring that would be in an ICU versus in a PACU?
24      A       A PACU is really an ICU. I mean it's an
25  intensive care unit, for all -- for all purposes.

Page 108

1      Q       One-on-one care?
2      A       One-on-one or one-on-two care.
3      Q       Okay.
4      A       So, yeah, I mean there is a high level
5  of care there. The difference, probably, that is at --
6  in the ICUs, that there's going to be a physician
7  dedicated to that ICU that doesn't leave and is working
8  in the other operating rooms and doesn't have
9  responsibilities there, like I'm sure Dr. Paidipalli
10  had.
11      Q       Do you believe that any of the
12  physicians or CRNAs would not have been available had
13  they been summoned by Nurse Kish?
14      A       I have no data to make a decision on
15  that.
16      Q       Do you have any reason to believe that
17  they would not have been available had she called for
18  them?
19      A       That would be supposition on my part.
20      Q       Well, when the code occurred, how
21  quickly was Dr. Paidipalli --
22      A       It sounds like immediate.
23      Q       And in this case, Brett had one-on-one
24  care in the PACU from Nurse Kish, did he not?
25      A       He did for about ninety minutes.

Page 109

28 (Pages 106 to 109)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  Q    Let's go to your --
2  A    Statement?
3  Q    -- third statement.
4  A    Third?
5  Q    Yes, please.
6  A    Okay. "Defendants failed to follow the
7  proper standard of care in that they failed to
8  appropriately ensure that Brett had fully emerged from
9  and recovered appropriately from the anesthetic prior
10 to the removal of the endotracheal tube. Brett's
11 documented tidal volumes prior to extubation were a
12 mere 145 to 180 cc's. This is a very small tidal
13 volume for an 81-kilogram child.
14    "This, combined with documented
15 hypercarbia, makes it unlikely that he was ventilating
16 adequately at the time of extubation. Brett's high
17 end-tidal CO2 level of 56 torr, as recorded on the
18 Anesthetic Record, support the assertion that
19 appropriate assessment and attention would have
20 prevented the subsequent hypoxemia and acidosis."
21 Q    That last sentence is what I'm hung on
22 "... support the assertion that appropriate assessment
23 and attention would have prevented his subsequent
24 hypoxemia and acidosis." How long does it take for a
25 patient in this -- such as this, to have brain damage

Page 110

1  from a hypoxic event?
2  A    So a lot of that depends on -- it
3  depends on multiple factors. So when looking at the
4  brain being hypoxemic, it's really dependent upon what
5  we call DO2, "delivery of oxygen" to the brain.
6    And DO2 is dependent upon two things;
7  and that's the content of oxygen within the blood and
8  the cardiac output. And it's also -- for the brain,
9  it's dependent upon the amount of vasoconstriction.
10 Okay? And high levels of CO2 initially cause
11 vasodilation in cerebral vasculatures, but eventually
12 will cause vasoconstriction.
13    The primary issue would be the amount of
14 oxygen in his blood and the -- his cardiac output. So
15 the issue is that, you know, that could have progressed
16 over time. He was -- so the answer to your question:
17 It's variable. Like if I pre-oxygenated you right now
18 and made you all of a sudden apneic, you can last about
19 eight or ten minutes if you were apneic, meaning not
20 breathing at all, and I had filled your lungs up with
21 oxygen.
22    And Brett was on 100 percent oxygen, as
23 documented, so his lungs were probably filled with
24 oxygen, though he wasn't ventilating well, which is
25 really the removal of CO2.

Page 111

1    He was still making some respiratory
2  effort. He was still having some minimal gas exchange,
3  not enough to keep his CO2 down. And so hypercarbia --
4  that could have taken quite a while.
5    So it's well within the realm of
6  understanding that this started here [indicating], and
7  if you look at his first gas, he had a PO2 in
8  excess of -- I mean a Pc O2 in excess of 100, that this
9  was a continuous, gradual decline that started in the
10 OR.
11 Q    Do you believe -- this last sentence
12 here indicates to me that you are discounting anything
13 that occurred in the PACU, as far as the end result in
14 this case. Is that accurate?
15 A    No, I'm not. No, that's not an accurate
16 statement.
17 Q    Okay. So I'll tell you what, let's look
18 at the PACU Record, if we can.
19 A    Sure.
20 Q    Here is a copy of the record you can
21 use. If you would, turn to -- for instance, there's O2
22 sats. Let's look at his vital signs while he's in the
23 recovery room. And I don't have it premarked. We're
24 going to have to both find it.
25 A    Okay.

Page 112

1  Q    Have you found his vitals from when he
2  arrived in the PACU?
3  A    No. I'm looking. I mean the first of
4  the vitals would have been on that PACU, on the
5  Anesthetic Care Record.
6  Q    Okay.
7  A    But subsequent vital signs are somewhere
8  else. And I remember seeing them. I'm just trying to
9  find them. Here they are. But the chart is not very
10 helpful in the order in which they order things.
11    MR. GILMER: Tell you what, why don't we
12 save the tape. Why don't we go off the tape real quick
13 and let us find this.
14    VIDEOGRAPHER: We're going off the
15 record. The time is 3:43.
16    (Recess taken.)
17    VIDEOGRAPHER: We're back on the record.
18 The time is 3:46.
19 BY MR. GILMER:
20 Q    At what point in the PACU did his vital
21 signs change that gave you any indication that the
22 patient was in distress?
23 A    I'd have to review it.
24 Q    Do you remember when his blood pressure
25 dropped?

Page 113

29 (Pages 110 to 113)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1    A    I don't recall the exact time. I'd have
2  to see that chart.
3    Q    According to my notes, it was at 11:34.
4    A    Then I would go with that.
5    Q    Which is about thirty minute before
6  Nurse Kish called anyone. What does a blood pressure
7  of 84/42 indicate to you?
8    A    It can mean a lot of different things.
9  It could indicate that somebody's very sleepy and
10  doesn't have enough intrinsic abionergy tone. It could
11  mean that he's hypovolemic. For, like a patient such
12  as Brett, who had tonsils done, that he had bled, an
13  isolated blood pressure, out of context with the rest
14  of it, doesn't mean a lot.
15    I think he recovered his blood pressure
16  immediately, with no interventions by her, if I recall.
17  And that -- so that isolated single blood pressure in a
18  twelve-year-old child is really not terribly
19  concerning.
20    Q    If there had been a decline in his blood
21  pressure over the course of the time -- see: At 10:49,
22  blood pressure is 129/63 with a pulse of 120.
23    A    Okay.
24    Q    A respiratory rate of 24 and O2 sats of
25  100 percent. At 11:03, blood pressure of 118/56, pulse

                                    Page 114

1  of 122, respirations of 24. Are there any issues with
2  those vital signs that you've seen?
3    A    No, sir.
4    Q    All right. At 11:20 -- so twenty
5  minutes later, we have a BP of 106/53, with a pulse of
6  118, and respiratory rate of 24.
7    A    You have the one issue that -- probably,
8  with the previous one, the previous set of vital signs,
9  and these vital signs, is that his heart rate continues
10  to be high. Now, the glycopyrrolate explains that when
11  he was in the operating room and immediately in the
12  recovery area, probably in the first thirty minutes,
13  maybe thirty-five or forty-five minutes, but to have
14  this persistent low-grade tachycardia, which was not
15  consistent with his age or his baseline heart rate,
16  does raise concern that there's something else going
17  on.
18    Q    Did the standard care require Nurse Kish
19  to notify someone of that continued tachycardia?
20    A    I would think so, that I would let
21  somebody know. The isolated blood pressure alone
22  wouldn't do it, but you know, it's not far outside of
23  reasonable to have a child that's a little
24  tachycardiac, and that is just a little tachycardiac.
25  It does kind of raise some red flags.

                                    Page 115

1    Q    Fourteen minutes later, his blood
2  pressure dropped to 84/42 with a continued pulse of 114
3  and a respiratory rate of 24. His O2 sats was noted as
4  99 percent on room air. So that change in those
5  fourteen minutes, does that indicate anything to you?
6    A    It could, but again, if I were caring
7  for that patient or I would -- if I had a nurse who was
8  caring for that patient, I would expect them to
9  re-cycle the blood pressure, reassess the patient, and
10  then make a decision whether or not to do something at
11  that point.
12    Q    And that's what the standard of care
13  requires?
14    A    That's what the standard of care would
15  require.
16    Q    Do you agree with Nurse Kish when she
17  testified that she should have notified somebody at
18  11:34 with this change in blood pressure.
19    MR. LEDBETTER: Object. Go on.
20    THE WITNESS: Do I agree that she
21  should -- you know, trying to go back and read her mind
22  is difficult. Like I said, that isolated blood
23  pressure, by itself, does not portend, per se, an
24  issue.
25    It could be the -- you know, it could be

                                    Page 116

1  caused by a lot of different things. Is her regret and
2  her statement based upon the fact that she has a
3  twelve-year-old child that died and that she's looking
4  for some explanation or something she should have done
5  different, maybe. I don't know.
6    I can't read her mind. But that
7  alone -- and there's other things, you know, that it
8  could be. It could be significant hypercarbia. It
9  could be, you know, the patient's bled out, so ...
10    Q    Well, we know he didn't bleed out,
11  right?
12    A    Exactly.
13    Q    And --
14    A    After the fact.
15    Q    Do you believe that there was a point in
16  time where Brett was beyond being saved?
17    A    There likely was, but that point, I
18  don't think you can determine from the available
19  records other than --
20    Q    Do you believe that that point fell
21  before 11:59?
22    A    Did that point fall before 11:59? It
23  clearly had to fall before 11:59 and sometime after he
24  was anesthetized.
25    Q    But you have no opinion as to at what

                                    Page 117

                                    30 (Pages 114 to 117)

A80609D
## JASON D. KENNEDY, M.D.  JUNE 25, 2014

1   point?
2      A      That would be conjecture on my part.
3      Q      Okay.  If you would, go back to your --
4      A      Yes, sir.
5      Q      -- statements there.
6      A      Statement 4?
7      Q      Yes, sir.
8      A      As read, "The defendant failed to follow
9   standards of care in that they failed to ensure
10  adequate ventilatory support in a patient who is obese,
11  with sleep apnea.  Brett's initial arterial blood gas,
12  his ABG, is recorded as a pH of 6.70, a partial
13  pressure of CO2 of 96, a partial pressure of oxygen of
14  502, a bicarbonate of 12.
15          "This ABG was performed after at least
16  ten minutes of positive pressure ventilation, since per
17  the code note, he is intubated -- re-intubated at
18  12:04, and the first blood gas was reported to be at
19  12:18.
20          "Therefore, the initial CO2 was likely
21  much higher.  There is a sample that is reported to be
22  a sample venous that has a pH of 6.59, a CO2 of greater
23  than 130," which is unmeasurable.
24          "This is an incredible amount of
25  hypercarbia resulting from a likely prolonged period of

Page 118

1   hypoventilation as consistent with a patient who was
2   extubated in a non-fully awakened state, in deep
3   extubation, and without appropriate insurance that he
4   was maintaining adequate respiratory rate and tidal
5   volumes.
6          "This was a clear breach of the standard
7   of care in any patient who had undergone a general
8   anesthetic, and especially true in an obese child with
9   sleep-deprived breathing who undergoes a
10  tonsillectomy."
11     Q      Let's go through that slowly.  There's a
12  lot of information contained in there.  When is the
13  initial ABG recorded?
14     A      I think there's initial venous blood
15  gas, but the initial arterial blood gas, I think, was
16  twelve or thirteen minutes after he was intubated.  I
17  think it was at 12:18.  I think he was intubated at
18  12:04.
19     Q      Okay.
20     A      And that timing on the blood gas is the
21  time it was ran, not the time it was drawn in those
22  institutions.
23     Q      Was it -- do we know when it was drawn?
24     A      I saw -- found no documented evidence of
25  when it was drawn.  And I don't know if that was a

Page 119

1   bedside arterial blood gas monitor or something that
2   would be sent to a lab and hand-delivered.  I have no
3   idea.  It's conjecture on my part.
4      Q      When you say "This is an incredible
5   amount of hypercarbia resulting likely -- resulting
6   likely a prolonged period of hypoventilation," how long
7   was that prolonged period?
8      A      So you can -- so if you're apneic --
9   that means not breathing at all and you have no --
10  you're not ventilating in any way, shape, or form --
11  your CO2 will go up.  I think it's 8 in the first
12  minute and 4 for every minute after that.
13          So you can say that Brett wouldn't have
14  went up greater than that, because he still was
15  breathing but hypoventilating in the recovery room and
16  in the operating room.  So it could have been going
17  on -- I mean I think that the -- from what we saw, the
18  evidence is clear that he was hypoventilating from the
19  time he left the operating room.
20     Q      Is there any testing that would have
21  told us whether or not he was adequately breathing when
22  he left the operating room?
23     A      They could have done an arterial blood
24  gas which would have been a needle stick to draw out
25  blood from his [inaudible] arteries.  You could have

Page 120

1   used an end-tidal CO2 to give an estimation of what it
2   was.
3          And for a patient that arrived in an
4   agitated, delirious state, with difficulty in
5   maintaining pulse oximetry on him and difficulty to
6   arouse, I think a reasonable physician in the same
7   situation would further assess him, but he or she would
8   have to have been present if they decided to do that.
9      Q      Is a CRNA adequate to assess a patient
10  upon arrival to the PACU?
11     A      Should be, yes, sir.
12     Q      You use CRNAs?
13     A      I do.  I still supervise her care, which
14  means I'm responsible for what they do, and I still am
15  sometimes there.  I mean their level of training is not
16  the same as a physician, and ultimately, I'm
17  responsible for what they do or don't do, so I always
18  go back and reassess the patient.  It's a safety net.
19     Q      And when you're -- you supervise CRNAs
20  that -- do they put patients to sleep?
21     A      Not without me present, and they don't
22  extubate without me present.
23     Q      Let's look at No. 5.
24     A      Yes, sir.  "Defendants failed to follow
25  the proper standard of care in that they failed to

Page 121

**ATKINSON BAKER, INC.**

31 (Pages 118 to 121)

**1-800-288-3376**

**A80609D**

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  appropriately ensure that Brett had adequate oxygen
2  supplementation in the post-anesthesia care unit.
3  Defendants failed to reaffirm airway patency and
4  adequacy of breathing.
5       "Defendants should have continued
6  delivery of oxygen by mask to Brett Lovelace until his
7  recovery was complete. Further Defendants -- further,
8  Defendants failed to maintain airway patency with
9  simple airway maneuvers or oro-nasopharyngeal airway
10  until the patient was fully awake. Neither Defendants
11  could explain these lapses, but both agree that such
12  steps were required and standard."
13     Q     So you -- do you believe that an oral
14  airway was necessary? Is that what you're saying?
15     A     If he was obstructing at the time.
16     Q     Do we know that he was obstructing at
17  any time?
18     A     He was reported to be snoring, which
19  snoring respirations, by definition, are obstruction.
20     Q     He had a history of snoring, did he not?
21     A     Uh-huh.
22     Q     Is that a yes?
23     A     Yes, sir. I'm sorry.
24     Q     And using an oral airway would have only
25  agitated the patient further, wouldn't it?

Page 122

1     A     Blow-by oxygen is a situation in which
2  you don't have very tight control of the concentration
3  of oxygen that the patient inhales.
4       So usually for pediatric patients, they
5  will take corrugated oxygen tubing or a tent and put it
6  by the patient -- which you don't really know what
7  percentage of oxygen the patient is actually seeing.
8       It could be, you know, a lower
9  percentage, you know, 25 or 30 percent, or it could be
10  as high as 50 or 60 percent, but usually not much
11  higher than that.
12     Q     Is that a deviation from the standard of
13  care to use the blow-by oxygen?
14     A     Blow-by is commonly used in children
15  once they ensure that their airway is adequately opened
16  and that they are adequately ventilating, yeah.
17     Q     What do you believe that -- in your
18  opinion, should supplemental oxygen have been
19  administered to Brett the entirety of the time that he
20  was in the PACU?
21     A     I think, based upon current standards of
22  care, national recommendations, and guidelines, in my
23  opinion as a physician, taking care of a patient such
24  as Brett, who is obese, with sleep apnea documented,
25  and having airway surgery -- I think it was appropriate

Page 124

1     A     We would not have put an oral airway in.
2  I would -- I might have put a nasopharyngeal airway,
3  which is a lot less inducing of laryngospasm. It does
4  tend to cause patients to have a little bit more
5  arousal, which would wake them up, but it would
6  maintain his airway.
7       It wouldn't have changed his tidal
8  volumes at all because Brett was -- even though he was
9  obstructing, he was still moving air and needed to have
10  his ventilatory support. And you see that in his
11  anesthetic record. He had an endotracheal tube in his
12  diaphragm -- your diaphragm is your primary muscle of
13  breathing -- was weakened by the anesthetic.
14      We know that it -- it's just that curve
15  that we talked about earlier. And I'm not certain even
16  a nasopharyngeal would have changed the course of
17  action.
18     Q     If oxygen was delivered by mask to
19  Brett, would that have changed your opinions in any
20  shape or form as far as once he was in the PACU?
21     A     If -- I think a reasonable physician
22  faced with the same patient would have administered
23  oxygen and then supplemented his ventilatory status
24  with mask ventilation.
25     Q     What is blow-by ventilation?

Page 123

1  for him to have oxygen for the duration of his event
2  until he was fully awake and conversant.
3     Q     If he was, in fact, breathing on his own
4  and had a -- had an O2 sats of 99 percent, what would
5  the supplemental oxygen have done for him?
6     A     If he was not conversant -- again, it
7  goes back to your question to how long would it take
8  him to get hypoxia. It gives you more time. It gives
9  you some room to prevent him from getting hypoxemic.
10      You know, in Brett's situation, he was
11  so hypercarbic that his respiratory drive wasn't going
12  to change until he was assisted. He had to get some of
13  the $CO_2$ off.
14      So would have the oxygen changed his
15  eventually -- he would have eventually stopped
16  breathing altogether. He would -- or had a cardiac
17  event even if supplemental oxygen was given.
18      So really the issue goes back to his
19  minimum minute ventilation. Oxygenation would have
20  given you a buffer. It would have been within, you
21  know, the standard of care of what I would have done
22  and what a -- any reasonably prudent physician,
23  especially an anesthesiologist, would have done. It
24  would have been the first thing I would have done.
25     Q     Was Dr. Paidipalli reasonable to --

Page 125

32 (Pages 122 to 125)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

---

1 reasonable to rely on the PACU nurse to continue the
2 use of supplemental oxygen?
3        A        I think I would have expected her to do
4 it, but then again, as an anesthesiologist, I'm
5 supervising her care, and sometimes the nurses make
6 decisions that I do not agree with.  Sometimes my CRNAs
7 make [coughs] -- excuse me -- decisions I don't agree
8 with, and I rectify that situation.  And the only way
9 to do that is to be present.
10        Q        In your -- what does the standard of
11 care require as far as being present?  It sounds to me
12 like you're expecting the physician to be bedside the
13 entire time that the patient is in the PACU in case
14 somebody does something that doesn't live up to your
15 standards.
16        A        So what's your question?
17        Q        So what does the standard of care
18 require as far as the length of time that the
19 anesthesiologist assesses and monitors the patient in
20 the PACU?
21        A        Until -- I mean each individual patient
22 is different, and I'm not asserting that the
23 anesthesiologist stay with the patient at bedside, but
24 he ensures that someone who is capable and taking care
25 of the patient is doing that appropriately.

Page 126

---

1        So in the construct of that, if I'm
2 anesthetizing a patient, I might put them to sleep but
3 not intubate them.  And I might walk out, away, but I'm
4 ensuring and supervising that the nurse-anesthetist was
5 doing the right thing before I walk out and, again, I'm
6 making certain I took care of the patient.  And the
7 recovery room is having the same thing done.
8        And so it doesn't require my immediate
9 presence at the bedside for the entirety, but it
10 actually does require me to -- at some point in time,
11 to assess the patient, make some decisions about the
12 patient, and interact with the nurse or CRNA or whoever
13 it might be, in making some decision.  And you can't
14 supervise if you're not physically present.
15        That's why it is part of
16 the recommended -- I mean that's part of the
17 standard -- the standard of care.  That's what the CMS
18 requires in order, you know, to have reasonable -- it
19 requires the supervision -- for an anesthesiologist,
20 it's to be immediately available and present during
21 all -- during induction emergence, and all other
22 indicated procedures.
23        Q        And do you believe that Dr. Paidipalli
24 was not immediately available?
25        A        He didn't see the patient for ninety

Page 127

---

1 minutes in the recovery room with a child that had an
2 obstructive sleep apnea and that was 86 kilos.  So I
3 don't know where he was at, but he obviously did not
4 assess the patient as per his own assertion and the
5 nurse's assertion.  So that --
6        Q        But you said that the standard requires
7 for the physician to be immediately available.  What
8 does that mean to you?
9        A        So to be present during induction
10 emergence and all other indicated procedures.  So
11 transferring the patient over, that's indicated by the
12 physician, and there's a fair amount of discretion
13 that's allowed for each physician.
14        What exactly is "immediately available,"
15 you know, there's no hard definition for that.  It
16 wouldn't mean being at home or being in the building or
17 being three stories up.  It's being able to respond
18 usually within two minutes.
19        Q        As an attending physician who supervises
20 residents, you often rely on your residents to do
21 procedures that you're not present in the room for,
22 correct?
23        A        They don't usually do procedures without
24 me in the room.  They might.  They are obviously
25 anesthetizing the patient while I'm not there, but any

Page 128

---

1 procedure, I supervise personally, and I'm personally
2 present and supervising them doing it.
3        Q        But when they anesthetize the patient,
4 what does the standard of care require for you
5 personally?  Do you have to be in the room with them?
6        A        Uh-uh, no, sir.
7        Q        What does it require of you, to be
8 immediately available?
9        A        Yeah.  So the exact attestation is, you
10 know, present during -- present during induction
11 emergence and all other indicated procedures.  So
12 what's indicated for an otherwise healthy adult or
13 child that's undergoing a general anesthetic is going
14 to be different than an 82-kilo, twelve- -- you know,
15 twelve-year-old that's got obstructive sleep apnea.
16        I tailor my care for that patient,
17 versus an otherwise healthy 12-year-old that doesn't
18 have sleep apnea having finger surgery done.  I -- you
19 know, that's a judgment decision.  And there's clearly
20 that, but what a reasonably prudent anesthesiologist
21 would do in that, you know, situation, you know, are
22 going to be two different things, versus what they
23 would do for a -- you know, for a knee surgery or
24 something that doesn't have the same risk that Brett
25 brought to the table.

Page 129

---

33 (Pages 126 to 129)

A80609D
## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  Q      Are those all of your opinions
2  concerning Dr. Paidipalli's care in the case?
3  A      Are those -- are these all of my
4  opinions?
5  Q      Well, I mean have we discussed all -- it
6  looks to me like the -- well, the next few refer to --
7  well, we'll keep going through these.  I'll go through
8  them.  Number 7 -- what does No. 7 say?
9  A      The --
10  MR. LEDBETTER:  Have you done Number 6?
11  MR. GILMER:  Yes.
12  MR. LEDBETTER:  Okay.
13  MR. GILMER:  Oh, no, I have not done
14  No. 6.
15  BY MR. GILMER:
16  Q      Let's go back.  Number 6.
17  A      "Defendant failed to follow the proper
18  standard of care in that they failed to appropriately
19  ensure that Brett was appropriately monitored in the
20  Post-Anesthesia Care Unit.  A patient in the prone or
21  knee/chest position is difficult to monitor and ensure
22  adequate oxygenation.
23      "Dr. Paidipalli did not attend the
24  patient in the PACU, reportedly and admittedly, and
25  Dr. Clemons did nothing to correct Brett Lovelace's

Page 130

1  in that position.  So assess their airway, assess their
2  ventilatory rate and status and then make a decision
3  from there of whether or not to move them, but more
4  than likely, I would have moved them into a more
5  lateral position or at least attempted to do so.
6  Q      But the decision to allow the patient to
7  be in a comfort position if he was -- had an adequate
8  airway was something that the physicians were allowed
9  to exercise their clinical judgment in under the
10  standard of care, right?
11  MR. LEDBETTER:  Object to the form.
12  THE WITNESS:  So you're asking me --
13  again, just restate it, please.
14  BY MR. GILMER:
15  Q      So the -- if the patient moved into this
16  comfort position that he was in in the PACU and he had
17  adequate ventilation, was adequately ventilating and
18  had an adequate airway, was the decision to allow him
19  to remain in that position a deviation from the
20  standard of care?
21  MR. LEDBETTER:  Object.  There's no
22  evidence that he had an adequate airway.
23  THE WITNESS:  If the physicians who had
24  assessed the patient had assessed first his adequacy of
25  ventilation and respiration and had done that first,

Page 132

1  position when he saw him prone and on his face without
2  oxygen support.
3      "Placing Brett Lovelace in a left
4  lateral or semi-prone (tonsil position) slightly
5  head-down, and with a pillow under his chest to allow
6  secretions and blood to drain, was necessary, as well
7  known, but not done here, which was a failure to follow
8  the pertinent standards of care."
9      And I refer to the Guidelines of the
10  Difficult Airway Society for the Management of Tracheal
11  Extubation.
12  Q      So elaborate on what criticisms you have
13  concerning the positioning in this case.
14  A      The knee/chest position, it would not be
15  a typical position that we would -- would place a
16  patient in after any surgery, but specifically an
17  airway-type surgery of a patient Brett's size.
18  Q      What if the patient moved to that
19  position as a comfort position?
20  A      You would assess the patient, make sure
21  that he wasn't just having postoperative delirium,
22  because in that situation, he or she might do something
23  that may not be necessarily in their best interest.
24      Just because they move in that position
25  doesn't necessarily mean you should allow them to stay

Page 131

1  that would have been a reasonable course of action, but
2  in the absence of those things, it is not a reasonable
3  course of action.
4  BY MR. GILMER:
5  Q      Now, the position that Brett was in was
6  a position that allowed for the blood and secretions to
7  drain from his throat in the event that -- since he was
8  a post-adenoidectomy/tonsillectomy patient, right?
9  A      Yes, sir.
10  Q      And that's something that's important
11  with patients who have just had throat surgery?
12  A      That is true.  The drainage of blood and
13  secretions away from their larynx would be very
14  important.
15  Q      Because you were explaining earlier that
16  those secretions can cause laryngeus spasm and --
17  A      Yes.
18  Q      Okay.  And with a laryngeus spasm, then
19  the patient's airway would be completely blocked?
20  A      Yes.
21  Q      And if the patient were in a lateral
22  position -- well, what position would you believe the
23  standard of care required for him to be in?
24  A      I think there are several different
25  options that you can do.  You can do a lateral

Page 133

34 (Pages 130 to 133)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

**Page 134**

1  position. There's a tonsil position; basically
2  anything that allows him to support his airway but acts
3  to allow secretions to drain out of his mouth.
4        Now, once he was more awake and talking
5  and conversant and clearly interacting, for him to sit
6  up -- but to be in the knee/chest position would not be
7  consistent with the standard of care for him,
8  especially in the absence of adequate monitoring.
9        Q    When you say, "in the absence of
10  adequate monitoring," what do you mean by that?
11        A    Well, without the ability to assess his
12  ventilatory status, of what his tidal volumes were, or
13  neurologically, just waking him up and doing a neural
14  exam; for instance, having him talk to you.
15        Q    Is that -- I believe that Nurse Kish did
16  an assessment throughout her care of the patient in the
17  PACU that did assess his neurological status, did she
18  not?
19        A    Uh-huh [affirmative].
20        Q    Is that a yes?
21        A    Yes, sir.  I'm sorry.
22        Q    And do you have any criticisms of her
23  assessments of that neurological test?
24        A    Do I have any criticisms of her
25  assessment?  I think she attested to the fact that that

**Page 135**

1  assessment was not an accurate reflection of the
2  child's situation.
3        Q    And had she adequately complied with the
4  standard of care and appropriately assessed his
5  neurological status, the outcome in this case would
6  have been different, right?
7        MR. LEDBETTER:  Object as to form,
8  compound.
9        THE WITNESS:  I don't know.  It depends
10  on when she actually adequately assessed the patient.
11  But he was clearly hypercarbic and not ventilating
12  adequately when he left the PACU.
13  BY MR. GILMER:
14        Q    But if she had not false-charted that he
15  was -- had an adequate neurological status, then
16  perhaps she would have known to notify the physicians
17  that there may be a problem, right?
18        MR. LEDBETTER:  Object.  It's
19  conjecture.
20        THE WITNESS:  I mean could have her
21  actions changed the course?  Yes.  Could Dr. Clemons,
22  when he came by to evaluate the patient, actually taken
23  responsibility as a physician who's caring for the
24  patient, in the sense that he operated on him, on this
25  boy, just taken a moment to assess him, that would have

**Page 136**

1  changed it.
2        Could have Paidipalli coming by 45
3  minutes earlier have changed the outcome?  Possibly.
4        Again, I -- those are all retrospective
5  conjectures that I can't answer to, but they're, you
6  know, within the realm of possibility.
7  BY MR. GILMER:
8        Q    Because you can't say to a reasonable
9  degree of medical certainty that had Dr. Paidipalli
10  come by to see the patient that it would have made a
11  difference in the outcome in this case, can you?
12        A    Well, he had a $CO_2$ of -- arterial $CO_2$ of
13  60 when he left the room.  I could say with a
14  reasonable degree of certainty that having checked on
15  him earlier and done an appropriate assessment early in
16  the child's care -- that he probably would have had a
17  different outcome.
18        Q    How would he have checked his $CO_2$ in the
19  PACU?
20        A    His primary method of assessing that
21  would have been just assessing his neurologic status,
22  and when he wouldn't wake up appropriately or follow
23  commands, that would have led a reasonably prudent
24  physician to then do further tests such as either an
25  arterial blood gas or just do something as simple as

**Page 137**

1  mask-ventilating Brett, which would have been very
2  simple to do.
3        Q    And if Nurse Kish had notified the
4  physicians that he may not have had an adequate
5  neurological status, then they would have had the
6  opportunity to do those things, correct?
7        A    Yes, sir.
8        Q    Now, when Dr. Clemons came by to see the
9  patient, how do you know that he did not assess the
10  patient's condition at that time?
11        A    I saw no documentation.  Other than
12  that, it would be conjecture.
13        Q    So do you believe that he did not assess
14  the patient because he didn't document it?
15        A    What we -- our documentation, a mere
16  chart is our documentation of what we did or didn't do.
17  There's no note or anybody's affidavit that they
18  assessed the patient, including Clemons, that he did a
19  neurologic exam or an airway exam at the time.  I
20  didn't see it.
21        And a physician, regardless of their
22  specialty, would -- in having assessed that patient,
23  could have and should have done something at that
24  point.
25        Q    Do you believe that just because it was

