## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESESEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

    Plaintiffs,

Vs.                                                         No. 2:13-cv-02289 dkv
                                                          JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and
MARK P. CLEMONS,

    Defendants.

**RESPONSE OF DEFENDANTS', PEDIATRIC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, M.D.'S TO PLAINTIFF'S PARTIAL MOTION IN LIMINE TO EXCLUDE PROPOSED EXPERT WITNESS TESTIMONY OF TIMOTHY W. MARTIN, M.D., IRA LANDSMAN, M.D., DWAYNE ACCARDO, CRNA, DIANE DOWDY, RN AND EDWARD BRUNDICK, III, AT TRIAL**

        Come now the defendants, Pediatric Anesthesiologists, P.A. and Babu Rao Paidipalli, M.D., by and through counsel of record, and in response to Plaintiffs' Partial Motion in Limine to Exclude Proposed Expert Witness Testimony of Timothy W. Martin, M.D., Ira Landsman, M.D., Dwayne Accardo, CRNA, Diane Dowdy, RN and Edward Brundick, III would show to the Court as follows:

### BACKGROUND

        This is a health care liability action in which plaintiffs, Daniel and Helen Lovelace, assert a claim for medical malpractice against Pediatric Anesthesiologists, P.A., Babu Rao Paidipalli, M.D., (a pediatric anesthesiologist) and Mark D. Clemons, M.D. (an otolaryngologist), and also assert a claim against these defendants for negligent infliction of emotional distress based upon

alleged medical malpractice in the care provided to plaintiffs' twelve year old son, Brett Lovelace, at Methodist Le Bonheur Children's Medical Center, following a tonsillectomy/adenoidectomy surgery on March 12, 2012, allegedly resulting in Brett Lovelace's death on March 14, 2012.  (ECF 1, paragraphs 8 – 12.)   Defendants deny any medical negligence on their part and deny that they caused injury to, and the subsequent death of the patient, Brett Lovelace. (ECF 13, paragraph 3.)  Plaintiffs settled with Methodist LeBonheur pre-suit based upon the egregious care rendered by a nurse in the recovery room, which included fraudulent documentation of the child's vital signs and playing on Facebook and another website while charged with monitoring the child. The nurse's license was later revoked as a result of her actions.

On August 8, 2014, Plaintiffs moved in limine to exclude expert testimony under the case of *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 286 (1993) and Rules 701-703 of the Federal Rules of Evidence. (ECF 126).  Plaintiffs primary objections to the listed defense expert witnesses are that they "contradict statements under oath of the Defendant, Paidipalli, their patron, so as to revive his defense; they express opinions outside their respective areas of expertise and assert legal opinions; they also offer opinions that lack reliability under any stated methodology, lack peer-review support, demonstrate no established rate-of-error, which opinions are also not shown to be generally accepted in the relevant medical community. Moreover, the opinions are "for this litigation" only, and are, thus, deficient." (ECF 126; pages 2-3).

For the reasons discussed below, these defendants respectfully urge the Court to deny Plaintiffs' motion.

## LAW AND ARGUMENT

### A. Response to Plaintiffs' Daubert Challenges

District Courts under *Daubert* and Rule 702 are charged to act as "gatekeepers" to ensure that the expert testimony presented to a jury is not only relevant under Rule 104 of the Federal Rules of Evidence, but also reliable. In a medical malpractice case, expert testimony is required to establish the recognized standard of acceptable practice, whether the conduct of the defendant(s) has departed from that standard, and whether the deviation from the standard of care caused an injury. (Tenn. Code. Ann. § 29-26-115).

Defendants aver that *Daubert* should not apply to expert testimony in a medical malpractice case. Rather, the *Daubert* test should only be used when deciding the admissibility of novel scientific evidence. Testimony regarding standard of care is based upon a medical expert's specialized medical knowledge from training and experience, not novel scientific evidence.

In *Dickenson v. Cardiac & Thoracic Surgery of East Tennessee, P.C.*, 388 F. 3d 976 (6th Cir. 2004), the Sixth Circuit analyzed the application of *Daubert* in a medical malpractice case. Similar to the facts of the present case, *Dickenson* involved allegations that the plaintiff was extubated prematurely following heart bypass surgery. The plaintiff sued a cardiac/thoracic surgery group and pulmonologist alleging that as result of the patient's premature extubation, plaintiff suffered brain damage. The parties consented to trial before a magistrate judge. After the magistrate excluded testimony of plaintiff's medical experts pursuant to *Daubert*/FRE 702 and granted summary judgment to defendants, plaintiff appealed.

