IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

_____

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as
Parents of BRETT LOVELACE, deceased,

      Plaintiffs,

vs.                                     NO.:    2:13-cv-02289 dkv
                                            JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and,
MARK P. CLEMONS,

      Defendants.

_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS, PEDIATRIC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, M.D.'s MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' DESIGNATED EXPERT WITNESSES, JASON KENNEDY, M.D. and ROBERT E. MARSH UNDER F.R.E. 702/*DAUBERT* AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

_____

Come the Plaintiffs, Daniel Lovelace and wife, Helen Lovelace, Individually, and as

Parents of Brett Lovelace, deceased, by counsel, and for their Response to Defendants, Pediatric

Anesthesiologists, P.A., and Babu Rao Paidipalli, M.D.'s Motion to Exclude Opinions of

Plaintiffs' Designated Expert Witnesses, Jason Kennedy, M.D. and Robert E. Marsh under

F.R.E. 702/*Daubert* Memorandum of Law in Support of Motion, states:

    1.      In the Movant's "Background," it is stated that the fraudulent documentation of

Brett Lovelace's vital signs were part of the reason for the prior settlement with Le Bonheur;

first, there is evidence here that Movant engaged in fraudulent documentation [sic] in this matter,

as has Defendant, Clemons, based upon proof in the case;[1] second, any such prior settlement is not admissible, nor is it a credit to be used against any verdict against Movant, nor is it a proper discussion here under Tennessee law.[2]

2.      Movant argues that Jason Kennedy, M.D. is an adult cardiovascular anesthesiologist.  In truth, Jason Kennedy, M.D. is a Board Certified General Anesthesiologist as is Dr. Babu Rao Paidipalli; Dr. Paidipalli lacks any fellowship training nor any certification in pediatric anesthesia, nor does he have any membership in the Society for Pediatric Anesthesia. Paidipalli's curriculum vitae, public advertisements and medical career record demonstrate that he is only a general anesthesiologist.[3] Thus, any argument relative to the distinction between Drs. Kennedy and Paidipalli on the basis of the latter being a fellowship–trained, tested and certified pediatric anesthesiologist, are devoid of merit.

3.      Plaintiffs submit the following Brief in support of their response.

## BRIEF

### Jason D. Kennedy, M.D. – Medical Expert

Plaintiffs agree with case law and general theories of expert qualifications that are provided on pages 3 and 4 of the Movant's Motion.  However, there is no basis in the cited cases

---

[1] Grace Freeman, CRNA, made a record entry in Brett Lovelace's Le Bonheur record that stated that when he arrived in the PACU, after his surgery, she conducted a proper "hand-off" to Kish; however, Nurse Kelly Kish testified that neither Freeman nor Paidipalli were present or attended Brett Lovelace in the PACU [Kish Dep. 125:8-23], which makes the Freeman entry fraudulent.  Further, Clemons' operative report was written almost four (4) hours prior to the surgery, was revised and re-transcribed, which, likewise, demonstrates possible fraudulent record-keeping on his part.  [Clemons Dep. 6:3-24; 7:1-8; 31:4-24; 43:1-24; 33:1-10 ; and Ex. 2 to Clemons Dep.] [Exhibit A]; [Le Bonheur "Operative Report," pp. 4-5, transcribed by two different employees at two different times.] [Exhibit D, attached hereto].
[2] T.C.A. § 29-26-119; Varner v. Perryman, 969 S.W.2d 410 (Tenn. Ct. App. 1997); Cullum v. Baptist Health Systems, Inc., 2011 WL553768 (Tenn. Ct. App. 2011); and Deuel v. The Surgical Clinic, PLLC, 2010 WL 3237297 (Tenn. Ct. App. 2010).
[3] See Paidipalli's c.v.; see also babupaidipalli.md.com, where he holds himself out only as a general anesthesiologist; see also www.lebonheur.org. which shows that none of the 9-11 members of Movant's anesthesia firm are fellowship-trained, tested or board certified as pediatric anesthesiologists.

