# EXHIBIT A

*Excerpts from the Depositions of:*

## Babu Rao Paidipalli, M.D.

\*

## Mark P. Clemons, M.D.
### and
## Exhibit 2 to Clemons Deposition

\*

## Jason D. Kennedy, M.D.
### and
## Exhibit 6 to Kennedy Deposition

*IN THE UNITED STATES DISTRICT COURT*

*FOR THE WESTERN DISTRICT OF TENNESSEE*

| | |
|---|---|
| *DANIEL LOVELACE AND HELEN LOVELACE, Individually, and as Parents of BRETT LOVELACE, Deceased* | ) ) ) ) ) |
| *Plaintiff,* | ) ) |
| *VS.* | )*NO. 2:13-cv-02289 dkv* |
| | ) |
| *PEDIATRIC ANESTHESIOLOGISTS, PA; BABU RAO PAIDIPALLI and MARK P. CLEMONS ,* | ) ) ) |
| | ) |
| *Defendants.* | ) |

*DEPOSITION OF BABU RAO PAIDIPALLI, M.D.*

*January 9, 2014*

*MIDSOUTH REPORTING SERVICE*

*LU ANNE R. DUDLEY, CSR, LCR #349*
*P.O. BOX 1631*
*CORDOVA, TENNESSEE 38088*
*(901)525-1022*

1    Aldrete score perfect.

2    Q        Now at the time that Brett Lovelace was

3    extubated, approximately how much time passed between

4    that moment and the time that he would have been

5    transported?

6             Is that normally five minutes?  Or how long

7    is that?

8    A        Can you rephrase the question, please.

9    Q        Yes.

10            Between the time of extubation of the

11   patient how much time elapsed before he was

12   transported to the PACU?

13   A        We extubated the patient 10:26.  And the

14   patient reached the recovery room 10:35, so nine

15   minutes.

16   Q        Is it your testimony that the patient was

17   virtually awake at the time that he was extubated?

18   A        Yes, sir.

19   Q        Okay.  As a rule and a practice how often

20   would you allow patients to go and be on their face

21   in recovery?

22                    MR. COOK:  Same, form.

23                    Go ahead.

24   A        That is a speculation.

25

BY MR. LEDBETTER:

Q        How often would you allow people to go in that position prone into the PACU at LeBonheur?

              MR. COOK:   Same.

A        Same.  I cannot answer that speculative question.

BY MR. LEDBETTER:

Q        Well, was it something that happened that you allowed a number of times?

A        That is the same thing I said.  It is very speculative.

Q        Why would it be speculation?

          Did you allow patients to go to the recovery room who were in a prone position, or not, before Brett Lovelace?

A        We, as long as the patient is not completely prone, but we -- actually, tonsil patients, semi prone is the ideal position for the patient because if there is any bleeding, it will come out.  The tongue will also fall out so that they breathe better.  That is called post tonsillectomy position.

Q        Now in this case do you rely upon any clinical guidelines for anesthesiologists that support your defense in this case?

1          Do you have any clinical guidelines or ASA

2    texts or standards that you see as relevant?

3    A          Well, we have books that are for reference

4    if we are there, but mostly we go by clinical

5    judgment and our -- you know, that is what we go by,

6    clinical judgment.  Because all of these books, it

7    won't pertain to the particular patient.  You know,

8    those are all differences.

9    Q          Are you familiar with clinical guidelines

10   for anesthesiologists that deal with patients who

11   have surgery with upper airway problems or

12   morbidities?

13   A          There are guidelines, but it is a clinical

14   judgment to maintain, you know, the airway problems.

15   Q          Well, what clinical guidelines can you cite

16   me to that apply to patients with upper airway

17   problems and the standard of care of an

18   anesthesiologist?

19   A          One of the clinical guides we look at is

20   for the patient to be extubated and is awake.  That

21   is the criteria for upper airway obstruction

22   patients.

23   Q          Are you familiar with the guideline that

24   urges caution on the part of an anesthesiologist in

25   the extubation or untimely -- against the untimely

```
 1   extubation of a patient with upper airway
 2   disturbances?
 3   A          That is what I'm telling you, sir.
 4              A patient, we extubate those patients awake
 5   compared to the patients who are deep.  That is the
 6   criteria we use, extubation awake.
 7   Q          Now at the time of his extubation in the
 8   operating room were you aware that Brett Lovelace had
 9   experienced hypercarbia or hypercapnia?
10   A          No, sir.
11   Q          When a person suffers asphyxia, is
12   hypercapnia or hypercarbia a coincident occurrence or
13   symptom?
14   A          Hypercapnia is a coincidence.  It is a
15   mystery.  The patient may be hypo-ventilating for
16   some time.
17   Q          Now at the time that you extubated Brett
18   Lovelace, was he in deep extubation?
19   A          No, sir.
20   Q          Okay.  Are you aware that at the time you
21   extubated him that he had pretty small title volumes
22   and inadequate effort?
23   A          No.
24              My clinical judgment was that the patient
25   was awake, breathing well.  And when he opened his
```

1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
2

3

4  DANIEL LOVELACE AND        )
   HELEN LOVELACE,            )
   INDIVIDUALLY AND AS        )
5  PARENTS OF BRETT           )
   LOVELACE, DECEASED,        )
6                             )
                              )
7      Plaintiffs,            )
   VS.                        )   2:13-CV-02289dkv
8                             )
                              )
9  PEDIATRIC                  )
   ANESTHESIOLOGIST, P.       )
10 A. BABU RAO                )
   PAIDIPALLI, AND MARK       )
11 P. CLEMONS,                )
                              )
12                            )
       Defendants.           )
13

14

15                    DEPOSITION

16                       OF

17             MARK CLEMONS, M.D.

18

19             February 6, 2014

20             ORIGINAL

21

22             MID-SOUTH REPORTING
               Pepper Glenn, CCR
               P. O. Box 609
23         Southaven, Mississippi 38671
               (901) 525-1022

24

1    we've previously met.  And I have passed to you

2    and to your counsel three items which I've

3    proposed to make exhibits to your deposition.

4    The first item is the anesthesia medication

5    record.  And do you have that before you?

6        A.      Yes.

7            (WHEREUPON, THE ABOVE-MENTIONED

8            DOCUMENT WAS MARKED AS EXHIBIT NO. 1

9            TO THE TESTIMONY OF THE WITNESS AND

10           IS ATTACHED HERETO.)

11       Q.      Okay.  Is that a document you have

12   previously seen or you're familiar with?

13       A.      No.

14       Q.      Okay.  Do you have any reason to

15   believe that that record is inaccurate or does

16   not apply to this patient?

17       A.      I do not give any of these drugs.  I'm

18   not an anesthesiologist.  I've never seen this

19   record before.

20       Q.      Okay.  Number 2, this is a history of

21   current problems for the patient.  And do you

22   identify that as a document that you've created?

