# EXHIBIT C

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
                   WESTERN DIVISION
                    - - - - - -
DANIEL LOVELACE, and            )
HELEN LOVELACE,                 )
Individually, and as Parents)
of BRETT LOVELACE, deceased,)
                                )
Plaintiffs,                     )
                                )
vs.                             )   No. 2:13-cv-02289-SHL-dkv
                                )
PEDIATRIC                       )
ANESTHESIOLOGISTS, P.A.;        )
BABU RAO PAIDIPALLI; and        )
MARK P. CLEMONS,                )
                                )
Defendants.                     )
```

VIDEOTAPED DEPOSITION OF:

JASON D. KENNEDY, M.D.

NASHVILLE, TENNESSEE

WEDNESDAY, JUNE 25, 2014

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  IVA L. TALLEY, LCR
FILE NO.:  A80609D

```
 1  what fields of medicine?
 2       A          Anesthesia, cardiac anesthesia, critical
 3  care anesthesia, echocardiography.
 4       Q          Anything else?
 5       A          I'm program director of ECMO.  So I
 6  don't -- that's E-C-M-O.  There's no "h" on it.
 7       Q          Oh, got you.  That's right.  Don't pay
 8  attention to my notes.  I've got terrible note-taking
 9  skills.
10                  The opinions that you expressed in this
11  case are also -- you're giving opinions about the
12  standard of care for an ENT physician.  Do you believe
13  that you have expertise in that field?
14       A          I don't recall giving an opinion about
15  the practice for an ENT physician.  I gave an opinion
16  about the practice of a physician who saw a patient in
17  distress or in an abnormal position.  No comment about
18  his practice as an ENT surgeon.
19       Q          What is the -- been the nature of your
20  practice, primarily, since you came to Vanderbilt?  Can
21  you just give me a thumbnail sketch of what your years
22  are like?
23       A          I'm sorry.  I don't --
24       Q          Do you see patients -- as an
25  anesthesiologist, you don't have clinic patients, do
```

1  A      I have a responsibility while the
2  patient is recovering from an anesthetic to ensure they
3  recover from that.  The surgeon, who also has a shared
4  responsibility because it's -- especially since it's an
5  airway case -- has a responsibility to at least -- you
6  know, especially if he walked by and saw the patient in
7  a position that's not conducive to appropriate airway
8  support and not consistent with the standards set at
9  Le Bonheur -- to rectify the situation or make another
10 physician, specifically, the anesthesiologist, aware.
11 Q      Now, we'll go back through most of those
12 things again when we go through your report, but you
13 mentioned something a couple of times as you were
14 telling me what the salient facts were and it is what
15 the parents said or did.  And I was wondering how you
16 had that information if you had not reviewed their
17 depositions?
18 A      I don't recall where it was at, to be
19 honest with you.  I ... it was ... I honestly don't
20 recall.
21 Q      Are you familiar with the standard of
22 care for a PACU nurse?
23 A      I'm familiar with what is involved with
24 a PACU nurse caring for a patient, yes.
25 Q      Is playing on Facebook appropriate while

```
 1   is one of the factors.
 2        Q         Was that the initial initiating factor?
 3        A         That was the first and -- from a time
 4   line standpoint, yes.
 5        Q         Was it an important factor?
 6        A         Yes, sir, it was an important factor.
 7        Q         In the PACU, as you mentioned earlier,
 8   sometimes it's one-on-one; sometimes it's one nurse for
 9   two patients, correct?
10        A         Yes, sir.
11        Q         Is one-on-one, at least theoretically,
12   better than one-on-two?
13        A         Theoretically, yeah.
14        Q         Okay. In this case, it was one-on-one,
15   correct?
16        A         Yes, sir.
17        Q         And a PACU nurse is charged with the
18   responsibility of monitoring a patient's airway?
19        A         Agree.
20        Q         As far as surgeons, are surgeons charged
21   with the administration of what goes on in the PACU, or
22   is that an anesthesia function?
23        A         Usually, it is the anesthesiologist that
24   is responsible in the ICU, but any physician,
25   especially a surgeon who operated on a patient, would
```

