# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION
                       - - - - - -
 3  DANIEL LOVELACE, and          )
    HELEN LOVELACE,               )
 4  Individually, and as Parents)
    of BRETT LOVELACE, deceased,)
 5                                )
    Plaintiffs,                   )
 6                                )
    vs.                           ) No. 2:13-cv-02289-SHL-dkv
 7                                )
    PEDIATRIC                     )
 8  ANESTHESIOLOGISTS, P.A.;      )
    BABU RAO PAIDIPALLI; and      )
 9  MARK P. CLEMONS,              )
                                  )
10  Defendants.                   )
    ---------------------------
11
                    VIDEOTAPED DEPOSITION OF:
12
                    JASON D. KENNEDY, M.D.
13
                     NASHVILLE, TENNESSEE
14
                  WEDNESDAY, JUNE 25, 2014
15  -----------------------------------------------------
16

17

18

19

20

21

22  ATKINSON-BAKER, INC.
    COURT REPORTERS
23  (800) 288-3376
    www.depo.com
24
    REPORTED BY:  IVA L. TALLEY, LCR
25  FILE NO.:  A80609D
```

1

1    what fields of medicine?

2         A          Anesthesia, cardiac anesthesia, critical

3    care anesthesia, echocardiography.

4         Q          Anything else?

5         A          I'm program director of ECMO.  So I

6    don't -- that's E-C-M-O.  There's no "h" on it.

7         Q          Oh, got you.  That's right.  Don't pay

8    attention to my notes.  I've got terrible note-taking

9    skills.

10                    The opinions that you expressed in this

11   case are also -- you're giving opinions about the

12   standard of care for an ENT physician.  Do you believe

13   that you have expertise in that field?

14        A          I don't recall giving an opinion about

15   the practice for an ENT physician.  I gave an opinion

16   about the practice of a physician who saw a patient in

17   distress or in an abnormal position.  No comment about

18   his practice as an ENT surgeon.

19        Q          What is the -- been the nature of your

20   practice, primarily, since you came to Vanderbilt?  Can

21   you just give me a thumbnail sketch of what your years

22   are like?

23        A          I'm sorry.  I don't --

24        Q          Do you see patients -- as an

25   anesthesiologist, you don't have clinic patients, do

1        A          I have a responsibility while the

2   patient is recovering from an anesthetic to ensure they

3   recover from that.  The surgeon, who also has a shared

4   responsibility because it's -- especially since it's an

5   airway case -- has a responsibility to at least -- you

6   know, especially if he walked by and saw the patient in

7   a position that's not conducive to appropriate airway

8   support and not consistent with the standards set at

9   Le Bonheur -- to rectify the situation or make another

10  physician, specifically, the anesthesiologist, aware.

11       Q          Now, we'll go back through most of those

12  things again when we go through your report, but you

13  mentioned something a couple of times as you were

14  telling me what the salient facts were and it is what

15  the parents said or did.  And I was wondering how you

16  had that information if you had not reviewed their

17  depositions?

18       A          I don't recall where it was at, to be

19  honest with you.  I ... it was ... I honestly don't

20  recall.

21       Q          Are you familiar with the standard of

22  care for a PACU nurse?

23       A          I'm familiar with what is involved with

24  a PACU nurse caring for a patient, yes.

25       Q          Is playing on Facebook appropriate while

1    is one of the factors.

2         Q          Was that the initial initiating factor?

3         A          That was the first and -- from a time

4    line standpoint, yes.

5         Q          Was it an important factor?

6         A          Yes, sir, it was an important factor.

7         Q          In the PACU, as you mentioned earlier,

8    sometimes it's one-on-one; sometimes it's one nurse for

9    two patients, correct?

10        A          Yes, sir.

11        Q          Is one-on-one, at least theoretically,

12   better than one-on-two?

13        A          Theoretically, yeah.

14        Q          Okay.  In this case, it was one-on-one,

15   correct?

16        A          Yes, sir.

17        Q          And a PACU nurse is charged with the

18   responsibility of monitoring a patient's airway?

19        A          Agree.

20        Q          As far as surgeons, are surgeons charged

21   with the administration of what goes on in the PACU, or

22   is that an anesthesia function?

23        A          Usually, it is the anesthesiologist that

24   is responsible in the ICU, but any physician,

