# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as
Parents of BRETT LOVELACE, deceased,

      Plaintiffs,

vs.                                  NO.: ___2:13-cv-02289 dkv___
                                        JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and,
MARK P. CLEMONS,

      Defendants.

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Come the Plaintiffs, Daniel Lovelace and wife, Helen Lovelace, Individually, and as Parents of Brett Lovelace, deceased, by counsel, Mark Ledbetter, and for their Statement of Undisputed Material Facts under Rule 56(c) and L.R. 56.1, state:

No genuine issue of material fact remains to be litigated in this matter as to the negligence or fault of Mark P. Clemons under T.C.A. § 29-26-115(1), (2) and (3).

Plaintiffs provide the following Statement of Undisputed Material Facts:

1.      Plaintiffs' decedent, Brett Lovelace, was a healthy active 12 year old boy at the time of his admission to LeBonheur Children's Hospital on March 12, 2012 for a tonsillectomy and adenoidectomy (hereinafter "T&A"), as described in Le Bonheur's Pre-Op Surgical History & Physical (pg. 0007) and Pre-Operative History (pg. 0455), attached hereto as Ex. "A". [Request No. 1 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

2.      The reason Brett Lovelace was admitted to have a T&A at LeBonheur Children's Hospital, instead of Crittenden Memorial Hospital, West Memphis, Arkansas 72301, was because he tossed and turned a lot during sleep, snored, had asthma, was a mouth breather, or was overly tired in the evening, or any of these. [Request No. 2 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

3.      Dr. Clemons recommended LeBonheur Children's Hospital as the place for this surgery because it was believed to be a safer hospital for Brett Lovelace's surgery, considering his history. [Request No. 3 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

4.      Dr. Clemons told the parents following the completion of the T&A that the surgery went well and that Brett was doing fine and they could join him in the LeBonheur recovery room. [Request No. 4 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

5.      When Dr. Clemons last saw Brett Lovelace as he arrived from the surgical suite to the PACU, he was face down on the gurney in a prone position, prior to him leaving LeBonheur and later being called and informed that he had coded. [Request No. 5 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

6.      When Dr. Clemons spoke to the parents after the surgery when Brett Lovelace was in the PACU, he was face down in a prone position on the gurney, and Dr. Clemons questioned his parents about whether the prone position Brett was in, was a normal sleeping position for him, and they said "no". [Request No. 6 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

7.      Dr. Clemons gave no orders, caution, warning or instructions to the PACU nurse, Kish, or to any other LeBonheur hospital personnel, and did not intervene in any way to ensure that Brett's airway was clear when he arrived in the PACU, and did not determine that he was oxygenating and ventilating properly following surgery. [Request No. 7 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

8.      Dr. Clemons failed to ensure that Brett was fully awakened from anesthesia and conscious (AAOX3) prior to leaving the PACU after the surgery, and specifically, after he saw Brett in a prone position on the gurney and discussed the matter with the parents.  [Request No. 8 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

9.      Dr. Clemons did not call for an anesthesiologist to awaken or assess Brett Lovelace in the PACU to ensure that he was fully awakened from anesthesia and alert, after seeing Brett in a prone position and being aware of the patient's high risk of respiratory and airway compromise prior to leaving the hospital on the date of the surgery. [Request No. 9 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

10.      Dr. Clemons took no action and failed to intervene to appropriately correct the improper face-down positioning of the patient after the T&A surgery and prior to him leaving the patient in the PACU and departing the hospital. [Request No. 10 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

3

11.     The drawing attached hereto and identified as Ex. "B" [Brett Lovelace's Postoperative Positioning & Mechanism of Asphyxia], is a fair and accurate depiction of Brett Lovelace at the time of his arrival in the PACU at 10:30 a.m. on March 12, 2013, and when Dr. Clemons left him in the PACU.  [Request No. 11 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

12.     The drawing attached hereto and identified as Ex. "C" [3/12/12 Head CT Findings], is a fair and accurate depiction of Brett Lovelace's brain showing diffuse cerebral edema with loss of sulci and compression of ventricular system after he went into cardiac arrest in the PACU at 11:59 a.m. on March 12, 2013.  [Request No. 12 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

13.     The drawing attached hereto and identified as Ex. "D" [3/14/12 Head CT Findings – showing brain dead], is a fair and accurate depiction of Brett Lovelace's brain subsequent to 11:59 a.m. on March 12, 2013.  [Request No. 13 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

14.     The drawing attached hereto and identified as Ex. "E" [Adenoidectomy and Tonsillectomy Surgery], is a fair and accurate depiction or representation of the surgery performed on Brett Lovelace by Dr. Mark P. Clemons at approximately 9:19 a.m. on March 12, 2013 at LeBonheur Children's Hospital.  [Request No. 14 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

15.     The drawing attached hereto and identified as Ex. "F" [Cerebral Edema and Hypoxia], is a fair and accurate depiction of what happed to Brett Lovelace's brain during the time his airway was blocked and he was unattended in PACU subsequent to his T&A surgery on March 12, 2013 at  LeBonheur Children's Hospital.  [Request No. 15 – Plaintiffs' First Request for

Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

16.     The drawing attached hereto and identified as Ex. "G" [Normal Brain - Herniations], is a fair and accurate depiction of a normal brain prior to and after an event of the sort that occurred to Brett Lovelace after the T&A surgery of March 12, 2013 at Le Bonheur Children's Hospital. [Request No. 16 – Plaintiffs' First Request for Admissions Propounded to All Defendants] [Attached hereto as Exhibit H – admitted by Defendant].

17.     During post-anesthetic recovery, all children should be administered oxygen supplementation during their transport from the operating room and on arrival at the PACU, until they can maintain satisfactory oxygen saturation in room air or at their base line $FiO_2$. Smith, *Anesthesia for Infants and Children*, 8th Edition, Exhibit 4 to Deposition of Jason Kennedy, M.D. [Attached hereto as Exhibit I].

18.     Dr. Clemons failed to follow the proper standard of care in that he failed to appropriately ensure that Brett had adequate oxygen supplementation in the post-anesthesia care unit (PACU). [See ¶ 5 of Expert Witness Report of Jason D. Kennedy, M.D. (attached hereto as Exhibit J); Kish Dep. 125:8-18; 126:19-23; 136:15-16 (attached hereto as Exhibit K)].

19.     Dr. Clemons failed to reaffirm airway patency and adequacy of breathing in the PACU. [See ¶ 5 of Expert Witness Report of Jason D. Kennedy, M.D., attached hereto as Exhibit J].

20.     Dr. Clemons also failed to maintain airway patency with simple airway maneuvers or oronasopharyngeal airway until the patient was fully awake. [See ¶ 5 of Expert Witness Report of Jason D. Kennedy, M.D. (attached hereto as Exhibit J)].

21.    Dr. Clemons failed to follow the applicable standard of care in that he failed to appropriately care for and recognize that Brett was not fully awakened from anesthesia. [See ¶ 7 of Expert Witness Report of Jason D. Kennedy, M.D. (attached hereto as Exhibit J); Helen Lovelace Dep. 41:4-21 (attached hereto as Exhibit L); Paidipalli Dep. 26:16-18; 30:6-11 (attached here to as Exhibit M)].

22.    Dr. Clemons also failed to appropriately intervene by his lack of any personal action in the care of Brett or by not calling for an appropriate trained anesthesiologist to ensure that Brett was oxygenating and ventilating appropriately.  An ENT surgeon routinely cares for such patients and should have known to intervene at the time Dr. Clemons saw Brett in the PACU.  [See ¶ 7 of Expert Witness Report of Jason D. Kennedy, M.D. (Exhibit J); Kish Dep. 123:16-24; 125:8-18; 125:19-23] (attached hereto as Exhibit K).

23.    Dr. Clemons, as respect Brett Lovelace's position in the PACU, which he observed, failed to follow the standard of care in his profession and in the locality of this event when he failed to intervene in Brett's poor positioning for a patient who was at high risk of respiratory compromise.  By documentation, Clemons observed Brett in the PACU in a knees-to-chest prone position prior to his arrest, and did not act appropriately to correct the situation. [See ¶ 5 of Expert Witness Report of Jason D. Kennedy, M.D. (attached hereto as Exhibit J)].

24.    Dr. Clemons did not adequately observe Brett Lovelace in the PACU so as to be able to exercise any judgment whatsoever.  The patient was abandoned.  The lack of attention, supervision and failure to follow the appropriate standard of care directly caused and contributed to the death of 12-year old Brett Lovelace. [See ¶ 10 and the final paragraph of Expert Witness Report of Jason D. Kennedy, M.D. (attached hereto as Exhibit J)].

25.    Brett Lovelace was not supplied with supplemental oxygen during his transfer from the O.R. to the PACU, nor afterwards, until he became anoxic and a "code" was called. [Kish Dep. 125:8-18; 125:19-23; 136:15-16; (attached hereto as Exhibit K)].

26.    It was consistent with local practice and customary practice for the Defendant to have a patient like Brett Lovelace receive supplemental oxygen in transit and in the PACU. [Clemons Dep. 25:21-24; 45:15-24; 46:1 (attached hereto as Exhibit N); Kish Dep. 143:20-23 (attached hereto as Exhibit K); Paidipalli Dep. 18:13-23; 19:3-8; 39:5-16 (attached hereto as Exhibit M)].

27.    The prone position of Brett Lovelace during his stay in the PACU was not a customary, normal or accepted position for an ENT patient.  [Clemons Dep. 44:1-24; 45:1-22 (attached hereto as Exhibit N); Kish Dep. 139:4-18; 140:1-7 (attached hereto as Exhibit K)].

