## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESESEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

     Plaintiffs,

Vs.                          No. 2:13-cv-02289 SHL-dkv
                                    JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and
MARK P. CLEMONS,

     Defendants.

## DEFENDANTS', PEDIATRIC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, MD'S, TRIAL MEMORANDUM OF FACTS AND LAW

Come now the defendants, Pediatric Anesthesiologists, P.A. and Babu Rao Paidipalli, M.D., by and through counsel of record, and pursuant to Local Rule 16.4, submit the following trial memorandum of facts and law.

### FACTS

The facts of this case center around Brett Lovelace's treatment at LeBonheur Hospital on March 12, 2012. Brett Lovelace, on March 12, 2012, was twelve years old.  He weighed 81.4 kilograms (179 pounds) and was 174 centimeters (5'7") tall.  On this date, Brett Lovelace presented to LeBonheur for a Tonsillectomy and Adenoidectomy ("T&A") to be performed by Dr. Mark Clemons. Dr. Rao Paidipalli and Grace Freeman, CRNA administered anesthesia to Brett Lovelace. The surgery itself was performed by Dr. Clemons without any complications.

The surgery ended at approximately 10:15 AM. When the surgery ended, both Dr. Paidipalli and Grace Freeman were present in the operating room. Under the supervision of Dr. Paidipalli, Grace Freeman turned off the anesthetic gas and increased the oxygen to 100% and increased the oxygen flow to 10L/min. Ms. Freeman suctioned the patient's mouth and stomach, and placed a bite block then an oral airway in the patient's mouth. The patient had a swallow reflex and was coughing because of the presence of the endotracheal tube. Furthermore, the patient was breathing on his own with good respiratory effort. The patient started moving all extremities, and lifting his head off the table. The patient's eyes were open. As the patient emerged from anesthesia, he became agitated with tube in his throat and began reaching with his hands to remove the endotracheal tube. It required five or six people to hold him down on the operating table.

At this point, it was the clinical judgment of both Dr. Paidipalli and Grace Freeman, that it was time to extubate the patient. At approximately 10:26 AM, Grace Freeman, under the supervision of Dr. Paidipalli, extubated Brett Lovelace. After extubation, the patient was given 50 μg of Fentanyl to calm him down so he did not roll off the table or injure himself. While Brett Lovelace was being restrained on the operating table after extubation, he asked Grace Freeman several times, "why are you holding me down?" The patient's vital signs were good, and he had spontaneous respiration with blow-by oxygen from the anesthesia machine circuit with a face mask. He was then moved from the operating table to a stretcher and the blow-by oxygen was changed from the anesthesia circuit to a Jackson Rees circuit with a face mask that was connected to transport oxygen cylinder on the stretcher with 4L/min flow, and placed by the patient's face.

Grace Freeman and Brittany Dye (the circulating nurse) transported the patient from the operating room to the PACU. At the time that the patient left the operating room, he had good vital signs, good color, and was breathing on his own with good respiratory effort. During the transport to the PACU, the mask connected to the Jackson Rees circuit was next to the patient's face. It was hooked up to an oxygen tank that was beneath the stretcher and the patient was receiving blow-by oxygen at 4 L/min. While Grace Freeman was transporting Brett Lovelace to the PACU, he turned himself over into a prone position with his knees under him with his head turned to the side. His breathing remained clear and unobstructed. His color and vital signs remained good.

When Grace Freeman arrived in the PACU[1] at approximately 10:36 AM, she rolled the stretcher to spot 29. Ms. Freeman locked the wheels on the stretcher. She connected the oxygen to the wall, turned the oxygen to 4-6 L/min flow, and placed the mask approximately 2 inches from the patient's face blowing oxygen. She hooked up the pulse oximeter and the blood pressure cuff to the monitor. After an initial artifact reading on the pulse oximeter, Ms. Freeman determined that the patient's oxygen saturation was 100%; his pulse rate was 118; and his blood pressure was 126/47. She counted his respirations at 22. His temperature was normal. During this time, the Lebonheur PACU nurse, Kelly Kish, was bed side.

Ms. Freeman informed Ms. Kish of the significant history of the patient including sleep apnea, asthma, and obesity. Ms. Freeman also gave the nurse the following information: the name of the surgeon; the type of surgery; the fact that the patient had awakened agitated; what narcotics the patient had been given; when the last narcotic had been given; the fluid status of the patient; and the IV location. Ms. Freeman then asked Kelly Kish, the PACU nurse, if she felt

---

[1] PACU is an acronym for Post-Anesthesia Care Unit.

comfortable with taking over the care of the patient and the nurse indicated that she did. Grace Freeman then handed the patient over to the PACU nurse, Kelly Kish.

When Ms. Freeman left the patient in the PACU, his condition was the following: sleeping but arousable; stable; breathing on his own with good respiratory effort; in a prone position with his knees up under him with his head turned to the side; and with the Jackson-Reese mask near his face with oxygen flowing.

Brett Lovelace was Kelly Kish's only patient during the 1.5 hours that he was in the PACU before the Harvey team code was called. According to Nurse Kish's deposition, the patient was stable upon his arrival in the PACU. She also testified that the patient's face was to the side while he was in the PACU. His parents were in the PACU during this time. Shortly after Brett's arrival in the PACU, Dr. Clemons stopped by the PACU, assessed Brett, ordered prescriptions, and left with the patient in the care of Kelly Kish.

In spite of Brett Lovelace being her sole responsibility during those 90 minutes, Kish failed to fulfill her nursing duties to him. Instead, she provided little to no care; did not ask any other provider for help; and fraudulently documented. For example, despite charting a rating of 9 out of 10 on the Aldrete scale[2], Kelly Kish admits that she never attempted to speak with or rouse Brett during the hour and a half he was under her care in the PACU. She admits to never rousing or checking the patient to make these ratings, but instead charted based on her observation of Brett's status when he initially entered the PACU. Kelly Kish also fraudulently documented oxygen saturations of Brett Lovelace that were not reflected in the monitor print-out. For example, Kish documented 100% oxygen saturation when the monitor read only "artifact" or levels below 25%.

---

[2] Such a score would indicate, among other things, able to move four extremities voluntarily or on command; able to deep breathe and cough freely; blood pressure +/-20% presentation level; arousable on calling; and able to maintain oxygen saturation greater than 90% on room air.

4

Approximately 30 minutes after Brett Lovelace was admitted to the PACU, Kelly Kish documented his blood pressure as 118 over 56. Approximately 45 minutes after the patient was admitted to the PACU, Kelly Kish documented the patient's blood pressure as 106 over 53. Approximately 60 minutes after the patient was admitted to the PACU, Kish charted the patient's blood pressure as 84 over 42. Despite these chart entries showing a clear drop in blood pressure, Kish did not contact Dr. Paidipalli, Grace Freeman, or Dr. Clemons. Kish has admitted that she should have at least contacted someone when the blood pressure dropped to 84 over 42.

Kelly Kish was not appropriately monitoring Brett Lovelace in the PACU because she was on Facebook and at least one other social media website using the hospital's computer at Brett's bedside. Mrs. Lovelace at one point did see Ms. Kish on Facebook on the hospital's computer. Kelly Kish admitted to this use during her deposition.

Brett stayed in the PACU under the care of Kelly Kish for approximately 90 minutes. Around the 90 minute mark, Kish left the patient to get him a slurpee. Upon her return, Kelly Kish has stated that she noticed Brett Lovelace had stopped snoring and asked for help to turn him. Brett's father, on the other hand, testified that he had to ask Kish for help turning Brett as Brett's leg appeared to be blue. When they turned Brett supine, he was noted to be deeply cyanotic, apneic, and pulseless. A "Harvey" code, indicating a nonresponsive patient, was called, and Dr. Paidipalli, along with others, immediately responded to help. Brett was eventually resuscitated, but suffered severe anoxic brain injury and died approximately 48 hours later.

On March 23, 2012, Kelly Kish resigned from her position as a PACU nurse at LeBonheur Children's Hospital in lieu of termination. She was reported to the Tennessee Board of Nursing for her conduct surrounding her duties to Brett Lovelace. On February 22, 2013, Kelly Kish agreed to an order that revoked her nursing license based on this Complaint. In the

order, Kish admitted to violating Tenn. Code Ann. § 63-7-115(a)(1)[3] which allowed the board to revoke her license due to the fact that she is unfit or incompetent by reason of negligence, habits, or other causes and is guilty of unprofessional conduct. Kish also agreed that she intentionally or negligently caused physical or emotional injury to a patient and abandoned or neglected a patient who required nursing care. Finally, Kish admitted that her actions failed to maintain a record for Brett which accurately reflected her nursing problems and interventions for Brett and engaged in acts of dishonest relating to the practice of nursing.

Due to the actions of Kelly Kish, Plaintiffs entered into a confidential settlement with Methodist – LeBonheur prior to even filing a lawsuit. Then, Plaintiffs filed the current lawsuit alleging medical negligence against Dr. Clemons, Dr. Paidipalli, and his group. It should be noted that the Plaintiffs cause of action accrued, at the earliest, on March 12, 2012; therefore, the recently enacted cap on noneconomic damages applies to this case.

Plaintiffs' sole medical expert, Dr. Jason Kennedy, is a cardiac anesthesiologist from Nashville with little to no experience in the pediatric anesthesiology field. Dr. Kennedy is of the opinion that Dr. Paidipalli fell below the standard of care in three respects: (1) he failed to appropriately ensure that Brett had fully emerged from and recovered appropriately from the anesthetic prior to the removal of the endotracheal tube and failed to ensure adequate ventilatory support in an obese patient with sleep apnea; (2) he failed to appropriately ensure that Brett was appropriately and safely monitored and assessed in the PACU; and (3) failed to ensure that Brett had adequate oxygen supplementation in the PACU. Dr. Kennedy also opines that Dr. Clemons failed to intervene in Brett's poor positioning during his visit to the PACU and thus deviated

---

[3] "The board has the power to deny, revoke, or suspend any certificate or license to practice nursing or to otherwise discipline a licensee upon proof that the person… (c) is unfit or incompetent by reason of negligence, habits, or other cause; or (f) is guilty of unprofessional conduct." Tenn. Code Ann. 63-7-115 (a) (1) (C), (F).

from the standard of care. Neither the surgery itself, the administering of anesthesia, or the drugs used are at issue in this lawsuit.

Dr. Paidipalli and Dr. Clemons deny each and every accusation brought forth by the Plaintiffs. Both Defendants disclosed experts who will testify that Defendants complied with the standard of care in caring for Brett Lovelace. These experts blamed Brett's death on the actions of Kelly Kish in the PACU. Dr. Paidipalli filed a certificate of good faith when he alleged comparative fault against Kelly Kish; therefore, the issue of comparative fault is still very much alive at trial. Defendants will not allege that the parents' monitoring of their son in the PACU was negligent because they are not healthcare providers.

