IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESESEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

        Plaintiffs,

Vs.

                                      No. 2:13-cv-02289 SHL-dkv
                                      JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and
MARK P. CLEMONS,

        Defendants.

DEFENDANT, DR. MARK P. CLEMONS', MOTION IN LIMINE NO. 1

Comes now Defendant Mark P. Clemons, M.D., by and through counsel of record, and moves this Court for an order precluding reference by Plaintiffs and Plaintiffs' counsel to the timing of and any revisions to Dr. Clemons' operative report written about the procedure performed on Brett Lovelace.  In support of his Motion, Defendant states as follows:

**I.**      **The only testimony in this case regarding timing of and revisions to the operative report clearly indicates that the time in Dr. Clemons' operative report is a typographical error and that no revisions were made to the report.**

During the deposition of Dr. Clemons, Plaintiffs' counsel questioned him about the timing of the dictation of and any revisions to his operative report as follows:

        Q.     Do you have -- in Exhibit Number 2 after the first page, Dr. Clemons, you have your op note or your operative report?

        A.     Correct.

        Q.     Do you see that?

A.     Correct.

Q.     Okay.  Now, do you know when this was written?  I see that the date of service was March 12th, but the date it was signed was March 19th.  Do you know when this was written by you or dictated?

A.     It probably would have been that day or the next day, the day after surgery.  Transcription could tell you that.  I don't know.

Q.     I think I see it.  Turn to the last page and let me ask you --

A.     Dictated.

Q.     Yeah.  It's a D.  Does that mean that it was dictated March 12 at 5:48 p.m. or when, 5:48 a.m.?

A.     It certainly wasn't 5:48 a.m.

Q.     Well, is that what it shows, is that you dictated it before the surgery?

A.     No.  I would never dictate anything before a surgery.

Q.     Okay.  But I'm saying is that what the record shows?

A.     I don't know.  I can barely tell what it says.

Q.     It says D. 03-12-12.  That would be the correct date of the surgery.

A.     Right.

Q.     And then it says 0548, and that would be 5:00 a.m. .  Would it not?

A.     True.  But more likely, it was dictated at 5:00 p.m.

Q.     But 5:00 p.m. would be 1748, would it not?

A.     Correct.

Q.     And it shows that it's transcribed at what.  6:10 a.m.?

A.     Right.

2

Q.      Okay.  Who is SC?

A.      Person transcribing it.  I guess.

Q.      Okay.  So the record itself shows that it was -- it was dictated before -- dictated and transcribed before the surgery; is that correct?

A.      That's what it says, but it wasn't.

Q.      All right.  Now, did you ever go back after it was dictated and make any changes to it before it was made a permanent record?

A.      Not that I know of, but I'm sure I read it and might have changed a "we" to a -- I change words like "we" to "I," but I couldn't tell you of I changed a word or two.

Q.      Well, do you think on the last page, you might have changed the word -- the last sentence from reading, "He tolerated the procedure without problems" to read "He tolerated the procedure itself without problems"?  Could you have made that change by adding the word "itself" after he died or after he had problems?

A.      Well, when I talk about the procedure, I'm talking about the procedure itself.

Q.      Right.

A.      We did the surgery.  We woke him up, extubated him and took him to the recovery room.

Q.      Well, my point is, where it says he tolerated the procedure itself, do you think after he coded, that you might have added the word "itself" or do you think that would have occurred maybe in a later revision, or do you know?

A.      I'm not as smart as you to think about that one.

Q.      Now, in your note -- in your note about the procedure, you agree that if you dictated this at 5:48 in the morning, you certainly couldn't predict the outcome of the surgery and how well he did in it, could you?

A.      I wasn't up at 5:48 that morning, so it couldn't have been dictated at 5:48 that morning.

Q.      Then you would agree that it couldn't have been dictated -- it couldn't have been correct if it was dictated then, right?

A.      It wasn't dictated then.

(Excerpts from Deposition of Mark Clemons, M.D., p. 31, l. 4 – p. 34, l. 18, attached hereto as

Exhibit "A").   Plaintiff's counsel later elicited the following testimony regarding revisions:

Q.      In your op note, are there any late entries in it, to your knowledge?  In other words, any entries that would not have been made in the first draft?

A.      Not to my knowledge.

Q.      Are you aware that the JCAHO requires that late entries must indicate that they are by a late entry?

A.      What do you consider to be a late entry?  Hang on.  Hang on.  When you look at an op note, you're supposed to review it before you signed it --

Q.      Right.

A.      -- to make sure it is correct.

Q.      And so what you are saying is that "itself" is not a late entry?

A.      That would be my concern because when you dictate --

Q.      Your interpretation.

A.      -- it, sometimes there is misspellings or other things that you can't correct until you review it.

Q.      Okay.  But if you then sign it and go back and change it, you think that would be a late entry?

A.      Correct.

(Excerpts from Deposition of Mark Clemons, M.D., p. 57, l. 16 – p. 58, l. 21, attached hereto as

4

Exhibit "A").

