IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESESEE

DANIEL LOVELACE and
HELEN LOVELACE, Individually, and as Parents of
BRETT LOVELACE, deceased,

      Plaintiffs,

Vs.                                  No. 2:13-cv-02289 SHL-dkv
                                       JURY TRIAL DEMANDED

PEDIATRIC ANESTHESIOLOGISTS, P.A.;
BABU RAO PAIDIPALLI; and
MARK P. CLEMONS,

      Defendants.

DEFENDANT, DR. MARK P. CLEMONS',
PRETRIAL MEMORANDUM OF FACTS AND LAW

Comes now Defendant Mark P. Clemons, M.D., by and through counsel of record, pursuant to United States District Court for the Western District of Tennessee Local Rule 16.4 and the Court's Pretrial Procedures (D.E. #90), and submits this Pretrial Memorandum of Facts and Law.

## FACTS

On March 12, 2012, Brett Lovelace, age 12, was taken to surgery at LeBonheur Hospital for a tonsillectomy and adenoidectomy, which was performed by a surgeon, Dr. Mark Clemons, who is a Board-Certified Otolaryngologist. Anesthesia was provided by Dr. Babu Rao Paidipalli, an anesthesiologist, and his anesthetist, Grace Freeman. The surgery went as planned, and there were no complications. There are no criticisms of Dr. Clemons' surgical procedure. After the surgery was completed at approximately 10:15 a.m., Grace Freeman, with the

supervision of Dr. Paidipalli, removed the patient's breathing tube, and Brett was transported from the operating room to the recovery room PACU (Post Anesthesia Care Unit) by Grace Freeman, CRNA, where she provided a report and turned the patient over to PACU Nurse/LeBonheur employee, Kelly Kish, RN. Once the patient was transferred to PACU, the recovery room nurse was in charge of the patient's care, including monitoring the airway, oxygenation, blood pressure, vital signs, and was to call anesthesia if there was any problem.

Dr. Clemons passed through PACU immediately after arrival to the unit at approximately 10:30 a.m. Dr. Clemons observed Brett Lovelace's monitors, all of which showed that the patient was oxygenating properly. Brett Lovelace was laying with his legs curled up under him on his stomach. Dr. Clemons asked Brett's mother about Brett's sleeping position, and Mrs. Lovelace responded stating that her son liked that position. He asked the parents if everything was okay and then gave a prescription to be called in. At the time that Dr. Clemons saw the patient in the recovery room, Brett Lovelace was breathing normally. Dr. Clemons then left to go to his office with the expectation that the recovery room personnel would ensure that he was oxygenating with an open airway.

While in the recovery room, Nurse Kelly Kish was assigned to care for Brett Lovelace. Brett was her only patient, and she was responsible for monitoring his pain, response activity, blood profusion, and oxygenation. Upon arrival in the PACU, the patient was stable. Nurse Kish remained with the patient bedside for approximately 90 minutes. The nurse never attempted to arouse the patient during the 90 minutes he was in the recovery room in order to check on him. The nurse documented normal oxygen saturations, but it was later determined that her recordings were incorrect. The nurse has no explanation for why the monitor print-out oxygen saturations were significantly lower than what she recorded. While in the recovery

2

room, the patient's blood pressure readings dropped, but Nurse Kish took no action.  She did not call Dr. Paidipalli or anyone else.  Nurse Kish was preoccupied with Facebook and at least one other social medial website on her computer during the time the patient was in the PACU.  After 90 minutes, it became apparent that the patient was not oxygenating well.  CPR was initiated, but the patient did not regain normal function.  The patient was taken off the ventilator on March 14, 2012.  Nurse Kish has since relinquished her nursing license.

Brett's parents, Daniel and Helen Lovelace, subsequently filed a lawsuit against Pediatric Anesthesiologists, Dr. Paidipalli, and Dr. Clemons, alleging that they violated the standard of care and caused Brett Lovelace's death.

## LAW

### I.      Health Care Liability Claim

Tennessee Code Annotated § 29-26-115 sets forth the elements of a health care liability action as follows:

> (a)  In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
>> (1)  The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>>
>> (2)  That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>>
>> (3)  As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115.  Plaintiff has the burden of proving these elements.