35 (Pages 134 to 137)

A80609D

## JASON D. KENNEDY, M.D.  JUNE 25, 2014

| | |
|---|---|
| 1 documented -- it wasn't documented, that means it | 1     Q    How are you familiar with the standard |
| 2 wasn't done? | 2 of care for an ENT surgeon? |
| 3     A    Not true, but there's multiple locations | 3     A    I'm discussing the standard of care of a |
| 4 where it says nothing to the effect of Dr. Clemons -- | 4 physician.  And an ENT surgeon is an airway surgeon. |
| 5 including his own affidavit. | 5 By definition, he operates in the airway and around the |
| 6     Q    And we do know that the documentation | 6 airway. |
| 7 that Nurse Kish put in the chart was not accurate, | 7     If we have a problem and we can't |
| 8 though, right? | 8 intubate someone, we call an ENT surgeon to trach them. |
| 9     A    Yes, sir, we do. | 9 So I would say an ENT surgeon is pretty familiar with |
| 10     Q    Now, have we talked about all of the | 10 airway management. |
| 11 opinions that you have concerning the positioning in | 11     And I can't comment at his surgical |
| 12 the case? | 12 standards of care or what he did during any surgery, |
| 13     A    I think so. | 13 but the medical management decisions -- that would be |
| 14     Q    Or would you like to elaborate on those | 14 consistent with any physician but also any physician |
| 15 any further? | 15 that cared for patients who had airway surgery.  So |
| 16     A    I think so.  If you have any other | 16 this would be similar to what an anesthesiologist would |
| 17 specific questions, I will be happy to answer them, but | 17 be expected to do. |
| 18 I can't think of anything else right now. | 18     Q    Number 8? |
| 19     Q    And you're basing your opinion that he | 19     A    Yes, sir.  "The ENT surgeon failed to |
| 20 was -- or you're basing your opinion about the | 20 follow standards of care in that he failed to intervene |
| 21 positioning on an assumption that he was in the | 21 in Brett's poor position for a patient who was at high |
| 22 knee/chest position the entire time that he was in the | 22 risk of respiratory compromise.  By documentation, he |
| 23 PACU? | 23 saw Brett in the PACU in the knee/chest prone position |
| 24     A    On the affidavits and the picture that | 24 prior to his arrest, and did not act appropriately to |
| 25 were shown to me. | 25 correct the situation." |
| Page 138 | Page 140 |

| | |
|---|---|
| 1     Q    Okay.  Do you know at what point in time | 1     Q    What do you believe the standard of care |
| 2 those pictures were taken? | 2 required of Dr. Clemons at that point? |
| 3     A    I don't remember seeing a time stamp on | 3     A    Any prudent physician would have |
| 4 them.  I remember seeing some that were pre-op, with | 4 immediately corrected the situation and assessed him |
| 5 Brett obviously talking to what appeared to be | 5 neurologically, see if he was awake, if his airway was |
| 6 different physicians -- I assume, Paidipalli and maybe | 6 actually opening, because you can be breathing but not |
| 7 the ENT surgeon -- that weren't identified that were | 7 moving adequate ventilation -- as we've talked about at |
| 8 clearly in pre-op. | 8 great length, with Brett -- and called for an |
| 9     And then there were pictures clearly | 9 anesthesiologist to immediately come to assess the |
| 10 post-op, but from a timing standpoint -- and there were | 10 patient. |
| 11 some pictures after the code was called when he was in | 11     And have I had that happen with me? |
| 12 the ICU, but I don't remember seeing any time stamp on | 12 Yes, I've had a surgeon who stopped by to see a patient |
| 13 them. | 13 and called for me to come and evaluate the patient. |
| 14     Q    Number 7. | 14 And I would expect that out of any physician.  It could |
| 15     A    Yes, sir.  As read, "The ENT surgeon | 15 be a family practice doctor.  It could be a |
| 16 failed to follow standards of care in that he failed to | 16 pathologist, for that matter.  This is very simple and |
| 17 appropriately care for and recognize Brett was not | 17 fundamental. |
| 18 fully awakened from anesthesia.  He also failed to | 18     Q    Just like you would expect the nurse |
| 19 appropriately intervene by his lack of any personal | 19 caring for the patient in the PACU to call you if they |
| 20 action in the care of Brett or by not calling for an | 20 had a question -- |
| 21 appropriate, trained anesthesiologist to ensure that | 21     A    I would. |
| 22 Brett was not oxygenated -- or was oxygenating and | 22     Q    -- or a concern? |
| 23 ventilating appropriately.  An ENT surgeon routinely | 23     A    Or a concern.  But with a higher |
| 24 cares for such patients and should have known to | 24 expectation for a physician, especially an airway |
| 25 intervene at that time he saw Brett in the PACU." | 25 surgeon such as an ENT.  I would have an even higher |
| Page 139 | Page 141 |

36 (Pages 138 to 141)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1  level of expectation for that.
2      Q      Number 9?
3      A      Number 9. As read, "Neither physician
4  appropriately followed up on the possibility of the
5  most likely anesthetic complication and cause of death
6  in patients undergoing a -- tonsils & adenoids --
7  bleeding or loss of airway. Neither arranged for
8  adequate follow-up and evaluation by themselves, a
9  CRNA, or the nursing staff.
10          The suggestion that clinical judgment is
11  appropriate for post-anesthetic care in this case is
12  analogous to the judgment that a pilot uses when
13  operating an airplane; however, the judgment of a
14  physician is also based upon instrumentation similar to
15  that provide objective information and data to a pilot.
16          For example, in a storm, a pilot must
17  disregard his physical senses and use the instruments
18  to appropriately fly the airplane. By analogy, the
19  anesthesiologist, like the pilot, has to have an
20  objective sense of the standard physiology variables in
21  order to 'land the plane' or bring the patient safely
22  out of anesthetic -- anesthesia.
23          "In this case, clinical judgment is not
24  a proper substitute for failure to pay attention to the
25  details and condition of a patient, and to use

Page 142

1      A      I don't know Dr. Paidipalli's specific
2  experiences.
3      Q      Do you know if he's been practicing
4  medicine? Do you know when he began practicing
5  anesthesia?
6      A      I remember reading it, but I don't
7  remember -- it's been probably for greater than twenty
8  years, I guess. I don't know the exact date.
9      Q      Do you know how long he had cared for
10  patients at Le Bonheur?
11      A      Again, in excess of ten or fifteen
12  years, but I don't know how long. I remember seeing
13  it. I guess an analogy to that is just because you've
14  been doing it a long time doesn't mean you're doing it
15  right.
16      Q      Sure, but it certainly increases your
17  knowledge base in order for you to exercise your
18  clinical judgment, does it not?
19      A      It certainly increases -- it allows the
20  possibility if you're -- if you're reassessing what
21  you're doing. But just because you've been doing it a
22  long time does not increase your likelihood necessarily
23  of doing it safely, per se. That alone -- you can't
24  say that just because someone has been doing it twenty
25  years, that they are the authoritative expert on

Page 144

1  customary and accepted safeguards."
2      Q      Well, clinical judgment, in and of
3  itself, requires you to pay attention to the details,
4  does it not? Does that not play into what clinical
5  judgment is?
6      A      I can have a plumber that has really
7  good judgment, but if he's not paying -- if he doesn't
8  understand what he's doing --
9          So a bedside nurse, for instance, Nurse
10  Kish, might have good judgment or might have poor
11  judgment, but she's limited by the level of her
12  education and what she does and doesn't know. An
13  anesthesiologist has a different expectation.
14          And you're correct in that if you're not
15  paying attention to the documented numbers on your
16  anesthetic record that are clearly there in the course
17  of action of Brett, then yes, you can have judgment
18  outside of data points. So to go on your gut -- which
19  by reading Dr. Paidipalli's statement, would seem that
20  he went on no other objective data and disregarded the
21  other pieces of evidence, the other instruments that he
22  had to fly the airplane, to land the patient, to get
23  Brett home safely.
24      Q      What experience did Dr. Paidipalli have
25  in taking care of patients such as Brett?

Page 143

1  something or that you have to only rely on their
2  judgment.
3          An experienced physician will use the
4  available data he has and rely more on that, because
5  they're aware that they can be blindsided or misguided
6  by their clinical gut feeling, such as, obviously,
7  Dr. Paidipalli -- happened to Dr. Paidipalli on this
8  situation.
9      Q      Well, an experienced physician, such as
10  Dr. Paidipalli, would have a knowledge base based upon
11  his own training and experiences with other patients
12  beyond that of an anesthesiologist who had only been
13  practicing for four years, correct?
14          MR. LEDBETTER: Object as to form.
15          THE WITNESS: So what is your question?
16  BY MR. GILMER:
17      Q      My question was an experienced physician
18  has a knowledge base that is greater than a -- a young
19  physician. I'm not using you. I don't mean to put you
20  into --
21      A      That's fine.
22      Q      But what I'm -- my question is that over
23  time --
24      A      Yeah.
25      Q      -- do you agree me that one's knowledge

Page 145

37 (Pages 142 to 145)

**ATKINSON BAKER, INC.**

**1-800-288-3376**

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  base becomes greater due to the experiences that they
2  have had in taking care of patients?
3         MR. LEDBETTER:  Object as to form, and
4  it's been asked and answered before.
5         THE WITNESS:  I think there is a great
6  to lay a lot of data, a lot of -- to give someone the
7  benefit of the doubt just because they have been doing
8  it for a long time because -- I make, kind of, a lot of
9  analogies for you, but it tends to be that young
10 physicians tend to be very attentive.
11        And frequently what -- there's something
12 called the ASA Closed Claims Database, and they have
13 actually studied this.  So it's actually -- so
14 frequently, older physicians are more likely to make
15 errors in judgment such as Dr. Paidipalli made in
16 regards to using their clinical judgment and their gut
17 over the available data, and they are actually more
18 likely to make those kind of mistakes than a young --
19    Q    What study is that?
20    A    It's a review of the Closed Claims
21 Database.
22    Q    And is that --
23    A    It's openly available.
24    Q    It is?
25    A    Yeah.

Page 146

1    Q    Okay.  And is that something you used to
2  formulate your opinions in this case?
3    A    I wasn't making my opinions about
4  Dr. Paidipalli's daily interaction, because all I had
5  was the data in front of me.  It was obvious that his
6  judgment to allow this child to be extubated at the
7  time was not accurate.
8    Q    What would -- what is your expectation
9  as far as -- you've mentioned a couple of times that
10 Dr. Paidipalli should have ensured that Nurse Kish was
11 trained or something to that effect.  Do you train the
12 PACU nurses?
13   A    I don't train my nurses, but I know my
14 strengths and weaknesses in my nurses.  So in certain
15 areas where we anesthetize patients, they go to a
16 recovery room that has nurses that are less experienced
17 taking care of certain types of patients.
18        And as the anesthesiologist supervising
19 the patient's care, it's my responsibility to know the
20 strengths and weaknesses of my team members.  And, you
21 know, that's part of my job, and until I assess each
22 member of the team, I have a fiduciary duty to that
23 patient to ensure that they are protected.
24        And sometimes that means a little bit
25 more work for me, but that's what I do, and that's what

Page 147

1  I think most physicians do in similar situations.
2    Q    Do you have any reason to believe that
3  the physicians in this case did not think that Nurse
4  Kish was a well-trained nurse?
5    A    The fact that Dr. Paidipalli didn't go
6  back and re-assess the patient for ninety minutes and
7  talk with the patient would make me believe that he did
8  not appropriately assess that.
9    Q    Why so?
10   A    Because any PACU nurse -- I would have
11 checked a patient before ninety minutes of being in the
12 recovery room, and especially Brett.  I would have
13 expected that a prudent physician would have assessed
14 him much quicker than that.
15        And other than that, I don't know if
16 Nurse Kish has a history of being on Facebook or being
17 on the computer, but -- and not paying attention to the
18 patient.  I think that's irrespective -- but it's his
19 responsibility to know the strengths and weaknesses of
20 his team members.
21   Q    All right.  I asked you this question
22 before and you --
23   A    Yes, sir.
24   Q    -- didn't necessarily answer it.  Are
25 you saying that Dr. Paidipalli was the captain of the

Page 148

1  ship here, that he had a duty to ensure that everyone
2  else was doing their job?
3    A    He had an obligation to ensure that the
4  patient is cared for, and he supervises their care.
5  And that means that he appropriately -- in order to
6  appropriately supervise, you don't do their job for
7  them, but you make sure that in leaving a patient in
8  the care of another provider, a nurse or a CRNA or a
9  respiratory therapist, that that patient is not being
10 abandoned, in essence, that that provider has the
11 adequate knowledge, abilities, to care for that
12 patient.
13        And so, yes, he has that responsibility.
14 The "captain of the ship" analogy -- if you want to use
15 that, that's your own words.  It's not mine.  There's
16 multiple physicians involved in the care of that
17 patient or any patient in an operating room.  And an
18 anesthesiologist has certain responsibilities.  The
19 surgeon, even though the patient is in the PACU, has
20 certain responsibilities to care for the patient.
21        That's a collaborative effort between
22 the two physicians, between the surgeon and the
23 anesthesiologist that shared responsibility for that
24 airway.  They both had a duty to make certain that the
25 patient was adequately cared for in the recovery room.

Page 149

38 (Pages 146 to 149)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  You can use whatever analogy you wish
2 to, and if your analogy is "captain of the ship," and
3 that helps you understand it better, then so be it.
4 It's much more complex than that.  And some people
5 would not choose to describe it as such.
6  Q      If Nurse Kish felt she was inadequate to
7 take care of this patient, did she have a duty to
8 notify the physicians of that?
9  A      Yeah.
10  Q      Number 10.  I think we've kind of talked
11 through all of this, but if you'd go ahead --
12  A      Yes, sir.
13  Q      -- and read No. 10.
14  A      As read, "Neither physician adequately
15 observed the patient in the PACU so as to be able to
16 exercise any judgment whatsoever.  The patient was
17 abandoned.  It does not appear that either physician
18 advised the PACU nursing staff of the risks of the
19 particular patient.
20  "The anesthesiologist did not ensure
21 that there was an adequate transfer of care,
22 information, nor remain with the patient as long as
23 medically necessary, nor ensured that the patient was
24 discharged from the PACU unit in accordance with proper
25 anesthesia policies.  The ENT surgeon did no better."

Page 150

1  And what I refer to is, basically,
2 guidelines for the care of -- the anesthesiology.
3  Q      What do you mean by the patient was
4 abandoned?
5  A      So patient abandonment is defined, I
6 know, by the ASA by basically -- there's a -- you have
7 a duty to transfer the care to an appropriately trained
8 patient -- I mean provider, such as a -- it can be a
9 nurse, but that the transfer of data and information
10 and relevant facts pertaining to that patient are also
11 transferred.  So by not doing so, that's abandonment.
12  You know, if I just drop a patient off
13 in the recovery room and, even though there's nurses
14 there, I don't convey to them the care that I had given
15 them, that's abandonment.
16  That is not -- and there's no evidence
17 to me, that I saw, that Nurse Kish was fully aware of
18 the situation; specifically the CO2 being high, in the
19 operating room, and the patient was probably in a state
20 of anesthetic when he arrived in the PACU.
21  And then further, Dr. Paidipalli for
22 ninety minutes, again, did not check on the patient as
23 a reasonably prudent anesthesiologist would have done
24 in that situation for Brett Lovelace, based upon his
25 medical condition.

Page 151

1  I may not check on someone in ten
2 minutes if they are an otherwise healthy patient who is
3 getting a bunion removed and they had an uneventful
4 case, but based upon the data that's present and the
5 Anesthesia Care Record present, any prudent
6 anesthesiologist would have checked on him in a more
7 reasonable period of time.
8  Q      Do you know Dr. Ira Landsman?
9  A      I do not.
10  Q      Have you read his report in this case?
11  A      I have.
12  Q      And have you read Dr. Martin's report?
13  A      He is an anesthesiologist at Arkansas;
14 is that right?
15  Q      Uh-huh [affirmative].
16  A      Yes, I have.
17  Q      And did it surprise you that others
18 disagree with your opinions?
19  A      Does it surprise me?  It surprises me
20 that anyone would look at the chart and come up with a
21 different opinion than what I saw.  I guess everybody
22 has their own motivations in why they might say
23 something and maybe don't look through the whole chart,
24 I guess.
25  I don't know if they did or not and

Page 152

1 whether they saw every piece of data that I saw.  I
2 don't know either one of these physicians personally,
3 but a Dr. Landsman used to work here, but he no longer
4 works here, I don't think.
5  Q      Do you know anything about Dr. Landsman?
6  A      Oh, I ...
7  Q      Other than he used to work here?
8  A      Yeah, that's it.
9  Q      He was in the Division of Pediatric
10 Anesthesiologists here?
11  A      Yeah, I saw something, some -- something
12 referred to about his C.V., but I don't remember seeing
13 his C.V.
14  Q      Do you agree that there's no cookbook,
15 per se, that a physician can go to to learn how to
16 practice medicine?
17  A      Absolutely not.
18  MR. LEDBETTER:  Objection to form.
19 BY MR. GILMER:
20  Q      Do you agree that doctors are called
21 upon every day to make judgments?
22  A      Absolutely.
23  Q      Is an error in judgment always
24 negligence?
25  A      It is not.

Page 153

39 (Pages 150 to 153)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

| | |
|---|---|
| 1    Q    Do you agree that bad results can happen | 1    A    Yes, sir. |
| 2   and often do even when the standard of care is adhered | 2    Q    And Mr. Johnson has some questions |
| 3   to? | 3   about -- I know I have not gone through everything |
| 4    A    I do agree to that. | 4   about Dr. Clemons, but Mr. Johnson will ask you about |
| 5    Q    Has that ever happened to you? | 5   those. So -- |
| 6    A    I can't think of a specific course. | 6    A    Okay. |
| 7    Q    Have you ever had a bad outcome? | 7    Q    -- what I'm -- what I am concerned about |
| 8    A    I never had a death. | 8   is making sure that we have discussed all of your |
| 9    Q    Ever had an unexpected PACU course? | 9   opinions about the anesthesia care in the case. |
| 10    A    Yeah -- yes. I'm sorry. | 10    A    As far as I can reasonably ascertain. |
| 11    Q    Have you ever deviated from the standard | 11   Based upon our discussion right now, we have discussed |
| 12   of care? | 12   everything, yes, sir. |
| 13    A    Have I ever deviated from the standard | 13    Q    All right. Thank you. |
| 14   of care? I don't remember a specific case where I | 14    A    Yes, sir. |
| 15   deviated from the standard of care. | 15      MR. LEDBETTER: I may need to take a |
| 16    Q    I'm almost finished with my questions, | 16   momentary break. How long do you think you'll be? |
| 17   if you'll give me just a couple of minutes. | 17      MR. JOHNSON: I don't know, thirty, |
| 18   .    Do you have any criticisms of Brett's | 18   forty-five minutes. |
| 19   parents in this situation, being in the PACU with the | 19      MR. LEDBETTER: Okay. Do you mind? |
| 20   child and seeing what was going on? Do you have any | 20      MR. JOHNSON: No, no. |
| 21   criticisms with them at all? | 21      VIDEOGRAPHER: We're going off the |
| 22    A    I've never been in their position, so | 22   record. The time is 4:37. |
| 23   it's hard to say that. | 23      (Recess taken.) |
| 24    Q    Have we discussed all of your opinions | 24      VIDEOGRAPHER: We're back on the record. |
| 25   concerning Dr. Paidipalli and the anesthesia care in | 25   The time is 4:44. |
|                    Page 154 |                    Page 156 |
| 1   this case? | 1           EXAMINATION |
| 2    A    We've reviewed what I've written down | 2   BY MR. JOHNSON: |
| 3   and submitted here. If there's anything else you want | 3    Q    Now, Dr. Kennedy, what hospitals do you |
| 4   to ask about specifically, I'll be happy to answer. | 4   have privileges at? |
| 5    Q    Well, do you have any other opinions | 5    A    Currently, Vanderbilt University Medical |
| 6   that are not contained in this disclosure? Because | 6   Center. |
| 7   this disclosure is supposed to contain all of the | 7    Q    All right. And that's an adult |
| 8   opinions that you have in the case. | 8   hospital, correct? |
| 9      MR. LEDBETTER: He gave you a document | 9    A    That's an adult hospital. We do take |
| 10   earlier, gave you have some pages earlier. I don't | 10   care of some children here, but usually that's for |
| 11   know what their role is, but -- do you want to ask him | 11   burns. |
| 12   about that, or is that -- | 12    Q    Okay. But you don't, do you? |
| 13      MR. GILMER: Well, the ... | 13    A    I do not attend in the Burn ICU, no, |
| 14      MR. LEDBETTER: It's just a tech -- | 14   sir. |
| 15   technical thing. | 15    Q    All right. And your privileges -- when |
| 16      MR. GILMER: Sure. | 16   you apply for privileges, you have to designate what |
| 17      MR. LEDBETTER: That's all. I don't | 17   type of medical -- either specialties or problems that |
| 18   want to make you ask him that. | 18   you are applying for, correct? |
| 19      MR. GILMER: I think that I've got what | 19    A    Yes, sir. |
| 20   I needed to out of this, and so ... | 20    Q    And your privileges are limited at the |
| 21   BY MR. GILMER: | 21   Vanderbilt Hospital to anesthesia, correct? |
| 22    Q    Will you agree to update any opinions | 22    A    To anesthesia and critical care. I have |
| 23   that you develop concerning -- | 23   additional -- |
| 24    A    Yeah. | 24    Q    Well, okay. |
| 25    Q    -- Dr. Paidipalli? | 25    A    -- privileges as an intensivist over a |
|                    Page 155 |                    Page 157 |

40 (Pages 154 to 157)

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

| | |
|---|---|
| 1 general anesthesiologist. | 1 BY MR. JOHNSON: |
| 2 **Q** **Okay, but with those limitations, that's** | 2 **Q** **Well, the notice requires you or asks** |
| 3 **what you are qualified to do at the Vanderbilt** | 3 **you to bring with you today any notes or things that** |
| 4 **Hospital?** | 4 **you have, correct?** |
| 5 A Yes, sir. | 5 A I think the notice he showed me today |
| 6 **Q** **And it doesn't include tonsillectomies** | 6 does, yes, sir. |
| 7 **or adenoidectomies, correct?** | 7 **Q** **Yes.** |
| 8 A Yes, sir. | 8 MR. LEDBETTER: The notice was contrary |
| 9 **Q** **It does not include any kind of surgery,** | 9 to law, and I made an objection to that. |
| 10 **does it?** | 10 BY MR. JOHNSON: |
| 11 A It involves any type of emergency | 11 **Q** **And you did not bring anything with you,** |
| 12 procedure, including thoracostomy tubes which would be | 12 **did you?** |
| 13 a semi-surgical procedure or ECMO initiation, but no, | 13 A I brought that one piece of paper I gave |
| 14 it does not include any type of tonsilar surgery. | 14 you guys. |
| 15 **Q** **All right. Do you know Dr. Werkhaven?** | 15 **Q** **Okay. That's all, though?** |
| 16 A No, sir. | 16 A Yes, sir. |
| 17 **Q** **Who is the chairman of your division?** | 17 **Q** **Okay. With regard to a patient who is** |
| 18 A The chairman of my division? | 18 **going to be put to sleep -- that's a lay term for what** |
| 19 **Q** **Yeah.** | 19 **you are, as an anesthesiologist.** |
| 20 A Of Anesthesia Critical Care, would be | 20 **All right. With regard to a patient who** |
| 21 Dr. Pratik Pandha- -- Pandharipande. | 21 **is going to be put to sleep, the anesthesia performs a** |
| 22 **Q** **All right.** | 22 **pre-op examination, correct?** |
| 23 A I'll get this -- | 23 A The anesthesiologist does perform a |
| 24 **Q** **You had trouble with it, and so would I.** | 24 pre-op evaluation, yes, sir. |
| 25 A Yeah. | 25 **Q** **Okay. And that would include history** |
| Page 158 | Page 160 |
| 1 **Q** **Spell his last name.** | 1 and whatever examination or whatever labs or whatever |
| 2 A Uh ... | 2 the anesthesiologist needs, correct? |
| 3 **Q** **You've got to look it up?** | 3 A Yes, sir. |
| 4 A I've got to look at it. It's P-A-N -- I | 4 **Q** **And that was done in this case, was it** |
| 5 know it when I see it -- P-A-N-D-H-A-R-I-P-A-N-D-E. | 5 **not?** |
| 6 **Q** **Y'all are close friends that you don't even know how to pronounce his last** | 6 A As best as I can tell, a reasonable |
| 7 **that you don't even know how to pronounce his last** | 7 evaluation was done, but again, I cannot reasonably |
| 8 **name?** | 8 interpret Dr. Paidipalli's limited notes. |
| 9 A Yeah. And we call him Pratik. | 9 **Q** **Okay. But that would have been at least** |
| 10 **Q** **Okay.** | 10 **something that he would have been charged with doing,** |
| 11 A Even the residents do, because he knows | 11 **correct?** |
| 12 it's hard to pronounce his name. | 12 A Yes, sir. |
| 13 **Q** **Okay.** | 13 **Q** **Okay. And then the anesthesiologist** |
| 14 A He's more laid back. | 14 **puts the patient to sleep?** |
| 15 **Q** **We talked about your notes or whatever** | 15 A Yes, sir. |
| 16 **you wrote out and you've left them at home. I asked** | 16 **Q** **The anesthesiologist or the CRNA** |
| 17 **for those in addition to Dr. Paidipalli. I don't know** | 17 **monitors breathing during the procedure?** |
| 18 **what Mr. Ledbetter's position is, but I asked you to** | 18 A He or she does, yes. |
| 19 **produce those.** | 19 **Q** **All right. Same with blood pressures?** |
| 20 A Okay. | 20 A Yes. |
| 21 **Q** **Can you do that?** | 21 **Q** **What else does the anesthesia monitor** |
| 22 MR. LEDBETTER: I objected to that and | 22 **during the surgery?** |
| 23 filed an objection to it weeks ago. And I've asked | 23 A The anesthesiologist or CRNA, either one |
| 24 that the witness not making contracts with people to do | 24 who is in the room, will monitor their tidal volumes, |
| 25 work. | 25 their oxygen saturations, their respiratory rate, the |
| Page 159 | Page 161 |

41 (Pages 158 to 161)

**A80609D**

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1 amount of fluid administered, the medications given,
2 the patient's response to surgical stimulation.
3            I would also -- you know, my experience
4 is that frequently the surgeon is aware of those
5 things, too, because the monitors are clearly, usually,
6 visible for most people in the room to see easily.
7       Q      But the anesthesiologist or CRNA are
8 charged with monitoring those things that you just
9 mentioned, correct?
10      A      Yes, sir, they are.
11      Q      All right.  And the anesthesia intubates
12 the patient?
13      A      An anesthesiologist or a CRNA would
14 intubate the patient, yes, sir.
15      Q      Okay.  When I'm using the word
16 "anesthesia," I'm broadening -- it's either an
17 anesthesiologist or the CRNA, correct, that will
18 intubate the patient?
19      A      Yes, sir.
20      Q      Okay.
21      A      Anesthesia is probably more of a noun.
22 I'm just -- I'm not trying to be picky, but it's -- I
23 mean an anesthesiologist is --
24      Q      I know.  I'm not going to get into the
25 grammar.  I'm trying to get the deposition through.

Page 162

1      A      Yes, sir.
2      Q      Do you mind just if we use "anesthesia"
3 to include the anesthesia personnel?
4      A      That's an original statement.
5      Q      Is that a noun?
6      A      Yes, sir.
7      Q      Is that a noun?
8      A      Yes, sir.
9      Q      Is that okay for you?
10      A      Yes, sir.
11      Q      Okay.  And so if we've got -- noun --
12 "anesthesia," that person intubates a patient before
13 surgery, correct?
14      A      Yes, sir.
15      Q      And the anesthesia -- noun -- then
16 monitors the intubation or the ventilation during the
17 procedure, correct.
18      A      Frequently, the anesthesiologist or the
19 CRNA would intubate.  There are occasions where an ENT
20 surgeon might actually intubate --
21      Q      Okay.
22      A      -- a patient.
23      Q      But in their -- usually, though, and in
24 this case, it was anesthesia, correct?
25      A      It was the anesthesiologist or the CRNA,

Page 163

1 yes.
2      Q      Okay.  And then when the surgery is
3 over, then the anesthesiologist, or the CRNA, first
4 decides when to extubate the patient, correct?
5      A      Usually, they do, yes, sir.
6      Q      All right.  And did they in this case?
7      A      They did.
8      Q      All right.  And it's your criticism --
9 one of your criticisms is that they intubated this
10 patient too soon?
11      A      No, sir --
12      Q      Is that correct?
13            MR. LEDBETTER:  It's "extubate."
14 BY MR. JOHNSON:
15      Q      I'm sorry -- extubated too soon?
16      A      Yes, sir.  They extubated too soon, yes,
17 sir.
18      Q      Okay.  And you've told us that that
19 caused the ultimate respiratory distress at the end?
20      A      That was the beginning of the problems,
21 and there are multiple issues that prevented that
22 patient from being saved, yes, but that was the, you
23 know -- I don't know if I would use the word, root
24 cause, but it's probably the most -- you know, that was
25 the beginning of the problems.