3

On Appeal, the Sixth Circuit noted that in excluding the expert, the district court erroneously relied upon a belief that the "expert must demonstrate familiarity with accepted medical literature and or published standards in these other areas of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702." *Id.* at 980. The Court noted that Rule 702 expressly contemplates that experience can serve to qualify an expert. *Id.* The Court went on to state:

> In sum, *Daubert's* role of "ensuring that the courtroom door remains closed to junk science," *Amorgianos v. AMTRAK,* 303 F. 2d 256, 267 (2d Cir. 2002), is not served by exluding testimony such as [the medical expert] that is supported by extensive relevant experience. **Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability.** *See generally* Daniel W. Shuman, *Expertiens in Law, Medicine, and Health Care,* 26 J. Health Pol. Pol'y & L. 267 (2001) (characterizing the effect of *Daubert* and *Kumho Tire* cases on claims of medical expertise as "much ado about little," while noting that these cases have had a significant effect on toxic tort and product liability litigation).

*Dickenson,* 388 F. 3d at 982. (Emphasis added)

While Defendants deposed all of Plaintiffs' experts and appropriately inquired into the background of the witnesses and the qualifications to offer the opinions expressed, Plaintiffs' counsel chose not to take the depositions of any of Defendants experts. As such, it is premature for Plaintiffs to claim that Defendants' experts should be excluded under *Daubert* because "[t]he witness[es] cite[s] no current standard, clinical guideline, text or authoritative source, nor does [the witness] use reliable methods…"  Because the challenged witnesses were never deposed, the methodology used in arriving at their opinions has not been fully explored   Moreover, as the Sixth Circuit noted in *Dickenson*, the Court should not exclude a medical expert's testimony in a medical malpractice case that is based upon relevant experience.  *Id.*

In compliance with Rule 26 (a) (2) each Defense expert submitted a report setting forth a brief summary of their opinions and the facts relied upon in forming those opinions. (See Exhibit A – Rule 26(A)(2) Expert Disclosures of Defendants' Pediatric Anesthesiologists, PA, and Babu Rao Paidipalli, M.D)  Each expert supplied a CV setting forth their qualifications and provided a general framework of the bases for their opinions.  Again, these experts have not been deposed so they have not been asked about the methodology used to arrive at their opinions; but all will rely upon their vast education, training and experience.  All of defendants experts are supremely qualified to testify based upon their specialized medical knowledge acquired through their training and experience.

Unlike Plaintiffs' anesthesia expert, Dr. Kennedy, whose practice is limited to adults (and mainly cardiac patients), defendants' experts work exclusively with pediatric patients. A review of the curriculum vitae of pediatric anesthesiology experts, Dr. Martin and Dr. Landsman, set forth their extensive qualifications and publications in the field of pediatric anesthesia. Dr. Martin is a professor and Chief of the Division of Pediatric Anesthesiology at University of Arkansas Children's Hospital.  He has been a pediatric anesthesiologist since 1988.  He has published extensively, including writing a book chapter on Pediatric Airway. (<u>The Emergency Airway</u>, New York, Prentice Hall, 2007). Dr. Landsman did a fellowship in Pediatric Critical Care (1984-1985), Pediatric Emergency Care (1985-1986), and Pediatric Anesthesiology (1993). He has lectured on numerous occasions in pediatric anesthesia, published extensively in the field of pediatric anesthesia, **even having published a textbook chapter on "Anesthesia for Pediatric Otorhinolaryngologic Surgery" in** <u>**Smith's Anesthesia for Infants and Children**</u>, the very issue involved in this case.

Plaintiffs' *Daubert* motion attempts to challenge the opinions of Dr. Martin and Dr. Landsman by relying upon an article in *Anesthesia Analgesics* as well as A.S.A. Clinical Practice Standards to establish the recognized standard of care on topics such as patient hand-overs, and recovery position of a post-operative patient in the ICU. Yet no expert has testified that these or any other publications are reliable and authoritative sources that establish the recognized standard of acceptable professional practice in this case pursuant to TCA § 29-26-115. Plaintiff has the burden of proof in a medical malpractice case to establish the standard of care through an expert, not an article or a practice guideline. Defendants aver that plaintiff is attempting to improperly use *Daubert* in a medical malpractice case.