for exclusion of the opinions of Dr. Kennedy.  First, the c.v. of Dr. Paidipalli reveals that he is a general anesthesiologist, not a fellowship-trained, tested or board certified pediatric anesthesiologist.  Accordingly, as respects Dr. Kennedy, the Motion lacks merit, and rests upon a false distinction between the two physicians.  If Dr. Paidipalli had sought to become a pediatric anesthesiologist, he was free to undertake a one-year fellowship training course, to have taken any necessary testing or to have sought to be certified under the "grandfather" rules as an alternate route to pediatric anesthesia certification.  He took none of these steps.  By representing himself as a pediatric anesthesiologist here, or by his counsel's so doing, he simply adds or compounds the other errors that the Movants committed in this case.  Thus, if Dr. Paidipalli is to be held to the standard of a pediatric anesthesiologist, Paidipalli himself is the first to fail to comply. [If he is to be held to that "standard," his admissions doom his defense, as will be hereafter shown.]

As the Motion, as respects Dr. Kennedy, is grounded principally upon the distinction between a general anesthesiologist and a pediatric anesthesiologist, it should be denied.

Moreover, in seeking through discovery from Dr. Paidipalli what, if any, clinical practice guidelines (CPG's) he might assert as a defense in order to exonerate him in this case, Paidipalli offered none.  This lapse was repeated in his deposition, as well as in his answers to written discovery.  [Paidipalli Dep. 27:23-25; 28:1-25; 29:1-22 [Exhibit A]; see also, Responses of Defendants, Pediatric Anesthesiologists, P.A. and Babu Rao Paidipalli, M.D., to Plaintiffs' First Set of Interrogatories and First Set of Request for Production of Documents Propounded to all Defendants, No. 16 (sic 17) [Exhibit B], wherein he cited no CPG that he met or complied with during Brett Lovelace's treatment.

Further, in his deposition when asked what if any difference that certain steps might or could have made in changing the fatal outcome in this case, Dr. Paidipalli essentially "copped" the "Physicians' Fifth Amendment" by answering only that he was being asked to "speculate" rather than giving an honest answer and, therefore, he gave no answer.  [Paidipalli Dep. 26:11-24; 27:2-11; 27:14-21] [Exhibit A].  Having been sued five times previously [Exhibit B – No. 3], having asserted falsely or suggested by this Motion that he, unlike Jason D. Kennedy, M.D., is a "pediatric anesthesiologist" entitled to special treatment or consideration by the Court, in addition to falsified records prepared by his staff, the Court may tire of this waste of its resources.

Dr. Kennedy was asked on page 12 of his deposition about his research in the case during the two (2) weeks prior to his deposition.  [Kennedy Dep. 12:1-25] [Exhibit A].  Unlike Dr. Paidipalli, Dr. Kennedy in his report [Exhibit C – Expert Witness Report of Jason D. Kennedy, attached hereto], as well as in the unmentioned remainder of his four-hour deposition [Kennedy Dep. 34:1-25; 35-38, 44; 52:5-25; 53:1-3; 56:4-25; 57:1-2; 59:1-25; 60-62; 69-79; 80:1-9; 81-91; 92:1-15; 93:8-25; 94-96; 97:1-13; and Kennedy Dep., Ex. 6] [Exhibit A], cited at great length, not only from the medical records of Brett Lovelace that he reviewed, but from authoritative texts, peer-reviewed articles and treatises, what his opinions were, and the bases therefore.  In comparison, neither Dr. Paidipalli nor his experts cited in his defense a single standard, text, or journal!

At every point in his deposition when Dr. Paidipalli was challenged to discuss at length his reasoning behind why the original problems with Brett Lovelace did or did not arise during the surgery and how these problems could reasonably have been prevented, he gave no sensible responses.  Dr. Kennedy had access to the medical records of Brett Lovelace, and gave opinions

based upon his findings, based upon the record, including his discussion of errors made during the surgery, which opinions have nowhere been challenged by Dr. Paidipalli as being inaccurate or contrary to local practice.  In pages 59-96 of his deposition, cited above, Dr. Kennedy draws a clear picture of how and why Dr. Paidipalli breached the prevailing standard of care to cause fatal harm to Brett Lovelace.