23       A.      That is my document.

24           (WHEREUPON, THE ABOVE-MENTIONED

1    DOCUMENT WAS MARKED AS EXHIBIT NO. 2

2    TO THE TESTIMONY OF THE WITNESS AND

3    IS ATTACHED HERETO.)

4    Q.      Okay.  And beneath it, you will see

5    that there are several pages that purport to be

6    an op note or an operatory narrative that you

7    also wrote.

8    A.      Yes, I did.

9    Q.      Okay.  And Exhibit Number 3 is a

10   series of photographs that I will represent to

11   you were taken by the parents of Brett Lovelace.

12   And let me ask if you can identify any of the

13   people in the photograph -- in the photograph

14   particularly on the first page.  Can you identify

15   that as Brett Lovelace?

16   A.      That is Brett Lovelace.

17          (WHEREUPON, THE ABOVE-MENTIONED

18          DOCUMENT WAS MARKED AS EXHIBIT NO. 3

19          TO THE TESTIMONY OF THE WITNESS AND

20          IS ATTACHED HERETO.)

21   Q.      Could you identify who is in the left

22   corner?

23   A.      Do not know.

24   Q.      Could that be his father, Daniel

1    A.       I cannot give it to you because I

2  don't know what the numbers are in the coma

3  scale.

4    Q.       Now, you have -- in Exhibit Number 2

5  after the first page, Dr. Clemons, you have your

6  op note or your operative report.

7    A.       Correct.

8    Q.       Do you see that?

9    A.       Correct.

10   Q.       Okay.  Now, do you know when this was

11  written?  I see that the date of service was

12  March 12th, but the date it was signed was

13  March 19th.  Do you know when this was written by

14  you or dictated?

15   A.       It probably would have been that day

16  or the next day, the day after surgery.

17  Transcription could tell you that.  I don't know.

18   Q.       I think I see it.  Turn to the last

19  page and let me ask you --

20   A.       Dictated.

21   Q.       Yeah, it's a D.  Does that mean that

22  it was dictated March 12 at 5:48 p.m. or when,

23  5:48 a.m.?

24   A.       It certainly wasn't 5:48 a.m.

1    it was -- it was dictated before -- dictated and

2    transcribed before the surgery; is that correct?

3         A.       That's what it says, but it wasn't.

4         Q.       All right.  Now, did you ever go back

5    after it was dictated and make any changes to it

6    before it was made a permanent record?

7         A.       Not that I know of, but I'm sure I

8    read it and might have changed a "we" to a -- I

9    change words like "we" to "I," but I couldn't

10   tell you if I changed a word or two.

11        Q.       Well, do you think on the last page,

12   you might have changed the word -- the last

13   sentence from reading, "He tolerated the

14   procedure without problems" to read "He tolerated

15   the procedure itself without problems"?  Could

16   you have made that change by adding the word

17   "itself" after he died or after he had problems?

18        A.       Well, when I talk about the procedure,

19   I'm talking about the operative procedure.

20        Q.       Right.

21        A.       We did the surgery.  We woke him up,

22   extubated him and took him to the recovery room.

23        Q.       Well, my point is, where it says he

24   tolerated the procedure itself, do you think

43

1    A.        Supine.

2    BY MR. LEDBETTER:

3    Q.        Okay.  What is that position?

4    A.        They are on their back.

5    Q.        And what is a prone position?

6    A.        On their belly.

7    Q.        Do you know what the Fowler's position

8    is?

9    A.        Well.  Semi-Fowler's is sort of a

10   sitting, laying position.  I don't know what the

11   Fowler's position is.

12   Q.        Okay.  Any reason why Brett was not in

13   a Fowler's position?

14             MR. GILMER:  Object to the

15   form.

16   A.        Well, what is a Fowler's position?

17   BY MR. LEDBETTER:

18   Q.        I'm asking you if you know what it is.

19   A.        I told you I don't know what a

20   Fowler's position is.  I know what Sub-Fowler's

21   is.

22   Q.        But you don't know what the Fowler's

23   position is?

24   A.        No.

**\* Dr. Clemons will fill out this Side \***

Patient Name: _Britt Taylor_                                     Date _3-5-12_

## HISTORY OF CURRENT PROBLEMS:

Ears: _____

Nose: _____

Throat _Recur Months Swollen tonsils + Tonsillectomy here_

Other: _____

_____

## PHYSICAL EXAM:

Ears:  EAC: _WNL_ _____
      TM: _clr_ _____

Nose: _clr_ _____

Throat: Tonsils:  Enlarged _3_ +     Cryptic _____     Exudates _____
          Erythematous _____

    Pharynx: _clr_ _____
    Tongue: _____
    Other: _____

Chest:  Clear _✓_    Other _____
CV: RRR _____ _✓_    Other _____
Abdomen: Soft ___    Other _____
Extremities:  Moves all Extremities without problems: _✓_
    Other: _____

Other findings: _____

ASSESSMENT: _T + A hypertrophy & h.x y_
PLAN: Tests: Blood, X-rays, Other _____

_____

Meds: _____

_____

Other: _____
Surgery: T _✓_ A _✓_ PETs _____,    Other _____
Follow up:  RTC: ____days, _____weeks, PRN ____.   Parent to call and check on C&S, X-ray, etc

_____
Other:
___✓_ For tonsillectomy & adenoidectomy, discussed the risks of anesthesia, bleeding, pain, blood transfusion
with the _mother + child_.
_____ For PE tubes discussed the risks of anesthesia, infections, perforated ear drum when the tube comes out,
possible need to go back to OR and remove tube if it becomes stuck or infected with

_____
Other: _____

MPC, MD _____

10/28/2012 22:58 FAX 8307223440    CLEMONS MD    Case 2:13-cv-02289-SHL-dkv    Document 132-1    Filed 08/22/14    Page 14 of 52    PageID 002/008

3/19/2012 8:03:40 AM   Methodist Healthcare  1(901)516-0000   Page 2 of 5



**Le Bonheur**
**Children's Hospital**

Le Bonheur
50 North Dunlap
Memphis, TN 38103

| | |
|---|---|
| Name. | LOVELACE, BRETT B |
| MRN. | 45854994 |
| FIN. | 68859557 |
| DOB. | 8/21/1999 |
| Age: | 12 years |
| Sex | Male |
| Location: | 8L05/01/A0 |
| Patient Type. | Inpatient |
| Chart Provider: Clemons, Mark P, M.D |

Admit Date·    3/12/2012 / 7:10·00 AM
Discharge Date.  3/14/2012 / 3 54 00 PM

## Transcribed Documents

| | |
|---|---|
| Document Type | Operative Report |
| Signed Date | 3/19/2012 7·54·46 AM |
| Date of Service | 3·12·2012 6·10:00 PM |

| | |
|---|---|
| Author. | Clemons, Mark P, MD |
| Document Status | Auth (Verified) |

DATE OF SURGERY: 03/12/2012

PREOPERATIVE DIAGNOSIS
Tonsillar and adenoidal hypertrophy with upper airway obstruction.