```
 1  be expected to act in a way that's appropriate for a
 2  given patient.
 3      Q       Okay. But as far as the responsibility,
 4  it's the anesthesiologist, correct?
 5      A       The anesthesiologist should have checked
 6  on the patient in the PACU, yes, sir.
 7      Q       Okay. And there's no requirement that a
 8  surgeon even go to the PACU, correct?
 9      A       No, there's not a requirement, but the
10  fact that he actually showed up, actually saw the
11  patient evaluated, is probably more concerning in that
12  he didn't take the action, due to convenience or
13  whatever reason. That would be, you know, conjecture
14  on my part as to why he didn't do what a reasonable
15  physician, any physician, would have done in the same
16  situation.
17      Q       And is it your position that the fact
18  that the patient was prone -- that that was a situation
19  that Dr. Clemons should have rectified?
20      A       He made a comment about it. Yeah, he
21  should have rectified it and he should have called the
22  anesthesiologist at that point when he noticed that the
23  patient was in a position that is not consistent with
24  what his previous patients -- that he had cared for.
25      Q       Well, but a patient who is prone with
```

```
 1   his head turned to the side -- that's a good position
 2   for a post-tonsillectomy patient because they are not
 3   going to aspirate, are not as likely to aspirate on
 4   blood, correct?
 5        A       Probably, in an 86-kilo
 6   twelve-year-old -- probably not, no, sir.
 7        Q       Okay.
 8        A       And there was not clear evidence that
 9   the patient had his head to the side.  There was some
10   debate about whether or not he was face-down or had his
11   head to the side.
12        Q       Did you read Nurse Kish's deposition?
13        A       There is one statement that she made at
14   one point that said the patient's head was turned.
15        Q       It was always turned to the side,
16   correct?
17        A       At one point, she said his face was in
18   the mattress.
19        Q       Did you not read where she said that it
20   was turned to the side the whole time?
21        A       I think there was a statement somewhere
22   in there -- and I forget exactly where -- where there
23   was something about the face being --
24        Q       "Question: Was it to the side the
25   entire time that he was in there?"
```

```
 1                  "Answer:  It was, it was."
 2             That's what she said, isn't it?
 3             MR. LEDBETTER:  I'm going to object.
 4   She said in paragraph 6 of her plea that he was on his
 5   face the whole time.  So there's a conflict.
 6             MR. JOHNSON:  All right.  All right.  Do
 7   not make any speaking objections, please.  If you're
 8   going to do that, then let's start --
 9             MR. LEDBETTER:  I made an objection --
10             MR. JOHNSON:  Let's just stop.  Then
11   we'll come back.
12             MR. LEDBETTER:  You can stop if you want
13   to.
14             MR. JOHNSON:  But I want you to stop.
15             MR. LEDBETTER:  What you're doing is
16   deceptive and unfair.
17             MR. JOHNSON:  Well, you can redirect.
18   You can redirect, if you want to, all right, but if you
19   want to object, you say "objection."  You don't make
20   speeches like you're doing.
21             MR. LEDBETTER:  I don't -- I'm free.  I
22   can state the basis for my objection.  If I don't, it's
23   not preserved.
24             MR. JOHNSON:  No.  It -- you didn't
25   state a -- you made a speaking objection where you
```

```
 1   wanted to comment on testimony or a document that we
 2   haven't even talked about.
 3              MR. LEDBETTER:  I'm sorry.  You want to
 4   be deceptive, and I did make a comment.
 5              MR. JOHNSON:  I'm not -- it's not --
 6              MR. LEDBETTER:  Try not to be deceptive,
 7   and I won't have to make that kind of comment anymore.
 8              MR. JOHNSON:  Well, do you want to see
 9   what's in the -- what I just read?  That was not
10   deceptive.
11              MR. LEDBETTER:  In Paragraph 6 of her
12   plea --
13              MR. JOHNSON:  I didn't read Paragraph 6
14   of her plea.
15              MR. LEDBETTER:  You sure --
16              MR. JOHNSON:  I read the deposition
17   testimony.
18              MR. LEDBETTER:  You sure did, and it's
19   under oath.
20   BY MR. JOHNSON:
21      Q       All right.  Did you see where she said
22   in her deposition that it was turned -- his head was
23   turned to the side the whole time?
24      A       I saw that, and also, I saw her plea
25   where she actually stated that the face was face down,
```