25   especially a surgeon who operated on a patient, would

169

1    be expected to act in a way that's appropriate for a

2    given patient.

3         Q         Okay.  But as far as the responsibility,

4    it's the anesthesiologist, correct?

5         A         The anesthesiologist should have checked

6    on the patient in the PACU, yes, sir.

7         Q         Okay.  And there's no requirement that a

8    surgeon even go to the PACU, correct?

9         A         No, there's not a requirement, but the

10   fact that he actually showed up, actually saw the

11   patient evaluated, is probably more concerning in that

12   he didn't take the action, due to convenience or

13   whatever reason.  That would be, you know, conjecture

14   on my part as to why he didn't do what a reasonable

15   physician, any physician, would have done in the same

16   situation.

17        Q         And is it your position that the fact

18   that the patient was prone -- that that was a situation

19   that Dr. Clemons should have rectified?

20        A         He made a comment about it.  Yeah, he

21   should have rectified it and he should have called the

22   anesthesiologist at that point when he noticed that the

23   patient was in a position that is not consistent with

24   what his previous patients -- that he had cared for.

25        Q         Well, but a patient who is prone with

1  his head turned to the side -- that's a good position

2  for a post-tonsillectomy patient because they are not

3  going to aspirate, are not as likely to aspirate on

4  blood, correct?

5      A           Probably, in an 86-kilo

6  twelve-year-old -- probably not, no, sir.

7      Q           Okay.

8      A           And there was not clear evidence that

9  the patient had his head to the side.  There was some

10  debate about whether or not he was face-down or had his

11  head to the side.

12      Q           Did you read Nurse Kish's deposition?

13      A           There is one statement that she made at

14  one point that said the patient's head was turned.

15      Q           It was always turned to the side,

16  correct?

17      A           At one point, she said his face was in

18  the mattress.

19      Q           Did you not read where she said that it

20  was turned to the side the whole time?

21      A           I think there was a statement somewhere

22  in there -- and I forget exactly where -- where there

23  was something about the face being --

24      Q           "Question:  Was it to the side the

25  entire time that he was in there?"

1          "Answer:  It was, it was."

2          That's what she said, isn't it?

3          MR. LEDBETTER:  I'm going to object.

4   She said in paragraph 6 of her plea that he was on his

5   face the whole time.  So there's a conflict.

6          MR. JOHNSON:  All right.  All right.  Do

7   not make any speaking objections, please.  If you're

8   going to do that, then let's start --

9          MR. LEDBETTER:  I made an objection --

10          MR. JOHNSON:  Let's just stop.  Then

11   we'll come back.

12          MR. LEDBETTER:  You can stop if you want

13   to.

14          MR. JOHNSON:  But I want you to stop.

15          MR. LEDBETTER:  What you're doing is

16   deceptive and unfair.

17          MR. JOHNSON:  Well, you can redirect.

18   You can redirect, if you want to, all right, but if you

19   want to object, you say "objection."  You don't make

20   speeches like you're doing.

21          MR. LEDBETTER:  I don't -- I'm free.  I

22   can state the basis for my objection.  If I don't, it's

23   not preserved.

24          MR. JOHNSON:  No.  It -- you didn't

25   state a -- you made a speaking objection where you

1  wanted to comment on testimony or a document that we

2  haven't even talked about.

3           MR. LEDBETTER:  I'm sorry.  You want to

4  be deceptive, and I did make a comment.

5           MR. JOHNSON:  I'm not -- it's not --

6           MR. LEDBETTER:  Try not to be deceptive,

7  and I won't have to make that kind of comment anymore.

8           MR. JOHNSON:  Well, do you want to see

9  what's in the -- what I just read?  That was not

10 deceptive.

11          MR. LEDBETTER:  In Paragraph 6 of her

12 plea --

13          MR. JOHNSON:  I didn't read Paragraph 6

14 of her plea.

15          MR. LEDBETTER:  You sure --

16          MR. JOHNSON:  I read the deposition

17 testimony.

18          MR. LEDBETTER:  You sure did, and it's

19 under oath.

20 BY MR. JOHNSON:

21     Q          All right.  Did you see where she said

22 in her deposition that it was turned -- his head was

23 turned to the side the whole time?

24     A          I saw that, and also, I saw her plea

25 where she actually stated that the face was face down,

173

```
 1   too.