Respectfully submitted,

/s/ Mark Ledbetter
Mark Ledbetter (#17637)
HALLIBURTON & LEDBETTER
Attorney for Plaintiffs
254 Court Avenue - Suite 305
Memphis, TN  38103
(901) 523-8153-phone
(901) 523-8115-fax

7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via the Court's ECF filing system this 8th day of August, 2014:

J. Kimbrough Johnson/Marcy Dodds Magee/Margaret Cooper
2900 One Commerce Square
40 S. Main Street
Memphis, TN 38103
Attorneys for Mark Clemons
901/525-8721-phone
901/525-6722-fax
jjohnson@lewisthomason.com
mmagee@lewisthomason.com
mcooper@lewisthomason.com

Brad Gilmer/Jerry Potter/Karen Koplon/David Cook
The Hardison Law Firm
119 S. Main Street, Suite 800
Memphis, TN 38103
Attorneys for Babu R. Paidipalli & Pediatric Anesthesiologists, P.A.
901/525-8776 – phone
901/525-8790 – fax
Bgilmer@hard-law.com
jpotter@hard-law.com
kkoplon@hard-law.com
dcook@hard-law.com

/s/ Mark Ledbetter
Mark Ledbetter, Certifying Attorney

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 10 of 82   PageID
2426
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 10 of 83   PageID 927

# EXHIBIT A

Le Bonheur's Pre-Op Surgical History &
Physical (pg. 0007) and Pre-Operative History
(pg. 0455)

Patient Name: LOVELACE, BRETT S
Facility: LE BONHEUR

MRN: 45854994
FIN: 68859557



**LeBonheur**
Children's Medical Center

**SURGICAL/SPECIAL PROCEDURE HISTORY & PHYSICAL**

**HISTORY FINDINGS**

Present Illness Include Indications & Symptoms:

Current Medications:

Allergies/Reactions:

Relevant Past Medical History:

Review Of System:

Bleeding Tendency:

Family Anesthesia History: Drug Sensitivities:

Immunizations:

**PHYSICAL FINDINGS**

Within Normal Limits
Yes  No   Comments

General Appearance / Mental Status:
Head / Neck (Loose Teeth):
Visual Acuity (When Indicated):
Heart:
Lungs:
Abdomen (Pelvic / Rectal If Appropriate):
Extremities / Neurologic:
Genitalia:
Other:

Planned Procedure:

Signature: _____ MD/DO# _____ Date _____ Time _____

**H & P UPDATE**

H&P Reviewed / With Changes As Documented:

Signature: _____ MD/DO# _____ Date _____ Time _____

**PHYSICIAN'S ORDERS**   ☐ Outpatient  ☐ 23 Hr.  ☐ A.M. Admit  ☐ Reg. Admit

Date Of Admit: _____   Date Of Surgery: _____

Admitting Diagnosis:

Consent To Say:

Lab:
Lab:
Radiology:
Meds:
Meds:
Other:
Attending Physician Is: _____
Signature: _____ MD/DO# _____ Date _____ Time _____

**POST OPERATIVE PROGRESS NOTES**

Surgeon:

Assistants:

Pre-Op Diagnosis:

Post Diagnosis:

Procedure:

Findings:

Specimens:

Transfusions:

Drains / Tubes:

Estimated Blood Loss:

Fluid Replacements:

Disposition / Complications:
☐ Convert To Inpatient (MUST WRITE ADMIT ORDER)
☐ Convert To 23 Hr. Obs. (MUST WRITE 23Hr. ADMIT ORDER)

Signature: _____ MD/DO# _____ Date _____ Time _____

**POST OP:** Discharge Orders
☐ Outpatient  ☐ 23 Hr.  ☐ A.M. Admit  ☐ Reg. Admit

Today's Date: _____ Time _____

Diagnosis:

Discharge Instructions:

Activities:  ☐ Routine  Other: _____
Diet:  ☐ Routine  Other: _____

I.V. Medications:

Special Instructions:

Follow-Up Appointment:

Disposition:  ☐ Home  ☐ Other, See MD Order Sheet

**DISCHARGE NOTE:**

Physician Signature:
Initials: _____ Date: _____
Pager: _____ MD #: _____
Nurse Practitioner:
Signature: _____ MD/DO# _____ Date _____ Time _____

Note: Only One Signature Required If The Same Physician Completes The H&P & Order Sections.

Page Number: 6

BL-MethLEB 0007



EXHIBIT A

Patient Name: LOVELACE, BRETT S
Facility: LE BONHEUR

MRN. 45854994
FIN: 68859557

Le Bonheur Children's Hospital

**ANESTHESIA EVALUATION**

68859557   458549557-2
Le Bonheur   FIN   MRN
LOVELACE, BRETT S
08/21/1999   12Y M/W
CLEMONS, MARK

3/12/12
Date of Surgery

## PRE-OPERATIVE HISTORY

| Pre-Op Diagnosis: Adenotonsillar Hypertrophy | Proposed Operation: tonsillectomy, adenoidectomy |
|---|---|
| Age 12  Sex M  Race    Wgt 4 kg  LMP | Lab |
| Allergies: Seroquel | Medications |

174 CM

Systems Review (Describe all positives at right)

CNS: Seizures ADHD Dev Delay learning disability    very emotional    albuterol    to use PRN before & AM of surgery

Cardiac: Murmur HTN Arrhythmia    0

Pulmonary: Wheezing Asthma URI Sleep Apnea Snoring    last wheezed Nov 2011 ; snore @ gasps

Endocrine: Diabetes Thyroid    0

GI: Reflux Hepatitis    0

Hematologic: SCD Anemia Bleeding    0 · no fam hx

Neuromuscular: MH Muscle Disease    hx MH

Prematurity: BW    Gest Age    hx B wrist fracture, @ arm x3, @ leg    cast only
1110    43 wk    0 complications

Renal    0

Other    0

Prev. Anes. Experience    0 previous surgery

Elizabeth S Hinson RN 3/8/12 1302
hx on phone per mom, Helen Lovelace
pt not seen

## PRE-OPERATIVE ASSESSMENT/EXAM

| Date: 3/12/12   Time: 851 | ASA Physical Status  1  2  3  4  5  E |
|---|---|
| Cardiac: Regular rhythm  no murmur | Immediate Pre-Op Reassessment |
| Pulmonary: clinically clear | Date 3/12/12   time 851 |
| Airway: ok | NPO Since 2330 3/11/12 |
| Dentition: ok | Chart Reviewed √ |

Pre-Med: No

Proposed Anesthesia
Anesthesia Risks, Benefits
Alternatives Discussed With:    Vanilla

☐ Staff  ☐ Resident  ☐ CRNA

## POST-OPERATIVE FOLLOW-UP

Date.    Time:

Signature    ☐ Staff  ☐ Resident  ☐ CRNA

SAP4240490510 REV

Le Bonheur Children's Hospital, Memphis, TN
White – Chart Copy    Yellow – Dept. Copy

BL-MethLEB 0455

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 13 of 82   PageID
2429
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 13 of 83   PageID 930

# EXHIBIT B

# Brett Lovelace's Postoperative Positioning & Mechanism of Asphyxia



Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 14 of 83   PageID 931

Brett Lovelace's Postoperative Positioning & Mechanism of Asphyxia

View From Above

© 2013 MediVisuals, Inc.

View From Side

Still under anesthesia, Brett is positioned face down with his legs drawn underneath his body

Position causes compression of chest and abdomen, impairing diaphragmatic expansion

Cyanosis of face difficult to appreciate due to positioning

EXHIBIT "B"

Case 2:13-cv-02289-SHL-dkv  Document 139-2  Filed 09/15/14  Page 15 of 82  PageID
2431
Case 2:13-cv-02289-SHL-dkv  Document 124-4  Filed 08/08/14  Page 15 of 83  PageID 932

# EXHIBIT C

# 3/12/12 Head CT Findings

Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 16 of 83   PageID 933

# 3/12/12 Head CT Findings



Diffuse cerebral edema with loss of sulci and compression of ventricular system

Planes of Section

Coronal View of Head

3/12/12 Coronal CT
Im: 23/40

Axial View of Head

3/12/12 Axial CT
Im: 19/33

© 2013 MediVisuals, Inc.

EXHIBIT "C"

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 17 of 82   PageID
2433
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 17 of 83   PageID 934

# EXHIBIT D

3/14/12 Head CT Findings – Showing Brain Dead

# 3/14/12 Head CT Findings



Mass effect causing uncal and cerebellar tonsil herniation

3/14/12 Coronal CT
Im: 23/40

L

R

© 2013 MedVisuals, Inc.

Coronal View of Head

EXHIBIT
"D"

exhibitsticker.com

R23783-03X.indd

Planes of Section

Severe intracranial edematous changes with near complete effacement of sulci, cisterns and the ventricular system

Findings consistent with brain death

3/14/12 Axial CT
Im: 20/34

L

R

A

B

Axial View of Head

B

# EXHIBIT E

# Adenoidectomy and Tonsillectomy Surgery

# Adenoidectomy and Tonsillectomy Surgery

Adenoid
Tonsil
Adenoid curet

1 Midline adenoid tissue removed with an adenoid curet

Right tonsil
Left tonsil

2 Right tonsil dissected from the tonsillar fossa

Right tonsillar fossa
Left tonsil

3 Left tonsil dissected from the tonsillar fossa

Adenoid tissue removed
Tonsillar tissue removed

4 Post-operative appearance of the oropharynx

© 2013 MediVisuals, Inc.

EXHIBIT "E"

# EXHIBIT F

# Cerebral Edema and Hypoxia

# Cerebral Edema and Hypoxia



**Normal**
- Subarachnoid space
- Skull
- Gray matter
- White matter
- Blood flow to brain tissue
- Ventricle

**Edema**
- Reduced oxygen causes brain swelling
- Swelling tissue restricts blood supply
- Further oxygen reduction causes additional brain swelling

**Edema and Hypoxia**
- Loss of gray-white matter differentiation
- Permanent loss of brain tissue
- Loss of blood flow

EXHIBIT "F"
PP0563

**Orientation**
- Plane of section

**Normal**
- Subarachnoid space
- Skull
- Gray matter
- White matter
- Sulci
- Basal ganglia
- Thalamus
- Ventricles
- Cerebrum
- Tentorium
- Cerebellum

**Edema**
- Effacement of cerebral sulci
- Edema extends into basal ganglia and thalami

**Edema and Hypoxia**
- Loss of gray-white matter differentiation

© 2013 MediVisuals, In

# EXHIBIT G

# Normal Brain - Herniations

Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 24 of 83   PageID 941



# Herniations

Tonsilar herniation

Transtentorial herniation

Parahippocampal gyrus

Hippocampus

Tentorium

Cerebellar tonsil

Spinal cord

Cerebral hemispheres

Foramen magnum

Cerebellum

Skull

Subdural/ Subarachnoid space

Lateral ventricle

# Normal Brain

© 2013 MediVisuals, inc.

EXHIBIT

# EXHIBIT H

# Plaintiffs' First Request for Admissions Propounded to All Defendants

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 26 of 82   PageID
2442
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 26 of 83   PageID 943

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

      Plaintiffs,

VS.

                                   NO.:   2:13-cv-02289 dkv
                                   JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and,
MARK P. CLEMONS,

      Defendants.

PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS
PROPOUNDED TO ALL DEFENDANTS

Come the Plaintiffs, DANIEL LOVELACE and wife, HELEN LOVELACE, individually,
and as parents of BRETT LOVELACE, deceased, by and through counsel, pursuant to Rule 36 of
the Federal Rules of Civil Procedure and for their Request for Admissions Propounded to all
Defendants, make the following requests of all the Defendants to admit the truth of the matters
which are related herein, under oath, and return said responses to Plaintiff in the time and manner
requested:

## REQUEST FOR ADMISSIONS TO DR. MARK P. CLEMONS

**REQUEST NO. 1**:    Admit that Plaintiffs' decedent, Brett Lovelace, was a healthy active

12 year old boy at the time of his admission to LeBonheur Children's Hospital on March 12, 2012,

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 27 of 82   PageID
2443
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 27 of 83   PageID 944

for a tonsillectomy and adenoidectomy (hereinafter "T&A"), as described in Le Bonheur's Pre-Op

Surgical History & Physical (pg. 0007) and Pre-Operative History (pg. 0455), attached hereto as Ex.

"A".

**REQUEST NO. 2**:   Admit that the reason Brett Lovelace was admitted to have a T&A to

LeBonheur Children's Hospital, instead of Crittenden Memorial Hospital, West Memphis, Arkansas

72301, because he tossed and turned a lot during sleep, snored, had asthma, was a mouth breather,

or was overly tired in the evening, or any of these.

**REQUEST NO. 3**:   Admit that you recommended Le Bonheur Children's Hospital as the

place for this surgery because it was believed to be a safer hospital for Brett Lovelace's surgery,

considering his history.

**REQUEST NO. 4**:   Admit that you told the parents following the completion of the T&A

that the surgery went well and that Brett was doing fine and they could join him in the Le Bonheur

recovery room.

**REQUEST NO. 5**:   Admit that when you last saw Brett Lovelace as he arrived from the

surgical suite to the PACU, he was face down on the gurney in a prone position, prior to your

leaving Le Bonheur and later being called and informed that he had coded.

**REQUEST NO. 6**:   Admit that when you spoke to the parents after the surgery when

Brett Lovelace was in the PACU, he was face down in a prone position on the gurney, and you

2

questioned his parents about whether the prone position Brett was in, was a normal sleeping position for him, and they said "no".

**REQUEST NO. 7:**   Admit that you gave no orders, caution, warning or instructions to the PACU nurse, Kish, or to any other Le Bonheur hospital personnel, and did not intervene in any way to ensure that Brett's airway was clear when he arrived in the PACU, and did not determine that he was oxygenating and ventilating properly following surgery.

**REQUEST NO. 8:**   Admit that you failed to ensure that Brett was fully awakened from anesthesia and conscious (AAOX3) prior to leaving the PACU after the surgery, and specifically, after you saw Brett in a prone position on the gurney and discussed the matter with the parents.

**REQUEST NO. 9:**   Admit that you did not call for an anesthesiologist to awaken or assess Brett Lovelace in the PACU to ensure that he was fully awakened from anesthesia and alert, after seeing Brett in a prone position and being aware of the patient's high risk of respiratory and airway compromise prior to leaving the hospital on the date of the surgery.

**REQUEST NO. 10:**   Admit that you took no action and failed to intervene to appropriately correct the improper face-down positioning of the patient after the T&A surgery and prior to your leaving the patient in the PACU and departing the hospital.

**REQUEST NO. 11:**       Admit that the drawing attached hereto and identified as Ex. "B" [Brett Lovelace's Postoperative Positioning & Mechanism of Asphyxia], is a fair and accurate

Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 29 of 83   PageID 946

depiction of Brett Lovelace at the time of his arrival in the PACU at 10:30 a.m. on March 12, 2013,

and when you left him in the PACU.

**REQUEST NO. 12:**          Admit that the drawing attached hereto and identified as Ex.

"C" [3/12/12 Head CT Findings], is a fair and accurate depiction of Brett Lovelace's brain showing

diffuse cerebral edema with loss of sulci and compression of ventricular system after he went into

cardiac arrest in the PACU at 11:59 a.m. on March 12, 2013.

**REQUEST NO. 13:**          Admit that the drawing attached hereto and identified as Ex.

"D" [3/14/12 Head CT Findings – showing brain dead], is a fair and accurate depiction of Brett

Lovelace's brain subsequent to 11:59 a.m. on March 12, 2013.

**REQUEST NO. 14:**          Admit that the drawing attached hereto and identified as Ex.

"E" [Adenoidectomy and Tonsillectomy Surgery], is a fair and accurate depiction or representation

of the surgery performed on Brett Lovelace by Dr. Mark P. Clemons at approximately 9:19 a.m. on

March 12, 2013 at Le Bonheur Children's Hospital.

**REQUEST NO. 15:**          Admit that the drawing attached hereto and identified as Ex.

"F" [Cerebral Edema and Hypoxia], is a fair and accurate depiction of what happed to Brett

Lovelace's brain during the time his airway was blocked and he was unattended in PACU

subsequent to his T&A surgery on March 12, 2013 at Le Bonheur Children's Hospital.

**REQUEST NO. 16:**          Admit that the drawing attached hereto and identified as Ex. "G" [Normal Brain - Herniations], is a fair and accurate depiction of a normal brain prior to and after an event of the sort that occurred to Brett Lovelace after the T&A surgery of March 12, 2013 at Le Bonheur Children's Hospital.

**REQUEST NO. 17:**          Admit that the drawing attached hereto and identified as Ex. "H" [Timeline of Care], which was created from the actual Le Bonheur Hospital medical records, is a fair and accurate chronology of the medical care rendered to Brett Lovelace on March 12, 2013 at Le Bonheur Children's Hospital.

## REQUEST FOR ADMISSIONS TO BABU RAO PAIDIPALLI

**REQUEST NO. 1:**     Admit that Plaintiff's decedent, Brett Lovelace, was a healthy active 12 year old boy at the time of his admission to LeBonheur Children's Hospital on March 12, 2012, for a tonsillectomy and adenoidectomy (hereinafter "T&A"), as described in Le Bonheur's Pre-Op Surgical History & Physical (pg. 0007) and Pre-Operative History (pg. 0455), attached hereto as Ex. "A".

**REQUEST NO. 2:**     Admit that you failed to personally ensure that Brett Lovelace was appropriately, safely and timely monitored and assessed in the PACU prior to leaving the patient after surgery, or afterwards.

**REQUEST NO. 3**:        Admit that the patient, Brett Lovelace, was not fully awake and breathing normally at the time you transferred his care to the PACU nurse, and left the PACU.

**REQUEST NO. 4**:        Admit that the patient, Brett Lovelace, was lying in a prone position face-down, knees to chest and breathing abnormally at the time he was transferred to the PACU nurse, Kish.

**REQUEST NO. 5**:     Admit that you never personally assessed the patient, Brett Lovelace, at any time subsequent to the T&A surgery during the time when he was in the PACU.

**REQUEST NO. 6**:     Admit that you only assessed the patient's condition after the initiation of the code, which was more than an hour subsequent to the completion of his T&A surgery.

**REQUEST NO. 7**:     Admit that you completely relied upon hospital personnel or others (CRNA) to assess and care for your patient, Brett Lovelace, following surgery and during the time that he was in the PACU.

**REQUEST NO. 8**:     Admit that you failed to determine and ensure that Brett Lovelace had fully emerged from, was conscious and recovered appropriately from the anesthetic that you gave him prior to the removal of his endotracheal tube.

6

**REQUEST NO. 9**:   Admit that Brett Lovelace's tidal volumes prior to extubation were a mere 145- 180 cc's, which is a very small tidal volume for an 81 kg child, and that this tidal volume documented with hypercarbia makes it unlikely that Brett was ventilating adequately at the time of extubation.

**REQUEST NO. 10**:   Admit that Brett's high end tidal $CO_2$ level of 56 torr, as recorded on the anesthetic record, support the assertion that appropriate assessment and attention would have prevented Brett's subsequent hypoxemia and acidosis.

**REQUEST NO. 11**:   Admit that you failed to ensure adequate ventilatory support in a patient who was obese, with an admission history of sleep apnea.

**REQUEST NO. 12**:   Admit that based upon the recordings of the initial arterial blood gas (ABG) the patient had hypercarbia resulting in a prolonged period of hypoventilation consistent with a patient who was extubated in a non-fully awakened state and without appropriate assurance he was maintaining an adequate respiratory rate and tidal volumes.

**REQUEST NO. 13**:       Admit that you failed to ensure that Brett Lovelace had adequate oxygen supplementation in the post anesthesia care unit (PACU).

**REQUEST NO. 14**:       Admit that you failed to determine, require and ensure that Brett was appropriately monitored in the PACU.

**REQUEST NO. 15:**       Admit that a patient in prone, or knee-chest position, is difficult to monitor and ensure that they have adequate oxygenation.

**REQUEST NO. 16:**       Admit that, as an anesthesiologist, your care and treatment of the patient does not end with the completion of the surgery proper, but continues until the patient is fully awakened and breathing normally.

**REQUEST NO. 17:**       Admit that the standard of care for this patient, viz., to fully awaken him in the PACU, was not followed and that, as a result thereof, Brett Lovelace, a 12 year old boy, died.

**REQUEST NO. 18:**       Admit that the drawing attached hereto and identified as Ex. "B" [Brett Lovelace's Postoperative Positioning & Mechanism of Asphyxia], is a fair and accurate depiction of Brett Lovelace at the time of his arrival in the PACU at 10:30 a.m. on March 12, 2013.

**REQUEST NO. 19:**       Admit that the drawing attached hereto and identified as Ex. "C" [3/12/12 Head CT Findings], is a fair and accurate depiction of Brett Lovelace's brain showing diffuse cerebral edema with loss of sulci and compression of ventricular system after he went into cardiac arrest in the PACU at 11:59 a.m. on March 12, 2013.

**REQUEST NO. 20:**       Admit that the drawing attached hereto and identified as Ex. "D" [3/14/12 Head CT Findings – showing brain dead], is a fair and accurate depiction of Brett Lovelace's brain subsequent to the occurrence of his cardiac event at 11:59 a.m. on March 12, 2013.

**REQUEST NO. 21:**          Admit that the drawing attached hereto and identified as Ex. "E" [Adenoidectomy and Tonsillectomy Surgery], is a fair and accurate depiction of the surgery performed on Brett Lovelace by Dr. Mark P. Clemons at approximately 9:19 a.m. on March 12, 2013 at Le Bonheur Children's Hospital.

**REQUEST NO. 22:**          Admit that the drawing attached hereto and identified as Ex. "F" [Cerebral Edema and Hypoxia], is a fair and accurate depiction of what happed to Brett Lovelace's brain during the time that his airway was blocked and he was in respiratory distress and unattended in the PACU subsequent to his T&A surgery on March 12, 2013 at Le Bonheur Children's Hospital.

**REQUEST NO. 23:**          Admit that the drawing attached hereto and identified as Ex. "G" [Normal Brain  - Herniations], is a fair and accurate depiction of a normal brain prior to and after an event of the sort that occurred to Brett Lovelace after the T&A surgery of March 12, 2013 at Le Bonheur Children's Hospital.