## LAW

Several issues of law have arisen throughout the course of this litigation. The case is a health care liability action filed pursuant to the Tennessee Civil Justice Act of 2011. Health care liability lawsuits in Tennessee are inherently complex and contain several different burdens that the Plaintiff must prove through expert testimony. Plaintiffs' Complaint also includes a claim for negligent infliction of emotional distress; however, for reasons stated below, Defendants do not believe Plaintiff will be able to meet their burden regarding this claim.  Additionally, Plaintiffs filed this claim for negligent infliction of emotional distress beyond the statute of limitations period.  Since the Plaintiffs failed to disclose expert proof of Negligent Infliction of Emotional Distress claim and filed the claim beyond their statute of limitations period, their claims for Negligent Infliction of Emotional Distress should be dismissed. Comparative fault against a third party is also an issue that will arise during trial given the severely negligent acts of Kelly Kish in the PACU. Finally, since these causes of action accrued in March of 2012, Tennessee's caps on noneconomic damages will apply.

**I.** **Health Care Liability Causes of Action in Tennessee**

Any cause of action for health care liability in Tennessee is governed by Tennessee Code

Annotated section 29-26-115. Section 115 sets forth the required elements of proof in subsection

(a), and the requirements for competency of a proffered medical expert in subsection (b).

Specifically, the statute reads as follows:

(a) In a health care liability action[4], the claimant shall have the burden of proving
by evidence as provided by subsection (b):

(1) **The recognized standard of acceptable professional practice in the
profession and the specialty thereof, if any, that the defendant
practices in the community in which the defendant practices or in a
similar community at the time the alleged injury or wrongful action
occurred;**

(2) **That the defendant acted with less than or failed to act with ordinary
and reasonable care in accordance with such a standard; and**

(3) **As a proximate result of the defendant's negligent act or omission, the
plaintiff suffered injuries which would not otherwise have occurred.**

(b) No person in a health care profession requiring licensure under the laws of
this state shall be competent to testify in any court of law to establish the facts
required to be established by subsection (a), unless the person was licensed to
practice in the state or a contiguous bordering state a profession or specialty
which would make the person's expert testimony relevant to the issues in the
case and had practiced this profession or specialty in one (1) of these states
during the year preceding the date that the alleged injury or wrongful act
occurred. This rule shall apply to expert witnesses testifying for the defendant
as rebuttal witnesses. The court may waive this subsection (b) when it
determines that the appropriate witnesses otherwise would not be available.

(c) In a health care liability action as described in subsection (a), there shall be no
presumption of negligence on the part of the defendant; provided, that there
shall be a rebuttable presumption that the defendant was negligent where it is
shown by the proof of the instrumentality causing injury was in the
defendant's (or defendants') exclusive control and that the accident or injury
was one which ordinarily doesn't occur in the absence of negligence.

---

[4] The 2012 amendment substituted "health care liability action" for "malpractice action" in the introductory
paragraph of (a) and in (c) and (d).

(d) In a health care liability action as described in subsection (a), the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence.

Tenn. Code Ann. § 29-26-115 (emphasis added). The Plaintiff is, therefore, charged with the burden of proving, by expert testimony, (1) the standard of care, (2) that defendant deviated from that standard, and (3) that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not have occurred otherwise. Shipley v. Williams, 350 S.W.3d 527, 537 (Tenn. 2011)

*A.  The Standard of Care*

In an action alleging negligence of a health care provider, competent evidence of the recognized standard of acceptable professional practice in the applicable profession is a prerequisite to recovery. Liability for malpractice therefore depends on whether or not the physician is lacking in and fails to exercise the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession. Dunham v. Stones River Hosp., Inc., 40 S.W.3d 47, 52 (Tenn. Ct. App. 2000) (*citing* Hurst v. Dougherty, 800 S.W.2d 183, 185 (Tenn. Ct. app. 1990); *see also* Ward v. United States, 838 F.2d 182 (6th Cir. Tenn. 1988); Watkins v. United States, 482 F. Supp. 1006 (M.D. Tenn. 1980)). An honest mistake in judgment is not sufficient to find a physician negligent. Hurst, 800 S.W.2d at 185. The duty of a physician is to use his best judgment in the treatment of a patient. Ward, at 187. Under Tennessee law, a physician must exercise his best judgment regarding treatment, and is not guilty of malpractice if he chooses a course of treatment supported by other physicians in good standing. Id. at 187.  The physician is not the insurer of the patient. Id. Rather, he is only liable for negligence, and negligence is not presumed from the fact that the treatment is unsuccessful.

Id. There is no presumption of negligence, and an honest mistake in judgment is not sufficient to find a physician negligent. Id.

In determining the degree of learning and skill required of a medical practitioner in the treatment of a particular case, regard must be given to the state of medical science at that time. Ward, at 187. Only the standard of care that applied on the date of the injury will be considered-the actions of the defendant cannot be viewed in hindsight. Evaluation of professional judgment must be based upon the facts available to the professional and the accepted practice among members of the profession. The reason for this crucial requirement centers on the state's interest in assuring that doctor charged with negligence in Tennessee receive a fair assessment of their conduct. Sutphin v. Platt, 720 S.W.2d 455, 458 (Tenn. 1986).

The term "recognized standard," therefore, means a standard recognized and accepted generally by the profession and not merely the particular standard of a single practitioner or group. Godbee v. Dimick, 213 S.W.3d 865, 896 (Tenn. Ct. App. 2006).The testimony of a physician as to what she or he would do or his or her opinion of what should have been done does not prove the statutory standard of medical practice. Lewis v. Hill, 770 S.W.2d 751, 754 (Tenn. Ct. App. 1988). Furthermore, what a majority of physicians in a community would consider to be reasonable medical care is not the meaning of the standard of care. Id. The standard of care is simply determined by whether a physician exercised the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession. Hurst v. Dougherty, 800 S.W.2d 183 (Tenn. App. 1990); see also Crawford v. Family Vision Center, 1990 Tenn. App. LEXIS 810 (Tenn. Ct. App. Nov. 16, 1990).

Guidelines, policies, and protocols likewise do not establish the standard of care. Flatt v. Claiborne County Hosp. & Nursing Home, 2010 Tenn. App. LEXIS 255 (Tenn. Ct. App. Apr. 8,

2010) (citing <u>Geesling v. Livingston Reg'l Hosp. LLC</u>, 2008 Tenn. App. LEXIS 738 (Tenn. Ct. App. Dec. 18, 2008)) (*see also* <u>Richardson v. Miller</u>, 44 S.W.3d 1, 25 (Tenn. Ct. App. 2000). Allowing plaintiffs to establish the standard of care solely on guidelines, policies, and procedures, would completely erase a physician's reliance on clinical judgment and thus fail the state's interest in assuring that the doctor charged with negligence receives a fair assessment of their conduct

The standard of care is only established by providing expert testimony pursuant to Tenn. Code Ann. § 29-26-115 (b). <u>Shipley v. Williams</u>, 350 S.W.3d 527, 550 (Tenn. 2011); <u>Williams v. Baptist Mem'l Hosp.</u>, 193 S.W.3d 545, 553 (Tenn. 2006); <u>Stovall v. Clarke</u>, 113 S.W.3d 715, 723 (Tenn. 2003); <u>Robinson v. Lecorps</u>, 724 S.W.3d 718, 724 (Tenn. 2002). Tenn. Code Ann. § 29-26-115(b) sets forth the three requirements for an expert witness to be competent to testify in a medical negligence case. <u>Shipley</u>, at 550. The witness must be (1) licensed to practice in the state or a contiguous bordering state; (2) a profession or specialty that would make the person's expert testimony relevant to the issues in the case; and (3) must have practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. <u>Id.</u>  Tenn. Code Ann. § 29-26-115(a) and (b) thus serve two distinct purposes. Subsection (a) provides the elements that must be proven in a medical negligence action, and subsection (b) prescribes who is competent to testify to satisfy the requirements of subsection (a).

The medical expert or experts used by the claimant to satisfy the standard of care requirement must demonstrate some familiarity with the medical community in which the defendant practices, or a similar community, in order for the expert's testimony to be admissible. <u>Shipley</u>, at 554. A medical expert is not required to demonstrate "firsthand" and "direct"

knowledge of a medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a health care liability case. Id. Tennessee has not adopted a national standard of care in health care liability cases. Id. at 553. However, in addition to testimony indicating a familiarity with the local standard of care, a medical expert may testify that there is a broad regional standard or a national standard of medical care to which members of his or her profession and/or specialty must adhere, coupled with the expert's explanation of why the regional or national standard applies under the circumstances. Id. at 554.

### B. Causation

Proof of negligence without causation is nothing. Mosley v. Metropolitan Gov. of Nashville, 155 S.W.3d 119, 124 (Tenn. Ct. App. 2004) (citing German v. Nichopopulos, 577 S.W.2d 197, 203 (Tenn. Ct. App. 1978)); Drewery v. County of Obion, 619 S.W.2d 397, 398 (Tenn. Ct. App. 1981). The Tennessee Supreme Court emphasized the importance of causation testimony in the landmark decision of Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). The Kilpatrick opinion involved a lawsuit against a physician for failing to detect breast cancer. In holding that the plaintiff failed to establish causation required by T.C.A § 29-26-115(a), the Kilpatrick court established the requirement that a plaintiff must have had a better than even chance of surviving or recovering from the underlying condition absent the physician's negligence. As a result, proof of causation equating to a "possibility," a "might have," "may have," or "could have" is not sufficient to establish the required nexus. Id. In refusing to relax this traditional cause in fact requirement, the Court emphasized that the mere occurrence of an injury does not prove negligence. Id. An admittedly negligent act does not necessarily entail liability. Thus, even if the plaintiffs show that the defendant breached a duty of care owed, the

plaintiff must still establish the required causal connection between the defendant's conduct and the plaintiff's injury.

Expert testimony is required to establish the required causal nexus in health care liability cases except where the act of alleged malpractice lies within the knowledge of ordinary laymen. Kenyon v. Handal, 122 S.W.3d 743, 758 (Tenn. Ct. App. 2003). Such a connection requires testimony from an expert that the injury or harm would not have occurred 'but for' the defendant's negligent conduct. Expert testimony that amounts to speculation cannot substantially assist the trier of fact. Hunter v. Ura, 163 S.W.3d 686, 704 (Tenn. 2004). When the matter of causation remains one of pure speculation or conjecture, or the probabilities are a best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.   Miller v. Choo Choo Partners, L.P., 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001) (citing Keaton, Torts, § 41, p. 269 (5th ed. 1984).