To Dr. Clemons' knowledge, Plaintiff's counsel did not attempt to depose anyone involved in the transcription of Dr. Clemons' operative report and did not make any further factual investigation into the dictation time or the history of revisions to the operative note.[1] The above referenced testimony by Dr. Clemons constitutes the only testimony in the present case regarding the timing of and any potential revisions to his operative note. It clearly indicates that the time in Dr. Clemons' operative report is a typographical error and that no revisions were made to the report. Further, the operative report itself indicates that the time referenced by Plaintiffs' counsel during Dr. Clemons' deposition of 6:10 a.m. should actually state 6:10 p.m. (Operative Report of Dr. Clemons, attached hereto as Exhibit "B"). While the report states "T: 03/12/12 06:10," it also states "06:10:00 PM" at the top of the page.

Any question that "calls for an assumption of a fact not in the record" is improper because any response thereto constitutes speculation. State v. Courtney, No. 03C01-9406-CR-00195, 1995 Tenn. Crim. App. LEXIS 325, at *10 (Tenn. Crim. App. Apr. 11, 1995) (unpublished opinion, attached hereto as Exhibit "C"). Further, once a witness answers a question, any repetition of this question is considered argumentative and therefore improper. See id.; see also Fed. R. Evid. 403. No proof exists that Dr. Clemons dictated his report before the surgery, and no proof exists that Dr. Clemons made any revisions to his report. The only testimony about these issues that exists in this case clearly indicates that the operative note was transcribed after the procedure and that no substantive revisions were made to the note. Any

---

[1]     Plaintiffs' counsel issued a subpoena to Methodist LeBonheur Healthcare seeking "Rule 0913 (Report of Operation), by whatever name, number or section known, for the date, March 12, 2012, and any other rule or procedure addressing the same subject, which states or provides that an Operation Report shall be dictated following surgery within a stated period of time." However, Plaintiffs did not perform any investigation as to their factual assumptions that Dr. Clemons report was dictated after the surgery and that Dr. Clemons revised his report.

attempt by Plaintiffs to suggest to the jury that a typographical error amounts to misconduct on the part of Dr. Clemons is improper when no testimony exists in this case that would support this theory.   Any attempt by Plaintiff to imply that Dr. Clemons revised his report is likewise unsupported by proof or testimony and is also improper.   Any indication that the note was dictated before surgery or that there were any revisions to the operative note is unsupported and amounts to pure speculation.  Therefore, references to timing of and revisions to Dr. Clemons' operative note should be excluded.

## II.   Information regarding the timing of Dr. Clemons' operative report is irrelevant and therefore inadmissible at trial.

The Federal Rules of Evidence provide that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402.  "Evidence is relevant if:  (a)  it has any tendency to make a fact more or less probable than it would be without the evidence; and (b)   the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The allegations in the present case do not relate to the timing of the operative report or any revisions thereto, and as such, any reference to them should be excluded.

Tennessee Code Annotated § 29-26-115 sets forth the elements of a health care liability action as follows:

> (a)  In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
>> (1)   The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>>
>> (2)  That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>>
>> (3)  As a proximate result of the defendant's negligent act

or omission, the plaintiff suffered injuries which would not
otherwise have occurred.

Tenn. Code Ann. § 29-26-115. The Complaint filed in this matter sets forth the bases of health

care liability in this action which must be proven by Plaintiffs. The Complaint does not include

any allegations regarding timing of Dr. Clemons' operative report, nor does it include any

allegation that Dr. Clemons revised his report subsequent to dictating it. (See D.E. #1). The

allegations in the present case involve whether Dr. Clemons deviated from the standard of care

and thus caused Brett Lovelace's injury. The timing of Dr. Clemons report does not tend to

make whether he deviated from the standard of care more or less probable. Whether Dr.

Clemons revised his note likewise does not tend to make whether he deviated from the standard

of care more or less probable. As such, any references to them are irrelevant and thus

inadmissible.

### III.    Alternatively, testimony regarding the timing of or alterations to Dr. Clemons' operative report should be excluded because of the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and waste of time.

The Court "may exclude relevant evidence if its probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In the

present case, any testimony regarding the timing of or alterations to Dr. Clemons' operative

report should be excluded. Such testimony would confuse the issue and potentially mislead the

jury to equate alleged timing issues or alterations to the report with liability in the present case,

which would unfairly prejudice Dr. Clemons. Additionally, presentation of evidence regarding

the timing of or alterations to Dr. Clemons' operative report would cause undue delay and waste

time because any testimony regarding these issues does not relate to liability. As such, the Court

should exclude reference to the timing of or alterations to Dr. Clemons' operative report by Plaintiffs or Plaintiffs' counsel.

## CONCLUSION

The Court should prohibit Plaintiffs and Plaintiffs' counsel from referencing to the timing of or alterations to Dr. Clemons' operative report. The uncontradicted testimony in this case indicates that the time in Dr. Clemons' operative report is a typographical error and that no revisions were made to his report. Additionally, information regarding the timing of Dr. Clemons' operative report is irrelevant and therefore inadmissible at trial. Finally, unfair prejudice, confusion the issues, misleading of the jury, undue delay, and waste of time would result from reference to timing of or alterations to Dr. Clemons' operative report. As such, Defendant respectfully requests that the Court exclude testimony and reference to timing of and alterations to Dr. Clemons' operative report.