It is admitted that Dr. Clemons owed Brett Lovelace the duty of care consistent with the

standard of acceptable professional practice applicable to otolaryngologists in this community, and Dr. Clemons complied with said duty. Dr. Clemons denies that his treatment fell below the acceptable standard of care for otolaryngologists in this or a similar community and denies that anything he did or did not do caused an injury to Brett Lovelace that would not have otherwise occurred.

Dr. Clemons performed the surgery in accordance with the standard of care, and there were no complications intra-operatively. Anesthesia took over custody of the patient and transferred him to the recovery room. Brett Lovelace left the operating room and arrived in the recovery room in stable condition, and there was no indication that there was a problem with breathing or anything else. Once the patient was transferred to PACU, the recovery room nurse was in charge of the patient's care, including monitoring the airway, oxygenation, blood pressure, vital signs, and was to call anesthesia if there was any problem.

When Dr. Clemons briefly stopped by the patient's bedside in recovery to provide prescriptions to the parents, the patient was breathing normally and doing well. He was in the prone position with his face turned to the side. Mrs. Lovelace relayed that this was a normal sleeping position for her son. Dr. Clemons did not expect the patient to remain in that position as it is the responsibility of the recovery room nurse to arouse the patient with movement, to do routine assessments, and to ensure there is a patent airway. All of the above referenced actions were in accordance with the standard of care. As such, Plaintiffs cannot carry their burden for their claim of health care liability against Dr. Clemons.

Alternatively, the actions by Nurse Kelly Kish during her treatment of Brett Lovelacew constitute independent superseding and intervening causes that resulted in Brett Lovelace's death. In Potter v. Ford Motor Co., the Court of Appeals explained that "[t]he intervening cause

4

doctrine operates to relieve a negligent actor from liability 'when a new, independent and unforeseen cause intervenes to produce a result that the negligent actor could not have reasonably foreseen.'" 213 S.W.3d 264, 273 (Tenn. Ct. App. 2006) (quoting Rains v. Bend of the River, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003); White v. Lawrence, 975 S.W.2d 525, 529 (Tenn. 1998)).   The intervening cause "doctrine applies only when the intervening act (1) was sufficient by itself to cause the injury, (2) was not reasonably foreseeable to the negligent actor, and (3) was not a normal response to the negligent actor's conduct." Id. (quoting Rains, 124 S.W.3d at 593; Waste Mgmt., Inc. of Tenn. v. South Central Bell Tel. Co., 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997); Elosiebo v. State, 2004 Tenn. App. LEXIS 790, No. E2003-02941-COA-R3-CV, 2004 WL 2709206 at *2 (Tenn. Ct. App. E.S., Nov. 29, 2004)) (internal quotation marks omitted).   The doctrine of intervening cause "relieves the defendant of liability to the plaintiff." Id.

In the present case, the patient was stable upon transfer from the operating room to the PACU, and Kelly Kish did not call anybody and ask for assistance until after the code was called approximately 90 minutes after the patient first arrived in the PACU.   Upon the patient's arrival into the PACU, Ms. Kish made an initial assessment but chose not to place the patient on a cardiac monitor, as permitted by hospital policy.   Ms. Kish replaced a pulse oximeter on the patient, but the oximeter worked only intermittently, and Ms. Kish did not notify anyone of the problem and did not replace the device.

At no time did Ms. Kish attempt to speak with or rouse the patient, despite charting a rating of 9 out of 10 on the Aldrete scale.   Such a score would indicate, among other things, full breathing, high oxygen saturation, full consciousness, good circulation, and lively activity and motor control.   Ms. Kish never roused or checked on the patient to make these ratings, but

instead based her charting on her observation of the patient's status when he initially entered the PACU. Among other things, Ms. Kish charted the patient's level of consciousness as "arousable on calling" from the time he entered the PACU up until the "Harvey" code, indicating an unresponsive patient, was called, as detailed below. Throughout her time caring for the patient, Ms. Kish documented oxygen saturations that were not reflected on the print-out. Ms. Kish documented, for example, 100% oxygen saturation when the monitor read only "artifact" or levels below 25%. Ms. Kish documented a series of assessments approximately every 15 minutes that the patient was in the PACU during the patient's first hour, then every 30 minutes thereafter, as dictated by hospital policy. In her assessments she documented, in addition to the Aldrete scores noted above, breath sounds and readings from an automated blood pressure cuff.