Page 164

1      Q      Okay.  And was that the most important
2 factor in what ultimately happened?
3      A      I don't know.  That would be conjecture
4 on my part, but I would say that was the inciting
5 event.  Was Brett able to be saved if, you know, five
6 minutes after walking in the PACU or rolling into the
7 PACU, if Dr. Paidipali would have came back and
8 reassessed the patient?  I don't know.
9            If your ENT surgeon would have done
10 something when he stopped by to see the patient, would
11 he have been saved?  That would have been conjecture on
12 my part.
13      Q      Well -- but you sat here for three hours
14 in giving us opinions and -- many of which are
15 conjecture, in my opinion.  Now, are you not in a
16 position to say that the extubation too soon was the
17 precipitating cause of what ultimately happened?
18            MR. LEDBETTER:  I'm going to object as
19 to form.
20            MR. JOHNSON:  Okay.  You've done it.
21            MR. LEDBETTER:  Well --
22            MR. JOHNSON:  You don't need to --
23            MR. LEDBETTER:  It's a compound
24 question.
25            MR. JOHNSON:  No -- well, you don't need

Page 165

42 (Pages 162 to 165)

A80609D
## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1 to say it. Just object.
2 BY MR. JOHNSON:
3     Q     All right. Go ahead.
4     A     So could you restate your question,
5 please?
6     Q     Yeah. Are you -- you have given
7 opinions for three hours --
8     A     Yes, sir.
9     Q     -- while we've been asking you
10 questions. Now I ask you a question. You say, well,
11 it's speculative.
12         All right. I want to know what your
13 opinion is as to whether the extubation that was done
14 too soon, according to you, was a primary cause in the
15 ultimate outcome.
16     A     It was one of the causes of the ultimate
17 outcome.
18     Q     All right.
19     A     And Dr. -- the ENT surgeon not assessing
20 the patient appropriately, nor doing anything about the
21 fact that he noted the patient was in an inappropriate
22 position was one of the issues, also.
23     Q     Okay. Well, are there any other issues,
24 or those -- just those two issues?
25     A     The fact that the anesthesiologist

Page 166

1 didn't come by. And if you look at the remainder of my
2 statement, those are the issues.
3     Q     Okay. But I'm asking -- I'm breaking it
4 down. I'm asking -- and I use the word "primary." Was
5 that a primary factor, the fact that this patient was
6 extubated too soon?
7         MR. GILMER: I'm going to object to the
8 form.
9         THE WITNESS: I'm not going to give a
10 number because I think that would --
11 BY MR. JOHNSON:
12     Q     I'm not asking you for a number. I said
13 was that a primary factor in what ultimately happened?
14     A     I've made my statement, all my
15 statements of the contributing factors.
16     Q     I'm asking you if that was a primary
17 factor.
18     A     I've answered --
19     Q     Yes, no, or you don't know?
20     A     I've answered. I've made my statement.
21     Q     No, no. We're going to stop then if
22 you're not going to answer. I get to ask the
23 questions. You get to answer. All right?
24         Now, I asked you: Was that a primary
25 factor that he was extubated too soon?

Page 167

1     A     That was one of the factors.
2     Q     Okay. Was it a primary factor?
3     A     That was one of the factors.
4     Q     Was it a primary factor? Are you not
5 going to answer that question or not?
6     A     I've answered your questions.
7     Q     You're not going to answer that?
8     A     I've answered your questions.
9     Q     No, you haven't. I said, was that a
10 primary factor, in your opinion?
11         MR. LEDBETTER: I'm going to object.
12 It's been asked and answered. You're wanting a
13 specific answer and the use of a word, and I just
14 object to that continued repetition.
15         MR. JOHNSON: Well, he's not answering.
16 BY MR. JOHNSON:
17     Q     Sir, are you not going to answer that?
18 Just say. If you're not going to answer it, that's
19 fine.
20     A     I've answered my -- your questions to
21 the best of my ability, yes, sir.
22     Q     So you're not able to say whether it was
23 a primary factor or not; is that what you're saying?
24     A     My statement is made. I've said what
25 are the contributing factors to Brett's death, and that

Page 168

1 is one of the factors.
2     Q     Was that the initial initiating factor?
3     A     That was the first and -- from a time
4 line standpoint, yes.
5     Q     Was it an important factor?
6     A     Yes, sir, it was an important factor.
7     Q     In the PACU, as you mentioned earlier,
8 sometimes it's one-on-one; sometimes it's one nurse for
9 two patients, correct?
10     A     Yes, sir.
11     Q     Is one-on-one, at least theoretically,
12 better than one-on-two?
13     A     Theoretically, yeah.
14     Q     Okay. In this case, it was one-on-one,
15 correct?
16     A     Yes, sir.
17     Q     And a PACU nurse is charged with the
18 responsibility of monitoring a patient's airway?
19     A     Agree.
20     Q     As far as surgeons, are surgeons charged
21 with the administration of what goes on in the PACU, or
22 is that an anesthesia function?
23     A     Usually, it is the anesthesiologist that
24 is responsible in the ICU, but any physician,
25 especially a surgeon who operated on a patient, would

Page 169

43 (Pages 166 to 169)

A80609D

## JASON D. KENNEDY, M.D.  JUNE 25, 2014

1  be expected to act in a way that's appropriate for a
2  given patient.
3    Q    Okay. But as far as the responsibility,
4  it's the anesthesiologist, correct?
5    A    The anesthesiologist should have checked
6  on the patient in the PACU, yes, sir.
7    Q    Okay. And there's no requirement that a
8  surgeon even go to the PACU, correct?
9    A    No, there's not a requirement, but the
10  fact that he actually showed up, actually saw the
11  patient evaluated, is probably more concerning in that
12  he didn't take the action, due to convenience or
13  whatever reason. That would be, you know, conjecture
14  on my part as to why he didn't do what a reasonable
15  physician, any physician, would have done in the same
16  situation.
17    Q    And is it your position that the fact
18  that the patient was prone -- that that was a situation
19  that Dr. Clemons should have rectified?
20    A    He made a comment about it. Yeah, he
21  should have rectified it and he should have called the
22  anesthesiologist at that point when he noticed that the
23  patient was in a position that is not consistent with
24  what his previous patients -- that he had cared for.
25    Q    Well, but a patient who is prone with

Page 170

1  his head turned to the side -- that's a good position
2  for a post-tonsillectomy patient because they are not
3  going to aspirate, are not as likely to aspirate on
4  blood, correct?
5    A    Probably, in an 86-kilo
6  twelve-year-old -- probably not, no, sir.
7    Q    Okay.
8    A    And there was not clear evidence that
9  the patient had his head to the side. There was some
10  debate about whether or not he was face-down or had his
11  head to the side.
12    Q    Did you read Nurse Kish's deposition?
13    A    There is one statement that she made at
14  one point that said the patient's head was turned.
15    Q    It was always turned to the side,
16  correct?
17    A    At one point, she said his face was in
18  the mattress.
19    Q    Did you not read where she said that it
20  was turned to the side the whole time?
21    A    I think there was a statement somewhere
22  in there -- and I forget exactly where -- where there
23  was something about the face being --
24    Q    "Question: Was it to the side the
25  entire time that he was in there?"

Page 171

1    "Answer: It was, it was."
2  That's what she said, isn't it?
3    MR. LEDBETTER: I'm going to object.
4  She said in paragraph 6 of her plea that he was on his
5  face the whole time. So there's a conflict.
6    MR. JOHNSON: All right. All right. Do
7  not make any speaking objections, please. If you're
8  going to do that, then let's start --
9    MR. LEDBETTER: I made an objection --
10    MR. JOHNSON: Let's just stop. Then
11  we'll come back.
12    MR. LEDBETTER: You can stop if you want
13  to.
14    MR. JOHNSON: But I want you to stop.
15    MR. LEDBETTER: What you're doing is
16  deceptive and unfair.
17    MR. JOHNSON: Well, you can redirect.
18  You can redirect, if you want to, all right, but if you
19  want to object, you say "objection." You don't make
20  speeches like you're doing.
21    MR. LEDBETTER: I don't -- I'm free. I
22  can state the basis for my objection. If I don't, it's
23  not preserved.
24    MR. JOHNSON: No. It -- you didn't
25  state a -- you made a speaking objection where you

Page 172

1  wanted to comment on testimony or a document that we
2  haven't even talked about.
3    MR. LEDBETTER: I'm sorry. You want to
4  be deceptive, and I did make a comment.
5    MR. JOHNSON: I'm not -- it's not --
6    MR. LEDBETTER: Try not to be deceptive,
7  and I won't have to make that kind of comment anymore.
8    MR. JOHNSON: Well, do you want to see
9  what's in the -- what I just read? That was not
10  deceptive.
11    MR. LEDBETTER: In Paragraph 6 of her
12  plea --
13    MR. JOHNSON: I didn't read Paragraph 6
14  of her plea.
15    MR. LEDBETTER: You sure --
16    MR. JOHNSON: I read the deposition
17  testimony.
18    MR. LEDBETTER: You sure did, and it's
19  under oath.
20  BY MR. JOHNSON:
21    Q    All right. Did you see where she said
22  in her deposition that it was turned -- his head was
23  turned to the side the whole time?
24    A    I saw that, and also, I saw her plea
25  where she actually stated that the face was face down,

Page 173

44 (Pages 170 to 173)

A80609D

JASON D. KENNEDY, M.D.   JUNE 25, 2014

1  too.
2      Q      Okay. Then --
3      A      We've lost the order --
4      Q      But you're not --
5      A      Sorry.
6      Q      Yeah, but you're not saying that a
7  patient has a compromised airway if they are lying with
8  their face turned to the side, are you?
9      A      Compromised diaphragm. So they can't
10  take normal tidal volumes, especially a child of his
11  size.
12      Q      Okay. Well, are you saying then that
13  this patient had a compromised airway for the ninety
14  minutes that he is in the ICU -- I mean PACU.
15      A      Compromised diaphragm. His ability to
16  ventilate was not preserved, as evidenced by the fact
17  that his CO2 was over 100.
18      Q      Okay. And would Nurse Kish be expected
19  to monitor that?
20      A      Well, she wouldn't have a way to monitor
21  directly his CO2, per se, as we discussed already.
22      Q      But I'm talking about the airway. Isn't
23  she charged with monitoring the airway?
24      A      Yes, sir.
25      Q      Okay. And so presumably she was

Page 174

1  monitoring it, and if there had been a problem with
2  that, then she should have called somebody or done
3  something about it.
4      MR. LEDBETTER: Object to the form.
5  BY MR. JOHNSON:
6      Q      Is that true?
7      A      I'm sorry. Repeat one more time.
8      Q      Is it your opinion that if she was
9  monitoring the airway and there was a problem with the
10  airway, then she should have done something about it or
11  called someone to do something about it?
12      A      I think that's an accurate statement,
13  yes, sir.
14      Q      You're not able to say -- between the
15  time that you say he was extubated too soon and the
16  time of the code, you're not able to say in that time
17  frame when, let's say, the die was cast --
18      A      Yeah, that would be --
19      Q      -- and could not be resuscitated or
20  salvaged; is that correct?
21      A      That would be conjecture.
22      Q      Is that correct?
23      A      That is -- would be conjecture.
24      Q      Okay. You can't put a time --
25      A      No, sir, you cannot.

Page 175

1      Q      Okay.
2      A      And it could have been before or after
3  the ENT surgeon stopped by to see the patient, yes,
4  sir.
5      Q      It may have been too late by the time
6  Dr. Clemons even saw the patient in the PACU, correct?
7      A      That is not beyond the realm of
8  possibilities, correct.
9      Q      Okay. You, I think, have said this, but
10  I'm going to put it in these terms. You're not
11  qualified to give standard of care opinions as to the
12  practice of otolaryngology?
13      A      I'm not an ENT surgeon, no, sir.
14      Q      Okay. Well, just say yes or no. You're
15  not qualified to do that, are you?
16      A      I'm not qualified to give what the
17  standard of care for an ENT surgeon -- but I am
18  qualified to say what the standard of care for a
19  physician who sees a patient who's in an inappropriate
20  position and has a compromised airway.
21      Q      Okay. Are you saying that if ... if he
22  had been lying on his back that this never would have
23  happened?
24      A      "If he was lying on his back, this would
25  have ..." If he was lying in a position where he would

Page 176

1  be assessed and he was assessed, as appropriate, this
2  might not have happened, but to say that it never would
3  have happened would be conjecture.
4      Q      Okay. Well, but you're saying that
5  it -- that he was lying prone, and you seem to complain
6  about that, that that was not a good position, correct?
7      A      I think that contributed to the
8  situation, yes, sir.
9      Q      Okay. I'm asking you, if he had been
10  lying on his back, would this have happened?
11      A      Usually -- like I said before, usually
12  we don't keep them supine. Usually, we do lateral or
13  the semi-lateral position.
14      Q      Well, all right. We'll start with
15  supine. If he were supine, would it have happened?
16      A      Don't know. That would be conjecture.
17      Q      All right. If he was lateral -- can you
18  say that if he had been lateral, lying on his side,
19  that this would not have happened?
20      A      No, sir.
21      Q      In your disclosure, it says, quote, I'm
22  familiar with the applicable standards of care and
23  issues in this case specifically regarding
24  anesthesiology treatment and care, medical, surgical
25  and post-surgical/PACU care." Is that your statement?

Page 177

45 (Pages 174 to 177)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

1    A      Are you referring to -- was this the
2  first page of my --
3    A      Uh-huh, yeah.
4    A      At the bottom, sir?
5    Q      Yeah, uh-huh.
6    A      Yes, sir.
7    Q      Who decided when to extubate this
8  patient?
9    A      The anesthesiologist, I presume.
10 There's no clear documentation that he was present at
11 the extubation.
12   Q      Well, either the anesthesiologist --
13   A      -- or the CRNA.
14   Q      -- or the CRNA?
15   A      Not the surgeon.
16   Q      Right.  And what is the criteria that
17 you say violated in this case by extubating this
18 patient, you say, too soon?
19   A      A -- sorry.  Rephrase the question.
20   Q      Yeah.  What is the criteria that you're
21 using to say that this patient was extubated too soon?
22   A      As I've stated before, his tidal volumes
23 were not adequate and he was hypercarbic, so he had
24 inadequate ventilation.
25           So when we're looking to extubate a

Page 178

1    the ...
2    Q      And if he had an oximeter on the finger
3  that was operating properly, that would, what, confirm
4  that there is oxygenation?
5    A      It would confirm that there was some
6  oxygenation, but it has no -- it would not necessarily
7  confirm adequate ventilation.
8    Q      You mentioned that bleeding is probably
9  the number one postoperative complication in a patient
10 who has had a tonsillectomy or adenoidectomy, correct?
11   A      Yes, sir.
12   Q      And had that occurred, then that would
13 have required the surgeon to be called in and pressed
14 into service, correct?
15   A      Yeah.  And that could have been part of
16 the reason, you know.  Looking not from the
17 retrospective scope, which we have the privilege of
18 doing, but looking from the ante-scope -- you know,
19 looking forward, you know, Brett could have been -- you
20 know, with that blood pressure being low and everything
21 else going on -- I mean he could have bled, and it
22 could have went into his stomach, and you wouldn't have
23 seen it.
24   Q      Uh-huh.
25   A      I think his initial blood gas after he

Page 180

1  patient, we look at -- you know, does he have reversal
2  or no muscle relaxant, you know, for doing it awake, as
3  they claim that they were doing.  Is he adequately
4  ventilating and oxygenating?  Is he adequately
5  following commands?  Those would be part of that.
6           So the fact that he was clearly not
7  adequately ventilating -- as the Anesthetic Care Record
8  documents would show that he was not -- met the
9  criteria, yes, sir.
10   Q      When a patient is in the PACU, who
11 decides when the patient can be discharged from the
12 PACU?
13   A      Usually, it's an anesthesiologist's
14 decision.  Frequently, though, the surgeons will weigh
15 on to whether or not they go home or whether they, you
16 know, stay in the hospital.
17   Q      Okay.  But the actual discharge
18 decision, though, is a responsibility of the
19 anesthesiologist, correct?
20   A      Usually, it's made in -- it's a combined
21 decision, but I'd say the weight goes towards the
22 anesthesiologist, yes, sir.
23   Q      Was this patient breathing during the
24 ninety minutes in the PACU?
25   A      It's charted that he was breathing in

Page 179

1  coded -- he had a lactate that was quite high, and the
2  significant acidosis had -- a lot of it was
3  respiratory, but there was some metabolic component --
4    Q      Okay.
5    A      -- and so that would be something, as an
6  anesthesiologist, I would evaluate, and I would expect
7  the surgeon to have that -- you know, since it's the
8  most common.
9    Q      Well, we don't have any evidence,
10 though, that this patient had a postoperative bleeding?
11   A      No, sir, we don't.
12   Q      Is that right?
13   A      That's right.
14   Q      Okay.  Do patients move when they are in
15 the PACU?
16   A      Yeah.
17   Q      Can they move on their own?
18   A      Yes, sir, should be able to.
19   Q      Can patients who move breathe?
20   A      Yes.
21   Q      You've read Nurse Kish's deposition and
22 you've seen the other documentation that refer to her
23 treatment in this case, correct?
24   A      Yes, sir.
25   Q      You saw where she lost her license?

Page 181

46 (Pages 178 to 181)

**A80609D**

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**Page 182**

1  A     Yes, sir.
2  **Q     She was terminated --**
3  A     Yes, sir.
4  **Q     -- from the hospital.  Did you ascertain**
5  **what occurred with regard to any problem with what**
6  **Nurse Kish did or Le Boneur Hospital did?**
7  A     I'm sorry.  Could you ...
8  **Q     Yeah.  Do you acknowledge that what**
9  **Nurse Kish did was a departure from the standard of**
10 **care for a PACU nurse?**
11 A     Yeah, I would agree so, yes, sir.
12 **Q     Okay.  And her employer was Le Boneur**
13 **Hospital, as far as you know, wasn't it?**
14 A     As far as I know, yes.
15 **Q     Okay.  Would they be responsible for**
16 **her?**
17       MR. LEDBETTER:  Object.  It's a legal
18 opinion.
19       THE WITNESS:  I presume, but that would
20 be conjecture on my part.
21 BY MR. JOHNSON:
22 **Q     Well, but you said that the**
23 **anesthesiologist is responsible, that you're**
24 **responsible for the nurses or the team that works under**
25 **you, correct?**

**Page 183**

1  A     Yes, sir.
2  **Q     Okay.  Would that not be applicable to**
3  **Nurse Kish?**
4        MR. LEDBETTER:  Object as to form.
5        THE WITNESS:  I'm trying to think of an
6  appropriate way to answer your question.  I'm not
7  trying to be evasive.  I'm just trying to answer your
8  question that -- from an operational standpoint of a
9  physician, regardless of who that nurse is paid for,
10 who her paycheck comes from --
11       MR. JOHNSON:  Uh-huh.
12       THE WITNESS:  -- she still answers to
13 the physician.  And physicians are still charged -- and
14 be it the ENT surgeon or the anesthesiologist or a
15 proctologist who happens to come by, it's still a
16 physician in the hospital and still has a certain
17 authority over the patient -- and especially the ENT
18 surgeon and the anesthesiologist.
19 BY MR. JOHNSON:
20 **Q     Well, but -- but in your hospital here,**
21 **are the PACU nurses employees of you?**
22 A     They are employers of the hospital.
23 **Q     Okay.  You can't say that if somebody**
24 **had turned Brett over on his side that he would not**
25 **have experienced what occurred in this case, can you?**

**Page 184**

1  A     I can't say that.
2  **Q     This thing that you brought with you**
3  **today, Smith's Anesthesia, states that agitation may be**
4  **caused by numerous factors, including emergence**
5  **delirium caused by anesthetic agents, pain, metabolic**
6  **disturbances, neurologic disturbances, a behavioral**
7  **response to sudden awakening in a strange environment,**
8  **separation anxiety.  So there are a whole lot of things**
9  **that, at least, explain agitation when a patient is**
10 **coming out of anesthesia, correct?**
11 A     There are.  And usually the first things
12 you assess for there are hypoxemia and hypercarbia
13 because they are the most lethal of things.
14 **Q     Okay.  Well, I'm just reading from what**
15 **you handed us today.**
16 A     Yes, sir.
17 **Q     All right.  Did I -- as far as you know,**
18 **did I read that correctly?**
19 A     Yes, sir.
20 **Q     Okay.  And there are multiple reasons**
21 **why a patient is thrashing around or becomes agitated**
22 **when waking up, correct?**
23 A     There are.
24 **Q     Did you see where this patient was**
25 **agitated when he was being waked up or was waking up in**

**Page 185**

1  the operating room?
2  A     As I remember, there were multiple
3  referrals that he turned over on his face and moved
4  around and was kind of -- knocked his probe off or
5  something like that.
6  **Q     All right.  He was belligerent or**
7  **whatever you -- I don't know that "belligerent" is the**
8  **right word --**
9  A     Probably not.
10 **Q     -- but he was fighting it, wasn't he?**
11 A     He was probably agitated and delirious,
12 which the first thing, as an anesthesiologist, you're
13 going to rule out is this --
14 **Q     Okay.**
15 A     -- hypoxemia and hypercarbia.
16 **Q     Okay.  You were asked if anyone -- or**
17 **you said that anyone in a hospital setting or a health**
18 **care provider is capable of administering oxygen,**
19 **correct?**
20 A     Any physician or nurse --
21 **Q     Okay.**
22 A     -- that was caring for a patient, yeah.
23 **Q     Yeah.  Okay.  Is a nurse capable of**
24 **evaluating an airway?**
25 A     To a limited extent of evaluating if

47 (Pages 182 to 185)

## A80609D
### JASON D. KENNEDY, M.D.   JUNE 25, 2014

| | |
|---|---|
| 1 it's -- if a patient is moving air, I would expect so. | 1    Q    Uh-huh. |
| 2 If it was actually done, yes. | 2    A    But that's not adequately awake. |
| 3    Q    Okay. And a PACU nurse would be -- that | 3    Q    Okay. Do you know that Nurse Kish has |
| 4 would be one of the things that a PACU nurse would be | 4 taken responsibility for what happened to Brett? |
| 5 looking for, wouldn't it? | 5    MR. LEDBETTER: Object as to form. |
| 6    A    Yes, sir. | 6    THE WITNESS: I'm aware of her plea and |
| 7    Q    You said that snoring can be an | 7 her losing her license. |
| 8 indication of an obstruction, but if someone is | 8 BY MR. JOHNSON: |
| 9 snoring, they are breathing, aren't they? | 9    Q    Okay. And didn't -- kept you from |
| 10    A    You're breathing, but you may not be | 10 reading her deposition and seeing the other |
| 11 breathing adequately. | 11 documentation in connection with losing her license, |
| 12    Q    Okay. Well, but -- but there's air | 12 that she was taking responsibility for this? |
| 13 passing through the airway, correct -- | 13    MR. LEDBETTER: Object as to legal |
| 14    A    There -- | 14 opinion being asked. |
| 15    Q    -- for a patient that's snoring? | 15    THE WITNESS: I think she was taking |
| 16    A    By definition, yeah, but not necessarily | 16 responsibility for not assessing the patient. |
| 17 adequate. | 17    MR. JOHNSON: Okay. That all I have. |
| 18    Q    Okay. But this patient's parents -- or | 18 Thank you. |
| 19 mother said that he was a snorer, correct? | 19    MR. LEDBETTER: I just have a few |
| 20    A    Yes. | 20 questions. |
| 21    Q    And he had been snoring for -- it was | 21    VIDEOGRAPHER: Do you want to change |
| 22 more than just that presentation at the hospital. He | 22 tapes? |
| 23 was snoring when he was at home, right? | 23    MR. LEDBETTER: No. |
| 24    A    Yes. | 24 |
| 25    Q    Okay. | 25 |
| Page 186 | Page 188 |

| | |
|---|---|
| 1    A    But he also didn't sleep knee/chest, and | 1    EXAMINATION |
| 2 so as you stated earlier that if you're knee/chest, | 2 BY MR. LEDBETTER: |
| 3 you're more likely for, actually, that tissue to be out | 3    Q    You have had your opinion admitted as an |
| 4 of your way. So you would be less likely to snore. So | 4 exhibit to the deposition. And I just want to ask you |
| 5 if he was really snoring in that position, his airway | 5 a couple of questions. |
| 6 was probably pretty obstructed. | 6    Are the opinions that you've expressed |
| 7    Q    Okay. Are you -- is it your opinion | 7 in your expert witness report relative to the physician |
| 8 that he was still asleep when he was extubated? | 8 and the oxygen supplementation and the extubation and |
| 9    A    It's my opinion that he was likely still | 9 the deviation of the positions still your opinion in |
| 10 anesthetized enough to suppress his respiratory drive | 10 this case, to a reasonable degree of medical certainty? |
| 11 when he was extubated, yes, sir. | 11    A    That's my medical opinion. |
| 12    Q    Okay. "Sleep," I guess, is a lay kind | 12    Q    Okay. And with respect to any questions |
| 13 of term, but do you know what I mean by when I say | 13 where you were asked to speculate or engage in guess or |
| 14 "sleep" or -- | 14 conjecture, that's not what you did in your report; do |
| 15    A    Well, differentiating those -- | 15 you agree? |
| 16    Q    Was he still anesthetized to the point | 16    A    No, I based it upon the available data |
| 17 that he wasn't awake? | 17 that we had in the data points. |
| 18    A    He was anesthetized to the point where | 18    MR. LEDBETTER: Okay. That's all I |
| 19 he wasn't adequately ventilating. And the subtleties | 19 have. |
| 20 of that are very important. So he might have moved | 20    MR. GILMER: No follow-up. |
| 21 around. | 21    VIDEOGRAPHER: That's the end of -- |
| 22    Q    Uh-huh. | 22    MR. LEDBETTER: Don't walk off with that. |
| 23    A    He might have coughed. He might have | 23    VIDEOGRAPHER: That's the end of the |
| 24 lifted his head. He might have moved his arm, even | 24 deposition. Is everybody done? |
| 25 purposefully. | 25    MR. GILMER: Yes, sir. |
| Page 187 | Page 189 |

48 (Pages 186 to 189)

Case 2:13-cv-02289-SHL-dkv   Document 129   Filed 08/12/14   Page 79 of 108   PageID 1628
Case 2:13-cv-02289-SHL-dkv   Document 128-2   Filed 08/09/14   Page 49 of 63   PageID
1518

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

1         VIDEOGRAPHER:  That's the end of the
2   deposition and Disc No. 2.  The time is 5:20.
3
4
5   (Deposition concluded at 5:20 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 190

1   STATE OF _____ )
2                  )
3   COUNTY OF _____ )
4         I, the undersigned, declare under
5   penalty of perjury that I have read the foregoing
6   transcript, and I have made any corrections, additions,
7   or deletions that I was desirous of making; that the
8   foregoing is a true and correct transcript of my
9   testimony contained therein.
10         EXECUTED this ____ day of
11   _____, _____, at
12   _____.
13     (City)         (State)
14
15
16
17   _____
18        JASON D. KENNEDY, M.D.
19
20   Subscribed and sworn to before me
21   this ____ day of _____, _____.
22
23
24   Notary Public in and for said
25       County and State

1
2
3       REPORTER'S CERTIFICATE
4         I, IVA L. TALLEY, LCR 336, Court Reporter
5   in the State of Tennessee, certify;
6         That the foregoing proceedings were taken
7   before me at the time and place therein set forth.
8         That the statements made were recorded
9   stenographically by me and were thereafter
10   transcribed;
11         That the foregoing is a true and correct
12   transcript of my shorthand notes so taken.
13         I further certify that I am not a relative
14   or employee of any attorney of the parties, nor
15   financially interested in the action.
16         I declare under penalty of perjury under
17   the laws of Tennessee that the foregoing is true and
18   correct.
19         Dated this 7th day of July, 2014.
20
21
22
23       _____
      Iva L. Talley, Court Reporter and
      Notary Public at Large
24         Commission Expires: 7-21-16
25

Page 191

49 (Pages 190 to 192)

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

**A**
abandoned 149:10 150:17
151:4
abandonment 151:5,11,15
ABG 118:12,15 119:13
abilities 149:11
ability 43:4 44:25 61:6
89:12 96:21 134:11
168:21 174:15
abionergy 114:10
able 19:5 37:11,13 78:19
128:17 150:15 165:5
168:22 175:14,16 181:18
abnormal 53:17 94:14
about's 84:13
absence 133:2 134:8,9
Absolutely 47:4 67:2 77:12
87:11 153:17,22
absorbed 69:18
AC 19:21
acceptable 75:21,21
accepted 25:16 143:1
access 81:17,18
accident 40:7
accompanied 107:8
accompany 65:6 106:18
107:23,24
accuracy 78:6
accurate 54:22 71:21 78:11
112:14,15 135:1 138:7
147:7 175:12
accurately 68:4,6,7
acidosis 110:20,24 181:2
acknowledge 182:8
act 140:24 170:1
acting 82:7
action 123:17 133:1,3
139:20 143:17 170:12
191:15
actions 135:21
acts 134:2
actual 179:17
add 43:21
added 17:12
addendum 39:24
addition 15:11 27:16 34:1
36:13 106:4,7 159:17
additional 11:1 17:12 22:10
25:6 30:23 39:11 54:21
54:24 157:23
additions 192:6
address 37:24
adenoid 13:18 15:13 91:4
108:16
adenoidectomies 158:7
adenoidectomy 51:23 52:7
60:6 61:16 90:14 180:10
adenoids 32:23 142:6
adequacy 61:5 122:4
132:24
adequate 60:23 89:13,13
89:14 118:10 119:4
121:9 122:1 130:22
132:7,17,18,22 134:8,10
135:15 137:4 141:7
142:8 149:11 150:21
178:23 180:7 186:17
adequately 110:16 120:21
124:15,16 132:17 135:3
135:10,12 149:25 150:14

179:3,4,7 186:11 187:19
188:2
adhered 154:2
administer 99:17
administered 44:17 123:22
124:19 162:1
administering 185:18
administration 44:13,16
62:11 97:18 169:21
admit 108:7,9,15
admitted 189:3
admittedly 130:24
Adobe 43:20
adult 8:17,18 28:1 57:23
77:20 96:13 107:19
129:12 157:7,9
adults 13:20 72:3 78:23
advance 33:15
advertise 57:24
advised 150:18
affect 11:6
affidavit 59:11 137:17
138:5
affidavits 76:14 138:24
affirmative 56:24 134:19
152:15
age 70:7 115:15
agent 72:15 75:6 82:5,6
99:15
agents 60:19 99:16 184:5
ages 23:11
agitated 94:18 121:4
122:25 184:21,25 185:11
agitation 184:3,9
ago 9:17 10:6 21:12 31:1
44:7 57:9 58:10 159:23
agree 14:3,6 40:1 42:9 58:2
63:16 68:11 98:15
107:13 116:16,20 122:11
126:6,7 145:25 153:14
153:20 154:1,4 155:22
169:19 182:11 189:15
agreed 80:12 98:19 105:11
agreement 5:5 6:1 46:23
ahead 17:17 48:17 150:11
166:3
air 70:19 81:12 116:4 123:9
186:1,12
airplane 73:10 142:13,18
143:22
airway 13:18 15:13 30:4
32:22 61:7 66:5,7 74:20
74:21,21 78:21,21 89:12
91:2 105:18 107:20
122:3,8,9,9,14,24 123:1
123:2,6 124:15,25
131:10 132:1,8,18,22
133:19 134:2 137:19
140:4,5,6,10,15 141:5,24
149:23 149:24 169:18
174:7,13,22,23 175:9,10
176:20 185:24 186:13
187:5
airway-type 131:17
al 105:22
Alabama 20:19,23 28:17,22
28:23 29:1,2,3 51:1,2,3
Alaska 75:23
allow 56:20 93:13 96:5
131:5,25 132:6,18 134:3