Defendants' also disclosed CRNA expert, Dwayne Accardo. Plaintiffs' motion in limine challenges the qualifications of Mr. Accardo on the grounds that he is not a physician. Plaintiffs also argue that his opinions are based on erroneous facts because they claim that no witness has placed Grace Freeman in the PACU[1]. Again, defendants aver that Plaintiffs' motion is premature, especially where the experts have not been deposed. Defendants dispute that the facts relied upon by this expert are erroneous. Mr. Accardo's expert opinions are based upon his training as a Certified Registered Nurse Anesthetist and his knowledge of the recognized standard of acceptable professional practice for anesthesiology treatment and care and post-op anesthesia care of pediatric patients and his experience as a PACU nurse. (See Exhibit A). Plaintiffs have submitted no expert proof that the role of a CRNA differs from an anesthesiologist as it relates to anesthetizing pediatric patients such as Brett Lovelace and the uncontroverted proof based upon Defendants' expert submissions is that they are the same. At best, Plaintiffs' challenge to Dwayne Accardo's qualifications and anticipated testimony would be proper cross examination but not a *Daubert* challenge.

---

[1] Ms. Freeman has not been deposed so her version of the events has not been established.

Moreover, at the time that these Defendants submitted expert disclosures, the PACU nurse Kelly Kish had not yet been deposed and additional facts were made available through her deposition which would augment the opinions of these experts. Plaintiffs rely solely upon the Rule 26 disclosures of these Defendants filed pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure to challenge the methodology used.  (Attached as Exhibit A)  However, the disclosures clearly set forth that:

> This designation is intended to provide a basic summary of the opinions which these defendants anticipate the witnesses will offer.  It is not intended to be an exhaustive or complete recitation of each and every opinion or belief that the designated witness may offer.  Many opinions may be offered in response to questions posed by opposing counsel and cannot reasonably be anticipated until such time as the expert is deposed or questioned at the time of trial.  In addition to the opinions set forth herein, these expert witnesses are expected to comment upon and refute the opinions, to the extent of their expertise, of any expert witness of the Plaintiff or another party who has opinions contrary to those set forth herein
>
> This defendant reserves the right to supplement this designation as additional information becomes available.  The experts identified by these defendants may adopt and rely upon the opinions expressed by all other experts disclosed by the defendants in this matter.

See Exhibit A – (Rule 26(A)(2) Expert Disclosures of Defendants' Pediatric Anesthesiologists, Pa, and Babu Rao Paidipalli, M.D)

Defendants' disclosed Diane Dowdy, RN to offer opinions in support of the comparative fault allegations raised by these Defendants against LeBonheur PACU nurse, Kelly Kish.  Her CV produced with the disclosure sets forth her experience.  (See Exhibit A).  Plaintiffs' challenge Nurse Dowdy on the grounds that no scientific evidence was used, no testing done, and no known methodology stated. It bears repeating that the recognized standard of acceptable professional practice is not set forth in a guideline or hospital standard. Rather, it is the education, training and experience of a medical expert that makes their testimony reliable in a medical malpractice case. She was not offered to give medical opinions as the plaintiffs'

7

challenge suggests but instead opine on the standard of care for nurses practicing in Memphis, Shelby County, Tennessee. Further, Nurse Dowdy has not been deposed so the methodology used to arrive at her opinions has not fully been explored.

Finally, plaintiffs challenge the opinions of economist, Edward Brundick, III. Mr. Brundick's opinions are both reliable and relevant. There can be no doubt but that Mr. Brundick is qualified. He holds not only a MBA but also a law degree. His opinions are relevant to refute the opinions of Plaintiffs' economist expert, Jay Marsh, who failed to take into consideration in his calculations of lost future earnings the possibility, based upon Brett Lovelace's education records, that he likely would not have completed high school. On the other hand, Mr. Brundick's assumptions are reasonable and based upon the facts contained in Brett Lovelace's records. Plaintiffs argue that Mr. Brundick's opinions exceed his stated area of expertise, but again, they failed to depose the expert to explore his qualifications and experience.

### B. The principles of Judicial Estoppel and Estoppel by Oath do not apply to limit the opinions of Defendants' experts

Plaintiffs contend that Dr. Paidipalli and Pediatric Anesthesiologists, PA should be judicially estopped to assert two positions in their defense of the Plaintiffs' claims: 1) that supplemental oxygen was not required for Brett Lovelace in transit or in the PACU; and 2) that the positioning of Brett Lovelace in the prone or face down position while in the PACU was not a deviation from the standard of care.