The Movant also states that no testing was done relative to the opinions of Dr. Kennedy. Dr. Kennedy had access to the medical records.  His opinions were based upon his excellent credentials, his education and experience, his findings from the records, citing where necessary, texts, guidelines, etc., and have nowhere been contradicted by Dr. Paidipalli or his retainers, as inaccurate or incorrect.  To consider the death of a child who has died at the hands of another physician, it seems both reasonable and responsible to review relevant literature before submitting an opinion.  Thus, the use of reference materials is not designed to substitute or replace knowledge or expertise to the point discussed, but to support the assertion of facts and common medical practice as would have been prudent to have prevented Brett's death. Authorship of a peer-reviewed study or paper that is relevant to this case is something that no party in this case has done, much less presented. [Paidipalli has never written an article much less a peer-reviewed one; however, Dr. Kennedy cites a myriad peer-reviewed medical articles, texts and journals in his deposition and report].

Further, there is no disagreement between the parties over the two fundamental errors in this case that gave rise to the death of Brett Lovelace, both of which are chargeable to these Defendants, viz., (1) the failure to reposition the patient upon arrival in the PACU, and (2) the failure to provide him with supplemental oxygen.  Both Defendants admitted (1) that the patient should have been in a position other than on his face while in the PACU, and (2) that

supplemental oxygen was standard and customary en route to and in the PACU at Le Bonheur.

Also, a review of Dr. Paidipalli's and Dr. Clemons' c.v.s reveal that nothing either ever wrote or offered in their support, warrants a finding that Dr. Kennedy's opinions are unqualified. To suggest that Dr. Kennedy has a complete lack of training and experience with this type of patient is to, again, insinuate that Dr. Paidipalli is somehow a "pediatric anesthesiologist," although the truth is to the contrary, as described in the excerpts, supra, cited from Kennedy's deposition.  To the point, Paidipalli has not cited a single standard, reference, text, or local practice in his defense, much less one that is purportedly drawn from the field of "pediatric anesthesiology."

Although he is no pediatric anesthesiologist, Paidipalli's work is predominantly with children.  There are 9 – 11 members of his firm, Pediatric Anesthesiologists, P.A.; however, not a single one of them is fellowship-trained, tested, credentialed or certified in pediatric anesthesiology, according to sources.  (See Fn. 3, supra).  Thus, the assertion that Dr. Kennedy's testimony would not assist the trier of fact is no argument at all.  Moreover, it is unsupported by any expert testimony or report that rebuts it or refutes the expert opinions of Dr. Kennedy, or the admissions of both Clemons and Paidipalli as to the two primary errors that they made [failure to reposition the patient; and lack of supplemental oxygen to the patient].

For the foregoing reasons, the expert testimony Jason D. Kennedy, M.D., must stand.


### ROBERT E. "JAY" MARSH – ECONOMIST TESTIMONY

First, there is no analytical gap between the data and the opinions offered by Jay Marsh. Second, Marsh did not state opinions drawn from fields outside his prior training or education, as was done by Mr. Brundick, who is no expert.  Third, Marsh has qualified in state and federal

courts in many states as an economist, and has never had his opinions excluded.  Fourth, in his deposition, Marsh fully explained his reasoning, and the limitations of an expert economist's report, which limitations and boundaries Mr. Brundick, Movant's expert, failed to mention, observe or respect.  As respects the challenge that Mr. Marsh derives his calculations from assumptions, Jay Marsh clearly explained that the jury has the duty to hear the case and freely apply the information (economic) to the facts.  Mr. Marsh further did not state which of the various tables that he provided were to be selected inasmuch as setting a range for a child in the future is a matter which the jury must ultimately determine from its range of choices.