POSTOPERATIVE DIAGNOSIS
Tonsillar and adenoidal hypertrophy with upper airway obstruction.

OPERATION
1.    Tonsillectomy.
2.    Adenoidectomy.

ATTENDING SURGEON
Dr. Mark Clemons.

ANESTHESIA
General with endotracheal (ET) tube.

ESTIMATED BLOOD LOSS
250 mL.

DESCRIPTION OF PROCEDURE
The patient was placed on the operating table in the supine position and
anesthetized using general anesthesia. Endotracheal tube was placed. Sterile
drapes were placed. A Crowe-Davis mouth gag was inserted into the patient's
mouth and was suspended from the Mayo stand. Catheter placed through his
nose and used to retract the soft palate.



Le Bonheur
50 North Dunlap
Memphis, TN 38103

Name:          LOVELACE, BRETT S
MRN:           45854994
FIN:           68859557
DOB:           8/21/1999
Age:           12 years
Sex:           Male
Pt Location:   8L05/01/A0
Patient Type:  Inpatient
Chart Provider: Clemons , Mark P, MD

Admit Date:    3/12/2012 / 7:10:00 AM
Discharge Date: 3/14/2012 / 3:54:00 PM

## Transcribed Documents

Document Type   Operative Report            Author:           Clemons , Mark P, MD
Signed Date     3/19/2012 7:54:46 AM        Document Status:  Auth (Verified)
Date of Service 3/12/2012 6:10:00 PM

The adenoid pad was visualized and found to be very large and obstructing the
airway. Tonsils were very large as well. Using an adenoid curette, multiple
passes were made removing a large amount of adenoid tissue. A saline-soaked
sponge was placed in the nasopharynx. The right tonsil was grasped with
straight Allis and retracted medially. A 12 blade was used to incise the mucosa.
Hurd dissector and Fischer knife were used to dissect the tonsil free and
amputate the base with snare.

A saline-soaked sponge was placed in the fossa. This was removed and
adequate hemostasis achieved using suction cautery. Sponges were placed in
the fossa. The left tonsil was removed in a similar manner; however, this was
removed in several pieces. Adequate hemostasis achieved using 3-0 plain
interrupted suture in the inferior mid fossa as well as suction cautery.

The nasopharyngeal packs were removed. The nasopharynx was examined. A
significant amount of adenoid tissue was still remaining in the posterior choanal
region and area proximal to the nose. Using adenoid curettes and suction
cautery, the tissue was removed opening up the posterior choanae. A saline-
soaked sponge was placed back in the fossa. Marcaine 0.25% with epinephrine
1:200,000 was injected in both tonsillar fossae. A total 6 mL was used.

A catheter was run down the patient's mouth into his stomach removing stomach
fluid. The nasopharyngeal pack was removed. Adequate hemostasis was
achieved using a small amount of additional suction cautery. All instruments
were removed. The patient was awakened from anesthesia, extubated, and



Le Bonheur
50 North Dunlap
Memphis, TN 38103

Admit Date      3/12/2012 7:10:00 AM
Discharge Date: 3/14/2012 3:54:00 PM

| | | |
|---|---|---|
| Name: | LOVELACE, BRETT S | |
| MRN. | 4585-4994 | |
| FIN: | 68859557 | |
| DOB. | 8/21/1999 | |
| Age: | 12 years | |
| Sex: | Male | |
| Pt Location. | 8L05/ 01/A0 | |
| Patient Type: | Inpatient | |
| Chart Provider: Clemons , Mark P. MD | | |

## Transcribed Documents

Document Type    Operative Report              Author:              Clemons , Mark P. MD
Signed Date.     3/19/2012 7.54:46 AM          Document Status:     Auth (Verified )
Date of Service  3/12 2012 6:10:00 PM

taken to recovery.  He tolerated the procedure itself without problems.

(E-signed on 03 19 12  at 07 54 AM)

Clemons , Mark P, MD

D  03/12/12  05 48 T  03/12/12 06:10  (SC )

# Exhibit 2 to Deposition
# of Mark P. Clemons, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TENNESSEE
 2                       WESTERN DIVISION
                        - - - - - -
 3   DANIEL LOVELACE, and       )
     HELEN LOVELACE,            )
 4   Individually, and as Parents)
     of BRETT LOVELACE, deceased,)
 5                              )
     Plaintiffs,                )
 6                              )
     vs.                        )   No. 2:13-cv-02289-SHL-dkv
 7                              )
     PEDIATRIC                  )
 8   ANESTHESIOLOGISTS, P.A.;   )
     BABU RAO PAIDIPALLI; and   )
 9   MARK P. CLEMONS,           )
                                )
10   Defendants.                )
     --------------------------
11
                    VIDEOTAPED DEPOSITION OF:
12
                      JASON D. KENNEDY, M.D.
13
                      NASHVILLE, TENNESSEE
14
                   WEDNESDAY, JUNE 25, 2014
15   ----------------------------------------------------------

16

17

18

19

20

21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY:  IVA L. TALLEY, LCR
25   FILE NO.:  A80609D
```

1

```
 1        Q          Now, between -- what did you do to
 2   prepare for your deposition the first time it was
 3   scheduled?
 4        A          The same series of events.  I reviewed
 5   the available records that I had received, including
 6   the depositions.  I had went back and reviewed what the
 7   current standards of care are within the anesthetic
 8   practice of patients undergoing anesthetics,
 9   specifically with sleep apnea, and I had reviewed
10   specifically that in relationship to pediatric
11   patients.
12        Q          Where did you review something
13   concerning what the standards of care were regarding
14   pediatric anesthesia in this particular case?
15        A          Multiple sources, including -- I think
16   it's called -- there's a textbook.  There's Miller's
17   Anesthesia, which is a general anesthesia textbook, but
18   it has sections about pediatric anesthesia.  It's
19   written by experts in pediatric anesthesia.  And then
20   there's two or three pediatric-specific textbooks.
21        Q          Which textbooks are those?
22        A          I would have to get back to you.  I
23   can't remember the name right offhand.
24        Q          Prior to reviewing Miller's and those
25   other three -- which I would ask that you supplement
```