```
 1   too.
 2        Q         Okay.  Then --
 3        A         We've lost the order --
 4        Q         But you're not --
 5        A         Sorry.
 6        Q         Yeah, but you're not saying that a
 7   patient has a compromised airway if they are lying with
 8   their face turned to the side, are you?
 9        A         Compromised diaphragm.  So they can't
10   take normal tidal volumes, especially a child of his
11   size.
12        Q         Okay.  Well, are you saying then that
13   this patient had a compromised airway for the ninety
14   minutes that he is in the ICU -- I mean PACU.
15        A         Compromised diaphragm.  His ability to
16   ventilate was not preserved, as evidenced by the fact
17   that his CO2 was over 100.
18        Q         Okay.  And would Nurse Kish be expected
19   to monitor that?
20        A         Well, she wouldn't have a way to monitor
21   directly his CO2, per se, as we discussed already.
22        Q         But I'm talking about the airway.  Isn't
23   she charged with monitoring the airway?
24        A         Yes, sir.
25        Q         Okay.  And so presumably she was
```

```
1    monitoring it, and if there had been a problem with
2    that, then she should have called somebody or done
3    something about it.
4              MR. LEDBETTER:  Object to the form.
5    BY MR. JOHNSON:
6         Q         Is that true?
7         A         I'm sorry.  Repeat one more time.
8         Q         Is it your opinion that if she was
9    monitoring the airway and there was a problem with the
10   airway, then she should have done something about it or
11   called someone to do something about it?
12        A         I think that's an accurate statement,
13   yes, sir.
14        Q         You're not able to say -- between the
15   time that you say he was extubated too soon and the
16   time of the code, you're not able to say in that time
17   frame when, let's say, the die was cast --
18        A         Yeah, that would be --
19        Q         -- and could not be resuscitated or
20   salvaged; is that correct?
21        A         That would be conjecture.
22        Q         Is that correct?
23        A         That is -- would be conjecture.
24        Q         Okay.  You can't put a time --
25        A         No, sir, you cannot.
```

1  Q     Okay.
2  A     And it could have been before or after
3  the ENT surgeon stopped by to see the patient, yes,
4  sir.
5  Q     It may have been too late by the time
6  Dr. Clemons even saw the patient in the PACU, correct?
7  A     That is not beyond the realm of
8  possibilities, correct.
9  Q     Okay. You, I think, have said this, but
10 I'm going to put it in these terms. You're not
11 qualified to give standard of care opinions as to the
12 practice of otolaryngology?
13 A     I'm not an ENT surgeon, no, sir.
14 Q     Okay. Well, just say yes or no. You're
15 not qualified to do that, are you?
16 A     I'm not qualified to give what the
17 standard of care for an ENT surgeon -- but I am
18 qualified to say what the standard of care for a
19 physician who sees a patient who's in an inappropriate
20 position and has a compromised airway.
21 Q     Okay. Are you saying that if ... if he
22 had been lying on his back that this never would have
23 happened?
24 A     "If he was lying on his back, this would
25 have ..." If he was lying in a position where he would

```
 1  be assessed and he was assessed, as appropriate, this
 2  might not have happened, but to say that it never would
 3  have happened would be conjecture.
 4      Q      Okay.  Well, but you're saying that
 5  it -- that he was lying prone, and you seem to complain
 6  about that, that that was not a good position, correct?
 7      A      I think that contributed to the
 8  situation, yes, sir.
 9      Q      Okay.  I'm asking you, if he had been
10  lying on his back, would this have happened?
11      A      Usually -- like I said before, usually
12  we don't keep them supine.  Usually, we do lateral or
13  the semi-lateral position.
14      Q      Well, all right.  We'll start with
15  supine.  If he were supine, would it have happened?
16      A      Don't know.  That would be conjecture.
17      Q      All right.  If he was lateral -- can you
18  say that if he had been lateral, lying on his side,
19  that this would not have happened?
20      A      No, sir.
21      Q      In your disclosure, it says, quote, I'm
22  familiar with the applicable standards of care and
23  issues in this case specifically regarding
24  anesthesiology treatment and care, medical, surgical
25  and post-surgical/PACU care."  Is that your statement?
```