 2        Q        Okay.  Then --

 3        A        We've lost the order --

 4        Q        But you're not --

 5        A        Sorry.

 6        Q        Yeah, but you're not saying that a

 7   patient has a compromised airway if they are lying with

 8   their face turned to the side, are you?

 9        A        Compromised diaphragm.  So they can't

10   take normal tidal volumes, especially a child of his

11   size.

12        Q        Okay.  Well, are you saying then that

13   this patient had a compromised airway for the ninety

14   minutes that he is in the ICU -- I mean PACU.

15        A        Compromised diaphragm.  His ability to

16   ventilate was not preserved, as evidenced by the fact

17   that his CO2 was over 100.

18        Q        Okay.  And would Nurse Kish be expected

19   to monitor that?

20        A        Well, she wouldn't have a way to monitor

21   directly his CO2, per se, as we discussed already.

22        Q        But I'm talking about the airway.  Isn't

23   she charged with monitoring the airway?

24        A        Yes, sir.

25        Q        Okay.  And so presumably she was
```

1  monitoring it, and if there had been a problem with

2  that, then she should have called somebody or done

3  something about it.

4                    MR. LEDBETTER:   Object to the form.

5  BY MR. JOHNSON:

6        Q         Is that true?

7        A         I'm sorry.  Repeat one more time.

8        Q         Is it your opinion that if she was

9  monitoring the airway and there was a problem with the

10 airway, then she should have done something about it or

11 called someone to do something about it?

12       A         I think that's an accurate statement,

13 yes, sir.

14       Q         You're not able to say -- between the

15 time that you say he was extubated too soon and the

16 time of the code, you're not able to say in that time

17 frame when, let's say, the die was cast --

18       A         Yeah, that would be --

19       Q         -- and could not be resuscitated or

20 salvaged; is that correct?

21       A         That would be conjecture.

22       Q         Is that correct?

23       A         That is -- would be conjecture.

24       Q         Okay.  You can't put a time --

25       A         No, sir, you cannot.

1        Q        Okay.

2        A        And it could have been before or after

3    the ENT surgeon stopped by to see the patient, yes,

4    sir.

5        Q        It may have been too late by the time

6    Dr. Clemons even saw the patient in the PACU, correct?

7        A        That is not beyond the realm of

8    possibilities, correct.

9        Q        Okay.  You, I think, have said this, but

10   I'm going to put it in these terms.  You're not

11   qualified to give standard of care opinions as to the

12   practice of otolaryngology?

13       A        I'm not an ENT surgeon, no, sir.

14       Q        Okay.  Well, just say yes or no.  You're

15   not qualified to do that, are you?

16       A        I'm not qualified to give what the

17   standard of care for an ENT surgeon -- but I am

18   qualified to say what the standard of care for a

19   physician who sees a patient who's in an inappropriate

20   position and has a compromised airway.

21       Q        Okay.  Are you saying that if ... if he

22   had been lying on his back that this never would have

23   happened?

24       A        "If he was lying on his back, this would

25   have ..."  If he was lying in a position where he would

176

1   be assessed and he was assessed, as appropriate, this

2   might not have happened, but to say that it never would

3   have happened would be conjecture.                .

4        Q        Okay.  Well, but you're saying that

5   it -- that he was lying prone, and you seem to complain

6   about that, that that was not a good position, correct?

7        A        I think that contributed to the

8   situation, yes, sir.

9        Q        Okay.  I'm asking you, if he had been

10  lying on his back, would this have happened?

11       A        Usually -- like I said before, usually

12  we don't keep them supine.  Usually, we do lateral or

13  the semi-lateral position.

14       Q        Well, all right.  We'll start with

15  supine.  If he were supine, would it have happened?

16       A        Don't know.  That would be conjecture.

17       Q        All right.  If he was lateral -- can you

18  say that if he had been lateral, lying on his side,

19  that this would not have happened?

20       A        No, sir.

21       Q        In your disclosure, it says, quote, I'm

22  familiar with the applicable standards of care and

23  issues in this case specifically regarding

24  anesthesiology treatment and care, medical, surgical

25  and post-surgical/PACU care."  Is that your statement?