**REQUEST NO. 24:**          Admit that the drawing attached hereto and identified as Ex. "H" [Timeline of Care], which was created from the actual Le Bonheur Hospital medical records, is a fair and accurate chronology of the medical care rendered to Brett Lovelace on March 12, 2013 at Le Bonheur Children's Hospital.

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 35 of 82   PageID
2451
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 35 of 83   PageID 952

Respectfully submitted,

HALLIBURTON & LEDBETTER

MARK LEDBETTER          AR# 74175
Attorney for Plaintiffs        TN#17637
254 Court Avenue, Suite 305
Memphis, TN 38103
(901) 523-8153-phone
(901) 523-8115-fax

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via the Court's ECF filing system.

J. Kimbrough Johnson/Marcy Dodds Magee
2900 One Commerce Square
40 S. Main Street
Memphis, TN 38103
Attorneys for Mark Clemons
901/525-8721-phone
901/525-6722-fax
Johnsonk@thomasonlaw.com
MageeM@thomasonlaw.com

10

Patient Name: LOVELACE, BRETT S
Facility: LE BONHEUR

MRN: 45854994
FIN: 68854557



**Le Bonheur**
Children's Medical Center

AS   68859557   45854994-2
Le Bon...   FIN
LOVELACE, BRETT S
08/21/1999  12Y M/W
CLEMONS, MARK
0413/12

## SURGICAL/SPECIAL PROCEDURE HISTORY & PHYSICAL

**HISTORY FINDINGS**

Present Illness Include Indications & Symptoms:

Current Medications:

Allergies/Reactions:

Relevant Past Medical History:

Review Of System:

Bleeding Tendency:

Family Anesthesia History: Drug Sensitivities:

Immunizations:

**PHYSICAL FINDINGS**

Within Normal Limits — Yes / No — Comments

General Appearance / Mental Status:
Head / Neck (Loose Teeth):
Visual Acuity (When Indicated):
Heart:
Lungs:
Abdomen (Pelvic / Rectal If Appropriate):
Extremities / Neurologic:
Genitalia:
Other:

Planned Procedure:

Signature: _____ MD/DO# _____ Date _____ Time _____

**H & P UPDATE**

H&P Reviewed / With Changes As Documented: _____

Signature: _____ MD/DO# _____ Date _____ Time _____

**PHYSICIAN'S ORDERS**   ☑ Outpatient  ☐ 23 Hr.  ☐ A.M. Admit  ☐ Reg. Admit

Date Of Admit: _____ Date Of Surgery: _____

Admitting Diagnosis: _____

Consent To Say: _____

Lab: _____
Lab: _____
Radiology: _____
Meds: _____
Meds: _____
Other: _____
Attending Physician Is: _____
Signature: _____ MD/DO# _____ Date _____ Time _____

**POST OPERATIVE PROGRESS NOTES**

Surgeon: _____
Assistants: _____
Pre-Op Diagnosis: _____
Post Diagnosis: _____
Procedure: _____
Findings: _____
Specimens: _____
Transfusions: _____
Drains / Tubes: _____
Estimated Blood Loss: _____
Fluid Replacements: _____
Disposition / Complications: _____
Convert To Inpatient (MUST WRITE ADMIT ORDER)
Convert To 23 Hr. Obs. (MUST WRITE 23 Hr. ADMIT ORDER)
Signature: _____ MD/DO# _____ Date _____ Time _____

**POST OP:** Discharge Orders
☐ Outpatient  ☐ 23 Hr.  ☐ A.M. Admit  ☐ Reg. Admit
Today's Date: _____ Time _____
Diagnosis: _____
Discharge Instructions:
Activities:   ☐ Routine   Other: _____
Diet:   ☐ Routine   Other: _____
I.V. Medications: _____

Special Instructions: _____

Follow-Up Appointment: _____
Disposition:  ☐ Home   ☐ Other, See MD Order Sheet
**DISCHARGE NOTE:**

Physician Signature: _____
Initials: _____ Date: _____
Pager: _____ MD #: _____
Nurse Practitioner: _____
Signature: _____ MD/DO# _____ Date _____ Time _____
Note: Only One Signature Required If the Same Physician Completes The H&P & Order Sections

PE001751.0607 REV

Page Number: 6

BL-MethLEB  0007



EXHIBIT
A

Patient Name: LOVELACE, BRETT S                                          MRN: 45854994
Facility: LE BONHEUR                                                     FIN: 68859557

## Le Bonheur Children's Hospital

**ANESTHESIA EVALUATION**

68859557   45854995-2
Le Bonheur   FIN   MRN
LOVELACE, BRETTS
08/21/1999  12Y M/W
CLEMONS, MARK

**3/12/12**
Date of Surgery

### PRE-OPERATIVE HISTORY

| | |
|---|---|
| Pre-Op Diagnosis: adenotonsillar hypertrophy | Proposed Operation: tonsillectomy, adenoidectomy |
| Age 12y   Sex M   Race   Wt 4 kg  LMP   114 CM | Lab |
| Allergies: Seroquel | Medications: Albuterol → to use pm before + am of surgery |

**Systems Review (Describe all positives at right)**

| CNS: Seizures ADHD Dev Delay hi IQ | learning disability    very emotional |
|---|---|
| Cardiac: Murmur HTN Arrhythmia | |
| Pulmonary: Wheezing Asthma URI Sleep Apnea Snoring | last wheezed Nov 2011 ; ⊕ snore ⊕ gasps |
| Endocrine: Diabetes Thyroid | ∅ |
| GI: Reflux Hepatitis | ∅ |
| Hematologic: SCD Anemia Bleeding | ∅ · no fam hx |
| Neuromuscular: MH Muscle Disease | hx ® wrist fracture, ® arm x 3, ® leg   cast only |
| Prematurity: BW   Gest Age   1 lb 10   43.6 L | ∅ complications |
| Renal | ∅ |
| Other | ∅ |

Prev. Anes. Experience: ∅ previous surgery

Maternal grandmother · lips + mouth blister + BA

Elizabeth S Hixson RN 3/8/12 1348

he on phos see mom, Helen Lovelace

### PRE-OPERATIVE ASSESSMENT/EXAM

pt not seen

| | |
|---|---|
| Date: 3/12/12   Time: 8.55 | ASA Physical Status   1 ② 3 4 5 E |
| Cardiac: Regular ⊕ rhythm   no murmur | |
| Pulmonary: clinically clear | **Immediate Pre-Op Reassessment** |
| Airway: OK | Date 3/12/12  Time 8.55 |
| Dentition: OK | NPO Since 23.30 3/11/12 |
| | Chart Reviewed |
| Pre-Med: Versed | |
| Proposed Anesthesia   Propofol   inhalation N2 sevoflurane   Vanilla | |
| Anesthesia Risks, Benefits Alternatives Discussed With: Propofol | S. Paul Padgett |
| | ☐ Staff  ☐ Resident  ☐ CRNA |

### POST-OPERATIVE FOLLOW-UP

Date:                    Time:

Signature                                        ☐ Staff  ☐ Resident  ☐ CRNA

SAP#240490510 REV                    Le Bonheur Children's Hospital, Memphis, TN
                    White – Chart Copy    Yellow – Dept. Copy

BL-MethLEB 0455



Brett Lovelace's Postoperative Positioning
& Mechanism of Asphyxia

View From Above

© 2013 MediVisuals, Inc.

View From Side

Still under anesthesia, Brett is
positioned face down with his
legs drawn underneath his body

Position causes compression of
chest and abdomen, impairing
diaphragmatic expansion

Cyanosis of face difficult to
appreciate due to positioning

Airway is obstructed

EXHIBIT
"B"

# 3/12/12 Head CT Findings



Planes of Section

Diffuse cerebral edema with loss of sulci and compression of ventricular system

3/12/12 Coronal CT
Im: 23/40

Coronal View of Head

3/12/12 Axial CT
Im: 19/33

Axial View of Head

EXHIBIT "C"

© 2013 MediVisuals, Inc.

# 3/14/12 Head CT Findings

Mass effect causing uncal and cerebellar tonsil herniation

3/14/12 Coronal CT
Im: 23/40

© 2013 MediVisuals, Inc.

**Coronal View of Head**

EXHIBIT
"D"

R23783-03X.indd

Planes of Section

Severe intracranial edematous changes with near complete effacement of sulci, cisterns and the ventricular system

*Findings consistent with brain death*

3/14/12 Axial CT
Im: 20/34

**Axial View of Head**

# Adenoidectomy and Tonsillectomy Surgery



1 Midline adenoid tissue removed with an adenoid curet

2 Right tonsil dissected from the tonsillar fossa

3 Left tonsil dissected from the tonsillar fossa

4 Post-operative appearance of the oropharynx

Adenoid

Tonsil

Adenoid curet

Right tonsil

Left tonsil

Right tonsillar fossa

Left tonsil

Tonsillar tissue removed

Adenoid tissue removed

EXHIBIT "E"

© 2013 MediVisuals, Inc.

# Cerebral Edema and Hypoxia



**Normal**

- Subarachnoid space
- Skull
- Gray matter
- White matter
- Ventricle
- Blood flow to brain tissue

**Edema**

- Reduced oxygen causes brain swelling
- Swelling tissue restricts blood supply
- Further oxygen reduction causes additional brain swelling

**Edema and Hypoxia**

- Loss of gray-white matter differentiation
- Permanent loss of brain tissue
- Loss of blood flow

EXHIBIT "F"

© 2013 MediVisuals, Inc.

**Edema and Hypoxia**

- Loss of gray-white matter differentiation
- Effacement of cerebral sulci
- Edema extends into basal ganglia and thalami

**Edema**

**Normal**

- Subarachnoid space
- Skull
- Gray matter
- White matter
- Sulci
- Basal ganglia
- Thalamus

**Orientation**

Plane of section

- Ventricles
- Cerebrum
- Tentorium
- Cerebellum

# Herniations

# Normal Brain



Cerebral hemispheres

Parahippocampal gyrus

Hippocampus

Tentorium

Cerebellar tonsil

Spinal cord

Skull

Cerebellum

Foramen magnum

Subdural/ Subarachnoid space

Lateral ventricle

Tonsilar herniation

Transtentorial herniation

EXHIBIT

© 2013 MediVisuals, Inc.



# Timeline of Care

○ Medical Notes    ○ Events



EXHIBIT
H

# EXHIBIT I

Smith, *Anesthesia for Infants and Children,* 8th Edition, Exhibit 4 to Deposition of Jason Kennedy, M.D.

Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 47 of 83   PageID 864


EXHIBIT 4
J. Kennedy MD
6/25/14

**From:** Smith's Anesthesia for Infants and Children ,
Eighth Edition
Copyright © 2011 by Mosby, Inc., an affiliate of Elsevier Inc.

Capnography in pediatric anesthesia is used to confirm placement of an endotracheal tube in the correct tracheal position and to continuously assess the adequacy of ventilation. Capnography also provides information about the respiratory rate, breathing pattern, endotracheal tube patency, and, indirectly, degree of neuromuscular blockade. Capnography can assist with the diagnosis of metabolic and cardiovascular events and can provide an early warning of a faulty anesthesia delivery system. In pediatric patients, an abnormal increase in **end-tidal carbon dioxide tension ($P_{ETCO_2}$) most commonly signifies hypoventilation**, but, rarely, it also indicates the presence of increased $CO_2$ production, as occurs with temperature elevation or as an early sign of malignant hyperthermia. On the other hand, an abnormally low $P_{ETCO_2}$ may indicate an increase in dead space or suggest a state of low pulmonary perfusion. Sudden absence of the capnographic tracing indicates a breathing circuit disconnection, and the abnormal presence of inspired $CO_2$ signifies the presence of a faulty unidirectional valve, an exhausted $CO_2$ absorber, or, when a semiopen circuit is being used, rebreathing secondary to an insufficient fresh gas flow.

## Postanesthetic recovery

The postanesthetic recovery **period is a time of high risk for pediatric patients**. A large percentage of otherwise healthy infants and children (20% to 40%) develop oxygen desaturation ($SpO_2$ = 94%) during transport and on arrival at the PACU ( Patel et al., 1988). Oxygen desaturation occurs sooner, is more pronounced, and has a longer duration in infants than in children and a longer duration in children than in adults ( Xue et al., 1996). Postoperative hypoxemia is most likely caused by atelectasis, but upper airway problems such as **obstruction**, croup, and laryngospasm, are more likely in children (4% to 5%) than adults ( Cohen et al., 1990). **All children, therefore, should be administered oxygen supplementation during their transport from the operating room and on arrival at the PACU, until they can maintain satisfactory oxygen saturation in room air or at their baseline $Fio_2$.** Nausea, vomiting, temperature instability, and postoperative pain also require prompt and effective treatment to ensure patient comfort and efficient discharge timing.

## Initial Care

On arrival at the PACU, **the anesthesiologist** confirms the patency of the patient's airway, assesses the adequacy of ventilation, and ensures the supply of humidified oxygen. **The anesthesiologist** records the heart rate, respiratory rate,

blood pressure, SpO $_2$, and temperature, which are reported to the nurse. The **anesthesiologist then gives** a report to the nurse concerning the child's condition, special problems related to any underlying illnesses, the events of the surgery, the anesthetic technique used, and medications given. The **anesthesiologist should remain at the bedside until the child is reasonably stable and well attended.**

With most currently used general anesthetic techniques, awakening occurs within a few minutes of the conclusion of surgery. Unfortunately, no one technique guarantees a smooth emergence, and agitation may occur in the early recovery period. **Agitation may be caused by** numerous factors, including emergence delirium caused by anesthetic agents, pain, metabolic disturbances (e.g., hypothermia, hyperthermia, hypoglycemia, hyponatremia), neurologic disturbances, a behavioral response to sudden awakening in a strange environment; separation anxiety, **airway obstruction with resultant hypoventilation and hypoxia,** and combinations of these factors. As discussed at the beginning of this chapter, a pediatric anesthesiologist should plan the general anesthetic approach to minimize or avoid many of these factors.

## Airway Obstruction

Although patients **should be able to maintain airway patency before leaving the operating room, it is not uncommon for an infant or a child to have an obstruction after the stimulation of extubation and transportation has subsided. The anesthesiologist must be acutely aware of any changes in the breathing pattern at this time, because hypoventilation can lead to a reaccumulation of volatile agents in the alveoli that can further blunt the respiratory drive. Hypercarbia may result in dysrhythmias and hypertension, and hypoxemia in infants may lead to further suppression of breathing** ( ). Neck extension, mouth opening, and jaw thrust alone or together may be enough to correct the problem. Nasopharyngeal airways, if necessary, are better tolerated than oropharyngeal airways in this setting. If obstruction continues, reassessment of anesthetic and neuromuscular blockade reversal should be conducted and possible reintubation may be considered.

Patients with obstructive sleep apnea syndrome (OSA) **are predisposed to postoperative apnea** (see Chapter 24, Anesthesia for Pediatric Otorhinolaryngologic Surgery). OSA is characterized by prolonged partial and/or intermittent complete upper airway obstruction that disrupts normal breathing and sleeping patterns ( American Thoracic Society, 1996). Although OSA in adults is commonly associated with obesity, in children it more often arises from enlarged tonsils and adenoids ( Young et al., 1993)

Children with OSAS tend to emerge from anesthesia more slowly than children without OSAS. This may be explained by their deficit in sleep arousal mechanisms. They seem to have elevated sleep arousal mechanisms in response to hypercarbia and increased upper airway obstruction ( ). Other subtle disturbances of sleep architecture may also be present ( Bandla et al., 1999).

Children with **hypertrophic tonsils and adenoids tend to have increased airway obstruction in the immediate postoperative period**. The presence of blood and secretions in the pharynx and larynx may provoke upper airway reflexes, leading to laryngospasm. These patients **tend to become hypoxemic more often and perhaps more severely during the first several hours after surgery than patients undergoing procedures not involving the upper airways** ( Motoyama and Glazener, 1986).

**Children with OSAS have a higher incidence of postoperative respiratory complications, including prolonged oxygen requirements, airway obstruction requiring nasal airway, and major respiratory compromise requiring airway instrumentation, than children without OSAS** ( Biavati et al., 1997; Wilson and Robertson 2002).

# EXHIBIT J

Expert Witness Report of Jason D. Kennedy, M.D.

# Expert Witness Report

*DANIEL LOVELACE and HELEN LOVELACE, Individually, and as Parents of BRETT LOVELACE, Deceased, vs. PEDIATRIC ANESTHESIOLOGISTS, P.A.;  BABU RAO PAIDIPALLI; and MARK P. CLEMONS*

\*       \*       \*       \*       \*

## Prepared by: Jason D. Kennedy, M.D.

## Prepared for: Mark Ledbetter

## Halliburton and Ledbetter

I, Jason D. Kennedy, M.D., declare and state as follows:

I am over the age of 18 and have personal knowledge of the facts stated in this report.

I graduated from the University of Alabama School of Medicine in June 2003. I completed an internship at Carraway Methodist Medical Center in Birmingham, Alabama; a residency in anesthesiology from the University of Alabama at Birmingham Medical Center, Birmingham, Alabama from July 2004 through June 2007; a fellowship in Critical Care Anesthesiology from Emory University Medical Center, Atlanta, Georgia; and, a fellowship in cardio-thoracic Anesthesiology from Emory University Medical Center, Atlanta, GA. I have been a licensed medical doctor in the state of Tennessee with a specialty in Anesthesiology since June 8, 2010, and my Tennessee medical license number is 46094. My qualifications are set forth in my c.v. attached hereto.

I am currently an Assistant Professor of Clinical Anesthesiology at Vanderbilt University in Nashville, Tennessee, and have been in this position from July 2010 to present. Prior to my current position, I was an Instructor in Anesthesiology, Department of Anesthesiology, University of Alabama Birmingham-UAB (Birmingham, AL).

I have reviewed the medical records of Brett Lovelace for the hospitalization of March 12, 2012 through March 14, 2012 from LeBonheur Children's Medical Center. I have also reviewed the following:

 (a) Depositions of the parties;

 (b) Discovery;

 (c) Photographs of Brett Lovelace at LeBonheur; and

 (d) Pleadings.

I am familiar with the applicable standards of care and issues in this case specifically regarding anesthesiology treatment and care, medical, surgical and post-surgical/PACU care, in and for the Memphis area and hospital where the incident occurred,[1] and my opinions are set forth as follows:

---

[1] I belong to the American Society of Anesthesiologists [ASA] and the Society of Cardiovascular Anesthesiology [SCA], both organizations with physicians practicing in Memphis, Knoxville, Chattanooga, and surrounding areas; I attend meeting[s] of the ASA and SCA where physicians, including anesthesiologists from Memphis, Nashville, Knoxville, Chattanooga and surrounding areas attend; that I have been to Memphis three or four times; that I am familiar with and have worked surgical cases with ENT physicians as well as am familiar with their standard of care in the surgical context as respects the continued need to protect the patient's airway and ventilation and with the safety practices which were not followed in this case, viz., safe positioning, airway patency, supplemental oxygen needed post-surgery and in the PACU; that the communities of Nashville, where I practice, and Memphis are of comparable size; the medical communities adhere to similar practices and rules; there are more than 15 hospitals in Nashville and Memphis; each city has a hospital reported to be among the 100 largest hospitals in

1.      I have reviewed the medical records of Brett Lovelace which were provided to the attorney for the Lovelace family for the dates of hospitalization in March of 2012 from LeBonheur Children's Medical Center.

2.      Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett was appropriately and safely monitored and assessed in the PACU. There are no records of them assessing the patient in the recovery room until after the initiation of the code, a period of about an hour. Both physicians agreed that such monitoring and assessment was necessary, but neither assured nor verified that proper positioning, proper supplemental oxygen or proper monitoring occurred or was provided.[2]  Anesthesiologist supervision was needed until the patient, Brett Lovelace, was awake and maintaining his own airway.

3.      Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett had fully emerged from and recovered appropriately from the anesthetic prior to the removal of the endotracheal tube. Brett's documented tidal volumes prior to extubation were a mere 145-180 cc's, this is a very small tidal volume for an 81 kg child. This, combined with documented hypercarbia, makes it unlikely that he was ventilating adequately at the time of extubation. Brett's high end tidal $CO_2$ level of 56 torr, as recorded on the anesthetic record, support the assertion that appropriate assessment and attention would have prevented his subsequent hypoxemia and acidosis.

4.      The Defendants failed to follow standards of care in that they failed to ensure adequate ventiltory support in a patient who was obese, with sleep apnea. Brett's initial arterial blood gas (ABG) is recorded as a pH of 6.70, a partial pressure of $CO_2$ of 96/, a partial pressure of oxygen of $PaO_2$ 502/ $HCO_3$ of 12. This ABG was performed after at least 10 minutes of positive pressure ventilation, since per the code note, he was reintubated at 1204 and the first blood gas is reported to be at 1218. Therefore, the initial $CO_2$ was likely much higher. There is a sample that is reported to be a venous sample that has a pH of 6.59, a $CO_2$ of >130. This is an incredible amount of hypercarbia resulting likely a prolonged period of hypoventilation as consistent with a patient who was extubated in a non-fully awakened state (deep extubation) and without appropriate insurance that he was maintaining adequate respiratory rate and tidal volumes. This was a clear breach of the standard of care in any patient who had undergone a general anesthetic, and especially true in an obese child with sleep-deprived breathing who undergoes tonsillectomy.