It is further well established that causation testimony must be to a reasonable degree of medical certainty. Causation in fact is a matter of probability and not possibility and in healthcare liability cases must be shown to a reasonable degree of medical certainty. White v. Vanderbilt Univ., 21 S.W.3d 215, 235 (Tenn. Ct. App. 1999) (citing Volz v. Ledes, 895 S.W.2d 677, 679 (Tenn. 1995); White v. Methodist Hosp. S., 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)). Each element of a medical malpractice action must be established by expert medical testimony to a reasonable degree of medical certainty. That an expert's testimony is reasonably certain is thus a prerequisite to the admissibility of that testimony and a question of law which is decided by the court, and not the jury. Kellon v. Lee, 2012 Tenn. App. LEXIS 323, at 19 (Tenn. Ct. App. 2012).

Tennessee courts have previously held that the terms "reasonable degree of medical certainty" and "more probable than not" are not synonymous. Bara v. Clarksville Memorial Health Systems, Inc. 104 S.W.3d 1, 10 (Tenn. Ct. App. 2002). In Bara, plaintiffs appealed a verdict for the defendants by asserting that it was error to charge the jury that the plaintiffs must prove causation to reasonable degree of medical certainty. The Bara Court, in holding that the phrase was a question of law and thus not "jury charge material," noted that the numerous Tennessee cases established a necessary degree of medical certainty to prove causation. Id. As a result, if a doctor cannot testify as to cause-in-fact to a reasonable degree of medical certainty, his testimony is not admissible before the jury. Id. The Court further noted that, as a matter of every day common sense, one cannot say that the terms "reasonable degree of medical certainty" and "more likely than not" are synonymous terms. Id. The two terms are not one and the same. The plaintiff's expert thus must meet both the Kilpatrick probability requirement and the reasonable degree of medical certainty requirement in order to present a *prima facie* case of health care liability to the jury.

While the terms "more probable than not," and "reasonable degree of medical certainty," are not one and the same, it is true that Tennessee law does not require an expert to explicitly state the magic language that is "to a reasonable degree of medical certainty." Mitchell v. Ensor, No. W2001-01683-COA-R3-CV, 2002 Tenn. App. LEXIS 810 (Tenn. Ct. App. 2002). In Mitchell, the trial court refused to strike the testimony of an expert witness because it was not, word for word, stated "to a reasonable degree of medical certainty." Id. In affirming the trial court's decision, the Mitchell Court noted that the only premise behind the plaintiff's argument was that the expert failed to incorporate the magic words "to a reasonable degree of medical certainty" into his testimony. Id. at 38. The Court held that such "magic language" was not

necessary for the admissibility of the testimony. However, the Court also cautioned that questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court.

## II. <u>Negligent Infliction of Emotional Distress in Tennessee</u>

In addition to the underlying medical malpractice claim concerning their son's treatment, Plaintiffs also maintain that they are entitled to individual claims of negligent infliction of emotional distress claim as pled in their Complaint. As outlined in their motion to strike such a claim, these Defendants do not believe Plaintiffs are entitled to these claims nor have they met their burden with respect to the required expert testimony. Additionally, Plaintiffs filed these claims beyond the one year statute of limitations. However, Defendants will include the Tennessee law regarding negligent infliction of emotional distress in this memorandum.

Claims for negligent infliction of emotional distress ("NIED") are analyzed under a general negligence approach. <u>Camper v. Minor</u>, 915 S.W.2d 437, 446 (Tenn.1996). "[A] plaintiff must present material evidence as to each of the five elements of general negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause . . . ." <u>Id</u>. Emotional harm is sufficient to satisfy the injury requirement. <u>See</u> <u>Flax v. DaimlerChrysler Corp.</u>, 272 S.W.3d 521, 530 (Tenn. 2008); <u>Garrison v. Bickford</u>, 377 S.W.3d 659, 670 (Tenn. 2012).

If a plaintiff claims to have suffered NIED due to witnessing the death or injury of a third-party, then the plaintiff's causation argument must show that the defendant's negligent act caused the death or injury of the third-party and the plaintiff's emotional injuries were the "proximate and foreseeable results of [the] defendant's negligence." <u>Eskin v. Bartee</u>, 262 S.W.3d 727, 736 (Tenn. 2008). There are four objective standards that a court will use to analyze

whether a plaintiff's emotional injuries were foreseeable: (i) "the plaintiff's physical location at the time of the accident"; (ii) the plaintiff's "awareness of the accident"; (iii) "the apparent seriousness of the victim's injuries"; and (iv) "the closeness of the relationship between the plaintiff and the victim." Id. (citing Ramsey v. Beavers, 931 S.W.2d 527, 531 (Tenn. 1996)).

Although Tennessee courts originally required an NIED claimant to have actually observed the alleged negligent action or omission, the Tennessee Supreme Court created a new standard to control whether a family member who did not observe the alleged negligent act or omission could recover. See Eskin, 262 S.W.3d. at 729-30. This new standard was designed to recognize that an individual may have a cognizable claim for NIED without observing the incident but also eliminate non-meritorious claims. See id. at 739 n.30. An NIED claimant that did not witness the actual injury-producing event must prove the following elements:

> (1) the actual or apparent death or serious physical injury of another caused by the defendant's negligence, (2) the existence of a close and intimate personal relationship between the plaintiff and the deceased or injured person, (3) the plaintiff's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene has been materially altered, and (4) the resulting serious or severe emotional injury to the plaintiff caused by the observation of the death or injury.

Id. at 739. This new objective standard is not included within the duty analysis. Id. at 739 n.30. Instead, it serves as a gateway test that allows courts to dismiss non-meritorious claims at the prima facie stage. Id. This objective standard "presents a factual issue to be determined by the finder of fact." Id.

The "serious or severe emotional injury" factor is subject to a heightened evidentiary standard if the NIED claim is a standalone claim, i.e., the claimant did not suffer any other injury that is personal to the claimant. See Camper, 915 S.W.2d at 446 (creating the heightened standard for emotional injury); Estate of Amos v. Vanderbilt University, 62 S.W.3d 133, 137 (Tenn. 2001); Flax, 272 S.W.3d at 529-30 (clarifying that Camper's heightened standard applies

16

only to standalone NIED claims). In order to prevail on a standalone NIED claim, a claimant must prove his serious or severe emotional injury by expert medical or scientific proof. Camper, 915 S.W.2d at 446 (citations omitted). Without such expert proof, the claimant may not prevail on his NIED claim. Id. Regardless of whether the serious or emotional injury is being proven as part of the Eskin gateway test for a claimant that did not witness the incident or in the general negligence portion of the case for a claimant that did or did not witness the incident, the heightened standard applies equally to standalone claims. See, e.g., Flax, 272 S.W.3d at 529-30 (stating that the Camper heightened evidentiary standard applies to all standalone claims, and applying it to a lawsuit in which the claimant witnessed the incident).

The Tennessee Supreme Court held that NIED claims filed in a wrongful death action *are* subject to this heightened Camper standard. See Flax v. DaimlerChrysler Corp, 272 S.W.3d 521, 525-31 (Tenn. 2008). Wrongful death actions belong to the decedent. Ki v. State, 78 S.W.3d 876, 880 (Tenn. 2002). Therefore, a survivor's NIED claim is a standalone claim that requires expert medical or scientific proof. Flax, 272 S.W.3d at 531. "Nothing in [the] opinion in Amos was intended to allow plaintiffs to avoid the heightened proof requirements of Camper by bringing a separate wrongful death suit on behalf of a decedent." Flax, 272 S.W.3d at 531. An NIED claimant whose allegations are connected to a wrongful death suit, or any suit in which the NIED claim is the only allegation personal to the claimant, must show that he suffered serious or severe emotional injury and *must demonstrate this injury through expert medical or scientific proof*. See id.

In Flax, a mother witnessed the death of her child in a car accident. Id. The mother filed a wrongful death suit against the car manufacturer in the name of her deceased child and included a personal claim for NIED. Id. at 526. However, the mother failed to offer any expert proof

regarding her emotional injury. <u>Id</u>. at 531. The court held that she failed to meet the <u>Camper</u> requirements and, thus, could not recover for NIED. <u>Id</u>. The <u>Flax</u> Court specifically noted that even though a mother witnessing the death of a child would seem to obviously indicate that the mother suffered severe or serious emotional injury, "the <u>Camper</u> requirements [were constructed] precisely because emotional injuries are uniquely subjective." <u>Id</u>. at 531; <u>see also Camper</u>, 915 S.W.2d at 446 (citations omitted) (stating that serious or severe emotional injury "occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case"). A plaintiff is required to meet the evidentiary burden. To hold otherwise would subvert <u>Camper</u>'s principles and create "ad hoc decisions that originally made negligent infliction of emotional distress case law unpredictable and incoherent." <u>Id</u>.

Thus, it is clear that Tennessee law requires an individual with a standalone NIED claim based to comply with the <u>Camper</u> heightened evidentiary standard. Regardless of whether this heightened evidentiary standard is applied to the <u>Eskin</u> gateway test or the general negligence analysis, the claimant must prove his serious or severe emotional injury by expert proof. In the absence of expert proof, the standalone NIED claimant may not prevail on his NIED claims. Plaintiffs have not provided expert proof regarding their NIED claims.

Plaintiffs' claims for negligent infliction of emotional distress were also filed outside of the one-year statute of limitations applicable to claims for NIED and are therefore time-barred. Tenn. Code Ann. § 29-26-116 provides that "[t]he statute of limitations in health care liability actions shall be one (1) year as set forth in § 28-3-104." Claims for negligent infliction of emotional distress are also subject to the one-year statute of limitations found in Tenn. Code Ann. § 28-3-104. <u>See Jackson v. CVS Corp.</u>, No. M2009-02220-COA-R3-CV, 2010 Tenn. App.

LEXIS 548, at *11–12 (Tenn. Ct. App. Aug. 26, 2010).  A plaintiff filing a health care liability claim who complies with the notice provisions of Tenn. Code Ann. § 29-26-121, however, receives a 120-day extension of the applicable statute of limitations to their health care liability claim.  Tenn. Code Ann. § 29-26-121(c).  Section 121(c) provides, in pertinent part:  "When notice is given to a provider as provided in this section, the applicable statutes of limitations and repose shall be extended for a period of one hundred twenty (120) days from the date of expiration of the statute of limitations and statute of repose applicable to that provider."  Id.

While Plaintiffs' health care liability claim is undeniably governed by and subject to the mandatory requirements and limitations of Tenn. Code Ann. § 29-26-101, et seq., they attempt to maintain individual claims for negligent infliction of emotional distress in the same action.  However, because Plaintiffs' original Complaint was filed more than one (1) year after their alleged negligent infliction of emotional distress cause of action accrued, their negligent infliction of emotional distress claims against Defendants violate the applicable statute of limitations and should be dismissed.  Tenn. Code Ann. § 29-26-121 only applies to health care liability actions; it does not apply to claims for negligent infliction of emotional distress.  (See Flax v. DaimlerChrysler Corp., 272 S.W.3d 521 (Tenn. 2008) (defining a mother's claim for negligent infliction of emotional distress as a "stand alone" claim in spite of the fact that she simultaneously brought a wrongful death claim on behalf of her son); see also Tenn. Code Ann. § 29-26-121(a)(1) ("Any person, or that person's authorized agent, **asserting a potential claim for health care liability** shall give written notice of the potential claim to each health care provider . . . ." (emphasis added))).