Respectfully submitted,

LEWIS THOMASON

By: s/Marcy D. Magee
   J. Kimbrough Johnson (7953)
   Marcy D. Magee (19360)
   Natalie M. Bursi (032017)
   40 South Main Street, Suite 2900
   Memphis, TN 38103
   Phone: (901) 525-8721
   *Attorneys for Defendant, Mark P. Clemons*
   KJohnson@LewisThomason.com
   MMagee@LewisThomason.com
   NBursi@LewisThomason.com

## CERTIFICATE OF CONSULATION

Pursuant to Local Rule 7.2(a)(1)(B), I hereby certify that on January 6, 2015, counsel for Dr. Clemons consulted with Mark Ledbetter, counsel for Plaintiffs, Daniel and Helen Lovelace, via e-mail concerning the contents of this motion, and that all counsel are unable to reach an accord as to all issues pertaining to this motion.

s/Marcy Dodds Magee
Marcy Dodds Magee

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via U.S. Mail, first class postage prepaid, and via the Court's ECF filing system:

Mark Ledbetter, Esq.
Halliburton & Ledbetter
254 Court Avenue, Suite 305
Memphis, TN 38103
Mark794@aol.com

Jerry O. Potter, Esq.
W. Bradley Gilmer, Esq.
Karen S. Koplon, Esq.
The Hardison Law Firm
119 South Main Street, Suite 800
Memphis, TN  38103
jpotter@hard-law.com
bgilmer@hard-law.com
kkoplon@hard-law.com

s/Marcy Dodds Magee
Marcy Dodds Magee

5807712

EXHIBIT
A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

DANIEL LOVELACE AND          )
HELEN LOVELACE,              )
INDIVIDUALLY AND AS          )
PARENTS OF BRETT             )
LOVELACE, DECEASED.          )
                             )
       Plaintiffs,           )
                             )     2:13-CV-02289dkv
VS.                          )
                             )
PEDIATRIC                    )
ANESTHESIOLOGIST, P.         )
A. BABU RAO                  )
PAIDIPALLI, AND MARK         )
P. CLEMONS.                  )
                             )
       Defendants.           )

DEPOSITION

OF

MARK CLEMONS, M.D.

February 6, 2014

COPY

MID-SOUTH REPORTING
Pepper Glenn, CCR
P. O. Box 609
Southaven, Mississippi 38671
(901) 525-1022

MID-SOUTH REPORTING
(901) 525-1022

1       The deposition of MARK CLEMONS,

2  M.D. is taken on this, 02/06/2014,

3  on behalf of the Plaintiffs,

4  pursuant to notice and consent of

5  counsel, beginning at approximately

6  10:00 a.m. in the law offices of

7  Thomason, Hendrix, Harvey, Johnson

8  & Mitchell.

9       This deposition is taken

10  pursuant to the terms and

11  provisions of the Tennessee Rules

12  of Civil Procedure.

13       All forms and formalities,

14  including the signature of the

15  witness, are waived, and objections

16  alone as to matters of competency,

17  irrelevancy and immateriality of

18  the testimony are reserved to be

19  presented and disposed of at or

20  before the hearing.

21

22

23

24

3

A P P E A R A N C E S

FOR THE PLAINTIFF:

                    Mark Ledbetter, Esq.
                    Halliburton & Ledbetter
                    254 Court Avenue
                    Memphis, Tennessee 38103
                    Phone: (901) 523-8153


FOR THE DEFENDANT:

                    J. Kimbrough Johnson, Esq.
                    Marcy Dodds Magee, Esq.
                    Thomason Hendrix, et al
                    2900 One Commerce Square
                    Memphis, TN 38103
                    901-525-8721

                    Brad Gilmer, Esq.
                    The Hardison Law Firm
                    119 S. Main Street
                    Suite 800
                    Memphis, TN 38103
                    901-525-8776

COURT REPORTING FIRM:

                    MID-SOUTH REPORTING
                    Pepper Glenn, CCR
                    P. O. Box 609
                    Southaven, Mississippi 38671
                    (901) 525-1022

4

I N D E X

1

2

3    WITNESS:     MARK CLEMONS, M.D.

4

5

6    DIRECT EXAMINATION                                5
     BY MR. LEDBETTER
7    CROSS-EXAMINATION                                65
     BY MR. JOHNSON
8    ERRATA SHEET                                     67

9

10

11

12   EXHIBIT NO. 1                                     6
     EXHIBIT NO. 2                                     7
13   EXHIBIT NO. 3                                     7
     EXHIBIT NO. 4                                    64
14

15

16

17

18

19

20

21   CERTIFICATE PAGE                                 68

22

23

24

5

1        VIDEO SPECIALIST:  This is the

2   video deposition of Dr. Mark

3   Clemons.  This is February 6, 2014.

4   We are on the record at 10:17.

5        Counsel, would each of you

6   please state your appearances for

7   the record which will then be

8   followed by the swearing in of the

9   witness by the court reporter.

10       MR. LEDBETTER:  Mark Ledbetter,

11   counsel for Plaintiffs.