Approximately 30 minutes after the patient was admitted to the PACU, Kelly Kish documented the patient's blood pressure as 118 over 56. Approximately 45 minutes after the patient was admitted to the PACU, Ms. Kish documented the patient's blood pressure as 106 over 53. Approximately 60 minutes after the patient was admitted to the PACU, Kelly Kish charted that the patient's blood pressure was 84 over 42. Kelly Kish did not take any action in response to these changes in the patient's blood pressure. Approximately 90 minutes after the patient was admitted to the PACU, Kelly Kish left to obtain fluids for the patient. Upon her return, the patient's father asked Ms. Kish for help turning the patient, as the patient's leg appeared blue. When the patient was turned, he was noted to be cyanotic, apneic, and pulseless. CPR was initiated, and a "Harvey" code was called. While the patient was eventually resuscitated, he suffered anoxic brain injury and died approximately 48 hours later.

During the patient's time in the PACU, Kelly Kish accessed Facebook and at least one other social media website using a hospital computer. On or about March 23, 2012, Ms. Kish

resigned in lieu of termination. It is Defendant's position that Kelly Kish's actions constitute independent superseding and intervening causes that resulted in Brett Lovelace's death. As such, Dr. Clemons cannot be held liable to Plaintiffs on their health care liability claim.

## II.     Negligent Infliction of Emotional Distress Claims

Defendant disputes Plaintiffs' claims for negligent infliction of emotional distress. Plaintiffs' claims for negligent infliction of emotional distress must be proven by expert testimony. Plaintiffs have not identified experts to testify as to their claims for negligent infliction of emotional distress. Additionally, Plaintiffs' claims for negligent infliction of emotional distress are time-barred, as they were filed past the statute of limitations. Therefore, these claims cannot be maintained.

### A.  Expert Proof in Claims for Negligent Infliction of Emotional Distress

Claims for negligent infliction of emotional distress ("NIED") are analyzed under a general negligence approach. Camper v. Minor, 915 S.W.2d 437, 446 (Tenn.1996). "[A] plaintiff must present material evidence as to each of the five elements of general negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause . . . ." Id. Emotional harm is sufficient to satisfy the injury requirement. See Flax v. DaimlerChrysler Corp., 272 S.W.3d 521, 530 (Tenn. 2008); Garrison v. Bickford, 377 S.W.3d 659, 670 (Tenn. 2012).

If a plaintiff claims to have suffered NIED due to witnessing the death or injury of a third-party, then the plaintiff's causation argument must show that the defendant's negligent act caused the death or injury of the third-party and the plaintiff's emotional injuries were the "proximate and foreseeable results of [the] defendant's negligence." Eskin v. Bartee, 262 S.W.3d 727, 736 (Tenn. 2008). There are four objective standards that a court will use to analyze

whether a plaintiff's emotional injuries were foreseeable: (i) "the plaintiff's physical location at the time of the accident"; (ii) the plaintiff's "awareness of the accident"; (iii) "the apparent seriousness of the victim's injuries"; and (iv) "the closeness of the relationship between the plaintiff and the victim." Id. (citing Ramsey v. Beavers, 931 S.W.2d 527, 531 (Tenn. 1996)).

Although Tennessee courts originally required an NIED claimant to have actually observed the alleged negligent action or omission, the Tennessee Supreme Court created a new standard to control whether a family member who did not observe the alleged negligent act or omission could recover. See Eskin, 262 S.W.3d at 729-30. This new standard was designed to recognize that an individual may have a cognizable claim for NIED without observing the incident but also eliminate non-meritorious claims. See id. at 739 n.30. An NIED claimant that did not witness the actual injury-producing event must prove the following elements:

> (1) the actual or apparent death or serious physical injury of another caused by the defendant's negligence, (2) the existence of a close and intimate personal relationship between the plaintiff and the deceased or injured person, (3) the plaintiff's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene has been materially altered, and (4) the resulting serious or severe emotional injury to the plaintiff caused by the observation of the death or injury.

Id. at 739. This new objective standard is not included within the duty analysis. Id. at 739 n.30. Instead, it serves as a gateway test that allows courts to dismiss non-meritorious claims at the prima facie stage. Id. This objective standard "presents a factual issue to be determined by the finder of fact." Id.