147:6
allowed 37:22 128:13 132:8
133:6
allows 134:2 144:19
altogether 125:16
alveoli 70:19
amended 81:12
amendment 81:12
American 19:22 28:5,6
amount 70:17 78:25 81:14
86:16 111:9,13 118:24
120:5 128:12 162:1
amounts 83:15 91:11
analogies 146:9
analogous 142:12
analogy 73:9 142:18
144:13 149:14 150:1,2
anatomy 87:14
anesthesia 4:16,21 8:1,3,4,5
8:9,17 12:14,17,17,18,19
21:25 22:2 23:10 25:6,16
27:23 28:2 30:10,14,23
32:20 34:6 35:11 36:13
53:2,2,3 60:6 63:6 80:25
81:3 90:11,13 92:12,17
92:18 93:9 104:12,13
139:18 142:22 144:5
150:25 152:5 154:25
156:9 157:21,22 158:20
160:21 161:21 162:11,16
162:21 163:2,3,12,15,24
169:22 184:3,10
anesthesiologist 8:16 13:4
14:17 22:12 25:1,3 29:18
53:25 56:7 63:25 65:5,11
66:10 74:2 79:7 89:6
97:2,20,23 104:3 105:16
107:16,18,19 123:9 127:19
129:20 139:21 140:16
141:9 142:19 143:13
145:12 147:18 149:18,23
150:20 151:23 152:6,13
158:1 160:19,23 161:2
161:13,16,23 162:7,13
162:17,23 163:18,25
164:3 166:25 169:23
170:4,5,22 178:9,12
179:19,22 181:6 182:23
183:14,18 185:12
anesthesiologists 1:8 2:8,14
3:6 13:9 19:23 29:23
30:1,21 35:2,4 80:6
104:6,16 153:10
anesthesiologist's 179:13
anesthesiology 8:12,14
15:12 23:3,8 25:9,14,15
26:2,12 27:16,17 151:2
177:24
anesthetic 12:7 14:24 30:12
54:8 62:6 64:21 66:2
69:13,17 70:5,11,14
71:16 72:4 74:7 82:4
87:4 89:22 90:15,22 91:7
92:10 93:18,21 97:12
99:12 110:9,18 113:5
119:8 123:11,13 129:13
142:5,22 143:16 151:20
179:7 184:5
anesthetics 12:8 75:24

86:25
anesthetize 129:3 147:15
anesthetized 75:4 117:24
187:10,16,18
anesthetizing 13:19 127:2
128:25
Angeles 99:23
answer 46:25 68:23 72:8
100:15 103:19 111:16
136:5 138:17 148:24
155:4 167:22,23 168:5,7
168:13,17,18 172:1
183:6,7
answered 46:19 103:2
146:4 167:18,20 168:6,8
168:12,20
answering 168:15
answers 7:8 183:12
ante-scope 180:18
anti-medic 82:19
anxiety 184:8
anybody's 137:17
anymore 34:17 61:21 103:7
173:7
apnea 12:9 13:20 15:13
18:24 59:23 60:1 63:7
70:8 79:3 83:20 85:12
87:4,13,16,19 89:25
107:17 118:11 124:24
128:2 129:15,18
apneic 87:14,23 111:18,19
120:8
appear 150:17
appeared 67:20 139:5
applicable 15:15 177:22
183:2
applied 27:19 50:20,22,23
applies 99:1
apply 14:12 45:7,9,15
67:14 157:16
applying 97:15 157:18
appropriate 16:18 64:13,18
64:24 66:7,25 80:7 89:11
90:13 110:19,22 119:3
124:25 136:15 139:21
142:11 170:1 177:1
183:6
appropriately 67:7 75:13
105:5,6 106:19,21,25
108:17,20 110:8,9 122:1
126:25 130:18,19 135:4
136:22 139:17,19,23
140:24 142:4,18 148:8
149:5,6 151:7 166:20
approximately 2:16 61:25
area 24:24 55:12 63:4
115:12
areas 147:15
argue 75:18 83:19,21
argument 91:14
Arkansas 152:13
arm 187:24
arousal 123:5
arouse 75:12 121:6
aroused 88:23
arranged 142:7
arrest 55:18 61:19 62:8
71:4 140:24
arrival 121:10
arrived 113:2 121:3 151:20

arterial 62:1,3 72:1 73:4
85:25 118:11 119:15
120:1,23 136:12,25
arteries 120:25
artificial 22:23
ASA 4:15 18:23 19:1,13,18
19:21 42:24 146:12
151:6
ascertain 156:10 182:4
asked 15:19 17:6 41:23,24
47:12 56:6,6,16 57:8,10
57:16,19 59:11 61:14
63:1 103:2 146:4 148:21
159:16,18,23 167:24
168:12 185:16 188:14
189:13
asking 44:4 132:12 166:9
167:3,4,12,16 177:9
asks 33:1 160:2
asleep 88:22 91:5 187:8
aspects 97:16 99:3
aspirate 171:3,3
asserting 126:22
assertion 110:18,22 128:4
128:5
assess 63:1,6 121:7,9
127:11 128:4 131:20
132:1,1 134:11,17
135:25 137:9,13 141:9
147:21 148:8 184:12
assessed 63:4 68:18 105:7
132:24,24 135:4,10
137:18,22 141:4 148:13
177:1,1
assesses 126:19
assessing 62:13 105:8
136:20,21 166:19 188:16
assessment 92:10 105:12
110:19,22 134:16,25
135:1 136:15
assessments 80:8 134:23
assigned 21:8 26:20,22
assist 93:14
assistant 23:20
assisted 125:12
assisting 93:18
associate 23:20
associated 13:19 25:7 35:6
assume 47:13 139:6
assumption 138:21
assured 105:13
asthma 60:3
ATKINSON-BAKER 1:22
Atlanta 73:14 98:22,23
atmosphere 71:8
attempt 28:9,15
attempted 132:5
attend 20:20 130:23 157:13
attended 30:2
attending 23:16 128:19
attention 53:8 68:8 78:25
110:19,23 142:24 143:3
143:15 148:17
attentive 146:10
attest 90:7
attestation 129:9
attested 134:25
attorney 11:18 57:13
191:14
Audiovisual 4:9,18 17:19

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

36:5
authoritative 13:8,11 34:21
34:22,24 144:25
authority 183:17
autopsy 10:2 46:3,4
available 12:5 14:11,13
25:8 57:25 71:9 76:2
100:6,7,16 101:9 102:13
109:12,17 117:18 127:20
127:24 128:7,14 129:8
145:4 146:17,23 189:16
Avenue 3:4
awake 69:2 75:1,2 78:18
83:22 89:10,10 99:12
105:17 122:10 125:2
134:4 141:5 179:2
187:17 188:2
awakened 61:1 119:2
139:18
awakening 184:7
aware 16:17 21:7 48:6
66:10 76:18 90:2,18,20
92:8 106:22 107:2 145:5
151:17 162:4 188:6
A80609D 1:25

**B**

b 4:8 51:15
babies 96:9
Babu 1:8 2:8,15 3:7
bachelor's 20:22
back 8:23 12:6,22 29:3 31:9
33:1 39:15 66:11 68:2
72:8 83:25 93:20 98:11
103:5 113:17 116:21
118:3 121:18 125:7,18
130:16 148:6 156:24
159:14 165:7 172:11
176:22,24 177:10
background 95:13
bad 108:11 154:1,7
balu 72:14
Baptist 102:10
base 11:14 84:11 100:1
144:17 145:10,18 146:1
based 11:2 14:4,10,24
65:16 69:2,9 74:10,24
89:23 92:7 97:9 107:4,10
117:2 124:21 142:14
145:10 151:24 152:4
156:11 189:16
baseline 60:14 115:15
bases 93:9
basically 23:11 25:17 43:3
44:7 78:17 86:3 96:4
134:1 151:1,6
basing 97:19 138:19,20
basis 22:12 26:19 44:9
105:3 172:22
Baugh 105:22
bed 94:19
beds 100:16 102:12
bedside 32:1,2 120:11
126:12,23 127:9 143:9
began 144:4
beginning 5:1 33:8 93:4
164:20,25
behalf 2:13 9:25 33:10
57:16,16
behavior 16:19

behavioral 184:6
believe 14:15,22 18:5 34:23
34:25 35:3 44:20 53:12
54:20 63:24 64:3 65:18
65:20 68:3,6 73:19 84:3
90:9 91:19 96:25 97:6,14
98:25 106:12 109:11,16
112:11 117:15,20 122:13
124:17 127:23 133:22
134:15 137:13,25 141:1
148:2,7
belligerent 185:6,7
beneficial 13:14 55:6
benefit 146:7
benefits 75:16,16
best 37:13 43:4 68:8 96:16
96:18 131:23 161:6
168:21
better 150:3,25 169:12
beyond 117:16 145:12
176:7
bgilmer@hard-law.com
3:10
bicarbonate 118:14
big 88:8,20
billed 39:17,19
billing 89:21
bills 41:7
Birmingham 20:19,23
21:23 23:24 98:20
bit 15:10 38:13 54:18 78:22
84:2 88:11 91:13 123:4
147:24
bled 114:12 117:9 180:21
bleed 117:10
bleeding 74:17,20 142:7
180:8 181:10
blindsided 145:5
blocked 133:19
blocking 60:19 99:16
blood 61:25 62:14 69:19
71:10,23 74:21 79:17
111:7,14 113:24 114:6
114:13,15,17,20,22,25
115:21 116:1,9,18,22
118:11,18 119:14,15,20
120:1,23,25 131:6 133:6
133:12 136:25 161:19
171:4 180:20,25
blood-fat 69:21
blow-by 123:25 124:1,13
124:14
blue 92:21
board 25:7 27:25 28:1,4,5,7
82:3 86:16
boarded 25:4,5 28:7
boards 28:8,10
body 63:8 87:23 95:22
96:10 107:10
bone 62:19
bones 24:4
Boneur 29:24 45:25 59:22
182:6,12
Bonheur 9:4 38:9 66:9
101:4,6 144:10
book 18:8,10,11
books 34:7
bottom 94:4 178:4
boy 52:20 59:19 63:8,9
107:16 135:25

BP 115:5
brachycardia 81:24
Bradley 3:8
brain 62:13,15,16 69:20,22
110:25 111:4,5,8
breach 119:6
break 80:17 92:25 156:16
breaking 167:3
breath 78:22
breathe 69:18 78:22 86:23
181:19
breathing 67:11 78:7 80:2
84:2 87:6 89:13 91:5
93:17,19 111:20 119:9
120:9,15,21 122:4
123:13 125:3,16 141:6
161:17 179:23,25 186:9
186:10,11
breaths 59:24 72:20
Brett 1:4 2:4 59:19 64:10
72:6,21 74:3 77:22 78:9
78:15 81:10 84:10 95:15
101:17 105:6,17 109:23
110:8 111:22 114:12
117:16 120:13 122:1,6
123:8,19 124:19,24
129:24 130:19,25 131:3
133:5 137:1 139:5,17,20
139:22,25 140:23 141:8
143:17,23,25 148:12
151:24 165:5 180:19
183:24 188:4
Brett's 14:25 45:23 70:22
71:16 72:25 87:6 95:21
96:12,14 110:10,16
118:11 125:10 131:17
140:21 154:18 168:25
brief 59:17
briefly 21:19
bring 15:19 17:6 33:2,17
57:3 75:8 98:5 142:21
160:3,11
bringing 99:6
broaden 52:6
broadening 162:16
bronchodilator 60:4
brought 76:15,18 129:25
160:13 184:2
buffer 125:20
building 7:16,20,21 8:3,7
128:16
buildings 8:10
bunion 152:3
burn 82:7 157:13
burns 157:11
Bypass 18:13

**C**

C 3:1 49:5
call 21:10 70:18 72:4 78:16
86:18 96:3 111:5 140:8
141:19 159:9
called 12:16 33:24 56:25
61:19 63:22 67:16,17
69:21 71:25 77:22 79:16
86:18 116:22 121:9
139:11 141:8,13 146:12
153:20 170:21 175:2,11
180:13
calling 139:20

calls 76:1
cannula 78:8
cannulation 22:22
capable 126:24 185:18,23
capnography 100:5
captain 65:18 148:25
149:14 150:2
car 40:6
cardiac 8:16,17 18:12
21:25 22:8,9,14 27:10
30:14 32:12 53:2 55:18
61:19 62:8 102:20 111:8
111:14 125:16
cardiologist 24:22 25:2
Cardiopulmonary 18:13
cardiothoracic 26:2,12,18
26:22 27:17 30:11
care 7:15 8:18 11:10 12:7
12:13 13:3,8 15:8,15
16:25 17:3 23:7 24:13,19
25:14,15,16,17,18,20,21
25:24 26:18 27:2,4 28:4
30:15,24 35:4,6,6 44:5
48:4 53:3,12 64:14,15,23
65:1,12,20,22 66:22 67:4
67:8,12,16 73:23 74:2
84:4,6 89:5,22 90:10
91:8,12 93:11 94:8 95:23
97:1,7,14,15 98:13 99:1
100:2 101:16 102:23,24
103:10,11,22,23 104:4,9
105:5 106:13 107:4,14
107:25 108:25 109:1,2,5
109:24 110:7 113:5
115:18 116:12,14 118:9
119:7 121:13,25 122:2
124:13,22,23 125:21
126:5,11,17,24 127:6,17
129:4,16 130:2,18,20
131:8 132:10,20 133:23
134:7,16 135:4 136:16
139:16,17,20 140:2,3,12
140:20 141:1 142:11
143:25 146:2 147:17,19
149:4,8,11,16,20 150:7
150:21 151:2,7,14 152:5
154:2,12,14,15,25 156:9
157:10,22 158:20 176:11
176:17,18 177:22,24,25
179:7 182:10 185:18
cared 55:8 62:10 101:17
106:25 140:15 144:9
149:4,25 170:24
carefully 80:11
cares 139:24
caring 8:16 14:9 22:12
23:10,17 27:9 45:15
66:24 116:6,8 135:23
141:19 185:22
Carraway 21:21
carried 64:13
carrier 48:10
case 5:23 6:10,12,16 9:25
10:22,24 11:11,15,20
12:14 13:15 15:1,19
16:24 18:16,22,22 19
32:19 33:3,23 34:3 36:10
36:16 38:3,4 39:2 40:9
44:10 45:4 46:15 53:11
54:23 55:23 56:5,18 57:8

57:15 58:24 59:9,15,18
60:21 62:23 66:5 68:12
68:14 76:23 91:20 95:9
95:16 96:12 97:6 98:14
98:15 103:3 106:1
108:14 109:23 112:14
126:13 130:2 131:13
135:5 136:11 138:12
142:11,23 147:2 148:3
152:4,10 154:14 155:1,8
156:9 161:4 163:24
164:6 169:14 177:23
178:17 181:23 183:25
189:10
cases 15:14 27:2 40:12 57:7
cast 175:17
cause 70:10 74:20 77:25
111:10,12 123:4 133:16
142:5 164:24 165:17
166:14
caused 77:18,20 82:17 83:1
117:1 164:19 184:4,5
causes 85:20 166:16
causing 80:1
cc's 70:20,20,24,25 71:2
84:14,14 110:12
Centennial 102:10
center 7:22 21:22 62:17
157:6
centers 91:3
centrally 82:7
cerebral 111:11
certain 16:17 23:25 37:23
44:19 65:8 70:17 75:23
86:21 87:17,18 97:16
101:2 123:15 127:6
147:14,17 149:18,20,24
183:16
certainly 144:16,19
certainty 136:9,14 189:10
CERTIFICATE 191:2
certification 25:7
certified 27:25 28:1,4,5,7
certify 191:5,13
chairman 158:17,18
chance 17:13
change 10:17 11:2,5 68:14
72:17,20 75:25 76:22
77:1 96:21 113:21 116:4
116:18 125:12 188:21
changed 10:19 11:4 24:2
49:23 56:8 68:12,19
104:20 123:7,16,19
125:14 135:21 136:1,3
changes 49:17 72:19
chapter 18:8,10,11
charge 40:21 42:2,6,10
charged 161:10 162:8
169:17,20 174:23 183:13
chart 89:24 92:5 113:9
114:2 137:16 138:7
152:20,23
charted 67:22 179:25
charts 84:18 88:16
check 64:8 65:2,7 106:23
107:17 151:22 152:1
checked 107:6,11 136:14
136:18 148:11 152:6
170:5
checks 64:24

A80609D
JASON D. KENNEDY, M.D.   JUNE 25, 2014

chest 131:5
child 38:18 56:21 57:22
  60:3,24 69:2,16 70:4,7,7
  73:2 74:1 75:2 77:20
  79:1,2 81:13,17 83:21
  85:11 86:8,15 87:4,22
  107:20 108:19 110:13
  114:18 115:23 117:3
  119:8 128:1 129:13
  147:6 154:20 174:10
children 4:17 13:20 24:4
  35:11 59:22 72:3 74:23
  78:24 81:19 87:16 96:9
  105:22 124:14 157:10
children's 9:4 23:22,23
  38:9 50:12 97:11
child's 135:2 136:16
choice 75:20
choices 75:15 83:13
choose 150:5
chose 26:13 91:11
chronically 85:18
circulating 76:15
circumstances 37:24,25
cite 106:8
cited 47:17
cites 47:11
cities 99:2 100:3
City 192:13
claim 48:7,10 179:3
Claims 146:12,20
clarify 6:3 10:9 15:4 35:15
class 31:25
classroom 31:17
clear 7:3 72:21 73:1 79:9
  95:6 119:6 120:18 171:8
  178:10
cleared 11:23
clearly 69:5 70:4 71:3 73:2
  73:18,24 74:1,5 78:15
  86:3 90:2 108:19 117:23
  129:19 134:5 135:11
  139:8,9 143:16 162:5
  179:6
Clemons 1:9,2 9:3 12 5:19
  39:14 63:17,23 130:25
  135:21 137:8,18 138:4
  141:2 156:4 170:19
  176:6
clinic 53:25 54:2,5,7
clinical 14:7,10 54:10,14
  72:10 73:8,17 75:17,18
  77:13 86:7 88:24 89:3,7
  105:21 132:9 142:10,23
  143:2,4 144:18 145:6
  146:16
clinician 54:16,19
close 159:6
closed 65:10 146:12,20
closer 86:13
closest 7:18
CMS 127:17
CNS 82:8
code 61:18 105:9 109:20
  118:17 139:11 175:16
coded 181:1
cognizant 78:19
collaborative 149:21
collective 4:19 48:20,21,25
college 20:20 28:6

combined 95:3 110:14
  179:20
come 25:19 41:17,20,23,24
  41:25 47:6 72:14 83:7
  96:6 136:10 141:9,13
  152:20 167:1 172:11
  183:15
comes 183:10
comfort 131:19 132:7,16
coming 20:5 41:22 95:7
  136:2 184:10
commands 89:13 136:23
  179:5
commencing 2:15
comment 47:10 53:17
  71:20 72:24 140:11
  170:20 173:1,4,7
commentary 50:3
commenting 69:8
Commerce 3:14
Commission 191:24
committee 104:15
common 31:25 71:7 72:10
  74:17,19 78:17 96:2
  181:8
commonly 124:14
communicate 37:18
communication 37:21 65:9
communications 37:23
  58:21
community 100:10 101:25
compass 73:11
compensate 86:6
complain 177:5
complaint 59:2
complete 122:7
completed 20:22 23:6
  25:13 30:21 38:12 73:11
completely 56:25 75:2
  83:22 96:8 133:19
completion 60:18
complex 150:4
complication 74:16 142:5
  180:9
complications 64:22
complied 135:3
component 181:3
compound 103:15 135:8
  165:23
compromise 13:18 15:13
  140:22
compromised 174:7,9,13
  174:15 176:20
computer 43:22 62:25
  148:17
computerized 34:19
concentration 124:2
concentrations 72:10
concern 74:18,19 83:18
  90:18 115:16 141:22,23
concerned 94:20 156:7
concerning 12:13 37:21
  87:5 92:3 114:19 130:2
  131:13 138:11 154:25
  155:23 170:11
concerns 61:11 64:11 65:9
  96:22
concluded 190:5
concludes 50:8
condition 55:12 65:4 74:3

137:10 142:25 151:25
conditions 87:6,7
conducive 66:7
conference 32:21
confirm 180:3,5,7
conflict 172:5
congenital 26:7
conjecture 118:2 120:3
  135:19 137:12 165:3,11
  165:15 170:13 175:21,23
  177:3,16 182:20 189:14
conjectures 136:5
connection 188:11
consider 13:6,10 52:25
  55:14 89:8 91:22 95:20
  108:20
considered 34:20
consistent 59:23,25 60:16
  60:23 61:3,5 62:6,13
  63:5 66:8 70:14 71:2
  82:10,13 85:1,10 86:7
  95:20 99:5,21 100:3
  115:15 119:1 134:7
  140:14 170:23
construct 127:1
contact 56:1 58:8,17
contacted 62:18
contain 155:7
contained 8:6 34:24 35:21
  58:12 119:12 155:6
  192:9
content 111:7
context 95:4 114:13
continue 7:10 26:13 84:7
  105:18 126:1
continued 115:19 116:2
  122:5 168:14
continues 115:9
continuous 112:9
contracts 159:24
contrary 160:8
contribute 87:10
contributed 177:7
contributing 167:15 168:25
control 78:21 124:2
controlled 51:17
convenience 170:12
conversant 125:2,6 134:5
conversations 29:22
convey 64:10 151:14
cookbook 153:14
copy 17:7 38:8 39:25 89:20
  95:11,12 112:20
cor 85:19
cord 74:22
cords 74:22
corner 94:4
correct 52:12 61:15 63:12
  92:22 96:15 128:22
  130:25 137:6 140:25
  143:14 145:13 157:8,18
  157:21 158:7 160:4,22
  161:2,11 162:9,17
  163:13,17,24 164:4,12
  169:9,15 170:4,8 171:4
  171:16 175:20,22 176:6
  176:8 177:6 179:19
  180:10,14 181:23 182:25
  184:10,22 185:19 186:13
  186:19 191:11,18 192:8

corrected 14 1 :4
corrections 1 92:6
correctly 184 : 18
correlate 73 :3
correspondence 58:13
corrugated 124:5
coughed 187:23
coughs 126:7
counsel 17:8 34:12 103:6
country 97:3 99:21
County 97:2 1 02:25 103:12
  192:3,25
couple 10:6 20:6 29:20
  34:4 36:17 66:13 98:15
  100:11,12 147:9 154:17
  189:5
course 37:9,1 2 64:22 67:21
  68:19 114:21 123:16
  133:1,3 135:21 143:16
  154:6,9
courses 31:6
court 1:1,22 2:1,16 3:4 5:5
  7:4 40:7 191:4,23
cover 27:1,10
covered 47:24
CO2 13:17 60:14,20 62:1,2
  62:3,4 71:9,17,19,23,24
  72:1,2,7,17,22 73:2,4
  78:3,7,11 79:25,25 84:24
  85:5,7,8 86 :4,18,20,23
  110:17 111:10,25 112:3
  118:13,20,22 120:11
  121:1 125:13 136:12,12
  136:18 151:18 174:17,21
CO2s 85:16,25 87:2,2
CPR 61:23
criteria 178:1,6,20 179:9
critical 7:15 8:18 23:7
  24:13 25:14,15,16 26:18
  28:4 30:20,24 53:2
  157:22 158:20
criticism 164:8
criticisms 83:14 89:16,24
  90:9 92:11 108:14
  131:12 134:22,24 154:18
  154:21 164:9
CRN 106:20
CRNA 64:20 75:11 76:4,10
  76:17 92:6,12 106:20
  121:9 127:12 142:9
  149:8 161:16,23 162:7
  162:13,17 163:19,25
  164:3 178:13,14
CRNAs 65:13 108:4 109:12
  121:12,19 126:6
cuffed 78:10
current 12:7 17:7 30:7
  64:21 124:21
currently 25:6 27:14,24
  34:9 30:20,24
curriculum 4:11,14 17:22
  18:15 19:13,21
curve 86:18 123:14
customary 97:21 98:1
  143:1
cutoff 33:14
C.V 17:7,21 18:1 20:4,8
  153:12,13

D 1:12 2:13 4:1 5:8 192:18
daily 22:12 147:4
damage 55:20 110:25
DANIEL 1:3 2:3
data 14:11,13 54:24 62:5
  63:14 73:1,24 78:13 95:5
  109:14 142:15 143:18,20
  145:4 146:6,17 147:5
  151:9 152:4 153:1
  189:16,17
Database 146:12,21
date 5:3 17:10 144:8
Dated 191:19
day 68:24 153:21 191:19
  192:10,21
days 27:6 33:15 35:17
DEA 51:9,18
dead 62:16 70:18 71:25
  85:3
deadline 35:18
dealing 32:21
death 62:13 142:5 154:8
  168:25
debate 88:8 171:10
debated 74:25
Decadron 82:13
deceased 1 4 2:4
deceptive 172:16 173:4,6
  173:10
decide 74:13 88:25
decided 121:8 178:7
decides 164:4 179:11
decision 73:25 74:9,24
  75:17,19 77:10,19 91:6
  106:16,17 108:14 109:14
  116:10 127:13 129:19
  132:2,6,18 179:14,18,23
decisions 15:8 75:14 78:20
  92:15 126:6,7 127:11
  140:13
declare 191:16 192:4
declared 62:15
decline 112:9 114:20
decrease 82:15
dedicated 27:9 109:7
deep 75:4 89:10 99:12
  119:2
defendant 3:12 118:8
  130:17
defendants 1:10 2:10,14
  3:6 9:5 105:4 110:6
  121:24 122:3,5,7,8,10
define 16:20,21 17:2
defined 151:5
definitely 70:10 73:7
definition 16:24 122:19
  128:15 140:5 186:16
degree 20:23 136:9,14
  189:10
deletions 192:7
delirious 92:2 94:18 121:4
  185:11
delirium 61:2 78:16 131:21
  184:5
delivered 74:7 76:21,24
  123:18
delivery 111:5 122:6
demonstrates 70:11
denied 50:24 51:3
department 7:24 8:1,2,5,9

D

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

8:10,12 31:8,10
**departure** 182:9
**dependent** 65:4 111:4,6,9
**depends** 69:1 89:9 111:2,3
  135:9
**deposed** 16:16
**deposition** 1:11 2:12 4:9,18
  5:2,18 6:6,7,18,20 9:1,12
  9:19 10:1,17,21,25 11:19
  11:20 12:2 15:3,6 16:1,5
  16:15 17:19,20,22 19:16
  19:17,19 35:12,21 36:5,6
  40:2 41:11 44:23 46:23
  48:22 63:20 68:2 89:2
  92:18 93:5 162:25
  171:12 173:16,22 181:21
  188:10 189:4,24 190:2,5
**depositions** 9:5,6,9 12:6
  38:12,15 39:14 43:10,11
  43:13 44:25 45:22 55:7,9
  55:10,17 66:17 101:22
  101:23
**depress** 83:23
**depressed** 80:1 86:24
**depresses** 71:14 86:17
**depression** 70:9 72:15
  83:20
**describe** 20:14 150:5
**designate** 157:16
**designated** 65:3
**designation** 4:19 48:18,21
**desirous** 192:7
**destroy** 36:25
**details** 142:25 143:3
**determination** 70:24
**determine** 54:8 55:8
  117:18
**develop** 37:5 155:23
**developed** 64:23
**developing** 77:4
**developmental** 59:20
**develops** 104:15
**deviate** 98:3
**deviated** 154:11,13,15
**deviation** 67:3,8,11,15 84:3
  84:5 90:10 91:20,23
  124:12 132:19 189:9
**device** 91:2
**devices** 80:4
**de-saturating** 94:2
**diagnostics** 73:20
**diaphragm** 123:12,12
  174:9,15
**diaphram** 96:11
**die** 175:17
**died** 117:3
**difference** 13:25 14:1 24:16
  79:13 109:5 136:11
**differences** 23:18
**different** 7:16 8:8 23:19
  25:24 27:11 30:1 31:6
  35:7 54:15 74:12 95:25
  98:9 99:4,8 100:12
  108:22 114:8 117:1,5
  126:22 129:14,22 133:24
  135:6 136:17 139:6
  143:13 152:21
**differentiate** 78:2
**differentiating** 187:15
**differently** 46:24 86:25

**difficult** 14:12 116:22
  130:21 131:10
**difficulties** 67:11
**difficulty** 77:15 121:4,5
**digging** 37:7
**digital** 34:17
**Dilaudid** 99:11
**directly** 41:6 108:9 174:21
**director** 23:1 53:5
**disagree** 152:18
**disagreed** 46:8,10
**disc** 43:17,17 58:15 93:1,5
  190:2
**discharge** 179:17
**discharged** 150:24 179:11
**disclosing** 16:23
**disclosure** 33:23 155:6,7
  177:21
**discounting** 112:12
**discovery** 33:14
**discretion** 128:12
**discuss** 30:4
**discussed** 32:20 49:18
  55:23 81:8 100:3 103:10
  106:5 130:5 154:24
  156:8,11 174:21
**discussing** 140:3
**discussion** 106:11 156:11
**discussions** 31:22 104:3
**displace** 71:9,12
**disregard** 142:17
**disregarded** 143:20
**distress** 53:17 113:22
  164:19
**district** 1:1,1 2:1,1 102:6
**disturbances** 184:6,6
**divided** 26:17
**division** 1:2 2:2 8:4,13,15
  27:15,16,19 153:9
  158:17,18
**divorced** 20:25
**doctor** 25:2 57:17 92:21
  93:8 141:15
**doctors** 153:20
**document** 4:16 17:11 20:12
  34:12 35:11 84:18,19,19
  84:22 104:18 137:14
  155:9 173:1
**documentation** 63:18 76:12
  76:19 92:4,9,12,14
  137:11,15,16 138:6
  140:22 178:10 181:22
**documented** 70:5 71:19
  84:9 110:11,14 111:23
  119:24 124:24 138:1,1
  143:15
**documents** 179:8
**doing** 17:14 26:13 30:23
  42:15,17,18 65:25 87:24
  89:9,10 90:18 97:10 98:2
  126:25 127:5 129:2
  134:13 143:8 144:14,14
  144:21,21,23,24 146:7
  149:2 151:11 161:10
  166:20 172:15,20 179:2
  179:3 180:18
**donation** 62:17
**Doolittle** 73:10
**doses** 82:11