In making this argument, Plaintiffs incorrectly rely upon Tennessee's doctrine of judicial estoppel. Plaintiffs rely upon numerous Tennessee cases including, but not limited to, the case of *Werne v. Sanderson*, 954 SW2d 742 (Tenn. App. 1997) in support of the argument that defendants should be judicially estopped to present expert proof of the opinions set forth above.

8

However, this Tennessee case law is inapplicable in this Federal Court case. The Sixth Circuit has instead held, even in diversity actions, that federal law rather than state law governs the application of the doctrine of judicial estoppel in federal courts. *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 n. 4 (6th Cir. 1982). For example, the United States District Court for the Middle District of Tennessee applied federal law in *Hickory Specialties, Inc. v. Forest Flavors Int'; Inc.,* 12 F.Supp 2d. 760, 771 (M.D. Tenn. 1998):

> The doctrine of judicial estoppel raises questions of whether it is best classified as substantive or procedural and, hence, whether a federal court sitting in diversity should apply state or federal law. (internal citations omitted). Without addressing the nature of the doctrine - - whether it is a substantive or procedural doctrine - - the Sixth Circuit has determined that the doctrine raises primarily federal interests, and that federal law should therefore control. (internal citation omitted).

*Id.* Federal law controls because the essential function of judicial estoppel is to prevent intentional inconsistency. The object of the rule itself is to protect the judiciary, as an institution, from the perversion of judicial machinery. *Edwards*, at 599 (citing *Allen v. Zurich Ins. Co,*., 667 F.2d at 1167; *Konstantinidis v. Chen*, 626 F.2d at 939).

The United States Court of Appeals for the Sixth Circuit recently applied federal law to a legal malpractice claim in which the doctrine of judicial estoppel was raised. *Watkins v. Bailey*, 2012 U.S. App. LEXIS 10697, (6th Cir. May 25, 2012) (Attached hereto as "Exhibit B").[2] The *Watkins* Court noted that the rule of judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase. *Id.* (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Although the contours of this doctrine are not defined, courts have identified several facts which inform the decision whether to apply the doctrine in a

---

[2] The *Watkins* Court acknowledged that the district court had incorrectly relied on Tennessee's doctrine of judicial estopel, then applied the correct federal doctrine.

9

particular case. *Id.* The factors include the following: (1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether the party has successfully persuaded a court to accept that party's earlier position, such that judicial acceptance in a later proceeding creates the perception that one of the two courts was misled; and (3) whether an unfair advantage or detriment would result. *Id.* (citing *New Hampshire*, at 750-51). Additional considerations may inform the doctrines' application in specific factual contexts. *Id.* In the case at bar, Plaintiff is unable to meet any of these burdens with respect to persuading this court to enforce the federal rule of judicial estoppel.

      No inconsistencies exist at this stage of the litigation.  Plaintiffs completely ignore the fact that the cited testimony of Dr. Paidipalli was not offered by Defendants affirmatively taking a position on the standard of care that applies in this case. Rather, Dr. Paidipalli was being deposed by the plaintiffs' counsel and was responding to questions asked, not about the standard of care, but what Dr. Paidipalli remembers having occurred in this case. Plaintiffs argue that because Dr. Paidipalli testified in his deposition that it was standard to transport patients on supplemental oxygen, Defendants' experts should not be permitted to express an opinion to the contrary. Defendants' would point out that Dr. Paidipalli did not testify that the recognized standard of acceptable professional practice required Brett Lovelace to be on supplemental oxygen as Plaintiffs' counsel suggests.  Rather, the following exchange took place:

      **Q:**    **Okay.  Did you order supplemental oxygen for him in the PACU?**

      **A:**    **Yes, sir.**

      **Q:**    **You ordered supplemental oxygen?**

A: Yeah. We have a standard order saying that, you know, that the patient needs O2 supplementation to maintain the saturation of 92 or 95 and above.

Q: All right. My question was when he left the surgery was he on supplemental oxygen.

A: Yes, sir.

Q: Okay. And when he arrived in the PACU, even though you were not there, was he on supplemental oxygen, do you think.

A: I think.

Q: All right.

A: That is the routine to have a supplemental oxygen in the recovery room.

(Deposition of Dr. Paidipalli, P. 18, lines 13-24; P. 19, lines 1-8. – Exhibit F to Plaintiffs' Motion)

…

Q: Did you issue instructions or orders for Brett to be on continuous positive airway pressure after he was transported?

A: We have a standard; not a continuous airway pressure, but continuously getting oxygen to the patient by a face mask.