It is also worth noting that although Brett Lovelace had learning disabilities, his father's uncontroverted testimony was that he was a "math genius."  Moreover, two of his father's employers authored letters stating that, upon completion of his education, each would have hired Brett and would have paid him as a truck driver salary ranges from $35,000 - $60,000 per year, as they had known him through his riding with his father on his routes over the course of Daniel Lovelace's (father) work for them.

In reviewing the c.v. of Jay Marsh in comparison to that of Brundick, it is evident that Mr. Brundick is not an "economist" who is trained and skilled.  Brundick's opinions are based upon one or two anecdotes or bits of information taken from a partial review of Brett's personal history, which ignored testimony that Brett Lovelace was at the time of his death being successfully home-schooled; and, in addition, that he was gifted in math.  Brundick's opinions were that Brett Lovelace would never finish high school, that he would have many children, and that he would die and leave an estate of less than $50,000.00.  Such testimony is patently speculative, is drawn from anecdote, not the complete history of Brett Lovelace, instead of economics, and is not of the sort or quality of report that an expert economist is expected or

permitted to render.  Further, the value of one's <u>estate</u> is not the same as the pecuniary losses recoverable in a Tennessee wrongful death case.

Brett Lovelace was 12 years old when he died as a result of alleged medical malpractice. Earning capacity losses of children with no work history has to be based upon statistical earnings data if children and their survivors are to recover such losses.  Mr. Marsh relied upon 2012 statistical data (provided to the Defendants) published by the U.S. Census Bureau indicating that of the 54,570,000 white male working population only 2,7856,000 (5.1%) had less than a high school or equivalent education.  The Defendants select certain excerpts from the limited educational records of a 12-year old, disregarding the parents' testimony, in arguing that Brett Lovelace will with great certainty many years later fall within this 5.1% of the population, and that, therefore, Mr. Marsh's testimony regarding the earnings of the white male working population with a high school or greater education is inadmissible.

The statistical data that Mr. Marsh provided to Defendants will enable Mr. Marsh to calculate at trial the earning capacity of this 5.1% of the population, should Defendants believe the trier of fact should also know this earning capacity loss.  Defendants do not assert that the methodology used by Mr. Marsh to calculate earning capacity losses based upon statistics is wrong or inappropriate, or that Mr. Marsh is not truly an economic expert within the meaning of Rule 702.  While neither Mr. Marsh nor Defendants' expert, Mr. Brundick, have the medical and vocational expertise to enable them to opine which level of educational attainment Brett Lovelace would have achieved, Mr. Marsh should be allowed to testify about the earning capacity losses at different levels of educational achievement.

For the foregoing reasons, the Motion should be denied as respects Jay Marsh.

## CONCLUSION

Plaintiffs submit that the Motion lacks merit and should be denied.


Respectfully submitted,

/s/ Mark Ledbetter
Mark Ledbetter (#17637)
HALLIBURTON & LEDBETTER
254 Court Avenue - Suite 305
Memphis, TN  38103
(901) 523-8153-phone
Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via the Court's ECF filing system this 22nd day of August, 2014:

J. Kimbrough Johnson/Marcy Dodds Magee/Margaret Cooper
2900 One Commerce Square
40 S. Main Street
Memphis, TN  38103
Attorneys for Mark Clemons
901/525-8721-phone
jjohnson@lewisthomason.com
mmagee@lewisthomason.com
mcooper@lewisthomason.com


Brad Gilmer/Jerry Potter/Karen Koplon/David Cook
The Hardison Law Firm
119 S. Main Street, Suite 800
Memphis, TN  38103
Attorneys for Babu R. Paidipalli and Pediatric Anesthesiologists, P.A.
901/525-8776 – phone
Bgilmer@hard-law.com
jpotter@hard-law.com
kkoplon@hard-law.com
dcook@hard-law.com


/s/ Mark Ledbetter
Mark Ledbetter, Certifying Attorney