```
1       Q          And in addition to this expert witness
2  report that we have here, what other records and notes
3  have you made in this case?
4       A          I've got just a couple of things I wrote
5  down here this morning when I was looking at -- that's
6  Smith's, Smith's Anesthesia.  That's one of the other
7  books that I have.
8       Q          Okay.
9       A          And that's really it.
10      Q          Let me see that.
11      A          Here, that's about all I've got.
12                 (Witness passes document to counsel.)
13 BY MR. GILMER:
14      Q          Was this something that you pulled from
15 the internet?
16      A          This is something I pulled off of -- we
17 have digital textbooks.  No one makes textbooks anymore
18 because it's just a lot of wasted trees.  So all of our
19 textbooks are now computerized, so I just pulled this
20 off, this textbook, that is considered probably -- I
21 won't say the authoritative textbook on pediatrics, but
22 one of the authoritative textbooks on pediatrics.
23      Q          And do you believe that the information
24 contained in this text is authoritative and reliable?
25      A          I believe it's reliable, and it's an
```

34

1   often-referenced opinion by practicing pediatric

2   anesthesiologists.

3       Q       Do you believe it establishes what the

4   standard of care is for pediatric anesthesiologists?

5       A       I think it helps to establish the

6   standard of care.  The standard of care is associated

7   with a lot of different things.

8                   MR. GILMER:  Let's mark this as our next

9   exhibit, please.

10                  MR. LEDBETTER:  No objection.

11                  (Document entitled "Smith's Anesthesia
                        For Infants and Children, Eighth
12                      Edition," marked Exhibit No. 4 to this
                        deposition.)
13

14                  (Off the record.)

15                  MR. GILMER:  I did want to clarify one

16  thing on the record.  Mr. Ledbetter made a statement

17  about receiving a notice seven days prior to the

18  expiration of a deadline.

19  BY MR. GILMER:

20      Q       This -- the original notice to take your

21  deposition was filed on May 22nd and contained the same

22  list of items that I have today.  Did you see the

23  original notice?

24      A       I honestly don't know.

25                  MR. JOHNSON:  That's the pre-pink eye.

```
 1                    THE WITNESS:   Yeah.

 2   BY MR. GILMER:

 3        Q        Let's mark the original notice as our

 4   next exhibit, please.

 5                        (Notice to Take Audiovisual Deposition
                          of Dr. Jason Kennedy filed May 22, 2014
 6                        marked Exhibit No. 5 to this
                          deposition.)
 7

 8   BY MR. GILMER:

 9        Q        Now, the text that you pulled to review

10   in this case -- when did you pull this?

11        A        I just happened to pull it this morning

12   just before I walked over here.

13        Q        In addition to this Smith's Anesthesia

14   section that you have here marked as Exhibit 4, what

15   other notes and records did you generate with respect

16   to this case?

17        A        I think I jotted down a couple of things

18   on paper, but I don't remember where they are at right

19   now.

20        Q        Do you still have those things?

21        A        They are probably at my -- either at my

22   home office or in my office over here.

23        Q        Okay.  I would ask that you -- subject

24   to plaintiff's objection, I would ask that you preserve

25   those and not destroy that evidence because we may be
```

```
 1   entitled to that down the road.
 2       A         Okay.
 3       Q         The notes that you made, what did they
 4   say?
 5       A         Mostly, I was trying to develop a time
 6   line of what happened.  And then I -- that's kind of --
 7   I was trying to figure out through digging through all
 8   those record-s, because it's quite voluminous, and I
 9   was just trying to find out what were the course of
10   events.
11       Q         Were you able to put together what you
12   thought was the course of events?
13       A         I was able to piece together, as best as
14   I could.
15       Q         What other notes and records did you
16   generate besides that?
17       A         That's probably about it.
18       Q         Okay.  Did you communicate with
19   Mr. Ledbetter via email?
20                 MR. LEDBETTER:  Objection to questions
21   concerning communication under Federal Rules.  They
22   pertain to expert witnesses.  You're not allowed to get
23   into communications unless they are under certain
24   circumstances, and your question does not address those
25   circumstances.
```

```
 1   BY MR. GILMER:
 2        Q        Did Mr. Ledbetter give you any facts or
 3   opinions related to this case before you formulated
 4   your opinions in the case?
 5        A        No, he didn't.
 6        Q        What did he provide you with originally
 7   so that you could form your opinions?
 8        A        I think he just sent me the copy of
 9   records from Le Bonheur Children's Hospital, and that's
10   it.
11        Q        And then at separate times, did he then
12   send you the depositions as they were completed?
13        A        Yeah.  That was quite a bit later.
14        Q        But he did not send you the parents'
15   depositions?
16        A        I don't recall seeing those.
17        Q        Did you know the parents were in the
18   PACU during the entire time that this -- that the child
19   was there?
20        A        I remember seeing something to that
21   effect that for a good portion of the time that the
22   parents were there.  I didn't know if it was all or
23   just part of it.
24        Q        Did you see the pictures that they took?
25        A        I did.
```

1       Q        That's fine.  Have you reviewed any

2  specific guidelines from the hospital itself regarding

3  their policies and procedures?

4       A        I remember asking for one when I first

5  saw this for their PACU care.  And I remember -- I

6  think I remember reviewing it, but that's been, like I

7  said, over a year ago.  And, basically, I think what I

8  got was their PACU order set is what I got.

9       Q        And did that provide you with any basis

10  for your opinions in the case?

11       A        It did.

12       Q        What specifically?

13       A        Relating to the administration of

14  oxygen.

15       Q        What specifically about the

16  administration of oxygen?

17       A        That oxygen was to be administered to

18  patients upon a physician's order and when indicated

19  and to maintain certain saturations.

20       Q        And did you -- do you believe that

21  oxygen was not used in the PACU?

22       A        It was my understanding, by reading the

23  deposition, that oxygen was not used in the PACU.

24       Q        And what is your understanding from

25  reading the depositions regarding the ability of the

```
 1      A           2000 -- probably '4, I'm thinking

 2 through 2005, 2006, when I was a resident.

 3      Q           2004 through 2006?

 4      A           Probably so, yeah, about.

 5      Q           And about how many of those

 6 procedures -- or we can even broaden it to

 7 adenoidectomy, tonsillectomy, any type of throat

 8 surgery on a pediatric patient?

 9      A           Probably in excess of fifty.

10      Q           In 2012 and the year preceding that,

11 2011, you did not do any of those procedures, though,

12 correct?

13      A           What do you mean?

14      Q           In 2011 and 2012, you did not put any

15 pediatric --

16      A           No, sir.

17      Q           -- patients to sleep, did you?

18      A           No, sir.

19      Q           Have you ever put together a

20 twelve-year-old boy that weighed 81 kilos for a

21 pediatric ...