5.      Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett had adequate oxygen supplementation in the post-anesthesia care

---

America, e.g., BMH, Memphis, and VUMC, Nashville; and I have attended CME with Memphis anesthesiologists, e.g., New Horizons in Anesthesiology, and studied and learned the same principles and methods, as well as in medical school.

[2] See Clinical Practice Guideline: Tonsillectomy in Children, Baugh, et. al., Otolaryngology - Head and Neck Surgery 2011 144: S1; Guidelines for Patient Care in Anesthesiology, American Society of Anesthesiologists, October 29, 2011, Section I - III, including post-anesthetic care.

unit (PACU).    Defendants failed to reaffirm airway patency and adequacy of breathing. Defendants should have continued delivery of oxygen by mask to Brett Lovelace until his recovery was complete.   Further, Defendants failed to maintain airway patency with simple airway maneuvers or oro-nasopharyngeal airway until the patient was fully awake.  Neither Defendant could explain these lapses, but both agreed that such steps were required and standard.

6.    Defendants failed to follow the proper standard of care in that they failed to appropriately ensure that Brett was appropriately monitored in the post anesthesia care unit. A patient in the prone or knee-chest position is difficult to monitor and ensure adequate oxygenation.  Dr. Paidipalli did not attend the patient in the PACU, reportedly and admittedly; and Dr. Clemons did nothing to correct Brett Lovelace's position when he saw him prone and on his face without oxygen support.  Placing Brett Lovelace in a left lateral or semi-prone ("tonsil position"), slight head-down position, with a pillow under the chest to allow secretions and blood to drain, was necessary, as well known, but not done, here, which was a failure to follow the pertinent standard of care. [3]

7.    The ENT surgeon failed to follow standards of care in that he failed to appropriately care for and recognize that Brett was not fully awakened from anesthesia.  He also failed to appropriately intervene by his lack of any personal action in the care of Brett or by not calling for an appropriate trained anesthesiologist to ensure that Brett was oxygenating and ventilating appropriately.  An ENT surgeon routinely cares for such patients and should have known to intervene at the time he saw Brett in the PACU.

8.    The ENT surgeon failed to follow standards of care in that he failed to intervene in Brett's poor positioning for a patient who was at high risk of respiratory compromise.  By documentation, he saw Brett in the PACU in the knee-chest prone position prior to his arrest, and did not act appropriately to correct the situation.

9.    Neither physician appropriately followed up on the possibility of the most likely anesthetic complication and cause of death in patients undergoing T & A – bleeding or loss of airway.  Neither arranged for adequate follow-up and evaluation by themselves, a CRNA or the nursing staff.  The suggestion that clinical judgment is appropriate for post-anesthetic care in this case is analogous to the judgment that a pilot uses when operating an airplane; however, the judgment of a physician is also based upon instruments similar to those that provide objective information and data to a pilot.  For example, in a storm, a pilot must disregard his physical senses and use the instruments to appropriately fly the airplane.   By analogy, the anesthesiologist, like the pilot, has to have an objective sense of the standard physiology variables in order to "land the plane" or bring the patient safely out of anesthesia.  In this case, clinical judgment is not a proper substitute for failure to pay attention to the details and condition of the patient, and to use customary and accepted safeguards.

10.    Neither physician adequately observed the patient in the PACU so as to be able to exercise any judgment whatsoever.  The patient was abandoned.  It does not appear that either physician advised the PACU nursing staff of the risks of this particular patient.   The

---

[3] Guidelines, Difficult Airway Society Guidelines For the Management of Tracheal Extubation,, Anesthesia 2012, 67, 318-340, Table 3.

anesthesiologist did not ensure that there was an adequate transfer of care information nor remain with the patient as long as medically necessary nor ensure that the patient was discharged from the PACU unit in accordance with proper anesthesiology policies. The ENT surgeon did no better. See fn. 2, Guidelines for Patient Care in Anesthesiology, supra, at III, E, 1-6.

The foregoing opinions are rendered to a reasonable degree of medical certainty; it is further my opinion that the lack of attention and supervision, and failure to follow the appropriate standard of care, directly caused and contributed to the death of 12-year old Brett Lovelace.

Jason D. Kennedy, M.D.

# Curriculum Vitae

Name:               Jason D. Kennedy
Work Email:         jason.d.kennedy@Vanderbilt.Edu

## Education

08/1999 – 06/2003    M.D. in Medicine from University of Alabama School of Medicine, Birmingham, AL

## Training

| | |
|---|---|
| 1992 - 1999 | B.A. from UAB, Birmingham Alabama |
| 07/2003 – 06/2004 | Internship from Carraway Methodist Medical Center, Birmingham, AL |
| 07/2004 – 06/2007 | Residency in Anesthesiology from University of Alabama at Birmingham Medical Center, Birmingham, AL |
| 07/2008 – 07/2009 | Fellowship in Critical Care Anesthesiology from Emory University Medical Center, Atlanta, GA |
| 07/2009 – 07/2010 | Fellowship in Cardio-thoracic Anesthesiology from Emory University Medical Center, Atlanta, GA |

## Licensure and Certification

| | |
|---|---|
| N/A | American Board of Anesthesiology, Diplomat of the ABA of Not Specified |
| N/A | American board of anesthesiology, Speciality certification in Critical Care medicine of Not Specified |
| 2010 – 06/2020 | American Board of Echocardiography, Special Competence in Advanced Perioperative Transesophageal Echocardiography (2010-00022268) |
| 06/2010 – 06/2014 | Tennessee medical license, Medical License of Tennessee (46094) |

## Academic Appointments

| | |
|---|---|
| 07/2008 - 07/2009 | Instructor in Anesthesiology, Department of Anesthesiology, University of Alabama Birmingham-UAB (Birmingham, Alabama) |
| 07/2010 - Present | Assistant Professor of Clinical Anesthesiology, Vanderbilt University (Nashville, Tennessee) |

## Professional Organizations

American Society Of Anesthesiologist

Society of Cardiovascular Anesthesiologist

## Professional Activities

### Intramural

| | |
|---|---|
| 10/10 – Present | Therapeutic hypothermia, Medicine, Intensive care represeative to this group, Physician represeative to this group alongwith Dr. Wagner |
| 02/2011 - Present | Pharmacy and therapeutics, Pharmacology, represent intrest of the Department and the hospital to the P and T commitee. Full voting member., Anesthesiology represeative |
| 01/2012 - Present | ICU Ultrasound, Anesthesiology, Developing standardized ultrasound curriculum for Intensive Care Fellows and Anesthesiology Residents |

## Teaching Activities

| | |
|---|---|
| N/A | Hemodynamic Echo monitoring: Assesment of LV and RV function and clinical applicability, Simulation center |
| 05/2010 - Present | Lung Isolation in Thoracic Surgery, Instructor |
| 08/2010 - 2011 | Perioperative managment of Aortic Dissections, Lecture and Group discussion, Fellows lecture room |
| 08/2010 - 07/2011 | Postoperative managment of Cardiac surgery patients, lecture and group discussion, Fellows confrence room |
| 09/2010 - Present | Echo in the ICU |
| 10/2010 - Present | Neuroprotection and Cardiac Surgery |
| 11/2010 - Present | Modes of Ventilation in the ICU and OR |
| 12/2010 - Present | ICU for Cardiac Surgery |
| 02/2011 - 02/2011 | Vasoplegia in the Cardiac operating Rooms, Lecture and group discussion |
| 04/2011 - Present | ICU and Cardiac Surgery |
| 05/2011 - Present | ICU and Cardiac Surgery |
| 10/2011 - Present | ICU for Cardiac Surgery |
| 12/2011 - Present | Lung Isolation in Thoracic Surgery |
| 02/2012 - Present | Pulmonary Hypertension |
| 02/2012 - Present | Vasoplegia in the OR and ICU |
| 02/2012 - 02/2013 | Vasoplegia in Cardiac surgery, Lecturer, Monthly lecture on Vasoplegia in CT surgery and Critical Care |
| 09/2012 - Present | Echo Bootcamp for ICU fellows, Course Director, Vanderbilt University, Developed a two day course to acclimate and familirize fellows in the perioperative use of echocardiography and ultrasound for criticaly ill patients. |
| 12/2012 - 2013 | Right Heart Dysfunction in the Operating Room, Lecturer, Lectured for one hour on Right heart failure in the perioperative enviorment |
| 01/2013 - 01/2013 | Medical Student UImmersion COurse: Managment of valvular disorders, Lecturer, Vanderbilt University, Taught A small group case based one hour lecture on valvular abnormalities |

## Other Significant Activities

| | |
|---|---|
| 02/2012 | Blood conservation in the ICU: Developed evidence based approach to Factor VIIa utilization and product managment .This has led to the dramatic reduction in the utilization of Factor VIIa with a costs savings of about half a million dollars in factor VIIa alone. |
| 07/2012 | Course director for Critical Care fellows rotation in Ultrasound/echo: Developed syllabus, course and lecture series for ICU fellows to become profecient in the use of Cardiac, thoracic and occular ultrasound. |
| 11/2012 | Extra-Corpereal Life Support Course : Veno-venous ECMO Course for adult Respitory failure |
| 01/2013 | Medical director of Clinical Perfusion- Vanderbilt University: Clinicl Director of Perfusion- Act as a liason for perfusionist and help to develop protocls for ECMO and transfusion services for VHVI |

## Honors / Awards

| | |
|---|---|
| 2003 | Alpha Omega Alpha Honor Society |
| 2004 | Top Ten Teacher of the Year Award, Department of Anesthesiology UAB |

## Publications

### Non-Peer Reviewed Publications

#### Abstracts

1. Costello W, Billings F, Bick J, **Kennedy J**, Wagner C. Transesophageal Echocardiography as a Hemodynamic Monitor in Post Operative Cardiac Surgery Patients. 2011 Oct.

### Research Articles

1. **Kennedy JD**, Sweeney TA, Roberts D, O'Connor RE. Effectiveness of a medical priority dispatch protocol for abdominal pain. 2003 Jan;89-93. PMID: 12540150.

### Book Chapters

1. Wagner, Ashby, Kennedy. Anesthesiology: A comprehensive Review for the Written Boards and Recertification Edited by Kai Matthes, Richard Urman, and Jesse Ehrenfeld . 2012 Nov;Chapter 20.