Plaintiffs clearly contemplated that their claim for negligent infliction of emotional distress was separate and distinct from their health care liability claim.  Plaintiffs appreciated and

admitted this distinction in the very title they gave their Complaint -- "Complaint for Personal Injuries, Wrongful Death, Medical Negligence [Health Care Liability Action] and Negligent Infliction of Emotional Distress (NIED)." (D.E. #1). As a separate claim, Plaintiffs' claim for negligent infliction of emotional distress was not governed by the statutory provisions governing health care liability, including either the statute of limitations set forth in Tenn. Code Ann. § 29-26-116 or the potential 120-day extension thereof set forth in Tenn. Code Ann. § 29-26-121.

Defendants' treatment of Brett Lovelace occurred on March 12, 2012, and Brett Lovelace died on March 14, 2012. "Once an injury occurs, a cause of action accrues to the person injured, and . . . the time for filing a lawsuit to redress that injury starts running right then." Cherry v. Williams, 36 S.W.3d 78, 83 (Tenn. Ct. App. 2000). On or around February 13, 2013, Plaintiffs mailed letters to Defendants pursuant to Tenn. Code Ann. § 29-26-121 notifying them of a potential claim for health care liability. Plaintiffs subsequently filed this lawsuit on May 8, 2013, relying on the extension of time found in Tenn. Code Ann. § 29-26-121. (See D.E. #1). The latest date Plaintiffs potentially could have filed their lawsuit was March 14, 2013. Plaintiffs, however, did not file this action until May 8, 2013, which is past the expiration of the statute of limitations for a claim for negligent infliction of emotional distress. Therefore, the Plaintiffs' claims for negligent infliction of emotional distress are timed-barred and should be dismissed.

### III. Comparative Fault

These Defendant's comparative fault allegations against Kelly Kish constitute a crucial part of this trial. Kelly Kish, and thereby Methodist Hospital, were never parties to this lawsuit because they settled prior to a lawsuit being filed. All experts, including Plaintiffs' own expert, agree that Kelly Kish fell below the standard of care in her treatment of Brett Lovelace. This

deviation resulted in Methodist Hospital settling with Plaintiffs prior to an action even being filed.

The Supreme Court of Tennessee abandoned outmoded and unjust common law doctrine of contributory negligence in the case of McIntyre v. Balentine, 833 S.W.2d 52, 52-59 (Tenn. 1992). The McIntyre Court adopted a system of modified comparative fault in its place. Comparative fault, as the Court envisioned it, would (1) enable plaintiffs to recover fully for their injuries, (2) fairly allocate liability for the plaintiff's injuries among the persons at fault, (3) conserve judicial resources, and (4) avoid inconsistent judgments. Samuelson v. McMurty, 962 S.W.2d 473, 476 (Tenn. 1998). Since the McIntyre decision, Tennessee Courts have undertaken to mold and apply the comparative fault doctrine in a way that strikes the proper balance between an injured plaintiff's interest in being made whole and a defendant's interest in being held liable only for the damages for which it is responsible. Brown v. Wal-Mart Discount Cities, 12 S.W.3d 785, 787 (Tenn. 2000).

The Tennessee Supreme Court recently found this balance in the case of Banks v. Elks Club Pride of Tenn. 1102, 301 S.W.3d 214, 220 (Tenn. 2010). The Banks Court recognized the following four principles:

> (1) that when "the separate, independent negligent acts of more than one tortfeasor combine to cause a single, indivisible injury, all tortfeasors must be joined in the same action, unless joinder is specifically prohibited by law"; (2) that when the separate, independent negligent acts of more than one tortfeasor combine to cause a single, indivisible injury, each tortfeasor will be liable only for that proportion of damages attributed to its fault"; (3) that the goal of linking liability with fault is not furthered by a rule that allows a defendant's liability to be determined by the happenstance of the financial wherewithal of the other defendants; and (4) that the purpose of the comparative fault regime is to prevent fortuitously imposing a degree of liability that is out of all proportion to fault.

Becker, at 220.

With the adoption of the comparative negligence system in Tennessee, defendants were called upon to answer allegations in negligence are permitted to allege, as an affirmative defense, that a nonparty caused or contributed to the injury or damage for which recovery is sought[5]. McIntyre, 833 S.W.2d at 58. In cases where such a defense is raised, the trial or district court shall instruct the jury to assign this nonparty the percentage of the total negligence for which he or she is responsible. Id.

When a defendant asserts comparative fault against a third party, that defendant bears the burden of proving the negligence of the third party. The Tennessee Supreme Court addressed this burden of proof in the case of Banks, 301 S.W.3d 214 (Tenn. 2010). The Banks Court held that the burden of proving the third party's negligence "does not shift but instead remains with the original defendant who asserted the affirmative defense of comparative fault. Thus, the plaintiff is not required to shoulder the difficulty and expense of proving negligence… (T)hat burden remains with the defendant who asserted the affirmative defense of comparative fault in the first place." Id. Dr. Paidipalli has disclosed numerous experts who will testify that Kelly Kish deviated from the standard of care and caused an injury to Brett Lovelace which would not occur otherwise. Therefore, these Defendants fully expect to assert the defense of comparative fault at trial.

### IV. Caps on Noneconomic Damages

Tennessee Code Annotated § 29-39-102 limits what noneconomic damages a plaintiff may recover in all actions which accrue on or after October 1, 2011:

---

[5] A large portion of Tennessee case law has addressed the Legislature's response to McIntyre which was the enactment of Tenn. Code Ann. § 20-1-119. Much of this case law concerns scenarios where defendants allege comparative fault against a third party whom the Plaintiff had not sued and had not recovered damages from prior to the filing of the lawsuit. In this case, the Plaintiff has already settled with Methodist Hospital for the actions of Kelly Kish; therefore, the case law addressing a Plaintiffs' ability to amend their Complaint to assert causes of action against a third party is irrelevant.

(a)  In a civil action, each injured plaintiff may be awarded:

(1)  Compensation for economic damages suffered by each injured plaintiff; and

(2)  *Compensation for any noneconomic damages suffered by each injured plaintiff not to exceed seven hundred fifty thousand dollars ($750,000) for all injuries and occurrences that were or could have been asserted, regardless of whether the action is based on a single act or omission or a series of acts or omissions that allegedly caused the injuries or death.*

****

(e)  All noneconomic damages awarded to each injured plaintiff, including damages for pain and suffering, *as well as any claims of a spouse or children for* loss of consortium or *any derivative claim for noneconomic damages*, shall not exceed in the aggregate a total of seven hundred fifty thousand dollars ($750,000), unless subsection (c) applies, in which case the aggregate amount shall not exceed one million dollars ($1,000,000).

Tenn. Code Ann. § 29-39-102 (emphasis added). Noneconomic damages are defined as:

damages, to the extent they are provided by applicable law, for: physical and emotional pain; suffering; inconvenience; physical impairment; disfigurement; mental anguish; *emotional distress*; loss of society, companionship, and consortium; injury to reputation; humiliation; noneconomic effects of disability, including loss of enjoyment of normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; and all other nonpecuniary losses of any kind or nature.

Id. § 29-39-101(2) (emphasis added).

When a court construes the language of a statute, it is "required to ascertain and effectuate the legislative intent and purpose of the statute." Ki, 78 S.W.3d at 879 (citing State v. Walls, 62 S.W.3d 119 (Tenn. 2001)). Tennessee Code Annotated section 29-39-102 was passed as part of the Tennessee Civil Justice Act of 2011. See H.B. 2008, 106th Gen. Assembly (Tenn. 2008). One of the sections of the Act created "a seven hundred fifty thousand dollar ($750,000) cap on non-economic damages for all torts." See 106th Tenn. Gen. Assembly, House Floor Discussion, at 240 (Rep. Stewart, May 9, 2011). The stated purpose of the caps on the noneconomic damages is to bring certainty and predictability to the civil litigation process

23

regarding the uncertain and hard-to-quantify noneconomic damages. See 106th Tenn. Gen. Assembly, Sen. Jud'y Comm. Mtg., at 112 (Sen. Kelsey, April 19, 2011); 106th Tenn. Gen. Assembly, Sen. Floor Discussion, at 333 (Sen. Kelsey, May 12, 2011); 106th Tenn. Gen. Assembly, Sen. Floor Discussion, at 454 (Sen. Faulk, May 12, 2011). The certainty and predictability created by the noneconomic damage caps were designed to provide "clarity for business owners, small and large, throughout this state in regard to risk management . . . ." See 106th Tenn. Gen. Assembly, House Floor Discussion, at 248 (Rep. Dennis, May 9, 2011).

The caps were designed to add predictability to civil litigation so businesses know how to quantify their risk. After the Tennessee Civil Justice Act of 2011, a business knows that it can plan to accrue no more than $750,000 in noneconomic damages in a wrongful death case. The statute was designed to incorporate any derivative claims for noneconomic damages of family members into the $750,000 cap. This is one of the ways that the Act provides certainty, predictability, and clarity to manage risk. It would run counter to the stated legislative intent of predictability to allow the cap to double, triple, etc. based only on the number of parents or children that are present at or near the time of any accident. If such an interpretation were made, then the entire goal of certainty and predictability is destroyed. Thus, Plaintiffs can recover for economic losses proven, including lost future earnings, funeral expenses, and medical expenses as well as $750,000 total in the aggregate for all emotional injuries, including those of the parents.

## **CONCLUSION**

These Defendants contend that they fully complied with the applicable standard of care and that no action or inaction on their part caused any injury to Brett Lovelace that would not have occurred otherwise. These Defendants will show that Kelly Kish fell far below the standard

of care while she was monitoring Brett Lovelace in the PACU, and this inexcusable negligence

caused Brett Lovelace's death and the injuries claimed

By:    s/ W. Bradley Gilmer
JERRY O. POTTER (4284)
W. BRADLEY GILMER (21490)
KAREN S. KOPLON (16282)
Attorneys for Defendants, Pediatric
Anesthesiologists, P.A. and
Babu Rao Paidipalli, M.D.
THE HARDISON LAW FIRM, P.C.
119 S. Main Street, Suite 800
Memphis, Tennessee 38103
(901) 525-8776
jpotter@hard-law.com
bgilmer@hard-law.com
kkoplon@hard-law.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served via U.S. Mail to all counsel of record identified below:

Mark Ledbetter, Esq.
Halliburton & Ledbetter
Attorney for Plaintiffs
254 Court Avenue
Suite 305
Memphis, TN 38103

J. Kimbrough Johnson (7953)
Marcy D. Magee (19360)
Natalie M. Bursi (032017)
Lewis, Thomason, King, Krieg & Waldrop, P.C.
40 South Main Street, Suite 2900
Memphis, TN 38103
Phone:  (901) 525-8721
*Attorneys for Defendant, Mark P. Clemons*
KJohnson@LewisThomason.com
MMagee@LewisThomason.com
NBursi@LewisThomason.com

this 6th day of January, 2015.

s/ W. Bradley Gilmer
W. BRADLEY GILMER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESESEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

  Plaintiffs,

Vs.         No. 2:13-cv-02289 SHL-dkv
           JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and
MARK P. CLEMONS,

  Defendants.