12       MR. JOHNSON:  Kim Johnson for

13   Dr. Clemons.

14       MS. MAGEE:  Marcie Magee for

15   Dr. Clemons.

16       MR. GILMER:  Brad Gilmer for

17   Dr. Paidipalli and Pediatric

18   Anesthesiologists.

19            MARK CLEMONS,

20   called as a witness, having been first duly

21   sworn, was examined and testified as follows:

22            DIRECT EXAMINATION

23   BY MR. LEDBETTER:

24       Q.     Dr. Clemons, I'm Mark Ledbetter and

31

1    A.    I cannot give it to you because I

2    don't know what the numbers are in the coma

3    scale.

4    Q.    Now, you have -- in Exhibit Number 2

5    after the first page, Dr. Clemons, you have your

6    op note or your operative report.

7    A.    Correct.

8    Q.    Do you see that?

9    A.    Correct.

10   Q.    Okay.  Now, do you know when this was

11   written?  I see that the date of service was

12   March 12th, but the date it was signed was

13   March 19th.  Do you know when this was written by

14   you or dictated?

15   A.    It probably would have been that day

16   or the next day, the day after surgery.

17   Transcription could tell you that.  I don't know.

18   Q.    I think I see it.  Turn to the last

19   page and let me ask you --

20   A.    Dictated.

21   Q.    Yeah, it's a D.  Does that mean that

22   it was dictated March 12 at 5:48 p.m. or when,

23   5:48 a.m.?

24   A.    It certainly wasn't 5:48 a.m.

1      Q.      Well, is that what it shows, is that

2   you dictated it before the surgery?

3      A.      No.  I would never dictate anything

4   before a surgery.

5      Q.      Okay.  But I'm saying is that what the

6   record shows?

7      A.      I don't know.  I can barely tell what

8   it says.

9      Q.      It says D 03-12-12.  That would be the

10  correct date of the surgery.

11     A.      Right.

12     Q.      And then it says 0548, and that would

13  be 5:00 a.m., would it not?

14     A.      True.  But more likely, it was

15  dictated at 5:00 p.m.

16     Q.      But 5:00 p.m. would be 1748, would it

17  not?

18     A.      Correct.

19     Q.      And it shows that it's transcribed at

20  what, 6:10 a.m.?

21     A.      Right.

22     Q.      Okay.  Who is SC?

23     A.      Person transcribing it, I guess.

24     Q.      Okay.  So the record itself shows that

1    it was -- it was dictated before -- dictated and

2    transcribed before the surgery; is that correct?

3        A.        That's what it says, but it wasn't.

4        Q.        All right.  Now, did you ever go back

5    after it was dictated and make any changes to it

6    before it was made a permanent record?

7        A.        Not that I know of, but I'm sure I

8    read it and might have changed a "we" to a -- I

9    change words like "we" to "I," but I couldn't

10   tell you if I changed a word or two.

11       Q.        Well, do you think on the last page,

12   you might have changed the word -- the last

13   sentence from reading, "He tolerated the

14   procedure without problems" to read "He tolerated

15   the procedure itself without problems"?  Could

16   you have made that change by adding the word

17   "itself" after he died or after he had problems?

18       A.        Well, when I talk about the procedure,

19   I'm talking about the operative procedure.

20       Q.        Right.

21       A.        We did the surgery.  We woke him up,

22   extubated him and took him to the recovery room.

23       Q.        Well, my point is, where it says he

24   tolerated the procedure itself, do you think

1    after he coded, that you might have added the

2    word "itself" or do you think that would have

3    occurred maybe in a later revision, or do you

4    know?

5         A.       I'm not as smart as you to think about

6    that one.

7         Q.       Now, in your note -- in your note

8    about the procedure, you agree that if you

9    dictated this at 5:48 in the morning, you

10   certainly couldn't predict the outcome of the

11   surgery and how well he did in it, could you?

12        A.       I wasn't up at 5:48 that morning, so

13   it couldn't have been dictated at 5:48 that

14   morning.

15        Q.       Then you would agree that it couldn't

16   have been dictated -- it couldn't have been

17   correct if it was dictated then, right?

18        A.       It wasn't dictated then.

19        Q.       Okay.  Now, did you have a

20   conversation with Brett when he was in the

21   operating room and when he was extubated?  Did

22   you visit with him?  Did he respond to you

23   verbally?

24        A.       When Brett woke up -- teenagers are

1    is sitting up.

2        Q.        They are in the lateral position?

3        A.        Usually, the lateral position or

4    laying down.

5              VIDEO SPECIALIST:  We are off

6        the record at 11:15.

7                  (Brief break)

8              VIDEO SPECIALIST:  We are back

9        on the record at 11:21.

10             MR. LEDBETTER:  Do we need to

11       re-identify or are we okay?

12             VIDEO SPECIALIST:  You're good.

13             MR. LEDBETTER:  We just go on?

14             VIDEO SPECIALIST:  Just go on.

15   BY MR. LEDBETTER:

16       Q.        Dr. Clemons. I don't mean to put

17   myself back in reverse and go back and continue

18   to beat something to death, but I just have a

19   series of questions that should be fairly simple

20   to answer.  In your op note, are there any late

21   entries in it, to your knowledge?  In other

22   words, any entries that would not have been made

23   in the first draft?

24       A.        Not to my knowledge.

1    Q.       Are you aware that the JCAHO requires

2    that late entries must indicate that they are by

3    a late entry?