The "serious or severe emotional injury" factor is subject to a heightened evidentiary standard if the NIED claim is a standalone claim, i.e., the claimant did not suffer any other injury that is personal to the claimant. See Camper, 915 S.W.2d at 446 (creating the heightened standard for emotional injury); Estate of Amos v. Vanderbilt University, 62 S.W.3d 133, 137

8

(Tenn. 2001); Flax, 272 S.W.3d at 529-30 (clarifying that Camper's heightened standard applies only to standalone NIED claims). In order to prevail on a standalone NIED claim, a claimant must prove his serious or severe emotional injury by expert medical or scientific proof. Camper, 915 S.W.2d at 446 (citations omitted). Without such expert proof, the claimant may not prevail on his NIED claim. Id. Regardless of whether the serious or emotional injury is being proven as part of the Eskin gateway test for a claimant that did not witness the incident or in the general negligence portion of the case for a claimant that did or did not witness the incident, the heightened standard applies equally to standalone claims. See, e.g., Flax, 272 S.W.3d at 529-30 (stating that the Camper heightened evidentiary standard applies to all standalone claims, and applying it to a lawsuit in which the claimant witnessed the incident).

The Tennessee Supreme Court held that NIED claims filed in a wrongful death action *are* subject to this heightened Camper standard. See Flax v. DaimlerChrysler Corp, 272 S.W.3d 521, 525-31 (Tenn. 2008). Wrongful death actions belong to the decedent. Ki v. State, 78 S.W.3d 876, 880 (Tenn. 2002). Therefore, a survivor's NIED claim is a standalone claim that requires expert medical or scientific proof. Flax, 272 S.W.3d at 531. "Nothing in [the] opinion in Amos was intended to allow plaintiffs to avoid the heightened proof requirements of Camper by bringing a separate wrongful death suit on behalf of a decedent." Flax, 272 S.W.3d at 531. An NIED claimant whose allegations are connected to a wrongful death suit, or any suit in which the NIED claim is the only allegation personal to the claimant, must show that he suffered serious or severe emotional injury and *must demonstrate this injury through expert medical or scientific proof.* See id.

In Flax, a mother witnessed the death of her child in a car accident. Id. The mother filed a wrongful death suit against the car manufacturer in the name of her deceased child and included

a personal claim for NIED. Id. at 526. However, the mother failed to offer any expert proof regarding her emotional injury. Id. at 531. The court held that she failed to meet the Camper requirements and, thus, could not recover for NIED. Id. The court recognized: "That the plaintiffs in this case brought a wrongful death suit is not sufficient to exempt the NIED claim from the requirements set forth in Camper and Ramsey because the filing of a wrongful death suit does nothing to demonstrate the reliability of an NIED claim." Id. at 530.

The Flax Court specifically noted that even though a mother witnessing the death of a child would seem to obviously indicate that the mother suffered severe or serious emotional injury, "the Camper requirements [were constructed] precisely because emotional injuries are uniquely subjective." Id. at 531; see also Camper, 915 S.W.2d at 446 (citations omitted) (stating that serious or severe emotional injury "occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case"). A plaintiff is required to meet the evidentiary burden. To hold otherwise would subvert Camper's principles and create "ad hoc decisions that originally made negligent infliction of emotional distress case law unpredictable and incoherent." Id.

Thus, it is clear that Tennessee law requires an individual with a standalone NIED claim based to comply with the Camper heightened evidentiary standard. Regardless of whether this heightened evidentiary standard is applied to the Eskin gateway test or the general negligence analysis, the claimant must prove his serious or severe emotional injury by expert proof. In the absence of expert proof, the standalone NIED claimant may not prevail on his NIED claims.

Plaintiffs in this case have identified no expert proof regarding their NIED claims and the deadline for such identification has long passed. (See Plaintiffs' Designation of Expert Witnesses and Physicians Not Employed as Experts). This lack of expert proof is contrary to their statement

found in Paragraph 12 of their Complaint which states: "Said claims are supported by expert medical or psychological proof and treatment rendered to the Plaintiffs on account of the harms and conduct alleged herein against Defendants." (See Complaint ¶ 12). Because Plaintiffs have not identified any expert scientific or medical proof to prove that Plaintiffs suffered serious or severe emotional harm, Plaintiffs cannot prevail on their individual NIED claims.