**dot** 81:21
**double** 76:7
**doubt** 77:12 146:7
**DO2** 111:5,6
**Dr** 4:10,11,12,13,15,18 5:2
  5:17 9:20 10:14 14:16,23
  15:2,24 17:19,22 19:15
  19:16,18 33:11,22 36:5
  39:14 46:2 49:10 56:12
  63:3,17,17,23 64:4,16
  65:2 68:17 73:19 88:25
  90:4 91:10 92:4 93:5,11
  97:9,10 98:7,8 106:13
  107:6 108:14 109:9,21
  125:25 127:23 130:2,23
  130:25 135:21 136:9
  137:8 138:4 141:2
  143:19,24 144:1 145:7,7
  145:10 146:15 147:4,10
  148:5,25 151:21 152:8
  152:12 153:3,5 154:25
  155:25 156:4 157:3
  158:15,21 159:17 161:8
  165:7 166:19 170:19
  176:6
**drafts** 49:12
**drain** 61:6 133:7 134:3
**drainage** 133:12
**dramatic** 88:19
**dramatically** 79:1,5
**draw** 120:24
**drawn** 10:6 61:25 119:21
  119:23,25
**drive** 86:18 93:14 125:11
  187:10
**drop** 151:12
**dropped** 113:25 116:2
**drug** 83:13
**drugs** 83:14,15
**Duane** 5:16
**due** 87:17,18 146:1 170:12
**duly** 5:9
**duration** 60:21 125:1
**duty** 147:22 149:1,24 150:7
  151:7

**E**

**E** 3:1,1 4:1,8
**ear** 15:15 22:4
**earlier** 9:18 103:10 106:5
  123:15 133:15 136:3,15
  155:10,10 169:7 187:2
**early** 136:15
**easily** 19:5 162:6
**East** 7:22
**echo** 18:6,7 28:7 30:17 31:2
  32:4
**echocardiogram** 62:14
**echocardiography** 28:6
  31:2 53:3
**ECMO** 22:22 53:5 158:13
**economist** 10:14
**edema** 85:21
**Edition** 4:17 35:12
**educated** 106:21
**education** 143:12
**effect** 38:21 69:20 72:15
  138:4 147:11
**effective** 71:1
**effects** 71:13 82:8 83:20

**effort** 55:18 112:2 149:21
**eight** 111:19
**Eighth** 4:17 35:11
**either** 27:12 36:21 64:19
  65:6 73:21 75:10,19 94:7
  106:18 107:7,24 136:24
  150:17 153:2 157:17
  161:23 162:16 178:12
**elaborate** 131:12 138:14
**elevated** 96:1,4
**email** 3:10,16 37:19
**emerged** 61:1 110:8
**emergence** 61:2 78:16
  106:16 127:21 128:10
  129:11 184:4
**emergency** 158:11
**emerging** 94:23
**Emory** 23:8,9 24:13 26:2,4
**employed** 4:20 48:19,22
**employee** 191:14
**employees** 183:21
**employer** 182:12
**employers** 183:22
**endocrinology** 101:16
**endotracheal** 60:7 78:8,10
  90:25 110:10 123:11
**end-tidal** 13:17 60:20 71:17
  71:24 72:17 73:3 78:3,11
  84:24 85:8 87:3 110:17
  121:1
**engage** 189:13
**ensure** 65:24 66:2 67:6
  105:6 106:18,20,24
  110:8 118:9 122:1
  124:15 130:19,21 139:21
  147:23 149:1,3 150:20
**ensured** 147:10 150:23
**ensures** 126:24
**ensuring** 80:6 127:4
**ENT** 22:14 53:12,15,18
  74:14 96:24 97:19 98:8
  101:11 139:7,15,23
  140:2,4,8,9,19 141:25
  150:25 163:19 165:9
  166:19 176:3,13,17
  183:14,17
**entered** 11:10
**entire** 31:25 38:18 126:13
  138:22 171:25
**entirety** 124:19 127:6
**entitled** 4:16 35:11 37:1
**envelope** 58:15
**environment** 184:7
**error** 153:23
**errors** 146:15
**esophagus** 32:10
**especially** 63:6 64:9 66:4,6
  74:14 79:1 83:24,25
  84:22 119:8 125:23
  134:8 141:24 148:12
  169:25 174:10 183:17
**Esq** 3:3,8,13
**essence** 149:10
**establish** 35:5 107:13
**establishes** 35:3
**establishing** 13:8
**estimation** 121:1
**et** 105:22
**Europe** 73:13
**evaluate** 61:20 135:22

141:13 181:6
**evaluated** 170:11
**evaluating** 185:24,25
**evaluation** 54:6 89:17
  142:8 160:24 161:7
**evasive** 183:7
**event** 111:1 125:1,17 133:7
  165:5
**events** 12:4 37:10,12
**eventual** 94:3
**eventually** 48:16 111:11
  125:15,15
**everybody** 152:21 189:24
**evidence** 36:25 89:1 119:24
  120:18 132:22 143:21
  151:16 171:8 181:9
**evidenced** 174:16
**exact** 49:9 114:1 129:9
  144:8
**exactly** 32:7 49:19 76:20
  81:3 117:12 128:14
  171:22
**exam** 59:25 134:14 137:19
  137:19
**examination** 4:2,3,5 5:12
  157:1 160:22 161:1
  189:1
**examined** 5:9
**example** 142:16
**exams** 80:9
**excess** 52:9 62:3 112:8,8
  144:11
**exchange** 70:20 71:1 112:2
**exchanging** 85:3
**excuse** 126:7
**EXECUTED** 192:10
**exercise** 32:19 149:17
  150:16
**exhibit** 17:20,22 19:9,15,17
  19:18 35:9,12 36:4,6,14
  48:20,22,25 49:1,2,5,5
  59:8 92:17,18 189:4
**exhibiting** 67:11
**exhibits** 19:11
**exited** 69:3
**expect** 16:15 73:12 85:14
  116:8 141 14,18 181:6
  186:1
**expectation** 141:24 142:1
  143:13 147:8
**expected** 74:5 87:2 126:3
  140:17 148:13 170:1
  174:18
**expecting** 126:12
**expended** 39:2
**experience** 143:24 162:3
**experienced** 145:3,9,17
  147:16 183:25
**experiences** 144:2 145:11
  146:1
**expert** 4:20 5:20 9:6 33:24
  34:1 37:22 39:24 40:10
  40:15 42:25 48:14,18,21
  49:6 52:25 57:7,25 71:20
  72:23 144:25 189:7
**expertise** 53:13
**experts** 4:20 9:6 12:19
  48:19,22
**expiration** 35:18
**expire** 29:2

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

expired 69:13
Expires 191:24
explain 81:3 105:3 122:11 184:9
explaining 133:15
explains 115:10
explanation 89:4 117:4
expressed 53:10 189:6
extent 159:6 185:25
extubate 74:1,9 77:10 88:25 93:12 106:16,17 121:22 164:4,13 178:7 178:25
extubated 77:2 86:10 88:13 88:23 107:9 108:17 119:2 147:6 164:15,16 167:6,25 175:15 178:21 187:8,11
extubating 55:13 89:6 178:17
extubation 75:1 89:10,11 99:13 107:9 108:10 110:11,16 119:3 131:11 165:16 166:13 178:11 189:8
eye 11:21 35:25
E-C-M-O 53:6
e-mail 58:14

**F**

face 61:14 96:14,17,20 131:1 171:17,23 172:5 173:25,25 174:8 185:3
Facebook 62:25 66:25 148:16
faced 123:22
face-down 171:10
fact 33:13 77:1 88:22 90:7 95:19 101:1 102:11 117:2,14 125:3 134:25 148:5 166:21,25 167:5 170:10,17 174:16 179:6
factor 165:2 167:5,13,17 167:25 168:2,4,10,23 169:2,5,6
factors 63:7 111:3 167:15 168:1,3,25 169:1 184:4
facts 11:3 38:2 56:5,18 58:23 59:17 62:20,22 66:14 67:20 74:3,7 151:10
faculty 28:24
fail 85:21
failed 63:2 105:4,5 110:6,7 118:8,9 121:24,25 122:3 122:8 130:17,18 139:16 139:16,18 140:19,20
failing 67:6,10,14
failure 65:16 77:5,10 85:16 85:17,22,23 131:7 142:24
fair 47:8 128:12
faithful 43:4
fall 117:22,23
falling 61:10
false-charted 135:14
familiar 13:2 16:24 29:23 43:7 66:21,23 97:1,6 140:1,9 177:22
family 21:1,3,25 24:21

101:15 141:15
far 19:10,11 39:6,20 55:10 59:5 72:6 95:24 99:20 112:13 115:22 123:20 126:11,18 147:9 156:10 169:20 170:3 182:13,14 184:17
fashion 61:4
fast 94:16,17
fat 69:23
father 20:25
Federal 37:21 58:21
feeling 145:6
fell 117:20
fellows 23:16,19 30:13,20 30:20 31:3 32:2
fellowship 23:7 24:12,17,24 25:22 26:1 98:24
fellowships 25:8 26:5
felt 150:6
fentanyl 60:10 70:4 82:11 82:16,23 83:19 91:14 99:10
fiduciary 147:22
field 53:13
fields 53:1
fifteen 61:25 65:7 107:11 108:1 144:11
fifth 7:23
fifty 52:9
fighting 185:10
figure 37:7 42:11
figured 58:6
FILE 1:25
filed 4:18 15:18,21 17:19 33:8,10 35:21 36:5 48:8 159:23
filled 111:20,23
final 49:13
financial 26:8 42:15,18
financially 191:15
find 7:19 13:25 37:9 62:22 76:19 101:14 112:24 113:9,13
fine 44:1 47:20 92:14 145:21 168:19
finger 61:10 129:18 180:2
finish 7:6,7
finished 154:16
FiO2 85:6
FIRM 3:8
first 5:9 6:24 12:2 15:20 16:2 20:14 23:12 28:9,15 40:1,9,17,18,19,19 44:4 48:13 58:8,17 74:13 79:9 83:13 84:8 95:12 104:19 104:25 105:19 112:7 113:3 115:12 118:18 120:11 125:24 132:24,25 164:3 169:3 178:2 184:11 185:12
firsthand 56:1
first-hand 101:19
fitness 54:8
five 39:11 62:2 165:5
flags 115:25
flew 73:10
floor 7:23
flow 16:17 62:15
fluid 82:19 162:1

fluids 99:17
fly 73:7 142:17 143:22
follow 89:12 105:4 110:6 118:8 121:24 130:17 131:7 136:22 139:16 140:20
followed 142:4
following 30:4 179:5
follows 5:10
follow-up 142:8 189:20
footnote 105:20
footnoted 106:6
foregoing 191:6,11,17 189:22,25
foremost 54:19
forensic 9:24
foreseeable 95:7
forget 171:22
form 14:18 38:7 68:20 76:6 89:22 95:15 103:1,13 120:10 123:20 132:11 135:7 145:14 146:3 153:18 165:19 167:8 175:4 183:4 188:5
formed 11:15
forming 106:1,3
formulate 11:1 46:14 147:2
formulated 10:22,23 38:3
forth 191:7
forty-five 115:13 156:18
forward 180:19
found 13:14 62:20 113:1 119:24
four 8:21 13:24 15:11 30:11,22 39:11 99:1 145:13
fourteen 116:1,5
frame 107:5 175:17
free 172:21
frequently 31:6 57:14 65:1 72:14 146:11,14 162:4 163:18 179:14
friends 159:6
front 147:5
full 23:20 28:25
fully 61:1 69:2 75:2 88:23 110:8 122:10 125:2 139:18 151:17
function 18:12 32:12 79:23 169:22
fundamental 141:17
further 71:15 121:7 122:7 122:7,25 136:24 138:15 151:21 191:13

**G**

gas 61:25 70:20 71:1,7 75:5 81:11 112:2,7 118:11,18 119:15,15,20 120:1,24 136:25 180:25
gasping 59:24 90:1
gastroscope 32:9
general 12:17 25:1 30:10 39:4 60:6 90:11,22,25 91:7 99:4 119:7 129:13 158:1
generate 36:15 37:16
generated 33:3
getting 77:4 79:4 81:19 85:2 86:4 98:11 125:9

152:3
Gilmer 3:8 4:2 5:13 14:21 17:21,24 19:20 20:13 33:21 34:13 35:8,15,19 36:2,8 38:1 42:1 47:14 47:18,20,23 48:24 49:2,4 50:4,7 58:22 68:22 76:8 80:14,18,21,24 92:16,20 92:24 93:7 103:5,8,14,18 113:11,19 130:11,13,15 132:14 133:4 135:13 136:7 145:16 153:19 155:13,16,19,21 167:7 189:20,22,25
give 7:10 38:2 43:3 51:15 53:21 58:23 59:17 71:11 82:13 83:22 84:13 88:9 97:25 121:11 146:6 154:17 167:9 176:11,16
given 6:6,7,19,20 32:18 40:2 54:23,25 74:2 82:14 88:15 91:16,16 125:17 125:20 151:14 162:1 166:6 170:2
gives 125:8,8
giving 53:11,14 75:24 83:25 165:14
glad 11:23
glottis 91:3
glycopyrrolate 77:23 95:2 115:10
go 16:11 17:17 26:4,11 39:12,15 40:7 41:3 47:14 47:21 48:17 55:2 56:21 66:11,12 69:20 75:6 77:25 80:13 81:2,4,7 84:20,21 95:8 104:24 110:1 113:12 114:4 116:19,21 118:3 119:11 120:11 121:18 130:7,16 143:18 147:15 148:5 150:11 153:15 166:3 170:8 179:15
goes 32:9 41:6 69:19 73:8 125:7,18 169:21 179:21
going 23:9 26:21 29:3 49:21 67:19 68:18,23 69:6 74:14 75:19 79:22 80:22,22 84:25 85:1,12 86:4,5 88:10 90:8 92:2 94:2 108:18 109:6 112:24 113:14 115:16 120:16 125:11 129:13,22 130:7 154:20 156:21 160:18,21 162:24 165:18 168:5,7,11 168:17,18 171:3 172:3,8 176:10 180:21 185:13
golf 104:11
good 38:21 80:16 81:23 100:11 143:7,10 171:1 177:6
GPS 73:13
grab 80:23
gradient 85:12
gradual 86:1 112:9
grammar 162:5
grand 29:12 31:22
great 141:8 146:5
greater 118:22 120:14

144:7 145:18 146:1
grew 20:18
ground 6:22
group 31:21,22
guess 15:25 16:18 41:16,19 58:15 63:13 68:25 73:9 88:12 144:8,13 152:21 152:24 187:12 189:13
Guideline 105:21
guidelines 44:2 104:15 124:22 131:9 151:2
gurney 96:20
gut 143:18 145:6 146:16
guys 160:14

**H**

h 4:8 53:6
habitus 95:22 107:10
HALLIBURTON 3:3
hand 20:11
handed 76:4 184:15
handwriting 92:8
hand-delivered 120:2
hand-off 64:19 76:18
happen 16:18 83:23 141:11 154:1
happened 36:11 37:6 55:21 95:6 145:7 154:5 165:2 165:17 167:13 176:23 177:2,3,10,15,19 188:4
happens 74:21 86:21 87:1 88:18 183:15
happy 17:16 41:25 138:17 155:4
hard 78:22 128:15 154:23 159:12
HARDISON 3:8
Harvey 61:19
head 71:14 39:23 96:1,4 171:1,9,11,14 173:22 187:24
head-down 131:5
health 185:17
healthy 129:12,17 152:2
hear 55:3
heart 32:10,12 60:13 77:23 77:25 81:20,21 84:20 85:15,17,20 88:6 94:16 102:19 115:9,15
heart/lung 22:23
Heidi 56:12,12
height 70:23 84:12
HELEN 1:3 2:3
help 5:1 16:20 46:14 95:15
helped 49:11,25 50:5
helpful 54:21 55:19 113:10
helping 16:21
helps 35:5 150:3
hemodynamically 89:15
hemoglobin 79:14,14
hepatology 101:16
hide 93:25
hides 81:24
high 60:1 63:7 64:10 74:23 87:2 109:4 110:16 111:10 115:10 124:10 140:21 151:18 181:1
higher 71:19 72:2 79:5 85:16 86:23 87:1 118:21

A80609D
JASON D. KENNEDY, M.D.   JUNE 25, 2014

| | | | |
|---|---|---|---|
| 124:11 141:23,25 | image 32:10,11 | instance 24:22 25:2 72:12 | Iva 1:24 2:16 191:4,23 |
| history 59:22 64:21 90:3 | immediate 109:22 127:8 | 97:17 112:21 134:14 | LV 60:8 81:17,18 82:4 |
| 122:20 148:16 160:25 | immediately 55:1 107:7,25 | 143:9 | |
| Hold 56:11 | 114:16 115:11 127:20,24 | institution 31:13 100:23 | **J** |
| hole 55:15 | 128:7,14 129:8 141:4,9 | institutions 119:22 | J 3:13 |
| holes 55:9 | impact 77:6 107:2 | instructor 23:10,11,12,14 | Jackson 20:24 |
| home 6:13 36:22 128:16 | important 14:8 69:22 77:17 | 28:25 | Jacksonville 20:21 |
| 143:23 159:16 179:15 | 80:5,10 133:10,14 165:1 | instrumentation 142:14 | Japan 73:10 |
| 186:23 | 169:5,6 187:20 | instruments 73:6 142:17 | Jason 1:12 2:13 4:18 5:2,8 |
| honest 43:4 66:19 | impossible 69:24 | 143:21 | 5:16 36:5 93:5 192:18 |
| honestly 20:7 21:11 35:24 | inadequate 62:7 73:4 77:2 | insurance 48:9 119:3 | Jay 16:14 |
| 42:4 66:19 90:7 | 150:6 178:24 | intend 33:20 41:17,20 | JD 15:25 |
| hospital 9:4 21:22 23:22,23 | inappropriate 166:21 | intensive 25:17,21 26:23 | Jimmy 73:10 |
| 25:25 27:11 29:15,24 | 176:19 | 101:16 108:25 | job 26:11 65:25 147:21 |
| 38:9 44:2 45:8 50:13,24 | inaudible 120:25 | intensivist 157:25 | 149:2,6 |
| 59:22 97:11 100:19 | inciting 165:4 | intention 29:3 | Johnson 3:13 4:4 35:25 |
| 101:4,15 102:12 157:8,9 | include 41:10 158:6,9,14 | interact 127:12 | 47:5 156:2,4,17,20 157:2 |
| 157:21 158:4 179:16 | 160:25 163:3 | interacting 75:3 134:5 | 160:1,10 164:14 165:20 |
| 182:4,6,13 183:16,20,22 | included 8:3 9:3 14:4 18:1 | interaction 147:4 | 165:22,25 166:2 167:11 |
| 185:17 186:22 | includes 80:8 | interest 27:22 32:13 131:23 | 168:15,16 172:6,10,14 |
| hospitals 29:9 50:10 100:14 | including 12:5,15 21:24 | interested 191:15 | 172:17,24 173:5,8,13,16 |
| 100:17 102:5,8,9 157:3 | 22:13 45:17,18 62:14 | interesting 23:24 55:16 | 173:20 175:5 182:21 |
| hour 16:10,14 40:22,24 | 137:18 138:5 158:12 | 69:15 | 183:11,19 188:8,17 |
| 41:15 42:7 105:10 | 184:4 | interests 32:15 | jotted 36:17 |
| hours 39:8,12,21 41:13 | incorporated 93:20 | interjected 63:15 | judgment 14:7,10,13 73:8 |
| 62:12 72:13 165:13 | incorrect 20:3 | internal 21:24 24:20,23 | 73:17 76:1 89:3 129:19 |
| 166:7 | increase 77:23 86:1 144:22 | 25:1 101:15 | 132:9 142:10,12,13,23 |
| Huh-uh 41:5 | increased 85:19 87:13 | international 73:12 | 143:2,5,7,10,11,17 |
| hung 110:21 | increases 144:16,19 | internet 19:6 34:15 | 144:18 145:2 146:15,16 |
| hurting 92:2 | increasing 73:2,3 | internist 24:19 | 147:6 150:16 153:23 |
| hypercarbia 71:13 77:19 | incredible 118:24 120:4 | internship 21:20,21 22:1 | judgments 14:8 153:21 |
| 78:1 79:8 81:8,24 85:18 | independent 46:3 102:23 | interpret 161:8 | July 191:19 |
| 88:7 110:15 112:3 117:8 | 103:11,22 | interpretation 30:17 | jump 88:21 |
| 118:25 120:5 184:12 | indicate 69:12 94:12 114:7 | interval 106:24 | June 1:14 2:15 5:3 29:5 |
| 185:15 | 114:9 116:5 | intervene 139:19,25 140:20 | jury 24:15,16 |
| hypercarbic 69:6 71:4,8 | indicated 5:3 44:18 67:20 | interventions 114:16 | |
| 77:4 79:24 85:2 94:21 | 127:22 128:10,11 129:11 | Intraoperative 18:11 | **K** |
| 125:11 135:11 178:23 | 129:12 | intra-operatively 55:21 | keep 39:1 75:4 80:21,22 |
| hypoc 93:25 | indicates 112:12 | intrinsic 114:10 | 112:3 130:7 177:12 |
| hypocarbia 87:10 | indicating 81:10,22 84:1 | introduction 5:5 | keeping 93:17 |
| hypothermic 18:7 | 92:7 95:11 112:6 | intubate 91:6 127:3 140:8 | Kelly 9:13 45:17,18 |
| hypoventilating 86:8 | indication 113:21 186:8 | 162:14,18 163:19,20 | Kennedy 1:12 2:13 4:10,12 |
| 108:19 120:15,18 | indications 77:14,14 | intubated 61:24 118:17 | 4:15,18 5:2,8,16,17 |
| hypoventilation 119:1 | individual 65:4 126:21 | 119:16,17 164:9 | 17:19 19:15,18 33:22 |
| 120:6 | individually 1:4 2:4 104:25 | intubates 162:11 163:12 | 36:5 93:5 157:3 192:18 |
| hypovolemic 114:11 | induce 81:13 | intubation 60:15 163:16 | Kennedy's 4:11,13 17:22 |
| hypoxemia 62:7 77:5 79:8 | induces 85:18 | invites 68:21 | 19:16 |
| 79:21 110:20,24 184:12 | inducing 123:3 | involve 6:11 57:22 | kept 89:2 188:9 |
| 185:15 | induction 60:7,11,14 82:5,6 | involved 55:18 64:20 66:23 | key 63:13,13 |
| hypoxemic 71:13 111:4 | 127:21 128:9 129:10 | 149:16 | kicks 81:22 |
| 125:9 | inevitable 77:5 | involves 57:23 158:11 | kidney 85:22 |
| hypoxia 125:8 | infant 77:19,20 | Ira 72:8 | kids 78:17 87:19 |
| hypoxic 111:1 | Infants 4:17 35:11 | irrespective 148:18 | kilo 70:6,21 82:12 84:14 |
| | inform 47:11 | Isoflurane 69:16 72:12 | kilograms 79:3 |
| **I** | information 21:9 34:23 | isolated 72:22,24,25 84:17 | kilos 52:20 84:10,13 128:2 |
| ICU 8:19 25:25 26:23,24 | 54:21 66:16 106:11 | 114:13,17 115:21 116:22 | Kimbrough 3:13 |
| 27:3 30:20 62:9 94:7 | 119:12 142:15 150:22 | issue 18:16 32:19 33:13 | kind 16:17,19 22:14 31:21 |
| 108:8,10,15,21,23,24 | 151:9 | 48:4,4 60:20 70:16 78:15 | 32:9 37:6 65:10 86:23 |
| 109:7 139:12 157:13 | informed 76:5 | 82:18 96:11 111:13,15 | 93:25 96:4 98:2 115:25 |
| 169:24 174:14 | inhalation 60:7 | 115:7 116:24 125:18 | 146:8,18 150:10 158:9 |
| ICUs 109:6 | inhaled 69:17 75:5 | issues 15:4 18:15,22 43:7 | 173:7 185:4 187:12 |
| ICU/PACU 94:6 | inhales 124:3 | 51:17 59:20,20 61:9 63:3 | Kish 9:13 45:17,18 61:20 |
| idea 76:10 120:3 | initial 26:6,7 60:13 83:13 | 64:23 68:18 78:6 81:7 | 62:24 63:16 64:13,17 |
| ideal 84:11 | 118:11,20 119:13,14,15 | 83:7 88:20 90:17 99:5 | 68:4,11 76:5,11,16,16 |
| identified 5:20 9:24 139:7 | 169:2 180:25 | 103:3 106:22 107:1,2 | 96:2,19 97:20 98:7 |
| ignore 73:18 | initially 9:3,16 39:9 111:10 | 115:1 164:21 166:22,23 | 109:13,24 114:6 115:18 |
| ignored 73:20,21 | initiating 169:2 | 166:24 167:2 177:23 | 116:16 134:15 137:3 |
| ignoring 76:2 | initiation 105:9 158:13 | item 33:9 | 138:7 143:10 147:10 |
| illiterate 43:22 | ink 92:22 | items 39:9,18 35:22 | 148:4,16 150:6 151:17 |
| ILMA 91:1 99:11 | insight 15:7 | IV 82:3 | |

| | |
|---|---|
| 174:18 182:6,9 183:3 | |
| 188:3 | |
| Kish's 10:16 68:2 97:10 | |
| 171:12 181:21 | |
| kjohnson@lewisthomaso... | |
| 3:16 | |
| knee 129:23 | |
| knee-to-chest 57:2 61:13 | |
| knee/chest 96:7 130:21 | |
| 131:14 134:6 138:22 | |
| 140:23 187:1,2 | |
| knocked 185:4 | |
| knocking 61:4 | |
| know 6:23 10:7 20:5 21:8 | |
| 21:10,11 32:21 35:24 | |
| 38:17,22 43:5 46:21,22 | |
| 47:1,3 55:11 57:18 58:3 | |
| 60:8 66:6 69:1,5 71:5 | |
| 72:21,24 73:7,10,23 | |
| 74:13,15 75:3,7,12 76:4 | |
| 77:18 78:12,13,23 79:6 | |
| 79:11,18 81:25 83:6 | |
| 84:10,20,24 85:11 86:8 | |
| 87:17,24 88:8,12,13,15 | |
| 88:17,21,24 90:17 92:7 | |
| 94:9,18 96:20 97:25 98:1 | |
| 98:6,7 99:15 100:9,15,16 | |
| 100:19,21,25 101:8,10 | |
| 102:5,11,12,15,17,19,21 | |
| 108:7 111:15 115:21,22 | |
| 116:21,25 117:5,7,9,10 | |
| 119:23,25 122:16 123:14 | |
| 124:6,8,9 125:10,21 | |
| 127:18 128:3,15 129:10 | |
| 129:14,19,21,21,23 | |
| 135:9 136:6 137:9 138:6 | |
| 139:1 143:12 144:1,3,4,8 | |
| 144:9,12 147:13,19,21 | |
| 148:15,19 151:6,12 | |
| 152:8,25 153:2,5 155:11 | |
| 156:3,17 158:15 159:5,7 | |
| 159:17 162:3,24 164:23 | |
| 164:23,24 165:3,5,8 | |
| 166:12 167:19 170:13 | |
| 177:16 179:1,2,16 | |
| 180:16,18,19,20 181:7 | |
| 182:13,14 184:17 185:7 | |
| 187:13 188:3 | |
| knowledge 11:14 14:11 | |
| 15:2 65:17 101:3,19,24 | |
| 102:22,24 103:11,21,23 | |
| 144:17 145:10,18,25 | |
| 149:11 | |
| known 59:22 131:7 135:16 | |
| 139:24 | |
| knows 159:11 | |

| | |
|---|---|
| **L** | |
| L 1:24 2:16 191:4,23 | |
| lab 62:5 69:12 120:2 | |
| labs 79:16 161:1 | |
| lack 65:17,17 139:19 | |
| lactate 181:1 | |
| Lactated 99:17 | |
| laid 159:14 | |
| land 142:21 143:22 | |
| Landsman 152:8 153:3,5 | |
| lapse 20:2 51:2 | |
| lapsed 33:14 51:2 | |
| lapses 122:11 | |

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

large 31:20 63:9 71:6
  191:23
largest 74:16
laryngeal 91:1
laryngeus 133:16,18
laryngospasm 123:3
larynx 133:13
late 176:5
lateral 131:4 132:5 133:21
  133:25 177:12,17,18
laughing 81:11
Laughs 11:25
law 3:8 160:9
laws 191:17
lawsuit 48:5,8
lay 146:6 160:18 187:12
laying 61:13 70:14 96:11
LCR 1:24 191:4
Le 9:4 29:24 38:9 45:25
  59:21 66:9 101:4,6
  144:10 182:6,12
lead 70:8
learn 5:22 153:15
learning 59:20
leave 20:24 31:3 109:7
leaving 149:7
lectures 31:19,20,21,24
led 49:10 55:22 62:7 77:10
  136:23
Ledbetter 3:3,3 4:5 6:23
  13:1 14:18 15:25 21:5,9
  33:7 35:10,16 37:19,20
  38:2 41:8,22 46:25 47:10
  47:15,19 49:1,3,10,18,25
  50:2 55:24 58:3,20 68:20
  76:6 103:1,13,15 116:19
  130:10,12 132:11,21
  135:7,18 145:14 146:3
  153:18 155:9,14,17
  156:15,19 159:22 160:8
  164:13 165:18,21,23
  168:11 172:3,9,12,15,21
  173:3,6,11,15,18 175:4
  182:17 183:4 188:5,13
  188:19,23 189:2,18
Ledbetter's 159:18
left 72:6 77:7 120:19,22
  131:3 135:12 136:13
  159:16
legal 182:17 188:13
legs 85:22
length 126:18 141:8
lethal 184:13
let's 17:17 19:10 20:8 35:8
  36:3 40:1 59:15 92:16
  95:8,13 98:15 104:18
  110:1 112:17,22 119:11
  121:23 130:16 172:8,10
  175:17
level 64:13,19,24 109:4
  110:17 121:15 142:1
  143:11
levels 70:1 111:10
LEWIS 3:13
license 11:10 28:20,22,23
  28:25 29:1,2 50:25 51:1
  51:3 181:25 188:7,11
licensed 28:18 29:4 106:20
lidocaine 60:10 82:4
lied 68:10

life 26:8
lifted 187:24
light 15:7
likelihood 144:22
limitations 80:5,7 158:2
limited 24:7 143:11 157:20
  161:8 185:25
line 37:6 97:11 169:4
linear 79:19 86:19
lines 49:24 62:10
lipid 69:24,24
list 4:12 13:1 19:10,15
  33:17,17 35:22
listed 18:15 20:4 33:9,9
literature 14:11
liters 81:12,12
little 15:7 19:10 54:18
  78:22 84:2 88:11 91:13
  94:15,17 115:23,24
  123:4 147:24
live 126:14
liver 24:1 85:22
local 82:4 90:13,15,23
locations 8:8 27:11 138:3
long 8:3 20:16,8 22:1 110:24
  120:6 125:7 144:9,12,14
  144:22 146:8 150:22
  156:16
longer 21:23 75:5 153:3
look 17:9 18:3 32:12 41:14
  55:16 57:20 62:15 71:16
  75:1 86:9 88:5 104:18
  112:7,17,22 121:23
  152:20,23 159:3,4 167:1
  179:1
looked 43:1,13
looking 34:5 57:20 79:15
  92:8 111:3 113:3 117:3
  178:25 180:16,18,19
  186:5
looks 85:10 130:6
loop 65:9
Los 99:23
losing 188:7,11
loss 74:19,20 142:7
lost 11:10 174:3 181:25
lot 21:1 34:18 35:7 63:14
  69:22 74:12 81:20 84:5
  91:16 95:25 111:2 114:8
  114:14 117:1 119:12
  123:3 146:6,6,8 181:2
  184:8
loud 90:1
Louis 99:23
Lovelace 1:3,3,4 2:3,3,4
  5:18 105:17 122:6 131:3
  151:24
Lovelace's 130:25
low 70:16 93:25 180:20
lower 73:4 86:4 124:8
low-grade 115:14
LR 82:19
lung 79:23
lungs 32:11 70:18 71:6
  111:20,23
lying 174:7 176:22,24,25
  177:5,10,18