Q: Okay. And what you are saying is he was continuously on oxygen until he was fully awake?

A: Supposed to be, yes.

**(Deposition of Dr. Paidipalli, P. 39 lines 5-16, Exhibit F to Plaintiffs'**

**motion)**

Plaintiffs' argue that this testimony is inconsistent with the opinions of Defendants' experts, Dr. Martin and Dr. Landsman. In reality, no contradiction exists. First, Defendants' would point out that the Dr. Paidipalli, in his testimony cited above, was not asked about what the recognized standard of acceptable practice required; rather, the questions posed were to him were factual. Dr. Paidipalli testified that it was standard to have a patient receive supplemental oxygen in order to maintain the O2 sat at 92 to 95%. The medical records, however, indicate that Brett's O2 sat was 100% leaving the OR. Therefore, it follows that supplemental oxygen would not have been needed even if it was ordered by Dr. Paidipalli.

Defense expert, Ira Landsman, M.D. states in his report: "The recognized standard of acceptable professional practice does not require that a patient arriving to the PACU from the OR receive supplemental oxygen in the PACU. The standard of care only requires a patient to receive supplemental oxygen when the patient has difficulty maintaining oxygen saturation either in the operating room or during the time the patient is monitored in the PACU. On arrival to the PACU Brett's $O_2$ saturation in the OR was 100%. The medical records reflect that the patient maintained an $O_2$ sat of 100% when he arrived in the PACU." (See report of Dr. Ira Landsman, Exhibit A).

Dr. Timothy Martin similarly notes that standard of care requires a patient be sent from the OR to the PACU with supplemental oxygen if the patient is having difficulty maintaining SATs in the OR and in this case Brett's O2 sat was 100% when he left the OR and remained at 100% in the PACU when the CRNA turned over Brett's care to the PACU nurse, Ms. Kish. (See report of Dr. Timothy Martin, Exhibit A.).

Defense expert, Dwayne Accardo, CRNA's opinions are similarly consistent. He states in his report:

> The recognized standard of acceptable professional practice in this community does not require that a patient be sent to the PACU on supplemental oxygen. In fact, the greater majority of patients do not receive supplemental O2 in route. The only time supplemental oxygen is mandated by the standard of care is when the patient is not maintaining their SATs in the OR. Here, Brett's oxygen saturation at the time he left the OR, when he arrived in the PACU, and when CRNA Freeman left the PACU, was 100%. Therefore, the anesthesia team complied with the standard of care in all respects with regard to monitoring the patient's oxygen level. The records indicate that Grace Freeman sent the patient to the PACU with a Jackson Reese O2 delivery system, which can provide "blow by" oxygen (a tube blowing oxygen by his face). As stated above, the standard of care does not require that a patient receive supplemental oxygen in route to the PACU. The fact that the CRNA sent him to the PACU with the Jackson Reese is over and above what is required by the standard of care.

(See report of Dwayne Accardo, CRNA, Exhibit A)

Plaintiffs' further argue that Dr. Paidipalli has attempted to take an inconsistent position with his expert proof by asserting that the prone, face-down position of Brett Lovelace in the PACU was "consistent with ordinary care or was in fact safe." (Plaintiffs' Motion in Limine, ECF 126, P. 14) Plaintiffs' cite to testimony in Dr. Paidipalli's deposition where he testified as follows:

**Q: Okay. Well, current practice concerning the apnea that we are discussing is not to allow them being on their fact because that blocks the airway.**

**A: No patient should be. It doesn't matter whether it is sleep apnea patient or any patient should not be on the mouth in the bed.**

(Deposition of Dr. Padipalli, P. 48, lines 11-16, attached to ECF 126 as Exhibit F).

Plaintiffs have completely mischaracterized Dr. Paidipalli's testimony and defendants' expert proof. No expert will offer opinions in this case that it was within the standard of care to

13

allow Brett Lovelace to remain prone, with his face down on the bed, unable to breathe. Rather, the testimony that will be elicited from the Defendants' experts, consistent with both Dr. Paidipalli's deposition and these defendants' expert disclosures, is that the prone position is acceptable if the patient's head is turned allowing the patient to adequately breathe.