22      A           Sure, I have.

23      Q           Okay.

24      A           Yeah.

25      Q           And you consider yourself an expert in
```

1    what fields of medicine?

2         A          Anesthesia, cardiac anesthesia, critical

3    care anesthesia, echocardiography.

4         Q          Anything else?

5         A          I'm program director of ECMO.  So I

6    don't -- that's E-C-M-O.  There's no "h" on it.

7         Q          Oh, got you.  That's right.  Don't pay

8    attention to my notes.  I've got terrible note-taking

9    skills.

10                   The opinions that you expressed in this

11   case are also -- you're giving opinions about the

12   standard of care for an ENT physician.  Do you believe

13   that you have expertise in that field?

14        A          I don't recall giving an opinion about

15   the practice for an ENT physician.  I gave an opinion

16   about the practice of a physician who saw a patient in

17   distress or in an abnormal position.  No comment about

18   his practice as an ENT surgeon.

19        Q          What is the -- been the nature of your

20   practice, primarily, since you came to Vanderbilt?  Can

21   you just give me a thumbnail sketch of what your years

22   are like?

23        A          I'm sorry.  I don't --

24        Q          Do you see patients -- as an

25   anesthesiologist, you don't have clinic patients, do

53

```
1       Q           Have you had any firsthand contact with
2    the parents?
3       A           I have not.
4       Q           Have you talked with any other
5    physicians about the facts of this case?
6       A           I have asked another -- I've asked a
7    pediatric anesthesiologist her opinion regarding a
8    prone position in a post-recovery that had changed.
9    And that's about it.
10      Q           Who was that?
11      A           Hold on a second.  I'll tell you right
12   now.  Heidi Smith, Dr. Heidi Smith.  You put me on the
13   spot.
14      Q           And, again, what did you talk to her
15   about?
16      A           I specifically asked her about
17   positioning in the postoperative recovery patient.  She
18   had no other facts of the case, just --
19      Q           What did she have to say?
20      A           That she would never routinely allow a
21   child to go prone, of his size.
22      Q           What about semi-prone?
23      A           A semi-lateral position?
24      Q           (Nods in the affirmative.)
25      A           That is completely -- that's called the
```

1    recovery position, but in a prone position, in a

2    knee-to-chest, no.

3          Q          Did you bring your medical records with

4    you today?

5          A          I did not.

6          Q          Have you had -- are you reviewing any

7    other cases as an expert witness right now?

8          A          I was asked to review a case one week

9    ago.  I just got the records.

10         Q          What -- by whom were you asked?

11         A          One of my senior partners is a physician

12   that has done previous medical/legal work and referred

13   the patient -- or referred an attorney to me in regards

14   to something that I do frequently.

15         Q          And is that a case that you're being

16   asked to review on behalf of a patient or on behalf of

17   a doctor?

18         A          I actually don't know who -- they didn't

19   tell me.  They just gave me the -- all they asked me to

20   do is look at these records, and I'm looking at the

21   records.

22         Q          Does it involve a child?

23         A          It involves an adult.

24         Q          Do you advertise yourself as being

25   available to be an expert witness?

1      Q           Did he simply send you the -- did he

2  send you the complaint?

3      A           No.

4      Q           Just the medical records?

5      A           As far as I remember, he sent me the

6  medical records.

7      Q           Other than the report that we've

8  referenced here under Exhibit 6 that you did, did you

9  make any other reports in this case?

10     A           No, sir.

11     Q           Were you asked to sign any affidavit or

12 anything of that nature?

13     A           I think so.  I don't think I sent it.  I

14 think that's the report, right?

15     Q           Okay.  Let's talk about this case

16 specifically now that we've gone through all of that.

17 Give me a brief summary of the facts that you think are

18 significant to this case.

19     A           Brett was a twelve-year-old boy with, I

20 think, some learning issues, developmental issues, that

21 presented for a tonsillectomy/adenoidectomy to Le

22 Boneur Children Hospital.  He had a known history, by

23 report, of symptoms consistent with sleep apnea,

24 specifically snoring and gasping breaths.

25                 His physical exam was consistent with

1    someone who would have sleep apnea and put him at high

2    risk.  If I recall right, he had some mention that he

3    had asthma or wheezing as a child, and he was on a

4    nebulizer and took a bronchodilator.

5                    He underwent a tonsillectomy and

6    adenoidectomy under general anesthesia using an

7    endotracheal tube, using an inhalation induction, you

8    know, with a peripheral I.V. placed.

9                    He had 200 milligrams of propofol, 100

10   milligrams of Lidocaine, 100 micrograms of fentanyl,

11   with a sevoflurane induction, starting off at 8

12   percent, and titrating down to about 3 percent.

13                   His initial heart rate prior to

14   induction was about 70 and his baseline CO2, after

15   intubation, was about 40, with tidal volumes of about

16   450, of which are consistent with normal tidal volumes

17   for a patient his size.

18                   At the completion of surgery, he had

19   received no neuromuscular blocking agents, so that was

20   not an issue.  He had an end-tidal CO2 that had

21   progressively risen through the duration of the case

22   with tidal volumes that were down to in the 160s that

23   are not consistent with adequate minimal ventilation

24   for a child his size.

25                   He was taken to the recovery room.  He

1  never awakened and really fully emerged, by reports of

2  the parents.  He did have emergence delirium, which

3  would be consistent with him thrashing around and

4  moving in an uncoordinated fashion, knocking his

5  monitors off, but that's not consistent with adequacy

6  of respiration, ventilation, or the ability to support

7  one's airway.

8           While in the recovery room, his oxygen

9  saturation was read as normal.  There were some issues

10  with the finger probe maybe falling off.  There, some

11  concerns were raised by the parents.

12           At one point, the surgeon came by and

13  saw the patient laying prone, knee-to-chest, with his

14  face down, and asked the parents if that's how he slept

15  and did nothing to correct the patient's obviously poor

16  position after a tonsillectomy and adenoidectomy.

17           And shortly thereafter, if I remember

18  right, at about 12 o'clock, the patient has a Code

19  Harvey, which is their cardiac arrest called in the

20  PACU.  And Kish turned the patient over to evaluate him

21  when she noticed that he was not snoring anymore, which

22  the patient --

23           At that point in time, CPR was started.

24  He was intubated at, if I recall right, 12:04 p.m.  A

25  blood gas that was drawn approximately fifteen minutes

1    later showed an arterial CO2 of 96.  One done about

2    five minutes before that showed a venous CO2 of

3    "unmeasurable," in excess of 130.  Normal arterial CO2

4    is 40 or so.  Normal venous CO2 would be about 45.

5                    Both of these, lab data and the

6    Anesthetic Record, were consistent with a patient who

7    had inadequate ventilation that led to hypoxemia and to

8    his cardiac arrest.

9                    He subsequently was taken to the ICU

10   where he was cared for then.  The lines were placed for

11   monitoring and for medicine administration.  And over a

12   period, I think, of about 48 hours, which is pretty

13   consistent with assessing brain death, he had multiple

14   tests, including an echocardiogram; I think a blood

15   flow study to look at his brain; and he was declared

16   brain dead.

17                   I think the organ donation center was

18   contacted, but I'd want to say that they refused any

19   visceral organs.  They might have done skin and bone.

20       Q        Any other facts that you found

21   significant?

22       A        The other facts that I did find as

23   significant and relevant to the case is the way the

24   patient was monitored in the PACU.  Nurse Kish was

25   noted to be on Facebook and using the computer.  And

```
 1    would be -- it depends on the timing.  You know, I

 2    think this child was not fully awake, based upon my

 3    review of the records, when he exited the operating

 4    room.

 5              So, you know, he was clearly very

 6    hypercarbic, and this had been going on for a while.

 7    And so that would be somewhat speculation on my part,

 8    and I'm not willing to speculate.  I'm only commenting

 9    on what I saw present, based upon the medical records

10    and my opinion.

11        Q         Have you seen any toxicology reports or

12    lab reports that would indicate that the patient still

13    had anesthetic in his system at the time he expired?