## Presentations

### Invited Presentation - Regional

1. Tennessee perfusionist society. Nashville, Tennessee. 2011 Sep 24; Colloids vs. Crystaloids in Cardiac surgery.

### Internal Grand Rounds

1. Grand Rounds Department of Anesthesiology. Nashville, Tennessee. 2013 Feb 1; Perioperative managment of Right Ventricular failure.

### Presentations at Scientific Meetings

1. Costello, Bick, Wagner, Billings, ASA-SOCCA. American Society of Anesthesiologist; Chicago, Illinois. 2011 Oct; Transesophageal Echocardiography as a Monitor in Post Operative Cardiac Surgery Patients.

# EXHIBIT K

Excerpts from Deposition of Kelly Kish, R.N.

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TENNESSEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually
and as Parents of BRETT
LOVELACE, Deceased,

        Plaintiff,

v.            Case Number 2:13-cv-02289

PEDIATRIC ANESTHESIOLOGISTS,
P.A., BABU RAO PAIDIPALLI, and
MARK P. CLEMONS,

        Defendant.

VIDEOTAPE DEPOSITION

OF

KELLY KISH

May 15, 2014



JILL W. HODGES, RPR, LCR #380
P O BOX 381722
Germantown, Tennessee  38138-1722
(901) 335-7952

R I V E R S I D E   R E P O R T I N G

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 60 of 82   PageID 2476
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 61 of 83   PageID 978

Page 123

1      A.    Yeah, I don't remember all the blankets.

2   I remember his feet, you know, his legs being

3   tucked under.   I don't remember them being that

4   far, and I can't tell which way his face is

5   facing there.   He kind of had longer hair than I

6   remember, but that's um ...

7      Q.    But do you have any reason to doubt

8   that's the same person in all these pictures?

9      A.    Yes, that's correct.

10             MS. MAGEE:   Did you mark this as 8?

11             MR. LEDBETTER:   Yes, mark it,

12        please.

13             (Whereupon, the above-mentioned

14        photograph was marked as Exhibit Number

15        8 to the testimony of the witness.)

16      Q.    (By Mr. Ledbetter)   Now, at the time --

17   at the time that you were there with him and his

18   parents were there with him, did Dr. Clemons have

19   an opportunity to see Brett positioned on his

20   stomach with his legs bunched up under him?

21             MS. MAGEE:   Object to the form.

22             MR. TALLEY: Go ahead and answer.

23      Q.    (By Mr. Ledbetter)   Go ahead and answer.

24      A.    He did.   He did.

1      Q.    Okay.  For how many minutes would Dr.

2  Clemons have been there talking and chatting as

3  he had a clear view of this patient in this

4  position on his stomach?

5                    MS. MAGEE:  Same objection.

6                    MR. TALLEY: Go ahead and answer.

7      A.    I would say approximately five minutes.

8      Q.    Okay.  Did either he or anyone acting on

9  behalf of the anesthesia team say, good gracious,

10 get him in his side in a normal position?

11                   MR. GILMER:  Object to the form.

12                   MS. MAGEE:  Object to the form.

13     Q.    (By Mr. Ledbetter)  Did they say that?

14                   MR. TALLEY: Go ahead and answer.

15     A.    No, they did not.

16     Q.    If they had said that to turn him to a

17 lateral position, would you have done that?

18     A.    I would have done that.

19     Q.    Okay.  And if they had told you that he

20 needed to be on supplemental oxygen, would you

21 have attached that or connected him to

22 supplemental oxygen?

23     A.    I would have.

24                   MS. MAGEE:  Object to the form of

1                    the question.

2          Q.    (By Mr. Ledbetter)  Do you agree that in

3    the course of what happened in the ensuing hour

4    and a half that if he had been moved to the

5    horizontal position or lateral position or if he

6    had been on supplemental oxygen that what

7    happened to him might have been avoided?

8                         MR. GILMER:  Calls for speculation.

9                         MS. MAGEE:  Same.

10                        MR. TALLEY:  Go ahead and answer if

11               you can.

12         Q.    (By Mr. Ledbetter)  Do you believe that

13   if the doctors had ordered him to be placed in a

14   lateral Fowler's position and given supplemental

15   oxygen that what happened to Brett Lovelace might

16   have been or could have been prevented?

17                        MR. GILMER:  Same objection.

18                        MS. MAGEE:  Objection, calls for

19               speculation.

20                        MR. TALLEY: If you can answer, go

21               ahead.

22         A.    Like I said before, if I had had him

23   supine, I don't think this would have happened.

24   The doctor did not tell me and it was not his --

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 63 of 82   PageID 2479
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 64 of 83   PageID 981

Page 136

 1  not seen the orders since I took care of him that

 2  day.  We use our judgment.

 3      Q.   Well, sitting here today -- I wouldn't

 4  ask you this if I thought this was false -- is it

 5  your best understanding that he was neither

 6  delivered with supplemental oxygen nor was there

 7  an order that he continue to have it?

 8              MR. GILMER:  Let me object.  You've

 9              asked this question about ten times

10              in about ten different ways.

11      Q.   (By Mr. Ledbetter)  So it's ten

12  questions.  Do you remember it?

13              MS. MAGEE:  Object to the form.

14              MR. TALLEY:  Go ahead and answer.

15      A.   It is my recollection he did not come to

16  me on oxygen when he came from the O.R.

17      Q.   Now, could you tell me whether Dr.

18  Paidipalli insured that Brett Lovelace was safely

19  discharged from the PACU?

20              MR. GILMER:  Object to the form.

21      Q.   (By Mr. Ledbetter)  In accordance with

22  LeBonheur's policies?  Did he insure that?

23              MR. GILMER:  Object to the form.

24      A.   That he was discharged?

Jill Hodges Court Reporter

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 64 of 82   PageID 2480
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 65 of 83   PageID 982

Page 139

 1              MS. MAGEE:  Same objection.

 2      A.    I do not remember having a patient like

 3  that.

 4      Q.    What was the common, customary and

 5  accepted position for a child of that age who had

 6  had a tonsillectomy as they delivered to you?

 7              MS. MAGEE:  Object to form.

 8              MR. GILMER:  Object.

 9      Q.    (By Mr. Ledbetter)  What's the common,

10  accepted position that they came in?

11              MS. MAGEE:  Object to the form.

12              MR. GILMER:  Same.

13              MR. TALLEY:  Go ahead and answer.

14      A.    They normally would be in a

15  semi-Fowler's position.

16      Q.    You better state that clearly for them.

17      A.    A semi-Fowler's position.  Usually

18  that's supine with the head of the bed elevated a

19  little bit.

20      Q.    And why is that the right way to

21  position someone who's had a tonsillectomy and

22  adenoidectomy?

23              MR. GILMER:  Object to the form.

24              MS. MAGEE:  Join the objection.

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 65 of 82   PageID 2481
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 66 of 83   PageID 983

Page 140

1          MR. TALLEY:  If you can answer.

2      A.    Well, that's the most common position

3  for most of our post-op patients to be able, you

4  know, with the head of their bed up a little bit

5  so that they're -- easier for them to breathe

6  instead of being flat with the head up a little

7  20 or 30 degrees.

8      Q.    What about mucus and then blood and such

9  things as that coming out freely rather than

10  pooling?

11              MS. MAGEE:  Object to the form.

12              MR. GILMER:  Object to the form.

13      Q.    (By Mr. Ledbetter)  Is that one reason

14  also that the secretions that came from the

15  surgery could come out?

16              MS. MAGEE:  Same objection.

17      A.    It's possible that that would be a

18  reason.

19      Q.    Okay.  After Brett was turned over,

20  did -- turned over after the code or before the

21  code was called, did you observe a pool of mucus

22  and blood where his face had been on the gurney?

23      A.    I don't recall that.

24      Q.    Don't recall, okay.  Had you on previous

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 66 of 82   PageID 2482
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 67 of 83   PageID 984

Page 143

1           and answered.

2       Q.    (By Mr. Ledbetter)   Do you agree with

3   that?

4               MR. TALLEY:   Go ahead and answer,

5           last time.

6       Q.    (By Mr. Ledbetter)   Do you agree Dr.

7   Clemons -- do you agree with him when he says

8   that he could have ordered his position to be

9   changed or moved but left it alone, Clemons, Page

10  61, Lines 9 through 11?

11      A.    He could have told me to put him in a

12  different position.

13      Q.    And do you agree with Dr. Clemons who on

14  Page 25 of his deposition said, my experience at

15  LeBonheur is everybody leaving the operating room

16  is on supplemental oxygen, Page 25, Lines 21

17  through 24?   Do you agree with that?

18      A.    Always on -- did he say always on

19  supplemental oxygen?

20      Q.    My experience is everybody leaving is on

21  supplemental oxygen; in other words, was that a

22  custom?

23      A.    It's common, very common.

24      Q.    Okay.   Well, that will do it.   Now,

# EXHIBIT L

Excerpts from Deposition of Helen Lovelace

1

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TENNESSEE

2

3    DANIEL LOVELACE and
    HELEN LOVELACE, Individually,

4    and as Parents of BRETT LOVELACE,
    deceased,

5

      Plaintiff,

6

Vs.               NO.2:13-cv-02289-JPM-dkv

7

    PEDIATRIC ANESTHESIOLOGISTS, P.A.;

8    BABU RAO PAIDIPALLI; and MARK P.
    CLEMONS, MD.

9

      Defendants.

10

11

12      THE DEPOSITION OF HELEN LOVELACE
           January 15, 2014

13

           VIDEO DEPOSITION

14

15

16

17

18

19

20

21

22

23         Madelyn E. Gray
         Court Reporter

24    Suite 303, 22 N. Second Street
      Memphis, Tennessee 38103
       (901) 527-1100

COPY

1      walked into PACU with Dr. Clemons.

2      Q.   Okay.

3      A.   That's the first time I had saw her.

4      Q.   All right.  But did she say, when you

5      were in PACU, that he had rolled over on his

6      stomach on the way from the OR to PACU?

7      A.   Yes.  When Dr. Clemons asked me about

8      Brett being, if he slept on his stomach.

9      Q.   Okay.

10     A.   That's when Nurse Kish told Dr. Clemons

11     and I that that's when he had rolled over.

12     Q.   Okay.  Was there anymore discussion among

13     the three or four of you about sleeping on his

14     stomach?

15     A.   No.

16     Q.   What was Brett's -- I mean, was he awake

17     at all, partially awake, groggy, out of it?