## DEFENDANTS', PEDIATRIC ANESTHESIOLOGISTS, P.A., AND BABU RAO PAIDIPALLI, MD'S, TRIAL MEMORANDUM OF FACTS AND LAW

Come now the defendants, Pediatric Anesthesiologists, P.A. and Babu Rao Paidipalli, M.D., by and through counsel of record, and pursuant to Local Rule 16.4, submit the following trial memorandum of facts and law.

### FACTS

The facts of this case center around Brett Lovelace's treatment at LeBonheur Hospital on March 12, 2012. Brett Lovelace, on March 12, 2012, was twelve years old.  He weighed 81.4 kilograms (179 pounds) and was 174 centimeters (5'7") tall.  On this date, Brett Lovelace presented to LeBonheur for a Tonsillectomy and Adenoidectomy ("T&A") to be performed by Dr. Mark Clemons. Dr. Rao Paidipalli and Grace Freeman, CRNA administered anesthesia to Brett Lovelace. The surgery itself was performed by Dr. Clemons without any complications.

The surgery ended at approximately 10:15 AM. When the surgery ended, both Dr. Paidipalli and Grace Freeman were present in the operating room. Under the supervision of Dr. Paidipalli, Grace Freeman turned off the anesthetic gas and increased the oxygen to 100% and increased the oxygen flow to 10L/min. Ms. Freeman suctioned the patient's mouth and stomach, and placed a bite block then an oral airway in the patient's mouth. The patient had a swallow reflex and was coughing because of the presence of the endotracheal tube. Furthermore, the patient was breathing on his own with good respiratory effort. The patient started moving all extremities, and lifting his head off the table. The patient's eyes were open. As the patient emerged from anesthesia, he became agitated with tube in his throat and began reaching with his hands to remove the endotracheal tube. It required five or six people to hold him down on the operating table.

At this point, it was the clinical judgment of both Dr. Paidipalli and Grace Freeman, that it was time to extubate the patient. At approximately 10:26 AM, Grace Freeman, under the supervision of Dr. Paidipalli, extubated Brett Lovelace. After extubation, the patient was given 50 µg of Fentanyl to calm him down so he did not roll off the table or injure himself. While Brett Lovelace was being restrained on the operating table after extubation, he asked Grace Freeman several times, "why are you holding me down?" The patient's vital signs were good, and he had spontaneous respiration with blow-by oxygen from the anesthesia machine circuit with a face mask. He was then moved from the operating table to a stretcher and the blow-by oxygen was changed from the anesthesia circuit to a Jackson Rees circuit with a face mask that was connected to transport oxygen cylinder on the stretcher with 4L/min flow, and placed by the patient's face.

Grace Freeman and Brittany Dye (the circulating nurse) transported the patient from the operating room to the PACU. At the time that the patient left the operating room, he had good vital signs, good color, and was breathing on his own with good respiratory effort. During the transport to the PACU, the mask connected to the Jackson Rees circuit was next to the patient's face. It was hooked up to an oxygen tank that was beneath the stretcher and the patient was receiving blow-by oxygen at 4 L/min. While Grace Freeman was transporting Brett Lovelace to the PACU, he turned himself over into a prone position with his knees under him with his head turned to the side. His breathing remained clear and unobstructed. His color and vital signs remained good.

When Grace Freeman arrived in the PACU[1] at approximately 10:36 AM, she rolled the stretcher to spot 29. Ms. Freeman locked the wheels on the stretcher. She connected the oxygen to the wall, turned the oxygen to 4-6 L/min flow, and placed the mask approximately 2 inches from the patient's face blowing oxygen. She hooked up the pulse oximeter and the blood pressure cuff to the monitor. After an initial artifact reading on the pulse oximeter, Ms. Freeman determined that the patient's oxygen saturation was 100%; his pulse rate was 118; and his blood pressure was 126/47. She counted his respirations at 22. His temperature was normal. During this time, the Lebonheur PACU nurse, Kelly Kish, was bed side.

Ms. Freeman informed Ms. Kish of the significant history of the patient including sleep apnea, asthma, and obesity. Ms. Freeman also gave the nurse the following information: the name of the surgeon; the type of surgery; the fact that the patient had awakened agitated; what narcotics the patient had been given; when the last narcotic had been given; the fluid status of the patient; and the IV location. Ms. Freeman then asked Kelly Kish, the PACU nurse, if she felt

---

[1] PACU is an acronym for Post-Anesthesia Care Unit.

comfortable with taking over the care of the patient and the nurse indicated that she did. Grace Freeman then handed the patient over to the PACU nurse, Kelly Kish.

When Ms. Freeman left the patient in the PACU, his condition was the following: sleeping but arousable; stable; breathing on his own with good respiratory effort; in a prone position with his knees up under him with his head turned to the side; and with the Jackson-Reese mask near his face with oxygen flowing.

Brett Lovelace was Kelly Kish's only patient during the 1.5 hours that he was in the PACU before the Harvey team code was called. According to Nurse Kish's deposition, the patient was stable upon his arrival in the PACU. She also testified that the patient's face was to the side while he was in the PACU. His parents were in the PACU during this time. Shortly after Brett's arrival in the PACU, Dr. Clemons stopped by the PACU, assessed Brett, ordered prescriptions, and left with the patient in the care of Kelly Kish.

In spite of Brett Lovelace being her sole responsibility during those 90 minutes, Kish failed to fulfill her nursing duties to him. Instead, she provided little to no care; did not ask any other provider for help; and fraudulently documented. For example, despite charting a rating of 9 out of 10 on the Aldrete scale[2], Kelly Kish admits that she never attempted to speak with or rouse Brett during the hour and a half he was under her care in the PACU. She admits to never rousing or checking the patient to make these ratings, but instead charted based on her observation of Brett's status when he initially entered the PACU. Kelly Kish also fraudulently documented oxygen saturations of Brett Lovelace that were not reflected in the monitor print-out. For example, Kish documented 100% oxygen saturation when the monitor read only "artifact" or levels below 25%.

---

[2] Such a score would indicate, among other things, able to move four extremities voluntarily or on command; able to deep breathe and cough freely; blood pressure +/-20% presentation level; arousable on calling; and able to maintain oxygen saturation greater than 90% on room air.

4

Approximately 30 minutes after Brett Lovelace was admitted to the PACU, Kelly Kish documented his blood pressure as 118 over 56. Approximately 45 minutes after the patient was admitted to the PACU, Kelly Kish documented the patient's blood pressure as 106 over 53. Approximately 60 minutes after the patient was admitted to the PACU, Kish charted the patient's blood pressure as 84 over 42. Despite these chart entries showing a clear drop in blood pressure, Kish did not contact Dr. Paidipalli, Grace Freeman, or Dr. Clemons. Kish has admitted that she should have at least contacted someone when the blood pressure dropped to 84 over 42.

Kelly Kish was not appropriately monitoring Brett Lovelace in the PACU because she was on Facebook and at least one other social media website using the hospital's computer at Brett's bedside. Mrs. Lovelace at one point did see Ms. Kish on Facebook on the hospital's computer. Kelly Kish admitted to this use during her deposition.

Brett stayed in the PACU under the care of Kelly Kish for approximately 90 minutes. Around the 90 minute mark, Kish left the patient to get him a slurpee. Upon her return, Kelly Kish has stated that she noticed Brett Lovelace had stopped snoring and asked for help to turn him. Brett's father, on the other hand, testified that he had to ask Kish for help turning Brett as Brett's leg appeared to be blue. When they turned Brett supine, he was noted to be deeply cyanotic, apneic, and pulseless. A "Harvey" code, indicating a nonresponsive patient, was called, and Dr. Paidipalli, along with others, immediately responded to help. Brett was eventually resuscitated, but suffered severe anoxic brain injury and died approximately 48 hours later.

On March 23, 2012, Kelly Kish resigned from her position as a PACU nurse at LeBonheur Children's Hospital in lieu of termination. She was reported to the Tennessee Board of Nursing for her conduct surrounding her duties to Brett Lovelace. On February 22, 2013, Kelly Kish agreed to an order that revoked her nursing license based on this Complaint. In the

order, Kish admitted to violating Tenn. Code Ann. § 63-7-115(a)(1)[3] which allowed the board to revoke her license due to the fact that she is unfit or incompetent by reason of negligence, habits, or other causes and is guilty of unprofessional conduct. Kish also agreed that she intentionally or negligently caused physical or emotional injury to a patient and abandoned or neglected a patient who required nursing care. Finally, Kish admitted that her actions failed to maintain a record for Brett which accurately reflected her nursing problems and interventions for Brett and engaged in acts of dishonest relating to the practice of nursing.

Due to the actions of Kelly Kish, Plaintiffs entered into a confidential settlement with Methodist – LeBonheur prior to even filing a lawsuit. Then, Plaintiffs filed the current lawsuit alleging medical negligence against Dr. Clemons, Dr. Paidipalli, and his group. It should be noted that the Plaintiffs cause of action accrued, at the earliest, on March 12, 2012; therefore, the recently enacted cap on noneconomic damages applies to this case.

Plaintiffs' sole medical expert, Dr. Jason Kennedy, is a cardiac anesthesiologist from Nashville with little to no experience in the pediatric anesthesiology field. Dr. Kennedy is of the opinion that Dr. Paidipalli fell below the standard of care in three respects: (1) he failed to appropriately ensure that Brett had fully emerged from and recovered appropriately from the anesthetic prior to the removal of the endotracheal tube and failed to ensure adequate ventilatory support in an obese patient with sleep apnea; (2) he failed to appropriately ensure that Brett was appropriately and safely monitored and assessed in the PACU; and (3) failed to ensure that Brett had adequate oxygen supplementation in the PACU. Dr. Kennedy also opines that Dr. Clemons failed to intervene in Brett's poor positioning during his visit to the PACU and thus deviated

---

[3] "The board has the power to deny, revoke, or suspend any certificate or license to practice nursing or to otherwise discipline a licensee upon proof that the person… (c) is unfit or incompetent by reason of negligence, habits, or other cause; or (f) is guilty of unprofessional conduct." Tenn. Code Ann. 63-7-115 (a) (1) (C), (F).

from the standard of care. Neither the surgery itself, the administering of anesthesia, or the drugs used are at issue in this lawsuit.