4    A.       What do you consider a late entry?

5    Hang on.  Hang on.  When you look at an op note,

6    you're supposed to review it before you signed

7    it --

8    Q.       Right.

9    A.       -- to make sure it is correct.

10    Q.       And so what you are saying is that

11    "itself" is not a late entry?

12    A.       That would be my concern because when

13    you dictate --

14    Q.       Your interpretation.

15    A.       -- it, sometimes there is misspellings

16    or other things that you can't correct until you

17    review it.

18    Q.       Okay.  But if you then sign it and go

19    back and change it, you think that would be a

20    late entry?

21    A.       Correct.

22    Q.       Okay.  Now, with respect to the

23    decision to send Brett Lovelace to the PACU or

24    the ICU, do you agree that that would have been a

68

```
1                    C E R T I F I C A T E

2    STATE OF TENNESSEE:
     COUNTY OF SHELBY:
3                    I, PEPPER GLENN, Court Reporter
     and Notary Public, Shelby County, Tennessee,
4    CERTIFY:

5                    The foregoing proceedings were
     taken before me at the time and place stated in
6    the foregoing styled cause with the appearances
     as noted.
7
                     Being a Court Reporter, I then
8    reported the proceeding in Stenotype, and the
     foregoing pages contain a true and correct
9    transcript of my said Stenotype notes then and
     there taken.
10
                     I am not in the employ of and am
11   not related to any of the parties or their
     counsel, and I have no interest in the matter
12   involved.

13                   I further certify that in order
     for this document to be considered a true and
14   correct copy, it must bear my original signature
     and that any reproduction in whole or in part of
15   this document is not authorized and not to be
     considered authentic.
16
                     Witness my signature this the 24th
17   day of _February_____ 2014.

18                   _Pepper Glenn_____
                     PEPPER GLENN, CCR
19

20   Notary Public at Large
     For the State of Tennessee
21   My Commission Expires:
     October 18, 2014
22

23

24
```




**Le Bonheur**

**Patient Name:** LOVELACE, BRETT S
**FIN:** 68859557

## C l i n i c a l   D o c u m e n t s

| | | | |
|---|---|---|---|
| Document Name: | Operative Report | Verified By: | Clemons , Mark P, MD |
| Document Status: | Auth (Verified) | Verified Date/Time: | 03/19/2012 07:54:46 AM |
| Performed/Dictated by: | Clemons , Mark P, MD | Signed By: | Clemons , Mark P, MD |
| Date: | 03/12/2012 06:10:00 PM | Signed Date/Time: | 03/19/2012 07:54:46 AM |

DATE OF SURGERY:  03/12/2012

PREOPERATIVE DIAGNOSIS
Tonsillar and adenoidal hypertrophy with upper airway obstruction.

POSTOPERATIVE DIAGNOSIS
Tonsillar and adenoidal hypertrophy with upper airway obstruction.

OPERATION
1. Tonsillectomy.
2. Adenoidectomy.

ATTENDING SURGEON
Dr. Mark Clemons.

ANESTHESIA
General with endotracheal (ET) tube.

ESTIMATED BLOOD LOSS
250 mL.

DESCRIPTION OF PROCEDURE
The patient was placed on the operating table in the supine position and anesthetized using general anesthesia. Endotracheal tube was placed. Sterile drapes were placed. A Crowe-Davis mouth gag was inserted into the patient's mouth and was suspended from the Mayo stand. Catheter placed through his nose and used to retract the soft palate.

The adenoid pad was visualized and found to be very large and obstructing the airway. Tonsils were very large as well. Using an adenoid curette, multiple passes were made removing a large amount of adenoid tissue. A saline-soaked sponge was placed in the nasopharynx. The right tonsil was grasped with straight Allis and retracted medially. A 12 blade was used to incise the mucosa. Hurd dissector and Fischer knife were used to dissect the tonsil free and amputate the base with snare.

A saline-soaked sponge was placed in the fossa. This was removed and adequate hemostasis achieved using suction cautery. Sponges were placed in the fossa. The left tonsil was removed in a

BL-MethLEB  0008



**Le Bonheur**

Patient Name: LOVELACE, BRETT S
FIN: 68859557

## C l i n i c a l    D o c u m e n t s

| | | | |
|---|---|---|---|
| Document Name: | Operative Report | Verified By: | Clemons , Mark P, MD |
| Document Status: | Auth (Verified) | Verified Date/Time: | 03/19/2012 07:54:46 AM |
| Performed/Dictated by: | Clemons , Mark P, MD | Signed By: | Clemons , Mark P, MD |
| Date: | 03/12/2012 06:10:00 PM | Signed Date/Time: | 03/19/2012 07:54:46 AM |

similar manner; however, this was removed in several pieces. Adequate hemostasis achieved using 3-0 plain interrupted suture in the inferior mid fossa as well as suction cautery.

The nasopharyngeal packs were removed. The nasopharynx was examined. A significant amount of adenoid tissue was still remaining in the posterior choanal region and area proximal to the nose. Using adenoid curettes and suction cautery, the tissue was removed opening up the posterior choanae. A saline-soaked sponge was placed back in the fossa. Marcaine 0.25% with epinephrine 1:200,000 was injected in both tonsillar fossae. A total 6 mL was used.