**B. The Statute of Limitations in Negligent Infliction of Emotional Distress Claims**

Plaintiffs' claims for negligent infliction of emotional distress are subject to dismissal because they were filed outside of the one-year statute of limitations applicable to claims for NIED and are therefore time-barred. Tenn. Code Ann. § 29-26-116 provides that "[t]he statute of limitations in health care liability actions shall be one (1) year as set forth in § 28-3-104." Claims for negligent infliction of emotional distress are also subject to the one-year statute of limitations found in Tenn. Code Ann. § 28-3-104. See Jackson v. CVS Corp., No. M2009-02220-COA-R3-CV, 2010 Tenn. App. LEXIS 548, at *11–12 (Tenn. Ct. App. Aug. 26, 2010). A plaintiff filing a health care liability claim who complies with the notice provisions of Tenn. Code Ann. § 29-26-121, however, receives a 120-day extension of the applicable statute of limitations to their health care liability claim. Tenn. Code Ann. § 29-26-121(c). Section 121(c) provides, in pertinent part: "When notice is given to a provider as provided in this section, the applicable statutes of limitations and repose shall be extended for a period of one hundred twenty (120) days from the date of expiration of the statute of limitations and statute of repose applicable to that provider." Id.

While Plaintiffs' health care liability claim is undeniably governed by and subject to the mandatory requirements and limitations of Tenn. Code Ann. § 29-26-101, et seq., they attempt to maintain individual claims for negligent infliction of emotional distress in the same action. (D.E.

#1 ¶ 12).  However, because Plaintiffs' original Complaint was filed more than one (1) year after their alleged negligent infliction of emotional distress cause of action accrued, their negligent infliction of emotional distress claims against Defendants violate the applicable statute of limitations and should be dismissed.  Tenn. Code Ann. § 29-26-121 only applies to health care liability actions; it does not apply to claims for negligent infliction of emotional distress.  (See Flax v. DaimlerChrysler Corp., 272 S.W.3d 521 (Tenn. 2008) (defining a mother's claim for negligent infliction of emotional distress as a "stand alone" claim in spite of the fact that she simultaneously brought a wrongful death claim on behalf of her son); see also Tenn. Code Ann. § 29-26-121(a)(1) ("Any person, or that person's authorized agent, **asserting a potential claim for health care liability** shall give written notice of the potential claim to each health care provider . . . ." (emphasis added))).

Plaintiffs clearly contemplated that their claim for negligent infliction of emotional distress was separate and distinct from their health care liability claim.  Plaintiffs appreciated and admitted this distinction in the very title they gave their Complaint -- "Complaint for Personal Injuries, Wrongful Death, Medical Negligence [Health Care Liability Action] and Negligent Infliction of Emotional Distress (NIED)."  (D.E. #1).  As a separate claim, Plaintiffs' claim for negligent infliction of emotional distress was not governed by the statutory provisions governing health care liability, including either the statute of limitations set forth in Tenn. Code Ann. § 29-26-116 or the potential 120-day extension thereof set forth in Tenn. Code Ann. § 29-26-121.

Defendants' treatment of Brett Lovelace occurred on March 12, 2012, and Brett Lovelace died on March 14, 2012.  "Once an injury occurs, a cause of action accrues to the person injured, and . . . the time for filing a lawsuit to redress that injury starts running right then." Cherry v. Williams, 36 S.W.3d 78, 83 (Tenn. Ct. App. 2000).  On or around February 13, 2013, Plaintiffs

12

mailed letters to Defendants pursuant to Tenn. Code Ann. § 29-26-121 notifying them of a potential claim for health care liability. Plaintiffs subsequently filed this lawsuit on May 8, 2013, relying on the extension of time found in Tenn. Code Ann. § 29-26-121. (See D.E. #1). The latest date Plaintiffs potentially could have filed their lawsuit was March 14, 2013. Plaintiffs, however, did not file this action until May 8, 2013, which is past the expiration of the statute of limitations for a claim for negligent infliction of emotional distress. Therefore, the Plaintiffs' claims for negligent infliction of emotional distress are timed-barred and should be dismissed.

### C. Damages

Defendant denies that the Plaintiffs are entitled to any relief. In the event that the jury returns a verdict in favor of the Plaintiffs, it is Defendant's position that Plaintiffs do not state a claim for their medical expenses. Plaintiffs' medical expert, Jason Kennedy, M.D., did not testify that any medical expenses were reasonable and necessary as required by Tennessee case law. (See Nash v. Carter, No. 87-192-II, 1987 WL 19312, Wheeler v. Cain, 459 S.W.2d 618 (Tenn. Ct. App. 1970), Garner v. Maxwell, 360 S.W.2d 64 (Tenn. Ct. App. 1962)). Additionally, pursuant to Tenn. Code Ann. § 29-26-119, proof of Plaintiffs' medical expenses is inadmissible, unless Plaintiffs establish a foundation that the amounts they are seeking were actual economic losses.