### M

MAC 72:4

machine 22:23 93:18,21
Main 3:9,14
maintain 44:19 75:6 122:8
  123:6
maintaining 105:18 119:4
  121:5
maintenance 30:4
majority 101:14
making 54:22 73:25 80:7
  112:1 127:6,13 147:3
  156:8 159:24 192:7
malignant 24:4
malpractice 6:12 48:1
management 18:24 30:16
  32:22 131:10 140:10,13
mandate 42:21
maneuvers 122:9
manually 93:19
map 73:11
March 10:14,14 97:3
marching 72:21
mark 1:9 2:9 3:3,12 17:18
  35:8 36:3 48:18 92:16
  39:25 48:22 92:18
Martin's 152:12
mask 78:7 88:10 91:1 122:6
  123:18,24
mask-ventilating 137:1
material 6:8
math 39:22
matter 5:18 13:22 32:19
  39:6 75:23 141:16
mattress 171:18
maximum 42:7 81:14
mcg 70:6 82:11 84:1
MD 21:15
mean 7:20 15:14,24 25:15
  25:17 30:22 42:8 45:13
  49:10 52:13 54:16 73:1
  76:16 79:9 80:21 88:6,15
  88:16 89:20 96:17 99:12
  101:13 103:4 108:24
  109:4 112:8 113:3 114:8
  114:11,14 120:17 121:15
  126:21 127:16 128:8,16
  130:5 131:25 134:10
  135:20 144:14 145:19
  151:3,8 162:23 174:14
  180:21 187:13
meaning 111:19
means 23:14 24:3 94:15
  120:9 121:14 138:1
  147:24 149:5
measured 72:16 78:7
measurement 72:25 78:9
measurements 84:17
medical 6:12 7:22 9:2,3,6
  11:3 15:5,21 22 28:21,21
  31:5,7 39:9,16 43:14
  46:11 57:3 58:16 59:4,6
  64:21 69:9 71:3 80:23
  92:15 100:10 101:22,24
  101:25 102:6 105:1
  136:9 140:13 151:25
  157:5,17 177:24 189:10
  189:11
medically 75:21,21 150:23
medical/legal 57:12

medications 162:1
medicine 14:4 21:15,24
  24:21,23 25:2,24 28:5,18
  53:1 62:11 77:22 81:19
  83:22 88:8 98:18,20 99:5
  101:15,17 104:10 144:4
  153:16
medicines 91:10 99:9
meet 16:8
meeting 7:18
meetings 29:20 30:1,3
  100:12 104:7
member 19:25 28:24
  147:22
members 31:10 147:20
  148:20
membership 20:2
membranes 69:24
Memphis 3:4,9,15 29:13,16
  29:19 75:22 97:2,7 98:18
  100:10,12,14,17,20,24
  101:25 102:2,16,18,24
  103:12,23,25 104:4,5,6
mention 60:2 67:25 76:13
mentioned 66:13 147:9
  162:9 169:7 180:8
mere 110:12 137:15
met 15:24 16:2 29:18,25
  100:11 179:8
metabolic 181:3 184:5
method 136:20
Methodist 21:22 100:21
  101:3,6
micrograms 60:10 70:6
middle 86:12
mildly 87:2
Miller's 12:16,24 13:6,13
  18:21
milligrams 60:9,10 82:8,9
  82:18
million 102:4
mind 18:3 73:24 116:21
  117:6 156:19 163:2
mine 149:15
minimal 60:23 108:17
  112:2
minimum 42:7 89:13
  125:19
minor 22:19
minute 39:4 89:13 108:18
  114:5 120:12,12 125:19
minutes 16:8 49:22 61:25
  62:2 64:9 65:8 77:11
  80:20,22 88:14,14
  107:11 108:1 109:25
  111:19 115:5,12,13
  116:1,5 118:16 119:16
  128:1,18 136:3 148:6,11
  151:22 152:2 154:17
  156:18 165:6 174:14
  179:24
misguided 145:5
misled 47:15
mission 73:11
mistakes 146:18
Mm-hmm 83:5
modified 10:20
modifier 43:21
modify 10:17 11:5
moment 135:25

momentary 156:16
money 41:3
monitor 68:9 69:25 70:1
  72:9 75:10 78:3 79:21
  80:11 120:1 130:21
  161:21,24 174:19,20
monitored 62:24 75:12,13
  105:7 130:19
monitoring 13:17 18:12
  62:11 67:1,20 72:22
  73:16 76:2 77:14 80:4
  99:20 100:2 105:12,14
  107:3 108:23 134:8,10
  162:8 169:18 174:23
  175:1,9
monitors 61:5 67:6 74:10
  79:12,20 126:19 161:17
  162:5 163:16
month 9:17 22:3
months 20:6 26:21 30:11
  31:1
morning 34:5 36:11 41:13
  58:6
Morphine 99:10
mother 186:19
motivations 152:22
mounted 32:8
mouth 32:9 134:3
move 131:24 132:3 181:14
  181:17,19
moved 131:18 132:4,15
  185:3 187:20,24
moving 61:4 94:24 123:9
  141:7 186:1
multifactorial 184:4
multiple 8:9 12:15 13:12
  21:24 62:13 63:1 68:13
  83:7 111:3 138:3 149:16
  164:21 184:20 185:2
muscle 123:12 179:2
M.D 1:12 2:13,15 3:7,12
  5:8 192:18

### N

N 3:1 4:1
name 5:14,16 12:23 22:14
  46:5 76:17 159:1,8,12
named 6:15 55:9
names 19:12 29:21 30:2
narcotic 82:12
narcotics 86:24
nasal 78:8
Nashville 1:13 75:22 98:21
  102:3,8,9,11,13,17,23
nasopharyngeal 123:2,16
national 97:15 103:9,22
  124:22
nature 53:19 59:12
nebulizer 60:4
necessarily 72:19 87:20
  131:23,25 144:22 148:24
  180:6 186:16
necessary 105:12 122:14
  131:6 150:23
need 156:15 165:22,25
needed 45:7,11 105:16
  123:9 155:20
needle 120:24
needs 161:2
negate 24:25

**ATKINSON BAKER, INC.**

**1-800-288-3376**

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**negligence** 153:24
**neither** 105:12 122:10
   142:3,7 150:14
**net** 121:18
**network** 101:1
**neural** 134:13
**neurologic** 136:21 137:19
   184:6
**neurological** 134:17,23
   135:5,15 137:5
**neurologically** 134:13
   141:5
**Neurology** 101:18
**neuromuscular** 60:19
   99:16
**neurons** 69:23
**never** 16:16 40:2,3 45:8
   48:1,11 50:23 51:21
   56:20 61:1 63:4,16,22,22
   90:15 96:13 98:17
   103:25 104:5 154:8,22
   176:22 177:2
**news** 81:23
**ninety** 64:9 77:11 109:25
   127:25 148:6,11 151:22
   174:13 179:24
**nitrogen** 71:7,12
**nitrous** 81:11
**nods** 7:11 56:24
**nonmembers** 19:6
**non-clinical** 27:6
**non-fully** 119:2
**non-training** 28:25
**Nope** 42:23 94:13
**norm** 70:21
**normal** 60:16 61:9 62:3,4
   67:20,22 81:13 84:11
   85:25 93:14 97:21 98:1
   99:18 174:10
**normally** 84:22 97:11,12
   98:2,10
**North** 7:23
**nose** 15:16 22:4
**Notary** 191:23 192:24
**notations** 43:15
**note** 85:11 118:17 137:17
   103:14 116:3 166:21
**notes** 33:2 34:2 36:15 37:3
   37:15 43:11,15,21 53:8
   114:3 159:15 160:3
   161:8 191:12
**note-taking** 53:8
**notice** 4:9,18 11:18,20
   15:18,20 17:6,18,19 33:1
   35:17,20,23 36:3,5 50:9
   83:9 160:2,5,8
**noticed** 61:21 170:22
**notified** 63:17,19,23 68:17
   116:17 137:3
**notify** 63:20 64:1,5,7 96:22
   115:19 135:16 150:8
**noting** 63:10
**noun** 162:21 163:5,7,11,15
**nowadays** 32:1
**number** 6:22 15:19 24:7
   27:9,10 47:24 51:9,11,18
   84:19 86:21,22 98:17
   99:18 105:2 130:8,10,16
   139:14 140:18 142:2,3

150:10 167:10,12 180:9
**numbered** 92:17
**numbers** 143:15
**numerous** 184:4
**nurse** 9:13 10:16 45:1,6,13
   45:18 62:24 63:16,25
   64:4,13,16 66:22,24 68:4
   68:11 76:5,11,15 80:11
   97:20 98:7 106:20 107:1
   109:13,24 114:6 115:18
   116:7,16 126:1 127:12
   134:15 137:3 138:7
   141:18 143:9,9 147:10
   148:3,4,10,16 149:8
   150:6 151:9,17 169:8,17
   171:12 174:18 181:21
   182:6,9,10 183:3,9
   185:20,23 186:3,4 188:3
**nurses** 55:7 65:13 126:5
   147:12,13,14,16 151:13
   182:24 183:21
**nurse's** 128:5
**nurse-anesthetist** 127:4
**nursing** 6:13 142:9 150:18

---

**O**

**oath** 6:25 173:19
**obese** 87:20 118:10 119:8
   124:24
**object** 14:18 50:2 68:20
   76:6 103:1,13 116:19
   132:11,21 135:7,18
   145:14 146:3 165:18
   166:1 167:7 168:1,11,14
   172:3,19 175:4 182:17
   183:4 188:5,13
**objected** 159:22
**objection** 33:8,10 35:10
   36:24 37:20 58:21
   103:14 153:18 159:23
   160:9 172:9,19,22,25
**objections** 68:24 103:6
   172:7
**objective** 142:15,20 143:20
**obligation** 149:3
**observed** 150:15
**obstruct** 78:21
**obstructed** 187:6
**obstructing** 122:15,16
   123:9
**obstruction** 122:19 186:8
**obstructive** 70:8 79:3 128:2
   129:15
**obvious** 64:11,12 147:5
**obviously** 6:24 61:15
   101:10 128:3,24 139:5
   145:6
**occasional** 54:7
**occasionally** 22:19 27:1
   54:4
**occasions** 63:2 163:19
**occurred** 55:19 105:14
   109:20 112:13 180:12
   182:5 183:25
**offhand** 12:23 14:2 21:13
   46:9 49:16,20 51:14 58:5
**office** 7:13,15,16,20,21,22
   33:5 36:22,22
**offices** 8:8,9
**often-referenced** 35:1

**Oh** 53:7 80:21 130:13
   153:6
**okay** 5:24,25 6:10,15,18,22
   7:5,11,17,24 8:25 10:11
   11:17,23 13:6 16:4,7
   17:15 19:8 20:8 21:14
   22:25 23:3 24:6,12 27:22
   28:3,8,14,20 29:4 31:16
   32:17 33:6 34:8 36:23
   37:2,18 39:1,5,19 40:9
   41:2,6 42:6,14,17 43:18
   43:24 47:7,19 49:3,12
   50:25 51:18,21,25 52:23
   54:3 59:15 68:25 72:5
   79:14 80:18 81:4 83:3,17
   84:7 86:21 88:1 89:16,19
   91:10,25 92:16,24 94:11
   98:23,25 104:24 109:3
   110:6 111:10 112:17,25
   113:6 114:23 118:3
   119:19 130:12 133:18
   139:1 147:1 156:6,19
   157:12,24 158:2 159:10
   159:13,20 160:15,17,25
   161:9,13 162:15,20
   163:9,11,21 164:2,18
   165:1,20 166:23 167:3
   168:2 169:14 170:3,7
   171:7 174:2,12,18,25
   175:24 176:1,9,14,21
   177:4,9 179:17 181:4,14
   182:12,15 183:2,23
   184:14,20 185:14,16,21
   185:23 186:3,12,18,25
   187:7,12 188:3,9,17
   189:12,18
**old** 6:9 20:15
**older** 146:14
**one** 24:3
**once** 78:12 81:18 123:20
   124:15 134:4
**ones** 102:11
**one** 61:7 145:25
**one-on-one** 109:1,2,23
   169:8,11,14
**one-on-two** 109:2 169:12
**ongoing** 46:18
**online** 4:15 19:3,14,18
**open** 21:23
**opened** 124:15
**opening** 141:6
**openly** 146:23
**operate** 22:17 72:5
**operated** 135:24 169:25
**operates** 140:5
**operating** 22:11,18 27:7,8
   30:17,18 32:3 55:7 69:3
   72:6 77:7,8 81:10 95:7
   108:5,9 109:8 115:11
   120:16,19,22 142:13
   149:17 151:19 180:3
   185:1
**operating-room-type** 31:18
**operational** 183:8
**opinion** 10:23 14:1 35:1
   43:3 45:6 53:14,15 56:7
   69:10 77:1 92:3 93:10
   117:25 124:18,23 138:19
   138:20 152:21 165:15
   166:13 168:10 175:8

**Oh** 53:7 80:21 130:13
**Oh**
   182:18 187:7,9 188:14
   189:3,9,11
**opinions** 5:22 9:6 10:17,20
   10:22 11:1,6,15 13:14,25
   16:23 38:3,4,7 44:10
   46:14 53:10,11 54:22
   71:21 76:23 93:10 95:15
   97:5 98:14 99:25 106:1,3
   123:19 130:1,4 138:11
   147:2,3 152:18 154:24
   155:5,8,22 156:9 165:14
   166:7 176:11 189:6
**opportunity** 5:21 137:6
**options** 133:25
**oral** 28:15 122:13,24 123:1
**order** 11:9,12 44:8,18
   70:18 113:10,10 127:18
   142:21 144:17 149:5
   174:3
**orders** 45:5 46:12
**organ** 62:17
**organization** 19:25 104:14
**organizational** 104:15
**organs** 62:19
**original** 35:23 36:3
   104:20 163:4
**originally** 20:17 38:6
**oro-nasopharyngeal** 122:9
**ortho** 24:3
**orthopedics** 22:14
**otolaryngology** 105:23
   176:12
**outcome** 68:12,14 74:5,6
   94:3 135:5 136:3,11,17
   154:7 166:15,17
**output** 111:8,14
**outside** 15:1 25:25 27:3
   30:18 100:4 115:22
   143:18
**overcome** 71:12
**overestimate** 71:22
**overlap** 26:19
**oversaw** 31:1
**ox** 84:21
**oximeter** 180:2
**oximetry** 121:5
**oxygen** 44:14,16,17,21,23
   45:1,7,9,16 61:8 67:14
   71:9,11 76:22,25 79:11
   79:14,17,20 93:22,24
   97:18,25 105:14 111:5,7
   111:14,21,22,24 118:13
   122:1,6 123:18,23 124:1
   124:3,5,7,13 125:1,5
   125:14,17 126:2 131:2
   161:25 185:18 189:8
**oxygenated** 139:22
**oxygenating** 139:22 179:4
**oxygenation** 125:19 130:22
   140:8
**o'clock** 61:18
**O2** 67:20 68:4 112:8,21
   114:24 116:3 125:4

---

**P**

**P** 1:9 2:9 3:1,1,12
**PACU** 9:13 38:18 44:5,8,21
   44:23 45:1,5,6 46:12
   55:11 61:20 62:24 63:25
   64:4 66:22,24 67:15,21

68:5 76:11,15,21 77:15
78:3 80:11 88:2,13 105:7
107:8,22 108:5,15,19,23
108:24 109:24 112:13,18
113:2,4,20 121:10
123:20 124:20 126:1,13
126:20 130:24 132:16
134:17 135:12 136:19
138:23 139:25 140:23
141:19 147:12 148:10
149:19 150:15,18,24
151:20 154:9,19 165:6,7
169:7,17,21 170:6,8
174:14 176:6 179:10,12
179:24 181:15 182:10
183:21 186:3,4
**page** 4:1 6:4 104:19,24
   178:2
**pages** 155:10
**paid** 183:9
**Paidipalli** 1:8 2:8,15 3:7
   5:19 14:16,23 33:11 63:3
   63:17,22 64:4,16 65:2
   68:17 73:19 88:25 91:10
   92:4 93:11 98:7 106:13
   107:6 109:9 122:15,25
   127:23 130:23 136:2,9
   139:6 143:24 145:7,7,10
   146:15 147:10 148:5,25
   151:21 154:25 155:25
   159:17 165:7
**Paidipalli's** 15:2 39:14 90:4
   97:9 108:14 130:2
   143:19 144:1 147:4
   161:8
**pain** 83:22 184:5
**Pandha** 158:21
**Pandharipande** 158:21
**PaO2** 79:16,22 80:2
**paper** 36:18 88:16 160:13
**paragraph** 172:4 173:11,13
**paragraphs** 95:12
**paramedic** 6:9,13 40:4
**parents** 1:4 2:4 9:10 20:25
   38:14,17,22 55:17 56:2
   61:2,11,14 63:1 66:15
   154:19 186:18
**part** 20:18 25:23 27:3
   38:23 42:19 54:18 64:7
   69:7 73:6 80:5 101:1
   104:14 109:19 118:2
   120:3 127:15,16 147:21
   165:4,12 170:14 179:5
   180:15 182:20
**partial** 79:17 118:12,13
**participate** 31:8 71:1
**particular** 12:14 14:9 106:9
   150:19
**particularly** 13:13
**parties** 191:14
**partners** 57:11
**party** 6:15
**pass** 28:8,14
**passed** 20:12 28:10
**passes** 34:12
**passing** 104:9 186:13
**patency** 122:3,8
**pathologist** 9:25 141:16
**patient** 14:9 14:1 15:9 45:15
   51:22,22 52:8 53:16 54:7

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

55:8,11 56:17 57:13,16
60:17 61:13,18,20,22
62:6,24 63:4,6,11 64:1,5
64:8,10,23,25 65:2,6,12
65:21,22 66:2,6,24 67:1
67:7,10 68:19 69:12 74:8
74:9 75:9,11 76:5,10,15
76:21,24,25 77:1,15 80:8
80:11 83:20 88:25 89:6
89:17 90:11,21 93:12
95:21,24 98:5,6 99:20
105:8,17 106:14,17,23
106:23 107:6,8,9,18,22
107:23,24 108:15 110:25
113:22 114:11 116:7,8,9
118:10 119:1,7 121:3,9
121:18 122:10,25 123:22
124:3,6,7,23 126:13,19
126:21,23,25 127:2,6,11
127:12,25 128:4,11,25
129:3,16 130:20,24
131:16,17,18,20 132:6
132:15,24 133:8,21
134:16 135:10,22,24
136:10 137:9,14,18,22
140:21 141:10,12,13,19
142:21,25 143:22 147:23
148:6,7,11,18 149:4,7,9
149:12,17,17,19,20,25
150:7,15,16,19,22,23
151:3,5,8,10,12,19,22
152:2 160:17,20 161:14
162:12,14,18 163:12,22
164:4,10,22 165:8,10
166:20,21 167:5 169:25
170:2,6,11,18,23,25
171:2,9 174:7,13 176:3,6
176:19 178:8,18,21
179:1,10,11,23 180:9
181:10 183:17 184:9,21
184:24 185:22 186:1,15
188:16
**patients** 8:17,18 12:8,11
13:17,19 15:13 18:7,12
18:24 22:13 23:10,17,18
24:10 25:17,18,25 27:4,9
27:13 30:16 31:17 32:24
44:18 50:15,16 52:17
53:24,25 54:2,4,6 72:14
79:6 82:14 87:13 97:25
108:5,9 121:20 123:4
124:4 133:11 139:24
140:15 142:6 143:25
144:10 145:11 146:2
147:15,17 169:9 170:24
181:14,19
**patient's** 55:12 61:15 64:20
65:4 93:13 117:9 133:19
137:10 147:19 162:2
169:18 171:14 186:18
**pattern** 73:1
**pay** 53:7 78:25 142:24
143:3
**paycheck** 183:10
**paying** 68:8 143:7,15
148:17
**Pc** 112:8
**PDF** 43:19
**pediatric** 1:7 2:7,14 3:6 8:2
8:4,12,14 12:10,14,18,19

13:4,9 14:16 15:12 24:3
24:10 25:3,5,9 27:13,16
27:23 32:24 35:1,4 51:22
52:8,15,21 56:7 79:7
89:6 101:11,16,18
107:19 124:4 153:9
**pediatrics** 26:8 34:21,22
**pediatric-specific** 12:20
**pen** 81:9
**penalty** 191:16 192:5
**people** 24:7 27:1,2 68:13
78:20 83:21 91:4 150:4
159:24 162:6
**percent** 60:12,12 79:23
80:3 81:14 101:2 111:22
114:25 116:4 124:9,10
125:4
**percentage** 124:7,9
**percutaneously** 22:24
**Peretti** 9:20,24
**Peretti's** 46:2
**perform** 90:21 91:7 160:23
**performed** 64:19 118:15
**performs** 160:21
**period** 62:12 64:25 70:9
105:9 118:25 120:6,7
152:7
**periods** 72:20 87:14,23
**peripheral** 60:8
**perjury** 191:16 192:5
**persistent** 115:14
**person** 106:19 163:12
**personal** 139:19
**personally** 129:1,1,5 153:2
**personnel** 163:3
**pertain** 37:22
**pertaining** 151:10
**pertinent** 106:11,23 131:8
**pH** 118:12,22
**phonetic** 72:15
**photographs** 95:15
**physical** 59:25 74:3 80:9
142:17
**physically** 127:14
**physician** 8:19 14:8,23 17:4
24:20 45:13 46:5 53:12
53:15,16 57:11 65:14,20
66:10 75:11 105:11
109:6 121:6,16 123:21
124:23 125:22 126:12
128:7,12,13,19 135:23
136:24 137:21 140:4,14
140:14 141:3,14,24
142:3,14 145:3,9,17,19
148:13 150:14,17 153:15
169:24 170:15,15 176:19
183:9,13,16 185:20
189:7
**physicians** 4:20 9:22 21:2
42:20,22 48:19,21 56:5
100:11 109:12 132:8,23
135:16 137:4 139:6
146:10,14 148:1,3
149:16,22 150:8 153:2
183:13
**physician's** 44:18
**physiologic** 71:25 75:24
**physiology** 142:20
**picky** 162:22
**picture** 86:7 95:3 96:16,18

138:24
**pictures** 38:24 139:2,9,11
**piece** 37:13 153:1 160:13
**pieces** 63:14 143:21
**pillow** 131:5
**pilot** 73:13 142:12,15,16,19
**pink** 11:21
**place** 131:15 191:7
**placed** 60:8 62:10
**places** 90:17 100:7
**Placing** 131:3
**plaintiff** 5:21
**plaintiffs** 1:5 2:5 3:2 10:13
11:18
**plaintiff's** 4:19 36:24 48:18
48:21
**plan** 26:6,7 90:4
**plane** 73:7 142:21
**plasmalyte** 90:18
**play** 143:4
**played** 83:2
**playing** 66:25
**plea** 172:4 173:12,14,24
188:6
**please** 5:15 18:3 35:9 36:4
45:3 110:5 132:13 166:5
172:7
**plumber** 143:6
**point** 46:6,19 54:25 55:20
61:12,23 65:6,9 72:1
74:13,24 77:2,3,6 91:20
93:15 94:25 113:20
116:11 117:15,17,20,22
118:1 127:10 137:24
139:1 141:2 170:22
171:14,17 187:16,18
**points** 63:14 73:25 74:13
76:3 78:13 143:18
189:17
**police** 42:20
**policies** 44:3 104:16 150:25
**poor** 61:15 63:11 140:21
143:10
**population** 102:2,15
**portend** 116:23
**portion** 38:21 71:6 92:6
**position** 53:17 56:8,23 57:1
57:1 61:16 63:11 66:7
68:12,14 95:19,21 96:3,7
96:22,23 97:18 130:21
131:1,4,14,15,19,19,24
132:1,5,7,16,19 133:5,6
133:22,22 134:1,1,6
138:22 140:21,23 154:22
159:18 165:16 166:22
170:17,23 171:1 176:20
176:25 177:6,13 187:5
**positioning** 56:17 95:24
105:13 131:13 138:11,21
**positions** 189:9
**positive** 118:16
**possibilities** 176:8
**possibility** 136:6 142:4
144:20
**Possibly** 136:3
**postoperative** 56:17 70:9
131:21 180:9 181:10
**postoperatively** 25:18
74:17
**post-adenoidectomy** 30:5

post-adenoidectomy/tons...
133:8
**post-anesthesia** 94:8 122:2
130:20
**post-anesthetic** 142:11
**post-op** 64:25 90:17 139:10
**post-recovery** 56:8
**post-resection** 87:23
**post-surgical/PACU**
177:25
**post-tonsillectomy** 95:21
171:2
**potency** 72:5
**potent** 82:11
**PO2** 112:7
**practice** 12:8 14:4 15:8
21:25 24:21 26:14,15,16
26:17 28:18 29:23 53:15
53:16,18,20 54:9,10,14
63:5 72:10 97:12,21 98:1
98:3 99:4 101:15 104:10
104:12 105:21 108:8
141:15 153:16 176:12
**practiced** 28:17 97:8,12
98:17,20 103:25 104:5
**practices** 14:25 15:2
**practicing** 17:5 35:1 65:5
97:2,23 144:3,4 145:13
**Pratik** 158:21 159:9
**preceding** 52:10
**precipitating** 165:17
**premarked** 112:23
**preoperative** 54:6
**preparation** 41:11
**prepare** 8:25 12:2 49:8
**prepared** 41:12 49:9
**prescribing** 51:16
**presence** 127:9
**present** 11:3 14:12 69:9
72:16 95:6 106:15 121:8
121:21,22 126:9,11
127:14,20 128:9 129:1
129:2,10,10 152:4,5
178:10
**presentation** 186:22
**presentations** 32:17
**presented** 59:21
**preserve** 36:24
**preserved** 172:23 174:16
**pressed** 180:13
**pressure** 79:17 113:24
114:6,13,15,17,21,22,25
115:21 116:2,9,18,23
118:13,13,16 180:20
**pressures** 161:19
**presumably** 174:25
**presume** 178:9 182:19
**pretty** 43:22 62:12 70:2
78:17 83:10 99:5,21
94:16 144:7
**prevent** 94:2 125:9
**prevented** 94:1 110:20,23
164:21
**prevents** 81:19,23
**previous** 24:25 49:12 55:10
57:12 115:8,8 170:24
**previously** 11:20
**pre-anesthesia** 89:17
**Pre-Anesthetic** 74:4
**pre-op** 92:9 139:4,8 160:22

160:24
**pre-oxygenated** 111:17
**pre-pink** 35:25
**primarily** 32:11 53:20
54:19 92:5
**primary** 24:18,19 26:24
32:13 79:7 82:6 91:4
111:13 123:12 136:20
166:14 167:4,5,13,16,24
168:2,4,10,23
**prior** 10:21 12:24 13:2
15:25 16:5,23 23:9 35:17
40:12,16 51:2 60:13 87:6
106:1,2 119:9,11 140:24
**private** 21:22
**privilege** 180:17
**privileges** 50:9,21,22,24
157:4,15,16,20,25
**probably** 9:16 16:10 29:25
34:20 36:21 37:17 39:3,7
39:7,11 41:15 52:1,4,9
55:6,20 58:14,14 68:7
74:15 77:17 82:17 83:1
85:25 88:16,22 91:21
98:3 100:5 101:13 109:5
111:23 115:7,12 136:16
144:7 151:19 162:21
164:24 170:11 171:5,6
180:8 185:9,11 187:6
**probation** 51:4
**probe** 61:10 185:4
**problem** 108:18 135:17
140:7 175:1,9 182:5
**problems** 21:1 63:17 64:1,5
68:1 157:17 164:20,25
**procedure** 25:20 129:1
158:12,13 161:17 163:17
**procedures** 22:19 23:25
24:1,8 27:10 44:3 52:6
52:11 104:16 127:22
128:10,21,23 129:11
**proceedings** 191:6
**process** 17:14 42:19
**processes** 90:8
**proctologist** 183:15
**produce** 33:20 159:19
**producing** 33:19
**professor** 23:20
**program** 23:1 31:2 53:5
**progressed** 111:15
**progressively** 60:21
**prolonged** 118:25 120:6,7
**prone** 56:8,21 57:1 61:13
78:24 96:8,14 97:18 98:5
130:20 131:1 140:23
170:18,25 177:1
**pronounce** 159:7,12
**proper** 105:4,13,13,14
110:7 121:25 130:17
142:24 150:24
**properly** 180:3
**propofol** 60:9 82:6
**pronounded** 11:17
**protect** 89:12
**protected** 147:23
**provide** 13:1 19:6 38:6
44:9 142:15
**provided** 11:11 17:8 33:23
48:4,17 83:15 105:15
106:11

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

provider 149:8,10 151:8
185:18
providers 45:24 65:24
prudent 107:15 125:22
129:20 136:23 141:3
148:13 151:23 152:5
Public 191:23 192:24
publication 18:5 106:9
publications 17:12 18:1,14
published 19:3 49:14 54:17
pull 36:10,11 75:4
pulled 19:5 34:14,16,19
36:9 41:15
pulmonale 85:19
pulmovasculature 85:20
pulse 84:21 114:22,25
115:5 116:12 125:5
purposefully 187:25
purposes 108:25
put 37:11 42:4,12 43:15
50:15 51:3,22 52:14,19
56:12 60:1 81:11 90:11
90:21 91:4,5 93:20
121:20 123:1,2 124:5
127:2 138:7 145:19
160:18,21 175:24 176:10
puts 161:14
P-A-N 159:4
P-A-N-D-H-A-R-I-P-A-N...
159:5
P.A 1:8 2:8,14 3:6
p.m 2:16 5:4 61:24 93:3
190:5