>Dr. Ira Landsman states in his report:

>Regarding the patient's repositioning himself to a prone position at some point following the surgery, it is not unusual for children to reposition themselves onto their stomachs after extubation, and it is not a deviation from the standard of care to allow a patient to reposition himself to a prone position **so long as the patient's head is turned to the side and the patient is breathing adequately**. In fact, such a position may be better in some cases with regard the risk of aspiration. In this case, at all times when the patient was under anesthesia's watch, the patient's position allowed him to breathe adequately. It would have been the PACU nurse's responsibility to monitor the positioning of the patient as well as the patient's vital signs to insure that his airway remained patent in that position. (Emphasis added).

>Dr. Timothy Martin's report states:

>[I]t is my opinion that it is not unusual for children to roll onto their stomachs or onto their sides after extubation; generally patients turn to whatever if most comfortable for the patient and it is not a deviation from the standard of care to allow a patient to reposition himself to a prone position **so long as the patient is being monitored to insure that his head is turned to the side a little bit**. The PACU nurse would have had the responsibility to monitor the patient's position and whether the patient's vital signs remained stable and airway patency in that position. In this case, the PACU nurse failed to properly monitor the positioning of the patient. (Emphasis added).

(See Exhibit A, reports of Dr. Timothy Martin and Dr. Ira Landsman)

Application of judicial estoppel is also improper due to no showing of the Plaintiffs that this Court has in any way judicially accepted this alleged "prior position." In fact, if anything, the Defendants have presented to the court information completely consistent with their alleged "new position" through their expert reports. The integrity of the judicial process should not be viewed as in jeopardy simply because this Defendant made factual statements concerning the

14

care and treatment of Plaintiff when asked in his deposition. Therefore, not only has there been no prior inconsistent position, but there has also been a complete lack of judicial acceptance.

Finally, this Defendant would obtain no unfair advantage were the doctrine deemed not to apply. This Defendant cannot enjoy an unfair advantage because the Defendant never affirmatively discussed the standard of care during the portions of his testimony to which Plaintiffs cite. Furthermore, Plaintiffs intentionally chose not to depose any of the Defendants' experts about these opinions on the standard of care in this case. No additional considerations exist to support the application of the equitable doctrine of judicial estoppel in this case. The rationale underlying the theory of judicial estoppel is the preservation of the sanctity of the oath and the elimination of prejudice in the administration of justice. *Watkins*, at *16 (quoting *McKay v. Owens*, 130 Idaho 148, 937 (Idaho 1997). This Defendant is not deliberately shifting his position to suit the exigencies of each particular phase of the case that may arise.

While Defendants' maintain that the plaintiff has incorrectly relied upon Tennessee jurisprudence regarding judicial estoppel and estoppel by oath in a District Court case, there has been no sworn statement offered by Defendants' which is inconsistent with the opinions of Defendants' experts. Additionally, no showing has been made of a judicial acceptance of such a position. Defendant enjoys no unfair advantage, and no additional circumstances exist to support the application of judicial estoppel. As such, this Court should deny Plaintiffs' Motion in Limine to preclude these Defendants' from presenting proof that supplemental oxygen was not required for Brett Lovelace in transit or in the PACU and that the positioning of Brett Lovelace in the prone or face down position while in the PACU was not a deviation from the standard of care.

## **CONCLUSION**

Based upon the foregoing, Defendants' respectfully urge the Court to deny Plaintiffs' Partial Motion in Limine.

                By:    <u>s/ W. Bradley Gilmer</u>
                         JERRY O. POTTER (4284)
                         W. BRADLEY GILMER (21490)
                         KAREN S. KOPLON (16282)
                         Attorneys for Defendants, Pediatric
                         Anesthesiologists, P.A. and
                         Babu Rao Paidipalli, M.D.
                         THE HARDISON LAW FIRM, P.C.
                         119 S. Main Street, Suite 800
                         Memphis, Tennessee 38103
                         (901) 525-8776
                         jpotter@hard-law.com
                         bgilmer@hard-law.com
                         kkoplon@hard-law.com

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true and correct copy of the foregoing has been served via the Court's electronic filing system upon:

| | |
|---|---|
| Mark Ledbetter, Esq. | J. Kimbrough Johnson, Esq. |
| Halliburton & Ledbetter | Marcy Dodds Magee, Esq. |
| Attorney for Plaintiffs | Attorneys for Defendant, Mark P. |
| 254 Court Avenue | Clemons, M.D. |
| Suite 305 | Thomason, Hendrix, Harvey, Johnson & |
| Memphis, TN 38103 | Mitchell, PLLC |
| | 2900 One Commerce Street |
| | Memphis, TN 38103 |

this 21st day of August, 2014.

                                            s/ W. Bradley Gilmer
                                            W. BRADLEY GILMER