14        A         I don't remember if there was a

15    toxicology report.  The interesting thing about both

16    Sevoflurane and Isoflurane -- and this child received

17    Sevoflurane, which is an inhaled anesthetic -- is that

18    it works by being absorbed.  You breathe it and then it

19    goes into the blood, but before it can actually have

20    any effect, it has to go into the brain.

21              So something called the blood-fat

22    solubility is very important.  And your brain has a lot

23    of fat in it because your neurons are surrounded by

24    lipid -- lipid membranes, and so it's impossible to

25    monitor that.  There's no toxicology report that would
```

1    show that.  So we don't monitor Sevoflurane levels.

2              What you do see -- and that's pretty

3    well-documented that Sevoflurane actually is around for

4    quite a while.  The child clearly received Fentanyl --

5    that's documented in the Anesthetic Record.  100

6    micrograms, which is about 1.2, 1.25 mcg per kilo for

7    this child, is enough even for a child his age with

8    obstructive sleep apnea to lead him to have significant

9    respiratory depression in the postoperative period.

10             The Sevoflurane definitely would cause

11   him to have what his anesthetic record demonstrates,

12   which is a rate of about 22 -- a respiratory rate of

13   about 22 and tidal volumes that are small.  And that's

14   very consistent with a volatile anesthetic still laying

15   around.

16             And the issue with having low tidal

17   volume, such as that, is that there's a certain amount

18   of what we call dead space within your lungs.  In order

19   for the air to get from here to your alveoli, where you

20   have gas exchange, it's about 150 cc's.  2 cc's per

21   kilo, actually, is what the norm is.

22             So even in Brett's situation, you would

23   use his height and not his weight to make that

24   determination.  So we'll say about 120 cc's for him.

25             That -- 120 cc's of that does not

1    participate in gas exchange, so his effective tidal

2    volumes were only 100 cc's, which is consistent with

3    the medical record that clearly shows that he was quite

4    hypercarbic at the time of his arrest, and that of --

5                     You know, there's only so much space in

6    your lungs, and a large portion of that is taken up by

7    nitrogen, which is the most common gas in the

8    atmosphere.  And then when you become very hypercarbic,

9    that $CO_2$ actually will displace the available oxygen in

10   your blood.

11                    So when we give supplemental oxygen,

12   we've trying to displace the nitrogen and just overcome

13   any hypoxemic effects.  The hypercarbia is still there.

14   It still makes you -- it still depresses your

15   respirations further.  It still makes you much more

16   sleepy.  And if you look at Brett's anesthetic record,

17   he had a end-tidal $CO_2$ of 54, if I remember right.

18                    Right before that was the last

19   documented $CO_2$.  It could have been higher than that.

20   And I think there was a comment on one of the expert

21   opinions that this is not accurate.  It can

22   underestimate, but it doesn't ever overestimate your

23   $CO_2$ in your blood.

24                    And a $CO_2$ of 54 by end-tidal -- there's

25   something called physiologic dead space.  And so his

1    arterial CO2 at that point in time was usually no less

2    than 6 higher, so it was at least 60.  If you get a CO2

3    of 80, on most adults and children, you get what we

4    call 1 "MAC" of anesthetic.  It's enough sedative

5    potency to actually -- to operate on you.  Okay.  So

6    Brett was not far from that when he left the operating

7    room, and he had that much CO2.

8                    So to get back to the answer to your

9    question, there's no way to monitor Sevoflurane

10   concentrations that we do in common clinical practice.

11   There's research ways that you can do that, and they

12   have shown that Isoflurane, for instance, will stick

13   around for about 96, sometimes 72 hours.  You can still

14   smell it frequently as patients come out.  That balto

15   agent [phonetic], that risk for a depression effect, is

16   still present, though not measured.

17      Q        End-tidal CO2 volumes change from second

18   to second?

19      A        It changes from not necessarily second

20   to second, but it can change over periods of breaths.

21   But, you know, for Brett, there was a clear marching up

22   of his CO2.  It just wasn't an isolated monitoring.

23                   And I think one of your expert witnesses

24   made that comment that -- you know, "this isolated

25   measurement."  Brett's was not isolated.  It was --

72

1   there was a clear pattern.  I mean that's what the data

2   clearly shows, is that this child had an increasing CO2

3   end-tidal, which would correlate with an increasing

4   arterial CO2, so inadequate ventilation with lower

5   tidal volumes.

6              And that is part of the instruments that

7   we use to fly the plane.  You know, there's definitely

8   a clinical judgment that goes along with this, but it

9   would be -- I guess the analogy would be that, you

10  know, Jimmy Doolittle flew an airplane to Japan and

11  completed a mission with a map and a compass, but you

12  wouldn't get onto an international 747 and not expect

13  the pilot to use the GPS to get you from here to Europe

14  or from here to Atlanta, whichever.

15       Q       Do --

16       A       Then so those monitoring systems, they

17  have to be tied in with clinical judgment, and you

18  can't just ignore those, and that was clearly there.

19       Q       Do you believe that Dr. Paidipalli

20  ignored the diagnostics?

21       A       He either ignored it or should have or

22  could -- he should have done something about it.  So I

23  don't know if he just said I don't care.  I can't read

24  his mind.  But the data is clearly there.

25              The end points from making the decision

73

1    to extubate that child clearly were not supportive of

2    that care.  And a reasonable anesthesiologist given the

3    set of facts for Brett, in his physical condition,

4    that's well-documented by the Pre-Anesthetic Record,

5    clearly support the outcome.  But it's an expected

6    outcome.  It's not a surprise at all, taking the set of

7    facts and the anesthetic that was delivered to that

8    patient.

9         Q        The decision to extubate a patient and

10   wake them up, is that based solely on what the monitors

11   say?

12        A        No, no.  There's a lot of different

13   points.  So, you know, the first point is to decide

14   whether or not you're going to do -- especially for ENT

15   surgery, there's, you know, one of the -- probably the

16   single largest complication with T&A's is actually

17   bleeding postoperatively.  That's the most common

18   concern.

19             The second most common concern is loss

20   of airway, which actually bleeding can cause loss of

21   airway for -- what happens is blood gets in your airway

22   and it gets on your vocal cords.  And your cord spasms.

23   Children are at high risk for this.

24             And so the decision point in this is a

25   debated way to do it, and there's actually studies that

```
1   look at do you do an awake extubation so you have the
2   child fully awake and they are completely with it and
3   interacting with you, and it's, you know -- or do you
4   keep them deep anesthetized, pull the tube out, and
5   then stay in the room longer, let the gas, inhaled
6   agent, go down enough for them to support and maintain
7   their respirations, and then -- you know.
8               And sometimes you would even bring that
9   patient to the recovery room in that state and you
10  would stay with them and monitor them, one of -- either
11  the CRNA or the physician would stay with the patient
12  while they were monitored until they, you know, arouse
13  and make sure that they are appropriately monitored.
14              Both -- both -- both decisions are
15  reasonable choices, and there's actually studies that
16  show the benefits of one and the benefits of the other,
17  and that's a clinical decision that you make.
18              And I can't argue with that clinical
19  decision, but if you're going to do either one,
20  whatever that choice is, you have to do it in a
21  medically acceptable way, and that medically acceptable
22  way could be done in Nashville, Tennessee or Memphis or
23  Alaska, for that matter, but there are certain
24  physiologic variables about giving anesthetics that
25  don't change.
```

```
 1                There's judgment calls and then there's

 2      "I'm ignoring the available monitoring I have."  And

 3      those are two separate points.