18     A.   He was not awake at all.

19     Q.   Okay.  And was he ever awake at all

20     during --

21     A.   No.

22     Q.   Let me finish.

23     A.   He was never awake from the time I walked

24     into PACU until I left on Thursday without my

RIVERSIDE REPORTING SERVICE

# EXHIBIT M

Excerpts from Deposition of Babu Rao Paidipalli

*IN THE UNITED STATES DISTRICT COURT*

*FOR THE WESTERN DISTRICT OF TENNESSEE*

| | |
|---|---|
| *DANIEL LOVELACE AND HELEN LOVELACE, Individually, and as Parents of BRETT LOVELACE, Deceased* | ) ) ) ) ) |
| *Plaintiff,* | ) ) |
| *VS.* | ) NO. 2:13-cv-02289 dkv ) |
| *PEDIATRIC ANESTHESIOLOGISTS, PA; BABU RAO PAIDIPALLI and MARK P. CLEMONS ,* | ) ) ) ) |
| *Defendants.* | ) |

*DEPOSITION OF BABU RAO PAIDIPALLI, M.D.*

*January 9, 2014*

*MIDSOUTH REPORTING SERVICE*

*LU ANNE R. DUDLEY, CSR, LCR #349*
*P.O. BOX 1631*
*CORDOVA, TENNESSEE 38088*
*(901) 525-1022*

1    A        I'm in the operating room area.

2    Q        You were in the operating room?

3    A        Uh-huh.

4    Q        Were you actually involved in handling an

5    operation?

6    A        No.

7    Q        You were just there?

8    A.       No.  I was just in the hallway.

9    Q        Okay.  Okay.  Now following the surgery

10   done by Dr. Clemons, was Brett given supplemental

11   oxygen afterwards during his transit to the PACU?

12   A        Yes, sir.

13   Q        Okay.  Did you order supplemental oxygen

14   for him in the PACU?

15   A        Yes, sir.

16   Q        You ordered supplemental oxygen?

17   A        Yeah.  We have a standard order saying

18   that, you know, that the patient needs 02

19   supplementation to maintain the saturation of 92 or

20   95 and above.

21   Q        All right.  My question was when he left

22   surgery was he on supplemental oxygen.

23   A        Yes, sir.

24   Q        Okay.  And when he arrived in the PACU,

25   even though you were not there, was he on

1    supplemental oxygen, do you think?

2    A        I think.

3    Q        All right.

4    A        That is the routine to have a supplemental

5    oxygen in the recovery room.

6    Q        Was he outfitted when he left the surgical

7    suite with a pulse oximeter on one of his fingers?

8    A        Yes, sir.

9    Q        And had there been any previous problem

10   with that pulse oximeter during his surgery?

11   A        No, sir.

12   Q        Do you know whether the pulse oximeter that

13   he wore when he went to the PACU was, in fact, the

14   same one that he wore when he went to the ICU after

15   the Harvey team came?

16   A        Probably the same one.

17   Q        Okay.  Did you ever test this pulse

18   oximeter to see whether it was defective or failed?

19   A        There are no tests in the sense because

20   we -- whether it is working or not.  If it is not

21   working, sometimes we change it to a different pulse

22   oximeter.

23   Q        Now at the time when the CRNA, Grace

24   Freeman, would have attended Brett Lovelace, would --

25   do you know whether she saw the parents at that time?

1    Aldrete score perfect.

2    Q        Now at the time that Brett Lovelace was

3    extubated, approximately how much time passed between

4    that moment and the time that he would have been

5    transported?

6             Is that normally five minutes?  Or how long

7    is that?

8    A        Can you rephrase the question, please.

9    Q        Yes.

10            Between the time of extubation of the

11   patient how much time elapsed before he was

12   transported to the PACU?

13   A        We extubated the patient 10:26.  And the

14   patient reached the recovery room 10:35, so nine

15   minutes.

16   Q        Is it your testimony that the patient was

17   virtually awake at the time that he was extubated?

18   A        Yes, sir.

19   Q        Okay.  As a rule and a practice how often

20   would you allow patients to go and be on their face

21   in recovery?

22                        MR. COOK:  Same, form.

23                        Go ahead.

24   A        That is a speculation.

25

1    eyes, we asked him to open the eyes and take a deep

2    breath.  When they follow those commands, that we

3    consider awake.  And we use the clinical judgment --

4    I used the clinical judgment to extubate that patient

5    at that time.

6    Q        Are you telling us that Brett Lovelace had

7    fully emerged from and recovered appropriately from

8    the anesthesia?

9    A        Not fully recovered, but he is awake enough

10   to be extubated.  That is why we take them to the

11   recovery room to be fully awake.

12   Q        Now on March 12, 2012 how well did you know

13   Nurse Kelly Kish?

14            What was your experience with her as a PACU

15   nurse?

16   A        I know she was working in the recovery

17   room.  I'm not sure how long she has been working.

18   Q        What was your experience with her?

19            Was she a good nurse?

20   A        I don't know much about her.

21   Q        Did you ever complain about her before this

22   event?

23   A        No, sir.

24   Q        Okay.  Did you talk to Grace Freeman and

25   ask if she personally visited with Nurse Kelly Kish

1    keep him on either a continuous positive airway

2    pressure or to continue his intubation and mechanical

3    ventilation until he was fully awake?

4    A        Can you repeat that question, please.

5    Q        Did you issue instructions or orders for

6    Brett to be on continuous positive airway pressure

7    after he was transported?

8    A        We have a standard; not a continuous airway

9    pressure, but continuously getting oxygen to the

10   patient by face mask.

11   Q        Okay.  And what you are saying is he was

12   continuously on oxygen until he was fully awake?

13   A        Supposed to be, yes.

14   Q        Okay.  Were you aware that he was not on

15   oxygen?

16   A        I did not know that.

17   Q        Okay.  I think you said earlier that you

18   did not administer any narcotic analgesic to him?

19   A        No, I didn't say that.

20                   MR. COOK:  Objection.

21   BY MR. LEDBETTER:

22   Q        You gave him an opiate for the anesthetic;

23   correct?

24   A        Yeah.

25   Q        But did you give him an analgesic besides

# EXHIBIT N

Excerpts from Deposition of Mark P. Clemons

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TENNESSEE
2

3

DANIEL LOVELACE AND          )
4    HELEN LOVELACE,              )
     INDIVIDUALLY AND AS          )
5    PARENTS OF BRETT             )
     LOVELACE, DECEASED,          )
6                                 )
                                  )
7        Plaintiffs,              )
     VS.                          )    2:13-CV-02289dkv
8                                 )
                                  )
9    PEDIATRIC                    )
     ANESTHESIOLOGIST, P.         )
10   A. BABU RAO                  )
     PAIDIPALLI, AND MARK         )
11   P. CLEMONS,                  )
                                  )
12                                )
         Defendants.             )
13   ─────────────────────────────────

14

15                 DEPOSITION

16                     OF

17         MARK CLEMONS, M.D.

18

19          February 6, 2014

20            ORIGINAL

21

22       MID-SOUTH REPORTING
          Pepper Glenn, CCR
23           P. O. Box 609
      Southaven, Mississippi 38671
24           (901) 525-1022

1   did you ever look at the Physicians' Desk

2   Reference to study Fentanyl's warnings?

3      A.     No, as I don't give Fentanyl.

4      Q.     Did you, on March 12, 2012, know that

5   there were specific warnings about respiratory

6   suppression, an alteration in the respiratory

7   rate of patients given the drugs?

8      A.     No, I did not know this.

9      Q.     So you lack knowledge of the FDA

10   approved warnings that applied to these drugs

11   that were given to Brett Lovelace by

12   Dr. Paidipalli?

13      A.     Correct.

14      Q.     Now, when Brett Lovelace reached the

15   recovery room -- which I'm going to call PACU or

16   I may call it recovery.

17      A.     We prefer recovery room, too.

18      Q.     Okay. It's interchangeable. He was

19   not -- this is a question, not an answer. He was

20   not on supplemental oxygen at that time, was he?

21      A.     My experience at LeBonheur is

22   everybody leaving the operating room is on

23   supplemental oxygen.

24      Q.     Do you recall him --

1      Q.      Do you know what a lateral position

2   is?

3      A.      On their side.

4      Q.      Okay.  Is that -- would that have been

5   a proper position for Brett to have been -- been

6   in, is on his side?  Would that have been an

7   effective --

8      A.      Commonly.

9              MR. GILMER:  Object to the

10          form.

11   BY MR. LEDBETTER:

12      Q.      Would that have been an effective

13   position for him to have been in?

14      A.      On the side would have been a good

15   position.

16      Q.      All right.  Now, at the time that you

17   departed the PACU after Brett Lovelace's surgery,

18   did you leave any orders for the attending nurse

19   in the PACU to put him in a different position

20   such as a lateral position or a Fowler's

21   position?

22      A.      I don't routinely tell the nurse to

23   put them in any particular position.  The

24   recovery room has its procedures to get people

1   awake and kids move around, but I had no -- I

2   don't believe I had any orders for any particular

3   position.

4       Q.      Now, would you agree that the lateral

5   position, which is also a Sims' position I'll

6   reference, you would have been able to observe

7   whether or not Brett Lovelace's airway was

8   functional -- his upper airway was functional,

9   could you not have?

10      A.      What you would better observe is

11  whether he was drooling or bleeding in the

12  lateral position, whether he was breathing or

13  not.  I don't know that that would have helped

14  you.

15      Q.      Okay.  Now, had you left him with

16  orders for supplemental oxygen, that would also

17  have been prudent if no one had, would it not

18  have?

19              MR. JOHNSON:  Objection.

20      A.      My experience is they roll out of the

21  operating room on oxygen whether I order it or

22  not.

23  BY MR. LEDBETTER:

24      Q.      But you did not verify that?

Case 2:13-cv-02289-SHL-dkv   Document 139-2   Filed 09/15/14   Page 82 of 82   PageID 2498
Case 2:13-cv-02289-SHL-dkv   Document 124-4   Filed 08/08/14   Page 83 of 83   PageID 46
1000

1        A.        No, I don't believe so.

2        Q.        Now, when it comes to doing this type

3    of surgery, what is called a T&A, do you agree

4    that it requires, between you and the

5    anesthesiologist, a high degree of cooperation

6    because you are sharing airway?

7        A.        We do share the airway.

8        Q.        Okay.  And you must jointly assure

9    that oxygen is provided to the patient, agree?

10       A.        Oxygen should be provided to the

11   patient.

12       Q.        And must jointly assure that carbon

13   dioxide is eliminated?

14       A.        If you're ventilating the patient,

15   oxygen is going in and carbon dioxide is going

16   out.

17       Q.        Okay.  But you understand -- you agree

18   that it's your joint goal to make sure that

19   carbon dioxide is eliminated?  In other words, it

20   isn't pooled so that they develop hypercapnia

21   or --

22       A.        Respire.  Oxygen goes in and carbon

23   dioxide goes out.

24       Q.        And you must both assure that there is