Dr. Paidipalli and Dr. Clemons deny each and every accusation brought forth by the Plaintiffs. Both Defendants disclosed experts who will testify that Defendants complied with the standard of care in caring for Brett Lovelace. These experts blamed Brett's death on the actions of Kelly Kish in the PACU. Dr. Paidipalli filed a certificate of good faith when he alleged comparative fault against Kelly Kish; therefore, the issue of comparative fault is still very much alive at trial. Defendants will not allege that the parents' monitoring of their son in the PACU was negligent because they are not healthcare providers.

## LAW

Several issues of law have arisen throughout the course of this litigation. The case is a health care liability action filed pursuant to the Tennessee Civil Justice Act of 2011. Health care liability lawsuits in Tennessee are inherently complex and contain several different burdens that the Plaintiff must prove through expert testimony. Plaintiffs' Complaint also includes a claim for negligent infliction of emotional distress; however, for reasons stated below, Defendants do not believe Plaintiff will be able to meet their burden regarding this claim. Additionally, Plaintiffs filed this claim for negligent infliction of emotional distress beyond the statute of limitations period. Since the Plaintiffs failed to disclose expert proof of Negligent Infliction of Emotional Distress claim and filed the claim beyond their statute of limitations period, their claims for Negligent Infliction of Emotional Distress should be dismissed. Comparative fault against a third party is also an issue that will arise during trial given the severely negligent acts of Kelly Kish in the PACU. Finally, since these causes of action accrued in March of 2012, Tennessee's caps on noneconomic damages will apply.

### I. <u>Health Care Liability Causes of Action in Tennessee</u>

Any cause of action for health care liability in Tennessee is governed by Tennessee Code Annotated section 29-26-115. Section 115 sets forth the required elements of proof in subsection (a), and the requirements for competency of a proffered medical expert in subsection (b). Specifically, the statute reads as follows:

(a) In a health care liability action[4], the claimant shall have the burden of proving by evidence as provided by subsection (b):

> **(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;**

> **(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such a standard; and**

> **(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.**

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

(c) In a health care liability action as described in subsection (a), there shall be no presumption of negligence on the part of the defendant; provided, that there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof of the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

---

[4] The 2012 amendment substituted "health care liability action" for "malpractice action" in the introductory paragraph of (a) and in (c) and (d).

> (d) In a health care liability action as described in subsection (a), the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence.

Tenn. Code Ann. § 29-26-115 (emphasis added). The Plaintiff is, therefore, charged with the burden of proving, by expert testimony, (1) the standard of care, (2) that defendant deviated from that standard, and (3) that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not have occurred otherwise. Shipley v. Williams, 350 S.W.3d 527, 537 (Tenn. 2011)

*A. The Standard of Care*

In an action alleging negligence of a health care provider, competent evidence of the recognized standard of acceptable professional practice in the applicable profession is a prerequisite to recovery. Liability for malpractice therefore depends on whether or not the physician is lacking in and fails to exercise the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession. Dunham v. Stones River Hosp., Inc., 40 S.W.3d 47, 52 (Tenn. Ct. App. 2000) (*citing* Hurst v. Dougherty, 800 S.W.2d 183, 185 (Tenn. Ct. app. 1990); *see also* Ward v. United States, 838 F.2d 182 (6th Cir. Tenn. 1988); Watkins v. United States, 482 F. Supp. 1006 (M.D. Tenn. 1980)). An honest mistake in judgment is not sufficient to find a physician negligent. Hurst, 800 S.W.2d at 185. The duty of a physician is to use his best judgment in the treatment of a patient. Ward, at 187. Under Tennessee law, a physician must exercise his best judgment regarding treatment, and is not guilty of malpractice if he chooses a course of treatment supported by other physicians in good standing. Id. at 187. The physician is not the insurer of the patient. Id. Rather, he is only liable for negligence, and negligence is not presumed from the fact that the treatment is unsuccessful.

Id. There is no presumption of negligence, and an honest mistake in judgment is not sufficient to find a physician negligent. Id.

In determining the degree of learning and skill required of a medical practitioner in the treatment of a particular case, regard must be given to the state of medical science at that time. Ward, at 187. Only the standard of care that applied on the date of the injury will be considered- the actions of the defendant cannot be viewed in hindsight. Evaluation of professional judgment must be based upon the facts available to the professional and the accepted practice among members of the profession. The reason for this crucial requirement centers on the state's interest in assuring that doctor charged with negligence in Tennessee receive a fair assessment of their conduct. Sutphin v. Platt, 720 S.W.2d 455, 458 (Tenn. 1986).

The term "recognized standard," therefore, means a standard recognized and accepted generally by the profession and not merely the particular standard of a single practitioner or group. Godbee v. Dimick, 213 S.W.3d 865, 896 (Tenn. Ct. App. 2006).The testimony of a physician as to what she or he would do or his or her opinion of what should have been done does not prove the statutory standard of medical practice. Lewis v. Hill, 770 S.W.2d 751, 754 (Tenn. Ct. App. 1988). Furthermore, what a majority of physicians in a community would consider to be reasonable medical care is not the meaning of the standard of care. Id. The standard of care is simply determined by whether a physician exercised the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession. Hurst v. Dougherty, 800 S.W.2d 183 (Tenn. App. 1990); see also Crawford v. Family Vision Center, 1990 Tenn. App. LEXIS 810 (Tenn. Ct. App. Nov. 16, 1990).

Guidelines, policies, and protocols likewise do not establish the standard of care. Flatt v. Claiborne County Hosp. & Nursing Home, 2010 Tenn. App. LEXIS 255 (Tenn. Ct. App. Apr. 8,

2010) (citing <u>Geesling v. Livingston Reg'l Hosp. LLC</u>, 2008 Tenn. App. LEXIS 738 (Tenn. Ct. App. Dec. 18, 2008)) (*see also* <u>Richardson v. Miller</u>, 44 S.W.3d 1, 25 (Tenn. Ct. App. 2000). Allowing plaintiffs to establish the standard of care solely on guidelines, policies, and procedures, would completely erase a physician's reliance on clinical judgment and thus fail the state's interest in assuring that the doctor charged with negligence receives a fair assessment of their conduct

The standard of care is only established by providing expert testimony pursuant to Tenn. Code Ann. § 29-26-115 (b). <u>Shipley v. Williams</u>, 350 S.W.3d 527, 550 (Tenn. 2011); <u>Williams v. Baptist Mem'l Hosp.</u>, 193 S.W.3d 545, 553 (Tenn. 2006); <u>Stovall v. Clarke</u>, 113 S.W.3d 715, 723 (Tenn. 2003); <u>Robinson v. Lecorps</u>, 724 S.W.3d 718, 724 (Tenn. 2002). Tenn. Code Ann. § 29-26-115(b) sets forth the three requirements for an expert witness to be competent to testify in a medical negligence case. <u>Shipley</u>, at 550. The witness must be (1) licensed to practice in the state or a contiguous bordering state; (2) a profession or specialty that would make the person's expert testimony relevant to the issues in the case; and (3) must have practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. <u>Id.</u>   Tenn. Code Ann. § 29-26-115(a) and (b) thus serve two distinct purposes. Subsection (a) provides the elements that must be proven in a medical negligence action, and subsection (b) prescribes who is competent to testify to satisfy the requirements of subsection (a).

The medical expert or experts used by the claimant to satisfy the standard of care requirement must demonstrate some familiarity with the medical community in which the defendant practices, or a similar community, in order for the expert's testimony to be admissible. <u>Shipley</u>, at 554. A medical expert is not required to demonstrate "firsthand" and "direct"

11

knowledge of a medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a health care liability case. Id. Tennessee has not adopted a national standard of care in health care liability cases. Id. at 553. However, in addition to testimony indicating a familiarity with the local standard of care, a medical expert may testify that there is a broad regional standard or a national standard of medical care to which members of his or her profession and/or specialty must adhere, coupled with the expert's explanation of why the regional or national standard applies under the circumstances. Id. at 554.

B. Causation

Proof of negligence without causation is nothing. Mosley v. Metropolitan Gov. of Nashville, 155 S.W.3d 119, 124 (Tenn. Ct. App. 2004) (citing German v. Nichopoulos, 577 S.W.2d 197, 203 (Tenn. Ct. App. 1978)); Drewery v. County of Obion, 619 S.W.2d 397, 398 (Tenn. Ct. App. 1981). The Tennessee Supreme Court emphasized the importance of causation testimony in the landmark decision of Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). The Kilpatrick opinion involved a lawsuit against a physician for failing to detect breast cancer. In holding that the plaintiff failed to establish causation required by T.C.A § 29-26-115(a), the Kilpatrick court established the requirement that a plaintiff must have had a better than even chance of surviving or recovering from the underlying condition absent the physician's negligence. As a result, proof of causation equating to a "possibility," a "might have," "may have," or "could have" is not sufficient to establish the required nexus. Id. In refusing to relax this traditional cause in fact requirement, the Court emphasized that the mere occurrence of an injury does not prove negligence. Id. An admittedly negligent act does not necessarily entail liability. Thus, even if the plaintiffs show that the defendant breached a duty of care owed, the

plaintiff must still establish the required causal connection between the defendant's conduct and the plaintiff's injury.

Expert testimony is required to establish the required causal nexus in health care liability cases except where the act of alleged malpractice lies within the knowledge of ordinary laymen. Kenyon v. Handal, 122 S.W.3d 743, 758 (Tenn. Ct. App. 2003). Such a connection requires testimony from an expert that the injury or harm would not have occurred 'but for' the defendant's negligent conduct. Expert testimony that amounts to speculation cannot substantially assist the trier of fact. Hunter v. Ura, 163 S.W.3d 686, 704 (Tenn. 2004). When the matter of causation remains one of pure speculation or conjecture, or the probabilities are a best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.  Miller v. Choo Choo Partners, L.P., 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001) (citing Keaton, Torts, § 41, p. 269 (5th ed. 1984).

It is further well established that causation testimony must be to a reasonable degree of medical certainty. Causation in fact is a matter of probability and not possibility and in healthcare liability cases must be shown to a reasonable degree of medical certainty. White v. Vanderbilt Univ., 21 S.W.3d 215, 235 (Tenn. Ct. App. 1999) (citing Volz v. Ledes, 895 S.W.2d 677, 679 (Tenn. 1995); White v. Methodist Hosp. S., 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)). Each element of a medical malpractice action must be established by expert medical testimony to a reasonable degree of medical certainty. That an expert's testimony is reasonably certain is thus a prerequisite to the admissibility of that testimony and a question of law which is decided by the court, and not the jury. Kellon v. Lee, 2012 Tenn. App. LEXIS 323, at 19 (Tenn. Ct. App. 2012).