A catheter was run down the patient's mouth into his stomach removing stomach fluid. The nasopharyngeal pack was removed. Adequate hemostasis was achieved using a small amount of additional suction cautery. All instruments were removed. The patient was awakened from anesthesia, extubated, and taken to recovery. He tolerated the procedure itself without problems.

(E-signed on 03/19/12  at 07:54 AM)

_____

Clemons , Mark P, MD

D: 03/12/12  05:48 T: 03/12/12 06:10   (SC )

BL-MethLEB  0009



## *State v. Courtney*

Court of Criminal Appeals of Tennessee, at Knoxville

April 11, 1995, FILED

No. 03C01-9406-CR-00195

**Reporter**

1995 Tenn. Crim. App. LEXIS 325; 1995 WL 221646

STATE OF TENNESSEE, Appellee, v. DALE L. COURTNEY, Appellant

**Subsequent History:** As Corrected April 12, 1995.

**Prior History:**  [*1]  Greene County. Hon. James E. Beckner, Judge. (Driving Under the Influence and Simple Possession).

**Disposition:** AFFIRMED

## Core Terms

trial court, trial judge, driving, grounds

## Case Summary

### Procedural Posture

A trial court for Greene County (Tennessee) convicted defendant of driving under the influence, a second offense, in violation of *Tenn. Code Ann. § 55-10-401* (1993), and simple possession of marijuana, in violation of *Tenn. Code Ann. § 39-17-418* (1994). The jury assessed fines against defendant, and the trial court sentenced defendant to a term in the county jail. Defendant appealed.

### Overview

The vehicle that defendant had been driving was observed to swerve across the center line on multiple occasions. The arresting officer testified that when he asked defendant to step out of the car, there was a noticeable odor of alcohol on defendant's breath. Defendant admitted to the officer that he had had "a few" that evening. The officer administered three field sobriety tests, none of which defendant was able to complete successfully. The officer arrested defendant, who later refused to take a breathalyzer test. Defendant insisted that he had not had a drink in the six hours prior to his arrest, that the roadway was rough, and that the erratic motion of the car was due to his efforts to avoid potholes. On review, the court noted that the testimony presented a classic credibility issue for the jury, who had resolved the matter in favor of the State. While the evidence was not overwhelming, it was sufficient to sustain the conviction. In affirming, the court held that the trial judge had not been required under Tenn. R. Evid. 103(a)(1) to state the grounds on which he sustained the prosecutor's objection to a question posed by defense counsel during cross-examination.

### Outcome

The court affirmed the judgment of the trial court.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN1* When the sufficiency of the evidence is challenged, the standard for review by an appellate court is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e).

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN2* A guilty verdict from the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in favor of the State. On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. In determining the sufficiency of the evidence, an appellate court should not reweigh or reevaluate the evidence. Nor may the appellate court substitute its inferences for those drawn by the trier of fact from the evidence.

Criminal Law & Procedure > ... > Vehicular Crimes > Driving Under the Influence > General Overview

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview

Criminal Law & Procedure > Trials > Witnesses > Credibility

Case 2:13-cv-02289-SHL-dkv   Document 195   Filed 01/06/15   Page 26 of 29   PageID 3206

Page 2 of 5
1995 Tenn. Crim. App. LEXIS 325, *1

Evidence > Weight & Sufficiency

*HN3* The credibility of witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the evidence are entrusted entirely to the jury as triers of fact.

> Civil Procedure > Judicial Officers > Judges > General Overview
>
> Evidence > ... > Procedural Matters > Objections & Offers of Proof > General Overview
>
> Evidence > Admissibility > Procedural Matters > Rulings on Evidence

*HN4* Tenn. R. Evid. 103(a)(1) does not direct the trial judge to require that the basis for an objection is stated nor does it require that the judge explain a ruling sustaining an objection.

> Evidence > ... > Procedural Matters > Objections & Offers of Proof > General Overview
>
> Evidence > ... > Procedural Matters > Objections & Offers of Proof > Objections
>
> Evidence > Admissibility > Procedural Matters > Rulings on Evidence

*HN5* The purpose of Tenn. R. Evid. 103(a)(i) is to enable meaningful appellate review of a trial court's evidentiary rulings. According to the rule, the objecting party has the burden of placing on the record the reasons for an objection. Tenn. R. Evid. 103(a)(1), (2). While the rule provides different requirements for situations in which the evidence is excluded or admitted, in both instances, the objecting party has the duty to state the specific basis for the objection. However, if the evidence is excluded, the party proposing the evidence must also provide a specific evidentiary basis in support of admission and make an offer of proof unless they are apparent from the context. Beyond permitting an offer of proof, the rule requires nothing of a trial judge. Tenn. R. Evid. 103(b).

> Evidence > ... > Procedural Matters > Objections & Offers of Proof > General Overview
>
> Evidence > Admissibility > Procedural Matters > Rulings on Evidence

*HN6* See Tenn. R. Evid. 103(a).