Plaintiffs have the burden of demonstrating what damages, if any, they are entitled to recover under the Medical Malpractice Act. See Tenn. Code Ann. § 29-26-119. In the present matter, Plaintiffs should be limited to introducing evidence of medical expenses and other economic losses that were actually sustained that were paid or payable thus constituting "actual economic loss". Id. To permit the Plaintiffs to seek the entirety of the medical charges or other economic losses without regard for the actual amounts paid or payable or other economic losses

that were not actually sustained would potentially award Plaintiffs a windfall double recovery, an outcome clearly prohibited by Tennessee law. See Richardson v. Miller, 44 S.W.3d 1, 32 (Tenn. Ct. App. 2000). Further, such evidence of gross billing or other gross economic losses is inadmissible as it is irrelevant and likely to cause unfair prejudice, confusion of the issues and mislead the jury. See Tenn. R. Evid. 402, 403.

      Plaintiffs are only entitled recover amounts for medical bills and other economic losses to the extent of actual loss or harm that "was or will be" suffered. To show harm that "will be" suffered, Plaintiffs must demonstrate the existence of bills payable by them or another collateral source or loss of earnings not replaced by a collateral source. Proof of damages is an essential element of an action under the Medical Malpractice Act, and Plaintiffs therefore have the burden of proof with regard to what damages, if any, are recoverable in this action. In order to meet the burden, Plaintiffs must show specifically what harm was or will be suffered.

      In Tennessee, Plaintiffs' recovery in a medical malpractice action is governed by Tenn. Code Ann. § 29-26-119, which states as follows:

> In a malpractice action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury including, but not limited to **cost of reasonable and necessary medical care**, rehabilitation services and custodial care, loss of services and **loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant** or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

Id. (emphasis added). The statute provides that a medical malpractice claimant may not recover for the expense of medical care if that expense was indemnified in whole or in part by certain

third party sources. Richardson v. Miller, 44 S.W.3d 1, 32 (Tenn. Ct. App. 2000). The statute seeks to prohibit injured parties from making a double recovery by reducing a Plaintiff's recovery by the amount of benefits paid by third-party sources. Id.

Tenn. Code Ann. § 29-26-119, in part, provides that a Plaintiff may recover actual economic damages for medical care, rehabilitation services, and loss of earned income "only to the extent that such costs are not paid or payable" and not replaced or indemnified by insurance provided by an employer, social security benefits, service benefit programs, unemployment benefits, or any other source. See Tenn. Code Ann. § 29-26-119. Tennessee courts have upheld the plain meaning of the statute. See Nance v. Westside Hospital, 750 S.W.2d 740 (Tenn. 1988); Hughlett v. Shelby Co. Health Care Corp., 940 S.W.2d 571 (Tenn. Ct. App. 1996).

In Nance v. Westside Hospital, the Supreme Court of Tennessee held that collateral source benefits are not included within the scope of the "any other source" reduced damages provisions of Tenn. Code Ann. § 29-26-119. Nance, 750 S.W.2d at 743. In reaching this conclusion the court required that the benefits be "paid or payable" to prevent double recovery and to remove from the statute any collateral source that has subrogation rights. Id.

In Hughlett v. Shelby County Healthcare, the Court of Appeals of Tennessee, Western Section addressed a specific issue, more closely related to the case presently before this court:

> [W]hether a Plaintiff in a medical malpractice action may recover from a Defendant health care provider the amount of Plaintiff's medical expenses paid by the Tennessee Medicaid program which is part of the federal social security program.

Hughlett, 940 S.W.2d 571, 572 (Tenn. Ct. App. 1996). The court opined that the Nance decision was dispositive and stated its inability to find a meaningful distinction between the nature of benefits in Nance and those in Hughlett. Hughlett, 940 S.W.2d at 574. Relying on Nance, the court held that:

> [W]here there is a right of subrogation, or a legal obligation on the part of the tort victim to repay the collateral source, the victim's losses have not been "replaced or indemnified," and, therefore, the benefits **SO PAID** are recoverable by the Plaintiff.

Id. (emphasis added).