### Q

qualified 158:3 176:11,15
176:16,18
question 7:8 14:20,25
37:24 45:2 46:19 64:2
68:21,23 72:9 76:7 81:5
98:11 103:2,5,16,19
108:11 111:16 125:7
126:16 141:20 145:15,17
145:22 148:21 165:24
166:4,10 168:5 171:24
178:19 183:6,8
questions 5:22 6:2 7:7
37:20 83:10 138:17
154:16 156:2 166:10
167:23 168:6,8,20
188:20 189:5,12
quick 113:12
quicker 148:14
quickly 81:16 109:21
quite 37:8 38:13 70:4 71:3
112:4 181:1
quote 43:2 177:21

### R

R 3:1
raise 115:16,25
raised 61:11
ran 119:21
random 84:19 86:2
Rao 1:8 2:8,15 3:7
rate 60:13 70:12,12 77:24
77:25 81:20,21 84:20,25
86:5,20,20,23 88:6 89:14
94:16,16 114:24 115:6,9

115:15 116:3 119:4
132:2 161:25
rational 78:19
read 46:2,4,7 55:5 61:9
72:23 89:18 90:5,6 105:2
116:21 117:6 118:8
139:15 142:3 150:13,14
152:10,12 171:12,19
173:9,13,16 181:21
184:18 192:5
reading 10:25 11:12 44:22
44:25 104:21 143:19
144:6 184:14 188:10
reaffirm 122:3
real 113:12
really 34:9 58:7 61:1 85:25
87:15,24 88:21,23 89:3
108:24 111:4,25 114:18
124:6 125:18 143:6
187:5
realm 112:5 136:6 176:7
reason 14:15,22 68:9
109:16 148:2 170:13
180:16
reasonable 47:8 64:6 74:2
75:15 82:10 84:15 96:6
107:18 115:23 121:6
123:21 125:25 126:1
127:18 133:1,2 136:8,14
152:7 161:6 170:14
189:10
reasonably 17:4 107:15
125:22 129:20 136:23
151:23 156:10 161:7
reasons 184:20
reassess 116:9 121:18
reassessed 165:8
reassessing 144:20
recall 6:21 9:11,21 10:10
10:19 14:2 15:22 16:21
20:7 30:6 38:16 40:5
46:9 53:14 58:7 60:2
61:24 63:21 66:18,20
114:1,16
receive 39:24
received 9:3 12:5 21:14
50:23 60:19 69:16 70:4
76:25 77:22
receiving 35:17
Recess 93:3 113:16 156:23
recognize 139:17
recognized 13:23 25:4
recollection 15:6
recommendations 124:22
recommended 127:16
recompensate 41:4
record 4:21 5:15 7:3 15:5
17:25 23:16 35:14,16
39:16 46:7 47:22 62:6
70:5,11 71:3,16 74:4
78:4 80:23,25 81:3 84:22
88:2,3,4 89:22 92:13,17
92:18,21 93:9 101:24
110:18 112:18,20 113:5
113:15,17 123:11 143:16
152:5 156:22,24 179:7
recorded 68:4,7,7 110:17
118:12 119:13 191:8
records 9:2,3 12:5 14:25
33:2 34:2 36:15 37:15

38:9 39:1,4,10 43:14,16
45:21,24,24 46:13 57:3,9
57:20,21 58:16 59:4,6
69:3,9 101:5,22 105:1,8
117:19
record- 37:8
recover 66:3
recovered 110:9 114:15
recovering 66:2
recovery 55:12 56:17 57:1
60:25 61:8 63:4 64:25
65:7 67:15 75:9 105:8
106:18,21 112:23 115:12
120:15 122:7 127:7
128:1 147:16 148:12
149:25 151:13
rectified 170:19,21
rectify 66:9 126:8
red 115:25
redirect 172:17,18
refer 130:6 131:9 151:1
181:22
referenced 58:19 59:8
referrals 185:3
referred 57:12,13 153:12
referring 10:4 178:1
reflection 135:1
refused 62:18
regard 160:17,20 182:5
regarding 12:13 18:22 44:2
44:25 56:7 81:8 97:17
104:3 177:23
regardless 137:21 183:9
regards 57:13 146:16
regret 117:1
regularly 106:24
reiterating 33:16
relate 21:25 19 32:18
38:3 39:16
Relating 44:13
relationship 6:8 12:10
13:16 79:18 86:19
relative 189:7 191:13
relaxant 179:2
relevant 18:15 55:21 62:23
106:10 151:10
reliable 13:7,10 34:24,25
relied 64:4
rely 63:25 64:6 108:4 126:1
128:20 145:1,4
remain 132:19 150:22
remainder 167:1
remember 9:22 11:12
12:23 21:10,12 36:18
38:20 40:6 44:4,5,6
46:23,24,24 49:16,17,19
49:23 51:13,14,16 58:5,8
58:17 59:5 61:17 69:14
71:17 76:17 89:2,2 113:8
113:24 139:3,4,12 144:6
144:7,12 153:12 154:14
185:2
removal 110:10 111:25
removed 78:12 152:3
removing 94:19
renew 58:20
renewal 20:6
repeat 120:20 175:7
repetition 168:14
repetitive 26:19

Rephrase 178:19
report 10:2 33:24 34:2
39:25 46:3,4 47:12 48:16
49:6,13,22 59:7,14,23
66:12 69:15,25 88:15
95:8 104:20 152:10,12
189:7,14
reported 1:24 63:22 76:11
118:18,21 122:18
reportedly 130:24
reporter 2:17 5:6 7:4 191:4
191:23
REPORTERS 1:22
REPORTER'S 191:2
reports 59:9 61:1 69:11,12
reposition 67:10
reputable 14:16
request 33:14 45:19 54:5
65:2 89:5,8 93:11 95:23
115:18 116:15 126:11,18
127:8,10 129:4,7
required 106:13 122:12
133:23 141:2 180:13
requirement 170:7,9
requires 116:13 127:18,19
128:6 143:3 160:2
research 18:19,22 72:11
researcher 54:17
resect 87:21
residency 23:3,6 24:16,18
24:20,23 25:14 28:11,12
31:25
resident 28:24 48:3 52:2
residents 23:15,19 30:10
31:20 32:2 128:20,20
159:11
resistance 85:19
respect 36:15 55:4 64:16
106:14 189:12
respiration 61:6 86:17 90:2
132:25
respirations 71:15 75:7
115:1 122:19
respiratory 70:9,12 77:4,10
80:1 83:19 84:25 86:5,18
90:3 93:14 94:16 112:1
114:24 115:6 116:3
119:4 125:11 140:22
149:9 161:25 164:19
181:3 187:10
respond 33:7 128:17
response 18:6 162:2 184:7
responses 7:11
responsibilities 23:18 30:8
31:11 109:9 149:18,20
responsibility 25:23 26:25
64:8 65:11,13,14,21,24
66:1,4,5 135:23 147:19
148:19 149:13,23 169:18
170:3 179:18 188:4,12
188:16
responsible 30:9,15,19,24
65:15 121:14,17 169:24
182:15,23,24
responsive 108:20
rest 97:13 114:13
restate 14:20 45:2 64:2
132:13 166:4
result 112:13

resulting 118:25 120:5,5
results 154:1
resuscitated 175:19
retrospective 136:4 180:17
return 93:14
reversal 89:11 99:15 179:1
review 9:15 12:12 13:14,22
13:24 14:24 15:14,22
19:2 36:9 40:22 45:23
57:8,16 69:3 89:23
113:23 146:20
reviewed 4:12,15 9:2,4,8,9
9:12,16,17,19,22 10:16
11:9 12:4,6,9 13:7,21
15:3 18:21,23 19:1,12,14
19:15,18 40:12,18,19
43:10 44:1 45:5,20,21,22
46:12,14 66:16 95:14,14
101:5 105:1,25 106:2
155:2
reviewing 10:21 12:24 13:2
15:11 39:10,14 44:6 45:4
57:6 101:21
Reviews 17:1
revoked 51:3
reward 42:16,18
re-assess 148:6
re-cycle 116:9
re-intubated 118:17
right 5:17 7:13 12:23 14:2
19:4 20:4 21:12 23:8
26:13 27:3 31:4,14 32:5
36:18 41:20 43:3 46:7
47:9 48:13,14 49:16,20
50:8 51:14 53:7 55:1
56:11 57:7 58:5 59:14
60:2 61:18,24 63:21
71:17,18 80:23 83:8 84:7
82:2 98:18,21 107:14
111:17 115:4 117:11
127:5 132:10 133:8
135:6,17 138:8,18
144:15 148:21 152:14
156:11,13 157:7,15
158:15,22 160:20 161:19
162:11 164:6,8 166:3,12
166:18 167:23 172:6,6,6
172:18 173:21 177:14,17
185:6,8 186:23
right-hand 94:4
Ringer's 99:17
risen 60:21
risk 13:17,19 15:13 60:2
63:7,7 64:10 72:15 74:23
87:13 129:24 140:22
risks 150:18
road 37:1
Robinul 81:18,23 82:4 88:7
88:9
role 8:20,21 40:13 155:11
roles 27:12
rolling 165:6
room 7:18 22:11 27:7,8
30:18,18 32:3 55:7 60:25
61:8 64:20 65:7 69:4
72:7 75:5,9 77:7,8 81:11
95:7 105:9 106:18,21
108:5,9 112:23 115:11

**A80609D**

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

| | | | | |
|---|---|---|---|---|
| 116:4 120:15,16,19,22 | see 34:10 35:22 38:24 | 183:24 | 161:14 187:1,12,14 | Spell 159:1 |
| 125:9 127:7 128:1,21,24 | 53:24 54:4 63:19 70:2 | sign 59:11 95:3 | sleeping 96:5 | spend 23:22 39:10 |
| 129:5 136:13 147:16 | 76:12 78:4,23 81:10,20 | significant 59:18 62:21,23 | sleepy 71:16 114:9 | spent 20:21 23:9,13 39:6 |
| 148:12 149:17,25 151:13 | 84:8,16,23,24 85:9,14,21 | 70:8 85:15 86:16 88:1 | sleep-deprived 119:9 | spite 80:6 |
| 151:19 161:24 162:6 | 85:24 86:1 88:18 89:1 | 117:8 181:2 | slept 61:14 | spontaneous 93:13 |
| 185:1 | 94:1 95:13 104:19,23 | signs 81:24 88:10,24 89:7 | slightly 86:25 96:4 131:4 | spot 56:13 |
| rooms 109:8 | 105:21 107:25 114:2,21 | 94:10,11 112:22 113:7 | slowly 119:11 | Square 3:14 |
| root 164:23 | 123:10 127:25 136:10 | 113:21 115:2,8,9 | small 31:21,22 70:13 99:3 | St 99:23 |
| rotate 25:23 31:6 | 137:8,20 141:5,12 159:5 | similar 17:5 33:9 140:16 | 110:12 | stable 89:15 |
| rotating 21:21 | 162:6 165:10 173:8,21 | 142:14 148:1 | smaller 31:21 96:10 | staff 50:9,20,22,23 142:9 |
| rotation 22:2,4,7,8,9 30:11 | 176:3 184:24 | simple 122:9 136:25 137:2 | smell 72:14 | 150:18 |
| round 50:16 | seeing 9:11 10:10 15:22 | 141:16 | Smith 56:12,12 | stamp 139:3,12 |
| rounding 31:17 | 38:16,20 39:16 113:8 | simply 59:1 | Smith's 4:16 34:6,6 35:11 | stand 88:21 |
| rounds 29:13 31:23 | 124:7 139:3,4,12 144:12 | single 13:11 74:16 83:6 | 36:13 184:3 | standard 5:4 13:3,8 15:15 |
| routinely 56:20 78:4 98:9 | 153:12 154:20 188:10 | 95:3 107:24 108:3 | snore 187:4 | 16:25 17:2 35:4,6,6 43:6 |
| 98:10 139:23 | seen 10:1,4 15:20 54:7 55:5 | 114:17 | snored 90:1 | 53:12 64:15 65:1 66:21 |
| rule 33:13 79:8 185:13 | 55:17 69:11 90:15 96:8 | sir 6:17 7:9,12 8:5,24 9:11 | snorer 186:19 | 67:3,8,12,15 84:4,6 89:5 |
| rules 6:23 37:21 58:21 | 115:2 180:23 181:22 | 10:8,12,15,24 11:8,13,16 | snoring 59:24 61:21 63:7 | 89:7 90:10 91:8,12 93:11 |
| running 55:2 | sees 176:19 | 11:22 15:23 16:6 18:18 | 122:18,19,20 186:7,9,15 | 95:20,23 97:1,7,14,15 |
| | semester 20:21 | 19:24 20:10 21:16,18 | 186:21,23 187:5 | 98:13 99:1,25 100:1 |
| **S** | semi-lateral 56:23 96:3 | 23:5 24:11,14 25:12 26:3 | Society 19:22 131:10 | 102:23,24 103:9,11,22 |
| | 177:13 | 27:14 28:13,19 29:6,8,11 | solely 14:4 74:10 | 103:23 104:4,8 105:5 |
| S 3:1,9 4:8 | semi-prone 56:22 131:4 | 29:14 31:12,15 32:6,25 | solubility 69:22 | 106:13 107:4,14 110:7 |
| safeguards 143:1 | semi-surgical 158:13 | 33:25 40:14,20,23 41:1 | somebody 21:11 115:21 | 115:18 116:12,14 119:6 |
| safely 105:6 142:21 143:23 | send 17:14 38:12,14 59:1,2 | 46:1,17 49:7 50:14,17,19 | 116:17 126:14 175:2 | 121:25 122:12 124:12 |
| 144:23 | sending 108:20 | 51:5,8 52:16,18 59:10 | 183:23 | 125:21 126:10,17 127:17 |
| safest 98:3 | senior 57:11 | 81:1 83:12,16 91:9 92:23 | somebody's 114:9 | 127:17 128:6 129:4 |
| safety 121:18 | sense 55:10 135:24 142:20 | 95:10 98:16,19 100:18 | somewhat 69:7 | 130:18 132:10,20 133:23 |
| salient 63:14 66:14 | senses 142:17 | 102:1 115:3 118:4,7 | soon 164:10,15,16 165:16 | 134:7 135:4 140:1,3 |
| saline 99:18 | sensitive 79:12 | 121:11,24 122:23 129:6 | 166:14 167:6,25 175:15 | 141:1 142:20 154:2,11 |
| salvaged 175:20 | sent 9:7 38:8 49:15 58:16 | 133:9 134:21 137:7 | 178:18,21 | 154:13,15 176:11,17,18 |
| sample 118:21,22 | 59:5,13 120:2 | 138:9 139:15 140:19 | sorry 19:21 43:25 50:4 | 182:9 |
| sat 165:13 | sentence 110:21 112:11 | 148:23 150:12 156:1,12 | 53:23 88:4 98:12 122:23 | standards 4:15 12:7,13 |
| sats 79:22 112:22 114:24 | separate 38:11 76:3 | 156:14 157:14,19 158:5 | 134:21 154:10 164:15 | 18:23 19:1,13,18 42:24 |
| 116:3 125:4 | separated 28:21 | 158:8,16 160:6,16,24 | 173:3 174:5 175:7 | 66:8 99:21 118:9 124:21 |
| saturation 61:9 79:11,13 | separation 184:8 | 161:3,12,15 162:10,14 | 178:19 182:7 | 126:15 131:8 139:16 |
| 79:20 80:3 85:7 | series 12:4 | 162:19 163:1,6,8,10,14 | sort 58:19 89:9 | 140:12,20 177:22 |
| saturations 44:19 68:5 | service 180:14 | 164:5,11,16,17 166:8 | sound 14:11,16,23 | standpoint 26:8,9 30:12 |
| 161:25 | services 21:24 | 168:17,21 169:6,10,16 | sounds 109:22 126:11 | 102:20 139:10 169:4 |
| save 113:12 | serving 42:25 | 170:6 171:6 174:24 | sources 12:15 13:12 47:11 | 183:8 |
| saved 117:16 164:22 165:5 | set 34:4 46:8 74:3,6 115:8 | 175:13,25 176:4,13 | South 3:14 | starr 172:8 177:14 |
| 165:11 | 191:7 | 177:8,20 178:4,6 179:9 | space 70:18 71:5,25 85:3 | started 61:23 85:9 112:6,9 |
| saw 10:2 44:5 53:16 55:4 | setting 31:18 185:17 | 179:22 180:11 181:11,18 | spasm 133:16,18 | starting 60:11 |
| 61:13 63:18 66:6 69:9 | settled 48:11 | 181:24 182:1,3,11 183:1 | spasms 74:22 | state 2:17 5:14 20:22,24 |
| 76:14 85:7 92:9 101:22 | seven 33:15 35:17 | 184:16,19 186:6 187:11 | speak 16:4 55:15 65:19 | 75:9 119:2 121:4 151:19 |
| 119:24 120:17 131:1 | Sevo 82:2 | 189:25 | speaking 64:16 103:6 172:7 | 172:22,25 191:5 192:1 |
| 137:11 139:25 140:23 | sevoflurane 60:11 69:16,17 | sit 46:16 134:5 | 172:25 | 192:13,25 |
| 151:17 152:21 153:1,1 | 70:1,3,10 72:9 81:14,15 | sits 91:2 | specialist 54:5 | stated 106:24 173:25 |
| 153:11 170:10 173:24,24 | 86:11,16,17,22 91:17 | situation 16:19 17:5 66:9 | specializes 24:24 | 178:22 187:2 |
| 176:6 181:25 | shape 120:10 123:20 | 70:22 91:15 121:7 124:1 | specialties 101:8,14 102:17 | statement 14:6 35:16 110:2 |
| saying 47:16 77:9 122:14 | share 81:9 | 125:10 126:8 129:21 | 157:17 | 110:3 112:16 117:2 |
| 148:25 168:23 174:6,12 | shared 66:3 149:23 | 131:22 135:2 140:25 | specialty 25:5 137:22 | 118:6 143:19 163:4 |
| 176:21 177:4 | shed 15:7 | 141:4 145:8 151:18,24 | specific 14:1 15:1,15 16:12 | 167:2,14,20 168:24 |
| says 104:25 105:20 138:4 | Shelby 97:2 102:25 103:12 | 154:19 170:16,18 177:8 | 18:19 24:24 32:22,24 | 171:13,21 175:12 177:25 |
| 177:21 | shift 86:22 | situations 148:1 | 44:2 79:12,21 81:5 83:10 | statements 96:19 97:10,19 |
| schedule 26:21 | shifts 86:17 | six 26:21 49:3 | 97:4 107:2 138:17 144:1 | 98:8 118:5 167:15 191:8 |
| scheduled 12:3 | ship 65:19 149:1,14 150:2 | size 8:10 56:21 60:17,24 | 154:6,14 168:13 | states 1:1 2:1 90:16 100:5,8 |
| school 28:21 45:24 | shorthand 191:12 | 63:8 83:24 95:22 99:14 | specifically 9:23 12:9,10 | 184:3 |
| scope 180:17 | shortly 61:17 | 102:10 131:17 174:11 | 13:16 18:6,17 44:12,15 | status 123:23 132:2 134:12 |
| screen 5:4 | shot 86:2 | sketch 53:21 | 47:21 56:16 59:16,24 | 134:17 135:5,15 136:21 |
| se 13:12 65:3 68:10 116:23 | show 21:14 70:1 75:16 | skills 53:9 | 66:10 80:8 81:7 97:5 | 137:5 |
| 144:23 153:15 174:21 | 179:8 | skin 62:19 | 99:10 101:6 106:8,19,25 | stay 75:5,10,11 126:23 |
| second 4:9 7:11 11:18 17:19 | showed 62:1,2 160:5 | sleep 12:9 13:20 15:12 | 131:16 151:18 155:4 | 131:25 179:16 |
| 20:9 28:10,12 56:11 | shown 72:12 138:25 | 18:24 50:15 51:22 52:17 | 177:23 | stenographically 191:9 |
| 72:17,18,19,20 74:19 | shows 71:3 73:2 95:13 | 59:23 60:1 63:7 70:8 | specify 86:12 | steps 122:12 |
| 82:21 | sic 97:10 | 79:3 83:20 85:12 87:4,13 | speculate 69:8 189:13 | stick 72:12 120:24 |
| secretions 96:6 131:6 133:6 | side 9:25 96:5,15 98:6 | 87:15,19 89:25 90:11,22 | speculation 62:21 69:7 | sticky 43:15 |
| 133:13,16 134:3 | 171:1,9,11,15,20,24 | 107:17 118:11 121:20 | speculative 166:11 | stimulation 162:2 |
| section 13:18 36:14 88:13 | 173:23 174:8 177:18 | 124:24 127:2 128:2 | speeches 172:20 | stomach 180:22 |
| sections 12:18 | | 129:15,18 160:18,21 | speed 15:12 | stop 82:20 105:19 167:21 |
| sedative 72:4 | | | | |

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

172:10,12,14
stopped 63:10 125:15
 141:12 165:10 176:3
stories 128:17
storm 142:16
strange 184:7
Street 3:9
strengths 147:14,20 148:19
stretch 91:21,22
students 31:5,7
studied 146:13
studies 74:25 75:15
study 62:15 146:19
subject 13:22 32:18 36:23
submitted 41:7,9 155:3
subpoenaed 41:19,21,24
Subscribed 192:20
subsequent 77:5 110:20,23
 113:7
subsequently 62:9
subspecializing 30:14
subspecialties 25:24
substances 51:17
substitute 142:24
subsumed 54:12
subtleties 97:24 99:7
 187:19
subtly 99:4
suction 86:10
sudden 111:18 184:7
sue 48:9
sued 47:25 51:21
sufficient 93:23
suggestion 142:10
suit 48:1,2
suite 3:4,9 27:3
summary 59:17
summoned 109:13
supervise 65:12,21 121:13
 121:19 127:14 129:1
 149:6
supervises 128:19 149:4
supervising 65:14 126:5
 127:4 129:2 147:18
supervision 105:16 106:14
 127:19
supine 96:1 177:12,15,15
supplement 12:25 17:15
supplemental 4:12,13,15
 19:9,11,15,16,18 45:1
 67:14 71:11 76:22 93:22
 93:24 105:14 124:18
 125:5,17 126:2
supplementation 122:17
 189:8
supplemented 123:23
support 61:6 66:8 74:5
 75:6 77:3 93:19 110:18
 110:22 118:10 123:10
 131:2 134:2
supportive 74:1
supposed 155:7
supposition 109:19
suppress 187:10
suppressed 84:1
sure 6:3 7:1,3 17:9 18:4
 40:1,11 42:8 47:2,25
 51:15 52:22 54:22,24
 58:10 63:15 64:13,18
 75:13 90:16 91:17

103:21 104:22 107:1
109:9 112:19 131:20
144:16 149:7 155:16
156:8 173:15,18
surely 108:6
surgeon 15:16 53:18 61:12
 63:9 66:3 96:24 97:20
 139:7,15,23 140:2,4,4,8
 140:9,19 141:12,25
 149:19,22 150:25 162:4
 163:20 165:9 166:19
 169:25 170:8 176:3,13
 176:17 178:15 180:13
 181:7 183:14,18
surgeons 169:20,20 179:14
surgeon's 98:8
surgeries 22:13
surgery 15:14 21:25 22:5,7
 22:8,9,10,15 52:8 60:18
 74:15 77:24 87:7,8 90:21
 91:7 107:20 124:25
 129:18,23 131:16,17
 133:11 140:12,15 158:9
 158:14 161:22 163:13
 164:2
surgical 25:20 64:22,22
 140:11 162:2 177:24
surprise 74:6 152:17,19
surprised 47:6
surprises 5:23 152:19
surrounded 69:23
suspended 51:3
swear 5:6
swelling 82:15
swing 78:20
sworn 5:9 6:25 192:20
symptoms 59:23 85:21
syndrome 87:20
system 69:13
systems 73:16 100:19

**T**

T 4:8
table 129:25
tachycardia 77:18,19 81:25
 115:14,19
tachycardiac 94:15 95:1
tailor 129:16
take 4:9,18 5:18 11:18 17:9
 17:19 27:1 31:7 35:20
 36:5 54:18 80:17 84:13
 92:24 95:5 107:25
 110:24 124:5 125:7
 150:7 156:15 157:9
 170:12 174:10
taken 2:13 60:25 62:9 71:6
 93:3 112:4 113:16
 135:22,25 139:2 156:23
 188:4 191:6,12
takes 8:23
talk 16:13 47:6,21 49:24
 56:14 59:15 79:15
 104:10 134:14 148:7
talked 7:2 18:20 30:6 45:21
 45:22 46:11,12,15 48:9
 50:25 56:4 93:9 95:14
 104:6,8 105:2 123:15
 138:10 141:7 150:10
 159:15 173:2

talking 19:22 89:3 104:11
 104:11 134:4 139:5
 174:22
talks 94:5
Talley 1:24 2:16 191:4,23
tape 113:12,12
tapes 188:22
teach 23:15
teaches 31:14
teaching 29:13 30:7,9,15
 30:19 31:11,13,16,17,18
 32:1,1 54:10,12 180:15
team 147:20,22 148:20
 182:24
tech 155:14
technical 155:15
technology 100:6,7
telephone 3:5,10,15 16:5
tell 6:25 17:25 21:19 23:14
 24:15 29:21 30:2 46:5
 49:22 56:11 57:19 58:11
 96:16 100:9 112:17
 113:11 161:6
telling 66:14 79:13
temporary 31:3
ten 65:7 88:14,14 107:11
 108:1 111:19 118:16
 144:11 152:1
tend 77:23 123:4 146:10
tends 146:9
Tennessee 1:1,13 2:1,17
 3:4,9,15 29:5,10 51:1,6
 75:22 97:3 102:25
 103:12 104:6 191:5,17
tent 124:5
term 160:18 187:13
terminated 182:2
terms 16:20,22 176:10
terrible 53:8
terribly 114:18
test 134:23
testified 5:10 40:18,20
 116:17
testify 41:18 42:22
testifying 40:10 43:8
testimony 10:5 11:5 40:25
 42:3 45:4 173:1,17 192:9
testing 120:20
tests 62:14 136:24
text 13:12 15:14 18:20
 34:24 36:9 46:11
textbook 12:16,17 14:5
 34:20,21
textbooks 4:12 12:20,21
 19:12,15 34:17,17,19,22
 19:12,15 34:17,17,19,22
 105:5
Thank 156:13 188:18
theoretically 169:11,13
therapist 149:9
thing 13:23 23:24 35:16
 43:3 46:18 58:19 69:15
 86:24 92:6 96:2 98:2
 125:24 127:5,7 155:15
 184:2 185:12
things 15:20 34:4 35:7
 36:17,20 40:1 47:16
 49:25 66:12 77:21,24
 79:7,10 87:18,19 94:19
 98:15 111:6 113:10

114:8 117:1,7 129:22
 133:2 137:6 160:3 162:5
 162:8 184:8,11,13 186:4
think 9:7,16,18 10:3,6 11:2
 11:7,7 12:15 14:10 17:11
 18:17 20:1,5 29:17,20
 31:4 35:5 36:17 38:8
 39:21,21 41:7,9,12 42:19
 43:12 44:6,7 45:20 46:16
 46:17 47:24 49:15 50:8
 55:1,6 59:13,13,14,17,20
 62:12,14,17 64:6 68:1,2
 68:7,10,13,16 69:2 71:20
 72:23 76:14,25 84:5
 85:11 86:9,13 89:21
 90:24,24 91:3,14 96:19
 97:16 100:25 101:1
 102:3 107:15,18 114:15
 115:20 117:18 119:14,15
 119:17,17 120:11,17
 121:6 123:21 124:21,25
 126:3 133:24 134:25
 138:13,16,18 146:5
 148:1,3,18 150:10 153:4
 154:6 155:19 156:16
 160:5 167:10 171:21
 175:12 176:9 177:7
 180:25 183:5 188:15
thinking 26:4 52:1 58:6
third 7:3 26:7 110:3,4
thirteen 119:16
thirty 114:5 115:12 156:17
thirty-five 115:13
THOMASON 3:13
thoracic 32:20
thoracostomy 158:12
thought 37:12 42:4,12 50:4
 87:17,18 90:6,8 106:10
thrashing 61:3 94:22
 184:21
threatened 48:9
three 12:20,25 13:1 18:21
 128:17 165:13 166:7
throat 15:16 22:5 52:7
 133:7,11
thumbnail 53:21
tidal 60:15,16,22 70:13,16
 71:1 73:5 84:9,9,11,15
 84:25 86:4 88:6 89:14
 93:25 108:17 110:11,12
 119:4 123:17 134:12
 161:24 174:10 178:22
tie 39:15
tied 73:17
tight 124:2
time 5:3 12:2 16:2 20:1
 23:21,21 24:2,11 27:8
 31:20 37:5 38:18,21 39:1
 39:2,5,10,13,17 40:21
 41:10 54:19 61:23 65:3
 69:13 71:4 72:1 78:23
 80:16 81:21 84:23 88:13
 88:16 91:17 93:2,6
 103:20 107:5 110:16
 111:16 113:15,18 114:1
 114:21 117:16 119:21,21
 120:19 122:15,17 124:19
 125:8 126:13,18 127:10
 137:10,19 138:22 139:1
 139:3,12,25 144:14,22

145:23 146:8 147:7
 152:7 156:22,25 169:3
 171:20,25 172:5 173:23
 175:7,15,16,16,24 176:5
 190:2 191:7
times 38:11 66:13 86:9
 100:13 147:9
timing 69:1 119:20 139:10
tissue 187:3
titrating 60:12
today 5:18,21 6:2,25 7:14
 9:1 16:1,2,9 18:2 35:22
 39:7 46:20 57:4 160:3,5
 184:3,15
today's 5:3 41:11
told 33:17 120:21 164:18
tone 114:10
tonsil 108:16 131:4 134:1
tonsilar 158:14
tonsillectomies 158:6
tonsillectomy 52:7 60:5
 61:16 90:14 105:21
 119:10 180:10
tonsillectomy/adenoidect...
 59:21
tonsils 13:18 32:22 79:4
 82:14 87:21 91:4 107:17
 114:12 142:6
torr 110:17
total 96:10
totality 95:5
touch 58:4
Tower 7:23
toxicology 69:11,15,25
trach 140:8
Tracheal 131:10
tracks 54:15
train 147:11,13
trained 17:4 63:25 106:19
 106:21 139:21 147:11
 151:7
training 24:18,25 25:7
 28:23 30:22,24 31:2
 121:15 145:11
transcribed 191:10
transcript 10:1 191:12
 192:6,8
transesophageal 18:7 30:17
 32:4
transfer 107:22 150:21
 151:7,9
transferred 76:10 151:11
transferring 128:11
transpired 64:9
transplants 24:1 102:20
transport 108:4
transported 55:11
trashing 94:19
treatment 177:24 181:23
trees 34:18
trend 84:20 86:3
trial 5:24 41:17 42:2 47:6
triple 28:7
trips 100:12
trouble 95:4 98:4 158:24
true 119:8 133:12 138:3
 175:6 191:11,17 192:8
truth 6:25
try 7:7 48:13 173:6
trying 9:7 10:9 37:5,7,9