 4           Q          Do you know what the CRNA that handed

 5      the patient off to Nurse Kish informed her about?

 6                      MR. LEDBETTER:  Object as to form.

 7      Also, it's a double question.

 8      BY MR. GILMER

 9           Q          Do you have what the -- do you have any

10      idea what the CRNA that transferred the patient to the

11      PACU reported to Nurse Kish?

12           A          I didn't see any documentation of what

13      she did or did not.  There was some mention that -- I

14      think in one of the affidavits I saw that the

15      circulating nurse, maybe, brought the patient to PACU,

16      and not Kish, so -- but, I mean -- not Kish, but the --

17      I can't remember her name, the CRNA -- that one of them

18      brought -- so I'm not aware of the hand-off.  And

19      there -- there's no documentation that I could find of

20      what exactly that was.

21           Q          If the patient was delivered to the PACU

22      with supplemental oxygen, would that change your

23      opinions in the case?

24           A          If the patient was delivered -- it would

25      make me think that the patient received oxygen, but it
```

```
1    wouldn't change my opinion to the fact that the patient

2    was extubated at a point when he was having inadequate

3    ventilation to support himself and that the end point

4    of him getting hypercarbic and developing respiratory

5    failure and subsequent hypoxemia were inevitable unless

6    something else was done about it.  The point to impact

7    that was in the operating room before he ever left the

8    operating room, so --

9         Q         So the decision -- are you saying that

10   the decision to extubate led to the respiratory failure

11   some ninety minutes later?

12        A         Absolutely, no doubt about it.

13        Q         And there was no -- what clinical

14   indications or monitoring indications do you have from

15   the PACU that the patient was having difficulty

16   ventilating?

17        A         Two.  Probably the most important one is

18   tachycardia, which is -- you know, is -- can be caused

19   by hypercarbia.  Tachycardia in a infant can be -- or a

20   child; he's not an infant -- or an adult can be caused

21   by a variety of things.

22                  This -- Brett received a medicine called

23   Glycopyrrolate, which does tend to increase your heart

24   rate, and he just had surgery, which are two things

25   that can cause your heart rate to go up.  So can
```

1    hypercarbia.

2            So it's hard to differentiate that out.

3    They do not monitor end-tidal $CO_2$ in the PACU

4    routinely, and I didn't see any record that they did it

5    there.

6            There's some issues with the accuracy of

7    $CO_2$ as measured by me breathing through a mask or a

8    nasal cannula as versus an endotracheal tube as --

9    which was the measurement that Brett had, because they

10   used a 6.5 endotracheal tube that was cuffed for him,

11   which would make the end-tidal $CO_2$ very accurate.  And

12   so they didn't -- you know, once the tube was removed,

13   that's -- you know, we don't have any more data points

14   for that.

15           The other issue is that Brett clearly

16   had what we call emergence delirium, and that is

17   actually pretty common with kids.  That's basically

18   what you and I might say you're awake but you're not

19   cognizant and you're not able to make rational

20   decisions.  You'll swing at people.  You will often

21   obstruct your airway.  You can't control your airway.

22   You can't breathe -- you might breath a little bit, but

23   it's -- you know, we see this in adults all the time.

24           Children are much more prone.  So

25   they're -- the amount of attention you have to pay to

78

1    this in a child is dramatically more, especially a

2    twelve-year-old child that weighs 80-something

3    kilograms, who has obstructive sleep apnea, like I

4    said, and is getting his tonsils done.   It is

5    dramatically higher.

6                    So when patients -- you know, one of the

7    primary things that, as a pediatric anesthesiologist,

8    you have to rule out is hypoxemia and hypercarbia.   I

9    mean that is very clear.   That's one of the first

10   things you have to do.

11                   And, you know, oxygen saturation

12   monitors are specific but not very sensitive, and the

13   difference is that they are telling you the saturation

14   of hemoglobin -- of oxygen and hemoglobin.   Okay.   So

15   if when we talk about -- when we're looking through the

16   labs, we have something called PaO2, which is the

17   partial pressure of oxygen within the blood.   Well,

18   that -- there's a -- you know, there's a relationship

19   between the two, and they are not linear.   And that's

20   why oxygen saturation monitors are not a -- not a very

21   specific monitor of hypoxemia.

22                   So if your PaO2 is 300, your sats going

23   to be 99 percent.   Well, if your lung function is down

24   or you're hypercarbic and you're not ventilating well

25   and your CO2 is up to maybe 100, and that CO2 of 100 is

1   causing you to get more respiratory depressed and not

2   breathing even more, your PaO2 may be down to 75 or 80,

3   and your saturation will still be 99 percent.

4                    So the monitoring devices that we use

5   have their limitations, and that's an important part of

6   what we do as anesthesiologists is ensuring, in spite

7   of those limitations, that we're making the appropriate

8   assessments of the patient, which includes specifically

9   physical exams.

10       Q        And that is also why it's important for

11  the PACU nurse to monitor the patient carefully?

12       A        Agreed.

13       Q        I want to go through and --

14                    MR. GILMER:  Well, how much more have

15  you got?

16                    VIDEOGRAPHER:  This would be a good time

17  to take a break.

18                    MR. GILMER:  Okay.

19                    VIDEOGRAPHER:  I've got about

20  twenty-five minutes, but --

21                    MR. GILMER:  Oh, I mean I can keep

22  going.  I can keep going for twenty-five minutes, if

23  that's all right.  I'll grab the medical record here.

24  BY MR. GILMER:

25       Q        The Anesthesia Record --

```
 1        A          Yes, sir.

 2        Q          I would like for you to go through the

 3   Anesthesia Record and explain to me exactly what ...

 4        A          Okay.  You want me to just go through

 5   it, or do you have a specific question you --

 6        Q          No, I -- yeah, I would like for you to

 7   go through specifically the issues that you've just

 8   discussed regarding the hypercarbia.