Tennessee courts have previously held that the terms "reasonable degree of medical certainty" and "more probable than not" are not synonymous. Bara v. Clarksville Memorial Health Systems, Inc. 104 S.W.3d 1, 10 (Tenn. Ct. App. 2002). In Bara, plaintiffs appealed a verdict for the defendants by asserting that it was error to charge the jury that the plaintiffs must prove causation to reasonable degree of medical certainty. The Bara Court, in holding that the phrase was a question of law and thus not "jury charge material," noted that the numerous Tennessee cases established a necessary degree of medical certainty to prove causation. Id. As a result, if a doctor cannot testify as to cause-in-fact to a reasonable degree of medical certainty, his testimony is not admissible before the jury. Id. The Court further noted that, as a matter of every day common sense, one cannot say that the terms "reasonable degree of medical certainty" and "more likely than not" are synonymous terms. Id. The two terms are not one and the same. The plaintiff's expert thus must meet both the Kilpatrick probability requirement and the reasonable degree of medical certainty requirement in order to present a *prima facie* case of health care liability to the jury.

While the terms "more probable than not," and "reasonable degree of medical certainty," are not one and the same, it is true that Tennessee law does not require an expert to explicitly state the magic language that is "to a reasonable degree of medical certainty." Mitchell v. Ensor, No. W2001-01683-COA-R3-CV, 2002 Tenn. App. LEXIS 810 (Tenn. Ct. App. 2002). In Mitchell, the trial court refused to strike the testimony of an expert witness because it was not, word for word, stated "to a reasonable degree of medical certainty." Id. In affirming the trial court's decision, the Mitchell Court noted that the only premise behind the plaintiff's argument was that the expert failed to incorporate the magic words "to a reasonable degree of medical certainty" into his testimony. Id. at 38. The Court held that such "magic language" was not

14

necessary for the admissibility of the testimony. However, the Court also cautioned that questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court.

## II. <u>Negligent Infliction of Emotional Distress in Tennessee</u>

In addition to the underlying medical malpractice claim concerning their son's treatment, Plaintiffs also maintain that they are entitled to individual claims of negligent infliction of emotional distress claim as pled in their Complaint. As outlined in their motion to strike such a claim, these Defendants do not believe Plaintiffs are entitled to these claims nor have they met their burden with respect to the required expert testimony. Additionally, Plaintiffs filed these claims beyond the one year statute of limitations. However, Defendants will include the Tennessee law regarding negligent infliction of emotional distress in this memorandum.

Claims for negligent infliction of emotional distress ("NIED") are analyzed under a general negligence approach. <u>Camper v. Minor</u>, 915 S.W.2d 437, 446 (Tenn.1996). "[A] plaintiff must present material evidence as to each of the five elements of general negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause . . . ." <u>Id</u>. Emotional harm is sufficient to satisfy the injury requirement. <u>See</u> <u>Flax v. DaimlerChrysler Corp.</u>, 272 S.W.3d 521, 530 (Tenn. 2008); <u>Garrison v. Bickford</u>, 377 S.W.3d 659, 670 (Tenn. 2012).

If a plaintiff claims to have suffered NIED due to witnessing the death or injury of a third-party, then the plaintiff's causation argument must show that the defendant's negligent act caused the death or injury of the third-party and the plaintiff's emotional injuries were the "proximate and foreseeable results of [the] defendant's negligence." <u>Eskin v. Bartee</u>, 262 S.W.3d 727, 736 (Tenn. 2008). There are four objective standards that a court will use to analyze

whether a plaintiff's emotional injuries were foreseeable: (i) "the plaintiff's physical location at the time of the accident"; (ii) the plaintiff's "awareness of the accident"; (iii) "the apparent seriousness of the victim's injuries"; and (iv) "the closeness of the relationship between the plaintiff and the victim." Id. (citing Ramsey v. Beavers, 931 S.W.2d 527, 531 (Tenn. 1996)).

Although Tennessee courts originally required an NIED claimant to have actually observed the alleged negligent action or omission, the Tennessee Supreme Court created a new standard to control whether a family member who did not observe the alleged negligent act or omission could recover. See Eskin, 262 S.W.3d. at 729-30. This new standard was designed to recognize that an individual may have a cognizable claim for NIED without observing the incident but also eliminate non-meritorious claims. See id. at 739 n.30. An NIED claimant that did not witness the actual injury-producing event must prove the following elements:

> (1) the actual or apparent death or serious physical injury of another caused by the defendant's negligence, (2) the existence of a close and intimate personal relationship between the plaintiff and the deceased or injured person, (3) the plaintiff's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene has been materially altered, and (4) the resulting serious or severe emotional injury to the plaintiff caused by the observation of the death or injury.

Id. at 739. This new objective standard is not included within the duty analysis. Id. at 739 n.30. Instead, it serves as a gateway test that allows courts to dismiss non-meritorious claims at the prima facie stage. Id. This objective standard "presents a factual issue to be determined by the finder of fact." Id.

The "serious or severe emotional injury" factor is subject to a heightened evidentiary standard if the NIED claim is a standalone claim, i.e., the claimant did not suffer any other injury that is personal to the claimant. See Camper, 915 S.W.2d at 446 (creating the heightened standard for emotional injury); Estate of Amos v. Vanderbilt University, 62 S.W.3d 133, 137 (Tenn. 2001); Flax, 272 S.W.3d at 529-30 (clarifying that Camper's heightened standard applies

16

only to standalone NIED claims). In order to prevail on a standalone NIED claim, a claimant must prove his serious or severe emotional injury by expert medical or scientific proof. Camper, 915 S.W.2d at 446 (citations omitted). Without such expert proof, the claimant may not prevail on his NIED claim. Id. Regardless of whether the serious or emotional injury is being proven as part of the Eskin gateway test for a claimant that did not witness the incident or in the general negligence portion of the case for a claimant that did or did not witness the incident, the heightened standard applies equally to standalone claims. See, e.g., Flax, 272 S.W.3d at 529-30 (stating that the Camper heightened evidentiary standard applies to all standalone claims, and applying it to a lawsuit in which the claimant witnessed the incident).

The Tennessee Supreme Court held that NIED claims filed in a wrongful death action *are* subject to this heightened Camper standard. See Flax v. DaimlerChrysler Corp, 272 S.W.3d 521, 525-31 (Tenn. 2008). Wrongful death actions belong to the decedent. Ki v. State, 78 S.W.3d 876, 880 (Tenn. 2002). Therefore, a survivor's NIED claim is a standalone claim that requires expert medical or scientific proof. Flax, 272 S.W.3d at 531. "Nothing in [the] opinion in Amos was intended to allow plaintiffs to avoid the heightened proof requirements of Camper by bringing a separate wrongful death suit on behalf of a decedent." Flax, 272 S.W.3d at 531. An NIED claimant whose allegations are connected to a wrongful death suit, or any suit in which the NIED claim is the only allegation personal to the claimant, must show that he suffered serious or severe emotional injury and *must demonstrate this injury through expert medical or scientific proof*. See id.

In Flax, a mother witnessed the death of her child in a car accident. Id. The mother filed a wrongful death suit against the car manufacturer in the name of her deceased child and included a personal claim for NIED. Id. at 526. However, the mother failed to offer any expert proof

17

regarding her emotional injury. Id. at 531. The court held that she failed to meet the Camper requirements and, thus, could not recover for NIED. Id. The Flax Court specifically noted that even though a mother witnessing the death of a child would seem to obviously indicate that the mother suffered severe or serious emotional injury, "the Camper requirements [were constructed] precisely because emotional injuries are uniquely subjective." Id. at 531; see also Camper, 915 S.W.2d at 446 (citations omitted) (stating that serious or severe emotional injury "occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case"). A plaintiff is required to meet the evidentiary burden. To hold otherwise would subvert Camper's principles and create "ad hoc decisions that originally made negligent infliction of emotional distress case law unpredictable and incoherent." Id.

Thus, it is clear that Tennessee law requires an individual with a standalone NIED claim based to comply with the Camper heightened evidentiary standard. Regardless of whether this heightened evidentiary standard is applied to the Eskin gateway test or the general negligence analysis, the claimant must prove his serious or severe emotional injury by expert proof. In the absence of expert proof, the standalone NIED claimant may not prevail on his NIED claims. Plaintiffs have not provided expert proof regarding their NIED claims.

Plaintiffs' claims for negligent infliction of emotional distress were also filed outside of the one-year statute of limitations applicable to claims for NIED and are therefore time-barred. Tenn. Code Ann. § 29-26-116 provides that "[t]he statute of limitations in health care liability actions shall be one (1) year as set forth in § 28-3-104." Claims for negligent infliction of emotional distress are also subject to the one-year statute of limitations found in Tenn. Code Ann. § 28-3-104. See Jackson v. CVS Corp., No. M2009-02220-COA-R3-CV, 2010 Tenn. App.

LEXIS 548, at *11–12 (Tenn. Ct. App. Aug. 26, 2010).  A plaintiff filing a health care liability claim who complies with the notice provisions of Tenn. Code Ann. § 29-26-121, however, receives a 120-day extension of the applicable statute of limitations to their health care liability claim.  Tenn. Code Ann. § 29-26-121(c).  Section 121(c) provides, in pertinent part:  "When notice is given to a provider as provided in this section, the applicable statutes of limitations and repose shall be extended for a period of one hundred twenty (120) days from the date of expiration of the statute of limitations and statute of repose applicable to that provider."  Id.

While Plaintiffs' health care liability claim is undeniably governed by and subject to the mandatory requirements and limitations of Tenn. Code Ann. § 29-26-101, et seq., they attempt to maintain individual claims for negligent infliction of emotional distress in the same action.  However, because Plaintiffs' original Complaint was filed more than one (1) year after their alleged negligent infliction of emotional distress cause of action accrued, their negligent infliction of emotional distress claims against Defendants violate the applicable statute of limitations and should be dismissed.  Tenn. Code Ann. § 29-26-121 only applies to health care liability actions; it does not apply to claims for negligent infliction of emotional distress.  (See Flax v. DaimlerChrysler Corp., 272 S.W.3d 521 (Tenn. 2008) (defining a mother's claim for negligent infliction of emotional distress as a "stand alone" claim in spite of the fact that she simultaneously brought a wrongful death claim on behalf of her son); see also Tenn. Code Ann. § 29-26-121(a)(1) ("Any person, or that person's authorized agent, **asserting a potential claim for health care liability** shall give written notice of the potential claim to each health care provider . . . ." (emphasis added))).