> Civil Procedure > Judicial Officers > Judges > General Overview
>
> Evidence > ... > Procedural Matters > Objections & Offers of Proof > General Overview

*HN7* Good trial practice and the Tennessee Rules of Evidence demand that counsel state the basis for an objection when the objection is made and that opposing counsel be given the opportunity to respond. Not only does this "make the record" for appellate review, but it encourages adequate preparation on the part of counsel so that meaningful objections and responses may be made. Trial judges should encourage the practice. Moreover, civility in the courtroom enhances the efficiency of the truth-finding process and creates an atmosphere in which justice rather than acrimony may prevail. Judges and lawyers are charged with the responsibility of being courteous and professional. In the press of trial, the basis for objections are sometimes not stated. Often the grounds will be apparent from the context. In many instances, an objection is anticipated and the grounds are well-known to counsel and the judge.

> Criminal Law & Procedure > Appeals > Procedural Matters > Records on Appeal
>
> Criminal Law & Procedure > ... > Reviewability > Preservation for Review > General Overview

*HN8* It is an appellant's duty to prepare a sufficient record, and if an essential part of the record is missing, the appellate court must presume that the trial court acted correctly.

**Counsel:** For Appellant: Danny Hryhorchuk, Attorney at Law, Morristown, TN. William H. Bell, Attorney at Law, Greeneville, TN.

For Appellee: Charles W. Burson, Attorney General & Reporter. Clinton J. Morgan, Counsel for the State, Criminal Justice Division, Nashville, TN. C. Berkeley Bell, Jr., District Attorney General. Cecil C. Mills, Jr., Assistant District Attorney General, Greeneville, TN.

**Judges:** Penny J. White, Judge, CONCUR: Jerry Scott, Presiding Judge, David G. Hayes, Judge

**Opinion by:** Penny J. White

# Opinion

## OPINION

Appellant, Dale L. Courtney, appeals as of right from convictions for driving under the influence, second offense

[1] [*2] and simple possession of marijuana. [2] The jury assessed fines of $ 400 and $ 500 respectively, and the trial court sentenced appellant to eleven months and twenty-nine days in the county jail on each count. The trial court ordered that the sentences run concurrently and that appellant serve twenty percent of his sentence prior to release.

On appeal, appellant raises three issues. He challenges the sufficiency of the evidence to support a conviction for driving under the influence. He argues that the trial judge erred by refusing to state the grounds on which he sustained the prosecutor's objection to a question posed by defense counsel during cross examination. Finally, [*3] appellant contends that the presence in the courtroom of a juror excused for cause violated due process and tainted the entire trial. Finding no merit to any of appellant's issues, we affirm the judgment of the trial court.

*HN1* When the sufficiency of the evidence is challenged, the standard for review by an appellate court is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985);* Tenn. R. App. P. 13(e).

Appellant was tried and convicted by a jury. *HN2* A guilty verdict from the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state. *State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).* On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Williams, 657 S.W.2d at 410.*

In [*4] determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978).* Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W. 2d 49, 51* (Tenn. Crim. App.), *cert. denied,* (Tenn. 1978).

After carefully reviewing the evidence in the record, we find that the evidence is more than sufficient to convict appellant of driving under the influence. [3] The arresting officer testified that on the evening of July 17, 1993, he observed a car approaching an I-81 overpass near Greeneville. The car was proceeding at less than forty miles an hour; however, just prior to reaching the bridge, the car swerved approximately three feet across the center line. The driver immediately corrected the movement. On the bridge, the car drifted to the center but did not cross the line. After crossing the bridge, the officer observed the car once again stray three to four feet across the center line. When the officer turned on the blue lights, the car immediately pulled over.

[*5] The officer approached and asked appellant to step out of the car. The officer testified that there was a noticeable odor of alcohol on appellant's breath. Appellant admitted to the officer that he had drunk "a few" that evening. The officer administered three field sobriety tests which appellant was unable to complete successfully. At this point, the officer arrested appellant who later refused to take a breathalyzer test. When the officer first approached the car, the two passengers were drinking beer. Several containers of beer were found in the car. On cross-examination, the officer stated that appellant was not unsteady on his feet as he exited the car, his eyes were not red or blurry, and that his speech, although "thick-tongued," was not slurred.

Appellant testified that, although he drank four beers during the afternoon, he had consumed no alcohol in the six hours prior to his arrest. He explained that the roadway was rough and that the erratic motion of the car was due to his efforts to avoid potholes. Danny Charles Arnold, a passenger in the car, corroborated appellant's testimony. Appellant also stated that his weak left knee, his cowboy boots, and the police cruiser's [*6] flashing blue lights explained his failure to complete the field tests satisfactorily. The officer, on the

---

[1] Tenn. Code Ann. § 55-10-401 (1993 Repl.).

[2] Tenn. Code Ann. § 39-17-418 (1994 Supp.). The record indicates that appellant pled guilty to the possession charge prior to trial. However, evidence relating to that charge was presented at trial. When the prosecutor began to ask questions relating to the discovery of the marijuana, defense counsel protested that his client had already pled guilty to the second count. The objection was lost in an ensuing discussion about the chain of evidence and counsel never renewed it. The state then introduced the marijuana, the laboratory results, and testimony by the arresting officer without any contemporaneous objections from the defense. Since the evidence was before the jury, the trial court apparently instructed the jury to find the defendant guilty on Count II.