In October 2010, issues nearly identical to those addressed in Defendant's motion were raised and addressed in the case of Nalawagan v. Dang, 2010 U.S. Dist. LEXIS 114576 (W.D. Tenn. Oct. 27, 2010). In Nalawagan, the United States District Court for the Western District of Tennessee, Western Division addressed the identical issue of "whether a Plaintiff may recover billed amounts exceeding Medicaid payments already made, over and above the amounts 'paid or payable' under Tennessee law." Nalawagan, 2010 U.S. Dist. LEXIS 114576, at *6–7. The District Court's analysis predicts how Tennessee courts would construe the Tennessee Medical Malpractice Act, Tenn. Code Ann. § 29-26-119.

In Nalawagan, the Court had before it the Defendant's Motion in Limine to Limit Evidence of Damages filed on October 12, 2010. Id. at *1. The Defendant alleged that the proof at trial would show that the medical expenses incurred by the Plaintiffs' son were paid by Medicaid, and that none of the medical expenses were paid out of pocket. The Defendant argued that the medical malpractice statute prevented the Plaintiffs from recovering any expenses which Medicaid had already paid on her son's behalf. Id. at *2. The Defendant also argued that to the extent the Plaintiffs incurred out of pocket expenses, the Plaintiff should only be permitted to seek recovery of amounts actually paid, and not the amounts billed by the medical providers. Id.

The District Court held that the Tennessee Court of Appeals' decision in Hughlett v. Shelby County Healthcare Corp., 940 S.W. 2d 951 (Tenn. Ct. App. 1996)(citing Nance v. Westside Hosp., 750 S.W. 2d 740 (Tenn. 1988)), supported its holding that the Plaintiff was permitted to seek recovery of medical expenses already "paid or payable" by Medicaid on behalf

16

of her son.  Id. at *6.  The District Court denied the Defendant's motion as to that issue.  The Plaintiff may be permitted to seek recovery of the amounts actually paid by Medicare and Cigna. This is contingent upon the Plaintiff meeting many burdens of proof at trial, which are imposed by Tennessee statutory law and Tennessee case law.

The Nalawagan Court also held "that pursuant to Tennessee law, Plaintiff may not recover the amounts actually billed by her son's medical providers over and above the amounts 'paid or payable.'"  Id. at *6.  In its analysis, the District Court determined that,

> [u]nder Tennessee law, the Court's role in construing a statute is to ascertain and give effect to the legislative intent without unduly restricting or expanding the statute's coverage beyond its intended scope.  In fulfilling this role, the Court must presume that every word in the statute has meaning and purpose and should be given full effect if the obvious intention of the Tennessee General Assembly is not violated by so doing.  When the language of the statute is clear, the Court should apply its plain meaning, without complicating the task.

Id. at *6–7.

The Nalawagan Court held that the Tennessee Medical Malpractice Act is sufficiently clear such that it limits a Plaintiff's damages to costs actually "paid or payable."  Id. at *8. Based on the plain meaning of the statute, the Nalawagan Court held that "**medical expenses are limited to expenses already paid or such expenses yet to be paid, and not simply the amounts billed.**"  Id.  (emphasis added).  Therefore, the Nalawagan Court granted the Defendant's motion to deny recovery for amounts billed but not actually paid or payable by the Plaintiffs. Id. at *8-9.

In this case, Defendant seeks an order denying the introduction into evidence the gross amounts billed and any other economic loss unless Plaintiffs lay a foundation that they were actually paid or payable.  Whether the Tennessee Medical Malpractice Act permits Plaintiffs to recover the amount billed and written off is the precise issue addressed in Nalawagan.

Tennessee law clearly limits a Plaintiff's recovery to actual economic damages for medical care, rehabilitation services, and loss of earnings if the care and services are **paid for or remain payable** and the care and services are not replaced or indemnified by insurance provided by an employer, social security benefits, service benefit programs, unemployment benefits, or any other source. See Tenn. Code Ann. § 29-26-119.  The statute serves to reduce a Defendant's liability by limiting recovery to "actual economic losses suffered." The requirement that the Plaintiff suffers actual economic loss is an abrogation of common law regarding collateral source payments. The statute expressly provides that the Plaintiff's recovery be limited to "...actual economic losses suffered by the claimant by reason of the personal injury..." Tenn. Code Ann. § 29-26-119. Sums written off by a provider for which the Plaintiffs bear no obligation to repay may appear as a loss on paper but is not an "actual" loss as required by the statute and such expenses may therefore not be recovered by the Plaintiffs.