A80609D

**JASON D. KENNEDY, M.D.   JUNE 25, 2014**

39:12 40:6 42:11 54:8
71:12 81:16 86:5 113:8
116:21 162:22,25 183:5
183:7,7
**TSV** 84:9
**tube** 60:7 75:4 78:8,10,12
90:25 91:1,5 93:17 99:14
110:10 123:11
**tubes** 158:12
**tubing** 124:5
**tumors** 24:4
**turn** 112:21
**turned** 61:20 86:10 96:15
171:1,14,15,20 173:22
173:23 174:8 183:24
185:3
**twelve** 39:8,21 119:16
129:14
**twelve-year-old** 52:20
59:19 63:8,9 79:2 85:15
88:9 107:16 114:18
117:3 129:15 171:6
**twenty** 115:4 144:7,24
**twenty-five** 80:20,22
**two** 12:20 17:12 18:1,10,22
24:9 26:5,21 30:11 31:1
40:1 41:7,12 76:3 77:17
77:24 79:19 87:15 105:2
111:6 128:18 129:22
149:22 166:24 169:9
**type** 22:22 25:19 29:13
52:7 58:12 87:16,16,17
87:18 157:17 158:11,14
**types** 22:13 23:25 24:9
87:15 147:17
**typical** 108:16 131:15
**T&A** 87:22
**T&A's** 74:16

**U**

**UAB** 20:23 21:15 23:4,11
24:5 50:22
**Uh** 39:3 51:12 54:11 89:1
159:2
**uh-huh** 87:9 122:21 134:19
152:15 178:3,5 180:24
183:11 187:22 188:1
**uh-huhs** 7:11
**Uh-uh** 129:6
**uh-uhs** 7:11
**ultimate** 164:19 166:15,16
**ultimately** 65:15 121:16
165:2,17 167:13
**ultrasound** 32:8
**uncomfortable** 92:1
**uncoordinated** 61:4
**underestimate** 71:22
**undergo** 22:13
**undergoes** 119:9
**undergoing** 8:17,18 12:8
129:13 142:6
**undergone** 119:7
**undersigned** 192:4
**understand** 6:2 7:11 11:19
26:10 33:19 143:8 150:3
**understanding** 8:11 15:8
44:22,24 65:17 100:1
112:6
**understands** 24:15
**understood** 90:7

**underwent** 60:5
**uneventful** 152:3
**unexpected** 154:9
**unfair** 172:16
**uninterpretable** 90:5 92:10
**unit** 25:18,21 64:8 94:8,9
108:25 122:2 130:20
150:24
**United** 1:1 2:1 90:16 100:4
100:7
**university** 20:22 27:15
157:5
**unmeasurable** 62:3 118:23
**unreasonable** 63:24 64:3
**untimely** 33:15
**update** 155:22
**up-to-date** 4:13 19:13,16
**use** 13:16 14:13 18:6 30:16
32:8 43:20 45:1 51:16
70:23 73:7,13 80:4 82:5
91:6,20 93:22 95:12 99:9
99:10,11,11,15,16
112:21 121:12 124:13
126:2 142:17,25 145:3
149:14 150:1 163:2
164:23 167:4 168:13
**uses** 142:12
**usually** 22:23 27:5 31:19,21
32:11 72:1 84:18 90:24
98:4 104:11,12 124:4,10
128:18,23 157:10 162:5
163:23 164:5 169:23
177:11,11,12 179:13,20
184:11
**UT** 101:1

**V**

**Vanderbilt** 8:22 23:2 29:7
30:8 32:14,16 41:3,3
42:21 50:10,12 53:20
54:16 102:10 157:5,21
158:3
**variable** 111:17
**variables** 75:24 142:20
**variety** 77:21
**vasculatures** 111:1
**vasoconstriction** 111:9,12
**vasodilation** 111:11
**venous** 62:2,4 118:22
119:14
**ventilate** 174:16
**ventilating** 77:16 79:24
110:15 111:24 120:10
124:16 132:17 135:11
139:23 179:4,7 187:19
**ventilation** 60:23 61:6 62:7
73:4 77:3 93:18 94:1
108:18 118:16 123:24,25
125:19 132:17,25 141:7
163:16 178:24 180:7
**ventilator** 93:20
**ventilatory** 86:20 118:10
123:10,23 132:2 134:12
**verbal** 7:10
**verified** 105:13
**versus** 54:10 78:8 94:8
108:15,23 129:17,22
**video** 5:4
**VIDEOGRAPHER** 5:1
80:16,19 93:1,4 113:14

113:17 156:21,24 188:21
189:21,23 190:1
**videotaped** 1:11 2:12 5:2
**violated** 178:17
**visceral** 62:19
**visible** 162:6
**vitae** 4:11,14 17:22 18:15
19:13,17
**vital** 94:10,11 95:3 112:22
113:7,20 115:2,8,9
**vitals** 113:1,4
**vocal** 74:22
**volatile** 70:14 86:25
**volume** 70:17 93:25 110:13
**volumes** 60:15,16,22 70:13
71:2 72:17 73:5 84:9,9
84:11,15,25 86:4 88:6
89:14 108:17 110:11
119:5 123:8 134:12
161:24 174:10 178:22
**voluminous** 37:8
**vs** 1:6 2:6 5:19

**W**

**W** 3:8
**wait** 7:6,7 108:11
**waived** 5:5
**wake** 74:10 123:5 136:22
**waked** 184:25
**wakes** 92:2
**waking** 134:13 184:22,25
**walk** 20:8 127:3,5 189:22
**walked** 36:12 66:6
**walking** 85:16 165:6
**want** 5:23 33:12 35:15 42:8
42:11 47:5 49:22 55:3
62:18 80:13 81:4 103:25
104:24 149:14 155:3,11
155:18 166:12 172:12,14
172:18,19 173:3,8
188:21 189:4
**wanted** 16:16 24:19,21
41:14 173:1
**wanting** 168:12
**washed** 91:17
**wasn't** 72:22 94:2 111:24
125:11 131:21 138:1,2
147:3 182:13 185:10
187:17,19
**wasted** 34:18
**waveform** 68:1
**way** 10:18,20 11:6 21:6
45:23 46:19 62:23 68:3
72:9 74:25 75:21,22
81:13 90:20 91:4 93:19
95:20 98:3 120:10 126:8
170:1 174:20 183:6
187:4
**ways** 72:11 96:1
**weakened** 123:13
**weaknesses** 147:14,20
148:19
**WEDNESDAY** 1:14
**week** 9:18 27:4,5 57:8
**weeks** 10:6 159:23
**weigh** 179:14
**weighed** 52:20
**weighs** 79:2
**weight** 70:23 83:24 84:11
96:10,11 179:21

**well-documented** 70:3 74:4
87:12
**well-explained** 87:12
**well-trained** 148:4
**went** 12:6 93:8 100:4
120:14 143:20 180:22
**weren't** 139:7
**Werkhaven** 158:15
**WESTERN** 1:1,2 2:1,2
**we'll** 15:10 16:7 19:9 47:20
48:17 49:24 66:11 70:24
84:12 105:19 130:7
172:11 177:14
**we're** 5:17 6:3 7:14 19:22
26:23 33:19 49:21 79:15
80:7 104:10,11 112:23
113:14,17 156:21,24
167:21 178:25
**we've** 7:2 45:20,22 46:11
59:7,16 71:12 95:14
105:1 141:7 150:10
155:2 163:11 166:9
174:3
**whatsoever** 150:16
**wheezing** 60:3
**whichever** 73:14
**wife** 26:9
**willing** 69:8
**wise** 91:15
**wish** 150:1
**witness** 5:6 6:8 14:19 20:12
33:16,24 34:1,12 36:1
40:6,10 41:23 42:25
47:11 48:14 49:6 57:7,25
103:2,4,17 116:20
132:12,23 135:9,20
145:15 146:5 159:24
167:9 182:19 183:5,12
188:6,15 189:7
**witnessed** 6:14
**witnesses** 4:20 33:20 37:22
48:19,21 72:23
**wonder** 88:14
**wondering** 17:8 66:15
**word** 162:15 164:23 167:4
168:13 185:8
**wording** 49:10 50:5
**words** 48:8 65:23 108:11
108:13 149:15
**work** 8:12,13,15 22:10
23:12 27:12 57:12
147:25 153:3,7 159:25
**worked** 21:23 24:10 29:9
29:12
**working** 27:23 33:3 67:7
68:9 109:7
**works** 31:14 69:18 153:4
182:24
**wouldn't** 73:12 77:1 85:14
115:22 120:13 122:25
123:7 128:16 136:22
174:20 180:22 186:5
**writing** 88:17
**writings** 46:13
**written** 12:19 28:14 84:22
155:2
**wrote** 34:13 42:3 159:16
**www.depo.com** 1:23

**X**

**x** 4:1,8 86:13,20

**Y**

**yeah** 6:5 14:19 36:1 38:13
39:3,4 47:20 48:15 52:4
52:24 54:7,13 67:9,13
68:16 81:6 82:25 87:11
94:7 95:2,17 109:4
124:16 129:9 145:24
146:25 150:9 153:8,11
154:10 155:24 158:19,25
159:9 166:6 169:13
170:20 174:6 175:18
178:3,5,20 180:15
181:16 182:8,11 185:22
185:23 186:16
**year** 21:12,17 23:10,12,13
28:10,12 30:22,23 44:7
52:10 58:10
**years** 6:8 8:21 30:22 53:21
144:8,12,25 145:13
**Yep** 43:8 92:22 99:24
**young** 24:3 96:9,9 145:18
146:9,18
**Y'all** 159:6

**Z**

**zero** 42:12
**Zofran** 82:18

**$**

**$350** 40:21
**$4,200** 39:22
**$500** 40:24 42:6

**1**

**1** 4:9 17:18,20 72:4 87:16
192:13 193:1
**1.2** 70:6 82:12
**1.25** 70:6
**1:28** 5:4
**1:30** 2:16
**10** 150:10,13
**10:15** 86:11
**10:26** 86:10 88:13 93:12
**10:30** 86:11,14
**10:35** 94:6,8,9
**10:36** 94:8,10
**10:49** 114:21
**100** 60:9,10 70:5 71:2
79:25,25 82:8,11 101:2
111:22 112:8 114:25
174:17
**106/53** 115:5
**11:03** 114:25
**11:20** 115:4
**11:34** 114:3 116:18
**11:59** 117:21,22,23
**110** 81:22
**114** 116:2
**118** 94:16 115:6
**118/56** 114:25
**119** 3:9
**12** 61:18 118:14
**12-year-old** 129:17
**12:04** 61:24 118:18 119:18
**12:18** 118:19 119:17
**120** 70:24,25 114:22
**122** 115:1

**U**

A80609D

## JASON D. KENNEDY, M.D.   JUNE 25, 2014

**129/63** 114:22
**130** 62:3 118:23
**145** 84:16 110:12
**150** 70:20
**157** 4:4
**160s** 60:22
**17** 4:10,11
**180** 84:17 110:12
**189** 4:5
**19** 4:12,14,15

### 2

**2** 4:11 17:21,22 70:20
   87:16,18 93:5 104:24
   105:20 190:2
**2:13-cv-02289-SHL-dkv**
   1:6 2:6
**200** 60:9 82:8 84:16
**2000** 52:1
**2003** 21:17
**2004** 52:3
**2005** 52:2
**2006** 52:2,3
**2010** 8:23 29:5
**2011** 52:11,14
**2012** 52:10,14 97:3
**2014** 1:14 2:15 4:18 5:3
   36:5 191:19
**21** 6:8
**22** 4:18 36:5 70:12,13
   94:17
**22nd** 35:21
**24** 114:24 115:1,6 116:3
**24/7** 27:5
**25** 1:14 2:15 5:3 124:9
**254** 3:4
**26** 33:13
**27-man** 26:23
**288-3376** 1:23
**2900** 3:14

### 3

**3** 60:12 81:12
**3-A** 4:12 19:15
**3-B** 4:13 19:17
**3-C** 4:15 19:18
**3:07** 93:2,3
**3:15** 93:3,6
**3:43** 113:15
**3:46** 113:18
**30** 33:13 124:9
**300** 79:22
**305** 3:4
**336** 191:4
**34** 33:13
**35** 4:17
**36** 4:18
**38103** 3:4,9,15

### 4

**4** 4:16 35:12 36:14 52:1
   82:18 85:13 118:6
   120:12
**4:37** 156:22
**4:44** 156:25
**40** 3:14 20:16 60:15 62:4
**41** 85:10
**416** 84:16
**420** 84:14

**446** 84:10,16
**45** 62:4 86:1 87:3 136:2
**450** 60:16
**48** 4:20 62:12

### 5

**5** 4:2,18 36:6 45:19,19 49:1
   85:13 121:23
**5:20** 190:2,5
**50** 82:16,23 84:1 124:10
**502** 118:14
**523-8153** 3:5
**525-8776** 3:10
**54** 71:17,24
**56** 87:4 110:17
**577-6125** 3:15

### 6

**6** 4:19 48:22 49:2,5 59:8
   72:2 84:14 130:10,14,16
   172:4 173:11,13
**6.5** 78:10
**6.59** 118:22
**6.70** 118:12
**60** 72:2 124:10 136:13

### 7

**7** 4:21 47:24 81:12 92:18
   130:8,8 139:14
**7th** 191:19
**7-21-16** 191:24
**70** 60:14 84:13
**72** 72:13
**747** 73:12
**75** 80:2

### 8

**8** 60:11 81:14 120:11
   140:18
**80** 72:3 80:2 81:22
**80-something** 79:2 84:10
**800** 1:23 3:9
**81** 52:20
**81-kilogram** 110:13
**81-kilos** 96:12
**82** 96:12
**82-kilo** 107:16 129:14
**84/42** 114:7 116:2
**86** 128:2
**86-k** 63:8
**86-kilo** 171:5

### 9

**9** 142:2,3
**901** 3:5,10,15
**92** 4:21
**96** 62:1 72:13 118:13
**99** 79:23 80:3 116:4 125:4

# Curriculum Vitae

**Name:**        Jason D. Kennedy
**Work Email:**    Jason.d.kennedy@Vanderbilt.Edu

## Education

08/1999 - 06/2003    M.D. in Medicine from University of Alabama School of Medicine, Birmingham, AL

## Training

1992 - 1999    B.A. from UAB, Birmingham Alabama

07/2003 - 06/2004    Internship from Carraway Methodist Medical Center, Birmingham, AL

07/2004 - 06/2007    Residency in Anesthesiology from University of Alabama at Birmingham Medical Center, Birmingham, AL

07/2008 - 07/2009    Fellowship in Critical Care Anesthesiology from Emory University Medical Center, Atlanta, GA

07/2009 - 07/2010    Fellowship in Cardio-thoracic Anesthesiology from Emory University Medical Center, Atlanta, GA

## Licensure and Certification

N/A    American Board of Anesthesiology, Diplomat of the ABA of Not Specified

N/A    American board of anesthesiology, Speciality certification in Critical Care medicine of Not Specified

2010 - 06/2020    American Board of Echocardiography, Special Competence in Advanced Perioperative Transesophageal Echocardiography (2010-00022268)

06/2010 - 06/2014    Tennessee medical license, Medical License of Tennessee (46094)

## Academic Appointments

07/2008 - 07/2009    Instructor in Anesthesiology, Department of Anesthesiology, University of Alabama Birmingham-UAB (Birmingham, Alabama)

07/2010 - Present    Assistant Professor of Clinical Anesthesiology, Vanderbilt University (Nashville, Tennessee)

## Professional Organizations

American Society Of Anesthesiologist

Society of Cardiovascular Anesthesiologist

## Professional Activities

### Intramural

10/10 - Present    Therapeutic hypothermia, Medicine, Intensive care represeative to this group, Physician represenative to this group alongwith Dr. Wagner

02/2011 - Present    Pharmacy and therapeutics, Pharmacology, represent intrest of the Department and the hospital to the P and T commitee. Full voting member., Anesthesiology represenative

01/2012 - Present    ICU Ultrasound, Anesthesiology, Developing standardized ultrasound curriculum for Intensive Care Fellows and Anesthesiology Residents

## Teaching Activities

| | |
|---|---|
| N/A | Hemodynamic Echo monitoring: Assesment of LV and RV function and clinical applicability, Simulation center |
| 05/2010 - Present | Lung Isolation in Thoracic Surgery, Instructor |
| 08/2010 - 2011 | Perioperative managment of Aortic Dissections, Lecture and Group discussion, Fellows lecture room |
| 08/2010 - 07/2011 | Postoperative managment of Cardiac surgery patients, lecture and group discussion, Fellows confrence room |
| 09/2010 - Present | Echo in the ICU |
| 10/2010 - Present | Neuroprotection and Cardiac Surgery |
| 11/2010 - Present | Modes of Ventilation in the ICU and OR |
| 12/2010 - Present | ICU for Cardiac Surgery |
| 02/2011 - 02/2011 | Vasoplegia in the Cardiac operating Rooms, Lecture and group discussion |
| 04/2011 - Present | ICU and Cardiac Surgery |
| 05/2011 - Present | ICU and Cardiac Surgery |
| 10/2011 - Present | ICU for Cardiac Surgery |
| 12/2011 - Present | Lung Isolation in Thoracic Surgery |
| 02/2012 - Present | Pulmonary Hypertension |
| 02/2012 - Present | Vasoplegia in the OR and ICU |
| 02/2012 - 02/2013 | Vasoplegia in Cardiac surgery, Lecturer, Monthly lecture on Vasoplegia in CT surgery and Critical Care |
| 09/2012 - Present | Echo Bootcamp for ICU fellows, Course Director, Vanderbilt University, Developed a two day course to acclimate and familirize fellows in the perioperative use of echocardiography and ultrasound for criticaly ill patients. |
| 12/2012 - 2013 | Right Heart Dysfunction in the Operating Room, Lecturer, Lectured for one hour on Right heart failure in the perioperative enviorment |
| 01/2013 - 01/2013 | Medical Student UImmersion COurse: Managment of valvular disorders, Lecturer, Vanderbilt University, Taught A small group case based one hour lecture on valvular abnormalities |

## Other Significant Activities

| | |
|---|---|
| 02/2012 | Blood conservation in the ICU: Developed evidence based approach to Factor VIIa utilization and product managment .This has led to the dramatic reduction in the utilization of Factor VIIa with a costs savings of about half a million dollars in factor VIIa alone. |
| 07/2012 | Course director for Critical Care fellows rotation in Ultrasound/echo: Developed syllabus, course and lecture series for ICU fellows to become profecient in the use of Cardiac, thoracic and occular ultrasound. |
| 11/2012 | Extra-Corpereal Life Support Course : Veno-venous ECMO Course for adult Respitory failure |
| 01/2013 | Medical director of Clinical Perfusion- Vanderbilt University: Clinicl Director of Perfusion- Act as a liason for perfusionist and help to develop protocls for ECMO and transfusion services for VHVI |

## Honors / Awards

| | |
|---|---|
| 2003 | Alpha Omega Alpha Honor Society |
| 2004 | Top Ten Teacher of the Year Award, Department of Anesthesiology UAB |

## Publications

### Non-Peer Reviewed Publications

#### Abstracts

1. Costello W, Billings F, Bick J, Kennedy J, Wagner C. Transesophageal Echocardiography as a Hemodynamic Monitor in Post Operative Cardiac Surgery Patients. 2011 Oct.

**Research Articles**

1. Kennedy JD, Sweeney TA, Roberts D, O'Connor RE. Effectiveness of a medical priority dispatch protocol for abdominal pain. 2003 Jan;89–93. PMID: 12540150.

**Book Chapters**

1. Wagner, Ashby, Kennedy. Anesthesiology: A comprehensive Review for the Written Boards and Recertification Edited by Kai Matthes, Richard Urman, and Jesse Ehrenfeld . 2012 Nov;Chapter 20.

# Presentations

**Invited Presentation – Regional**

1. Tennessee perfusionist society. Nashville, Tennessee. 2011 Sep 24; Colloids vs. Crystaloids in Cardiac surgery.

**Internal Grand Rounds**

1. Grand Rounds Department of Anesthesiology. Nashville, Tennessee. 2013 Feb 1; Perioperative managment of Right Ventricular failure.

**Presentations at Scientific Meetings**

1. Costello, Bick, Wagner, Billings, ASA-SOCCA. American Society of Anesthesiologist; Chicago, Illinois, 2011 Oct; Transesophageal Echocardiography as a Monitor in Post Operative Cardiac Surgery Patients.

In the Matter Of:

DANIEL LOVELACE and HELEN LOVELACE Vs.

PEDIATRIC ANESTHESIOLOGISTS

ROBERT MARSCH

June 09, 2014



R E P O R T I N G

22 North Second Street/Suite 303, Memphis, TN, 38103 (901) 527-1100

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014                                                 11

1   Q.   Well, other than the fact that, that you

2   understand that he was being home schooled, do

3   you know anything else about his grades or

4   educational accomplishments?

5   A.   Not specifically.  No.

6   Q.   Why did you ask for that information

7   then?

8   A.   Well, for instance, if his grades were

9   such that it was, let's say he was seventeen

10  years old, had one, only one additional year

11  of high school, he was in college preparatory

12  classes, he was getting all A's and B's, then

13  I would probably make sure at least that I

14  included the calculation for a bachelors

15  degree.  Or sometimes, I mean, you could even

16  make perhaps a justification if he had a

17  specific career set out.  You could make a

18  justification for calculating an economic loss

19  based on a specific career aspiration.  So I

20  typically will ask for that information.  It

21  doesn't mean I always get it, but I'll often

22  ask for it.

23  Q.   Well, in this case, you didn't get it,

24  did you?



Riverside Reporting Services  |  901.527-1100

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014

12

1    A.    No.

2    Q.    And so you didn't factor in his mental or

3    educational accomplishments, or lack thereof.

4    Is that a fair statement?

5    A.    That's correct.  I treated him as the

6    average statistical individual and provided

7    earnings for a range of different educational

8    attainments.

9    Q.    In a broad sense, what are the, what are

10   these documents that are attached to the

11   e-mail that I just referenced?

12   A.    Those are work papers.  They're entitled

13   age earnings.  They are a set of documents for

14   different levels of educational attainment

15   that take statistical data on earnings by five

16   year intervals and enable me to compute what

17   the earnings would be at different ages.

18   Q.    All right.  I believe that what you

19   handed me, it's says preliminary draft dated

20   5/14.  Is this your most up-to-date report?

21   A.    It is.

22   Q.    Okay.  And then there's a stack of

23   documents that has some handwritten

24   information on the front.  Is that yours?



DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014                                                31

1   assumptions will be, would be applicable in

2   this case, do you?

3   A.   I'm not going to second guess the jurors'

4   decision with regard to where in that range of

5   earnings it would be appropriate to put Brett.

6   Q.   You could have made a fourth category --

7   well, at least another calculation based on

8   this statistical information involving a white

9   male who does not complete high school,

10  couldn't you?

11  A.   I could have.  On the other hand, he is

12  home schooled.  And so the statistics

13  available for those who are home schooled are

14  not readily available.  In other words, I

15  don't have age earnings data for home schooled

16  children.  I do know that home schooled kids

17  have a somewhat higher likelihood of attending

18  college than a high school kid.  But I don't

19  have age earnings data for home schooled

20  children so I have not used it.

21  Q.   So the same source that you used for high

22  school graduate, some college, and college

23  graduate, it doesn't have that same

24  information regarding someone who has not



Case 2:13-cv-02289-SHL-dkv   Document 129   Filed 08/12/14   Page 103 of 108   PageID
1652
Case 2:13-cv-02289-SHL-dkv   Document 128-4   Filed 08/09/14   Page 9 of 14   PageID 1544

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014                                                    32

1   completed high school?

2   A.    Well, it has high school dropouts.   But I

3   don't know how you become a home schooled

4   dropout.   Assume that home schooled kids,

5   they, they take tests which gives them some

6   sort of certificate for essentially having

7   completed high school.   But I don't know that

8   they are what I would call a high school

9   graduate.

10  Q.    Well --

11  A.    So I don't know what, you know, a home

12  schooled dropout would be.   And I'm not sure

13  at all a home school dropout would be the same

14  set of earnings as that for a, you know, high

15  school drop out.

16  Q.    Well, if you have a GED, doesn't that at

17  least tell someone that that person has the

18  equivalent of a high school education?

19  A.    Yes.   Some of those statistics combine

20  high school and GED educational attainments

21  together.   That's correct.

22  Q.    Okay.   But if someone drops out, whether

23  they're dropping out from home school or

24  dropping out from formal school, that's a high



Riverside Reporting Services | 901.527-1100

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014                                                    33

1    school dropout, isn't it?

2    A.    I don't know that I would consider that.

3    I don't know -- you know, when you talk about

4    ninth grade and tenth grade, I don't know

5    where that comes within the home school side

6    of things.  I'm simply not an expert on home

7    school, and there's not a whole lot of

8    statistics with regard to the educational

9    attainment of those who are home schooled that

10   I feel comfortable relying on it.

11         Moreover, if you look at the

12   statistics for high school, you're talking

13   about 70 percent.  And you can compute them

14   based on the data that I gave you.  But you're

15   looking at -- well, let's be specific.

16         If you look at those with a high

17   school education -- excuse me.  Look at those,

18   I'm sorry, with a high school, ninth to

19   twelfth non-graduate.  Out of 54 million

20   people, there's only 2.298 that have ninth to

21   twelfth non-graduate.  And another 487,000

22   that have less than ninth grade.

23         So the numbers that you're talking

24   about, while you could have included a range



Riverside Reporting Services  |  901.527-1100

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014

34

1    statistically, not only do I not have data for

2    home school, the statistical number of those

3    folks that don't graduate from high school is

4    insignificant compared to the other ranges for

5    which I've provided data.

6    Q.    All right.  Do you think that it would be

7    advantageous, from a potential earnings

8    category, that Brett failed kindergarten, was

9    diagnosed with a learning disability, by the

10   time he was in the sixth grade he could only

11   read on a second grade level?  Do you think

12   that that says a lot about his potential

13   earning --

14          MR. LEDBETTER:  Object as to form.

15   You can answer.

16          THE WITNESS:  I don't have an

17   opinion on that.  That requires the expertise

18   from a medical perspective or a vocational

19   expert perspective, and I'm not trained in

20   either fields.

21   Q.    (BY MR. JOHNSON:)  Well, you're using it

22   in part of your calculations there, a high

23   school graduate; correct?

24   A.    Correct.



Case 2:13-cv-02289-SHL-dkv   Document 129   Filed 08/12/14   Page 106 of 108   PageID
1655
Case 2:13-cv-02289-SHL-dkv   Document 128-4   Filed 08/09/14   Page 12 of 14   PageID
1547

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014                                                    35

1   Q.    Okay.  If you can't read but on a second

2   grade level, you're not going to be a high

3   school graduate, are you?

4   A.    Well, it depends on what age you're

5   talking about and how long you have to get

6   through high school.  If you're talking about

7   someone who was in grade school or even in

8   ninth grade, they may well improve their

9   reading.  And in fact, I would have to say at

10  the University of Arkansas, we have folks that

11  start college whose reading, they had to go

12  through remedial reading just to survive in

13  college at Fayetteville.  And so I don't think

14  that's determinative of how far one would get

15  in their educational attainment.

16  Q.    It's not a good sign though, is it?

17  A.    Well, again, you're beyond my --

18  Q.    Would you answer me, sir, with you

19  answer.  It's not a good sign, is it, if you

20  can't read but on a second grade?

21         MR. LEDBETTER:  Object as to the --

22         THE WITNESS:  At what age?  If

23  you're saying at age, at sixth grade, if you

24  can't read --

**riverside**
R E P O R T I N G

Riverside Reporting Services  |  901.527-1100

Case 2:13-cv-02289-SHL-dkv   Document 128-4   Filed 08/09/14   Page 13 of 14   PageID 1548

DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014

36

```
 1   Q.    (BY MR. JOHNSON:)   Yes.
 2   A.    -- at seventh grade level.
 3   Q.    Yes.
 4   A.    No.   I would say if you, if your reading
 5   is slow, that's not a good sign.   Whether it
 6   means a difference in your earnings or not,
 7   no.   I don't have an opinion.
 8   Q.    If you wanted to, could you prepare a
 9   fourth column on people who have not graduated
10   from high school?
11   A.    Yes.   You could look at the same data
12   that I looked at and calculate the age
13   earnings data for a ninth to twelfth grade, or
14   a non-ninth grade graduate as to -- as I said,
15   the statistical likelihood of that is not
16   great, but you certainly can calculate it.
17   Q.    All right.   And in round numbers, the
18   overall earning capacity of someone in that
19   category, one who has not graduated from high
20   school, is what, in the range of 25 percent
21   less than a high school graduate?
22   A.    Average earnings of a graduate, including
23   GED, is 42,157.   High school, ninth to twelfth
24   is 26,833.   So 25 percent less.   Actually, it
```



DANIEL LOVELACE and HELEN LOVELACE Vs. PEDIATRIC ANESTHESIOLOGISTS
MARSCH, ROBERT on 06/09/2014                                                    37

1   shows less than ninth grade as being an

2   average of 33,659, even greater than that with

3   a ninth to twelfth grade non-grad.  But would

4   it be less?  Yes.  I haven't calculated

5   whether it would be 25 percent or not, but

6   that may be close.

7   Q.   In round numbers, that's good enough,

8   isn't it?

9   A.   That may be close.  I would like to

10  calculate it, but I am -- that may be correct.

11  Q.   Well, you said 42,000 versus?

12  A.   28.  Well, if you took the average of

13  them, you would be looking at the average of

14  33 and 26.  So I would say 30, 42 to 30,

15  that's 12 divided by 42.  Yeah.  It would be

16  25 percent.

17  Q.   Okay.  I'm not an economist, but I did

18  figure that up.  Will you accept that?

19  A.   Yes.

20  Q.   Okay.  Thank you.  Now, in making your

21  calculations, you intended to replace what

22  Brett might have earned in his lifetime;

23  correct?

24  A.   I didn't intend to replace.  I simply



Riverside Reporting Services  |  901.527-1100