 9        A          So may I share your pen?  So as you can

10   see here [indicating], Brett came into the operating

11   room and he was put on nitrous, which is laughing gas

12   and air, 7 liters, amended in 3 liters -- an amendment

13   which is a normal way we induce a child -- and then

14   Sevoflurane, 8 percent.  That's the maximum amount of

15   Sevoflurane.

16                   So you're trying to, very quickly, get

17   the child -- but you don't have I.V. access.  And then

18   once you get I.V. access, then they gave Robinul, which

19   is a medicine that prevents children from getting their

20   heart rate down a lot in -- so you see that.  At the

21   same time, his heart rate, which is this dot here

22   [indicating], kicks up from 80 to 110, which -- the

23   good news about Robinul is it prevents the

24   brachycardia, but it also hides signs of hypercarbia,

25   such as tachycardia, because you don't know what that's
```

1      A          Because if he's uncomfortable, then he's

2   going to be delirious, too, if he wakes up hurting.

3      Q          Do you have any opinion concerning the

4   documentation that Dr. Paidipalli made?

5      A          This chart is primarily done by the

6   CRNA, and the only thing that he did was this portion

7   right here [indicating] as -- you know, based upon the

8   handwriting, looking at it.  I'm not aware of any other

9   documentation that I saw other than the pre-op

10  anesthetic assessment, and that was uninterpretable.

11     Q          Do you have any criticisms of the

12  documentation made by the CRNA on this Anesthesia

13  Record?

14     A          The documentation seems fine.  The

15  medical decisions do not.

16                MR. GILMER:  Okay.  Let's mark the

17  Anesthesia Record as the next numbered exhibit.

18                (Anesthesia Record marked as
                   Exhibit No. 7 to this deposition.)
19

20  BY MR. GILMER:

21     Q          And, Doctor, for the record, the blue

22  ink that is on here, you just made, correct?

23     A          Yes, sir.

24                MR. GILMER:  Okay.  Why don't we take a

25  break?

```
 1                    VIDEOGRAPHER:  This is the end of Disc
 2   No. 1.  The time is 3:07.
 3                    (Recess taken from 3:07 to 3:15 p.m.)
 4                    VIDEOGRAPHER:  This is the beginning of
 5   Disc 2 of the deposition of Dr. Jason Kennedy.  The
 6   time is 3:15.  You may begin.
 7   BY MR. GILMER:
 8        Q         Doctor, we had just went through the
 9   Anesthesia Record and talked about your -- the bases
10   for your opinions.  What, in your opinion, did the
11   standard of care require of Dr. Paidipalli to do rather
12   than extubate the patient at 10:26?
13        A         To allow the patient's spontaneous
14   respiratory drive to return to normal and to assist him
15   into that point.
16        Q         And how would he have done that?
17        A         By keeping the breathing tube in and
18   assisting his ventilation via the anesthetic machine as
19   a way you can manually support his breathing, or you
20   can put him back on the ventilator that's incorporated
21   into the anesthetic machine.
22        Q         This use of supplemental oxygen was not
23   sufficient?
24        A         No, because supplemental oxygen can
25   actually kind of hide that hypoc -- low tidal volume
```

```
 1    ventilation that you see.  It might have prevented him

 2    de-saturating, but it wasn't going to prevent his

 3    eventual outcome.

 4         Q         The -- at the bottom right-hand corner

 5    here, it talks about the -- what does this say,

 6    "ICU/PACU at 10:35"?

 7         A         Yeah.  That's either ICU or the

 8    Post-Anesthesia Care Unit at 10:35 versus 10:36.  I

 9    don't know if they were in the unit at 10:35 and did

10    that at 10:36.  And these are the vital signs.

11         Q         Okay.  And what do -- do the vital signs

12    indicate anything to you?

13         A         Nope.

14         Q         Anything abnormal?

15         A         He's a little tachycardiac, which means

16    he has a fast heart rate at 118.  His respiratory rate

17    is 22, which is a little fast.  And in someone who was

18    agitated and delirious, it would make me -- you know,

19    were trashing around in the bed or removing things, it

20    would make me very concerned that they are actually

21    hypercarbic.

22         Q         But being -- thrashing around or

23    emerging --

24         A         Moving.

25         Q         -- at that point, that in itself, can't
```

1    that make you tachycardiac?

2          A          Yeah.  So can the glycopyrrolate, but

3    the combined picture -- so taking one single vital sign

4    out of -- out of context, can get you into trouble.

5    But if you take the totality of the data that's

6    present, it's very clear what happened to him, and this

7    was foreseeable coming out of the operating room.

8          Q          Let's go over your report that you did

9    in the case.

10         A          Yes, sir.

11         Q          That's your copy [indicating], and I'll

12   use his copy.  The first paragraphs have to do with

13   your background.  Let's see, it shows what you have

14   reviewed.  And we've talked about what you've reviewed.

15   Did the photographs of Brett help you form any opinions

16   in the case?

17         A          Yeah, it did.

18         Q          How so?

19         A          The fact that he was in a position that

20   I would not consider consistent with the standard way I

21   would position a post-tonsillectomy patient of Brett's

22   size and body habitus.

23         Q          What did the standard of care require as

24   far as the positioning of the patient?

25         A          You can do it in a lot of different

1    ways.  You could be supine with the head elevated,

2    which according to Kish was a common thing.  You could

3    be in what they call the semi-lateral position with

4    your head slightly elevated with the -- basically kind

5    of sleeping on your side to allow some of the

6    secretions to come out.  That would be reasonable.

7                    The knee/chest position, being

8    completely prone -- I've seen that, and I've done that

9    before with young babies, young children, but they are

10   so much smaller, and the weight, their total body

11   weight, is less of an issue, laying on their diaphram,

12   as in Brett's case, who was 82-, 81-kilos, not -- I've

13   never done that with an adult before.

14       Q          With -- when you say prone, Brett's face

15   was turned to the side, though, correct?

16       A          As best as I could tell in the picture,

17   he was face down and -- but it was -- I mean it was a

18   picture.  And that's -- and that's the best I have.

19   And I think there were statements made by Kish about

20   him being, you know, face into the gurney.

21       Q          And she had the ability to change that

22   position or notify someone about any concerns that she

23   had about that position?

24       A          As did the ENT surgeon, yes.

25       Q          Now, why do you believe that you're

96

1    familiar with the standard of care for an

2    anesthesiologist practicing in Memphis, Shelby County,

3    Tennessee, in March of 2012?

4         A          Specific to what?  What?

5         Q          Well, specifically with your opinions to

6    this case.  Why do you believe that you're familiar

7    with the standard of care from Memphis when you have

8    not practiced there?

9         A          Based upon what Dr. Paidipalli's and

10   Dr. Kish's [sic] statements were, doing what they

11   normally did at the children's hospital, and in line

12   with what is normally practiced for anesthetic practice

13   throughout the rest of the country.

14        Q          Do you believe that the standard of care

15   that you are applying is a national standard of care?

16        A          I think there are certain aspects of it,

17   yes, and some of it regarding, for instance, the

18   administration of oxygen or being in a prone position,

19   I'm basing upon the statements that both the ENT

20   surgeon, the anesthesiologist, and Nurse Kish said what

21   was normal and customary in their practice.

22        Q          And so that would be the same for any

23   anesthesiologist practicing anywhere?

24        A          There might be subtleties about whether

25   or not you give oxygen to patients, but, you know, what