Plaintiffs clearly contemplated that their claim for negligent infliction of emotional distress was separate and distinct from their health care liability claim.  Plaintiffs appreciated and

admitted this distinction in the very title they gave their Complaint -- "Complaint for Personal Injuries, Wrongful Death, Medical Negligence [Health Care Liability Action] and Negligent Infliction of Emotional Distress (NIED)."  (D.E. #1).  As a separate claim, Plaintiffs' claim for negligent infliction of emotional distress was not governed by the statutory provisions governing health care liability, including either the statute of limitations set forth in Tenn. Code Ann. § 29-26-116 or the potential 120-day extension thereof set forth in Tenn. Code Ann. § 29-26-121.

Defendants' treatment of Brett Lovelace occurred on March 12, 2012, and Brett Lovelace died on March 14, 2012.  "Once an injury occurs, a cause of action accrues to the person injured, and . . . the time for filing a lawsuit to redress that injury starts running right then." Cherry v. Williams, 36 S.W.3d 78, 83 (Tenn. Ct. App. 2000).  On or around February 13, 2013, Plaintiffs mailed letters to Defendants pursuant to Tenn. Code Ann. § 29-26-121 notifying them of a potential claim for health care liability.  Plaintiffs subsequently filed this lawsuit on May 8, 2013, relying on the extension of time found in Tenn. Code Ann. § 29-26-121.  (See D.E. #1).  The latest date Plaintiffs potentially could have filed their lawsuit was March 14, 2013.  Plaintiffs, however, did not file this action until May 8, 2013, which is past the expiration of the statute of limitations for a claim for negligent infliction of emotional distress.  Therefore, the Plaintiffs' claims for negligent infliction of emotional distress are timed-barred and should be dismissed.

### III. Comparative Fault

These Defendant's comparative fault allegations against Kelly Kish constitute a crucial part of this trial. Kelly Kish, and thereby Methodist Hospital, were never parties to this lawsuit because they settled prior to a lawsuit being filed. All experts, including Plaintiffs' own expert, agree that Kelly Kish fell below the standard of care in her treatment of Brett Lovelace. This

deviation resulted in Methodist Hospital settling with Plaintiffs prior to an action even being filed.

The Supreme Court of Tennessee abandoned outmoded and unjust common law doctrine of contributory negligence in the case of McIntyre v. Balentine, 833 S.W.2d 52, 52-59 (Tenn. 1992). The McIntyre Court adopted a system of modified comparative fault in its place. Comparative fault, as the Court envisioned it, would (1) enable plaintiffs to recover fully for their injuries, (2) fairly allocate liability for the plaintiff's injuries among the persons at fault, (3) conserve judicial resources, and (4) avoid inconsistent judgments. Samuelson v. McMurty, 962 S.W.2d 473, 476 (Tenn. 1998). Since the McIntyre decision, Tennessee Courts have undertaken to mold and apply the comparative fault doctrine in a way that strikes the proper balance between an injured plaintiff's interest in being made whole and a defendant's interest in being held liable only for the damages for which it is responsible. Brown v. Wal-Mart Discount Cities, 12 S.W.3d 785, 787 (Tenn. 2000).

The Tennessee Supreme Court recently found this balance in the case of Banks v. Elks Club Pride of Tenn. 1102, 301 S.W.3d 214, 220 (Tenn. 2010). The Banks Court recognized the following four principles:

> (1) that when "the separate, independent negligent acts of more than one tortfeasor combine to cause a single, indivisible injury, all tortfeasors must be joined in the same action, unless joinder is specifically prohibited by law"; (2) that when the separate, independent negligent acts of more than one tortfeasor combine to cause a single, indivisible injury, each tortfeasor will be liable only for that proportion of damages attributed to its fault"; (3) that the goal of linking liability with fault is not furthered by a rule that allows a defendant's liability to be determined by the happenstance of the financial wherewithal of the other defendants; and (4) that the purpose of the comparative fault regime is to prevent fortuitously imposing a degree of liability that is out of all proportion to fault.

Becker, at 220.

With the adoption of the comparative negligence system in Tennessee, defendants were called upon to answer allegations in negligence are permitted to allege, as an affirmative defense, that a nonparty caused or contributed to the injury or damage for which recovery is sought[5]. McIntyre, 833 S.W.2d at 58. In cases where such a defense is raised, the trial or district court shall instruct the jury to assign this nonparty the percentage of the total negligence for which he or she is responsible. Id.

When a defendant asserts comparative fault against a third party, that defendant bears the burden of proving the negligence of the third party. The Tennessee Supreme Court addressed this burden of proof in the case of Banks, 301 S.W.3d 214 (Tenn. 2010). The Banks Court held that the burden of proving the third party's negligence "does not shift but instead remains with the original defendant who asserted the affirmative defense of comparative fault. Thus, the plaintiff is not required to shoulder the difficulty and expense of proving negligence… (T)hat burden remains with the defendant who asserted the affirmative defense of comparative fault in the first place." Id.  Dr. Paidipalli has disclosed numerous experts who will testify that Kelly Kish deviated from the standard of care and caused an injury to Brett Lovelace which would not occur otherwise. Therefore, these Defendants fully expect to assert the defense of comparative fault at trial.

**IV. Caps on Noneconomic Damages**

Tennessee Code Annotated § 29-39-102 limits what noneconomic damages a plaintiff may recover in all actions which accrue on or after October 1, 2011:

---

[5] A large portion of Tennessee case law has addressed the Legislature's response to McIntyre which was the enactment of Tenn. Code Ann. § 20-1-119. Much of this case law concerns scenarios where defendants allege comparative fault against a third party whom the Plaintiff had not sued and had not recovered damages from prior to the filing of the lawsuit. In this case, the Plaintiff has already settled with Methodist Hospital for the actions of Kelly Kish; therefore, the case law addressing a Plaintiffs' ability to amend their Complaint to assert causes of action against a third party is irrelevant.

(a)  In a civil action, each injured plaintiff may be awarded:

> (1)  Compensation for economic damages suffered by each injured plaintiff; and
>
> (2)  *Compensation for any noneconomic damages suffered by each injured plaintiff not to exceed seven hundred fifty thousand dollars ($750,000) for all injuries and occurrences that were or could have been asserted, regardless of whether the action is based on a single act or omission or a series of acts or omissions that allegedly caused the injuries or death.*

****

(e)  All noneconomic damages awarded to each injured plaintiff, including damages for pain and suffering, *as well as any claims of a spouse or children for* loss of consortium or *any derivative claim for noneconomic damages*, shall not exceed in the aggregate a total of seven hundred fifty thousand dollars ($750,000), unless subsection (c) applies, in which case the aggregate amount shall not exceed one million dollars ($1,000,000).

Tenn. Code Ann. § 29-39-102 (emphasis added). Noneconomic damages are defined as:

> damages, to the extent they are provided by applicable law, for: physical and emotional pain; suffering; inconvenience; physical impairment; disfigurement; mental anguish; *emotional distress*; loss of society, companionship, and consortium; injury to reputation; humiliation; noneconomic effects of disability, including loss of enjoyment of normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; and all other nonpecuniary losses of any kind or nature.

Id. § 29-39-101(2) (emphasis added).

When a court construes the language of a statute, it is "required to ascertain and effectuate the legislative intent and purpose of the statute." Ki, 78 S.W.3d at 879 (citing State v. Walls, 62 S.W.3d 119 (Tenn. 2001)). Tennessee Code Annotated section 29-39-102 was passed as part of the Tennessee Civil Justice Act of 2011. See H.B. 2008, 106th Gen. Assembly (Tenn. 2008). One of the sections of the Act created "a seven hundred fifty thousand dollar ($750,000) cap on non-economic damages for all torts." See 106th Tenn. Gen. Assembly, House Floor Discussion, at 240 (Rep. Stewart, May 9, 2011). The stated purpose of the caps on the noneconomic damages is to bring certainty and predictability to the civil litigation process

regarding the uncertain and hard-to-quantify noneconomic damages. See 106th Tenn. Gen. Assembly, Sen. Jud'y Comm. Mtg., at 112 (Sen. Kelsey, April 19, 2011); 106th Tenn. Gen. Assembly, Sen. Floor Discussion, at 333 (Sen. Kelsey, May 12, 2011); 106th Tenn. Gen. Assembly, Sen. Floor Discussion, at 454 (Sen. Faulk, May 12, 2011). The certainty and predictability created by the noneconomic damage caps were designed to provide "clarity for business owners, small and large, throughout this state in regard to risk management . . . ." See 106th Tenn. Gen. Assembly, House Floor Discussion, at 248 (Rep. Dennis, May 9, 2011).

The caps were designed to add predictability to civil litigation so businesses know how to quantify their risk. After the Tennessee Civil Justice Act of 2011, a business knows that it can plan to accrue no more than $750,000 in noneconomic damages in a wrongful death case. The statute was designed to incorporate any derivative claims for noneconomic damages of family members into the $750,000 cap. This is one of the ways that the Act provides certainty, predictability, and clarity to manage risk. It would run counter to the stated legislative intent of predictability to allow the cap to double, triple, etc. based only on the number of parents or children that are present at or near the time of any accident. If such an interpretation were made, then the entire goal of certainty and predictability is destroyed. Thus, Plaintiffs can recover for economic losses proven, including lost future earnings, funeral expenses, and medical expenses as well as $750,000 total in the aggregate for all emotional injuries, including those of the parents.

## CONCLUSION

These Defendants contend that they fully complied with the applicable standard of care and that no action or inaction on their part caused any injury to Brett Lovelace that would not have occurred otherwise. These Defendants will show that Kelly Kish fell far below the standard

of care while she was monitoring Brett Lovelace in the PACU, and this inexcusable negligence caused Brett Lovelace's death and the injuries claimed

By:     s/ W. Bradley Gilmer
JERRY O. POTTER (4284)
W. BRADLEY GILMER (21490)
KAREN S. KOPLON (16282)
Attorneys for Defendants, Pediatric
Anesthesiologists, P.A. and
Babu Rao Paidipalli, M.D.
THE HARDISON LAW FIRM, P.C.
119 S. Main Street, Suite 800
Memphis, Tennessee 38103
(901) 525-8776
jpotter@hard-law.com
bgilmer@hard-law.com
kkoplon@hard-law.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served via U.S. Mail to all counsel of record identified below:

Mark Ledbetter, Esq.
Halliburton & Ledbetter
Attorney for Plaintiffs
254 Court Avenue
Suite 305
Memphis, TN 38103

J. Kimbrough Johnson (7953)
Marcy D. Magee (19360)
Natalie M. Bursi (032017)
Lewis, Thomason, King, Krieg & Waldrop, P.C.
40 South Main Street, Suite 2900
Memphis, TN 38103
Phone:  (901) 525-8721
*Attorneys for Defendant, Mark P. Clemons*
KJohnson@LewisThomason.com
MMagee@LewisThomason.com
NBursi@LewisThomason.com

this 6th day of January, 2015.

s/ W. Bradley Gilmer
W. BRADLEY GILMER

25