[3] We note that there is nothing in the record to prove that appellant had been previously convicted of driving under the influence. The record indicates, however, that appellant waived his right to have a bifurcated trial on this issue. The transcript reveals that the jury returned a verdict of guilty on the charge of driving under the influence, second offense.

other hand, testified that he had turned off the blue lights prior to administering the horizontal gaze nystagmus test and that he was aware of and had taken into consideration that appellant had a knee problem and was wearing cowboy boots.

The testimony presented a classic credibility issue for the jury. *HN3* The credibility of witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the evidence are entrusted entirely to the jury as triers of fact. *State v. Boling, 840 S.W.2d 944, 947* (Tenn. Crim. App.), *perm. to appeal denied,* (Tenn. 1992). In this case, the jury resolved the credibility issue in favor of the state. While the evidence is not overwhelming, it is sufficient to sustain appellant's conviction for driving under the influence beyond a reasonable doubt. [4]

Appellant's [*7] second issue is somewhat confusing. He apparently is contending that a trial judge must require that an objecting party state the basis for an objection. [5] Appellant's reliance on Tennessee Rules of Evidence 103(a)(1) is misplaced. *HN4* The rule does not direct the trial judge to require that the basis for an objection is stated nor does it require that the judge explain a ruling sustaining an objection.

*HN5* The purpose of Rule 103(a)(1) is to enable meaningful appellate review of a trial court's evidentiary rulings. According to the rule, the objecting party has the burden of placing on the record the reasons for an objection. Tenn. R. Evid. 103(a)(1)&(2). While the rule provides different requirements for situations in which the evidence is excluded or admitted, in both instances, [*8] *the objecting party* has the duty to state the specific basis for the objection.

However, if the evidence is excluded, the party proposing the evidence must also provide a specific evidentiary basis in support of admission and make an offer of proof unless they are apparent from the context. [6] Beyond permitting an offer of proof, the rule requires nothing of a trial judge. Rule 103(b).

[*9] In this instance, the trial court sustained an objection to this question posed by defense counsel during cross-examination of the police officer: "Can't you assume that the mirrors were working?" The prosecutor objected without stating any reason, and the trial court immediately sustained the objection. When defense attorney asked what the basis for the objection was, the court replied: "I sustained it. You don't have to worry about it."

*HN7* Good trial practice and the Rules of Evidence demand that counsel state the basis for an objection when the objection is made and that opposing counsel be given the opportunity to respond. Not only does this "make the record" for appellate review, but it encourages adequate preparation on the part of counsel so that meaningful objections and responses may be made. Trial judges should encourage the practice.

Moreover, civility in the courtroom enhances the efficiency of the truth-finding process and creates an atmosphere in which justice rather than acrimony may prevail. Judges and lawyers are charged with the responsibility of being courteous and professional.

We recognize that, in the press of trial, the basis for objections are sometimes not [*10] stated. [7] Often the grounds will be apparent from the context. In many instances,

---

[4]  Appellant pled guilty to the charge of simple possession of marijuana. See footnote 2.

[5]  The state incorrectly argues appellant has waived this issue because it was not raised in the motion for new trial. The record, however, demonstrates that the issue is raised in the third paragraph of appellant's Motion for New Trial.

[6]  Rule 103 of the Tennessee Rules of Evidence provides:

   *HN6* (a) Effect of Erroneous Ruling. - Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

   (1) Objection. - In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context; or

   (2) Offer of Proof. - In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

[7]  We note that during this short trial, defense counsel objected six times and failed to state a basis for the objection twice. The state objected six times and failed to state the grounds three times.

1995 Tenn. Crim. App. LEXIS 325, *10

an objection is anticipated and the grounds are well-known to counsel and the judge.

In this instance, the form of the question indicates that it was improper. It calls for an assumption of a fact not in the record and any response would have been speculative. Moreover, the question was argumentative since the police officer had already testified that he did not know whether the car was equipped with rear view mirrors. The grounds for the objection are apparent, and the trial court acted properly in sustaining it. Appellant was not prejudiced by the prosecutor's failure to state the grounds.

Counsel argues that the trial judge's curt response demonstrated that he had "lost his position of neutrality . . . and appeared to become [*11] an advocate for the state." We have reviewed this entire record and find no basis for appellant's argument. Certainly, a brief responsive statement by the trial judge would have been preferable. Nonetheless, the response given does not indicate the partiality appellant urges. We, consequently, find no merit to this issue.

In his final issue, appellant alleges that it was error for a juror excused for cause to remain in the courtroom during the trial. However, appellant's counsel concedes that no contemporaneous objection was raised challenging the juror's continued presence. Moreover, the record on appeal does not contain the voir dire proceedings. The record contains no indication that the excused juror's actions or comments in any way prejudiced the defendant or tainted the trial results.

*HN8* It is appellant's duty to prepare a sufficient record, and if an essential part of the record is missing, this court must presume that the trial court acted correctly. _State v. Boling, 840 S.W.2d 944, 951_ (Tenn. Crim. App.) *perm. to appeal denied,* (Tenn. 1992). This issue is without merit. Therefore, we affirm appellant's conviction and sentence in this case.

Penny J. White, Judge

CONCUR:

Jerry [*12]  Scott, Presiding Judge

David G. Hayes, Judge