Any evidence of gross medical charges and lost earnings that were billed is irrelevant. In Tennessee, evidence which is irrelevant is not admissible. Tenn. R. Evid. 402.  As Tenn. Code Ann. § 29-26-119 only permits Plaintiffs to recover those medical expenses which are paid or payable, and evidence of medical charges billed is irrelevant and should be deemed irrelevant. Id. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of **unfair prejudice, confusion of the issues, or misleading the jury...**" Tenn. R. Evid. 403 (emphasis added). Thus, even if evidence of Plaintiffs' gross medical charges were generally deemed relevant, it should be excluded as it is likely to prejudice the Defendant, confuse the issues at trial and mislead the jury. Id.  Clearly, under the Tennessee Rules of Evidence, introduction of Plaintiffs' gross medical charges is irrelevant and is likely to cause unfair prejudice, confusion of the issues and mislead the jury. Therefore, pursuant to Tenn.

R. Evid. 402 and 403, evidence of Plaintiffs' gross medical charges is inadmissible cannot support Plaintiffs' claim for damages.

In the present case, Brett Lovelace was covered under Arkansas Medicaid and all amounts due and owing to the Arkansas Department of Human Services (Medicaid) were paid in full and/or written off. There are no outstanding medical bills. The LeBonheur bill was written off as part of its pre-suit settlement. Plaintiffs are not entitled to recover the amounts that were written off. Additionally, Plaintiffs have not provided expert proof stating that the medical expenses were reasonable and necessary, and therefore, they may not present the expenses at trial and are not entitled to these expenses.

Additionally, Defendant is of the position that Plaintiffs' noneconomic damages are capped at $750,000 pursuant to Tenn. Code Ann. § 29-39-102, and that only one cap applies in the present case. The statute provides, in pertinent part:

> (a) In a civil action, each injured plaintiff may be awarded:
>
>> (1) Compensation for economic damages suffered by each injured plaintiff; and
>>
>> (2) Compensation for any noneconomic damages suffered by each injured plaintiff not to exceed seven hundred fifty thousand dollars ($750,000) for all injuries and occurrences that were or could have been asserted, regardless of whether the action is based on a single act or omission or a series of acts or omissions that allegedly caused the injuries or death.
>
> (b) If multiple defendants are found liable under the principle of comparative fault, the amount of all noneconomic damages, not to exceed seven hundred fifty thousand dollars ($750,000) for each injured plaintiff, shall be apportioned among the defendants based upon the percentage of fault for each defendant, so long as the plaintiff's comparative fault (or in a wrongful death action, the fault of the decedent) is not equal to or greater than fifty percent (50%), in which case recovery for any damages is barred.

. . .

> (e) All noneconomic damages awarded to each injured plaintiff,
> including damages for pain and suffering, as well as any claims of
> a spouse or children for loss of consortium or any derivative claim
> for noneconomic damages, shall not exceed in the aggregate a total
> of seven hundred fifty thousand dollars ($750,000) . . . .

Tenn. Code Ann. § 29-39-102.

If the Court allows Plaintiffs' claims for negligent infliction of emotional distress to go forward, it is Defendant's position that these claims are derivative of the medical negligence claim.   As such, one cap of $750,000 applies to limit Plaintiffs' recovery, if Plaintiffs recover any amounts at trial.

Respectfully submitted,

LEWIS THOMASON

By:   s/Marcy D. Magee
      J. Kimbrough Johnson (7953)
      Marcy D. Magee (19360)
      Natalie M. Bursi (032017)
      40 South Main Street, Suite 2900
      Memphis, TN 38103
      Phone:  (901) 525-8721
      *Attorneys for Defendant, Mark P. Clemons*
      KJohnson@LewisThomason.com
      MMagee@LewisThomason.com
      NBursi@LewisThomason.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been properly served upon all counsel of record identified below via U.S. Mail, first class postage prepaid, and via the Court's ECF filing system:

Mark Ledbetter, Esq.
Halliburton & Ledbetter
254 Court Avenue, Suite 305
Memphis, TN 38103
Mark794@aol.com


Jerry O. Potter, Esq.
W. Bradley Gilmer, Esq.
Karen S. Koplon, Esq.
The Hardison Law Firm
119 South Main Street, Suite 800
Memphis, TN  38103
jpotter@hard-law.com
bgilmer@hard-law.com
kkoplon@hard-law.com


s/Marcy Dodds Magee
Marcy Dodds Magee

5810377